**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| PARENTS DEFENDING EDUCATION, | |
| *Plaintiff,* | |
| v. | |
| OLENTANGY LOCAL SCHOOL DISTRICT BOARD OF EDUCATION; MARK T. RAIFF, in his official capacity as Superintendent of Olentangy Local School District; RANDY WRIGHT, in his official capacity as Olentangy's Chief of Administrative Services; PETER STERN, in his official capacity as Olentangy's Assistant Director of Equity and Inclusion; KEVIN DABERKOW, BRANDON LESTER, KEVIN O'BRIEN, LIBBY WALLICK, and LAKESHA WYSE, in their official capacities as members of the Olentangy Board of Education, | Case No. _____ |
| *Defendants.* | |

## VERIFIED COMPLAINT

Plaintiff Parents Defending Education ("PDE") brings this complaint against Defendants Olentangy Local School District Board of Education ("District") and Olentangy officials and alleges as follows:

## INTRODUCTION

1.      Nearly a century of Supreme Court precedent makes three things clear: Parents have the freedom to care for their children and control their upbringing. Their children have the freedom to speak, including in accordance with their upbringing. And neither parents nor their children abandon these freedoms at the schoolhouse gate. The District is flouting these constitutional guarantees through numerous policies.

2.      The District has enacted a series of speech codes—Policy 5517, Policy 5136, and the District's Code of Conduct—that punish students for their speech and compel them to mouth support for the District's preferred viewpoints at all times of the day, whether at school or not.

3.      Policy 5517 (titled "Anti-Harassment") prohibits "any threatening, insulting, or dehumanizing" speech "directed against a student or school employee" if the speech "has the effect of substantially interfering with a student's educational performance, opportunities, or benefits." Through Policy 5517, the District punishes speech that other students find to be "insulting," "dehumanizing," "unwanted," "discomfort[ing]," and "offensive."

4.      Through Policy 5136 (titled "Personal Communication Devices"), the District punishes speech expressed through students' personal cell phones or other electronic devices that "might reasonably create in the mind of another person an impression of being" "humiliated," "harassed," or "embarrassed." Whether on the school's campus or off, whether during the school day or after, the policy prohibits students from using their personal devices to transmit material "that can be construed as harassment or disparagement of others based upon … transgender identity … or political beliefs," among other categories.

5.      And through the Code of Conduct, contained in the District's student handbook, the District prohibits speech that includes "discriminatory language," broadly defined as "verbal or written comments" that are "derogatory towards an individual or group" based on, among other things, "transgender identity."

6.      The District, through its own attorneys, has confirmed to parents that these policies prohibit "purposefully referring to another student by using gendered language they

know is contrary to the other student's identity" (*i.e.*, "misgendering"). Together, the District's policies unconstitutionally forbid speech the District dislikes and compel speech it favors.

7.  PDE brings this lawsuit to stop the District from abridging the fundamental rights of students and their parents. PDE is a membership organization whose members include both parents with children in the District and students themselves. These students have views that the District disfavors. Specifically, they believe that people are either male or female, that biological sex is immutable, and that sex does not change based on someone's internal feelings. Accordingly, they "d[o] not want to be forced to 'affirm' that a biologically female classmate is actually a male—or vice versa—or that a classmate is 'nonbinary' and neither male nor female." Being forced to express such speech would contradict their deeply held beliefs, including sincerely held religious beliefs.

8.  Yet the District's policies require the students to conform their speech to the District's views on gender identity. The Policies require students to refer to their peers with their "preferred pronouns," even if those pronouns are contrary to the peer's biological sex. If students voice their closely held views that sex is immutable or refer to peers with their "unpreferred pronouns," they would violate the District's broadly written Policies. The District would deem such speech "insulting," "discomfort[ing]," "humiliat[ing]," and "discriminatory." Lest there be any doubt about the scope of the Policies, the District's attorneys recently made clear that any student who "purposefully refer[s] to another student by using gendered language they know is contrary to the other student's identity" will violate the District's policies and be subject to punishment. As a consequence, the children of PDE's

members are forced to alter their speech by remaining silent or avoiding using sex-specific pronouns altogether.

9.    The District's policies are facially unconstitutional.

10.   The Policies unconstitutionally compel speech because they force students to alter their speech or use other students' "preferred pronouns"—despite the students' firmly held beliefs that sex is immutable. Controlling Sixth Circuit precedent compels the conclusion that the District's policies—and any materially similar policy or law that applies at Olentangy schools—violate the First Amendment. In *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), the Sixth Circuit held that a gender-identity policy requiring a university professor to affirm a student's gender identity, even if inconsistent with their biological sex, violated the professor's First Amendment rights. *Id.* at 503. That is because "[p]ronouns can and do convey a powerful message implicating a sensitive topic of public concern" and by requiring a person to use a "preferred pronoun," the school is compelling a person "to communicate a messag[e] [that] [p]eople can have a gender identity inconsistent with their sex at birth." *Id.* at 507-08. A policy that compelled speech on such a pivotal issue is viewpoint-based and violates the First Amendment. So too here. As in *Meriwether*, the District's policies require affirming another's gender identity even when inconsistent with the person's biological sex. And under *Meriwether*, the Policies compel speech and are viewpoint-based. The Policies thus violate the First Amendment.

11.   The Policies are also unconstitutional because they punish students based on the viewpoint and content of the speech. The viewpoint-based Policies prohibit "offensive" speech, *e.g.*, speech that is "insulting," "humiliating," "dehumanizing," "derogatory," and

"unwanted." It is well-established that giving offense is a viewpoint, such that the offense-triggered Policies here are viewpoint discriminatory. *See, e.g.*, *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019); *Matal v. Tam*, 582 U.S. 218, 243 (2017). The Policies, moreover, are impermissibly content-based speech regulations because their definitions hinge on the listener's response to the speech. *See, e.g.*, *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992). In these ways, the Policies violate the First Amendment twice over.

12.     Finally, the Policies are also overbroad because they restrict a substantial amount of constitutionally protected speech, including off-campus speech, and they transgress the fundamental rights of parents to raise their children. A school does not stand in place of parents in all places, at all times, and for all things. The Policies bar countless forms of protected speech, even a substantial amount of speech at the core of the First Amendment, including speech on gender identity. But the Policies don't stop there. They prohibit this core speech *off* school grounds, including speech with no relation to school-sponsored activities, even though the District's ability to punish off-campus speech is extremely limited. *See Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2046 (2021). They purport to reach students' cell phones or discussions within the privacy of their own homes. The Policies thus violate the First and Fourteenth Amendment.

13.     PDE brings this action to protect the constitutional rights of its members, parents, and students in the Olentangy Local School District.

## PARTIES

14.     Plaintiff PDE is a nationwide, grassroots membership organization whose members include parents, students, and other concerned citizens. PDE's mission is to

prevent—through advocacy, disclosure, and, if necessary, litigation—the politicization of K-12 education.

15.     PDE's members include parents who live in the Olentangy School District and whose children are enrolled in Olentangy public schools. PDE's members include Parents A-D and Parents A, B, and D's school-aged children.

16.     Defendant Olentangy Local School District Board of Education is the body politic and corporate of the Olentangy Local School District. The District is the public school district for much of Delaware County and portions of Franklin County, Ohio. The District serves all or part of ten distinct townships and municipalities, including Orange Township, Berkshire Township, Berlin Township, Concord Township, Genoa Township, Liberty Township, Delaware Township, the City of Delaware, the City of Columbus, the City of Westerville, and the City of Powell. It operates sixteen elementary schools, two intermediate schools, six middle schools, and four high schools. In total, the District provides K-12 public education services to more than 22,000 students.

17.     Defendant Mark T. Raiff is the Superintendent of Olentangy Local School District. In that role, Raiff is responsible for the oversight and enforcement of all Olentangy policies, including the District's policies challenged here. Raiff is sued in his official capacity.

18.     Defendant Randy Wright is Chief of Administrative Services and serves as one of the District's Anti-Harassment Compliance Officers. In that role, Wright is responsible for the oversight and enforcement of the District policies challenged here. Wright is sued in his official capacity.

19.     Defendant Peter Stern is Assistant Director of Equity and Inclusion and serves as one of the District's Anti-Harassment Compliance Officers. In that role, Stern is responsible for the oversight and enforcement of the District policies challenged here. Stern is sued in his official capacity.

20.     Defendants Kevin Daberkow, Brandon Lester, Kevin O'Brien, Libby Wallick, and Lakesha Wyse are members of the Olentangy Board of Education. The Board Defendants are responsible for the enactment and oversight of all Olentangy policies, including the District policies challenged here. The Board Defendants are sued in their official capacities.

## JURISDICTION AND VENUE

21.      This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought via 42 U.S.C. §1983 and §1988.

22.     The Court has subject-matter jurisdiction under 28 U.S.C. §1331 and §1343.

23.     Venue is proper under 28 U.S.C. §1391 because Olentangy is located in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### I.  The Growing Use of Speech Codes to Punish Student Speech Regarding Gender Identity

24.     Public-school students have First Amendment freedoms, and those freedoms do not disappear "at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969); *cf. Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011) ("Minors are entitled to a significant measure of First Amendment protection." (cleaned up)). Nor do schools get

to follow students home, policing their speech at all hours of the day on their own personal devices in place of their parents. *See Mahanoy*, 141 S. Ct. at 2046-48. Because "America's public schools are the nurseries of democracy," students must be free to express their opinions, even if their views are "unpopular." *Id.* at 2046. Protecting speech in public schools "ensur[es] that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Id.* In fact, "public schools have the duty to teach students that freedom of speech, including unpopular speech, is essential to our form of self-government." *Id.* at 2049 (Alito, J., concurring). Public school officials thus cannot "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion"; nor can they force students "to confess by word or act their faith therein." *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943).

25.     Anti-discrimination and anti-harassment policies are no exception. They cannot be used as a sword, versus a shield, to compel students to speak in the way that the government dictates, contrary to their deeply held beliefs. That is why courts have a "longstanding hesitation to enforce anti-discrimination statutes in the speech context." *Green v. Miss USA, LLC*, 52 F.4th 773, 792 (9th Cir. 2022); *see also, e.g.*, *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001) (Alito, J.) ("There is no categorical 'harassment exception' to the First Amendment's free speech clause."); *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 597 (5th Cir. 1995); *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1182-84 (6th Cir. 1995).

26.     Despite these well-established First Amendment rights, schools often seek to silence controversial student expression. Two ways are relevant here. First, speech codes are the tried-and-true method of suppressing unpopular student speech. They prohibit expression

that would otherwise be constitutionally protected. *See Spotlight on Speech Codes 2021*, Foundation for Individual Rights in Education (FIRE), 10, perma.cc/S22E-76Q3. Speech codes punish students for unpopular speech labeled as "harassment," "bullying," "hate speech," or "incivility"—categories so broad that school officials can use them to ban speech based on one's firmly held views including religious views, or compel speech contrary to such views. *Id.* When such policies impose vague, overbroad, content-based or viewpoint-based restrictions on speech, they are unconstitutional. *Id.* at 10, 24; *see, e.g., Speech First v. Fenves*, 979 F.3d 319, 338-39 n.17 (5th Cir. 2020) (collecting "a consistent line of cases that have uniformly found campus speech codes unconstitutionally overbroad or vague").

27.     Despite the Constitution, schools are increasingly adopting speech codes regarding gender identity to compel students to affirm beliefs they do not hold and that are incompatible with their deeply held convictions. One example is a policy that requires students to use other students' "preferred pronouns," even if they are contrary to the other students' sex. While sex-specific personal pronouns ("he," "him," and "his," or "she," "her," and "hers") have long been used for males and females respectively, some individuals including school-age children are now adopting different pronouns, including new sets of "gender-neutral pronouns," that do not correlate with their biological sex. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1782 (2020) (Alito, J., dissenting); *see also, e.g., United States v. Varner*, 948 F.3d 250, 257 (5th Cir. 2020). A "preferred pronoun" policy would require others to adopt a student's chosen pronouns when referring to the student, even if different from his or her biological sex.

28.     "Preferred pronoun policies" subject students to formal discipline for referring to other students according to the pronouns that are consistent with their biological sex rather than their gender identity. Under these types of policies, a student who uses "he" or "him" when referring to a biological male who identifies as a female will be punished for "misgendering" that student. *See, e.g.*, *Bostock*, 140 S. Ct. at 1782 (Alito, J., dissenting) ("Some jurisdictions, such as New York City, have ordinances making the failure to use an individual's preferred pronoun a punishable offense, and some colleges have similar rules." (footnotes omitted)); R. Esenberg & L. Berg, *The Progressive Pronoun Police Come for Middle Schoolers*, The Wall Street Journal, (May 23, 2022), perma.cc/3GAY-D5TX.

29.     As the Sixth Circuit Court of Appeals has already observed, "the use of gender-specific titles and pronouns has produced a passionate political and social debate." *Meriwether*, 992 F.3d at 508; *see also Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018) (explaining that "sexual orientation and gender identity" are "sensitive political topics [that] are undoubtedly matters of profound value and concern to the public" (internal quotation marks omitted)); A. Cronin, *Controversy Sparks over Frisco Transgender Students' Right to Choose Preferred Pronouns*, Local Profile (Sept. 28, 2020), perma.cc/Q4FN-MX7K; T. Bejan, *What Quakers Can Teach Us About the Politics of Pronouns*, N.Y. Times (Nov. 16, 2019), perma.cc/8BHL-4BYE. "Never before have titles and pronouns been scrutinized as closely as they are today for their power to validate—or invalidate—someone's perceived sex or gender identity." *Meriwether*, 992 F.3d at 509. So it is unsurprising that "titles and pronouns carry a message." *Id.* at 507.

30. When, as here, schools adopt policies barring misgendering, they "recogniz[e] that and wan[t] [their] [school officials and students] to use pronouns to communicate a message: People can have a gender identity inconsistent with their sex at birth." *Id.* Similarly, "continued refusal to address [a person] as a woman," or vice versa, "advance[s] a viewpoint on gender identity." *Id.* at 509. Simply put, "[p]ronouns can and do convey a powerful message implicating a sensitive topic of public concern." *Id.* at 508; *see also Green*, 52 F.4th at 785 n.12 (explaining that "for controversies regarding transgenderism," "an individual's use or omission of certain words and phrases in this context often reflects a 'struggle over the social control of language in a crucial debate about the nature and foundation, or indeed real existence, of the sexes'"). Requiring someone to affirm someone else's gender identity forces the person to take "a side in that debate," even when it is contrary to the person's deeply held convictions. *Meriwether*, 992 F.3d at 509.

31. The Constitution prohibits the government from taking sides in that debate. Whether a public school district is compelling students to use a preferred pronoun, contrary to sex, or prohibiting students from using preferred pronouns, contrary to sex, the public school district is transgressing the First Amendment. *See Taking Offense v. State*, 66 Cal. App. 5th 696, 710-11 (2021) ("For purposes of the First Amendment, there is no difference between a law compelling an employee to utter a [person's] preferred pronoun and prohibiting an employee from uttering a pronoun the [person] does not prefer."); *Meriwether*, 992 F.3d at 506 ("By defendants' logic, a university could likewise prohibit professors from addressing university students by their preferred gender pronouns—no matter the professors' own views. And it could even impose such a restriction while denying professors the ability to explain to

students why they were doing so."). The District cannot impose its preferred viewpoint (*e.g.*, persons can transition genders) over another (*e.g.*, sex is immutable). "To hold differently would be to treat religious [or traditionally conservative] expression as second-class speech and eviscerate this Court's repeated promise that [students] do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2425 (2022) (quoting *Tinker*, 393 U.S. at 506).

32.     In addition to speech codes, schools are increasingly turning to so-called bias reporting teams or systems to invite fellow students or teachers to report on a student's disfavored speech. *See Free Speech in the Crosshairs: Bias Reporting on College Campuses*, Speech First (2022), perma.cc/DX37-LX3F; *Bias Response Team Report 2017*, FIRE (2017), perma.cc/84NZ-SM2E. These systems began at universities, but K-12 schools have begun mimicking colleges. *See, e.g.*, N. Neily, *Reading, Writing, Ratting Each Other Out*, Real Clear Education (June 14, 2021), perma.cc/JHM2-29DC (collecting examples); *Parents Prevail Over K-12 'Bias Incidents'*, Wall Street Journal Opinion (Feb. 7, 2022), perma.cc/S6S7-5A7W ("Wellesley Public Schools amends woke policies after families sue.").

33.     Living up to their Orwellian name, bias-reporting systems encourage students to monitor each other's speech and report incidents (often anonymously). "Bias" is defined broadly enough to cover wide swaths of protected speech. Schools need only determine that the listener took offense. Their subjective reaction to it is enough to report an incident, after which school administrators can log the incident, investigate it, meet with the relevant parties, attempt to reeducate the "offender," and can recommend and pursue formal or informal discipline.

34.     In the university context, courts have recognized the chilling effect of bias-response teams on college-aged students, who are more mature and developed than the minor students in K-12 education. *See, e.g.*, *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019) (holding that university's team imposed an "objective chill" on speech because it "act[ed] by way of implicit threat of punishment and intimidation to quell speech"); *Fenves*, 979 F.3d at 338 (similar); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1124 (11th Cir. 2022) (similar).

35.     The chilling effect is even greater in the K-12 context, because adolescents are less mature and more susceptible to pressure from authority figures. *See Lee v. Weisman*, 505 U.S. 577, 592 (1992) ("[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools."). The Fourth Circuit, for example, recently concluded that a high school's "Share, Speak Up, Speak Out: Bias Reporting Form … caused the parents' children to experience a non-speculative and objectively reasonable chilling effect on their speech." *Menders v. Loudoun Cnty. Sch. Bd.*, 65 F.4th 157, 165-66 (4th Cir. 2023).

## II.     The District's Speech Codes Punishing Certain Speech Concerning Gender Identity

36.     Despite students' and parents' fundamental rights to discuss issues of sex and gender freely, consistent with their deeply held convictions, the District has adopted some of the most aggressive speech codes in the country designed to punish disfavored student speech concerning, among other things, gender identity. These policies unconstitutionally impinge on students' and parents' fundamental rights.

A.  **"Anti-Harassment" Policies**

37.    The District has adopted multiple "anti-harassment" policies that unconstitutionally require a student to affirm another student's gender identity when inconsistent with that student's biological sex, discriminate on the basis of content and viewpoint, and can be applied to substantial amount of protected speech, including speech that is at the core of the First Amendment.

38.    ***Policy 5517.*** On September 28, 2022, the Olentangy School Board adopted a revised version of Policy 5517, titled "Anti-Harassment."

39.    Policy 5517 states that the District "will vigorously enforce its prohibition against discriminatory harassment based on … gender identity" or membership in various "'Protected Classes'" that are "protected by Federal civil rights laws," which the District says "includ[es] sexual orientation and gender identity." The District describes violations of the policy as "unlawful harassment."

40.    Policy 5517 defines prohibited "harassment" to include "any threatening, insulting, or dehumanizing gesture, use of technology, or written, verbal or physical conduct directed against a student or school employee" if it "has the effect of substantially interfering with a student's educational performance, opportunities, or benefits."

41.    "[U]nlawful harassment" also includes "any unwanted and repeated" speech "that is severe or pervasive enough to create" either (a) "an intimidating, hostile, or offensive educational or work environment"; (b) "cause discomfort or humiliation"; or (c) "unreasonably interfere with the individual's school or work performance or participation[.]" And prohibited harassment includes incidents "when one … or more persons

systematically and chronically inflict physical hurt or psychological distress on one … or more students or employees" *and* "that [conduct] is based upon one … or more Protected Classes." Prohibited harassment "may involve" speech that a student finds "humiliat[ing]."

42.     Policy 5517 applies to speech "on school property" and during any "activity sponsored by" the District.

43.     The District also emphasizes that "[a]ll students, administrators, teachers, staff, and all other school personnel share responsibility for avoiding, discouraging, and reporting any form of unlawful harassment." They are also all "required to report incidents of harassing conduct to a teacher, administrator, supervisor, or other District official so that the Board may address the conduct *before* it becomes severe, pervasive, or persistent."

44.     The District stresses that it will "vigorously enforce its prohibitions against unlawful harassment/retaliation by taking appropriate action reasonably calculated to stop the harassment and prevent further such harassment." Violating the policy "may result in disciplinary action up to and including … suspension/expulsion of a student." The Superintendent determines the appropriate discipline and "consider[s] the totality of the circumstances, including the ages and maturity levels of those involved." But even in "cases where unlawful harassment is not substantiated, the [District] may consider whether the alleged conduct nevertheless warrants discipline in accordance with other Board policies."

45.     ***Policy 5136.*** The District's speech codes also apply to student speech on their personal cell phones, social media, email, and all other digital modes of communication. On November 9, 2017, the District adopted a revision of Policy 5136, titled "Personal Communication Devices." Policy 5136 defines "personal communication devices" or "PCDs"

to include "computers, tablets …, electronic readers …, cell phones …, and/or other web-enabled devices of any type."

46. Policy 5136 prohibits students from using their own phones or other personal electronic devices "in any way that might reasonably create in the mind of another person an impression of being threatened, humiliated, harassed, embarrassed or intimidated." By the policy's terms, students cannot use their phones or other electronic devices to "transmit material," including their own speech, if it "can be construed as harassment or disparagement of others" based on their "transgender identity" or "political beliefs," among other categories. The policy does not stop at the schoolhouse gate. It purports to apply everywhere, including when students are at home or otherwise not engaged in school-related activity.

47. Students that violate the policy are subject to "disciplinary action," which can include confiscation of their personal phones or other electronic devices. The District will "[d]iscipline" a student "on an escalating scale ranging from a warning to an expulsion based on the number of previous violations and/or the nature of or circumstances surrounding a particular violation."

48. ***Code of Conduct.*** The District has approved student handbooks containing a Code of Conduct. Board Policy 5000 (titled, "Student Conduct") requires students to abide by the Code of Conduct: "Students may be subject to discipline for violation of the Code of Conduct/Student Discipline Code."

49. The Code of Conduct states that the District "is committed to having an environment free from all discrimination," defined to include "harassment, intimidation, or bullying" based on "transgender identity."

50. The Code states that "harassment" is "strictly prohibited and will not be tolerated." Harassment is defined as "any intentional written, verbal, electronic, or physical act that a student has exhibited toward another particular student or students more than once and the behavior causes mental or physical harm to the other student(s) and is sufficiently severe, persistent or pervasive that it creates an intimidating, threatening or abusive educational environment for the other student(s)."

51. The Code also prohibits "language" and "gestures" that are "obscene" or "discriminatory." "Discriminatory language is defined as verbal or written comments, jokes, and slurs that are derogatory towards an individual or group based on one or more of the following characteristics: race, color, national origin, sex (including sexual orientation and transgender identity), disability, age, religion, ancestry, or genetic information."

52. Finally, the Code of Conduct subjects students to formal discipline not only for committing "harassment" themselves, but also for "encourag[ing]" another student who engages in harassment or any other prohibited activity. And they authorize student discipline for unspecified "[o]ther violations."

53. Violating the Code of Conduct could result in "verbal or written warning or reprimand"; "parental contact or conference"; "after-school, morning, or lunch detention"; "referral to school counselor"; "Saturday or Wednesday School"; "in-school detention"; "Suspension Alternative Program"; "out-of-school suspension"; "emergency removal"; "referral to law enforcement agencies"; "expulsion"; "permanent exclusion"; "compensatory payment of damages"; "loss of bus privileges"; and "loss of other privileges."

54. The Code applies "while students are under the authority of school personnel or involved in any school activity." The Code also applies to (1) "[m]isconduct by a student that occurs off school district property but is connected to activities or incidents that have occurred on school district property"; (2) "[m]isconduct by a student that, *regardless of where it occurs*, is directed at a district official or employee"; and (3) misconduct "engaged in via computer and/or electronic communications devices."

55. The handbook states that District employees will discuss instances that they deem harassment with students and instruct them "to end the behavior(s) immediately." The relevant administrators will "investigat[e]," and that investigation must "include documentation of the event, response, and strategy for protecting the victim."

56. If the administrator finds a harassment occurred, then he will promptly discipline the accused student. Discipline can "include suspension or up to expulsion." Notably, not only "racist" but also "sexist, or abusive comments or actions directed at others will not be tolerated and will result in suspension or up to expulsion."

57. In a February 27, 2023 email sent by the District's attorney (Jessica K. Philemond), the District made clear that "[a] student purposefully referring to another student by using gendered language they know is contrary to the other student's identity would be an example of discrimination under Board Policy." The District's lawyer also discounted students' religious beliefs by writing that "[w]hile your children certainly maintain religious rights of freedom at school, those rights do not relieve them of the obligation to comply with Board Policy and the code of conduct."

58.     Similarly, a District webpage, titled "Reporting Bullying and Harassment," makes clear that the District's policies—particularly the District's bars on "harassment" and "discrimination"—trump students' First Amendment rights: "The District recognizes the First Amendment rights of students and community members to express their opinions and beliefs on controversial topics. But while at school, students' expression cannot disrupt or attempt to disrupt the educational process…. [T]he District prohibits bullying, harassment, intimidation and discrimination of students."

**B.     Reporting and Enforcement of School Policies**

59.     The District provides several ways to file a complaint against a student or teacher, including a hotline and reporting system—the District's own version of a "bias-reporting system."

60.     An informal complaint can be made "orally or in writing" to a teacher or administrator, to the Superintendent or other District-level employee, or "directly to one of the Compliance Officers." So too for a formal complaint. The District instructs students to file written complaints with District officials. Students can report anonymously on the District's "Stay Safe Speak Up helpline." Reports can be made online or by phone.

61.     The District provides students with examples of concerns that students ought to report. The District includes as examples not just violent or dangerous crimes but also "bullying" or "discrimination."

62.     The online tool also has the reporter select an "Issue Category." One available category is "bullying, harassment, intimidation" and "discrimination."

63.     The creation of the hotline was an Equity & Inclusion initiative by the District.

64. The District says that reporting discrimination and harassment is required. The District's "Reporting, Bullying, Discrimination, Harassment, and Hazing" webpage states that "[a]ll students, administrators, teachers, staff, and all other school personnel are required to report any form of unlawful harassment, discrimination, bullying, or hazing." By the District's lights, "bullying" that must be reported includes "[i]nappropriate conduct that is repeated enough, or serious enough, to negatively impact a student's educational, physical, or emotional well being." And the "definition" of "harassment and discrimination" is "[d]iscriminatory or harassing conduct based upon an individual's race, color, national origin, sex (including sexual orientation and gender identity), disability, age (except as authorized by law), religion, ancestry, or genetic information."

65. Violations of school policy or the Code of Conduct can ultimately result in suspension and expulsion. Short of that, one punishment Olentangy uses across the District at all grade levels—including the elementary-school level—is a "No Contact Order," which the District also calls a "No Contact/No Communication Contract" or "Contract for Getting Along." In essence, the order directs the "accused" to stay away from the "victim," even though both attend the same school and might have classes together and even though the school has not finished its investigation and determined if there was a violation of school policy. *See, e.g.*, *DeJong v. Pembrook*, --- F.Supp.3d ----, 2023 WL 2572617 (S.D. Ill. Mar. 20) (denying motion to dismiss free-speech claim related to no-contact orders). The District euphemizes "no contact orders" as "supportive measures" (formerly called "interim measures").

66.    Engaging in speech or expression that is fully protected under the First Amendment can provide the justification for a No Contact Order. Yet the District sets substantial consequence for violating a No Contact Order, including suspension and expulsion, even though the District claims No Contact Orders are "non-disciplinary" and "non-punitive" and even though the accused student has not been found at fault before the No Contact Order was imposed.

## IV.    PDE's Members and This Litigation

67.    PDE has members who live in the Olentangy district and whose children attend Olentangy schools.

68.    Parents A, B, C, and D are members of PDE and have children attending an Olentangy school now and children who will attend an Olentangy school next school year. The school-aged children of Parents A, B, and D are also members of PDE.

69.    Parent A's child is enrolled in a District high school and will continue to attend the same school next year.

70.    Parent A's high-school-aged child is also a member of PDE.

71.    Parent A believes that people are either male or female. Parent A acknowledges that gender dysphoria exists but believes that it is historically a rare condition. Parent A believes there is a difference between gender dysphoria and a child's confusion about their gender, which can lead a child to adopt a different name, pronouns, clothing, and so forth. Parent A also believes that confusion about gender can be a part of adolescence and that it does not always persist beyond adolescence. Parent A believes that issues of gender are

sensitive issues that should be left to families to discuss and resolve, not to schools. These views stem from Parent A's sincerely held religious beliefs.

72.    Parent A has raised their child to believe that biological sex is immutable and does not change based on someone's internal feelings. Parent A has taught their child to be respectful to others but also to tell the truth and always stand up for their beliefs, even when those beliefs are unpopular.

73.    Parent A's child believes that people are either male or female and that a child cannot "transition" from one sex to another. Parent A's child has no ill-will toward children or adults who identify as transgender or nonbinary, but Parent A's child does not want to be forced to "affirm" that a biologically female classmate is actually a male—or vice versa—or that a classmate is "nonbinary" and neither male nor female. Doing so would contradict the deeply held beliefs of Parent A's family, including Parent A's beliefs that Parent A has imparted to their child and their child's own sincerely held religious beliefs.

74.    Parent A's child knows and routinely comes into contact with students that identify as transgender or nonbinary at school.

75.    When issues involving gender identity arise in class or in school-sponsored activities, Parent A's child wants to speak about these topics and wants to repeatedly state their belief that biological sex is immutable.

76.    In addition, Parent A's child wishes to use pronouns that are consistent with a classmate's biological sex, rather than the classmate's "preferred pronouns"—*i.e.*, the pronouns that the classmate has decided reflects the classmate's gender identity. Parent A's child wishes to use the pronouns that are consistent with Parent A's child's classmates'

biological sex repeatedly and at all times, including inside and outside the classroom, in the classmates' presence, and when referring to the classmates outside their presence. Parent A's child understands that their speech will be considered "insulting," "humiliating," "dehumanizing," "derogatory," and "unwanted" to those who want to go by different pronouns. But Parent A's child has no ill will against these students. Parent A's child just wants to express their deeply held views.

77.     Parent A's child also wants to communicate their beliefs about controversial topics, including gender identity, on a regular basis and to send materials about those topics through Parent A's child's personal phone, computer, and on social media. Parent A's child wants to discuss these topics with other students and the Olentangy community both on and off campus, including during off-campus activities with no connection to any school-related activity.

78.     Parent A's child self-censors, however, because Parent A's child fears that expressing their belief that sex is immutable—by using biologically accurate pronouns or otherwise explaining their views—will cause Parent A's child to be punished for violating school policies.

79.     For example, Parent A's child refrains from using pronouns that correlate with classmates' biological sex and avoids any conversation involving sex and gender because of the District's policies. When Parent A's child is called upon in class, Parent A's child feels like they have no choice except to tell the teachers what they want to hear and phrase their responses as narrowly as possible, because Parent A's child knows that openly expressing their convictions can lead to disciplinary action.

80.     Parent A's child's fear of speaking openly is informed by years of personal experience with the District and its officials. For example, Parent A's child enrolled in a class on a subject they were interested in. The classroom walls were covered in flags that expressed only one view about gender ideology. These actions, combined with Parent A's child's knowledge of the District's harassment policies, created a classroom environment that made Parent A's child deeply uncomfortable and ultimately led Parent A to withdraw Parent A's child from the class. Because of the District's policies and the classroom environment, Parent A's child was denied an opportunity to maximize their college admissions opportunities.

81.     Parent A's child and Parent A are also aware that, according to the District, "[a] student purposefully referring to another student by using gendered language they know is contrary to the other student's identity would be an example of discrimination under Board Policy."

82.     Parent A wants their child to be educated in an environment that involves the free exchange of ideas and to be free to express their beliefs, even if others disagree with them or find them offensive. Parent A does not want Parent A's child to be forced to affirm beliefs about gender identity that are inconsistent with their deeply held convictions.

83.     Under the District's school policies, however, Parent A's child can be punished for the things Parent A's child wants to say, including expressing opinions about the immutable nature of biological sex, using pronouns that are not a student's "preferred pronouns," disagreeing with students' assertion about whether they are male or female, stating that biological males who identify as female should not be allowed to compete in women's

sports, and expressing discomfort about sharing bathrooms with teachers or students of the opposite biological sex.

84. Parent A is concerned that Parent A's child will be subjected to formal discipline unless they affirm ideas that are inconsistent with their deeply held beliefs. Such discipline for speech consistent with Parent A's child's own deeply held convictions is detrimental to Parent A's child's current school experience, and Parent A fears it will also harm Parent A's child's college admission chances and Parent A's child's extracurricular opportunities.

85. Parent A also worries that being disciplined for stating their fundamental beliefs will inflict mental and psychological harm on Parent A's child by forcing them to "choose" between expressing their beliefs and following the instructions of teachers and other Olentangy authority figures.

86. Further, Parent A knows that the process of repeatedly being subjected to discipline for stating their beliefs will expose Parent A's child to reputational harm and personal attacks from other students and members of the Olentangy community.

87. Parent A's child has repeatedly told Parent A that they want to go to school in an environment that allows Parent A's child to express their views. Parent A has watched their child steadily lose self-confidence over the course of the 2022-2023 school year because of the District's speech policies.

88. Parent A's constant anxiety that Parent A's child will be subjected to this harm has, in turn, caused Parent A emotional and psychological harm. For example, it has caused Parent A to question whether to instruct Parent A's child to follow their conscience, remain silent, or affirm viewpoints contrary to their conscience in order to preserve their child's

college opportunities. It has also caused Parent A to question whether Parent A is subjecting Parent A's child to these harms from the District's policies by not withdrawing Parent A's child from Olentangy, even though Parent A's family cannot afford the financial strain that would impose.

89. Parent B has two children that are enrolled in a District high school. Parent B's older child is a senior, but Parent B's younger child will continue to attend the same District high school next year.

90. Both of Parent B's high-school-aged children are also members of PDE.

91. Parent B believes that people are either male or female. Although Parent B acknowledges that gender dysphoria exists, it is historically a rare condition. Parent B believes that there is a difference between gender dysphoria and a child's confusion about their gender, which can lead a child to adopt a different name, pronouns, clothing, and so on. Parent B also believes that confusion about gender can be a part of adolescence and that it does not always persist beyond adolescence. Parent B believes that these issues of gender are sensitive issues that should be left to families to discuss and resolve, not to schools. These views stem from Parent B's sincerely held religious beliefs.

92. Parent B has raised their children to believe that biological sex is immutable and that gender does not exist on a spectrum, as many people now claim. Parent B has also taught their children to share their beliefs and to tell the truth, but to do so charitably and respectfully.

93. Parent B's children believe that people are either male or female and that biological sex is unchangeable. Parent B's children have no ill-will toward children or adults who identify as transgender or nonbinary, but they do not want to be forced to "affirm" that

a biologically male classmate is actually a female—or vice versa—or that a classmate is "nonbinary" and neither male nor female. Doing so would contradict the deeply held beliefs of Parent B's family, including Parent B's beliefs that Parent B has imparted to them and Parent B's children's own sincerely held religious beliefs.

94.     Both of Parent B's children know and routinely interact with students that identify as transgender or nonbinary at school.

95.     When issues involving gender identity arise in class or in school-sponsored activities, Parent B's children want to speak about these topics and want to repeatedly state their belief that biological sex is immutable.

96.     In addition, they wish to use pronouns consistent with a classmate's biological sex and to explain to their classmates why they believe that all human beings are created male or female by God. They wish to use the pronouns that are consistent with their classmates' biological sex repeatedly and at all times, including inside and outside of the classroom, in the classmates' presence, and when referring to the classmates outside of their presence. Parent B's children understand that their speech will be considered "insulting," "humiliating," "dehumanizing," "derogatory," and "unwanted" to those who want to go by different pronouns. But Parent B's children have no ill will against these students. Parent B's children just want to express their deeply held views.

97.     Parent B's children also want to communicate with others about gender identity and other controversial topics through their personal phones, computers, and on social media, including sending materials about these topics. They want to discuss these topics with other

students and the Olentangy community, and they want to do so on and off campus, including during off-campus activities with no connection to any school-related activity.

98.     Parent B's children censor themselves, however, because they fear that expressing their belief that sex is immutable—by using biologically accurate pronouns or otherwise explaining their views—will cause them to be punished for violating school policies.

99.     For example, Parent B's children refrain from using pronouns that correlate with classmates' biological sex or discussing gender-identity topics on and off campus, because they are aware of the District's policies. As a result, Parent B's children try their best to avoid any discussions regarding sex and gender, both in and out of the classroom. When they are called on in class, they feel like they must tell their teachers what they want to hear and phrase their responses as narrowly as possible.

100.     Parent B's children's fears of speaking openly are informed by years of personal experience with the District and its officials.

101.     One of Parent B's children has been asked by a teacher via an "introductory survey" "[w]hat pronouns should [the teacher] use for you in this space?" The available options were "He/Him," "She/Her," "They/Them," and "Other – I'll send [the teacher] a private message!" Parent B was neither told that Parent B's child would be taking the survey nor given the opportunity to opt Parent B's child out.

102.     Another one of Parent B's children was given a writing assignment about "How does gender influence how you see the world?" and other topics, which included "What are gender roles?"; "What is toxic masculinity?"; and "How does [toxic masculinity] affect men AND women?" In a schoolroom Parent B's child had class in, a teacher was celebrating

"International Pronoun Day" and had written the appropriate pronouns that students should use on the classroom whiteboard.

103.    Parent B has repeatedly expressed concern that District policies force students to affirm a student's gender identity when it does not match the student's biological sex and that Parent B's children's sincerely held religious beliefs require otherwise. Nevertheless, the District has repeatedly failed to assure Parent B that Parent B's children can express their beliefs without punishment. And Parent B is aware that, according to the District, "[a] student purposefully referring to another student by using gendered language they know is contrary to the other student's identity would be an example of discrimination under Board Policy."

104.    Parent B wants their children to be educated in an environment that involves the free exchange of ideas and to be free to express their beliefs, even if others disagree with them or find them offensive. Parent B does not want their children to be forced to affirm beliefs about gender identity that are inconsistent with their deeply held convictions.

105.    Under the District's policies, however, Parent B's children can be punished merely for expressing an opinion about the nature of biological sex, declining to use another student's "preferred pronouns," disagreeing with another student's assertion about whether they are male or female, stating that a biological male who identifies as female should not be allowed to compete in women's sports, or for expressing discomfort about sharing bathrooms with teachers or students of the opposite biological sex. All of these are views that Parent B's children wish to express on and off campus.

106.    Parent B is concerned that Parent B's children will be subjected to formal discipline unless they affirm ideas that are inconsistent with their deeply held beliefs. Such

discipline for speech consistent with their own deeply held convictions is detrimental to their current school experience, and Parent B fears it will also harm their college admission chances and their extracurricular opportunities.

107.    Parent B also worries that being disciplined for stating their fundamental beliefs will inflict mental and psychological harm on Parent B's children by forcing them to "choose" between expressing their beliefs and following the instructions of teachers and other Olentangy authority figures.

108.    Moreover, Parent B knows that the process of repeatedly being subjected to discipline for stating their beliefs will expose Parent B's children to reputational harm and personal attacks from other students and members of the Olentangy community.

109.    Parent B's children have repeatedly told Parent B that they want to go to school in an environment that allows them to express their views. Parent B has watched their children steadily lose self-esteem and self-confidence while they have attended Olentangy schools because of the District's speech policies.

110.    Parent B's constant anxiety that Parent B's children will be subjected to this harm has, in turn, caused Parent B emotional and psychological harm. For example, it has caused Parent B to question whether to instruct Parent B's children to follow their conscience and their religious faith or to remain silent and affirm viewpoints contrary to their conscience and faith in order to preserve their opportunities for college, among other things. It has also caused Parent B to question whether Parent B is subjecting their children to these harms from the District's policies by not withdrawing them from Olentangy, even though Parent B's family cannot afford the financial strain that would impose.

111.    Parent C has multiple children that attend District schools, including middle and elementary schools. All Parent C's children will attend a District school next year.

112.    Parent C believes that people are either male or female and that the recent increase of adolescents identifying as transgender or "non-binary" is a product of social contagion and other underlying societal factors. Parent C believes that most children who express a transgender or non-binary identity are confused or struggling with other difficulties in their lives. Parent C also believes that most children who experience feelings of gender dysphoria grow out of that stage after finishing puberty. Parent C believes that issues of gender are sensitive issues that should be left to families to discuss and resolve—not to schools.

113.    Parent C has raised their children to believe that people are either male or female, that biological sex is immutable, and that sex does not change based on someone's internal feelings. Parent C has raised their children to be kind, but Parent C has also taught them that kindness does not require them to state things that they know to be false. Likewise, Parent C has taught them to tell the truth and always stand up for their beliefs, even when those beliefs are unpopular.

114.    Parent C's children believe that people are either male or female, that a boy cannot become a girl, or vice versa, and that a person cannot be "nonbinary" (*i.e.*, neither male nor female). They do not have animosity toward children or adults who identify as transgender or nonbinary. Still, they do not want to be forced to "affirm" that a biologically female classmate is actually a male, or vice versa; nor do they want to "affirm" that a classmate is nonbinary. Doing so would conflict with Parent C's family's deeply held beliefs, including the

beliefs that Parent C has passed on to Parent C's children, as well as their child's own beliefs and notions of common sense.

115. Each of Parent C's children know and interact with students that identify as transgender or nonbinary at school. For example, Parent C's child in elementary school comes into contact with a biological male student who identifies as female during the school day, including in the girl's bathroom.

116. When issues involving gender identity arise in class or in school-sponsored activities, Parent C's children want to repeatedly state their belief that biological sex is unchangeable, among other beliefs about sex and gender. In addition, they wish to use pronouns that are consistent with a classmate's biological sex, rather than the classmate's "preferred pronouns." They believe that using pronouns that describe a biological female as a male is participating in a lie. They also wish to share their discomfort about using a restroom with people of the other biological sex. They refrain from doing so, however, because they fear that expressing their beliefs that sex is immutable—or similar views—will cause them to violate District policies.

117. For example, Parent C's children refrain from using pronouns that match classmates' biological sex if they know that the classmate has a different "preferred" pronoun. They also refrain from stating their beliefs about sex and gender and from expressing their concerns about sharing bathrooms with students of the opposite sex. Parent C's children often remain silent in classroom environments, but when they do participate in class, they feel that they must tell their teachers what they want to hear.

118. Parent C's children's fear of speaking openly is informed by years of personal experience with the District and its officials.

119. Parent C is also aware that, according to the District, "[a] student purposefully referring to another student by using gendered language they know is contrary to the other student's identity would be an example of discrimination under Board Policy."

120. Parent C wants their children to be educated in a challenging environment that involves the free exchange of ideas and to be free to express their beliefs, even if others disagree with them or find them offensive. Parent C does not want their children to be forced to affirm beliefs about gender identity that conflict with their deeply held convictions.

121. Under the District's school policies, however, Parent C's children can be punished merely for declining to use another student's "preferred pronouns" or for expressing discomfort about sharing bathrooms with teachers or students of the opposite biological sex.

122. Parent C is concerned that Parent C's children will be subjected to formal discipline unless they affirm ideas that are inconsistent with their deeply held beliefs. Such discipline for speech consistent with their own deeply held convictions is detrimental to their current school experience.

123. Parent C also worries that being disciplined for stating their fundamental beliefs will inflict mental and psychological harm on Parent C's children by forcing them to "choose" between expressing the beliefs they have been taught at home and following the instructions of teachers and other District authority figures.

124. Further, Parent C knows that the process of repeatedly being subjected to discipline for stating their beliefs will expose Parent C's children to reputational harm and personal attacks from other students and members of the Olentangy community.

125. Parent C's children have repeatedly told Parent C that they want to go to school in an environment that allows them to express their views. Parent C has watched their children steadily lose self-esteem and self-confidence over the course of the 2022-2023 school year because of the District's policies.

126. Parent C's constant anxiety that their children will be subjected to this harm has caused Parent C emotional and psychological harm. For example, it has caused Parent C to question whether to instruct their children to follow their conscience or to remain silent and affirm viewpoints contrary to their convictions in order to preserve their opportunities for college, among other things. It has also caused Parent C to question whether Parent C is subjecting their children to these harms from the District's policies by not withdrawing them from Olentangy, even though Parent C's family cannot afford the financial strain that would impose.

127. Parent D has two children that attend and are enrolled in Olentangy high schools. Both of Parent D's children will be attending an Olentangy high school next year.

128. Parent D's two high-school-aged children are also members of PDE.

129. Parent D believes that people are either male or female and that a person cannot "transition" from one sex to another. Parent D acknowledges that gender dysphoria exists but that it is historically a rare condition. Parent D believes there is a difference between gender dysphoria and a child's confusion about their gender, which can lead a child to adopt a

different name, pronouns, clothing, and so forth. Parent D also believes that confusion about gender can be a part of adolescence and that it does not always persist beyond adolescence. Parent D believes that these issues of gender are sensitive issues that should be left to families to discuss and resolve, not to schools. These beliefs stem in part from Parent D's Christian faith.

130. Parent D has raised their children to believe that "people are either male or female," and that someone cannot change from one to the other simply because they feel that way. Parent D has taught their children to be respectful to others but also to tell the truth and always stand up for their beliefs, even when those beliefs are unpopular.

131. Parent D's children believe that sex is binary and that someone's internal perceptions about themselves cannot change biology. They do not want to be forced to "affirm" that a biologically female classmate is actually a male—or vice versa—or that a classmate is "nonbinary" and neither male nor female. Doing so would contradict the deeply held beliefs of Parent D's family, including Parent D's beliefs that Parent D has imparted to their children and Parent D's children's own beliefs.

132. Both of Parent D's children know and routinely interact with students that identify as transgender or nonbinary at school.

133. When issues involving gender identity arise in class or in school-sponsored activities, Parent D's children want to repeatedly speak about these topics and state their belief that biological sex is immutable. Parent D's children also wish to use pronouns that are consistent with a classmate's biological sex and do not want to be forced to use "preferred pronouns" that imply that biological sex is irrelevant and that a person's gender is malleable.

In addition to expressing the religious basis for their belief that sex is immutable, they also wish to discuss the scientific and biological evidence supporting their beliefs about sex and gender.

134.    Parent D's children wish to use the pronouns that are consistent with their classmates' biological sex repeatedly and at all times, including inside and outside of the classroom, in the classmates' presence, and when referring to the classmates outside of their presence. Parent D's children understand that their speech will be considered "insulting," "humiliating," "dehumanizing," "derogatory," and "unwanted" to those who want to go by different pronouns. But Parent D's children have no ill will against these students. Parent D's children just want to express their deeply held views.

135.    Parent D's children also want to communicate with others about gender identity and other controversial topics through their personal phones, computers, and on social media, including sending materials about these topics. They want to discuss these topics with other students and the Olentangy community through those devices and social media, and they want to do so on and off campus, including during off-campus activities with no connection to any school-related activity.

136.    Parent D's children censor themselves, however, because they fear that expressing their belief that sex is immutable—by using biologically accurate pronouns or otherwise explaining their views—will cause them to violate District policies.

137.    For example, Parent D's children refrain from using pronouns that correlate with classmates' biological sex and avoid any conversation involving sex and gender, because they are aware of the District's policies. They often remain silent in school environments

altogether. When they are called upon in class, they feel like they must tell their teachers what they want to hear and phrase their responses as narrowly as possible.

138.    Parent D's children's fear of speaking openly is informed by years of personal experience with the District and its officials.

139.    For example, one of Parent D's children was given a survey by a teacher asking for "preferred pronouns" and whether Parent D's child would like to use a different name than the one given at birth. This child has also been given surveys that discuss gender identity.

140.    One of Parent D's children has seen preferred-pronoun bracelets being sold and worn by many students. This child has also seen numerous advertisements for the bracelets, including advertisements that suggest that anyone who does not purchase a bracelet is not an "ally" but rather an "enemy" of transgender and nonbinary students.

141.    Parent D is also aware that, according to the District, "[a] student purposefully referring to another student by using gendered language they know is contrary to the other student's identity would be an example of discrimination under Board Policy."

142.    Parent D wants their children to be educated in an environment that involves the free exchange of ideas and to be free to express their beliefs, even if others disagree with them or find them offensive. Parent D does not want their children to be forced to affirm beliefs about gender identity that are inconsistent with their deeply held beliefs.

143.    Under the District's school policies, however, Parent D's children can be punished merely for expressing an opinion about the nature of biological sex (whether based on science or religion), declining to use another student's "preferred pronouns," disagreeing with another student's assertion about whether they are male or female, stating that a biological

male who identifies as female should not be allowed to compete in women's sports, or for expressing discomfort about sharing bathrooms with teachers or students of the opposite biological sex. Parent D's children wish to express all these opinions, but the District's policies deter them from doing so in class, in school-sponsored activities, and off campus.

144. Parent D is concerned that Parent D's children will be subjected to formal discipline unless they affirm ideas that are inconsistent with their deeply held beliefs. Such discipline for speech consistent with their own deeply held convictions is detrimental to their current school experience, and Parent D fears it will also harm their college admission chances and their extracurricular opportunities.

145. Parent D also worries that being disciplined for stating their fundamental beliefs will inflict mental and psychological harm on Parent D's children by forcing them to "choose" between expressing the beliefs they have been taught at home and following the instructions of teachers and other Olentangy authority figures.

146. And Parent D knows that the process of repeatedly being subjected to discipline for stating their beliefs will expose Parent D's children to reputational harm and personal attacks from other students and members of the Olentangy community.

147. Parent D's children have repeatedly told Parent D that they want to go to school in an environment that allow them to express their views.

148. Parent D's constant anxiety that Parent D's children will be subjected to this harm has, in turn, caused Parent D emotional and psychological harm. For example, it has caused Parent D to question whether to instruct their children to follow their conscience or to remain silent and affirm viewpoints contrary to their conscience in order to preserve their

opportunities for college, among other things. It has also caused Parent D to question whether Parent D is subjecting their children to these harms from the District's policies by not withdrawing them from Olentangy, even though Parent D's family cannot afford the financial strain that would impose.

149. Parents A-D are participating in this litigation under pseudonyms, because they fear that if their identities are discovered, they or their children will suffer retaliation from the District, its employees, other students, other parents, and members of the broader community. Parents A-D also want to protect the identity and privacy of their children concerning these deeply sensitive issues.

## COUNT I
### Violation of the First Amendment: Compelled Speech

150. Plaintiff repeats and realleges each of the prior allegations in this complaint.

151. The Supreme Court has "held time and again that freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'" *Janus*, 138 S. Ct. at 2463 (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642. "The First Amendment mandates that [courts] presume that speakers, not the government, know best both what they want to say and how to say it." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 790-91 (1988). "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Janus*, 138 S. Ct. at 2463.

152.    Here, the District has adopted Policies that unconstitutionally compel student speech. The District's lawyer has confirmed to parents that these policies forbid students from referring to a classmate according to their biological sex rather than their gender identity.

153.    The children of Parents A-D believe that biological sex is inherent and immutable. They bear no ill will toward other students, but they do not want to be forced to "affirm" that a biologically male student is actually a female—or vice versa—or that another student is neither male nor female because doing so would contradict their deeply held beliefs. For many of them, those beliefs are inseparable from their religious convictions. Yet that is exactly what the Policies require.

154.    *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), compels the conclusion that the Policies are unconstitutional. There, the Sixth Circuit held that a similar "preferred pronoun" requirement was "anathema to the principles underlying the First Amendment." *Id.* at 510. "Indeed, the premise that gender identity is an idea 'embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view.'" *Id.* (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000)); *see also Green*, 52 F.4th at 785-86 & n.12. "Pronouns can and do convey a powerful message implicating a sensitive topic of public concern." *Meriwether*, 992 F.3d at 508. Accordingly, the policy at issue unconstitutionally compelled the plaintiff "to communicate a messag[e] [that] [p]eople can have a gender identity inconsistent with their sex at birth." *Id.* at 507-08.

155.    So too here. The District cannot force the children of PDE's members to "mouth support" for beliefs they do not hold, especially for "controversial subjects" like "gender identity." *Janus*, 138 S. Ct. at 2463, 2476.

156.    That the Policies do not literally require students to speak is of no moment. Using pronouns is a "'virtual necessity'" for engaging in any conversation. *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1325 (M.D. Ala. 2019) (quoting *Wooley*, 430 U.S. at 715). The Policies prohibit students "from speaking in accordance with [their] belief that sex and gender are conclusively linked," and trying not to "use any pronouns" would be "impossible to comply with." *Meriwether*, 992 F.3d at 517. The District thus "cannot force [students] to choose between carrying a government message" and remaining silent in another student's presence at school. *Doe 1*, 367 F. Supp. 3d at 1326.

157.    Moreover, the District's policies compelling student speech contrary to their sincerely held beliefs are no different from the policy requiring schoolchildren to pledge allegiance to the flag in *Barnette*. Like the West Virginia State Board of Education in *Barnette*, 319 U.S. at 631, 633, the District is requiring students to declare statements that they believe to be false and affirm ideologies with which they deeply disagree. *See also Wooley*, 430 U.S. at 715 (state cannot require message on license plates, even though no one is required to drive); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 575-76 (1995) (parade organizers cannot be forced to include certain groups in a parade, even though no one is required to hold a parade).

158.    In sum, the Constitution prohibits the District from taking sides in the gender-identity debate. Whether a public school district is compelling students to use a preferred

pronoun, contrary to sex, or prohibiting students from using preferred pronouns, contrary to sex, the District is transgressing the First Amendment. *See Taking Offense*, 66 Cal. App. 5th at 710-11 ("For purposes of the First Amendment, there is no difference between a law compelling an employee to utter a [person's] preferred pronoun and prohibiting an employee from uttering a pronoun the [person] does not prefer."); *Meriwether*, 992 F.3d at 506 ("By defendants' logic, a university could likewise *prohibit* professors from addressing university students by their preferred gender pronouns—no matter the professors' own views. And it could even impose such a restriction while denying professors the ability to explain to students why they were doing so."). Schools cannot effectively compel their preferred viewpoint (*e.g.*, persons can transition genders) and ban the opposing viewpoint (*e.g.*, sex is immutable). "To hold differently would be to treat religious [or traditionally conservative] expression as second-class speech and eviscerate this Court's repeated promise that [students] do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Kennedy*, 142 S. Ct. at 2425 (quoting *Tinker*, 393 U.S. at 506).

159. The District adopted these policies "under color of state law" and District officials are acting "under color of state law" within the meaning of §1983.

## COUNT II
### Violation of the First Amendment: Content- and Viewpoint-Based Discrimination

160. Plaintiff repeats and realleges each of the prior allegations in this complaint.

161. The Policies are viewpoint- and content-based restrictions on speech in violation of the First Amendment.

162. "If there is a bedrock principle underlying the First Amendment, it is that government may not prohibit the expression of an idea simply because society finds the idea

itself offensive or disagreeable." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victim's Bd.*, 502 U.S. 105, 118 (1991). Speech restrictions "based on viewpoint are prohibited." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018); *see also e.g.*, *Iancu*, 139 S. Ct. at 2302; *Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 893 (6th Cir. 2021) ("But the government may not engage in a more invidious kind of content discrimination known as viewpoint discrimination." (cleaned up)); *Shurtleff v. City of Bos.*, 142 S. Ct. 1583, 1593 (2022) (viewpoint discrimination prohibited); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1126 (11th Cir. 2022) ("Restrictions … based on viewpoint are prohibited, seemingly as a per se matter." (cleaned up)).

163.    And "[c]ontent-based regulations" are "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Accordingly, "any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009); *see, e.g.*, *Westfield High School L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98, 123 (D. Mass. 2003) (school policy allowing only "responsible" speech was a content-based regulation subject to strict scrutiny).

164.    Here, the District has several overlapping "harassment" policies—Policy 5517, Policy 5136, and the Code of Conduct—that discipline students for the content and viewpoint of their speech. Specifically, the Policies bar speech that is, among other things, "insulting," "humiliating," "dehumanizing," "derogatory," and "unwanted." And as noted above, the District's legal counsel has stated that referring to a classmate according to biological sex rather than gender identity violates District policies.

165. This is a classic content-based and viewpoint-based regulation of speech. *See, e.g.*, *Saxe*, 240 F.3d at 206 (bans on "'harassment'" covering speech impose "'content-based'" and often "'viewpoint-discriminatory'" restrictions on that speech); *Meriwether*, 992 F.3d at 507-09 (requiring affirmance of a person's gender identity that is inconsistent with the person's biological sex is viewpoint discrimination).

166. Because the District's policies are a viewpoint discrimination restriction on speech, they are necessarily unconstitutional. *See, e.g.*, *Barr v. Lafon*, 538 F.3d 554, 571 (6th Cir. 2008); *Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 336 (6th Cir. 2010); *Morgan v. Swanson*, 659 F.3d 359, 390 (5th Cir. 2011) (en banc) (Jones, J., concurring) (highlighting "the axiomatic prohibition of viewpoint discrimination" against "school children['s]" speech by a K-12 school district); *Mahanoy*, 141 S. Ct. at 2046 (schools cannot "suppress speech simply because it is unpopular").

167. Whether the policies are viewpoint- or content-based, the District has no adequate interest in suppressing this type of student speech, and, even if it did, the District's restrictions are not sufficiently tailored to further that interest. *See id.*; *see also Willson v. City of Bel-Nor*, 924 F.3d 995, 1001 (8th Cir. 2019); *Kennedy*, 142 S. Ct. at 2421 (Once plaintiff shows speech is impinged, "the focus then shifts to the defendant to show that its actions were nonetheless justified and tailored consistent with the demands of … case law."). It thus violates the Constitution.

168. The District adopted these policies "under color of state law" and District officials are acting "under color of state law" within the meaning of §1983.

## COUNT III
### Violation of the First Amendment: Overbreadth

169.     Plaintiff repeats and realleges each of the prior allegations in this complaint.

170.     The First Amendment prohibits the government from adopting regulations of students that are "so broad as to 'chill' the exercise of free speech and expression." *Dambrot*, 55 F.3d at 1182. "'Because First Amendment freedoms need breathing space to survive, a government may regulate in the area only with narrow specificity.'" *Gooding v. Wilson*, 405 U.S. 518, 522 (1972). Schools must carefully craft their regulations "to punish only unprotected speech and not be susceptible of application to protected expression." *Id.* A policy is overbroad "if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008).

171.     The District policies are unconstitutionally overbroad.

172.     The Policies punish countless forms of protected speech. Consider the statement: "I have no ill-will toward you, but you are not a boy/girl. People are created either male or female and so you can never transition from one sex to another." This is protected speech, yet would be seen by the listener as "insulting," "humiliating," "dehumanizing," "derogatory," and "unwanted." Consider, too, other speech the students want to engage in: They want to "expres[s] opinions about the immutable nature of biological sex," "stat[e] that biological males who identify as female should not be allowed to compete in women's sports," "expres[s] discomfort about sharing bathrooms with teachers or students of the opposite biological sex," among other things. This is likewise protected speech, yet these statements too would violate the Policies.

173.    While a school could prohibit harassing *conduct*, *Davis v. Monroe County Board of Educ.*, 526 U.S. 629 (1999), the school does not have unlimited authority to punish *protected speech*. Harassment must be "so severe, pervasive, *and* objectively offensive that it *denies* its victims the equal access to education." *Id.* at 652 (emphases added).

174.    The Policies come nowhere close to satisfying the *Davis* standard. Instead of targeting "pervasive" conduct, the Policies could be deployed to punish a *single* instance of unwanted speech. And instead of punishing "severe" and "objectively offensive" conduct, the Policies reach speech that a student subjectively finds, among other things, "insulting," "humiliating," "dehumanizing," "derogatory," and "unwanted." The District makes clear that it does not follow *Davis* by stating that it seeks to discipline students "*before* [speech] becomes severe, pervasive, *or* persistent." Plus, instead of punishing expressive activity only when it "*denies*" other students "equal access to education," the Policies prohibit speech that creates "psychological distress" or "cause[s] discomfort" and "interferes with" another student's education.

175.    Policies that fail to honor the line drawn by *Davis* are unconstitutionally overbroad because they sweep in "a substantial amount of speech that is constitutionally protected." *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). Courts regularly find these types of far-reaching school policies to be unconstitutionally overbroad. *See, e.g.*, *Saxe*, 240 F.3d at 215-16 (high-school speech policy punishing "harassment" was overbroad because it "prohibit[ed] a substantial amount of non-vulgar, non-sponsored student speech"); *Flaherty v. Keystone Oaks Sch. Dist.*, 247 F. Supp. 2d 698, 701-02 (W.D. Penn. 2003) (speech policy prohibiting "abusive," "inappropriate," and "offen[sive]" language was overbroad).

176.     Policy 5136 and the Code of Conduct are also overbroad because they do not limit their reach to speech made on school grounds or during a school-sponsored activity. Policy 5136 applies to *all* off-campus speech—including off-campus speech with *no* relation to school or speech on their own personal cell phones. The Code of Conduct also applies to off-campus speech, specifically, "[m]isconduct by a student that, *regardless of where it occurs*, is directed at a district official or employee or the property of an official or employee" and "[m]isconduct by a student that occurs off school district property but is connected to activities or incidents that have occurred on school district property."

177.     The Supreme Court, however, in *Mahanoy* made clear that school policies prohibiting off-campus speech is constitutionally suspect. "When it comes to political or religious speech that occurs outside school or a school program or activity, the school will have a heavy burden to justify intervention." *Mahanoy*, 141 S. Ct. at 2046. That is precisely the type of speech that Policy 5136 and the Code of Conduct prohibit and that the children of Parents A, B, and D want to engage in. The students want to "communicate their beliefs about controversial topics, including gender identity, on a regular basis and to send materials about those topics through [their] personal phone, computer, and on social media." They also want "to discuss these topics with other students and the Olentangy community both on and off campus, including during off-campus activities with no connection to any school-related activity."

178.     By regulating off-campus speech, including by students on personal cell phones and other electronic devices, District policies sweep in "a substantial amount of speech that is constitutionally protected" and thus are unconstitutionally overbroad. *Forsyth*, 505 U.S. at 130.

179.    The District adopted these policies "under color of state law" and District officials are acting "under color of state law" within the meaning of §1983.

## COUNT IV
### Violation of the Fourteenth Amendment: Parental Rights

180.    Plaintiff repeats and realleges each of the prior allegations in this complaint.

181.    The Fourteenth Amendment provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law." "[T]he interest of parents in the care, custody, and control of their childre[n] is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court" as protected by the Fourteenth Amendment. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality); *see also id.* at 80 n.* (Thomas, J., concurring in the judgment) (expressing interest in reevaluating the meaning of the Privileges or Immunities Clause in parental-rights case); *Ent. Merchants Ass'n*, 564 U.S. at 836-37 (Thomas J., dissenting) (similar).

182.    Children are "not the mere creature of the state." *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925). A parent's right, confirmed by the Fourteenth Amendment, "to raise one's children ha[s] been deemed 'essential'" and one of the "'basic civil rights of man.'" *Stanley v. Illinois*, 405 U.S. 645, 651 (1972).

183.    These parental rights are rooted in the "historica[l] … recogni[tion] that natural bonds of affection lead parents to act in the best interests of their children." *Parham v. J. R.*, 442 U.S. 584, 602 (1979) (citing 1 W. Blackstone, Commentaries, 447; 2 J. Kent, Commentaries on American Law, 190). Indeed, "[t]he history clearly shows a founding generation that believed parents to have complete authority over their minor children and expected parents

to direct the development of those children." *Ent. Merchs. Ass'n*, 564 U.S. at 834 (Thomas, J.,

dissenting); *accord id.* at 795 n.3 (stating that this statement is "true enough"); *see also Bellotti v.

Baird*, 443 U.S. 622, 638 (1979) ("[D]eeply rooted in our Nation's history and tradition, is the

belief that the parental role implies a substantial measure of authority over one's children."); 

*Deanda v. Becerra*, 2022 WL 17572093, at *12 (N.D. Tex. Dec. 8) ("This natural parental right

has been characterized as essential, a basic civil right of man, and far more precious than

property rights. Our law did not create this right: it merely recognizes and respects a bond that

already exists by virtue of our human nature." (cleaned up)).

184.    Thus, "'[i]t is cardinal'" that "'the custody, care and nurture of the child reside

first in the parents, whose primary function and freedom include preparation for obligations

the state can neither supply nor hinder.'" *Troxel*, 530 U.S. at 65-66. "This primary role of the

parents in the upbringing of their children is now established beyond debate as an enduring

American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972); *see also, e.g., McMurry v. Brunner*,

2022 WL 17493708, at *9 & n.2 (5th Cir. Dec. 7) (Oldham, J., concurring in the judgment)

(collecting cases). "These repeated pronouncements from the Supreme Court are not simply

platitudes or mere surplusage, which may be given lip service and brushed aside." *Tatel v. Mt.

Lebanon Sch. Dist.*, 2022 WL 15523185, at *13 (W.D. Pa. Oct. 27). To the contrary, "[t]he

Supreme Court clearly recognized that the right of parents to control the upbringing and

education of their children is fundamental. This right is deeply rooted in the nation's history

and implicit in the concept of ordered liberty." *Id.*

185.    The right of parental control is particularly strong in circumstances involving

"fundamental values," such as "religious beliefs." *Arnold v. Bd. of Educ. of Escambia Cnty.*, 880

F.2d 305, 312 (11th Cir. 1989); *see also H. L. v. Matheson*, 450 U.S. 398, 410 (1981) (parents' rights "presumptively includ[e] counseling [their children] on important decisions"). In such circumstances, parents are presumed to be fit to make decisions for their children absent strong evidence to the contrary. *See Parham*, 442 U.S. at 602-03.

186.    "Parents do not implicitly relinquish all [their parental rights] when they send their children to a public school." *Mahanoy*, 141 S. Ct. at 2053 (Alito, J., concurring); *see also, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 402 (1923); *Pierce*, 268 U.S. at 534-35. "In our society, parents, not the State, have the primary authority and duty to raise, educate, and form the character of their children." *Mahanoy*, 141 S. Ct. at 2053 (Alito, J., concurring); *accord Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000). "Public schools must not forget that '*in loco parentis*' does not mean displace parents." *Id*. To the contrary, all the doctrine of *in loco parentis* "amounts to [today] is simply a doctrine of inferred parental consent to a public school's exercise of a degree of authority that is commensurate with the task that the parents ask the school to perform." *Mahanoy*, 141 S. Ct. at 2052 (Alito, J., concurring). Whatever right is not delegated is still retained by the parent.

187.    Here, at a minimum, District policies intrude into the parents' right to raise their children beyond the schoolhouse gate. The Policies do not limit their reach to speech made on school grounds or during a school-sponsored activity. Policy 5136 applies to *all* off-campus speech—including off-campus speech with *no* relation to school and speech on students' own personal cell phones. The Code of Conduct also applies to off-campus speech, specifically, "[m]isconduct by a student that, *regardless of where it occurs*, is directed at a district official or employee or the property of an official or employee" and "[m]isconduct by a student that

occurs off school district property but is connected to activities or incidents that have occurred on school district property."

188.    But the District's ability to punish speech made off school grounds is extremely limited. *See Mahanoy*, 141 S. Ct. at 2046. Indeed, "[w]hen it comes to political or religious speech that occurs outside school or a school program or activity, the school will have a heavy burden to justify intervention." *Id.* Yet that is precisely the type of speech that the Policies prohibit. As explained above, the District cannot overcome its near-insurmountable burden and thus violates students' First Amendment rights.

189.    But by prohibiting off-campus speech, including speech not during a school-sponsored activity, the Policies also violate parents' "fundamental right[s] … to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66; *see also, e.g.*, *Meyer*, 262 U.S. at 402; *Pierce*, 268 U.S. at 534-35. While the Sixth Circuit has explained that parents "generally" cannot "direct how a public school teaches their child," *Blau v. Fort Thomas*, 401 F.3d 381, 395 (6th Cir. 2005), the Policies go well beyond the dress codes at issue in *Blau* or even what occurs during the school day. These policies purport to control the speech of Olentangy parents' children off school grounds and at all hours of the day, including on their own cell phones and other personal electronic devices.

190.    Whatever control a school may wield over students during the day, the school's *in loco parentis* status does not extend into families' homes. The doctrine merely "treats school administrators as standing in the place of students' parents under circumstances where the children's actual parents cannot protect, guide, and discipline them." *Mahanoy*, 141 S. Ct. at 2046. Put another way, under the doctrine of *in loco parentis*, "parents are treated as having

relinquished [or delegated] the measure of authority that the schools must be able to exercise in order to carry out their state-mandated educational mission, as well as the authority to perform any other functions to which parents expressly or implicitly agree." *Id.* at 2052 (Alito, J., concurring). Schools thus infringe the parents' Fourteenth Amendment right by impinging that not-delegated authority.

191.    In these circumstances, the Policies violate parents' Fourteenth Amendment rights by intruding into the parents' role to provide for the care and custody of their children and regulating matters beyond school grounds and school hours that "fal[l] within the zone of parental, rather than school-related, responsibility." *Id.* at 2046 (majority). In other words, because the District exceeded its authority under *in loco parentis*, the Policies violate parents' constitutional rights in addition to students' First Amendment rights.

192.    The District adopted these policies "under color of state law" and District officials are acting "under color of state law" within the meaning of §1983.

## PRAYER FOR RELIEF

**WHEREFORE**, PDE respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants and provide the following relief:

A.  A declaratory judgment that Policy 5517, Policy 5136, and the Code of Conduct—and any materially similar policy, provision, or law that applies at Olentangy schools—violate the First and Fourteenth Amendments;

B.  A preliminary and permanent injunction barring Defendants from enforcing Policy 5517, Policy 5136, and the prohibition on "discriminatory language" and

"harassment" contained in the Code of Conduct, and any materially similar policy, provision, or law that applies at Olentangy schools;

C. A preliminary and permanent injunction barring Defendants from compelling speech to affirm another person's gender identity;

D. A preliminary and permanent injunction barring Defendants from enforcing Policy 5136 and the Code of Conduct or taking any action to punish students for speech occurring off school grounds that is not for or during a school-sponsored activity;

E. Plaintiff's reasonable costs and expenses of this action, including attorneys' fees, per 42 U.S.C. §1988 and all other applicable laws; and

F. All other relief that the Court deems just and proper.

Dated: May 11, 2023

Respectfully submitted,

*s*/ Emmett E. Robinson

J. Michael Connolly (*pro hac vice forthcoming*)
Taylor A.R. Meehan (*pro hac vice forthcoming*)
James F. Hasson (*pro hac vice forthcoming*)
Thomas S. Vaseliou (*pro hac vice forthcoming*)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
taylor@consovoymccarthy.com
james@consovoymccarthy.com
tvaseliou@consovoymccarthy.com

Emmett E. Robinson (OH Bar No. 88537)
Trial Attorney
ROBINSON LAW FIRM LLC
6600 Lorain Ave. #731
Cleveland, OH 44102
Telephone: (216) 505-6900
Facsimile: (216) 649-0508
erobinson@robinsonlegal.org

*Counsel for Plaintiff*

## VERIFICATION

I, Nicole Neily, declare as follows:

1.     I am the President of Parents Defending Education, the plaintiff in this case.

2.     I have reviewed this complaint.

3.     For the allegations within my personal knowledge, I believe them all to be true.

4.     For the allegations not within my personal knowledge, I believe them all to be true based on my review of the cited policies and documents and based on my conversations with members of Parents Defending Education, including Parents A, B, C, and D.

5.     I declare under penalty of perjury that the foregoing is true and correct.


Executed on May 10, 2023

_____
Nicole Neily
President of Parents Defending Education