**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

PARENTS DEFENDING EDUCATION

*Plaintiff,*

v.

OLENTANGY LOCAL SCHOOL
DISTRICT BOARD OF EDUCATION, *et al.*,

*Defendants.*

Case No. <u>2:23-cv-01595</u>

**PARENTS DEFENDING EDUCATION'S MOTION FOR
A PRELIMINARY INJUNCTION AND BRIEF IN SUPPORT**

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................................1

BACKGROUND..................................................................................................................3

I.      The Growing Use of Speech Codes to Punish Student Speech Regarding Gender Identity ...3

II.      The District's Speech Codes Punishing Certain Speech Concerning Gender Identity .............5

III.     Parents Defending Education and This Litigation .................................................7

ARGUMENT ....................................................................................................................10

I.      PDE is likely to prevail on the merits....................................................................10

      A.      The Policies unconstitutionally compel speech.................................................10

      B.      The Policies are viewpoint- and content-based restrictions on speech......................12

      C.      The Policies are overbroad. ...................................................................15

II.      PDE satisfies the remaining preliminary-injunction criteria. ......................................19

III.     The Court should not require an injunction bond. ..................................................20

CONCLUSION .................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
140 S. Ct. 2335 (2020) ........................................................................................................15

*Barr v. Lafon,*
538 F.3d 554 (6th Cir. 2008) ..............................................................................................13

*Blau v. Fort Thomas,*
401 F.3d 381 (6th Cir. 2005) ..............................................................................................18

*Bonnell v. Lorenzo,*
241 F.3d 800 (6th Cir. 2001) ..............................................................................................19

*Bostock v. Clayton Cnty.,*
140 S. Ct. 1731 (2020) ..........................................................................................................4

*Brown v. Ent. Merchants Ass'n,*
564 U.S. 786 (2011) ...................................................................................................... 4, 18

*Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't,*
533 F.3d 780 (9th Cir. 2008) ..............................................................................................14

*Dahl v. Bd. of Trustees of W. Michigan Univ.,*
15 F.4th 728 (6th Cir. 2021) ...............................................................................................20

*Dambrot v. Cent. Michigan Univ.,*
55 F.3d 1177 (6th Cir. 1995) ........................................................................................ 13, 15

*Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.,*
526 U.S. 629 (1999) ...................................................................................................... 16, 17

*Defoe ex rel. Defoe v. Spiva,*
625 F.3d 324 (6th Cir. 2010) ..............................................................................................13

*DeJohn v. Temple Univ.,*
537 F.3d 301 (3d Cir. 2008) ...............................................................................................13

*Doe 1 v. Marshall,*
367 F. Supp. 3d 1310 (M.D. Ala. 2019) .............................................................................12

*Doster v. Kendall,*
54 F.4th 398 (6th Cir. 2022) ...............................................................................................20

*Elrod v. Burns,*
427 U.S. 347 (1976) ............................................................................................................19

*Flaherty v. Keystone Oaks Sch. Dist.,*
247 F. Supp. 2d 698 (W.D. Penn. 2003) .............................................................................17

*Forsyth Cnty. v. Nationalist Movement,*
505 U.S. 123 (1992) ............................................................................................................14

*Gooding v. Wilson,*
405 U.S. 518 (1972) ............................................................................................................15

*Gordon v. City of Houston,*
   79 F. Supp. 3d 676 (S.D. Tex. 2015) ............................................................20

*Green v. Miss USA, LLC,*
   52 F.4th 773 (9th Cir. 2022) ............................................................16

*Iancu v. Brunetti,*
   139 S. Ct. 2294 (2019) ............................................................ 12, 13

*IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.,*
   993 F.2d 386 (4th Cir. 1993) ............................................................15

*Ison v. Madison Loc. Sch. Dist. Bd. of Educ.,*
   3 F.4th 887 (6th Cir. 2021) ............................................................12

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31,*
   138 S. Ct. 2448 (2018) ............................................................10, 11, 16

*Jones v. Caruso,*
   569 F.3d 258 (6th Cir. 2009) ............................................................20

*Kennedy v. Bremerton Sch. Dist.,*
   142 S. Ct. 2407 (2022) ............................................................12

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.,*
   385 U.S. 589 (1967) ............................................................ 4

*Mahanoy Area Sch. Dist. v. B.L. by & through Levy,*
   141 S. Ct. 2038 (2021) ............................................................passim

*Matal v. Tam,*
   582 U.S. 218 (2017) ............................................................ 13, 17

*Meriwether v. Hartop,*
   992 F.3d 492 (6th Cir. 2021) ............................................................passim

*Meyer v. Nebraska,*
   262 U.S. 390 (1923) ............................................................18

*Miller v. City of Cincinnati,*
   622 F.3d 524 (6th Cir. 2010) ............................................................19

*Minn. Voters All. v. Mansky,*
   138 S. Ct. 1876 (2018) ............................................................12

*Moltan Co. v. Eagle-Picher Indus., Inc.,*
   55 F.3d 1171 (6th Cir. 1995) ............................................................20

*Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't,*
   984 F.3d 477 (6th Cir. 2020) ............................................................10

*Morgan v. Swanson,*
   659 F.3d 359 (5th Cir. 2011) ............................................................13

*Obama for Am. v. Husted,*
   697 F.3d 423 (6th Cir. 2012) ............................................................19

*Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*,
   268 U.S. 510 (1925) ................................................................................................18

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992) ................................................................................................15

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ..........................................................................................14, 15

*RGIS, LLC v. Gerdes*,
   2020 WL 409657 (E.D. Mich. Jan. 24) ................................................................20

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
   487 U.S. 781 (1988) ..................................................................................................3

*Roberts v. Neace*,
   958 F.3d 409 (6th Cir. 2020) ................................................................................10

*Saxe v. State Coll. Area Sch. Dist.*,
   240 F.3d 200 (3d Cir. 2001) ..............................................................13, 14, 16, 17

*Select Distributors, LLC v. Breeze Smoke, LLC*,
   2021 WL 2820985 (E.D. Mich. July 7) ................................................................20

*Shurtleff v. City of Bos.*,
   142 S. Ct. 1583 (2022) ............................................................................................13

*Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*,
   56 F.4th 400 (6th Cir. 2022) ................................................................................19

*Speech First v. Fenves*,
   979 F.3d 319 (5th Cir. 2020) ..................................................................................4

*Speech First, Inc. v. Cartwright*,
   32 F.4th 1110 (11th Cir. 2022) ........................................................................13, 14

*Taking Offense v. State*,
   66 Cal. App. 5th 696 (2021) ................................................................................12

*Thomas v. Varnado*,
   511 F. Supp. 3d 761 (E.D. La. 2020) ..................................................................20

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
   393 U.S. 503 (1969) ......................................................................................1, 4, 12

*Troxel v. Granville*,
   530 U.S. 57 (2000) ................................................................................................18

*United States v. Williams*,
   553 U.S. 285 (2008) ..........................................................................................15, 16

*West Virginia Bd. of Ed. v. Barnette*,
   319 U.S. 624 (1943) ......................................................................................1, 4, 10

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ..................................................................................................10

*Wooley v. Maynard,*
  430 U.S. 705 (1977) ......................................................................................................................12

## INTRODUCTION

Public-school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Nor do schools get to follow students home, policing their speech at all hours of the day on their own personal devices in place of their parents. *See Mahanoy Area Sch. Dist. v. B.L. by & through Levy*, 141 S. Ct. 2038, 2046-48 (2021). Because "America's public schools are the nurseries of democracy," students must be free to express their opinions, even if their views are "unpopular." *Id.* at 2046. Protecting speech in public schools "ensur[es] that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Id.* Public school officials thus can neither "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion" nor force students "to confess by word or act their faith therein." *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943).

Despite these well-established fundamental rights, the Olentangy Local School District has enacted a series of speech codes that punish students for their speech and compel them to mouth support for the District's preferred viewpoints. In particular, the Policies require students to use other students' preferred pronouns and otherwise go along with the District's preferred view that gender is a fluid, mutable characteristic. Three of the District's speech codes are particularly egregious. Through Policy 5517, the District punishes speech that other students find to be "insulting," "dehumanizing," "unwanted," "discomfort[ing]," and "offensive." Ex. A at 1-3.[1] Through Policy 5136, the District punishes speech expressed using students' personal electronic devices (such as cell phones) that "might reasonably create in the mind of another person an impression of being" "humiliated," "harassed," or "embarrassed," "particular[ly]" speech "based upon [another's] "transgender identity"

---

[1] Exhibits A-R are contained in the declaration of Thomas S. Vaseliou and Exhibits S and T are in the declaration of Nicole Neily.

or "political beliefs," among other characteristics. Ex. B at 1-2. That cell-phone policy applies anytime and anywhere, not just school grounds. *Id.* at 2. And through the Code of Conduct, the District prohibits speech that includes "discriminatory language," which is defined as "verbal or written comments" that are "derogatory towards an individual or group" based on, among other things, "transgender identity." Ex. D at 9. And all such policies are buttressed by the District's "Transgender Guidelines," which require staff to use preferred pronouns, names, and affirm other aspects of gender identity. Ex. E at 1-3.

Parents Defending Education (or PDE) is a membership organization whose members include parents who send their children to schools within the District, as well as students who are enrolled at schools within the District. These parents and students have views that the District disfavors. In particular, they believe that people are either male or female, that biological sex is immutable, and that sex does not change based on someone's internal feelings. *E.g.*, Parent A Decl. ¶¶6-8. Accordingly, they "d[o] not want to be forced to 'affirm' that a biologically female classmate is actually a male—or vice versa—or that a classmate is 'nonbinary' and neither male nor female." *E.g.*, *id.* ¶8. Being forced to express such speech would contradict their deeply held beliefs. *E.g.*, *id.*

And therein lies the rub—the District's broadly written policies compel students to use their peers' "preferred pronouns," even when those "preferred pronouns" do not correspond with their peers' biological sex. The District deems students' failure to use their peers' preferred pronouns to be "insulting," "discomfort[ing]," "humiliat[ing]," and "discriminatory" speech. Lest there be any doubt on that score, the District's attorneys recently confirmed that any student who "purposefully refer[s] to another student by using gendered language they know is contrary to the other student's identity" will violate the District's policies and be subject to punishment. Ex. S at 2. As a consequence, the children of PDE's members are forced to alter their speech by remaining silent or avoiding using sex-specific pronouns altogether. *E.g.*, Parent B Decl. ¶¶13-14.

A preliminary injunction is warranted. PDE is likely to succeed on the merits of its claims because the District's policies plainly violate the First and Fourteenth Amendments. First, the Policies compel speech because they force students to alter their speech or use other students' "preferred pronouns"—even if those preferred pronouns are contrary to their peers' biological sex and despite the students' firmly held beliefs that sex is immutable. Controlling Sixth Circuit precedent compels holding such a restriction unconstitutional. *See Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021). Second, the Policies punish students based on the viewpoint and content of the speech (*e.g.*, pronouns that align with the idea that gender is fluid are permitted, while pronouns that align with the idea that sex is immutable are prohibited). Third, the Policies are overbroad because the anti-harassment policies restrict a substantial amount of constitutionally protected speech, and the cell-phone policies plainly reach students' off-campus speech. Finally, Policy 5136 and the Code of Conduct also violate parents' fundamental rights. By regulating students' off-campus activity, including activity with no relation to the school, the District's cell-phone policies violate the parents' Fourteenth Amendment right to direct the upbringing of their children. Because PDE readily satisfies the remaining criteria for a preliminary injunction, the Court should grant PDE's motion and preliminarily enjoin Defendants from enforcing the Policies and from violating these fundamental rights of parents and students.

## BACKGROUND

I. **The Growing Use of Speech Codes to Punish Student Speech Regarding Gender Identity**

The First Amendment protects an individual's right to speak freely, including "the decision of both what to say and what *not* to say." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 797 (1988). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Barnette*, 319 U.S. at 642. Nor do public-school students forfeit their First Amendment rights "at the schoolhouse gate." *Tinker*, 393 U.S. at 506. Quite the opposite, more than 50 years ago, the

Supreme Court made clear that the First Amendment prohibits discriminatory restrictions on speech unless the school can provide evidence that the restriction "is necessary to avoid material and substantial interference with schoolwork or discipline." *Id.* at 506, 511. *Tinker* is a "demanding standard." *Mahanoy*, 141 S. Ct. at 2048; *see Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011) ("Minors are entitled to a significant measure of First Amendment protection." (cleaned up)). The "vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967).

Despite these well-established rights, schools often seek to silence controversial student expression. Speech codes are the tried-and-true method of suppressing unpopular student speech. They prohibit expression that would otherwise be constitutionally protected, Ex. L at 10, punishing students for unpopular speech by labeling it "harassment," "bullying," "hate speech," or "incivility," *id.* These policies, imposing overbroad, content-based (and sometimes viewpoint-based) restrictions on speech, are unconstitutional. *Id.* at 10, 24; *Speech First v. Fenves*, 979 F.3d 319, 338-39 n.17 (5th Cir. 2020) (collecting "a consistent line of cases that have uniformly found campus speech codes unconstitutionally overbroad or vague").

The First Amendment notwithstanding, school districts including Olentangy are increasingly using speech codes to censor minority viewpoints, especially when gender-identity issues are involved. So-called "preferred pronouns policies," in particular, subject students to formal discipline for referring to other students according to the pronouns that are consistent with their biological sex rather than their gender identity. Under these types of policies, a student who uses "he" or "him" when referring to a biological male who identifies as a female will be punished for "misgendering" that student. *See, e.g.*, Ex. P; *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1782-83 & nn.58-60 (2020) (Alito, J., dissenting). Other speech codes are written so broadly or vaguely that they effectively shut down all discussion or debate on transgender issues. *See, e.g.*, Ex. L at 29.

## II.     The District's Speech Codes Punishing Certain Speech Concerning Gender Identity

Despite students' and parents' fundamental rights to discuss issues of sex and gender freely, consistent with their deeply held convictions, Olentangy has adopted some of the most aggressive speech codes in the country. The Policies are designed to punish disfavored student speech concerning, among other things, gender identity. Together, Policy 5517, Policy 5136, and the District's Code of Conduct compel speech and discriminate against disfavored speech. They are also overbroad, applying on- and off-campus, including on students' personal cell phones.

**Policy 5517.** On April 10, 2023, the District adopted a revised version of Policy 5517 to prohibit students from engaging in speech that constitutes "harassment." Ex. A at 1. The policy defines "harassment" broadly to include disfavored speech about "gender identity." *Id.* Specifically, the policy prohibits:

1.  Any "insulting" or "dehumanizing" speech directed against a student that "has the effect of substantially interfering with a student's educational performance, opportunities, or benefits";

2.  Any "unwanted and repeated" speech, including "insulting" or "dehumanizing" speech, that is "severe or pervasive enough" to (a) create a "hostile" or "offensive educational … environment"; (b) "cause discomfort or humiliation"; or (c) "unreasonably interfere with the individual's school … performance or participation"; and

3.  Any speech that "systematically and chronically inflict[s] … psychological distress" on students when the speech is "based upon … characteristics that are protected by Federal civil rights laws," including "gender identity."

*Id.* at 1-3. The District "vigorously enforce[s]" Policy 5517. *Id.* at 1.

**Policy 5136.** The District has also adopted Policy 5136 to prohibit students from expressing speech using personal electronic devices, including "cell phones," "computers," and "tablets," when the speech "in any way … might reasonably create in the mind of another person an impression of being" "humiliated," "harassed," "embarrassed," or "intimidated." Ex. B at 1-2. Students violate the policy when they use their electronic devices to engage in speech that "can be construed as harassment

or disparagement of others" based on their "transgender identity" or "political beliefs." *Id.* at 2. The policy extends well beyond the schoolhouse gate, purporting to apply at all hours of the day, whether the student is at school or away from school. *See id.* at 2 ("in any way"). The District emphasizes that "[v]iolation[s] of these prohibitions shall result in disciplinary action." *Id.*

**The Code of Conduct.** The District's Code of Conduct prohibits any speech that includes "discriminatory language," which is defined as "verbal or written comments" that are "derogatory towards an individual or group" based on, among other things, "transgender identity." Ex. D at 9; *see* Ex. C ("Students may be subject to discipline for violation of the Code of Conduct/Student Discipline Code."). The Code also prohibits "harassment," which is defined as "written, verbal, [or] electronic" speech that "a student has exhibited toward another particular student or students more than once," that causes "mental … harm," and that is "sufficiently severe, persistent or pervasive" that it creates an "intimidating" or "abusive" "educational environment" for the student. Ex. D at 16. The Code also extends well beyond the schoolhouse gate and at all hours of the day. *Id.* at 8, 33 ("[m]isconduct by a student that occurs off school district property but is connected to activities or incidents that have occurred on school district property" and "[m]isconduct by a student that, *regardless of where it occurs*, is directed at a district official or employee or the property of an official or employee" (emphasis added)). Violations of these policies are "strictly prohibited and will not be tolerated." Ex. D at 16.

The District (through its attorneys) recently made clear that it will enforce the Policies to punish misgendering and disfavored speech concerning gender identity. In February 2023, a parent wrote to the District asking whether their child "who believes in two biological genders male/female" would "be forced to use the pronouns that a transgender child identifies with or be subject to reprimand from the district if they refuse to do so." Ex. S at 3. Through its legal counsel, the District responded that the parent's child has an "obligation to comply with Board Policy and the code of conduct." *Id.* at 2. Accordingly, any student who "purposefully refer[s] to another student by using

6

gendered language they know is contrary to the other student's identity" would violate the District's policies. *Id.*

While the District punishes certain speech involving gender identity, it promotes and supports speech on the other side of the gender-identity debate. *See, e.g.*, Ex. E at 1 (requiring staff to "use the name and pronoun requested by the student or parents that matches their gender identity"); Ex. T at 1 (same); Ex. I at 1-2 (promoting the sale of "pronoun bracelets" to identify the student's pronouns); Parent C Decl. ¶12 (child received a "Culture Quest Challenge" from a teacher directing the student to answer questions on showing "acceptance," "respec[t]," and "support" of the transgender community for a chance at a "prize"); Parent Decl. B ¶16 (teacher assigned survey asking their child and fellow classmates for their "preferred pronouns"); Parent Decl. D ¶16 (same); Parent Decl. B ¶17 (discussing "International Pronoun Day" with list of "preferred pronoun" options written on whiteboard in a classroom).

## III.     Parents Defending Education and This Litigation

PDE is a nationwide, grassroots membership organization whose members include parents, students, and other concerned citizens. Neily Decl. ¶3. PDE's mission is to prevent—through advocacy, disclosure, and, if necessary, litigation—the politicization of K-12 education, including government attempts to coopt parental rights and to silence students who express opposing views. *Id.* PDE has members in the District who are harmed by the Policies, including Parents A-D and the children of Parents A, B, and D. *See id.* ¶¶4-5.

The children of Parents A-D ("Students") attend District schools. Parent A Decl. ¶¶4-5 (high school); Parent B Decl. ¶¶4-5 (high school); Parent C Decl. ¶4 (middle and elementary school); Parent D Decl. ¶¶4-5 (high school). Parents A-D and their children believe that people are either male or female, that biological sex is immutable, and that sex does not change based on someone's internal feelings. *E.g.*, Parent A Decl. ¶¶6-8; Parent B Decl. ¶¶6-8, 11; Parent C Decl. ¶¶5-7; Parent D Decl.

¶¶6-8. The Students "kno[w] and routinely com[e] into contact with students that identify as transgender or nonbinary at school." Parent A Decl. ¶9; Parent B Decl. ¶9; Parent C Decl. ¶8; Parent D Decl. ¶9. For example, one Student regularly interacts with "a biological male student who identifies as female during the school day, including in the girl's bathroom." Parent C Decl. ¶8. The Students have "no ill-will toward children or adults who identify as transgender or nonbinary," but they "d[o] not want to be forced to 'affirm' that a biologically female classmate is actually a male—or vice versa—or that a classmate is 'nonbinary' and neither male nor female." Parent A Decl. ¶8; *e.g.*, Parent B Decl. ¶8; Parent C Decl. ¶7; Parent D Decl. ¶8. Doing so would contradict the Students' deeply held beliefs. *Id.*

When issues involving gender identity arise in class or in school-sponsored activities, the Students "wan[t] to speak about these topics and wan[t] to repeatedly state their belief that biological sex is immutable." Parent A Decl. ¶10; *e.g.*, Parent B Decl. ¶10; Parent C Decl. ¶9; Parent D Decl. ¶10. In addition, the Students want "to use pronouns that are consistent with a classmate's biological sex, rather than the classmate's 'preferred pronouns—*i.e.*, the pronouns that the classmate has decided reflects the classmate's gender identity." Parent A Decl. ¶11; *e.g.*, Parent B Decl. ¶11; Parent C Decl. ¶10; Parent D Decl. ¶11. The Students want "to use the pronouns that are consistent with [their] classmates' biological sex repeatedly and at all times, including inside and outside the classroom, in the classmates' presence, and when referring to the classmates outside their presence." Parent A Decl. ¶11; *e.g.*, Parent B Decl. ¶11; Parent C Decl. ¶¶9-10; Parent D Decl. ¶11.

The Students also want to "communicate their beliefs about controversial topics, including gender identity, on a regular basis and to send materials about those topics through [their] personal phone, computer, and on social media." Parent A Decl. ¶12; Parent B Decl. ¶12; Parent D Decl. ¶12. The Students and their parents want "to discuss these topics with other students and the Olentangy community both on and off campus, including during off-campus activities with no connection to any

school-related activity." *Id.*; *see also* Parent A Decl. ¶6 ("issues of gender are sensitive issues that should be left to families to discuss and resolve, not to schools"); Parent B Decl. ¶6; Parent C Decl. ¶5; Parent D Decl. ¶6.

But under the Policies, the Students can be punished merely for expressing an opinion about the nature of biological sex, declining to use another student's "preferred pronouns," disagreeing with another student's assertion about whether they are male or female, stating that a biological male who identifies as female should not be allowed to compete in women's sports, or expressing discomfort about sharing bathrooms with teachers or students of the opposite sex. Parent B Decl. ¶21; *e.g.*, Parent A Decl. ¶18; Parent C Decl. ¶15; Parent D Decl. ¶21. PDE's members and the Students are aware of communications from the District's counsel stating that purposely misgendering a student violates school policies. *E.g.*, Parent A Decl. ¶16; Parent B Decl. ¶18; Parent C Decl. ¶13; Parent D Decl. ¶18.

Because of the Policies, the Students remain silent in school environments or avoid using sex-specific pronouns altogether. *See, e.g.*, Parent A Decl. ¶¶13-14; Parent B Decl. ¶¶13-14; Parent C Decl. ¶10; Parent D Decl. ¶¶13-14. The Students self-censor because they "fea[r] that expressing their belief that sex is immutable—by using biologically accurate pronouns or otherwise explaining their views— will cause [them] to be punished for violating school policies." Parent A Decl. ¶13; *e.g.*, Parent B Decl. ¶13; Parent C Decl. ¶10-11; Parent D Decl. ¶13. For example, the Students "refrai[n] from using pronouns that correlate with classmates' biological sex and avoi[d] any conversation involving sex and gender because of the District's policies." Parent A Decl. ¶14; *e.g.*, Parent B Decl. ¶14; Parent C Decl. ¶10; Parent D Decl. ¶14. PDE brings this lawsuit on behalf of its members so that the Students can be free to express their deeply held beliefs at school without fear of punishment and so that District's policies do not extend beyond school grounds into the privacy of the Students and parents' homes.

## ARGUMENT

PDE is entitled to a preliminary injunction if it shows four things: (1) it is "likely to succeed on the merits"; (2) it is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of the equities" favors a preliminary injunction; and (4) "an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In cases involving violations of constitutional rights, the first factor is typically dispositive. *See, e.g.*, *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) ("Preliminary injunctions in constitutional cases often turn on likelihood of success on the merits, usually making it unnecessary to dwell on the remaining three factors."); *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 482 (6th Cir. 2020). Because PDE satisfies all four requirements, the Court should issue a preliminary injunction.

## I.      PDE is likely to prevail on the merits.

PDE is likely to prevail on the merits of its claims because the Policies unconstitutionally compel speech, regulate speech based on viewpoint and content, and are overbroad.

### A.      The Policies unconstitutionally compel speech.

The Supreme Court has "held time and again that freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'" *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette,* 319 U.S. at 642. "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Janus*, 138 S. Ct. at 2463.

Here, Parents A-D and their children believe that biological sex is inherent and immutable. *E.g.*, Parent A Decl. ¶¶6-8; Parent B Decl. ¶¶6-8, 11; Parent C Decl. ¶¶5-7; Parent D Decl. ¶¶6-8. They

"bear no ill will" toward other students, but they do not want to be forced to "affirm" that a biologically male student is actually a female—or vice versa—or that another student is neither male nor female because doing so would contradict their deeply held beliefs. Parent A Decl. ¶8; Parent B Decl. ¶8; Parent C Decl. ¶7; Parent D Decl. ¶8. Yet that is exactly what the Policies require. According to the District, any student who "purposefully refer[s] to another student by using gendered language they know is contrary to the other student's identity" would violate the District's policies. Ex. S at 2.

The Sixth Circuit's decision in *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), compels the conclusion that the Policies are unconstitutional. There, a devout Christian professor challenged Shawnee State University's "preferred pronoun" policy, which would apply "'regardless of the professor's convictions or views on the subject.'" *Id.* at 498. The Sixth Circuit held that the "preferred pronoun" requirement was "anathema to the principles underlying the First Amendment." *Id.* at 510. "Indeed, the premise that gender identity is an idea 'embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view.'" *Id.* "Pronouns can and do convey a powerful message implicating a sensitive topic of public concern." *Id.* at 508. Accordingly, the policy at issue unconstitutionally compelled the plaintiff "to communicate a messag[e] [that] [p]eople can have a gender identity inconsistent with their sex at birth." *Id.* at 507-08. So too here.

That the Policies do not literally require students to speak is of no moment. Using pronouns is a "'virtual necessity'" for engaging in any conversation. *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1325 (M.D. Ala. 2019) (quoting *Wooley v. Maynard*, 430 U.S. 705, 715 (1977)). The Policies prohibit students "from speaking in accordance with [their] belief that sex and gender are conclusively linked," and trying not to "use any pronouns" would be "impossible to comply with." *Meriwether*, 992 F.3d at 517. The District thus "cannot force [students] to choose between carrying a government message" and remaining silent in another student's presence at school. *Doe 1*, 367 F. Supp. 3d at 1326.

In sum, the Constitution prohibits the District from taking sides in the gender-identity debate. Whether a public school district is compelling students to use a preferred pronoun, contrary to sex, or prohibiting students from using preferred pronouns, contrary to sex, the District is transgressing the First Amendment. *See Taking Offense v. State*, 66 Cal. App. 5th 696, 710-11 (2021) ("For purposes of the First Amendment, there is no difference between a law compelling an employee to utter a [person's] preferred pronoun and prohibiting an employee from uttering a pronoun the [person] does not prefer."); *Meriwether*, 992 F.3d at 506 ("By defendants' logic, a university could likewise *prohibit* professors from addressing university students by their preferred gender pronouns—no matter the professors' own views. And it could even impose such a restriction while denying professors the ability to explain to students why they were doing so."). Schools cannot effectively compel their preferred viewpoints (*e.g.*, persons can "transition" genders) and ban the opposing viewpoints (*e.g.*, sex is immutable). "To hold differently would be to treat religious [or traditionally conservative] expression as second-class speech and eviscerate this Court's repeated promise that [students] do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2425 (2022) (quoting *Tinker*, 393 U.S. at 506).

**B.    The Policies are viewpoint- and content-based restrictions on speech.**

Speech restrictions "based on viewpoint are prohibited." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018); *see also e.g.*, *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019); *Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 893 (6th Cir. 2021) ("But the government may not engage in a more invidious kind of content discrimination known as viewpoint discrimination." (cleaned up)); *Shurtleff v. City of Bos.*, 142 S. Ct. 1583, 1593 (2022) (viewpoint discrimination prohibited); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1126 (11th Cir. 2022) ("Restrictions … based on viewpoint are prohibited, seemingly as a per se matter." (cleaned up)). This remains true in K-12 schools. *See, e.g.*, *Barr v. Lafon*, 538 F.3d 554, 571 (6th Cir. 2008); *Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 336 (6th Cir. 2010); *Morgan*

*v. Swanson*, 659 F.3d 359, 390 (5th Cir. 2011) (en banc) (Jones, J., concurring) (highlighting "the axiomatic prohibition of viewpoint discrimination" for "school children"); *Mahanoy*, 141 S. Ct. at 2046 (schools cannot "suppress speech simply because it is unpopular").

Here, the Policies are facially viewpoint-based. The Policies bar speech that is, among other things, "insulting," "humiliating," "dehumanizing," "derogatory," and "unwanted." Ex. A at 2; Ex. B at 2; Ex. D at 9. But "[g]iving offense is a viewpoint." *Matal v. Tam*, 582 U.S. 218, 243 (2017). Here, the policies that prohibit offensive speech—that is, speech concerning biological sex that the District disfavors—impose "'viewpoint-discriminatory restrictions.'" *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 (3d Cir. 2001); *see also DeJohn v. Temple Univ.*, 537 F.3d 301, 316 (3d Cir. 2008) (When antiharassment regulations "attempt to regulate oral or written expression," they "stee[r] into the territory of the First Amendment." (internal quotation marks omitted)). The Sixth Circuit has long held that when anti-harassment policies reach "negative" speech, they impose "viewpoint discriminat[ory]" restrictions. *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1184-85 (6th Cir. 1995). Especially so here—the Policies do not bar "harassment" alone; they bar "harassment" "based upon" some "protected classes," including students identifying as transgender or non-binary, but not other groups of students such as student athletes. *See* Ex. A at 2; Ex. B at 2; Ex. D at 9. By barring speech based on some classes and not others, the District "disapprov[es] of a subset of messages it finds offensive." *Iancu*, 139 S. Ct. at 2299 (cleaned up). This is particularly true where, as here, the Policies "prohibi[t] harassment based on personal characteristics that are not protected under federal law." *Saxe*, 240 F.3d at 210; Ex. B at 2 (*e.g.*, "age" and "political beliefs"); Ex. D at 9 ("age"). Finally, *Meriwether* holds that policies that require affirming a person's gender identity inconsistent with the person's biological sex are viewpoint-based. *See* 992 F.3d at 506-07. Because the Policies are viewpoint-based, they violate the First Amendment.

The Policies also impermissibly discriminate based on the content of students' speech. A policy "is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). The Policies' definitions of "harassment" and "discriminatory language" hinge on the *listener's* response to the speech—whether the speech is "insulting," "humiliating," "dehumanizing," "derogatory," and "unwanted." Ex. A at 2; Ex. B at 2; Ex. D at 9. It is well-established that "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992); *see also, e.g.*, *Saxe*, 240 F.3d at 209 ("The Supreme Court has made it clear, however, that the government may not prohibit speech under a 'secondary effects' rationale based solely on the emotive impact that its offensive content may have on a listener."); *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*, 533 F.3d 780, 787 (9th Cir. 2008) ("If the statute … would allow or disallow speech depending on the reaction of the audience, then the ordinance would run afoul of an independent species of prohibitions on content-restrictive regulations.").

The Policies are also "content-based because the [District] imposes differential burdens upon speech on account of the topics discussed, and draws facial distinctions defining regulated speech by particular subject matter, when it prohibits speech about any of a long list of characteristics." *Cartwright*, 32 F.4th at 1126 (cleaned up). In other words, to determine whether particular speech violates the District policies, the speaker and listener must know whether the speech was based on one of the listed characteristics. *See* Ex. A at 2; Ex. B at 2; Ex. D at 9; *cf. Reed*, 576 U.S. at 164 ("laws that cannot be justified without reference to the content of the regulated speech, or that were adopted by the government because of disagreement with the message the speech conveys" (cleaned up)).

In short, the Policies "singl[e] out specific subject matter for differential treatment," *id.* at 169, and so must satisfy strict scrutiny, *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020). Thus, the District must "prov[e]" that the policies are "narrowly tailored to serve compelling state

interests." *Reed*, 576 U.S. at 163. It cannot. The District has no legitimate interest in drafting its policies to regulate certain viewpoints, let alone a compelling one. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 395-96 (1992); *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 393 (4th Cir. 1993). Even if the District had a compelling interest, the Policies are not narrowly tailored to punish unlawful *conduct*, rather than simply disfavored *speech*. The Policies thus fail strict scrutiny.

      **C.**     **The Policies are overbroad.**

The First Amendment prohibits the government from enacting rules that are "so broad as to chill the exercise of free speech and expression." *Dambrot*, 55 F.3d at 1182. "Because First Amendment freedoms need breathing space to survive," the government "may regulate in the area only with narrow specificity." *Gooding v. Wilson*, 405 U.S. 518, 522 (1972) (cleaned up). Schools must carefully craft their regulations "to punish only unprotected speech and not be susceptible of application to protected expression." *Id.* A policy is overbroad "if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). That is the case here.

      **1.**     **The overbroad Policies silence otherwise protected speech.**

The Policies are unconstitutionally overbroad. Countless forms of protected speech violate the District's Policies. Consider the statement: "I have no ill-will toward you, but you are not a boy/girl. People are created either male or female and so you can never transition from one sex to another." *See, e.g.*, Parent A Decl. ¶8 (parent and child holding such views and child wants to express this belief); Parent B Decl. ¶8 (same); Parent C Decl. ¶7 (same); Parent D Decl. ¶8 (same). This is protected speech, yet it unquestionably would be seen by the listener as "insulting," "humiliating," "dehumanizing," "derogatory," and "unwanted." Ex. A at 2; Ex. B at 2; Ex. D at 9. Consider, too, other speech the Students want to engage in: They want to "expres[s] … opinion[s] about the nature of biological sex," "stat[e] that biological males who identif[y] as female should not be allowed to compete in women's sports," and "expres[s] discomfort about sharing bathrooms with teachers or

students of the opposite biological sex," among other things. *E.g.*, Parent B Decl. ¶21. This is likewise protected speech, yet these statements too would violate the Policies.

The District's policies cover a broad swath of protected speech that "strik[e] at the heart of moral and political discourse—the lifeblood of constitutional self government (and democratic education) and the core concern of the First Amendment." *Saxe*, 240 F.3d at 210; *see also, e.g.*, *Janus*, 138 S. Ct. at 2476 (explaining that "sexual orientation and gender identity" are "sensitive political topics … [that] are undoubtedly matters of profound value and concern to the public" (internal quotation marks omitted)); *Green v. Miss USA, LLC*, 52 F.4th 773, 784 n.12 (9th Cir. 2022) (explaining that "for controversies regarding transgenderism," "an individual's use or omission of certain words and phrases in this context often reflects a 'struggle over the social control of language in a crucial debate about the nature and foundation, or indeed real existence, of the sexes'"). Here, in particular, the Policies cover speech that "relates to [the Students' and their parents'] core religious and philosophical beliefs" where "First Amendment interests are especially strong." *Meriwether*, 992 F.3d at 509; Exs. O & P. Because the Policies plainly "prohibi[t] a substantial amount of protected speech," they are overbroad. *Williams*, 553 U.S. at 292.

To be sure, the Supreme Court has said that a school can prohibit harassing *conduct* that is "so severe, pervasive, and objectively offensive that it denies its victims the equal access to education." *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 652 (1999). But the Policies come nowhere close to satisfying the *Davis* standard. Instead of targeting "pervasive" conduct, the Policies punish a *single* instance of unwanted speech. *See, e.g.*, Ex. D at 9 ("use … discriminatory language"); Ex. B at 2 ("in any way" and "transmit material"); Ex. A at 1-2 ("any"). And instead of punishing "severe" and "objectively offensive" conduct, the Policies reach speech that a student subjectively finds, among other things, "insulting," "humiliating," "dehumanizing," "derogatory," and "unwanted." Ex. A at 2; Ex. B at 2; Ex. D at 9. The District makes clear that it does not follow *Davis*

16

by stating that it seeks to discipline students "*before* [speech] becomes severe, pervasive, *or* persistent." *Compare, e.g.*, Ex. A at 5 (emphases added), *with Davis*, 526 U.S. at 652 ("so severe, pervasive, *and* objectively offensive"). Plus, the Policies do not purport to punish expressive activity only when it "*denies*" other students "equal access to education," or when proven to interfere with the educational environment. The Policies prohibit speech that creates "psychological distress" or "cause[s] discomfort," but they do not also require that any such "distress" or "discomfort" also interfere with the educational environment. *Compare, e.g.*, Ex. A at 2; Ex. D at 9 (barring protected speech does not affect another student), *with Davis*, 526 U.S. at 652 ("*denies* its victims *the equal access to education*" (emphases added)).

Simply put, there is no First Amendment exception for "harassing" or "discriminatory" speech. *Saxe*, 240 F.3d at 210; *Matal*, 582 U.S. at 244-47. That is why courts regularly find these types of far-reaching school policies to be unconstitutionally overbroad. *See, e.g., Saxe*, 240 F.3d at 215-16 (high-school speech policy punishing "harassment" was overbroad because it "prohibit[ed] a substantial amount of non-vulgar, non-sponsored student speech"); *Flaherty v. Keystone Oaks Sch. Dist.*, 247 F. Supp. 2d 698, 701-02 (W.D. Penn. 2003) (speech policy prohibiting "abusive," "inappropriate," and "offen[sive]" language was overbroad). This Court should too.

### 2. Policy 5136 and the Code of Conduct apply to off-schoolgrounds speech in violation of student and parental rights.

The District's Policy 5136 and the Code of Conduct apply to students' cell phones and do not limit their reach to speech made on school grounds or during a school-sponsored activity. *See, e.g.*, Ex. B at 2 ("in any way"); Ex. D at 8 (prohibiting "[m]isconduct by a student that occurs off school district property but is connected to activities or incidents that have occurred on school district property"); Ex. C at 1. But the District's ability to punish speech made off school grounds is extremely limited. *See Mahanoy*, 141 S. Ct. at 2046. Indeed, in *Mahanoy*, the Supreme Court held that a public high school student's use of "vulgar language and gestures criticizing both the school and the school's cheerleading

17

team" on social media and off schoolgrounds was constitutionally protected. *Id.* at 2042-43. And in reaching that result, the Court stressed that "[w]hen it comes to political or religious speech that occurs outside school or a school program or activity, the school will have a heavy burden to justify intervention." *Id.* If the school could not justify its punishment of the cheerleader's off-campus vulgar speech in *Mahanoy*, then it necessarily follows that the school cannot justify prohibiting the political and religious speech that the Students wish to express off schoolgrounds through their cell phones here. *E.g.*, Parent A Decl. ¶12; *see supra* 15-16. In short, the District cannot overcome its near-insurmountable burden.

The same cell-phone policies, applying at any hour and any place including families' homes, also violate parents' "fundamental right[s] … to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality); *see also, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 402 (1923); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534-35 (1925). The Fourteenth Amendment "'provides heightened protection against government interference with certain fundamental rights and liberty interests.'" *Troxel*, 530 U.S. at 65; *see also id.* at 80 n.* (Thomas, J., concurring in the judgment) (discussing the Privileges or Immunities Clause in a parental-rights case). And while the Sixth Circuit has explained that parents "generally" cannot "direct how a public school teaches their child," *Blau v. Fort Thomas*, 401 F.3d 381, 395 (6th Cir. 2005) (emphasis omitted), Policy 5136 and the Code of Conduct are nothing like the dress codes at issue in *Blau*. They extend well beyond the confines of the school day and into the privacy of families' homes. These policies purport to control the speech of Olentangy parents' children off schoolgrounds and at all hours of the day on their own cell phones and other personal electronic devices.

Whatever control a school may wield over students during the day, the school's *in loco parentis* status does not extend into families' homes. The doctrine merely "treats school administrators as

standing in the place of students' parents under circumstances where the children's actual parents cannot protect, guide, and discipline them." *Mahanoy*, 141 S. Ct. at 2046. Under the doctrine of *in loco parentis*, "parents are treated as having relinquished [or delegated] the measure of authority that the schools must be able to exercise in order to carry out their state-mandated educational mission, as well as the authority to perform any other functions to which parents expressly or implicitly agree." *Id.* at 2052 (Alito, J., concurring). Schools thus infringe parents' Fourteenth Amendment right by impinging that not-delegated authority. The District has exceeded its *in loco parentis* authority here. How students use their cell phones off schoolgrounds to discuss sensitive issues of gender "fall[s] within the zone of parental, rather than school-related, responsibility." *Id.* at 2046 (majority). Policy 5136 and the Code of Conduct thus violate students' and parents' constitutional rights.

## II. PDE satisfies the remaining preliminary-injunction criteria.

Because PDE is likely to prevail on its constitutional claims, it readily meets the other preliminary-injunction criteria. *See, e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).

**Irreparable Harm:** "[I]f it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001); *see also, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Obama*, 697 F.3d at 436. Without a preliminary injunction, PDE's members will be deprived of their First and Fourteenth Amendment rights and suffer irreparable harm. *See, e.g.*, *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 408 (6th Cir. 2022); *Miller v. City of Cincinnati*, 622 F.3d 524, 540 (6th Cir. 2010).

**Balance of Harms and Public Interest:** "In cases concerning constitutional rights, … it [is] unnecessary to 'dwell' on the discretionary balancing of harms or the public interest." *Doster v. Kendall*, 54 F.4th 398, 428 (6th Cir. 2022). That is because "[t]he government usually cannot rely on the harm from stopping its likely unconstitutional conduct." *Id.* Moreover, because "[p]roper application of the

Constitution … serves the public interest," it is "always in the public interest to prevent the violation of a party's constitutional rights." *Dahl v. Bd. of Trustees of W. Michigan Univ.*, 15 F.4th 728, 736 (6th Cir. 2021) (cleaned up); *see also, e.g.*, *Jones v. Caruso*, 569 F.3d 258, 278 (6th Cir. 2009) (same). These factors strongly favor a preliminary injunction.

## III. The Court should not require an injunction bond.

"The party being enjoined has the burden of establishing the need for a bond and the required amount." *RGIS, LLC v. Gerdes*, 2020 WL 409657, at *1 (E.D. Mich. Jan. 24). "[T]he rule in [the Sixth] circuit has long been that the district court possesses discretion over whether to require the posting of security." *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). When "there is no risk of monetary loss to the defendants as a result of [a] preliminary injunction," courts often grant "request[s] that the bond be waived." *Gordon v. City of Houston*, 79 F. Supp. 3d 676, 695 (S.D. Tex. 2015). No bond is needed here. "Courts often waive the security requirement when the plaintiff [is] vindicating constitutional rights." *Thomas v. Varnado*, 511 F. Supp. 3d 761, 766 n.1 (E.D. La. 2020) (cleaned up). Bonds are usually reserved for situations, unlike this one, where a "'wrongfully enjoined'" party will incur "'damages.'" *Id.* at 766. Waiving the bond requirement is particularly appropriate since PDE is likely to succeed on the merits and the District will incur no harm from an injunction that stops it from violating the Constitution. *Id.*; *see also, e.g.*, *Select Distributors, LLC v. Breeze Smoke, LLC*, 2021 WL 2820985, at *5 (E.D. Mich. July 7).

## CONCLUSION

For these reasons, the Court should grant PDE's motion.

Date: May 11, 2023

Respectfully submitted,

<u>s/Emmett E. Robinson</u>

Emmett E. Robinson (OH Bar No. 88537)
Trial Attorney
ROBINSON LAW FIRM LLC
6600 Lorain Ave. #731
Cleveland, OH 44102
Telephone: (216) 505-6900
Facsimile: (216) 649-0508
erobinson@robinsonlegal.org

J. Michael Connolly (*pro hac vice* forthcoming)
Taylor A.R. Meehan (*pro hac vice* forthcoming)
James F. Hasson (*pro hac vice* forthcoming)
Thomas S. Vaseliou (*pro hac vice* forthcoming)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
taylor@consovoymccarthy.com
james@consovoymccarthy.com
tvaseliou@consovoymccarthy.com

**CERTIFICATE OF SERVICE**

I certify that on May 11, 2023, I electronically filed the foregoing with the Clerk of the Court

using the Court's ECF system, which will automatically send email notification to all counsel of record.

I am also serving the foregoing by email and by certified mail, return receipt requested, to the addresses

below:

> Jessica K. Philemond
> Scott Scriven LLP
> 250 East Broad Street, Suite 900
> Columbus, OH 43215
>
> Kevin O'Brien
> Olentangy Board of Education President
> Olentangy Schools
> 7840 Graphics Way
> Lewis Center, OH 43035

s/ Emmett E. Robinson