**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| PARENTS DEFENDING EDUCATION | |
| *Plaintiff,* | |
| v. | Case No. 2:23-cv-01595 |
| OLENTANGY LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, *et al.,* | |
| *Defendants.* | |

**DECLARATION OF THOMAS S. VASELIOU**

1.      I am an attorney at the law firm Consovoy McCarthy PLLC and counsel for plaintiff Parents Defending Education.

2.      I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, I would competently testify to them.

3.      The following materials attached as exhibits are true and accurate copies of pages from public websites that were downloaded as PDF files on or after May 1, 2023:

   a.   Exhibit A is Olentangy Local School District's Policy 5517, entitled "Anti-Harassment," which is available at https://rb.gy/zzw7p and was last accessed on May 9, 2023;

   b.   Exhibit B is Olentangy Local School District's Policy 5136, entitled "Personal Communication Devices," which is available at https://rb.gy/zzw7p and was last accessed on May 9, 2023;

c. Exhibit C is Olentangy Local School District's Policy 5500, entitled "Student Conduct," which is available at https://rb.gy/zzw7p and was last accessed on May 9, 2023;

d. Exhibit D is Olentangy Local School District's student handbook for high school, which contains a "Code of Student Conduct," was last accessed on May 1, 2023, and is available at perma.cc/VDX3-UYV6;

e. Exhibit E is a document, entitled "Transgender Guidelines," obtained pursuant to a Freedom of Information Act request and is available at perma.cc/V3XK-WLXK, and was last accessed on May 8, 2023;

f. Exhibit F is a webpage from Olentangy, entitled "Reporting Bullying and Harassment," last accessed on May 1, 2023, and available at perma.cc/5DZS-9XRK;

g. Exhibit G is a webpage from Olentangy, entitled "Board Policies Regarding Diversity," last accessed on May 1, 2023, and available at perma.cc/X87A-KUDB;

h. Exhibit H is a webpage from Olentangy, entitled "Reporting Bullying, Discrimination, Harassment, and Hazing," last accessed on May 1, 2023, and available at perma.cc/FFZ5-K29T;

i. Exhibit I is a collection of screenshots from a portion of a morning announcement played to students at Berlin High School on April 5, 2023. The announcement is available at https://rb.gy/qvbtm after clicking on the stream

2

for April 5 and was last accessed on May 9, 2023. The relevant portion begins around the two-minute mark and ends around the four-minute mark;

j.  Exhibit J is a collection of screenshots from Olentangy Local Schools' "Stay Safe. Speak Up!" hotline and reporting system, which is available at perma.cc/8JJF-6KHU and last accessed on May 5, 2023;

k.  Exhibit K is a report from Speech First, entitled "Free Speech in the Crosshairs: Bias Reporting on College Campuses," published in 2022, and available at perma.cc/YY5S-WSLD;

l.  Exhibit L is a true and correct copy of a report from the Foundation for Individual Rights in Education, entitled "Spotlight on Speech Codes 2021," which was published on January 4, 2021, and is available at perma.cc/S22E-76Q3;

m.  Exhibit M a report published by the Foundation for Individual Rights in Education, entitled "Bias Response Team Report 2017," last accessed on May 1, 2023, and available at perma.cc/8H43-BWD5;

n.  Exhibit N is an article published in the Wall Street Journal by Rick Esenberg and Luke Berg, entitled "The Progressive Pronoun Police Come for Middle Schoolers." The article was published on May 23, 2022, and is available at perma.cc/3GAY-D5TX;

o.  Exhibit O is an article published in Local Profile by Alexandra Cronin, entitled "Controversy Sparks over Frisco Transgender Students' Right to Choose

Preferred Pronouns." The article was published on September 28, 2020, and is available at perma.cc/Q4FN-MX7K;

p. Exhibit P is an article published in the New York Times by Teresa M. Bejan, entitled "What Quakers Can Teach Us About the Politics of Pronouns." The article was published on November 16, 2019, and is available at perma.cc/8BHL-4BYE;

q. Exhibit Q is an article published in Real Clear Education by Nicole Neily, entitled "Reading, Writing, Ratting Each Other Out." The article was published on June 14, 2021, and is available at perma.cc/JHM2-29DC; and

r. Exhibit R is an article published in the Wall Street Journal Opinion, entitled "Wellesley Parents Prevail Over K-12 'Bias Incidents.'" The article was published on February 7, 2022, and is available at perma.cc/S6S7-5A7W.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 11th day of May, 2023

                                             _/s/Thomas S. Vaseliou_

4

# Exhibit A



| | |
|---|---|
| Book | Policy Manual |
| Section | 5000 Students |
| Title | ANTI-HARASSMENT |
| Code | po5517 |
| Status | Active |
| Adopted | May 25, 2011 |
| Last Revised | April 10, 2023 |

**5517 - ANTI-HARASSMENT**

**General Policy Statement**

It is the policy of the Board of Education to maintain an education and work environment that is free from all forms of unlawful harassment, including sexual harassment. This commitment applies to all School District operations, programs, and activities. All students, administrators, teachers, staff, and all other school personnel share responsibility for avoiding, discouraging, and reporting any form of unlawful harassment. This policy applies to unlawful conduct occurring on school property, or at another location if such conduct occurs during an activity sponsored by the Board.

The Board will vigorously enforce its prohibition against discriminatory harassment based on race, color, national origin, sex (including sexual orientation and gender identity), disability, age (except as authorized by law), religion, ancestry, or genetic information (collectively, "Protected Classes") that are protected by Federal civil rights laws (hereinafter referred to as unlawful harassment), and encourages those within the School District community as well as Third Parties, who feel aggrieved to seek assistance to rectify such problems. The Board will investigate all allegations of unlawful harassment and in those cases where unlawful harassment is substantiated, the Board will take immediate steps to end the harassment, prevent its reoccurrence, and remedy its effects. Individuals who are found to have engaged in unlawful harassment will be subject to appropriate disciplinary action.

**Other Violations of the Anti-Harassment Policy**

The Board will also take immediate steps to impose disciplinary action on individuals engaging in any of the following prohibited acts:

A. Retaliating against a person who has made a report or filed a complaint alleging unlawful harassment, or who has participated as a witness in a harassment investigation.

B. Filing a malicious or knowingly false report or complaint of unlawful harassment.

C. Disregarding, failing to investigate adequately, or delaying investigation of allegations of unlawful harassment, when responsibility for reporting and/or investigating harassment charges comprises part of one's supervisory duties.

**Definitions**

Words used in this policy shall have those meanings defined herein; words not defined herein shall be construed according to their plain and ordinary meanings.

**Complainant** is the individual who alleges, or is alleged, to have been subjected to unlawful harassment, regardless of whether the person files a formal complaint or is pursuing an informal resolution to the alleged harassment.

**Respondent** is the individual who has been alleged to have engaged in unlawful harassment, regardless of whether the Reporting Party files a formal complaint or is seeking an informal resolution to the alleged harassment.

**School District community** means students and Board employees (i.e., administrators, and professional and classified staff), as well as Board members, agents, volunteers, contractors, or other persons subject to the control and supervision of the Board.

**Third Parties** include, but are not limited to, guests and/or visitors on School District property (e.g., visiting speakers, participants on opposing athletic teams, parents), vendors doing business with, or seeking to do business with, the Board, and other individuals who come in contact with members of the School District community at school-related events/activities (whether on or off District property).

**Day(s):** Unless expressly stated otherwise, the term "day" or "days" as used in this policy means a business day(s) (i.e., a day(s) that the Board office is open for normal operating hours, Monday – Friday, excluding State-recognized holidays).

### Bullying

Bullying rises to the level of unlawful harassment when one (1) or more persons systematically and chronically inflict physical hurt or psychological distress on one (1) or more students or employees and that bullying is based upon one (1) or more Protected Classes, that is, characteristics that are protected by Federal civil rights laws. It is defined as any unwanted and repeated written, verbal, or physical behavior, including any threatening, insulting, or dehumanizing gesture, by an adult or student, that is severe or pervasive enough to create an intimidating, hostile, or offensive educational or work environment; cause discomfort or humiliation; or unreasonably interfere with the individual's school or work performance or participation; and may involve:

A. teasing;

B. threats;

C. intimidation;

D. stalking;

E. cyberstalking;

F. cyberbullying;

G. physical violence;

H. theft;

I. sexual, religious, or racial harassment;

J. public humiliation; or

K. destruction of property.

### Harassment

Harassment means any threatening, insulting, or dehumanizing gesture, use of technology, or written, verbal or physical conduct directed against a student or school employee that:

A. places a student or school employee in reasonable fear of harm to his/her person or damage to his/her property;

B. has the effect of substantially interfering with a student's educational performance, opportunities, or benefits, or an employee's work performance; or

C. has the effect of substantially disrupting the orderly operation of a school.

**Sexual Harassment**

For purposes of this policy and consistent with Title VII of the Civil Rights Act of 1964, "sexual harassment" is defined as:

Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature, when:

A. Submission to such conduct is made either implicitly or explicitly a term or condition of an individual's employment, or status in a class, educational program, or activity.

B. Submission or rejection of such conduct by an individual is used as the basis for employment or educational decisions affecting such individual.

C. Such conduct has the purpose or effect of interfering with the individual's work or educational performance; of creating an intimidating, hostile, or offensive working, and/or learning environment; or of interfering with one's ability to participate in or benefit from a class or an educational program or activity.

Sexual harassment may involve the behavior of a person of any gender against a person of the same or another gender.

Sexual Harassment covered by Policy 2266 - Nondiscrimination on the Basis of Sex Education Programs or Activities is not included in this policy. Allegations of such conduct shall be addressed solely by Policy 2266.

Prohibited acts that constitute sexual harassment under this policy may take a variety of forms. Examples of the kinds of conduct that may constitute sexual harassment include, but are not limited to:

A. Unwelcome sexual propositions, invitations, solicitations, and flirtations.

B. Unwanted physical and/or sexual contact.

C. Threats or insinuations that a person's employment, wages, academic grade, promotion, classroom work or assignments, academic status, participation in athletics or extra-curricular programs, activities, or events, or other conditions of employment or education may be adversely affected by not submitting to sexual advances.

D. Unwelcome verbal expressions of a sexual nature, including graphic sexual commentaries about a person's body, dress, appearance, or sexual activities; the unwelcome use of sexually degrading language, profanity, jokes or innuendoes; unwelcome suggestive or insulting sounds or whistles; obscene telephone calls.

E. Sexually suggestive objects, pictures, graffiti, videos, posters, audio recordings or literature, placed in the work or educational environment, that may reasonably embarrass or offend individuals.

F. Unwelcome and inappropriate touching, patting, or pinching; obscene gestures.

G. Asking about, or telling about, sexual fantasies, sexual preferences, or sexual activities.

H. Speculations about a person's sexual activities or sexual history, or remarks about one's own sexual activities or sexual history.

I. Giving unwelcome personal gifts such as lingerie that suggests the desire for a romantic relationship.

J. Leering or staring at someone in a sexual way, such as staring at a person's breasts, buttocks, or groin.

K. A pattern of conduct, which can be subtle in nature, that has sexual overtones and is intended to create or has the effect of creating discomfort and/or humiliation to another.

L. Inappropriate boundary invasions by a District employee or other adult member of the School District community into a student's personal space and personal life.

M. Verbal, nonverbal or physical aggression, intimidation, or hostility based on sex or sex stereotyping that does not involve conduct of a sexual nature.

Not all behavior with sexual connotations constitutes unlawful sexual harassment. Sex-based or gender-based conduct must be sufficiently severe, pervasive, and persistent such that it adversely affects, limits, or denies an individual's employment or education, or such that it creates a hostile or abusive employment or educational environment, or such that it is intended to, or has the effect of, denying or limiting a student's ability to participate in or benefit from the educational program or activities.

**Race/Color Harassment**

Prohibited racial harassment occurs when unwelcome physical, verbal, or nonverbal conduct is based upon an individual's race or color and when the conduct has the purpose or effect of interfering with the individual's work or educational performance; of creating an intimidating, hostile, or offensive working, and/or learning environment; or of interfering with one's ability to participate in or benefit from a class or an educational program or activity. Such harassment may occur where conduct is directed at the characteristics of a person's race or color, such as racial slurs, nicknames implying stereotypes, epithets, and/or negative references relative to racial customs.

**Religious (Creed) Harassment**

Prohibited religious harassment occurs when unwelcome physical, verbal, or nonverbal conduct is based upon an individual's religion or creed and when the conduct has the purpose or effect of interfering with the individual's work or educational performance; of creating an intimidating, hostile, or offensive working and/or learning environment; or of interfering with one's ability to participate in or benefit from a class or an educational program or activity. Such harassment may occur where conduct is directed at the characteristics of a person's religious tradition, clothing, or surnames, and/or involves religious slurs.

**National Origin/Ancestry Harassment**

Prohibited national origin/ancestry harassment occurs when unwelcome physical, verbal, or nonverbal conduct is based upon an individual's national origin or ancestry and when the conduct has the purpose or effect of interfering with the individual's work or educational performance; of creating an intimidating, hostile, or offensive working and/or learning environment; or of interfering with one's ability to participate in or benefit from a class or an educational program or activity. Such harassment may occur where conduct is directed at the characteristics of a person's national origin or ancestry, such as negative comments regarding customs, manner of speaking, language, surnames, or ethnic slurs.

**Disability Harassment**

Prohibited disability harassment occurs when unwelcome physical, verbal, or nonverbal conduct is based upon an individual's disability and when the conduct has the purpose or effect of interfering with the individual's work or educational performance; of creating an intimidating, hostile, or offensive working and/or learning environment; or of interfering with one's ability to participate

in or benefit from a class or an educational program or activity. Such harassment may occur where conduct is directed at the characteristics of a person's disability, such as negative comments about speech patterns, movement, physical impairments or defects/appearances, or the like.

**Anti-Harassment Compliance Officers**

The following individual(s) shall serve as the District's Anti-Harassment Compliance Officer(s) (hereinafter, "the Compliance Officer(s)"):

Trond Smith
Director of Administrative Services
7840 Graphics Way
Lewis Center, Ohio 43035
740-657-4050
trond_smith@olsd.us

Peter Stern
Assistant Director, Equity and Inclusion
7840 Graphics Way
Lewis Center, Ohio 43035
740-657-4050
peter_stern@olsd.us

The names, titles, and contact information of these individuals will be published annually on the School District's website.

The Compliance Officer(s) are responsible for coordinating the District's efforts to comply with applicable Federal and State laws and regulations, including the District's duty to address in a prompt and equitable manner any inquiries or complaints regarding harassment.

The Compliance Officer(s) will be available during regular school/work hours to discuss concerns related to unlawful harassment, to assist students, other members of the District community, and third parties who seek support or advice when informing another individual about "unwelcome" conduct, or to intercede informally on behalf of the individual in those instances where concerns have not resulted in the filing of a formal complaint and where all parties are in agreement to participate in an informal process.

Compliance Officers shall accept reports of unlawful harassment directly from any member of the School District community or a Third Party or receive reports that are initially filed with an administrator, supervisor, or other District-level official.  Upon receipt of a report of alleged harassment, the Compliance Officer(s) will contact the Complainant and begin either an informal or formal complaint process (depending on the request of the Complainant or the nature of the alleged harassment), or the Compliance Officer(s) will designate a specific individual to conduct such a process. The Compliance Officer(s) will provide a copy of this policy to the Complainant and Respondent.  In the case of a formal complaint, the Compliance Officer(s) will prepare recommendations for the Superintendent or will oversee the preparation of such recommendations by a designee. All Board employees must report incidents of harassment that are reported to them to the Compliance Officer within two (2) days of learning of the incident.

Any Board employee who directly observes unlawful harassment is obligated, in accordance with this policy, to report such observations to the Compliance Officer(s) within two (2) days. Additionally, any Board employee who observes an act of unlawful harassment is expected to intervene to stop the harassment, unless circumstances make such an intervention dangerous, in which case the staff member should immediately notify other Board employees and/or local law enforcement officials, as necessary, to stop the harassment. Thereafter, the Compliance Officer(s) or designee must contact the Complainant, if age eighteen (18) or older, or Complainant's parents/guardians if the Complainant is under the age eighteen (18), within two (2) days to advise of the Board's intent to investigate the alleged wrongdoing.

**Reports and Complaints of Harassing Conduct**

Students and all other members of the School District community along with Third Parties are required to report incidents of harassing conduct to a teacher, administrator, supervisor, or other District official so that the Board may address the conduct before it becomes severe, pervasive, or persistent. Any teacher, administrator, supervisor, or other District employee or official who receives such a report shall file it with the Compliance Officer within two (2) days of receiving the report of harassment.

Members of the School District community and Third Parties, which includes students, or third parties who believe they have been unlawfully harassed are entitled to utilize the Board's complaint process that is set forth below. Initiinterfere with the rights of a student to pursue a complaint of unlawful harassment or retaliation with the United States Department of Education Office for Civil Rights.

**Informal Complaint Procedure**

The goal of the informal complaint procedure is promptly to stop inappropriate behavior and to facilitate resolution through an informal means, if possible. The informal complaint procedure is provided as a less formal option for a student who believes s/he has been unlawfully harassed or retaliated against. This informal procedure is not required as a precursor to the filing of a formal complaint. The informal process is only available in those circumstances where the Complainant and the Respondent mutually agree to participate in it.

Students who believe that they have been unlawfully harassed may initiate their complaint through this informal complaint process, but are not required to do so. The informal process is only available in those circumstances where the parties (alleged target of harassment and alleged harasser(s)) agree to participate in the informal process.

The Complainant may proceed immediately to the formal complaint process and individuals who seek resolution through the informal procedure may request that the informal process be terminated at any time to move to the formal complaint process.

All complainants involving a District employee, any other adult member of the School District community, or a Third Party and a student will be formally investigated.

As an initial course of action, if a Complainant feels comfortable and safe in doing so, the individual should tell or otherwise inform the Respondent that the alleged harassing conduct is inappropriate and must stop. The Complainant should address the allegedly harassing conduct as soon after it occurs as possible. The Compliance Officers are available to support and counsel individuals when taking this initial step or to intervene on behalf of the Complainant if requested to do so. A Complainant who is uncomfortable or unwilling to directly approach the Respondent about the alleged inappropriate conduct may file an informal or a formal complaint. In addition, with regard to certain types of unlawful harassment, such as sexual harassment, the Compliance Officer may advise against the use of the informal complaint process.

A Complainant may make an informal complaint, either orally or in writing: 1) to a teacher, other employee, or building administrator in the school the student attends; 2) to the Superintendent or other District-level employee; and/or 3) directly to one (1) of the Compliance Officers.

All informal complaints must be reported to one (1) of the Compliance Officers who will either facilitate an informal resolution as described below, or appoint another individual to facilitate an informal resolution.

The Board's informal complaint procedure is designed to provide students who believe they are being unlawfully harassed with a range of options designed to bring about a resolution of their concerns. Depending upon the nature of the complaint and the wishes of the Complainant, informal resolution may involve, but not be limited to, one (1) or more of the following:

A. Advising the Complainant about how to communicate the unwelcome nature of the behavior to the Respondent.

B. Distributing a copy of this policy as a reminder to the individuals in the school building or office where the Respondent works or attends.

C. If both parties agree, the Compliance Officer may arrange and facilitate a meeting or mediation between the Complainant and the Respondent to work out a mutual resolution.

While there are no set time limits within which an informal complaint must be resolved, the Compliance Officer/designee is directed to attempt to resolve all informal complaints within fifteen (15) business days of receiving the informal complaint. If the Complainant is dissatisfied with the informal complaint process, the Complainant may proceed to file a formal complaint. And, as stated above, either party may request that the informal process be terminated at any time to move to the formal complaint process.

**Formal Complaint Procedure**

If a complaint is not resolved through the informal complaint process, if one (1) of the parties has requested that the informal complaint process be terminated to move to the formal complaint process, or the Complainant, from the outset, elects to file a formal complaint, or the CO determines the allegations are not appropriate for resolution through the informal process, the formal complaint process shall be implemented.

The Complainant may file a formal complaint, either orally or in writing, with a teacher, principal, or other District employee at the student's school, the Compliance Officer, Superintendent, or another District official who works at another school or at the district level. Due to the sensitivity surrounding complaints of unlawful harassment, timelines are flexible for initiating the complaint process; however, individuals should make every effort to file a formal complaint within thirty (30) days after the conduct occurs while the facts are known and potential witnesses are available. If a Complainant informs a teacher, principal, or other District employee at the student's school, Superintendent, or other District official, either orally or in writing, about any complaint of harassment, that employee must report such information to the Compliance Officer within two (2) business days.

Throughout the course of the process, the Compliance Officer should keep the parties reasonably informed of the status of the investigation and the decision-making process.

All formal complaints must include the following information to the extent known: the identity of the Respondent; a detailed description of the facts upon which the complaint is based (i.e., when, where, and what occurred); a list of potential witnesses; and the resolution sought by the Complainant.

If the Complainant is unwilling or unable to provide a written statement including the information set forth above, the Compliance Officer shall ask for such details in an oral interview. Thereafter, the Compliance Officer will prepare a written summary of the oral interview, and the Complainant will be asked to verify the accuracy of the reported charge by signing the document.

Upon receiving a formal complaint, the Compliance Officer will consider whether any action should be taken in the investigatory phase to protect the Complainant from further harassment or retaliation, including, but not limited to, a change of work assignment or schedule for the Complainant and/or the Respondent. In making such a determination, the Compliance Officer should consult the Complainant to assess whether the individual agrees with the proposed action. If the Complainant is unwilling to consent to the proposed change, the Compliance Officer may still take whatever actions deemed appropriate in consultation with the Superintendent.

Within two (2) business days of receiving the complaint, the Compliance Officer/designee will initiate a formal investigation to determine whether the Complainant has been subjected to offensive conduct/harassment/retaliation. The Principal will not conduct an investigation unless directed to do so by the Compliance Officer.

Simultaneously, the Compliance Officer will inform the Respondent that a formal complaint has been received. The Respondent will be informed about the nature of the allegations and provided with a copy of any relevant policies and/or administrative guidelines, including the Board's Anti-Harassment policy. The Respondent must also be informed of the opportunity to submit a written response to the complaint within five (5) business days.

Although certain cases may require additional time, the Compliance Officer/designee will attempt to complete an investigation into the allegations of harassment/retaliation within fifteen (15) business days of receiving the formal complaint. The investigation will include:

A. interviews with the Complainant;

B. interviews with the Respondent;

C. interviews with any other witnesses who may reasonably be expected to have any information relevant to the allegations;

D. consideration of any documentation or other information presented by the Complainant, Respondent, or any other witness that is reasonably believed to be relevant to the allegations.

At the conclusion of the investigation, the Compliance Officer or the designee shall prepare and deliver a written report to the Superintendent that summarizes the evidence gathered during the investigation and provides recommendations based on the evidence and the definition of unlawful harassment as provided in Board policy and State and Federal law as to whether the Complainant has been subjected to unlawful harassment. The Compliance Officer's recommendations must be based upon the totality of the circumstances, including the ages and maturity levels of those involved. In determining if discriminatory harassment or retaliation occurred, a preponderance of evidence standard will be used. The Compliance Officer may consult with the Board's legal counsel before finalizing the report to the Superintendent.

Absent extenuating circumstances, within ten (10) school days of receiving the report of the Compliance Officer/designee, the Superintendent must either issue a written decision regarding whether the complaint of harassment has been substantiated or request further investigation. A copy of the Superintendent's final decision will be delivered to both the Complainant and the Respondent.

If the Superintendent requests additional investigation, the Superintendent must specify the additional information that is to be gathered, and such additional investigation must be completed within ten (10) school days. At the conclusion of the additional investigation, the Superintendent shall issue a written decision as described above.

The decision of the Superintendent shall be final.

The Board reserves the right to investigate and resolve a complaint or report of unlawful harassment/retaliation regardless of whether the student alleging the unlawful harassment/retaliation pursues the complaint. The Board also reserves the right to have the formal complaint investigation conducted by an external person in accordance with this policy or in such other manner as deemed appropriate by the Board or its designee.

The parties may be represented, at their own cost, at any of the above-described meetings/hearings.

The right of a person to a prompt and equitable resolution of the complaint shall not be impaired by the person's pursuit of other remedies such as the filing of a complaint with the Office for Civil Rights, the filing of charges with local law enforcement, or the filing of a civil action in court. Use of this internal complaint process is not a prerequisite to the pursuit of other remedies.

**Privacy/Confidentiality**

The District will employ all reasonable efforts to protect the rights of the Complainant, the Respondent, and the witnesses as much as possible, consistent with the Board's legal obligations to investigate, to take appropriate action, and to conform with any discovery or disclosure obligations. All records generated under the terms of this policy and related administrative guidelines shall be maintained as confidential to the extent permitted by law. Confidentiality, however, cannot be guaranteed. Additionally, the Respondent must be provided the Complainant's identity.

During the course of a formal investigation, the Compliance Officer/designee will instruct all members of the School District community and third parties who are interviewed about the importance of maintaining confidentiality. Any individual who is interviewed as part of a harassment investigation is expected not to disclose any information that is learned or provided during the course of the investigation.

**Sanctions and Monitoring**

The Board shall vigorously enforce its prohibitions against unlawful harassment/retaliation by taking appropriate action reasonably calculated to stop the harassment and prevent further such harassment. While observing the principles of due process, a violation of this policy may result in disciplinary action up to and including the discharge of an employee or the suspension/expulsion of a student. All disciplinary action will be taken in accordance with applicable State law and the terms of the relevant collective bargaining agreement(s). When imposing discipline, the Superintendent shall consider the totality of the circumstances involved in the matter, including the ages and maturity levels of those involved. In those cases where unlawful harassment is not substantiated, the Board may consider whether the alleged conduct nevertheless warrants discipline in accordance with other Board policies, consistent with the terms of the relevant collective bargaining agreement(s).

Where the Board becomes aware that a prior remedial action has been taken against a member of the School District community, all subsequent sanctions imposed by the Board and/or Superintendent shall be reasonably calculated to end such conduct, prevent its reoccurrence, and remedy its effects.

**Retaliation**

Retaliation against a person who makes a report or files a complaint alleging unlawful harassment/retaliation or participates as a witness in an investigation is prohibited. Neither the Board nor any other person may intimidate, threaten, coerce or interfere with any individual because the person opposed any act or practice made unlawful by any Federal or State civil rights law, or because that individual made a report, formal complaint testified, assisted or participated or refused to participate in any manner in an investigation, proceeding, or hearing under those laws and/or this policy, or because that individual exercised, enjoyed, aided or encouraged any other person in the exercise or enjoyment of any right granted or protected by those laws and/or this policy.

Retaliation against a person from making a report of discrimination, filing a formal complaint, or participating in an investigation or meeting is a serious violation of this policy that can result in imposition of disciplinary sanction/consequences and/or other appropriate remedies.

Formal complaints alleging retaliation may be filed according to the internal complaint process set forth above.

The exercise of rights protected under the First Amendment of the United States Constitution does not constitute retaliation prohibited under this policy.

**Allegations Constituting Criminal Conduct: Child Abuse/Sexual Misconduct**

State law requires any school teacher or school employee who knows or suspects that a child with a disability under the age of twenty-one (21) or that a child under the age of eighteen (18) has suffered or faces a threat of suffering a physical or mental wound, disability or condition of a nature that reasonably indicates abuse or neglect of a child to immediately report that knowledge or suspicion to the county children's services agency. If, during the course of a harassment investigation, the Compliance Officer or a designee has reason to believe or suspect that the alleged conduct reasonably indicates abuse or neglect of the Complainant, a report of such knowledge must be made in accordance with State law and Board Policy.

State law defines certain contact between a teacher and a student as "sexual battery." If the Compliance Officer or a designee has reason to believe that the Complainant has been the victim of criminal conduct as defined in Ohio's Criminal Code, such knowledge should be immediately reported to local law enforcement.

Any reports made to a county children's services agency or to local law enforcement shall not terminate the Compliance Officer or a designee's obligation and responsibility to continue to investigate a complaint of harassment. While the Compliance Officer or a designee may work cooperatively with outside agencies to conduct concurrent investigations, in no event shall the harassment investigation be inhibited by the involvement of outside agencies without good cause after consultation with the Superintendent.

**Allegations Involving Conduct Unbecoming the Teaching Profession/Suspension**

The Superintendent will report to the Ohio Department of Education, on forms provided for that purpose, matters of misconduct on the part of licensed professional staff members convicted of sexual battery, and will, in accordance with Policy 8141, suspend such employee from all duties that concern or involve the care, custody, or control of a child during the pendency of any criminal action for which that person has been arrested, summoned and/or indicted in that regard.

**Education and Training**

In support of this Anti-Harassment Policy, the Board promotes preventative educational measures to create greater awareness of unlawful discriminatory practices. The Superintendent shall provide appropriate information to all members of the School District community related to the implementation of this policy and shall provide training for District students and staff where appropriate. All training, as well as all information, provided regarding the Board's policy and harassment in general, will be age and content appropriate.

**Retention of Investigatory Records and Materials**

The Compliance Officer(s) is responsible for overseeing retention of all records that must be maintained pursuant to this policy. All individuals charged with conducting investigations under this policy shall retain all documents, electronically stored information ("ESI"), and electronic media (as defined in Policy 8315) created and/or received as part of an investigation, which may include but not be limited to:

A. all written reports/allegations/complaints/grievances/statements/responses pertaining to an alleged violation of this policy;

B. any narratives that memorialize oral reports/allegations/complaints/grievances/statements/responses pertaining to an alleged violation of this policy;

C. any documentation that memorializes the actions taken by District personnel or individuals contracted or appointed by the Board to fulfill its responsibilities related to the investigation and/or the District's response to the alleged violation of this policy;

D. written witness statements;

E. narratives, notes from, or audio, video, or digital recordings of witness interviews/statements;

F. e-mails, texts, or social media posts that directly relate to or constitute evidence pertaining to an alleged violation of this policy (i.e., not after-the-fact commentary about or media coverage of the incident);

G. notes or summaries prepared contemporaneously by the investigator in whatever form made (e.g., handwritten, keyed into a computer or tablet, etc.), but not including transitory notes whose content is otherwise memorialized in other documents;

H. written disciplinary sanctions issued to students or employees and other documentation that memorializes oral disciplinary sanctions issued to students or employees for violations of this policy;

I. dated written determinations/reports (including summaries of relevant exculpatory and inculpatory evidence) and other documentation that memorializes oral notifications to the parties concerning the outcome of the investigation, including any consequences imposed as a result of a violation of this policy;

J. documentation of any supportive measures offered and/or provided to the Complainant and/or the Respondent, including no contact orders issued to both parties, the dates the no contact orders were issued, and the dates the parties acknowledged receipt of the no contact orders;

K. documentation of all actions taken, both individual and systemic, to stop the discrimination or harassment, prevent its recurrence, eliminate any hostile environment, and remedy its discriminatory effects;

L. copies of the Board policy and/or procedures/guidelines used by the District to conduct the investigation, and any documents used by the District at the time of the alleged violation to communicate the Board's expectations to students and staff with respect to the subject of this policy (e.g., Student Code of Conduct and/or Employee Handbooks);

M. copies of any documentation that memorializes any formal or informal resolutions to the alleged discrimination or harassment.

The documents, ESI, and electronic media (as defined in Policy 8315) retained may include public records and records exempt from disclosure under Federal (e.g., FERPA, ADA) and/or State law (e.g., R.C. 3319.321) – e.g., student records and confidential medical records.

The documents, ESI, and electronic media (as defined in Policy 8315) created or received as part of an investigation shall be retained in accordance with Policy 8310, Policy 8315, Policy 8320, and Policy 8330 for not less than three (3) years, but longer if required by the District's records retention schedule.

Revised 12/12/13
T.C. 7/13/15
Revised 11/9/17
Revised 4/25/19
Revised 4/8/21
T.C. 9/28/22
T.C.4/10/23

© Neola 2021

Legal          R.C. 4112.02

               20 U.S.C. 1400 et seq., The Individuals with Disabilities Education Improvement Act of 2004 (IDEIA)

               20 U.S.C. 1681 et seq.

               29 U.S.C. 621 et seq., Age Discrimination in Employment Act of 1967

               29 U.S.C. 794, Rehabilitation Act of 1973, as amended

               29 U.S.C. 6101, The Age Discrimination Act of 1975

               42 U.S.C. 2000d et seq.

               42 U.S.C. 2000e et seq.

               42 U.S.C. 12101 et seq., Americans with Disabilities Act of 1990, as amended

               42 U.S.C. 1983

               National School Boards Association Inquiry and Analysis - May, 2008

# Exhibit B



| Book | Policy Manual |
|---|---|
| Section | 5000 Students |
| Title | PERSONAL COMMUNICATION DEVICES |
| Code | po5136 |
| Status | Active |
| Adopted | May 25, 2011 |
| Last Revised | November 9, 2017 |

**5136 - PERSONAL COMMUNICATION DEVICES**

Students may possess personal communication devices (PCDs) in school, on school property, and on school buses or other Board-provided vehicles during school hours and afterschool activities (e.g. extra-curricular activities) and at school-related functions. Building administrators and teachers will have the authority to modify this allowance.

For purposes of this policy, "personal communication device" includes computers, tablets (e.g., iPads and similar devices), electronic readers ("e-readers"; e.g..Kindles and similar devices), cell phones (e.g., mobile/cellular telephones, smartphones (e.g., BlackBerry, iPhone, Android devices, Windows Mobile devices, etc.)), and/or other web-enabled devices of any type. Students may not use PCDs on school property or at a school-sponsored activity to access and/or view Internet web sites that are otherwise blocked to students at school. Students may use PCDs while riding to and from school on a school bus or other Board-provided vehicles or on a school bus or Board-provided vehicle during school-sponsored activities, at the discretion of the bus driver, classroom teacher, or sponsor/advisor/coach. Distracting behavior that creates an unsafe environment will not be tolerated.

Also, during after school activities, PCDs shall be powered completely off (not just placed into vibrate or silent mode) and stored out of sight when directed by the administrator or sponsor.

Under certain circumstances, a student may keep his/her PCD "On" with prior approval from the building principal.

Except as authorized by a teacher, administrator or IEP team, students are prohibited from using PCDs during the school day, including while off-campus on a field trip, to capture, record and/or transmit the words or sounds (i.e., audio) and/or images (i.e., pictures/video) of any student, staff member or other person. Using a PCD to capture, record and/or transmit audio and/or pictures/video of an individual without proper consent is considered an invasion of privacy and is not permitted. Students who violate this provision and/or use a PCD to violate the privacy rights of another person may have their PCD confiscated and held until a parent/guardian picks it up, and may be directed to delete the audio and/or picture/video file while the parent/guardian is present. If the violation involves potentially illegal activity the confiscated-PCD may be turned-over to law enforcement.

PCDs, including but not limited to those with cameras, may not be activated or utilized at any time in any school situation where a reasonable expectation of personal privacy exists. These locations and circumstances include, but are not limited to classrooms, gymnasiums, locker rooms, shower facilities, rest/bathrooms, and any other areas where students or others may change clothes or be in any stage or degree of disrobing or changing clothes. The Superintendent and building principals are authorized to determine other specific locations and situations where use of a PCD is absolutely prohibited.

Students are expressly prohibited from using covert means to listen-in or make a recording (audio or video) of any meeting or activity at school.  This includes placing recording devices, or other devices with one - or two-way audio communication technology (i.e., technology that allows a person off-site to listen to live conversations and sounds taking place in the location where the device is located), within a student's book bag or on the student's person without express written consent of the Superintendent. Any requests to place a recording device or other device with one- or two-way audio communication technology within a student's book bag or on a student's person shall be submitted, in writing, to the principal. The District representative shall notify the parent(s), in writing, whether such request is denied or granted within five (5) days.

Students shall have no expectation of confidentiality with respect to their use of PCDs on school premises/property.

Students may not use a PCD in any way that might reasonably create in the mind of another person an impression of being threatened, humiliated, harassed, embarrassed or intimidated. See Policy 5517.01 – Bullying and Other Forms of Aggressive Behavior. In particular, students are prohibited from using PCDs to: (1) transmit material that is threatening, obscene, disruptive, or sexually explicit or that can be construed as harassment or disparagement of others based upon their race, color, national origin, sex (including sexual orientation/transgender identity), disability, age, religion, ancestry, or political beliefs; and (2) engage in "sexting" - i.e., sending, receiving, sharing, viewing, or possessing pictures, text messages, e-mails or other materials of a sexual nature in electronic or any other form. Violation of these prohibitions shall result in disciplinary action. Furthermore, such actions will be reported to local law enforcement and child services as required by law.

Students are also prohibited from using a PCD to capture, record, and/or transmit test information or any other information in a manner constituting fraud, theft, cheating, or academic dishonesty. Likewise, students are prohibited from using PCDs to receive such information.

Possession of a PCD by a student at school during school hours and/or during extra-curricular activities is a privilege that may be forfeited by any student who fails to abide by the terms of this policy, or otherwise abuses this privilege.

Violations of this policy may result in disciplinary action and/or confiscation of the PCD. The building principal will also refer the matter to law enforcement or child services if the violation involves an illegal activity (e.g., child pornography, sexting). Discipline will be imposed on an escalating scale ranging from a warning to an expulsion based on the number of previous violations and/or the nature

of or circumstances surrounding a particular violation. If the PCD is confiscated, it will be released/returned to the student's parent/guardian after the student complies with any other disciplinary consequences that are imposed, unless the violation involves potentially illegal activity in which case the PCD may be turned-over to law enforcement. A confiscated device will be marked in a removable manner with the student's name and held in a secure location until it is retrieved by the parent/guardian or turned-over to law enforcement. School officials will not search or otherwise tamper with PCDs in District custody unless they reasonably suspect that the search is required to discover evidence of a violation of the law or other school rules. Any search will be conducted in accordance with Policy 5771 – Search and Seizure. If multiple offenses occur, a student may lose his/her privilege to bring a PCD to school for a designated length of time or on a permanent basis.

A person who discovers a student using a PCD, recording device, or other device with one- or two-way audio communication technology in violation of this policy is required to report the violation to the building administration.

Students are personally and solely responsible for the care and security of their PCDs. The Board assumes no responsibility for theft, loss, or damage to, or misuse or unauthorized use of, PCDs brought onto its property.

Revised 12/13/12

**© Neola 2017**

# Exhibit C



| Book | Policy Manual |
|------|---------------|
| Section | 5000 Students |
| Title | STUDENT CONDUCT |
| Code | po5500 |
| Status | Active |
| Adopted | May 25, 2011 |

### 5500 - **STUDENT CONDUCT**

Respect for law and for those persons in authority shall be expected of all students. This includes conformity to school rules as well as general provisions of law affecting students. Respect for the rights of others, consideration of their privileges, and cooperative citizenship shall also be expected of all members of the school community. The Board of Education has zero tolerance of violent, disruptive, or inappropriate behavior by its students.

Respect for real and personal property; pride in one's work; achievement within the range of one's ability; and exemplary personal standards of courtesy, decency, and honesty shall be maintained in the schools of this District.

Students may be subject to discipline for violation of the Code of Conduct/Student Discipline Code even if that conduct occurs on property not owned or controlled by the Board but that is connected to activities or incidents that have occurred on property owned or controlled by the Board, or conduct that, regardless of where it occurs, is directed at a Board official or employee, or the property of such official or employee.

Student conduct shall be governed by the rules and provisions of the Student Code of Conduct/Student Discipline Code. This Code of Conduct/Student Discipline Code shall be reviewed annually.

**© Neola 2005**

| Legal | R.C. 3313.20, 3313.534, 3313.66, 3313.661 |
|-------|--------------------------------------------|

# Exhibit D



# HIGH SCHOOL
# STUDENT HANDBOOK
## 2022-2023



Adopted by the Board of Education on March 24, 2022.
Technical corrections June 23, 2022.

# OLENTANGY SCHOOLS

Administrative Offices
7840 Graphics Way
Lewis Center, OH 43035
740-657-4050
http://www.olentangy.k12.oh.us

## BOARD OF EDUCATION

| | |
|---|---|
| Mr. Kevin O'Brien | Board President |
| Dr. LaKesha Wyse | Board Vice President |
| Dr. Kevin Daberkow | Board Member |
| Mr. Brandon Lester | Board Member |
| Dr. Elizabeth Wallick | Board Member |

## HIGH SCHOOLS

Olentangy Berlin High School
3140 Berlin Station Road
Delaware, OH 43015
740-657-5900

Olentangy High School
675 Lewis Center Road
Lewis Center, OH 43035
740-657-4100

Olentangy Liberty High School
3584 Home Road
Powell, OH 43065
740-657-4200

Olentangy Orange High School
2840 East Orange Road
Lewis Center, OH 43035
740-657-5100

## PROGRAMS

OASIS
814 Shanahan Road
Lewis Center, OH 43035
740-657-4331

Olentangy Academy
774 Graphics Way
Lewis Center, OH 43035
740-657-5800

Academy for Community Transition (ACT)
STEM Academy (science, technology, engineering, and math)

Final 3.24.2022  mrr
Technical corrections 6.23.2022  mrr

## Table of Contents

INTRODUCTION .................................................................................................................................1

    FOREWORD _____ 1
    MISSION STATEMENT_____ 1
    VISION STATEMENT _____ 1
    DISTRICT INFORMATION SOURCES _____ 1
    EQUAL EDUCATION OPPORTUNITY / PROHIBITION AGAINST DISCRIMINATION _____ 1
    ONLINE ACCESS TO STUDENT INFORMATION _____ 2
    SCHOOL CLOSINGS AND DELAYS _____ 2

ATTENDANCE ................................................................................................................................3

    HIGH SCHOOL HOURS _____ 3
    PARENTAL CONTACT REGARDING STUDENT ABSENCES_____ 3
    ABSENCES, TARDINESS, AND TRUANCY _____ 3
    EXCUSED ABSENCES _____ 4
    UNEXCUSED ABSENCES _____ 5
    ILLNESS WHILE AT SCHOOL_____ 5
    EARLY DISMISSAL OF STUDENTS _____ 5
    EXTRA- AND CO-CURRICULAR DAY PARTICIPATION_____ 6
    REVIEW PANEL _____ 6
    INCENTIVE PROGRAMS _____ 6
    COLLEGE VISITATION PROCEDURES _____ 6
    SPECIAL ABSENCES _____ 6
    WITHDRAWAL FROM SCHOOL_____ 7

CODE OF CONDUCT .......................................................................................................................8

    IMPORTANT NOTICES _____ 8
    CODE OF CONDUCT VIOLATIONS _____ 9
    ALCOHOL, TOBACCO, AND DRUG PREVENTION GUIDELINES _____ 12
    HAZING, HARASSMENT, INTIMIDATION, BULLYING, AND SEXUAL HARASSMENT _____ 16
    DRESS CODE _____ 18
    CAFETERIA RULES _____ 19
    DISCIPLINE OPTIONS _____ 19
    DUE PROCESS AND RIGHT OF APPEAL _____ 22
    DANCES _____ 22
    DRIVING REGULATIONS _____ 23
    HALL PASSES _____ 24
    QUESTIONING OF STUDENTS BY LAW ENFORCEMENT _____ 24
    SCHOOL'S RIGHT TO SEARCH _____ 24

TRANSPORTATION ..........................................................................................................................26

    BUS RULES _____ 26
    BUS PASSES _____ 28

CURRICULUM, INSTRUCTION, AND ASSESSMENT ...........................................................................29

    ALTERNATE EDUCATION PROGRAMS _____ 29
    CLASS SCHEDULES _____ 29
    SCHOOL COUNSELOR SERVICES _____ 30
    COLLEGE CREDIT PLUS (CCP) _____ 30
    CREDIT FLEXIBILITY _____ 31
    EQUITY AND INCLUSION PROGRAM _____ 31
    FIELD TRIPS _____ 31
    GIFTED SERVICES_____ 32
    LIBRARY/MEDIA CENTER _____ 32
    PE WAIVER _____ 32
    WORK PERMITS _____ 32

TECHNOLOGY USAGE POLICY ........................................................................................ 33

GRADING ................................................................................................................. 37

    CLASS RANK .......................................................................................................... 37
    GRADE CLASSIFICATION ......................................................................................... 37
    GRADING INFORMATION ......................................................................................... 37
    GRADING SCALES ................................................................................................... 38
    HIGH SCHOOL CREDIT BELOW THE NINTH GRADE ...................................................... 38
    NATIONAL HONOR SOCIETY .................................................................................... 39
    REPORT CARDS ..................................................................................................... 39

GRADUATION .......................................................................................................... 40

    DIPLOMA DEFERRAL .............................................................................................. 40
    EARLY GRADUATION .............................................................................................. 40
    GRADUATION REQUIREMENTS ................................................................................ 40
    GRADUATE ACADEMIC RECOGNITION ..................................................................... 40
    POLICY ON ACADEMIC ACCELERATION, EARLY ENTRANCE TO KINDERGARTEN, AND EARLY HIGH SCHOOL GRADUATION ................................................................................................. 41
    TRANSCRIPTS ....................................................................................................... 42

HEALTH AND SAFETY ................................................................................................ 43

    HEALTH REGULATIONS .......................................................................................... 43
    ANIMALS IN SCHOOLS AND ON DISTRICT PROPERTY .................................................. 43
    CONTROL OF CASUAL-CONTACT COMMUNICABLE DISEASES ....................................... 44
    DISTRICT SAFETY PLAN .......................................................................................... 44
    HEALTH SCREENINGS ............................................................................................. 44
    HOMEBOUND INSTRUCTION ................................................................................... 44
    ILLNESS / INJURY .................................................................................................. 45
    MEDICAL CONCERNS ............................................................................................. 45
    NON-SMOKING / VAPING POLICY ............................................................................ 45
    STAY SAFE. SPEAK UP! ........................................................................................... 45
    SUICIDE PREVENTION RESOURCES .......................................................................... 45

GENERAL INFORMATION ........................................................................................... 46

    COPYRIGHT INFRINGEMENT ................................................................................... 46
    FEES .................................................................................................................... 46
    FEE COLLECTIONS AND FEE WAIVERS ...................................................................... 46
    FOOD SERVICE ...................................................................................................... 46
    FUNDRAISING ACTIVITIES ...................................................................................... 47
    INTRADISTRICT TRANSFERS ................................................................................... 47
    LOCKER ASSIGNMENTS .......................................................................................... 47
    LOST AND FOUND ................................................................................................. 48
    POSTERS / COMMUNITY ANNOUNCEMENTS ............................................................. 48
    PROCEDURES TO RESOLVE PARENT-TEACHER DISAGREEMENTS .................................. 48
    RELEASE OF STUDENT PHOTOS AND WORK ONLINE ................................................... 49
    RELEASE OF STUDENT PHOTOS AND MEDIA INTERVIEWS ............................................ 49
    RELEASE OF STUDENT RECORDS ............................................................................. 50
    UNAUTHORIZED USE OF THE BUILDING .................................................................... 50
    VALUABLE PERSONAL PROPERTY ............................................................................ 50

CO- AND EXTRA-CURRICULAR ACTIVITIES ................................................................... 51

    EXTRA-CURRICULAR ACTIVITIES ............................................................................. 51
    ATHLETIC ELIGIBILITY ............................................................................................ 51
    PAY TO PARTICIPATE ............................................................................................. 51
    SCHOOL CLUBS AND ORGANIZATIONS ..................................................................... 52

# INTRODUCTION

## FOREWORD

The Student Handbook was developed to provide specific information about certain policies and procedures relevant to being a student in Olentangy. Please take time to become familiar with the important information contained in this handbook and keep the handbook available for reference. Please note that the majority of information in our handbooks is standardized and applies to all students K-12. If you have any questions that are not addressed in this handbook, you are encouraged to talk to your teachers or the building principal. This handbook replaces all prior handbooks and other written material on the same subjects. If any of the policies or administrative guidelines referenced herein are revised, the language in the most current policy or administrative guideline prevails. Current Board policies and administrative guidelines are available on the district's website.

## MISSION STATEMENT

Our mission is to facilitate maximum learning for every student

## VISION STATEMENT

To be the recognized leader for high performance and efficiency in education

## DISTRICT INFORMATION SOURCES

The Olentangy Local School District offers a variety of ways to keep up with important news and information from our district:

Website – The district's website offers a wealth of information about Olentangy, including building information, district policies, school closings and delays, kindergarten registration, top news, the district strategic plan, Continuous Improvement Plan, and curriculum maps. Regularly visit the website.

Email Notification System – Parents/guardians will receive news, announcements and updates via email from the district and the schools their children attend. Parents / guardians of Olentangy Schools students are automatically registered for email notifications based on their PowerSchool account information. To learn more, visit the Email Notification System webpage.

Calling System – Parent / guardian calling, email and text message contact information is based on their PowerSchool account. For instructions on how to update your PowerSchool account information, please view the Back-to-School Forms and PowerSchool Update Instructions.

Social Media – Follow the district on the following social media channels:  Facebook, Twitter, Instagram, and Linkedin.

Mobile App – The district's free mobile app makes it easy to receive customizable school news, school building and district calendars, push notifications, texts messages, phone calls and more – all sent directly to your smartphone and mobile devices. The Olentangy Schools app is available for download for iPhone and Android users in the app store (iTunes, Google Play).

## EQUAL EDUCATION OPPORTUNITY / PROHIBITION AGAINST DISCRIMINATION

This district provides an equal educational opportunity for all students. The Olentangy Local School District is committed to having an environment free from all discrimination, including harassment, intimidation, or bullying on the basis of race, color, national origin, sex (including sexual orientation and transgender identity), disability, age, religion, ancestry, or genetic information. The district prohibits harassment, intimidation, or bullying in the school environment, including all academic, extracurricular, and school-

sponsored activities. A student who violates this prohibition will be subject to the potential penalties set forth in the Code of Conduct Discipline section of this handbook.

A staff member, any student or student's parent or legal custodian who believes that a student has been subjected to harassment, intimidation, or bullying on the basis of race, color, national origin, sex (including sexual orientation and transgender identity), disability, age, religion, ancestry, or genetic information may seek resolution of his/her complaint through the district's complaint procedures.

The district employee responsible for receiving and/or investigating reports of harassment are:

Randy Wright                              Peter Stern
Chief of Administrative Services          Assistant Director, Equity and Inclusion
randy_wright@olsd.us                      peter_stern@olsd.us
740-657-4050                              740-657-4050

For more information about the district's prohibition against bullying, harassment, and discrimination, please see Board Policies 5517, 5517.01, 5517.02, and 5517.03.

Furthermore, Olentangy Local School District complies with federal laws that prohibit discrimination in programs and activities receiving federal assistance. Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of race, color or national origin. The Americans with Disabilities Act (A.D.A.) and Section 504 of the Rehabilitation Act of 1973 prohibits discrimination on the basis of handicap. Title IX of the Education Amendments of 1972 prohibits discrimination on the basis of sex. The Age Discrimination Act of 1975 prohibits discrimination on the basis of age. Olentangy Local Schools also complies with the Family Education Rights and Privacy Act of 1994 and grants parents/guardians the right to examine children's official school records. Inquiries regarding unlawful discrimination may be directed to the building principal or the district compliance officer.

## ONLINE ACCESS TO STUDENT INFORMATION

Students and parents are able to access information via a web-based system:

- Students use their myOLSD account to access curriculum resources, report cards, and additional individual student information. Students can access myOLSD from the Students dropdown menu on the district website.

- Parents can access student lunch account and transportation information via their PowerSchool account. In addition, parents can access student courses, class materials, online assignments, and course calendar information via their Schoology account. Parents can access Schoology and PowerSchool from the Parents dropdown menu on the district website.

The district website can be found at https://www.olentangy.k12.oh.us.

## SCHOOL CLOSINGS AND DELAYS

In the event of inclement weather, school delays and closings will be posted on the district website. Delay and closing information will also be reported using an automated phone system, text message, social media, the email notification system, local television stations (Channels 4, 6, 10 and 28), radio stations (FM Channels 92.3, 94.3, 94.7, 97.9, 99.7, 103.9, 103.5/104.3, 104.9, 105.7 and 107.9 and AM Channels 610, 920, 1490 and 1550), and the district's mobile app. There may be times when it is necessary to dismiss school during the day because of an emergency. In such instances, parents will be contacted using the district's automated phone system. Parents are urged to make arrangements with a neighbor or friend so that their child will have a place to go in case of an emergency if a parent/adult is not home.

# ATTENDANCE

## HIGH SCHOOL HOURS

The high school is in session from 7:20 a.m. until 2:35 p.m. Students arriving before 7:10 a.m. are to wait in either the commons or main lobby areas. No student should be in any other area of the building without permission prior to 7:10 a.m. Students not involved in extra-curricular activities or not supervised by a school staff member must leave the building by 3:00 p.m.

## PARENTAL CONTACT REGARDING STUDENT ABSENCES

If a student is absent from school, a parent or guardian must notify the attendance office to inform the **school of their student's absence. Without this notification, Ohio law requires that**, within 120 minutes after the beginning of each school day, the school **shall make at least one attempt to contact a student's parent**, guardian, or other person having care of the student. Contact shall be made through one of the following methods:

a. A telephone call placed in person:

b. An automated telephone call:

c. **A notification sent through the school's automated student information system;**

d. A text-based communication:

e. **A notification sent to the electronic mail address of the parent, guardian, or other person's wireless** communication device:

f. A visi**t, in person, to the student's residence of record.**

## ABSENCES, TARDINESS, AND TRUANCY

**ABSENCES AND TARDIES**

The following definitions determine how student absences from school are recorded. See Board Policy 5200 for additional rules regarding student absences.

Tardy – Students who arrive within 90 minutes of the school starting time will be considered tardy.

Half-Day Absence – Students who are in school for more than 90 minutes but less than 3 hours and 20 minutes will be considered a half-day (1/2 day) absent.

Full-Day Absence – Students who are in school for less than 3 hours and 20 minutes will be considered a full-day absent.

Early Departure – Students who leave within 90 minutes of the end of the day will be considered a p.m. tardy.

After school begins, students are required to report to the attendance office immediately upon arrival to obtain an Admit Slip.

- Each student will be permitted one tardy per quarter.

- On the second, third and fourth unexcused tardies in a quarter, a detention may be issued and a parent conference may be requested.

- On the fifth and subsequent unexcused tardies in a quarter, a Wednesday or Saturday School, or a similar consequence, may be issued and a parent conference may be requested.

Special note regarding students 18 years of age and older: If, during the school year, the student accumulates 21 or more unexcused absences, the school may proceed with a recommendation to withdraw the student from school for non-attendance.

## EXCESSIVE ABSENCES

Per Ohio law, the school will notify a student's parent/guardian whenever a student is absent from school with combined nonmedical excused absences and unexcused absences in excess of

    a.   thirty-eight (38) or more hours in one (1) school month or

    b.   sixty-five (65) or more hours in one (1) school year

## HABITUAL TRUANCY

Students shall arrive at school and be in the classroom for each of their assigned classes at the properly scheduled time. Per Ohio law, a student will be considered habitually truant if the student is absent without a legitimate excuse

    a.   for thirty (30) or more consecutive hours,

    b.   for forty-two (42) or more hours in one (1) school month, or

    c.   for seventy-two (72) or more hours in one (1) school year.

When a student is habitually truant, the district will convene an Absence Intervention Team, to which the student's parent/guardian will be invited. The team will develop an Absence Intervention Plan to improve the student's attendance. If the student fails to make progress on the plan the district will report the student to juvenile court (Ohio Revised Code §3321.19).

Excessive Absences and Habitual Truancy Summary Chart

|  | Consecutive Hours | Hours per School Month | Hours per School Year |
|---|---|---|---|
| Excessive Absences | Not Applicable | Thirty-eight (38) Hours<br>With combined nonmedical excused absences and unexcused absences | Sixty-five (65) Hours<br>With combined nonmedical excused absences and unexcused absences |
| Habitual Truancy | Thirty (30) Hours<br>Without a legitimate excuse | Forty-two (42 Hours<br>Without a legitimate excuse | Seventy-two (72) Hours<br>Without a legitimate excuse |

## EXCUSED ABSENCES

The following are typical conditions that may excuse a student from school attendance:

    a.   Personal illness or injury (a medical verification note may be required by the school principal);

    b.   Family illness - an emergency situation requiring the student to be absent from school;

    c.   Quarantine of the home by local health officials;

    d.   Death of a relative (limited to three days unless reasonable cause can be shown for a longer absence);

    e.   Observance of a religious holiday consistent with student's established creed or belief;

    f.   Good cause approved by the superintendent;

    g.   Emergency circumstances approved by the principal.

Students returning to school after an absence may bring a written note from their parents or guardian stating:

1. the dates of absences,
2. the reason for the absences,
3. the parent or guardian signature: and,
4. the parent or guardian phone number.

The student should report to the attendance office the day he/she returns to school. All students must obtain an Admit Slip the day of return. Absences documented with medical verification notes for each date absent will be excused.

## UNEXCUSED ABSENCES

Any student absences that cannot be confirmed with a medical note or parent contact upon or prior to the student's return to school may be subject to the following consequences:

1. On the first offense a student may be issued a detention.
2. On the second offense a student may be issued a Wednesday or Saturday School.
3. On the third offense a student may be issued In-School Detention.
4. On the fourth or subsequent offenses a student may be issued Out-of-School Suspension.

Any of the above consequences may be waived upon the submission of a written excuse for the absence(s) in question.

Students may be permitted to complete/submit work missed due to an unexcused absence for full credit. Students leaving school because of illness or other excused reason still require parent confirmation. After repeated absences, a doctor's note may be required to excuse future absences. Parent and or doctor's notes may be accepted by fax or email in the attendance office. Admit slips for absences should be obtained before the start of the school day. Failure to follow Attendance Guidelines may result in school discipline. It is the responsibility of the school to report all attendance concerns to the Juvenile Court. A court officer will follow procedures to ensure the regular attendance of all students.

## ILLNESS WHILE AT SCHOOL

If a student should become ill or injured during school, s/he must ask his/her teacher for a pass to the clinic. The school must obtain parental permission in order for a student to be released from school due to illness. Prior to leaving the clinic for home, students and/or parents must sign out in the attendance office.

If the student is sent home from school by the clinic staff for medical reasons, the absence for that school day will be counted as excused. Parents are requested to report all communicable diseases to the clinic. Being ill in the restroom for any extended period of time will not be accepted as an excuse to miss class. If a student is too ill to report to the clinic, notify the school office as soon as possible.

## EARLY DISMISSAL OF STUDENTS

Middle and high school students seeking an early dismissal should report to the attendance office before first period with a parent note stating the reason and time to be excused. The student will be given a pass that is to be shown to the classroom teacher before signing out. The reason for early dismissal must be explicit in order to be considered excused. In case of a medical appointment, the student should turn in a doctor's note upon their return to school in order for it to be excused. Students must never leave the

school building without permission and/or without signing out in the attendance office with custodial parent(s) or guardian approval. Failure to follow this procedure may result in school discipline.

## EXTRA- AND CO-CURRICULAR DAY PARTICIPATION

In order to participate in a school day extra-curricular/co-curricular activity, students must be in attendance four periods of the school day (or the half-day equivalent), not including lunch. A block scheduled class is equal to two regular class periods. Field trips, Alternate Learning Experiences, concurrent enrollment, medical/dental appointments, and special family situations may be excused by an administrator.

## REVIEW PANEL

Parents or students may request that a review panel examine their case if, in their opinion, there were extenuating circumstances that caused the student to exceed five absences in a class. A review panel will consist of a building administrator and four teachers chosen by the building administrator. The review will not take place until a Saturday School make-up has been arranged. The request for review must be received within five days after the end of the grading period.

## INCENTIVE PROGRAMS

Blue Card- Students who are not tardy or late to school during a grading period will be awarded a Blue Card which entitles them to one "free tardy" to school for any tardy in which the student arrives within the first twenty minutes after school begins. Blue Cards may not be used on scheduled two-hour late starts or weather-related delayed starts to the school day. The Blue Card is not transferrable to another student.

Gold/Platinum/Orange/Bear Card- Students who have perfect attendance during a grading period will be awarded a Gold/Platinum/Orange/Bear Card which entitles them to one free absence. The following restrictions apply to the use of this card:

1. Students must have their parent's permission in writing;

2. All teachers must acknowledge the absence on the acknowledgement form;

3. Students must inform the attendance office in advance of the planned absence;

4. The card is not transferrable to another student;

5. The cards may not be used during the last two weeks of a semester, or during district testing dates;

6. Cards must be used within the same school year, except for those earned during the last nine weeks (they must be used in the first quarter of the new school year).

## COLLEGE VISITATION PROCEDURES

Submit a College Visitation Request form to the attendance office in advance. College visitation days are limited to three days total per year and are only for 11th and 12th grade students.

## SPECIAL ABSENCES

Alternate Learning Experience (ALE) and Student Vacations During the School Year

The Olentangy Board of Education recognizes that educational experiences are not limited to those taking place within the building. It is desirable to afford students the opportunity to take advantage of an unusual opportunity to learn, provided those experiences have obvious educational benefits. Students may be required to submit a report or journal of their experience. Students are also permitted to take vacation with

their family during the school year. ALE and student vacation absence days count as absences and state laws about excessive absences still apply in these circumstances.

If approved, school absences due to an ALE or vacation will be considered excused and schoolwork missed during the experience may be made up. Teachers will not be required to give homework assignments prior to the absence. Upon receiving an ALE or vacation request, the building administrator will do one of the following:

   a. approve the request,

   b. give conditional approval to the request, or

   c. deny the request.

Requests that would cause a student significant academic risk may be conditionally approved by the building administrator pending the student satisfactorily achieving relevant academic expectations. It should be noted that additional days absent beyond the ALE or vacation could negatively impact the student academically. An ALE will not be approved for longer than 10 days. Absences that are not approved for an ALE or vacation may be marked as unexcused.

To be granted an Alternate Learning Experience or vacation request, the student will meet the following criteria:

   1. Submit an Alternate Learning Experience/Student Vacation Request Application one week prior to the proposed absence;

   2. Document a valid learning content to the alternate experience, if applicable;

   3. Demonstrate satisfactory attendance history; and

   4. The ALE request must not fall within district testing windows.

An ALE or vacation request will not be approved for applications submitted after the experience, if there are academic concerns, for experiences that fall within district testing windows. An ALE or vacation request may be denied at the discretion of the building principal. Multiple ALEs and vacation requests are discouraged from being submitted in the same academic year.

## WITHDRAWAL FROM SCHOOL

When withdrawing from Olentangy Local Schools, a parent or guardian must be present, sign the Withdrawal Notice, and the following must be met:

   a. All fees are paid, including library fines, etc.;

   b. Books are returned in satisfactory condition; and,

   c. Assigned work is completed.

**You must provide the address of the new school and your family's forwarding address. Your child's records** will be sent within 14 days of our receiving a request for records from the new school.

The superintendent is required to report those students who drop out of school to the Bureau of Motor Vehicles. The Bureau of Motor Vehicles may revoke the driver's license of the student.

## CODE OF CONDUCT

Olentangy Local Schools' **Code of Conduct** seeks to foster self-discipline in all students and maintain an appropriate educational atmosphere. First and foremost, the district is committed to implementing a system of Positive Behavioral Interventions and Supports (PBIS) to promote school safety and good behavior. All students are expected to be responsible citizens and to conduct themselves property and in accordance with Federal, State, and local laws, Board policies and Administrative Guidelines, and in a way that respects the rights and safety of others (Policy 5500-Student Conduct).

The Board believes that students should assume responsibility for their behavior and the consequences of their actions. The Board has zero tolerance of violent, disruptive, or inappropriate behavior by its students. (Policy 5600-Student Discipline)

Because the Board believes that students, staff members, and visitors are entitled to function in a safe school environment, students are required to report knowledge of dangerous weapons or threats of violence to the principal. Failure to report such knowledge may subject the student to discipline. In addition, sexual harassment of a student may reasonably be considered child abuse that must be reported to the proper authorities.

This Code of Conduct is in effect while students are under the authority of school personnel or involved in any school activity. This includes but is not limited to school buses and property under the control of school authorities, and while at interscholastic competitions, extracurricular events, or other school activities or programs.

In addition, this Code of Conduct includes 1.) Misconduct by a student that occurs off school district property but is connected to activities or incidents that have occurred on school district property; and 2.) Misconduct by a student that, regardless of where it occurs, is directed at a district official or employee or the property of an official or employee.

Furthermore, participation in extra-curricular activities, including interscholastic sports, is a privilege and not a right. Students may be prohibited from all or part of their participation in such activities for offenses or violations of the Student Code of Conduct or Athletic Code of Conduct. Students prohibited from participation in all or part of any extra-curricular activity are not entitled to further notice, hearing and/or appeal rights (see Policies 2431 – Interscholastic Athletics and 5610.05 – Prohibition from Extra-Curricular Activities).

Violation of the Code of Conduct may result in:

- Verbal or written warning or reprimand
- Parental contact or conference
- After-school, morning, or lunch detention
- Referral to school counselor
- Saturday or Wednesday School
- In-School Detention (ISD)
- Suspension Alternative Program (SAP)
- Out-of-School Suspension

- Emergency removal
- Referral to law enforcement agencies
- Expulsion
- Permanent Exclusion
- Compensatory payment of damages
- Loss of bus privileges
- Loss of other privileges

## IMPORTANT NOTICES

Discipline of Students with Disabilities – Students with disabilities are entitled to the rights and procedures afforded by the Individuals with Disabilities Education Improvement Act (I.D.E.I.A.), and, where

applicable, the Americans with Disabilities Act (A.D.A.), and/or Section 504 of the Rehabilitation Act of 1973 (Policy 5610).

Notification of Criminal Activity – School staff may report suspected criminal misconduct by a student to law enforcement. Law enforcement officers will be permitted to carry out necessary law enforcement functions in the schools, including the removal of a student from school grounds in appropriate circumstances.

Video Surveillance – For student safety and welfare, video surveillance cameras are placed throughout the district in buildings, on school grounds, and on buses. Actions recorded on these cameras may be used as evidence in disciplinary action and these records will remain in possession of the school/district.

## CODE OF CONDUCT VIOLATIONS

1. Disruption of School – Students shall not cause disruption or obstruction to the normal operation of this school or any other school or school district.

2. Harassment, Sexual Harassment/Violence, Bullying and/or Retaliation – Students or groups of students shall not harass, sexually harass, bully and/or retaliate against other students, school employees, persons that are guests of the school or persons conducting business for the school. This applies to but not limited to act or acts that create a hostile environment when it interferes with or limits a student's ability to participate in or benefit from the school's program. (Refer to Hazing, Harassment, Intimidation, Bullying, and Sexual Harassment/Violence section below)

3. Intimidation and / or Threats – Students shall not, through verbal, written, technological or any other means, make statements that state that physical or emotional harm may come to another person or to an institution. Bomb threats will result in a recommendation of expulsion from school.

4. Use of Obscene or Discriminatory Language / Materials / Actions / Gestures – Students shall not use obscene, vulgar, profane, or discriminatory language, make inappropriate gestures / actions or possess vulgar materials. Note: Discriminatory language is defined as verbal or written comments, jokes, and slurs that are derogatory towards an individual or group based on one or more of the following characteristics: race, color, national origin, sex (including sexual orientation and transgender identity), disability, age, religion, ancestry, or genetic information.

5. Attendance – No student shall fail to comply with state attendance laws including, but not limited to, truancy or tardiness from a specific class or school. No student shall leave school property or an assigned educational location once he or she has come under the supervision of a school employee, prior to specified dismissal times, without official permission.

6. Forgery – Students shall not misrepresent a signature on any document.

7. Damage of Property – Students shall not cause or attempt to cause damage of school property, including buses and bus seats, or personal property. Students shall not touch or handle another person's property without their authorization. Students must pay for any damages they cause to school equipment, materials or facilities and may be subject to additional disciplinary action. Anything, such as fire, that endangers school property and its occupants will not be tolerated. Arson is a felony.

8. Assault – Students shall not act or threaten to act in such a way as to cause physical injury to other students, any school employee, or other persons. Specific violations include but are not limited to:

    a. Fighting/Violence

    b. Serious bodily injury

    c. Threats or intentions of fighting, violence, or serious bodily injury (see #3 – Threats)

d. Unauthorized touching, pushing, shoving, slapping, snapping and/or hands on or threats to put hands on.

9. Failure to Obey Instructions / Insubordination/Disrespect – No student shall fail to comply with any lawful instructions or requests of teachers, student teachers, principals, or other authorized personnel during any period of time when he or she is properly under the authority of such school personnel. No student shall fail to provide information, or supply false information, when it is requested.

10. Dangerous Weapons and Instruments – Students shall not possess, handle, transmit or conceal any dangerous weapon or instrument on school property, in a school vehicle or at any school-sponsored activity. Bringing a firearm (as defined in the Federal Gun-Free Schools Act of 1994) onto school property, competition, extracurricular event, or other school sponsored event, regardless of where it occurs, will result in a mandatory one (1) year expulsion under Ohio law. This expulsion may be reduced on a case-by-case basis by the superintendent.

Firearms (including starter pistols), objects that are indistinguishable from and/or represented as firearms, explosives, incendiary devices, and knives (any object with a blade and a handle) are considered dangerous weapons. Other instruments/devices may also be defined as dangerous weapons depending on their use or intended use. Should a student have knowledge of a weapon or dangerous instrument on school property, in a school vehicle or at a school-sponsored activity and not report it to a school employee, the student may be held to the same disciplinary measures as that of the perpetrator. (Refer to Ohio Revised Code §2923.122.) Specific violations include but are not limited to:

a. Use, possession, sale, distribution, or knowledge of a firearm

b. Firearm is defined as any weapon (including a starter gun) that will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; or destructive device (as defined in the Federal Gun-Free Schools Act of 1994). Firearms include any unloaded firearm and any firearm that is inoperable but that can be readily operated.

c. Students are prohibited from knowingly possessing an object on school premises, in a school or a school building, at a school activity or on a school bus that is indistinguishable from a firearm, whether or not the object is capable of being fired, and indicating they are in possession of such an object and that it is a firearm or knowingly displaying or brandishing the object and indicating it is a firearm.

d. Use, possession, sale, distribution, or knowledge of any explosive, incendiary, or poison gas

e. Use, possession, sale, distribution, or knowledge of a dangerous weapon other than a firearm or explosive, incendiary, or poison gas (including knives and any other object with a blade and a handle)

f. A weapon is any device that may be used for offensive or defensive purpose, including but not limited to conventional objects such as guns, pellet guns, knives, or club type implements. It may also include any toy that is presented as a real weapon or reacted to as a real weapon. Possession and/or use of a weapon may subject a student to expulsion and possible permanent exclusion.

g. A knife is defined as any cutting instrument consisting of a sharp blade fastened to a handle, a razor blade or any similar device that is used for, or is readily capable of, causing death or serious bodily injury.

h. Any object that is used to threaten, harm, or harass another may be considered a weapon. This includes but is not limited to padlocks, pens, pencils, laser pointers, and jewelry.

     i.   Use, possession, sale, distribution, or knowledge of objects that are indistinguishable from and/or represented as firearms, explosives, incendiary devices, and knives.

11. Narcotics, Alcoholic Beverages and Drugs – Students shall not possess, use, transmit, conceal, make arrangements to sell or purchase, or use the aforementioned items immediately prior to or during school or a school function. Look-alike drugs and drug paraphernalia are included and will be dealt with accordingly. (See Alcohol, Tobacco and Drug Prevention Guidelines in the Code of Conduct section.) Specific violations include but are not limited to:

    a.   Use, possession, sale, distribution, or knowledge of intoxicating alcoholic beverages

    b.   Use, possession, sale, distribution, or knowledge of drugs other than tobacco or alcohol

12. Tobacco – Possession, consumption, distribution, purchase or attempt to purchase, and/or use of tobacco products or electronic cigarettes or similar devices in school, on school grounds, and at any interscholastic competition, extracurricular event, or other school-sponsored event is prohibited. Tobacco products include, but are not limited to cigarettes, clove cigarettes, cigars, pipe tobacco, chewing tobacco, snuff or any other matter or substance that contains tobacco. Paraphernalia used for the consumption of tobacco products is prohibited including e-cigarettes and vaping devices. Per Senate Bill 218, administrators may refer violators of the tobacco policy to the Delaware Juvenile Court.

13. Theft – Students shall respect the personal ownership rights of others. Students shall not take ownership of items of others. The principal may exercise the prerogative of reporting thefts to local authorities.

14. Academic Dishonesty – Students shall not give or receive unauthorized information regarding class work or class activities, misrepresent the results of researched or laboratory assignments, or give or receive unauthorized assistance on assignments. Use of electronic translators without permission is a violation of this rule. Repeated violations may result in failure of academic subjects.

15. Driving (applicable to High School only) – Students driving a vehicle on school property shall follow the rules and regulations established for this privilege. (Refer to the Code of Conduct – Driving Regulations section).

16. Dress Code – Refer to the Dress Code, in the Code of Conduct section.

17. Inappropriate Display of Affection – Students shall refrain from displays of affection. Students are not to hold hands, hug, kiss or demonstrate other similar acts of affection. In unusual circumstances involving sorrow or extreme joy, hugging is natural and acceptable.

18. Unauthorized or Unsupervised Areas – Students may not be in areas for which they have not been authorized or areas that are unsupervised.

19. Hazing (Initiations) – Initiations of any sort are prohibited. Initiations and/or hazing are those activities into which students are coerced in order to become part of a group or activity or to avoid harm.

20. Technology Misuse/Abuse – Computers/technology is provided for student use for teacher assigned work in courses or programs at the high school. Students may not use cell phones, including wearable technology and other electronic communication devices, except in designated areas and at designated times. (Refer to the Technology Usage Policy.)

21. Violation of Bus Rules – Students must follow all bus rules as outlined in the Bus Rules Code of Conduct section.

22. General Misconduct – Students shall refrain from throwing objects or being abusive or excessively disruptive in their behavior. Respect the rights and feeling of others.

23. Gross Misconduct – Repeated violations of the Code of Conduct.

     Back to Table of Contents

24.  Other violations – Other conduct violations not covered in the above rules.

## ALCOHOL, TOBACCO, AND DRUG PREVENTION GUIDELINES

The Board prohibits the use, possession, concealment, or distribution of any drug or any drug-related paraphernalia as defined by law, on school grounds, on school vehicles, or at any school-sponsored event. It further establishes a drug-free zone within 1000 feet of any facility used by the district for educational purposes (Policy 5530-Drug Prevention).

It is the primary objective of Olentangy Local Schools to assure that the education of all students proceeds in an efficient, orderly, and non-disruptive manner. Possessing, using, actual or attempted transmitting, buying, selling, or supplying of mood-altering chemicals or look-alike substances or paraphernalia on school premises is an obstacle to that objective and an interference with the rights of other students to receive quality academic instruction. While student drug education and referral to counseling resources will continue to be made available, such measures should be viewed as instructional or rehabilitative and will not ordinarily be considered as an alternative to the disciplinary measures specified in Section 9.

1.  <u>STATEMENT OF POLICY REGARDING STUDENTS</u>

    Students of Olentangy Local Schools, while on school property or at a school-sponsored activity, shall not possess, use, transmit, buy, sell, supply, or attempt to do so with a mood-altering chemical of any kind prior to or during the school day, at any school-sponsored activity or event or at any time while on school premises.

    a.  Definitions

        i.  "Possession" includes, without limitation: holding **in the student's hand, retention on the student's person or in purses, wallets, lockers, desks or any other personal** possessions, or vehicles parked on school property or at school functions.

        ii.  "Use of mood-altering chemical" is defined as manifesting signs of chemical misuse such as staggering, reddened eyes, odor of chemicals, nervousness, restlessness, memory loss, abusive language, falling asleep in class or any other behavior not normal for that particular student, or a preponderance of evidence that a student has used a mood-altering chemical.

        iii.  "Tobacco" includes any product containing tobacco or nicotine that is smoked, chewed, inhaled, or placed against the gums.

        iv.  "Mood-altering chemical" Includes, without limitation, alcohol, marijuana, inhalants, ecstasy or other club drugs, depressants, stimulants, hallucinogens, narcotics, over-the-counter medications (including any over-the-counter pain medications containing aspirin, acetaminophen, ibuprofen, or any other pain relievers, any cough or cold medications, etc.), substances such as Betel Nuts, Wite-Out, glue, toxic markers and caffeine pills. Prescription drugs are included, unless authorized by a medical prescription from a licensed physician and kept in the original container that states the student's name and directions for proper use, according to Policy 5330-Use of Medications. See also Medication section of this policy. This list is intended for example only and not as comprehensive list.

        v.  "Counterfeit controlled substance" or look-alike drug is (Ohio Revised Code §2925.01(O)) means any of the following:

            1.  Any drug that bears, or whose container or label bears a trademark, trade name or other identifying mark used without authorization of the owner of rights to that trademark, trade name or identifying mark.

2. Any unmarked or unlabeled substance that is represented to be a controlled substance/mood-altering chemical, manufactured, processed, packed, or distributed by a person other than the person that manufactured, processed, packed, or distributed it.

3. Any substance that is represented to be a controlled substance/mood-altering chemical but is not a controlled substance/mood-altering chemical or is a different controlled substance/mood-altering chemical.

4. Any substance other than a controlled substance/mood-altering chemical that a reasonable person would believe to be a controlled substance/mood-altering chemical because of its similarity in shape, size and color or its markings, labeling, packaging, distribution, or the price for which it is sold or offered for sale.

b. Jurisdiction

This policy extends to use of the above:

i. On or in close proximity to any property owned, leased by or under the control of the Olentangy Board of Education, including vehicles used for the transportation of students.

ii. During normal school hours, including recess, lunch and class changes, and summer school.

iii. At any school-sponsored or sanctioned activity or event away from or within the school district.

2. <u>STUDENT RESPONSIBILITY</u>

Students are responsible for understanding the Olentangy Alcohol, Tobacco, and Drug Prevention Guidelines and the counseling services available to them.

3. <u>PARENT RESPONSIBILITIES</u>

The Olentangy Board of Education recognizes that parents are primarily responsible for their children. The link between school and parents is the child. The effectiveness of these Alcohol, Tobacco, and Drug Prevention Guidelines will be assisted by the cooperative effort of the family, the school officials and the Board.

4. <u>STAFF RESPONSIBILITIES</u>

All Olentangy staff members have the responsibility to report all suspected cases of drug and/or alcohol use, misuse, or abuse by students to the appropriate school officials. Staff members will report to the building official alleged possession, use, actual or attempted transmitting, buying, selling, or supplying of mood-altering chemicals, counterfeit or look-alike substances or paraphernalia. Staff will immediately notify the principal or designee and may be required to submit a written report at a later time.

5. <u>SCHOOL OFFICIALS' RESPONSIBILITIES</u>

It is the responsibility of the school officials to inform students, staff and parents about the drug and alcohol abuse policy of this school district and to share with these audiences any available pertinent information regarding the extent of the drug and alcohol problem in the school.

Except for the persons directly involved in the students' education and except as otherwise provided herein, all matters concerning reports of drug or alcohol abuse shall be and remain confidential.

When a school official has reason to believe that a student is in violation of the drug/alcohol code of conduct, the following action will be taken:

a.   The student will be informed of the alleged offense, the evidence to support the allegations and the disciplinary action that may apply.

b.   If the student is in need of medical attention, the school nurse and/or the local emergency squad will be notified to give medical attention.

c.   The parent or guardian of the student will be notified and asked to meet with the school officials. Only in the case of medical emergency or if the parent(s) cannot be reached will the person on the student's emergency call list be notified.

d.   School officials will cooperate fully with law enforcement agencies and report to them any information that would be considered beneficial in their efforts to stem the use of drugs and alcohol.

e.   Notification to the local law enforcement agency shall be in accordance with the provisions under each offense. When reported, a written record shall be made of the incident to the law enforcement official who, at their discretion, may conduct an investigation.

6.   <u>MEDICATION</u>

The Olentangy Board of Education wishes to cooperate fully with students, parents, and the medical profession to ensure that students receive any required medication during the normal school day at the time that it is required. It is preferred that medications be administered to students at home; however, it is also recognized that certain circumstances may necessitate administering medications during school hours. Guidelines have been established to maintain control of authorized drugs within the schools and to ensure the health and welfare of students. In accordance with O.R.C. 3313.713, all medications must be kept in a locked storage place and administered by school personnel unless medically prescribed to self-carry. Effective July 1, 2011, only employees of the Board who are licensed health professionals or who have completed a drug administration training program conducted by a licensed health professional and considered appropriate by the Board may administer to a student a drug prescribed for the student.

7.   <u>DRUG PARAPHERNALIA</u>

Drug paraphernalia or instruments such as pipes, roach clips, syringes, pacifiers, hypodermic needles, cocaine spoons or kits, nitrous oxide paraphernalia, rolling papers, water pipes, and any other items normally or actually used for the packaging, conveyance, dispensation or use of mood-altering substances will not be permitted on any school property or (student and/or district) vehicles and will be subject to confiscation. Possession of drug paraphernalia will be treated the same as possession of a mood-altering substance. Addiction to an illegal substance may not be used as an excuse for a violation.

8.   <u>SEARCHES</u> **– See School's Right to Search**

9.   <u>OFFENSES AND DISCIPLINARY ACTION</u>

The actions set forth below will be considered routine disciplinary measures for each category and occurrence of offense. The penalties delineated below shall be considered the standard penalty to be imposed for the offenses described. In incidents where extreme violations occur, the specified

actions may be waived by the school official in favor of stronger measures such as longer suspensions (not to exceed ten days), expulsion or other appropriate action. At the hearing, the school official may consider matters in mitigation of the routine disciplinary measures.
School officials will follow the process below when handling level II & III offenses:

a. The rapid eye movement test may be administered for screening purposes. If the screening is positive, it will be recommended that the parents seek professional guidance with a certified chemical dependency counselor. Also, an investigation will be conducted by the legal authorities as to the source of the drug.

b. Parents will be notified immediately, and the student may be removed from classes or the school event.

c. Law enforcement officials may be notified and, at their discretion, conduct an investigation. In any instance in which it is illegal for a school official to possess or dispose of a mood-altering drug, law enforcement will be notified. School officials will notify law officials in the jurisdiction in which the offense occurs. School officials may file charges in the appropriate court.

d. Parents will consult with the principal or designee.

Detailed below are the levels of prohibited offenses and the consequences that will result from the **student's decision not to abide by the school policy. Violations are cumulative within grades 7**-12.

- Tobacco/Vaping
  Use or possession of tobacco, nicotine or paraphernalia used to consume tobacco products including e-cigarettes/vaping devices
- Level I Drug & Alcohol Offense
  Possession, use or application of any mood-altering chemical, as defined above
- Level II Drug & Alcohol Offense
  Actual or attempted transmitting, selling, supplying or purchasing of mood-altering chemicals, counterfeit or look-alike substance or paraphernalia

| Offenses | Tobacco/Vaping Consequences | Level I Drug & Alcohol Consequences | Level II Drug & Alcohol Consequences |
|---|---|---|---|
| First Offense | Three days Out-of-School Suspension | Ten days Out-of-School Suspension | Ten days Out-of-School Suspension with an expulsion recommendation |
| Second Offense | Three days Out-of-School Suspension | Ten days Out-of-School Suspension with an expulsion recommendation | Ten days Out-of-School Suspension with an expulsion recommendation |
| Third and Subsequent Offenses | Five days Out-of-School Suspension | Ten days Out-of-School Suspension with an expulsion recommendation | Ten days Out-of-School Suspension with an expulsion recommendation |

Suspension/Discipline Reduction Options

- Three (3) days Out-of-School Suspension may be reduced to one at the discretion of the administrator if student/parent agrees to enroll in and complete an assessment with a certified chemical dependency counselor as specified in Section 10. Following the assessment, the student must complete the required education program.

- Ten (10) days Out-of-School Suspension may be reduced to five (5) days at the discretion of the administrator if student/parent agrees to enroll in and complete an assessment with a certified chemical dependency counselor as specified in Section 10. Following the assessment, the student must complete the required education program.

10. <u>SELF-REFERRAL</u>

Students have the opportunity for a voluntary referral procedure to seek information, guidance, counseling and/or assessment in regard to the use or possession of tobacco, alcohol and other controlled or non-controlled substances. The student or his/her immediate family may make voluntary referrals.

For an alcohol and/or controlled substances/mood-altering chemicals referral, the student must have, within five days, an appointment for an assessment with a certified chemical dependency counselor and notify the principal or designee of the appointment. The student must participate in the assessment process (the cost of any and all assessment will be the responsibility of the student and/or parents) and follow the counselor's recommendations to completion. If treatment or counseling is recommended it must be with an Ohio-certified chemical dependency counselor. The student must waive his/her rights of confidentiality so that verification of this assessment and a written report can be given to the principal or designee.

For a tobacco referral, the student must, within five days, provide verification of enrollment in an out-of-school tobacco education/cessation program approved by the principal or designee. Parents must sign a release of information to the principal or designee so that the student's progress in the program can be followed and written verification of completion given to the principal or designee. The student must complete the program or receive the original discipline.

Voluntary referrals will not carry violation consequences on the first offense only. Voluntary referral must occur prior to any report of violations. Involvement by law enforcement officials negates the option of voluntary referral. The student may use the option of voluntary referral once in his/her career at Olentangy Local Schools.

Any subsequent violations will be enforced as a second or subsequent violation. If the student requesting the voluntary referral opportunity does not complete the assessment recommendations by the established time schedule, the violation consequence will be put into effect immediately.

## HAZING, HARASSMENT, INTIMIDATION, BULLYING, AND SEXUAL HARASSMENT

Hazing, harassment, intimidation, bullying, and sexual harassment are strictly prohibited and will not be tolerated. This applies to all activities in the district, including activities on school property, on a school bus, or while en route to or from school, as well as activities occurring off school property if the activity is school-sponsored, school-approved, or school-related activity or function, such as field trips or athletic events.

Hazing is defined as doing any act or coercing another, including the victim, to do any act of initiation into any class, team, or organization that causes or creates a substantial risk of causing mental or physical harm to any person.

Harassment, intimidation, or bullying is any intentional written, verbal, electronic, or physical act that a student has exhibited toward another particular student or students more than once and the behavior causes mental or physical harm to the other student(s) and is sufficiently severe, persistent or pervasive that it creates an intimidating, threatening or abusive educational environment for the other student(s). Sexual harassment includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal or physical conduct of a sexual nature. Sexual harassment may involve the behavior of a person

of either gender against a person of the same or opposite gender. It would include, but not be limited to, unwelcome propositions, unwanted physical and/or sexual contact, verbal expressions, patterns of conduct intended to create discomfort and/or humiliation, boundary invasions, and sexual violence. Sexual harassing creates a hostile environment when it interferes with or limits a student's ability to participate in or benefit from the school's program. It may be a single or isolated incident. Title IX protects against retaliation of reporting such acts. For more information about the **district's** Sexual Harassment and Sexual Violence procedures, please see Board Policy 5517.

Permission, consent, or assumption of risk by an individual subjected hazing, harassment, intimidation, bullying, or sexual harassment does not lessen the prohibition contained in this policy. Prohibited activities of any type including those activities engaged in via computer and/or electronic communications devices are inconsistent with the educational process and are prohibited at all times. No administrator, teacher, or other employee of the district shall encourage, permit, condone or tolerate any of these behaviors. No student, including leaders of student organizations, may plan, encourage, or engage in any of these behaviors.

Administrators, teachers, and all other district employees are particularly alert to possible conditions, circumstances or events that might include these behaviors. If any of these behaviors are discovered, involved students will be informed by the discovering district employee of the prohibition contained in this policy and are required to end the behavior(s) immediately. All hazing, harassment, intimidation, bullying, and sexual harassment incidents are reported immediately to the building administrator or other appropriate administrator. An investigation will result and shall include documentation of the event, response, and strategy for protecting the victim.

If the investigation finds an instance of hazing, harassment, intimidation, bullying, and/or sexual harassment, by an electronic act or otherwise, has occurred, it will result in prompt and appropriate remedial and disciplinary action. This will include suspension or up to expulsion for students. Furthermore, racist, sexist, or abusive comments or actions directed at others will not be tolerated and will result in suspension or up to expulsion.

If, during the investigation, the principal or appropriate administrator believes the reported misconduct may have created a hostile learning environment and may have constituted unlawful discriminatory harassment, said will report the act of to one of the Anti-Harassment Compliance Officers so that it may be investigated in accordance with the procedures set forth in Policy 5517.

A victim of sexual harassment has the right to file criminal and/or Title IX complaints simultaneously. A student does not need to wait until the Title IX investigation is completed before filing a criminal complaint or may also be filed with the **U.S. Department of Education's Office for Civil Rights. The district respects students' privacy and will only disclose information regar**ding alleged sexual violence to individuals who are responsible for handling the school's response, the student's parents (if the student is a minor or dependent under Section 152 of the Internal Revenue Code), or otherwise required by law. Students or pa**rents may ask that the student's name not be disclosed to the alleged perpetrators or that no** investigation or disciplinary action be pursued to address the alleged sexual violence which may limit the **district's** ability to respond fully to the incident, including pursuing disciplinary action against the alleged perpetrator. For more information about the **district's** Sexual Harassment and Sexual Violence procedures, please see Board Policy 5517.03.

Retaliation against any person who reports or is thought to have reported or otherwise participates in an investigation/inquiry related to a complaint of hazing, harassment, intimidation, bullying, sexual harassment, and violence is prohibited. Deliberately making false reports for the purpose of getting someone in trouble is similarly prohibited and will not be tolerated. Deliberately making false reports or retaliation may result in disciplinary action.

The Superintendent/designee must provide the Board President with a semiannual written report of all reported incidents of bullying and post the report on the district's website. For more information, please refer to Board Policy 5517, 5517.01. The **district's** policy and consequences for violations of the policy **shall be sent annually to each student's** custodial parent or guardian. The statement may be delivered electronically.

The student athlete may be denied participation in athletics for violation of this policy and may be subject to Code of Conduct violation.

## DRESS CODE

The Olentangy Local School District is committed to providing a safe, friendly learning environment for its students. No article of clothing shall be worn that distracts from the educational process. Building administrators have the final decision as to the appropriateness of all clothing and attire.

Following are guidelines for students:

1. Clothing must cover areas from one armpit across to the other armpit, down to the thighs.
2. Tops must have shoulder straps.
3. Shorts and skirts must reach the mid-thigh.
4. Appropriate footwear must be worn at all times and should be safe for the school environment.
5. See-through or mesh garments must not be worn without appropriate coverage underneath that meets the minimum requirements of the dress code.
6. Any clothing or statement that may cause a hostile, intimidating, degrading, offensive, harassing or discriminatory environment, or promotes vulgar, illegal (including alcohol, drugs, tobacco), or lewd behavior is prohibited.
7. Sunglasses will not be permitted in school unless worn for medical purposes or approved by the principal.
8. Head coverings are only permitted for religious or medical purposes, unless approved by a principal.
9. Accessories featuring spikes or other sharp or dangerous objects are prohibited.

Some school programs, such as industrial arts, laboratory activities, physical education and interscholastic athletics may require special hair care, clothing, footwear, or restrictions on jewelry to ensure the health and safety of all students.

Failure to comply with the Dress Code guidelines is considered to be an insubordinate act and will be treated as such. Following are the procedures for violations of the school Dress Code:

1. First Offense: The student will be sent to the main office. Student will change clothes or will be sent home to change his/her clothes. Inappropriate accessories will be confiscated. If the student is sent home, this absence will be treated as an unexcused absence. Any class work missed during an unexcused absence may be made up for full credit. Student may be placed in ISD until appropriate clothing can be obtained.
2. Second Offense: Same as 1st offense. In addition, the student may be assigned to detention. Parents will be contacted.

3. Third Offense: Same as 1st and 2nd offense. In addition, the student may be assigned to Saturday/Wednesday School.

4. Further Offenses: The student may be suspended from school.

## CAFETERIA RULES

The following common courtesies are expected of our students during lunch:

- Moving ahead of others in the lunch line is unacceptable.

- Loud talk and noise are not appropriate behavior.

- Throwing food, paper or other items is unacceptable.

- All trash/trays in your area must be disposed of properly.

- Treat everyone with respect.

- Pay for all food.

- Ask permission to leave your seat (elementary and middle school).

- A signed pass must be presented to leave the cafeteria (high school).

At the discretion of the cafeteria duty teacher, high school seniors (only) may eat on the patio during their lunch periods. Students are not permitted in unauthorized areas. Failure to obey this rule may result in school discipline.

Students may use designated restrooms during lunches. Designated restrooms will be different in each building. Students will be permitted in the school store during lunch periods to purchase items. After visiting the store, students are to return to the commons.

## DISCIPLINE OPTIONS

### DETENTION

Detention is generally served after school for duration of 30-45 minutes. At times, detention can be served in the morning if arrangements are made. Students are notified of the infraction and are to serve the detention on the "to be served" date listed on the detention slip. The parents will receive a copy of the detention slip, which will be sent home with the student. Transportation home after detention is the responsibility of the student/parent. All school rules apply while serving detention. Failure to serve assigned detention may result in further disciplinary action.

### LUNCHTIME DETENTION

Occasionally it becomes necessary to discipline a student for violating the established school rules or Code of Conduct. In an effort to deter such actions and hold students accountable for their behavior, detention during lunchtime may be assigned. Students are to report to the assigned room for the entire lunch period. Cafeteria privileges for that day are lost. Failure to return the signed detention slip or failure to serve the detention may result in the assignment of an After-School Detention.

### SATURDAY OR WEDNESDAY SCHOOL

Students may be assigned to a Saturday or Wednesday School. Please refer to the Saturday or Wednesday School form for specific times and directions. Saturday and Wednesday School guidelines follow:

1. Absence from an assigned Saturday or Wednesday School, without prior approval of an administrator, may result in a suspension.

2. Students are to sign in upon arrival.

3. Students are to bring schoolwork.

4. Talking is not permitted.

5. Appropriate breaks will be determined by the monitor.

6. Parents will be notified of assigned Saturday or Wednesday School and students are also to inform parents.

7. No sleeping will be permitted.

## IN-SCHOOL DETENTION (ISD)

1. Students serving In-School Detention shall be permitted to make up and receive credit for assignments during In-School Detention.

2. Students are to bring schoolwork.

3. Parents will be notified of In-School Detention.

4. Guidelines for ISD will be issued and discussed upon assignment of the student to this detention.

## SUSPENSION ALTERNATIVE PROGRAM (SAP)

Suspension Alternative Programs may be assigned for students in lieu of Out-of-School Suspension.

1. Students must successfully complete each full day, including community service work in area parks or other designated areas, and any other program components.

2. Besides work (e.g., picking up litter in the parks) students will have a short break, lunch, and a study session.

3. Upon completing the program, students will have earned the right to make up work missed while serving SAP.

4. The Delaware Area Career Center (DACC) bus will take students from their home school at about 7:10 a.m. and drop them off at the pick-up point at DACC to be picked up by Juvenile Court personnel. At the completion of the day, students will be dropped off at DACC and take the Olentangy bus **back to their home school. The bus will arrive at the student's home school prior to the student's normal dismissal time.**

5. The program supervisor will transport the students to the work area.

6. Students will receive credit for participation based on their work performance and overall behavior.

7. Students may be required to repeat any segment of the program if they only earn partial credit.

8. **The supervisor will report the student's behavior to the school and to the probation counselor, if** applicable.

9. Students must dress appropriately for the weather and wear hard shoes. Students should bring their own lunch, including a drink.

10. Students must follow all school and juvenile court policies.

## OUT-OF-SCHOOL SUSPENSION (OSS)

The principal or designee may suspend a student from school for a period of up to ten (10) days for violation(s) of the Code of Conduct.

1. Parents will be notified of the suspension and may be asked to take the student home. The student may not attend school through the length of the suspension.

2. Students will be permitted to make up class work, quizzes, tests, papers, and/or major projects missed while serving Out-of-School Suspension for full credit.

3. **Parents will be notified of the student's rights to appeal.**

4. Students may not attend any school functions, home or away, while serving Out-of-School Suspension.

5. Students serving Out-of-School Suspension may not be present on school property, participate or attend any school activities or contests, or be present at activities or on property controlled by the school, unless an exception is made by the school administrator.

EMERGENCY REMOVAL

**If a student's presence poses a continuing danger to persons or property, or an ongoing threat of** disrupting the academic process, then the superintendent, principal or assistant principal, or personnel employed to directly supervise or coach a student activity, may remove the student from the school premises. If school personnel make an emergency removal, reasons will be submitted to the principal in writing as soon after the removal as practical. In all cases of normal disciplinary procedures where a student is removed from a curricular or extracurricular activity for less than 24 hours and is not subject to suspension or expulsion, the due process requirements do not apply.

If either suspension or expulsion is contemplated, then a due process hearing will be held within three school days after the removal is ordered. Written notice of the hearing and the reason for removal and any intended disciplinary action will be given to the student as soon as practical prior to the hearing. The student will have the opportunity to appear at an informal hearing before the principal, assistant principal, superintendent, or designee and has the right to challenge the reasons for the intended suspension or otherwise explain his/her actions. The person who ordered or requested the removal will be present at the hearing. Within one school day of the decision to suspend, written notification will be given to the parent, guardian or custodian of the student and Treasurer of the Board of Education. This notice will include the reasons for the suspension and the right of the student or parent to appeal to the superintendent or his/her designee.

If the superintendent or principal reinstates a student prior to the hearing for emergency removal, the teacher may request and will be given written reasons for the reinstatement. The teacher cannot refuse to reinstate the student.

In an emergency removal, a student can be kept from class until the matter of his/her misconduct is disposed of either by reinstatement, suspension, or expulsion.

PERMANENT EXCLUSION

In accordance with the law, the Board of Education may seek to permanently exclude a student, 16 years of age or older, who has been convicted of or adjudicated delinquent for the reason of the following offenses:

1. Carrying a concealed weapon or conveying or possessing a deadly weapon or dangerous ordnance on property owned or controlled by a board of education or at an activity held under the auspices of this Board:

2. Possessing, selling, or offering to sell controlled substances on property owned or controlled by a board of education or at an activity under the auspices of this Board: and/or

3. Complicity to commit any of the above offenses, regardless of where the complicity occurred.

In accordance with law, any student, 16 years of age or older, who has been convicted or adjudicated delinquent for committing the following offenses may be subject to permanent exclusion:

1. Rape, gross sexual imposition or felonious sexual penetration:
2. Murder, manslaughter, felonious or aggravated assault;
3. Complicity to commit offenses described in paragraphs A and B, regardless of where the complicity occurs.

EXPULSION

If all other attempts to modify student behavior are unsuccessful, or a serious violation of the Code of Conduct is committed, the student may be recommended for expulsion from school. If a student is expelled, the length of the expulsion may be up to eighty (80) school days, and in some cases for an entire year. Expulsions may extend into the following semester or school year. Schoolwork missed as a result of expulsion may not be made up.

## DUE PROCESS AND RIGHT OF APPEAL

When a student is being considered for an Out-of-School Suspension by the superintendent, principal, or other administrator:

1. The student will be informed in writing of the potential suspension and the reasons for the proposed action.
2. The student will be afforded an opportunity for an informal hearing to challenge the reason for the intended suspension and to explain his/her actions.
3. An attempt will be made to notify parents or guardians by telephone if a suspension is issued.

Students may be permitted to make up class work, tests, papers, and/or major projects missed while serving Out-of-School Suspension for full credit.

If the assigned school discipline is served entirely in the school setting, it will not require any notice or meeting or be subject to appeal.

The pupil, parent, guardian, or legal custodian may file an appeal of the administrative decision to suspend or expel a pupil to the Board of Education or designee by filing a notice of appeal in writing with the treasurer within 14 calendar days of the formal written notice of suspension or expulsion to the parent, guardian, or custodian of the pupil. Failure to timely file an appeal in this manner waives any right to appeal the suspension or expulsion.

## DANCES

For high school, dances are open to district students only with the exception of prom and homecoming(s). All dances are open to students in grades 9-12 only. All other guests must be pre-approved by the administration. Some dances may be designated as advance ticket sales only.

For middle school, only students from the sponsoring middle school will be admitted. No guests will be allowed. Also, the sponsoring organization is expected to assist with cleanup after the dance. Expectations for both middle and high school students include appropriate dancing (administration has a right to determine what is appropriate or not), beverages and food are not permitted in the gym, once students leave they are not permitted to return, and chaperones are required at all school dances.

High school students and their guests attending dances will acknowledge the following:

- Dance admission fees are non-refundable.

- Use or possession of tobacco, drugs, alcohol, and any mind-altering substances are not permitted for the protection and safety of everyone.

- The parking lot is off-limits unless students are entering or leaving the dance. Loitering will not be permitted.

- There are no re-entries. Once the student leaves the dance, he/she may not return.

- Students will be required to demonstrate good character, maintain high community standards, follow all dance rules, and be courteous to all students and chaperones.

- Sexually explicit or dangerous dancing will not be permitted at any time. Sexually explicit dancing includes:  freaking, grinding, inappropriate or vulgar backside dancing or any other type of dancing **which could be construed as provocative or vulgar. Dangerous dancing includes violent or "mosh pit" style dancing.**

Any deviation from these rules may lead to removal from the dance and/or appropriate school consequences. The purpose of this code of conduct is to promote healthy, safe, and enjoyable dances for all students. The above behavior expectations are designed to ensure a positive dance environment.

## DRIVING REGULATIONS

In the interest of student safety, provisions have been made to provide bus transportation for all students to and from school. Those students granted permission to operate a vehicle should understand that driving their vehicles to school is a privilege that may be revoked by the school authorities in the event a student violates any of the guidelines pertaining to the Driving Regulations. In order to obtain a parking permit, students may be placed in the random drug testing pool.

The Olentangy Local Schools assumes no responsibility or liability for injuries to persons or for damage to or loss of contents from any vehicle while on school property.

Any student wishing to drive to school must abide by all applicable state laws and the following rules:

1. Students with a probationary license must obey all applicable restrictions.

2. Students must observe a proper speed while on the school grounds.

3. Students must park only in the designated parking spots within the proper student parking lot.

4. Students may not park in faculty or visitor parking lots.

5. Students are not to drive on the grass.

6. School buses have the right-of-way at all times.

7. Driving privileges may be denied for violation of Attendance Policies (to include absences, tardies and/or leaving school without permission).

8. To be issued a parking permit, students are to complete a Pupil Driving Permit Registration and Agreement form. A parking fee will be charged. The permit must be displayed from the front mirror of the car that is being driven to school.

9. Violation of these rules may result in suspension of driving privileges for a period of time to be determined by the principal or designee.

Loss of Driving Privileges: The superintendent of the school district may revoke driving privileges if a student of compulsory school age has:

1. Been absent without legitimate excuse for more than ten consecutive days or a total of at least fifteen school days;

                                    Back to Table of Contents

2. Withdrawn from school for a reason other than a change of residence and is not enrolled in and attending an approved program to obtain a diploma or its equivalent;

3. Been suspended or expelled from school and the reason for the suspension or expulsion is the use or possession of alcohol and/or drugs; or,

4. Been suspended or expelled from school pursuant to Ohio Revised Code 2923.122 (A), (B), (D) and (E) (1), knowingly conveying, or attempting to convey, a deadly weapon or dangerous ordnance, knowingly possessing a deadly weapon or dangerous ordnance on school premises, in a school or school building, at a school activity or on a school bus.

The superintendent may be required to notify the registrar of motor vehicles and the juvenile judge of the county. The registrar of motor vehicles is required to suspend the temporary instruction permit or driver's license of the student who is the subject of the notice. If a temporary permit or license has not been issued for that student, the registrar is prohibited from issuing a temporary permit or a license.

Denial of privileges will remain in effect until the student reaches age 18, or until the denial is terminated for another reason allowed by law. The student will have an opportunity to present evidence that s/he has not been habitually absent without legitimate excuse.

## HALL PASSES

No student may be out of his assigned classroom without an approved pass.

## QUESTIONING OF STUDENTS BY LAW ENFORCEMENT

The school is committed to protecting students from harm that may be connected with the school environment and also recognizes its responsibility to cooperate with law enforcement and public child welfare agencies. While the school believes these agencies should conduct their investigations off school property if possible, investigations can take place at school in emergency situations or if the violation being investigated occurred on school property.

Before students are questioned by law enforcement or child welfare agencies as witnesses or suspects in an alleged criminal violation, the building administrator will attempt to contact a parent prior to questioning and shall remain in the room during questioning.

If a student is questioned as the subject of alleged child abuse or neglect, the building administrator will attempt to contact a parent prior to questioning, and s/he (or a designated guidance counselor) will remain in the room during questioning. If the agency investigating the alleged child abuse or neglect suspects the parent is the perpetrator, neither parent will be contacted prior to questioning, but the building administrator (or a designated guidance counselor) will remain in the room during questioning.

If law enforcement or children's services agency removes a student from school, the building administrator will notify a parent.

## SCHOOL'S RIGHT TO SEARCH

Lockers supplied by the school and used by the students are the property of the Board of Education. Therefore, student lockers and the contents of the lockers are subject to random search at any time without regard to whether there is a reasonable suspicion that any locker or its contents contains evidence of a violation of a school rule or criminal statute. Random searches of lockers may include the assistance of dogs trained to detect the presence of drugs.

Search of a student and the possessions of a student, including vehicles, may be conducted at any time the student is under the jurisdiction of the Board of Education if there is a reasonable suspicion that the

student is in violation of school rules. A search may also be conducted to protect the safety of others. Any student who exercises the privilege or parking an automobile on school grounds shall be considered to have given implied consent to a search of such automobile at any time a search is requested by the school administration. In addition, the contents of a cell phone or other electronic devices may be searched if there is a reasonable suspicion that it may have been used in an activity prohibited by the Code of Conduct. Failure to comply with a reasonable search will be considered insubordination.

# TRANSPORTATION

## BUS RULES

Notice to students: The use of video and audio surveillance equipment may be used in the investigation of violations of the Code of Conduct. Please refer to the Security Recording section of this handbook for additional details. Students may receive discipline as a result of what is recorded.

The following bus regulations are considered recommended guidelines to correct behaviors that could create an unsafe environment. Administrative responsibility prior to the first written conduct report: Building administrators will assure that each student receives a copy of the Student Handbook (with Bus Rules included) at the beginning of each school year or upon enrollment of a new student.

It is our privilege and pleasure to furnish students with the safest transportation possible as they travel between home and school and on school-related trips. In order to protect all students riding Olentangy school buses, safety precautions are a must!

All students are to understand that the bus driver is in charge of the bus at all times. Any student who repeatedly violates the safety precautions and/or conduct rules may be denied the privilege of riding the bus and is subject to other disciplinary action to be determined by the principal and/or transportation director.

To that end, the following conduct rules comply with Ohio Administrative Code 3301-83-08 and are called to your attention:

1. To provide maximum safety, district procedure requires all students to arrive at the bus stop five (5) minutes before the bus is scheduled to arrive. If a student is not at the designated place of safety (at least 20 or more steps away from the bus stop), the bus is not required to wait.

2. Students must wait quietly in a location clear of traffic and away from the bus stop.

3. Student behavior at bus stops must not threaten life, limb, or property of any individual.

4. Each pupil shall be assigned a designated place of safety on the residence side of the roadway on which the vehicle is schedule to stop: The driver must account for each pupil at the designated place of safety before leaving. Pupils are not to proceed to their residence until the school bus has departed the area.

5. The driver must use an approved hand signal and eye contact with students outside the bus at any stop where students must cross the roadway in front of the bus.

6. Students must go directly to an available or assigned seat.

7. Students must remain seated, keeping aisles and exits clear.

8. Students must observe classroom conduct. All school rules apply on the bus. Obey the driver promptly and respectfully.

9. Students must be courteous and respectful to fellow students and to the bus driver.

10. Students must not engage in loud talking or laughing, excessive horseplay, or fighting.

11. **Unnecessary confusion diverts the driver's attention and might result in a serious accident**.

12. Students must not use profane or abusive language.

13. Students must refrain from chewing gum, eating, and drinking on the bus except as required for medical reasons.

14. Students must not use tobacco in any form or alternative nicotine product. This includes any

vaping device (Ohio Administrative Code 3301.83.08 and Ohio Revised Code 2151.87).

15. Students must not have alcohol or drugs in their possession on the bus except for prescription medication required for student.

16. Students must not throw or pass objects on, from or into the bus (Ohio Law 3301.83.08).

17. Students may carry on the bus only objects that can be held in their laps. No living creatures are permitted.

18. Students must treat bus equipment as one would treat valuable furniture in his/her home. Vandalism will not be tolerated. Keep the bus clean and sanitary.

19. Students must not extend any part of their bodies out of the bus windows.

20. Students are to remain absolutely quiet at railroad crossings until the bus has completely crossed and the driver says it is OK to talk.

21. Students must leave or board the bus at locations to which they have been assigned unless they have written parental and administrative authorization to do otherwise.

The use of cellular phones or electronic devices on an Olentangy school bus will be determined at the discretion of the driver. Students permitted to use their cellular phones or electronic devices will do so for personal use only. Students are not permitted to share the content of cellular phones or electronic devices and taking photographs or videos is strictly forbidden. When a student is listening to audio content, headphones or earbuds are required. The use of an external speaker is prohibited. In the case of driver distraction, the driver is authorized to confiscate the cellular phone or electronic device until arrival at the school or the student's bus stop.

Driver's responsibility prior to the first written conduct report:

1. Drivers will confer with the student.

2. Drivers will confer with the student, change the student's seating assignment, and call the parents.

Level I (Minor Infractions): Level I behaviors are those that disrupt the driver's concentration, or behavior that may cause harm to the student or others.

Some other Level I infractions are:

- Loud talking (at any time) or talking at railroad crossings
- Moving around the bus/out of the seat
- Pushing/touching/disrupting others
- Repeated tardiness to the bus
- Disrespect to other students or the driver
- Harassment of other students
- Not following the reasonable request of the driver

- Use of profanity
- Possession of a match or lighter
- Eating or drinking (food or gum) on the bus
- Tampering with emergency equipment or doors
- Littering/throwing objects from the bus
- Any other infraction of the building's student behavior code

Level II (Major Infractions): Level II behaviors are those that are severe in nature or that directly or indirectly endanger the student or other students, the driver, or the public.

Some examples are:

- The threat of violence to the driver or other school employees
- The use of profanity directed to the bus driver
- Igniting a match or lighter
- Possession of an incendiary device (smoke bomb, firecracker, cherry bomb, sparkler, etc.)

- Fighting/assault
- Possession of a weapon
- Vandalism or arson
- Theft
- Inappropriate physical contact
- Any action resulting in injury or threat of injury

Recommended Consequences for Level I & II Bus Rules Infractions

| High School | Level I | Level II |
|---|---|---|
| First Written Report | Principal action | Up to 5 days off bus |
| Second Written Report | 5 days off bus | 10 days off bus |
| Third Written Report | 10 days off bus | Expelled |
| Fourth Written Report | Expelled | |

FOLLOW-UP COMMUNICATION

Following the disciplinary action taken with a student, it is the administrator's responsibility to inform the parent, the transportation supervisor and/or transportation specialist of the disciplinary action taken via the bus conduct system. It is then the transportation supervisor or **transportation specialist's** responsibility to inform the driver of that action.

DESIGNATED PLACES OF SAFETY

All students who ride a school bus are assigned a designated place of safety on the residence side of the street. The reason for this is by law, the driver must account for each student upon arriving and departing the bus stop. In order to do that, students must be at their place of safety before the bus arrives and must remain there until the bus departs after dropping them off. Each year the bus driver will notify your student about their designated place of safety. We ask for your support in helping us teach your student to adhere to his/her instructions. Below is a description of how a student should approach a school bus from their designated place of safety.

## BUS PASSES

A request from a parent/guardian is required in order for a student to ride a different bus or get off at a different stop. The request must be submitted at the beginning of the school day to the appropriate designated party. The student will receive a prepared pass before the end of the school day. If a student does not have a Bus Pass, he/she cannot ride home on a different bus or get off at a different stop. Students will not be dropped off at other than board-approved bus stops. Bus passes will be approved contingent upon available seating, timeliness of request, and/or discretion of the building administrator or designee.

## CURRICULUM, INSTRUCTION, AND ASSESSMENT

Olentangy Local Schools offers many services to ensure equal opportunity for all children, including enrichment services, early childhood education, academic intervention, reading support programs, services to support English language learners, home instruction, special education, and related services such as speech and language therapy, physical therapy, occupational therapy, adapted physical education services, psychological services, mental health services, and transportation. Support is also available through our school counselors, school nurses, social services, and alternative education opportunities.

The Board of Education furnishes all necessary instructional materials. However, there may be a fee associated with some co-curricular and extra-curricular courses as identified in the course guide and fee schedule. Each student is responsible for all instructional materials loaned to him or her and is expected to return all instructional materials at the end of participation in the course. Students will be responsible to pay for any instructional materials that are lost, destroyed, stolen or damaged.

### ALTERNATE EDUCATION PROGRAMS

- Olentangy Academy: Supporting Individualized Success (OASIS):  The Olentangy Local Schools is proud to offer OASIS, a unique, student-centric educational program for families who are looking for an alternative option to the traditional school setting. OASIS provides students with customized online learning experiences, academic support in a setting with low student-to-teacher ratio, intensified career and college preparation, readily available adult mentoring, and individualized service learning opportunities. OASIS uses best practices, including research-based methods of connecting with and supporting students in their academic and developmental growth.

- Olentangy Academy: Science, Technology, Engineering, and Mathematics (STEM)
  The STEM program at Olentangy Academy is focused on an integrated, transdisciplinary approach to teaching and learning. Students will start their day at Olentangy Academy and in the afternoon will be transported back to their home high school for lunch and three additional periods. Applications for Olentangy Academy are due at the end of January and are available on all middle school and high school websites.

### CLASS SCHEDULES

Schedules are provided to each student at the beginning of the school year or upon enrollment. Schedules are based on the student's needs and available class space. Any changes in a student's schedule should be handled through the guidance office provided they follow the regulations listed below. Students may be denied course enrollment due to lack of available space or the need for the student to pass prerequisite courses. Students are expected to follow their schedules. Any variation must be approved with a pass or schedule change.

The following regulations will be followed for schedule changes:

I.    Due to commitments for staff employment/assignments and the ordering of textbooks and other supplies, no schedule changes can be made after June 1st except for the following reasons:

- Mechanical error changes.

- Changes necessitated by failures.

- Class balancing (guidance and administrative).

- Subject-level changes (teacher recommendation).

                                    Back to Table of Contents

- Addition of a class in lieu of study hall the same period.
- Administrative (teacher/guidance) recommendation.

II.    If a student wishes to appeal the schedule change, the following steps will be adhered to:

1. Appeal Form must be obtained from the student services office.

2. Teachers, parents, and students must properly sign the Appeal Form.

3. The form must be returned to the student services office for consideration by the Appeal Committee.

4. **The school counselor will then notify the student of the committee's decision.**

5. Schedule change appeals must be submitted by the end of the 25th day of the school year.

III.   If a student is permitted to withdraw from a course after the beginning of the school year, the **student may receive a Withdraw Pass "WP" or withdraw fail "WF" on his/her transcri**pt.

## SCHOOL COUNSELOR SERVICES

Should a student desire to talk with a school counselor, he/she should make an appointment with Student Services in advance. Students will be given appointments during study halls only. No student should miss a scheduled class unless he/she does not have any study halls or an emergency exists. Student Services will also designate office hours for walk-in students during lunch.

The school counselor offices are located in Student Services in the high school. A student might want to see a school counselor concerning the following:

- Schedule changes
- Career information
- College information
- Test information
- Study help
- Job opportunities
- Personal problems
- High school program
- Summer school
- Transcript requests
- Financial aid
- Other

## COLLEGE CREDIT PLUS (CCP)

Students in grades 7-12 may enroll full- or part-time in a post-secondary institution to take courses for high school and/or college credit. A post-secondary institution or college is defined as any state-assisted college or university described in the Ohio Revised Code or any nonprofit institution holding a certificate of authorization. The Board will approve participation by students who apply to the participating college or

university (institute of higher education or IHE) and meet the IHE's and relevant academic program's established standards for admission, enrollment, and course placement.

For more information regarding College Credit Plus (CCP), visit our website and refer to the Olentangy Local Schools High School Course Planning Guide. Click on the following link to read additional College Credit Plus information:  Department of Higher Education College Credit Plus.

Student Code of Conduct in CCP Settings

Students enrolled in CCP courses remain responsible for their behaviors like traditionally enrolled students according to Olentangy policy. In addition, CCP students are also accountable to the code of conduct of the post-secondary institution in which they are enrolled. Olentangy recognizes that an effective educational program is one that provides opportunities for all students to customize aspects of their learning around needs and interests.

## CREDIT FLEXIBILITY

The **district's** Credit Flexibility Plan offers options to students to earn high school credit by:

   a.  testing out or showing mastery of course content;

   b.  pursuing an educational option and/or an individually approved option: and/or

   c.  any combination of the above.

Credit Flexibility applies to any alternative coursework, assessment and or performance. If a student is using Credit Flexibility to receive equivalent graduation credit, they must apply for and receive approval from the school district in advance. Approved credit awarded through this policy will be posted on the **student's transcript and count toward a student's grade point average (GPA), class rank and as graduation** credit in the related subject areas or as an elective. The school district will include details of the Credit Flexibility policy and program on the district website.

## EQUITY AND INCLUSION PROGRAM

Our equity and inclusion program supports students, families, and teachers by educating and promoting understanding, exposure, and acceptance of individual differences. Every school in our district has a diversity liaison who runs an open student group focused on these principles, as well as helping students understand their identity, build friendships across cultures, and provide service to others. If you are interested in becoming involved with the program or if you would like assistance in this area, please reach **out to your school's diversity liaison or contact** Peter Stern, Assistant Director of Equity and Inclusion at peter_stern@olsd.us.

## FIELD TRIPS

The Board of Education recognizes that field trips, when used for teaching and learning integral to the curriculum, are an educationally sound and important ingredient in the instructional program of the schools (Policy 2340-Field and Other District –Sponsored Trips).

Parent permission is required in advance of field trips. Students will travel by school vehicles, but the Board of Education authorizes the incidental transportation by private vehicle when necessary. Students will only be released during the course of the trip to parents or guardians. These releases should be arranged in advance by submitting a written request to the teacher or adviser in charge of the trip. In addition, parents will be asked to sign out their child at the time of departure.

                                     Back to Table of Contents

## GIFTED SERVICES

The state of Ohio requires school districts to identify students for potential areas of giftedness. Students are identified as gifted in cognitive ability, specific academic achievement, visual / performing arts areas, and creative thinking through state approved assessment procedures. Olentangy Local Schools provides a continuum of services to support the varying instructional and social emotional needs of gifted learners.

For additional information, visit Olentangy's Gifted Services webpage.

## LIBRARY/MEDIA CENTER

Each school has a library/media center to develop students' information literacy, media literacy, and technology literacy. Library/media centers provide technology such as computers, scanners, production software, printing, recording devices, and projectors. Library materials which are borrowed by students should be returned in good condition in a timely manner and lost materials should be paid for so that they can be replaced.

## PE WAIVER

In accordance with Section 3313.603 of the Ohio Revised Code, students in grades 9-11 may be excused from all physical education course requirements by participating in district-sponsored interscholastic athletics, marching band, cheerleading, show choir, or JROTC for at least two seasons (or two full years for JROTC). Students in grade 12 who have not completed the waiver requirements or taken a physical education course will be automatically enrolled in physical education their senior year. The Olentangy Local Board of Education shall not require the student to participate in a physical education course as a condition to graduate. However, the student shall be required to complete one half-unit, consisting of at least 60 hours of instruction, in another course of study.

## WORK PERMITS

All working students are required by the State of Ohio to have a work permit up to the age of 18. You may obtain information and an Application for Minor Work Permit from the school office. The Application for Minor Work Permit is to be filled out by the student and signed by a parent or guardian. The employer will complete the Pledge of Employer portion of the permit application. The Physician's Certificate for Minor Work Permit must be completed and signed by a physician. If the student has a sports physical on file for the current school year, a copy will be accepted in lieu of a physician's signature. Once the form has been completed by the student, employer, and physician, the student will return the form to the school office where they will process the application and provide the student with a valid work permit signed by a school official. Students working without permits place their employers in jeopardy of legal action by state authorities.

Back to Table of Contents

# TECHNOLOGY USAGE POLICY

Students are encouraged to use the school's computers, network, internet connection, and their assigned student account(s) for teacher assigned, educational work. All references to schools in this section will mean any school in the Olentangy Local School District. The term computer or computer equipment includes but is not limited to electronic devices, personal or school owned, that are used on school property (including on district-owned vehicles) or during district-sponsored trips. Student accounts are defined as accounts provided for student use by the district or a teacher to access resources or materials to complete educational work either within a school building or while at an offsite location.

Students are responsible for their behavior and communication on the network and while using any student account regardless of location. Transmission of any material in violation of any State or Federal law or regulation, or Board policy is prohibited. Unauthorized or inappropriate use of the network or student accounts, including any violation of these rules, may result in cancellation of privilege, disciplinary action consistent with the Student Code of Conduct, and/or civil or criminal liability.

Parents or guardians and students are advised that the Board makes every effort but may not be able to technologically limit access to only those services that have been authorized for the purpose of instruction, study, and research related to the curriculum. Use of student accounts or equipment which takes place on an internet connection other than the Board's will not inherently contain equivalent protections. It is impossible to guarantee students will not gain access to information and communications that they and/or their parents or guardians may find inappropriate, offensive, objectionable, or controversial regardless of internet connection used. No privacy in communication over the internet and the network is to be expected.

Student use of the district's computers, network, accounts, resources, and internet services (Network) are governed by district Policies and Administrative Guidelines 7540.00 (Technology), 7540.02 (Web Content, Services, and Apps), 7540.03 (Student Education Technology Acceptable Use and Safety) as well as the Student Code of Conduct. Student-created web content, services and apps are subject to Policy 5722 - School-Sponsored Student Publications and Productions.

In order to verify compliance with these guidelines, the Board reserves the right to monitor, review, and inspect any (not all encompassing):

- Directories
- Files
- Documents
- Messages
- Network Activity

If these items are residing on, sent through, or created using the network or a student account. Messages relating to or in support of illegal activities will be reported to the appropriate authorities.

Students using computers are expected to abide by the following rules:

1. Students may only access district resources by using their assigned account. Use of another person's account or password is prohibited. Students may not allow others to utilize their password.

2. Students may not intentionally seek out, obtain copies of or modify data or passwords belonging to other users. **Students may not portray or imitate other user's accounts.**

3. Students are permitted to use networked software and school-supplied software. Programs written by the student, which are part of an assignment in a school's course of study, may be ran, as required, for that course of study's requirements with teacher supervision.

4. Students may not download programs from the internet, nor may they copy programs from any removable device or other outside media. Students may not install or delete programs, extensions, or apps on the school's computers without express permission.

5. Students may not use the internet to engage in hacking or other unlawful activities. These activities may include but are not limited to: privilege escalation, exploitation of system vulnerabilities, data harvesting, or user impersonation.

6. Students may not create keyboard macros in Microsoft Word or any other program. Macros written by the student which are part of an assignment in a school's course of study may be run, as required, for that course of study's requirements with teacher supervision.

7. Students should only use computer programs or websites approved by the classroom teacher.

8. The district staff may review computer files, messages, or other communications that are created by the student. Material may be reviewed for grading, appropriate content, or misuse. It may also be reviewed for any harassing or threatening material (e.g., cyber bullying), trade secret protection and/or any vulgar or obscene content.

9. Students may utilize district technology to participate in online learning or related group discussion as directed by teachers. This may include the use of district-approved technology, such as Microsoft Teams, to chat or communicate with staff and other students. Students will utilize applications as directed and should practice proper digital citizenship including not disrupting other students, participating in cyberbullying, using profanity, or making transient threats of harm.

10. A teacher may authorize the copying of student-created work to a removable device or other outside media. The use of a removable device or other outside media is not permitted without permission from a teacher.

11. Students may not have food or drink when working on school computers.

12. All copyright laws are to be enforced. Illegally downloading, displaying, or sharing copyrighted works such as movies, songs, books, or games is prohibited.

13. Students are not to unplug or change any computer device or network connections.

14. Students are not to change any display screen settings.

15. **Students are not to change any program's toolbars or settings.**

16. Students are not to add or delete any program icons on the desktop or Start Menu.

17. **Malicious use of computers or the school's network to develop programs that harass other users or infiltrate any other computer system and/or damage the software components of a computing system is prohibited. Students may not use computers or the school's network in such a way that would disrupt the network's use by others.**

18. Students are not to remove, modify, damage, or destroy any computer or networking equipment.

19. Students are not to modify or remove any identifying labels on computer equipment.

20. Students are not to modify or remove any printer settings.

21. Students are to advise school staff when they observe any violation of the school's policy for the use of the school's computers.

                                    Back to Table of Contents

22. **Students are to advise school staff when a school's computer malfunctions in any way (example: a program is not opening or closing properly)** the teacher will notify the technical support staff so that the computer can be repaired.

23. The possession of: or the taking, disseminating, transferring or sharing content including but not limited to: nude, obscene, pornographic, lewd or otherwise illegal images or photographs, whether by electronic data transfers or other means (commonly called texting, emailing, sexting, etc.) may constitute a crime under state and/or federal law. Any person possessing, taking, disseminating, or sharing nude, obscene, pornographic, lewd or otherwise illegal images or photographs may be punished under this code of conduct and may be reported to the appropriate law enforcement agencies.

24. Students should practice proper digital citizenship and digital civility while interacting with others on the network. Communication on the network that threatens, harasses, or bullies others should be reported to building administration or another trusted adult.

25. Students should not make transient threats of harm using district technology, applications, or accounts. Any threat of harm may be reviewed, and disciplinary actions taken.

26. The use of electronic devices for recording purposes must have prior approval.

27. Students may not send unsolicited or unwanted documents, messages, images, or data to other students or staff. Receiving unsolicited or unwanted content should be reported to staff or building leadership. Content found to violate the student Code of Conduct may result in disciplinary actions being taken.

28. Students are permitted to use their cellular phones or electronic devices in designated areas during designated times only. Designated times and areas will be determined at the discretion of the building administration. Students using their cellular phones or electronic devices at times other than designated or in locations other than designated may be subject to school discipline. Contents of cell phones or electronic devices may be searched if there is a reasonable suspicion that it may have been used in an activity prohibited by the Code of Conduct. At the building **leadership's discretion, students' confiscated cellular phon**es or electronic devices may only be returned to their parent or guardian.

29. Olentangy will provide access to filtered wireless internet and the my.olsd.us platform (Schoology, PowerSchool, Google Drive, district email, etc.) for personally owned computing devices for educational purposes. The Technology Usage Policy fully applies to personal computing devices. Configuration changes, installed software, or tools which violate the Code of Conduct or negatively impact the network may result in the loss of privilege to utilize a personal device. This privilege may be restored when the device is determined to no longer violate this policy or negatively impact the network.

30. District computers should not be used for playing games unless sanctioned through a classroom or club activity and only during times directed by a club advisor or teacher. If gaming activities are disruptive or negatively impact the learning environment, they may be blocked.

Students are not allowed to circumvent the internet filter or click-through warnings. This includes through the use of Virtual Private Network (VPN) providers or internet proxies. Personal computing devices are not to be attached to the Olentangy network other than the wireless network provided for student use. Computing devices that have been determined to be a threat to network integrity will be immediately removed from the network and will not be allowed back on until the technology department is assured that the cause for removal has been resolved.

As **a condition to using Olentangy's wireless network, students should have no expectation of privacy in** their use of the network, and by signing the handbook awareness statement specifically understand and agree that their personal computing device may be confiscated and searched anytime school officials have

reasonable suspicion of violations of the Technology Usage Policy or any other Board policies, guidelines, or laws. Passwords, passkeys, or access codes are not to be shared with others. Exceptions to the above rules are permitted only under direct teacher supervision.

Violations of these rules may result in disciplinary action, including but not limited to detention, Wednesday School, Saturday School, Suspension Alternative Program and/or suspension. Violations also may result in removal from the wireless network, confiscation of equipment, notification to the appropriate legal authorities and/or other legal action may be pursued.

Student speech online is a protected right; however, this right is not unlimited. Student speech which occurs on school grounds or through the use of district technology should adhere to the Student Code of Conduct. Statements of cyberbullying, threats, harassment, or other speech that impacts the schooling environment or violates the Code of Conduct can be addressed by the district.

Student speech that takes place outside of school grounds and utilizes personal accounts or technology are the responsibility of the parent or guardian to monitor or address. Student speech which occurs off school grounds but creates a severe disruption to the school environment can also be addressed by school administration or applicable law enforcement.

Parents and guardians should discuss proper and appropriate use of social media or other services with their students and be aware of their student's actions online. Student speech that occurs on public social media or other sites or services falls under that platform's terms of service. The district does not have direct control over the public speech of its students and cannot directly remove content from public services. If the district becomes aware of inappropriate accounts or content, we may report content to the social network or site, but this does not guarantee the removal of the content in a timely fashion or at all.

Use of the internet and any information procured from the internet is at the student's own risk. The Board makes no warranties of any kind, either express or implied, that the functions or the services provided by or through the network will be error-free or without defect. The Board is not responsible for any damage a user may suffer, including, but not limited to, loss of data, service interruptions, or exposure to inappropriate material or people. The Board is not responsible for the accuracy or quality of information obtained through the internet. Information (including text, graphics, audio, video, etc.) from internet sources used in student papers, reports, and projects should be properly cited as a source or reference material. The Board will not be responsible for financial obligations arising through the unauthorized use of the network. Students, parents, or guardians will indemnify and hold the Board harmless from any losses sustained as the result of misuse of the network by the student. Use of the network by students may be limited to those students whose parents or guardians have acknowledged the Student Handbook and this Technology Usage Policy.

The use of technology outside of the district network (for example a home internet connection or cellular network) may not provide the same levels of filtering, monitoring, or protections as outlined in this handbook. Parents and guardians should be aware of these limitations and ensure adequate expectations are established for the responsible use of technology outside of the district network.

Please note Olentangy will not be able to provide technical support for personal computing devices. OLSD will not be responsible for lost, stolen, or damaged property whether it be by accidental or malicious means including but not limited to other users, viruses, malware, spyware, or bot traffic.

Technology Usage Agreement: If you do NOT desire for your child to use district-provided technology while at school, please submit a letter to your building principal. In the event that we do not receive this information, ALL students will be permitted to use district-provided technology according to the provisions listed in the Technology Usage Policy.

# GRADING

Olentangy High Schools have a standard grading procedure, as well as additional notations that indicate work in progress or incomplete work. In general, students are assigned grades based upon test results, homework, projects, and classroom participation. Each teacher may place a different emphasis on these areas in determining a grade and will so inform the students at the beginning of the course work. If a student is not sure how his/her grade will be determined, she/he should ask the teacher.

## CLASS RANK

The Board of Education authorizes a system of class ranking by grade point average, for students in grades 9-12. At the end of each semester of the freshman, sophomore, junior, and senior years, students will be ranked scholastically. The final grade will be used in specific subjects to calculate average.

## GRADE CLASSIFICATION

Assignments to grade level classifications are made on the basis of credits accumulated as follows:

- Freshman must have completed 8th grade

- Sophomore must have five credits

- Junior must have ten credits

- Senior must have fifteen credits

## GRADING INFORMATION

- A student should receive a grade if enrolled for three or more weeks of the grading period.

- **Students receiving an "incomplete" must make up the work with a** reasonable time or credit may be denied for the course. It is suggested the student be granted the same amount to time to make up the work, as they were absent from school. The time of the grading period may influence this guideline.

- Counting each quarter letter grade as 2/5 and the exam letter grade as 1/5 of the total grade determine semester grades. (Example: first quarter = 2/5: second quarter = 2/5: exam = 1/5.). The final grade is determined by averaging the first and second semester letter grade.

- Transfer credit – Only those grades on transcripts for AP courses and College Credit Plus courses will be converted to the weighted scale and quality points.

Back to Table of Contents

## GRADING SCALES

| High School Regular Grading Scale | | | | | |
|---|---|---|---|---|---|
| Letter Grade | Percentage | Point Value | Letter Grade | Percentage | Point Value |
| A | 93-100% | 4.000 | C | 73-76% | 2.000 |
| A- | 90-92% | 3.670 | C- | 70-72% | 1.670 |
| B+ | 87-89% | 3.330 | D+ | 67-69% | 1.330 |
| B | 83-86% | 3.000 | D | 63-66% | 1.000 |
| B- | 80-82% | 2.670 | D- | 60-62% | 0.670 |
| C+ | 77-79% | 2.330 | F | 0-59% | 0.000 |

| High School Weighted Grade Scale AP & CCP Courses Only | | | | | |
|---|---|---|---|---|---|
| Letter Grade | Percentage | Point Value | Letter Grade | Percentage | Point Value |
| A | 93-100% | 5.00 | C | 73-76% | 3.00 |
| A- | 90-92% | 4.67 | C- | 70-72% | 2.67 |
| B+ | 87-89% | 4.33 | D+ | 67-69% | 2.33 |
| B | 83-86% | 4.00 | D | 63-66% | 2.00 |
| B- | 80-82% | 3.67 | D- | 60-62% | 1.67 |
| C+ | 77-79% | 3.33 | F | 0-59% | 0.00 |

## HIGH SCHOOL CREDIT BELOW THE NINTH GRADE

Olentangy Local Schools will award credit for all high school courses taken prior to the ninth grade. In most instances, a grade of "P" (passing) benefits a student's cumulative grade point average. Therefore, students will receive a grade of "P" on their high school transcript for each high school course taken. If, prior to the **end of the first semester of the student's senior year, the student and** parent wish to change the "P" grade into an academic letter grade, the student and parent must request this change in writing. Upon written request, the "P" grade will be replaced with the final grade issued on the student's 8th grade report card.

Per Ohio law, students new to the district desiring such credit must provide their respective counselor the following documentation on their previous school's letterhead:  1) that the course which credit is being pursued was a high school course; and 2) that the course was taught by a teacher who held the appropriate secondary teaching license/certificate for the course.

Students electing to re-take any course will not receive high school credit or a grade for the course below the ninth grade.

Back to Table of Contents

## NATIONAL HONOR SOCIETY

Qualifications:

1. Students must have attained 11th or 12th grade standing.

2. Students should secure an application from the National Honor Society (NHS) adviser.

3. Students applying to NHS must have attended an Olentangy high school at least two semesters prior to application.

4. Cumulative GPA must be 3.5 or better for membership eligibility and must be maintained to remain eligible.

5. Selection for membership is by a faculty council and is based on outstanding scholarship, character, leadership, and service. Once selected, members have the responsibility to continue to demonstrate these qualities.

## REPORT CARDS

All student report cards will be made available electronically to parents and students for quarterly grade reporting. A paper copy will not be mailed home unless specifically requested. Grade progress is available through PowerSchool. Dates are posted on the school calendar.

Back to Table of Contents

## GRADUATION

Typically, students will complete graduation requirements in four (4) years. In order to receive a diploma and graduate, a student must pass all assessment tests required by the Ohio Department of Education (ODE) for graduation or the State-approved alternative pathway, meet the school requirements for basic course work, and earn the total number of minimum credits. For students enrolled in special education, the criteria for graduation and the extent of participation in the State-mandated assessment tests will be determined by their IEP team.

### DIPLOMA DEFERRAL

Social graduation is an opportunity for students with individualized education programs (IEPs) to participate in high school graduation ceremonies without obtaining an official diploma. Students with IEPs who have completed all academic requirements for high school graduation, but who have not yet completed their transition-related IEP goals may be eligible for social graduation. Students may participate in social graduation only upon the recommendation of their respective IEP teams. If social graduation is recommended, the student may engage in all aspects of the graduation celebration (e.g., wearing a cap and gown: sitting with the graduating class: having his/her name printed in the program and read aloud at the ceremony: walking across the stage to receive a faux diploma). Instead of receiving an official diploma, however, the student will receive an unsigned diploma or a certificate of participation.

### EARLY GRADUATION

Students desiring to accelerate their four-year high school academic program should contact the principal for approval. An Academic Acceleration Form obtained from Student Services should be completed prior to the parent/counselor/administrative conference.

Requirements for early graduation include:

1. Scheduling accordingly in the spring of the sophomore year

2. Plans to attend an institution of higher learning after graduation

3. A cumulative grade point average of 3.0 or higher

4. A required four credits of English

### GRADUATION REQUIREMENTS

A diploma shall be awarded to students meeting the curriculum credit requirements and who achieve one of the following three options: a cumulative passing score with the required number of points in each area on end of course exams, earn the required points on the WorkKeys assessment and an approved industry-recognized credential, or earn a remediation-free score in English language arts and mathematics on the ACT or SAT.

Specific information regarding graduation requirements is available in the Course Planning Guide, which is posted on each high school's website.

### GRADUATE ACADEMIC RECOGNITION

Because of the competitive nature of the Olentangy high schools, students are not ranked for college admission purposes. The high schools will instead honor students based upon the following standards of achievement:

Students will be honored at commencement based on the following cumulative GPA scale:

- Summa Cum Laude        4.000 GPA and above
- Magna Cum Laude        3.800 to 3.999
- Cum Laude               3.670 to 3.799

Beginning with the class of 2020, the high schools will recognize as valedictorian(s) at the end of seven or eight semesters anyone who achieves the highest cumulative GPA in the class.

In order to be eligible, a student must have attended an Olentangy high school for his/her entire fifth through eighth semesters.

This ranking is used for certain senior honors.

1. Class rank shall be computed by the final grade in specific subjects.

2. The rank of the student will be determined by grade point average. All students receiving the same GPA shall receive the same class rank.

3. In recognition of the heavier burden of Advanced Placement classes, grade point averages shall be weighted by awarding up to 1.0 extra unit.

4. A student's grade point average and rank in class shall be entered only on his/her record and shall be subject to Board Policy 8330 on release of student records. A student's class rank is used for internal purposes and is not released to colleges and/or other institutions or agencies without prior written consent from the individual or his/her parents/legal guardians if the student is less than eighteen (18) years of age.

## POLICY ON ACADEMIC ACCELERATION, EARLY ENTRANCE TO KINDERGARTEN, AND EARLY HIGH SCHOOL GRADUATION

The degree to which academic content standards are met and the time it takes to reach the standards will vary from student to student. The Olentangy Board of Education believes that all students, including advanced learners, should be challenged and supported to reach their full potential. For some advanced learners, this can best be achieved by affording them access to curriculum, learning environments, and instructional interventions more commonly provided to older peers. The Olentangy Acceleration Policy 5408 provides students with opportunities for possible accelerated placement through early admission to kindergarten, individual subject acceleration, whole-grade acceleration, and early graduation from high school.

A teacher, administrator, gifted education specialist, school counselor, school psychologist, or parent/ legal guardian of the student may submit referrals for possible accelerated placement to the school principal. A student may refer himself, herself, or a peer through a district staff member who has knowledge of the abilities of the student. Accelerated placement is a team decision and includes a review of classroom performance and standardized testing history, information regarding student work habits, motivation and desire for acceleration, and possible additional assessments as needed. The acceleration process evaluates the academic, social, and emotional readiness of students in order to determine a placement to best meet the needs of the whole child.

Copies of referral forms for evaluation for possible early entrance, whole-grade acceleration and individual subject acceleration are available to district staff and parents at each school building and on the district website.

## TRANSCRIPTS

Students desiring a copy of their transcript should complete a Transcript Request Form available from Student Services. Please allow one week to process transcripts, scholarships, college applications, recommendations, etc.

## HEALTH AND SAFETY

### HEALTH REGULATIONS

Your child must meet county and state health regulations for entrance to school, including compliance with state immunization laws. The school nurse checks health records each year and will send you a reminder of the required immunizations your child still needs.

Students will be excluded from school if the immunization schedule is not completed within 14 calendar days after the student's first day of school. Written statements of objection to immunizations due to parent's or guardian's philosophical or religious reasons are filed in the student's health folder. Medical exemption for immunization must be signed by the child's physician.

Parents are required by state law to fill out an Emergency Medical Authorization Form. The Emergency Medical Authorization Form is online and should be completed at the time of enrollment and checked for accuracy at the beginning of each school year. A complete Emergency Medical Authorization Form must be on file with the school in order for a student to participate in any activity off school grounds, including field trips, spectator trips, athletic and other extracurricular activities, and co-curricular activities.

The Olentangy Board of Education wishes to cooperate fully with students, parents, and the medical profession to ensure that students receive any required medication during the normal school day at the time that it is required. It is preferred that medications be administered to students at home; however, it is also recognized that certain circumstances may necessitate administering medications during school hours. Guidelines have been established to maintain control of authorized drugs within the schools and to ensure the health and welfare of students. In accordance with Ohio Revised Code §3313.713, all medications unless medically prescribed to self-carry must be kept locked in a storage place and administered by school personnel. Only employees of the Board who are licensed health professionals or who have completed a drug administration training program conducted by a licensed health professional and considered appropriate by the Board may administer to a student a drug prescribed for the student.

A *Physician's Medication Procedure Request Form* and *Parent's Medication Procedure Request Form* must be completed, signed and on file in the office before any medication, including over-the-counter and essential oils will be given by the clinic staff. Children are NOT permitted to transport any medication to school. All medications must be brought to school by a parent or guardian and must be locked in a storage place unless medically prescribed to self-carry. This is critical to the health and safety of all children. In rare instances, a student may be allowed to carry certain prescription medications (e.g., asthma inhalers). If the physician deems it medically necessary for the student to carry a medication with him/her, the *Physician's* Medication Procedure Request Form must be signed and contain those instructions.

Middle and high school students are permitted to carry a one-day's supply of non-prescription medication, including essential oils, to self-administer if a Parent's Non-Prescription Medication Request form is signed by the parent and on file in the school office.

A parent note is required for elementary students to use cough drops at school. Cough drops must be supplied by the parent or guardian, kept in the clinic, and administered by the clinic staff. Medication forms are available in the school office and on the district website and expire at the end of each school year.

### ANIMALS IN SCHOOLS AND ON DISTRICT PROPERTY

Animals permitted in schools and elsewhere on district property shall be limited to those necessary to support specific curriculum-related projects and activities, those that provide assistance to a student or staff member due to a disability, those that serve as service animals as required by Federal and State law, or those that conduct random searches for illegal substances. All animals must meet veterinary

requirements set forth in the State law and County regulation/ordinance.

The student's need for and use of a service animal must be documented in the student's individual education plan (IEP) or Section 504 Plan. A service animal is the personal property of the student and/or parents. The Board of Education does not assume responsibility for training, daily care, health care, or supervision of service animals. The Board of Education does not assume responsibility for personal injury or property damage arising out of or relating to the presence or use of service animals on district property or at district-sponsored events. For more information, please refer to Policy 8390-Animals on District Property.

## CONTROL OF CASUAL-CONTACT COMMUNICABLE DISEASES

Because a school has a high concentration of people, it is necessary to take specific measures when the health or safety of the group is at risk. The school's professional staff may remove or isolate a student who has been ill or has been exposed to a communicable disease or highly-transient pest, such as lice (Policy 8450).

Specific communicable diseases include diphtheria, scarlet fever, strep infections, whooping cough, mumps, measles, rubella, and other conditions indicated by the Local and State Health Departments. Any removal will be limited to the contagious period as specified by the Delaware General Health District and the Ohio Department of Health).

In cases of communicable disease, a letter may be sent home and/or a notice may be passed on to the school community via email informing parents that a situation exists in their child's classroom. Because of the contagious nature of these conditions, it is important that you call the office if you find your child has been diagnosed with a communicable disease. If your child has head lice, it will be necessary for you to bring him/her to be checked in at the clinic to verify that he/she has no live lice before he/she can be readmitted to school. The school nurse or designee will make the final decision on re-admittance to school.

## DISTRICT SAFETY PLAN

Students and staff are expected to immediately report to a teacher or administrator any suspicious behavior or situation that makes them uncomfortable. In case of an emergency, district personnel will follow the district's Safety Plan. This plan specifies steps to be followed should an emergency arise that threaten the well-being of students, staff and the public while utilizing school property. In addition to the steps outlined in the district's Safety Plan, our staff routinely trains on many of these procedures.

To ensure that the district has accurate contact information, please review the Back-to-School and PowerSchool Update Instructions and update your account as needed.

## HEALTH SCREENINGS

In accordance with Ohio Department of Health requirements and guidelines, school health staff conducts periodic health screenings to detect abnormalities in hearing, and vision. Health screenings may also be conducted when a concern arises. A permission slip will not be sent home for parent permission in advance of the screening. Parents may opt out by completing and submitting the Vision and Hearing Waiver form each school year.

## HOMEBOUND INSTRUCTION

The school may arrange for individual instruction at home for students who are unable to attend school because of an accident, illness, or disability. Such instruction may be arranged upon receipt of documentation of the student's condition from a physician (Policy 2412-Homebound Instruction). For more information, contact the building administrator or guidance counselor.

## ILLNESS / INJURY

It is important that students are not sent to school if they experience (d) a fever (100.4°F or above), vomiting, diarrhea and/or a persistent cough within the last 24 hours. It is advisable to keep a child home until the child is symptom-free for 24 hours without benefit of any medication. If a child returns to school and remains ill, parents will be called.

## MEDICAL CONCERNS

Notify the school nurse of any health concerns that impact your child's school day. If your student is transported to school by bus, the bus drivers should also be provided with this information. Each year, Food Service must have an updated statement from your physician documenting the specific food allergy and acceptable substitutes in order to make accommodations within the National School Breakfast and/or Lunch Program.

## NON-SMOKING / VAPING POLICY

The Ohio Department of Health prohibits smoking in all enclosed public places within the state. Olentangy Local Schools is committed to providing students, staff, and visitors with a smoke-free environment. Smoking and vaping is expressly prohibited in all Olentangy buildings, on school property, on a school bus, or while en route to or from school, and at events occurring off school property if the student is at any school-sponsored, school-approved, or school-related activity or function, such as field trips or athletic events.

This non-smoking/vaping policy applies to staff, students, contractors, and visitors. Evidence of indoor smoking/vaping, including the ashes of cigarettes, cigars, pipes, other smoking equipment or products, or vaping paraphernalia (e.g. electronic cigarettes and vape pens) will result in disciplinary action. Additionally, the sale and/or marketing of cigarettes, tobacco products, e-cigarettes, vape pens, and all e-cigarette and vape pen paraphernalia, is prohibited.

## STAY SAFE. SPEAK UP!

Stay Safe. Speak Up! is a resource available to students to anonymously report bullying and other safety concerns. The link to Stay Safe. Speak Up! is in the student myOLSD portal, on the homepage of the district's website, and in the Student Resources section on the district website.

## SUICIDE PREVENTION RESOURCES

If you or someone you know is in crisis, please reach out to someone who can help. Do not wait, contact any staff member or administrator (see AG 5350). In an urgent situation, please use the resources below:

- The National Suicide Prevention Lifeline provides 24/7 free confidential support for people in distress, prevention and crisis resources are also available: 1-800-273-TALK (8255).

- The Helpline of Delaware and Morrow Counties: Need to talk? Call 211 or 1-800-6842324 or text 898211 to connect with a Suicide Prevention Coordinator.

## GENERAL INFORMATION

### COPYRIGHT INFRINGEMENT

Email claims of copyright infringement to olswebmaster@olsd.us or mail claims to the Communications Department: 7840 Graphics Way, Lewis Center, Ohio 43035.

### FEES

According to Policy 6152-Students Fees, Fines, and Charges, the Board may need to levy certain charges to students to facilitate the utilization of other appropriate materials for curricular as well as co-curricular and extra-curricular activities. Any waiver of fees shall be made pursuant to Policy 6152.01. A list of course and workbook fees is available on the district's website. You may log into PowerSchool to view/pay your student's fee accounts and any outstanding fees.

Payments should be made in full by credit card online or by cash/check/money order to the school office. To view your fee account and make payments online, please go to your PowerSchool parent account and select Lunch and Fee Payments. If you are paying by check, please make it payable to Olentangy Local Schools. We appreciate your prompt attention to school fees.

Students with carryover delinquent fees of any kind from the previous school year are precluded from participation in fall extracurricular activities. Delinquencies in the current school year will preclude the student from participating in winter and spring extracurricular activities. Eligibility will be restored once all fees have been paid, or a payment plan has been established and the first payment has been received.

At the high school level, all delinquent fee balances must be paid in full in order for a student to receive a parking pass. In addition, transcripts of grades and credit may not be sent to another school system or to any institution of continuing education for a student with unpaid fees; and any such student will not be permitted to attend the graduation ceremony of Olentangy Local Schools per (Policy 6152). In addition, the student diploma will be withheld until all fees are paid in full.

### FEE COLLECTIONS AND FEE WAIVERS

The Olentangy Local School District outsources the collection of Non-Sufficient Fund (NSF) checks to the CheckRedi service. The district is happy to accept checks as payment, but every check must include your name, address and phone number. Please keep in mind that when a check is provided as payment, it is an authorization by the check writer to either make a one-time electronic transfer from the account or to process the payment as a check transaction. In doing so, the check writer also authorizes CheckRedi to collect a $34.50 fee through an electronic fund transfer from the check writer's account if the payment is returned unpaid.

If you receive a notice from your bank about a non-sufficient funds check, contact CheckRedi at 800-239-1222.

### FOOD SERVICE

Olentangy schools participate in the National School Lunch Program, providing nutritious, well-balanced lunches meeting the Federal and state guidelines including but not limited to the current USDA Dietary Guidelines for Americans and the USDA Smart Snacks in School nutrition standards. The lunch program provides meals at free or reduced prices for qualified students. Applications are available on the district website or at any school office. You may apply at any time during the school year. For additional information, please refer to Policy and Administrative Guidelines 8500-Food Service & 8531-Free and Reduced-Price Meals.

Olentangy also participates in the School Breakfast Program, and the free and reduced-price program applies to breakfast as well.

Information regarding the breakfast and lunch program, including menus and prices, is available on the district website. Information can be found by selecting Food Service under the Department heading.

Students may pay with cash, check or they may utilize the debit card system which allows parents to put money on their child's account in advance to pay for meals. Deposits may be made online through the Lunch and Fee Payment section of PowerSchool parent accounts. Please refer to Administrative Guideline 8500D, Meal Charge Procedures, for current charging procedures.

If your child has a medically documented food allergy/disability, Olentangy Food Service will work with you to make the necessary accommodations. Please contact the cafeteria manager at your school or the Food Service Department at 740-657-4053.

## FUNDRAISING ACTIVITIES

Student fundraising by approved school organizations, (those whose funds are managed by the treasurer) may be permitted in school as approved by the principal according to Policy 5830-Student Fundraising. Any fund-raiser that involves the sale of food items and/or beverages to students that will be consumed on the school campus during the school day to thirty (30) minutes after the end of the day must comply with the current USDA Dietary Guidelines set forth in Policy 8550-Competitive Foods. Fundraisers also include giving away goods or services, but suggesting a monetary donation. Student fundraising by approved school organizations off school grounds may be permitted under administrative guidelines of the superintendent.

## INTRADISTRICT TRANSFERS

The Board of Education will permit any student (grades K - 12) to apply for attendance at their school of choice based upon criteria established by the school administration (Policy 5113.01-Intra-District Open Enrollment).

The specific criteria shall be consistent with state law and shall include:

    a.  Application procedures, including deadlines for application and for notification of acceptance or rejection of students;

    b.  Establishing district capacity limits by grade level, school building, staffing levels and educational program;

    c.  Student safety in one building as opposed to another can be a basis for transfer;

    d.  The process must ensure that proper racial balance is maintained;

    e.  Notification that parents must provide transportation for their students;

    f.  Students entering Grades 9 - 12 will forfeit athletic eligibility for one year.

Complete information about intradistrict transfers is available by contacting the district offices at 740/657-4050 or by visiting the Olentangy Local Schools website:  https://www.olentangy.k12.oh.us. For specific information concerning athletic bylaws, grades 9 through 12 only, contact your athletic director.

## LOCKER ASSIGNMENTS

Subject to availability, a locker may be assigned to each student at the beginning of the school year. Each student is responsible for cleaning and maintaining his or her locker. All lockers remain the property of the school and are subject to search at any time. Student must pay for lost or damaged locks, if applicable. The

only locks that may be used are school locks, except in a short-term emergency situation approved by the homeroom teacher or principal. In order to protect personal belongings, each locker must be kept locked, and the combination numbers used only by the assigned student. Students are advised not to share lockers or combination numbers! Students must provide their own combination lock for gym lockers that are not equipped with built-in locks. Students violating the locker policy are subject to the Code of Conduct.

## LOST AND FOUND

Found items are kept in a Lost and Found location. Found items that are identified with the child's name will be returned. With this in mind, please remember to label your child's clothing. Parents or students are encouraged to check the Lost and Found for missing items. Items not claimed will be given to a charitable organization.

## POSTERS / COMMUNITY ANNOUNCEMENTS

The principal will approve all posters/announcements.

## PROCEDURES TO RESOLVE PARENT-TEACHER DISAGREEMENTS

Whenever a complaint is made directly to the Board as a whole, a Board member as an individual, the superintendent, principal, or other administrator, it will be referred to the appropriate building administrator. A teacher who is the object of a complaint will be informed promptly.

Step 1 – Direct Conversation

If a parent or community member (complainant) has a disagreement or misunderstanding with a teacher, the complainant should address the concern to the specific teacher directly involved with the circumstances surrounding the concern. The staff member will meet with them as soon as possible, but in no case longer than five calendar days after the teacher has been notified of the concern (subject to change by mutual agreement).

Step 2 – Fact and Possible Resolution

If the complainant or the teacher is not satisfied with the outcome of Step 1, or the complainant or teacher is unwilling to meet independent of an administrator, a meeting with the teacher, appropriate administrator, and complainant will be arranged at a mutually convenient time, but in no case more than five calendar days after the meeting in Step 1. This step is to be informal and verbal. No further action will be taken beyond Step 2, unless the complainant submits in writing a signed and dated statement of facts giving rise to this concern, the name of the teacher involved, and the remedy sought.

Step 3 – Formal Process

If a complainant's concern is not satisfactorily resolved at either the first or second level, the complainant should then refer this concern to the superintendent in writing. At that time another meeting will be arranged at the convenience of the complainant and staff member directly concerned, but in no case more than 10 calendar days (subject to change by mutual agreement). The staff member has the right to be at all meetings with or without a representative as he/she so determines. Copies of the disposition will be sent to the Board.

Dispositions

Dispositions at Step 3 will be sent in writing to all parties within 10 calendar days of the meeting with reasons stated.

Repeat Concerns

If a complainant believes there has been a repeat of the previous concern, they may go directly to Step 3 – Formal Process.

Relation to Other Procedures

This Article does not limit or affect the actions or procedures available to the administration and/or Board based on an investigation of alleged misconduct and an administrative or Board conclusion based on that investigation that action adverse to the teacher is warranted. Any such action against the teacher is subject to applicable laws and other articles of this Agreement.

## RELEASE OF STUDENT PHOTOS AND WORK ONLINE

Olentangy Schools believes it is important to share accurate and timely information about the district with stakeholders. In addition, many online tools provide educational opportunities for student learning. As such, from time to time the district may share student information with the public in a web-based environment such as, but not limited to, the district's website and social media channels. The district's Web Guidelines allow for the following student information to be used online at the middle and high school levels (unless additional permission is granted by the parent/guardian:

- **Student's first name** and last initial only:

- Student photographs.: and

- Student work (such as, but not limited to, artwork, podcasts, blogs, writing samples, videos, etc.).

If you do not want **your student's information used in** web-based environment, please submit a written request to the Communications Department. Direct your request to Olentangy Local School District, Attn: Communications Department, 7840 Graphics Way, Lewis Center, Ohio 43035, (740) 657-4050.

## RELEASE OF STUDENT PHOTOS AND MEDIA INTERVIEWS

Olentangy Schools often has the opportunity to film and photograph students in a variety of school-related activities. Student recognition programs, academic and fine arts programs are a few examples of these activities.

As such, videos and photographs may be used in communication tools such as the district newsletter, district website, social media, community publications, and in communications with the media such as allowing interviews or photographs with students. The district reserves the right to deny media requests for student interviews at any time.

Highlighting achievements in our schools is an integral part of reporting responsibly to our community and is a way of sharing in the success of our schools and students. However, it is our primary goal to respect your privacy.

Parents have the right to submit a written request to the Communications Department directing the district not to release directory information, including the information as listed above. Direct the written request or any questions to the Communications Department, Olentangy Local School District, 7840 Graphics Way, Suite 100, Lewis Center, Ohio 43035, (740) 657-4050.

## RELEASE OF STUDENT RECORDS

The Family Educational Rights and Privacy Act (FERPA) affords parents and students 18 years or older certain rights with respect to the student's education records. These rights, which are fully explained in Olentangy Board of Education Policy and Guideline 8330-Student Records include:

- The right to inspect and review the student's education records.

- The right to request the amendment of the student's education records that are believed to be inaccurate and the right to a hearing if the request is not honored.

- The right to file a complaint with the U.S. Department of Education regarding an alleged violation of FERPA.

- The right to consent to the disclosure of personally identifiable information within the student's records, unless disclosure is otherwise authorized by law or unless disclosure is made to school officials with legitimate educational interests. A school official is a person employed by the school as an administrator, supervisor, instructor, or support staff member (including health or medical staff and law enforcement unit personnel): a person serving on the school board: a person or company with whom the school has contracted to perform a special task (such as an attorney, auditor, medical consultant or therapist): or a parent or student serving on an official committee, such as a disciplinary or grievance committee, or assisting another school official in performing his or her tasks. A school official has a legitimate educational interest if the official needs to review an education record in order to fulfill his or her professional responsibility.

- The following is designated as directory information, which may be disclosed without prior written consent: a student's name, mailing address, telephone number, date and place of birth, major field of study, participation in officially recognized activities and sports, height and weight, if a member of an athletic team, dates of attendance, date of graduation, and awards received.

Parents have the right to submit a written request to the Communications Department, preferably within two weeks after the first day the student is enrolled in a school year, directing the district not to release directory information concerning their child to third parties. Examples of third parties include PTOs, Booster organizations and the media. According to Ohio Revised Code, public schools are prohibited from releasing directory information to third parties who intend to use the information for profit-making ventures. Direct the written request or any questions to the Communications Department, Olentangy Local School District, 7840 Graphics Way, Lewis Center, Ohio 43035, (740) 657-4050.

## UNAUTHORIZED USE OF THE BUILDING

Students are not to remain at school after dismissal unless they are part of a school activity supervised by a teacher, adviser or coach. Any student using the building without authorization and supervision will be referred to the local police authorities. No students will be permitted to use the building when school is not in session without authorization and supervision and will be subject to school disciplinary action. Students who remain after dismissal to use outdoor recreational facilities do so at their own risk. The school district assumes no responsibility for them.

## VALUABLE PERSONAL PROPERTY

The school will NOT accept responsibility for the loss, damage, or theft of personal property. Valuable personal property should be left at home. Electronic items are to be turned off, kept out of sight, and not used during the school day unless authorized by building policy. The use of any personal property that is contrary to building policy may result in disciplinary action and confiscation of the item(s). At the building leadership's discretion, confiscated items may only be returned to a student's parent or guardian.

# CO- AND EXTRA-CURRICULAR ACTIVITIES

## EXTRA-CURRICULAR ACTIVITIES

Extra-curricular activities are available to high school or community students who meet eligibility requirements. Students should be attentive to announcements of meetings for these activities. Students may be removed from these activities for violations of the Code of Conduct. Participation in these activities is a privilege and not a right, and students may be prohibited from all or part of their participation in such activities by authorized school personnel without further notice, hearing and/or appeal rights in accordance with Board Policy 5610.05-Prohibition From Extra-Curricular Activities.

## ATHLETIC ELIGIBILITY

According to the Ohio High School Athletic Association (OHSAA), for a student to be eligible, he/she must be passing subjects the preceding nine-week grading period that earn a minimum of five credits or its equivalent toward graduation. All grades must, when combined, result in a GPA of at least 1.5, based on a 4.0 scale. Furthermore, they must be enrolled in 5 classes, not including physical education/activity courses, during the 9 weeks in which they are a participant. An athlete will be eligible or ineligible for the next grading period beginning with the fifth school day after the end of each grading period. Eligibility or ineligibility would remain until the fifth school day after the end of the next grading period. All incoming freshmen need to have passed at least five classes and attained at least a 1.5 GPA during the previous grading period.

Important note:  See the Athletic Handbook or OHSAA for details about athletic rules and regulations.

## PAY TO PARTICIPATE

Olentangy Local Schools has adopted a policy that requires an $80 fee per sport for participation in interscholastic athletics. Please refer to the Athletic Handbook or on the district's website for the fee structure. There is also a $25 fee for participation in co-curricular or extracurricular activities. The student fees are to defray only a part of the expenses of our activity programs. Fees for activity participation are to be assessed for one full year.

Payments should be made in full by credit card online or by cash/check/money order to the school office. To view your fee account and make payments online, please go to your PowerSchool parent account and select Lunch and Fee Payments. If you are paying by check, please make it payable to Olentangy Local Schools. We appreciate your prompt attention to school fees. For athletics, all fees are non-refundable after the first game and paying the fee does not guarantee an athlete's playing time. The payment deadline is before the first scrimmage or game. The athlete may not be allowed to participate until the fee or any previously owned pay-to-participate fees are paid.

If you receive a notice from your bank about a non-sufficient funds check, contact CheckRedi at 800-239-1222.

Students with carryover delinquent fees of any kind from the previous school year are precluded from participation in fall extracurricular activities. Delinquencies in the current school year will preclude the student from participating in winter and spring extracurricular activities. Eligibility will be restored once all fees have been paid, or a payment plan has been established and the first payment has been received.

## SCHOOL CLUBS AND ORGANIZATIONS

The clubs at Olentangy appeal to a variety of interests and are available to high school or community students. It is hoped that each student can find an outlet for expression in one or more of these organizations. Students can request information regarding specific clubs and organizations by visiting the main office.

# Exhibit E

**Transgender Guidelines**

*A student's transgender status or gender assigned at birth is not considered directory information and therefore cannot be released without prior consent. Disclosing this information to other students, their parents, or other third parties may violate privacy laws, such as FERPA. Therefore, school staff must not disclose information that may reveal a student's transgender status to others, including parents and other school staff, unless legally required to do so or unless the parents or student (if over 18) have authorized such disclosure.*

I.  Non-Discrimination, Harassment, Intimidation, and Bullying
    A.  The policies below should be followed for all students, including those identifying as transgender.
        1.  Anti-Harassment Policy (5517)
        2.  Bullying and Other Forms of Aggressive Behavior Policy (5517.01)
        3.  Sexual Violence Policy (5517.02)
II.  Names, Privacy, Confidentiality, and Record Keeping
    A.  Legal Documents
        1.  You are required to maintain legal name and gender assigned at birth on all legal documents and permanent student records UNTIL you are provided with a legal name change.
        2.  At the point where a legal name change is provided, all documents moving forward should have the new name listed, but all previous documents should maintain their birth name (unless otherwise requested by a parent or legal guardian).
        3.  Any document that is not considered an official school document should feature the student's preferred name (e.g., yearbook).
        4.  Once a legal name change has been made and documentation is provided, the previous identification documents are no longer needed and the updated ones should be kept on file.
    B.  Preferred Names & Pronoun Usage
        1.  Staff should use the name and pronoun requested by the student or parents that matches their gender identity.
        2.  Subs: Powerschool Roster
            a)  If you know that a student goes by a preferred name and you are preparing your sub packet, please make sure to cross out the legal name on the PowerSchool roster and insert the preferred name. This will prevent unintentional "outing" of a student's gender identity.
    C.  Graduation
        1.  Legal name must be written on the enclosed diploma.
        2.  However, preferred name may be read aloud if all parties are in agreeance.
        3.  If the student is 18, and all parties are NOT in agreeance, the decision should be left up to the student due to their status as a legal adult.

D.  Communicating with Parents
1.  In situations where parents disagree or parents don't know the student's gender identity…
    a)  PreK-5
        (1)  If the school staff are noticing a possible gender identity expression that is misaligned with their gender assigned at birth AND it is disruptive to their education, the school staff should consult with a counselor, social worker, or district employee to engage in a non-leading discussion with the student to better understand certain behaviors or expressions you are noticing.
        (2)  Based off this discussion, engage the parents in a conversation about the child's behaviors and expressions you have noticed in the classroom.
    b)  And they are in 6th - 12th grade
        (1)  The school staff should have a discussion with the student first about how to address them (names/pronouns) with their parents.
        (2)  The staff should not out the student to parents unless it is a matter of health and/or safety.
        (3)  Work with the student to gain confidence to share their identity with their parents.

III.  Bathrooms/Locker Rooms
A.  Bathrooms
1.  A student shall have access to facilities that correspond with their gender identity. Any student that is uncomfortable using a gender-segregated facility, regardless of the reason, will be provided with a safe and non-stigmatizing alternative. Students should NOT be required to use a single-stall restroom alternative, but it can be provided as an option.
B.  Locker Rooms
1.  Establish, communicate, and model clear guidelines for respecting privacy and boundaries in changing areas.
2.  Work with the student to determine a comfortable space for them to change and provide alternative options to any student who is uncomfortable in their currently assigned changing area.

IV.  Overnights
A.  When a transgender student is part of a team or trip that needs overnight accommodations, please provide the student and family the following options:
1.  Do you have students who know about your situation?
    a)  If yes:
        (1)  If the student is able to self-select their roommates, with whom they've shared their gender identity, and all students and parents agree to the rooming arrangements, the

<ul>
<li style="list-style:none">
<ul>
<li style="list-style:none">
<ul>
<li style="list-style:none">
<ul>
<li style="list-style:none">(1) student should be allowed to stay with students of the same gender identity.</li>
<li style="list-style:none">(2) If other students know about the situation and they are not comfortable rooming with the student, then we must go to the other options listed below.</li>
</ul>
</li>
<li>If no or students are uncomfortable sharing a rooming assignment:
<ul>
<li style="list-style:none">(1) The student can stay with students of their corresponding birth gender.</li>
<li style="list-style:none">(2) The student can stay in a room with their parents or in a room with a chaperone (if agreed upon by student and parents).</li>
<li style="list-style:none">(3) The student can commute home for the evening if the location is close enough to permit driving back and forth.</li>
</ul>
</li>
</ul>
</li>
<li style="list-style:none">B. Establish, communicate, and model clear guidelines for respecting privacy and boundaries. Explicitly name expectations of what it means to be in a communal environment. This is critically important and will improve all students' experiences.</li>
</ul>
</li>
<li style="list-style:none">V. Dress Code
<ul>
<li style="list-style:none">A. Students should be allowed to dress consistently with their gender identity, so long as they are abiding by the dress code policy with their clothing selections.</li>
</ul>
</li>
<li style="list-style:none">VI. Sports & Gender Segregated Activities
<ul>
<li style="list-style:none">A. Students should be allowed to participate on sports and co-curricular teams consistent with their gender identity, so long as they meet the rules and regulations of the OHSAA:<br>http://www.ohsaa.org/Portals/0/Eligibility/OtherEligibiltyDocs/TransgenderPolicy.pdf</li>
<li style="list-style:none">B. In circumstances where students are separated by gender in a school activity, students should be allowed to participate in a manner consistent with their gender identity (e.g., boy and girl busses, boy and girl lines in elementary, etc.).</li>
</ul>
</li>
<li style="list-style:none">VII. Transition Support & Resources
<ul>
<li style="list-style:none">A. Stonewall Columbus (1160 North High St, Columbus, 614-299-7764)</li>
<li style="list-style:none">B. Kaleidoscope Youth Center (603 East Town St, Columbus, 614-294-5437)</li>
</ul>
</li>
</ul>

# Exhibit F

TS-
CES/SCHOOL-    ✏    (/DEPARTMENTS/NEW-
AR    ENROLLSTUDENT-WELCOME-
          CENTER)

🍎    E-    (/COMMUNITY/EFLYERS-
          FLYERSAND-PEACHJAR)

🇺🇸 English

**HOME (/)** › **DEPARTMENTS (/DEPARTMENTS)** ›

DATA AND CONTINUOUS IMPROVEMENT (/DEPARTMENTS/DATA-AND-CONTINUOUS-IMPROVEMENT)  ›

EQUITY AND INCLUSION (/DEPARTMENTS/DATA-AND-CONTINUOUS-IMPROVEMENT/EQUITY-AND-INCLUSION)
›

REPORTING BULLYING AND HARASSMENT

# REPORTING BULLYING AND HARASSMENT

**Reporting Bullying, Discrimination, Harassment, and Hazing** (/fs/resource-manager/view/609b3f1e-8ee9-47dd-9c47-b282f3fff9b7)

Olentangy Schools is committed to having a school environment free from all discrimination, bullying, harassment, and intimidation. All students, administrators, teachers, staff, and school personnel share responsibility for avoiding, discouraging, and reporting any form of unlawful discrimination. Under Federal civil rights laws discrimination based on race, color, national origin, sex, disability, age, religion, ancestry, or genetic information is strictly prohibited. Furthermore, retaliation against individuals who file a complaint is also prohibited.

Bullying, harassment, or intimidation includes any *intentional, persistent, and repetitive* written, verbal, graphic, electronically submitted, or physical act that a student or group of students exhibits toward another student and the behavior both: a). causes mental or physical harm to the other student AND b). is sufficiently severe that it creates an intimidating, threatening, or abusive educational environment for the victim.

When an incident arises that requires a report to be filed, please direct your complaint to the appropriate personnel below. You can also fill out an anonymous report on our Stay Safe Speak Up (https://staysafespeakup.app/Welcome/district/OLSD) helpline.

1). All reports involving a district employee should be directed to:

Nancy Freese

Director of Human Resources

nancy_freese@olsd.us (mailto:nancy_freese@olsd.us)

(740) 657-4003

2). All reports involving district programs (curricular or co-curricular) should be directed to:

Marty Arganbright

Director of Pupil Services

marty_arganbright@olsd.us (mailto:marty_arganbright@olsd.us)

(740) 657-4075

Krista Davis

Chief Communications Officer

krista_davis@olsd.us (mailto:krista_davis@olsd.us)

(740) 657-4066

3). All reports involving student incidents should be directed to:

Peter Stern

Title VI Coordinator

Assistant Director of Equity and Inclusion

peter_stern@olsd.us (mailto:peter_stern@olsd.us)

(740)-657-5040

Trond Smith

Director of Administrative Services

trond_smith@olsd.us (mailto:trond_smith@olsd.us)

(740) 657-4378

## Glossary of Federal Civil Rights Laws

- **Title VI of the Civil Rights Act of 1964**: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from

  participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."

  - Information about Title VI in education (https://www2.ed.gov/about/offices/list/ocr/docs/hq43e4.html)

  - Information about the application of Title VI to religious and ancestry protections (https://www2.ed.gov/about/offices/list/ocr/docs/know-rights-201701-

    religious-disc.pdf)

  - Statement on Racial Harassment (/fs/resource-manager/view/c150518f-9b0a-4731-b4ca-7c2ab299e8e1)

  - Board Policy 5517.02 - Title VI (/fs/resource-manager/view/492cad81-4028-44fb-a9e1-3b17e8904617)

- **Title IX of the Education Amendments of 1972**: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance."
  - Information about Title IX in education (https://www2.ed.gov/about/offices/list/ocr/docs/tix_dis.html)
  - Investigator Foundations Training (/fs/resource-manager/view/bed679da-6f45-4273-906f-b14f3e915a81)

## ▼ Frequently Asked Questions About Transgender Students

Each student's privacy rights under the Family Educational Rights and Privacy Act ("FERPA") and R.C. 3319.321 must be respected. Teachers and other school employees cannot reveal information about a student's transgender status unless the student's parents or legal guardian (or the student if over 18) consent to such a disclosure.

## ▼ Who is a transgender student?

A "transgender student" is a student who "consistently, persistently, and insistently express[es] a gender that, on a binary [e.g. male vs. female], we would think of as opposite to his/her assigned sex." A student who identifies as nonbinary, a student born intersex who does or does not identify with their sex-assigned-at-birth, and others whose identities belie gender norms, may also be considered "transgender."

## ▼ How does the District decide whether to make accommodations for transgender students?

When the parent of a transgender student, or a transgender student, requests accommodations, the building administrator and/or school counselor or social worker will meet with the parent, student, and any other individuals with relevant information. The team will discuss the requested accommodations; the consistency, persistency, and insistency of the asserted gender expression; and any supports needed to ensure equal access to and equal opportunity to participate in the District's education programs.

Accommodations are granted on a case-by-case basis, after considering the circumstances. When determining whether to permit an accommodation, the school will consider the following:

- evidence regarding whether the student has "consistently, persistently, and insistently" expressed the gender identity;
- ensuring the student has equal access to, and an equal opportunity to participate in, the District's education programs;
- student safety and comfort; and
- protecting student privacy and minimizing stigmatization of the student.

## ▼ What are the rules with regard to restroom use?

The District respects the privacy and dignity of each and every student. The District allows a transgender student access to the facilities consistent with their gender identity, whether that is access to the sex-segregated facilities with which the student identifies, or providing more private alternatives (*i.e.*, access to staff/unisex restrooms) if the transgender student is uncomfortable using either sex-segregated bathroom. The District's primary aim is protecting the safety and privacy of all students, and it considers each request for an accommodation on an individualized basis. **Any student who has a need or desire for increased privacy, regardless of the reason, may request access to a private restroom.**

## ▼ Does this mean that a student can decide one day to use the female restroom and the next to use the male restroom?

No. As explained above, requests for accommodations are granted after considering the specific circumstances. Restroom accommodations will only be made for a student who consistently, persistently, and insistently expresses a gender that differs from their sex-assigned-at-birth, or in situations in which other medical or legal evidence requires accommodation.

## ▼ Why does the District permit these accommodations?

The Board of Education has a policy (See, Board Policy 5517 – Anti-Harassment (http://go.boarddocs.com/oh/olenoh/Board.nsf/goto?open&id=CJXGJE43D5E5)) prohibiting discrimination or harassment on the basis of sex, *including sexual orientation and gender identity*, in all educational programs or activities. Federal courts, including the Sixth Circuit Court of Appeals, which has jurisdiction over Ohio, have opined that prohibiting a student from using the

Case: 2:23-cv-01595-ALM-KAJ Doc #: 7-1 Filed: 05/11/23 Page: 89 of 229  PAGEID #: 204

restroom consistent with his or her consistently and uniformly held gender identity is unlawful sex discrimination under Title IX of the Education Amendments of 1972 ("Title IX"), and/or a violation of the student's equal protection rights under the United States Constitution. Title IX is a federal civil rights law that prohibits discrimination on the basis of sex in federally funded education programs and activities.  A public school that violates these laws may be forced to pay the student money damages and the student's attorney fees, in addition to its own legal expenses.

▼ **I've heard that the courts have already ruled on this issue and found against transgender students. Is that true?**

The Sixth Circuit Court of Appeals, which has jurisdiction over the School District, has weighed in on the issue of a transgender student's restroom use and found for the student. In June 2016, Highland Local School District filed suit against the federal government after the U.S. Department of Education threatened to begin an enforcement action against the district for not allowing a transgender student to use the restroom consistent with the student's gender identity. Highland sought a court order prohibiting the Department from starting the process to take Highland's federal funding. The student intervened in the case seeking a court order allowing her to use the girls' restroom. The Southern District Court of Ohio issued an opinion denying Highland's request for a court order and granting the student's request for a court order. The District Court and Sixth Circuit both denied the District's request to stay the order while the matter was pending. As a result, the student was permitted to use the restroom consistent with her identified gender. If the District chose to act contrary to the ruling in the Highland case by not permitting a transgender student to use the restroom consistent with the student's gender identity, the District has no reason to expect a different result in its favor.

▼ **What action is the Board taking in relation to Title IX and Transgender Students?**

Consistent with the law, the Board of Education has a policy prohibiting discrimination on the basis of sex. The administration is responsible for implementing Board policy consistent with law. That is what the administration is doing with respect to transgender students.

▼ **What about locker rooms or overnight accommodations on school trips?**

Case: 2:23-cv-01595-ALM-KAJ Doc #: 7-1 Filed: 05/11/23 Page: 90 of 229 PAGEID #: 205

If a student meets the qualifications noted above for restroom access, the District will permit them access to other facilities corresponding to their gender identity. However, as with the options provided to students regarding restroom use, any student who has a need or desire for increased privacy, regardless of the underlying reason, may request access to private changing/restroom stalls or share their concerns regarding overnight accommodations with their building administration.

▼ **How does the dress code apply to transgender students?**

The dress code is outlined in the student handbook and is gender neutral and applies to all students equally.

▼ **How can students safely express their views?**

The District recognizes the First Amendment rights of students and community members to express their opinions and beliefs on controversial topics. But while at school, students' expression cannot disrupt or attempt to disrupt the educational process. The classrooms are places for learning, and the District's focus will be on educating all of its students. The District hopes discussions will remain civil. However, the District prohibits bullying, harassment, intimidation and discrimination of students. School counselors are available to all students for further discussion or for help reporting bullying, harassment, intimidation or discrimination.

▼ **Can transgender students participate in extra-curricular activities and athletics?**

Yes. The Ohio High School Athletic Association (OHSAA) has a policy governing the participation of transgender students in OHSAA sponsored sports. The policy generally allows for the participation of a transgender student on the team corresponding to their gender identity, subject to some restrictions on hormonal therapy and the student's transitional phase. The full policy is available at: http://www.ohsaa.org/Portals/0/Eligibility/OtherEligibiltyDocs/TransgenderPolicy.pdf (http://www.ohsaa.org/Portals/0/Eligibility/OtherEligibiltyDocs/TransgenderPolicy.pdf)

- **Section 504 of the Rehabilitation Act of 1973**: "No otherwise qualified individual with a disability in the United States…shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."

  - Information about Section 504 in education (https://www2.ed.gov/about/offices/list/ocr/504faq.html)

- **Title II of the Americans with Disabilities Act of 1990**: "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

  - Information about ADA (https://www2.ed.gov/about/offices/list/ocr/docs/hq9805.html)

- **Age Discrimination Act of 1975**: "The Age Discrimination Act of 1975 prohibits discrimination on the basis of age in programs and activities receiving federal financial assistance."

  - Information about the Age Discrimination Act (https://www2.ed.gov/policy/rights/guid/ocr/ageoverview.html)

- **Genetic Information Nondiscrimination Act of 2008**: "An act to prohibit discrimination on the basis of genetic information with respect to health insurance and employment."

  - Information about the Genetic Information Nondiscrimination Act (https://www.eeoc.gov/laws/statutes/gina.cfm)

The Olentangy Board of Education has adopted the following policies (https://www.olentangy.k12.oh.us/Page/2253)  (https://www.olentangy.k12.oh.us/board-of-education/board-policies-and-negotiated-agreements) to address discrimination, bullying, harassment, and intimidation in the district:

- 3362: Anti-Harassment (https://go.boarddocs.com/oh/olenoh/Board.nsf/goto?open&id=B9RVGP63597A)
- 4362: Anti-Harassment (https://go.boarddocs.com/oh/olenoh/Board.nsf/goto?open&id=B9RVGU635982)
- 5517: Anti-Harassment (/fs/pages/459)

## Harassment Reports

- Harassment Report - August - December 2022 (/fs/resource-manager/view/29cf1af3-5a4e-4999-8adb-2d9c3cc988b8)
- Harassment Report - January - May 2022 (/fs/resource-manager/view/a259a18e-c5f3-4077-a6e3-f32994303250)
- Harassment Report - August - December 2021 (/fs/resource-manager/view/32a3b791-2841-4159-b1c0-8a07a1a9c251)
- Harassment Report - January-May 2021 (/fs/resource-manager/view/66ffa8d9-dfd7-4263-b479-4c12a7c649d9)
- Harassment Report - August - December 2020 (/fs/resource-manager/view/c2a9a09e-d23f-4740-a680-449508daadb2)
- Harassment Report -January -May 2020 (/fs/resource-manager/view/953c2a65-6e44-4b6e-a660-2c9340ba7496)
- Harassment Report - August - December 2019 (/fs/resource-manager/view/1cfdc6de-ee48-4713-8678-b4ec372ab185)
- Harassment Report - January - May 2019 (/fs/resource-manager/view/a9b9078a-7734-4f8b-a5f9-71e2b2184eed)
- Harassment Report - August - December 2018 (/fs/resource-manager/view/50a6bbae-8e14-4e0e-afc6-40d32e7af9f4)

Case: 2:23-cv-01595-ALM-KAJ Doc #: 7-1 Filed: 05/11/23 Page: 92 of 229  PAGEID #: 207

- <u>Harassment Report - January - May 2018 (/fs/resource-manager/view/87a72a08-7232-4258-88cd-51acb110de16)</u>

- <u>Harassment Report - August - December 2017 (/fs/resource-manager/view/9d85e04d-eedb-4a93-a4b5-36366b8f9256)</u>

- <u>Harassment Report - January - May 2017 (/fs/resource-manager/view/7270ee67-ff3c-4cf0-9ab4-73670b0ef308)</u>

- <u>Harassment Report - August - December 2016 (/fs/resource-manager/view/75bc9e7d-5b63-4fe1-b8ff-a43809a08c89)</u>

- <u>Harassment Report - January - May 2016 (/fs/resource-manager/view/cce26e6b-efeb-4942-a6d2-a223fc8b7487)</u>

- <u>Harassment Report - August - December 2015 (/fs/resource-manager/view/6a2e22f2-858b-4f97-a294-84dc1ffce598)</u>

- <u>Harassment Report - January - May 2015 (/fs/resource-manager/view/9bf5e524-29b9-4b08-9069-82d6078738a3)</u>

- <u>Harassment Report - August - December 2014 (/fs/resource-manager/view/4cb8dbcd-3d44-47d2-b6ad-a730f23b5a73)</u>

- <u>Harassment Report - January - May 2014 (/fs/resource-manager/view/c5c50382-2705-4924-99bb-64d0ac480c56)</u>

- <u>Harassment Report - August - December 2013 (/fs/resource-manager/view/02c96420-74de-4f34-a7a6-333aa25206cd)</u>

# Exhibit G

TS-
CES/SCHOOL-

🖊 (/DEPARTMENTS/NEW-
ENROLLSTUDENT-WELCOME-
CENTER)

🍎 E-    (/COMMUNITY/EFLYERS-
FLYERSAND-PEACHJAR)

🇺🇸 English

**HOME (/)** › **BOARD OF EDUCATION (/BOARD-OF-EDUCATION)** ›

**BOARD POLICIES AND NEGOTIATED AGREEMENTS (/BOARD-OF-EDUCATION/BOARD-POLICIES-AND-NEGOTIATED-AGREEMENTS)**
›
**BOARD POLICIES REGARDING DIVERSITY**

# BOARD POLICIES REGARDING DIVERSITY

## OLENTANGY POLICIES

- Olentangy Board of Education Policies (http://www.boarddocs.com/oh/olenoh/Board.nsf/Public?open&id=policies)

# BOARD POLICIES REGARDING DIVERSITY

- 2211 Multicultural/ Inclusive Education

- 5517 Anti-Harassment

- 5517.01 Bullying and Other Forms of Aggressive Behavior

- 5517.02 Anti-Harassment and Non-Discrimination

- 5136 Wireless Communication Devices

- 5136.01 Electronic Equipment

# NEGOTIATED AGREEMENTS

- 2018-21 OTA (Olentangy Teachers Association) Contract (/fs/resource-manager/view/ba2dc6ae-a052-49b2-a460-4dbaddcbc750)

- Bus Drivers Local 322 Transportation Contract 2018-2021 (/fs/resource-manager/view/6830063c-c8b6-42f4-8682-3997a6794da9)

- CMF Local 039 Negotiated Agreement 2018-2021 (/fs/resource-manager/view/9ccec570-de1b-4aa9-85da-9d58899bb31e)

# Exhibit H



# REPORTING BULLYING, DISCRIMINATION, HARASSMENT, AND HAZING

The Board of Education is committed to providing a safe, positive, productive, and nurturing educational environment for all students and an education and work environment free from all forms of unlawful harassment. All students, administrators, teachers, staff, and all other school personnel are required to report any form of unlawful harassment, discrimination, bullying, or hazing.

## BULLYING

**Definition**: Inappropriate conduct that is repeated enough, or serious enough, to negatively impact a student's educational, physical, or emotional well being.

## HARASSMENT AND DISCRIMINATION

**Definition**: Discriminatory or harassing conduct based upon an individual's race, color, national origin, sex (including sexual orientation and gender identity), disability, age (except as authorized by law), religion, ancestry, or genetic information.

## SEXUAL HARASSMENT

**Definition**: Conduct on the basis of sex that satisfies one of the following:
1. quid pro quo sexual harassment
2. unwelcome conduct that is severe, pervasive, or objectively offensive; or
3. sexual assault, dating violence, domestic violence, or stalking.

## HAZING

**Definition**: Any act of initiation into any class, team, or organization that causes or creates a substantial risk of causing mental or physical harm, regardless of whether permission or consent was given.

## REPORTING

If a staff member is approached by a student who has a complaint or expresses a need for accommodations based upon the student's protected class (e.g., disability, religion, or sex, including sexual orientation or gender identity) the staff member must report that need immediately to the building principal, compliance officer, or Title IX Coordinator (for complaints of sexual harassment).

# Exhibit I





# Exhibit J



 **Back**





**Olentangy Local Schools**

(scroll to read)

### Submit a Report

The Stay Safe. Speak Up! Student Safety Reporting System is provided for students and parents to report any safety concern, 24/7. Tap the blue button below to report your safety concern.

Important things to know:

- The more you tell us, the more we can help you.

**Continue**



**STAY SAFE. SPEAK UP!**

## Welcome

### About Stay Safe. Speak Up!

The Stay Safe. Speak Up! Student Safety Reporting System is provided for students and parents to report concerns to school officials which may affect the peace of mind of students or jeopardize the safety of people or school facilities.

### Your Reporting Options

- Online using this tool          Click on button below to submit a report
- Telephone hotline          1-866-547-8362
- Mobile app          Search for Stay Safe. Speak Up! on the App Store or Google Play

### Example Concerns to Report

Concerns may include, but are not limited to, bullying, abuse, bomb threats, cyber crimes, discrimination, drugs, health concerns, suspicious behavior, vandalism, fighting, & weapons. Your information helps us maintain a school environment that is safe and conducive for learning.

**Close**







# Exhibit K



# SPEECH FIRST



**2 0 2 2**

# FREE SPEECH IN THE CROSSHAIRS:
## BIAS REPORTING ON COLLEGE CAMPUSES

# TABLE OF CONTENTS

ABOUT SPEECH FIRST     2

LETTER FROM THE EXECUTIVE DIRECTOR     2

EXECUTIVE SUMMARY     3

WHAT ARE BIAS REPORTING SYSTEMS?     5

THE DANGERS OF BRSs     6

METHODOLOGY     8

RESULTS     9

WHAT CAN BE DONE     12

APPENDIX OF UNIVERSITIES WITH BRSs     15

ENDNOTES     19

# ABOUT SPEECH FIRST

Speech First is a membership association of students, parents, faculty, alumni, and concerned citizens committed to restoring the freedom of speech on college campuses through advocacy, education, and litigation. Launched in 2018, Speech First is dedicated to preserving the free and open discourse essential to a comprehensive education and counteracting the increasingly toxic censorship culture on college campuses.

# LETTER FROM THE EXECUTIVE DIRECTOR

Colleges and universities routinely threaten their students' speech rights. Those who fight back are met with open hostility from campus administrators, professors, and peers. As a result, students across campus are often denied the opportunity to express their views in open debate.

One increasingly popular method of quelling campus speech and enforcing ideological uniformity is the adoption of Bias Reporting Systems (BRSs), which schools often create under the guise of "Diversity, Equity, and Inclusion." BRSs actively chill student speech through fear and intimidation. Sadly, the students themselves often anonymously report their peers for alleged infractions. By creating a tattle-tale culture, students are empowered to enforce agendas on others.

I could give you countless examples of brave students who stand up for what they believe in. But the prospect of standing up to a college or university can be overwhelming, expensive, and time-consuming (not to mention awkward, since the student still wants a diploma at the end of the day). That's why many students stay silent.

The prospect of speaking freely looks less daunting when students are supported by like-minded individuals from all over the country and have the partnership and support of an organization with the resources to fight back. That's why Speech First exists. We've created a nationwide community of free speech supporters so that students won't have to go at it alone. We provide support every step of the way: on campus, in the media, and in court.

Speech First is restoring the freedom of speech on college campuses because when students are exposed to different and challenging ideas, they emerge stronger, smarter, and more resilient. That's the point of education, after all. And that's why we're putting colleges and universities on notice that we'll be there whenever they censor, shut down, or unjustly punish speech.

We hope you'll join us.

*Cherise Trump*

Executive Director, Speech First

# EXECUTIVE SUMMARY

Free speech is under attack. Today, higher education is ground zero for testing out dangerous forms of censorship that instill fear, propel viewpoint discrimination, and restrict vital academic discourse.

One increasingly popular tactic is the Bias Reporting System (BRS). These elaborate schemes are designed to silence dissenters, stifle open dialogue, and encourage students to report speech they deem unacceptable. Two federal courts of appeals have already recognized the chilling effect of BRSs. In 2019 the Sixth Circuit stated that BRSs impose an "objective chill" on speech because they "act by way of implicit threat of punishment and intimidation to quell speech."[1] Similarly, in 2020, the Fifth Circuit agreed, stressing that BRSs "represent the clenched fist in the velvet glove of student speech regulation."[2]

This 2022 Report, 'Free Speech in the Crosshairs: Bias Reporting on College Campuses,' is the first comprehensive report covering these issues in nearly five years. Speech First's report provides updated data, trends, and reflections in order to provide new insights into the rapid growth of bias reporting systems.



**456 BIAS REPORTING SYSTEMS**

249 PUBLIC

207 PRIVATE

We evaluated 824 institutions of higher education and found that the **majority** of them (56%) have Bias Reporting Systems. In total, we identified **456 Bias Reporting Systems** (BRSs)[3] at public and private institutions of higher education across the country. Of these, **249** were found in *public* institutions and **207** in *private* institutions – and 53% of the most egregious forms[4] of BRSs were housed in Diversity, Equity, and Inclusion (DEI) offices.

Before this Report, the primary data available on this issue was the 2017 report from the Foundation for Individual Rights in Education (FIRE),[5] which identified **232 Bias Reporting Systems** (BRSs) on American college campuses. The FIRE report predicted that this number would "grow rapidly."[6] FIRE's prediction turned out to be correct. In this report, Speech First identifies **456 BRSs**, **twice as many** as identified by FIRE just five years ago. Moreover, this report is largely based on information that universities publicly report. It is very likely that some BRSs are not publicized, and so these reporting systems are far more pervasive than we know.

In short, our data shows that Bias Reporting Systems have been spreading rapidly. Our report outlines the scope of this problem and includes an underline appendix of all the schools we found with identified BRSs.

Tackling BRSs will require some combination of the following:
- *Legal action* – Hold universities accountable for their bad policies in the court of law.
- *Public pressure* – Parents, students, and alumni should inform state and national legislators as well as the media about free speech concerns on their campuses.
- *Engage alumni and donors* – Donors should demand transparency from the universities they give to.
- *Use state and federal funding to apply pressure* – Tax-payer funded institutions are beholden to the people.
- *Empower students* – Students should know their rights and recognize when those rights are being violated.



"For the people to rule wisely, they must be free to think and speak without fear of reprisal."

James Madison

# WHAT ARE BIAS REPORTING SYSTEMS?

FIRE's 2017 Report defined a bias reporting system 'as any system identified as such, or that provides':[7]

1. a formal or explicit process for or solicitation of

2. reports from students, faculty, staff, or the community

3. concerning offensive conduct or speech that is protected by the First Amendment or principles of expressive or academic freedom.

Bias Reporting Systems are university teams or procedures that are specifically designated to solicit, receive, investigate, and respond to reports of "bias incidents" or other similar speech at their institutions. Typically, BRSs invite students and faculty to report speech that is "biased" on the basis of some protected characteristic such as race, religion, sex, sexual orientation, gender identity/expression, age, disability.[8] Many even include "bias" against someone's "political affiliation."[9]

Students, faculty, and staff who believe they have experienced or witnessed a "bias incident" can usually report the incident to their college or university through an online reporting form. In most of these forms, the reporter can choose to remain anonymous.

BRSs are typically staffed by the university's senior faculty and staff. And some include a police officer on the team itself—a literal speech police.

After receiving a complaint about an alleged "bias incident," the BRS reviews the incident report and will either conduct an "educational intervention"[10] with the accused student or forward the complaint to another university department for further review. Some BRSs maintain a public log of reported bias incidents, sometimes with enough detail that others on campus can deduce who was involved. And virtually all universities claim that these processes are designed to assess the campus climate and monitor "patterns" of hate and bias to help the university improve its trainings, programs, or policies. Students reported to these systems do not know whether or not the university is keeping records—records that could follow them well beyond college and into their professional careers.

The University of Maryland's description of its BRS is emblematic:

> The primary role of the Hate-Bias Response Team is to review hate-bias incidents, to provide appropriate responses based on the nature of the incident and to work collaboratively to provide educational outreach to the campus … Bias Incident Support Services (BISS) is charged with addressing hate-bias incidents targeting UMD students, faculty and staff. The program responds, educates and reports to the campus community about bias, its impact, as well as protocols related to bias … [BISS] is committed to holistically addressing hate-bias incidents that target UMD community members by focusing on incident response and support, proactive training and education initiatives, and data collection and distribution … BISS staff collects and analyzes data related to hate-bias incidents which allows for the evaluation of trends, the assessment of training needs and strategizing of prevention efforts.

Similarly, the University of Tennessee at Knoxville describes its BRS (what it calls the "Bias Education and Response Team," or BERT) as using the following protocol:

> The team members will review incident reports and meet with affected students to facilitate services such as counseling, health services, or other referrals as needed to address safety concerns and to provide assistance and comfort to those impacted … [and] develop an appropriate plan to initiate communication with the broader community and make referrals to the Office of Student Conduct and Community Standards, Office of Equity and Diversity, or the University of Tennessee Police Department if the incident appears to violate a university policy or state/federal law … Any student found to

be responsible for an act of bias, which violates university Standards of Conduct or criminal law, will be subject to disciplinary sanctions up to and including permanent dismissal from the university.

BRSs frequently define "bias incidents" in vague and overbroad terms, making them difficult for students to interpret and easy for administrators to employ at their discretion. Nevertheless, all of the definitions make one thing clear: they apply to student speech. As a result, students often self-censor to avoid running afoul of these teams. Recent data shows that only 32% of college students feel that it is very or extremely clear that their college administration protects free speech on campus.[11]

Apart from the reporting teams described above, BRSs can often arise as vague online systems embedded within other boards or committees already established on campus — systems soliciting reports of incidents concerning speech that is biased, offensive, unwanted, discriminatory, hateful, or a "microaggression."

# THE DANGERS OF BRSs

BRSs intimidate and silence students whose viewpoints do not conform to the dominant social, political, and cultural narratives on campus. By design, these teams create an environment of fear that chills speech and dialogue between students of diverse beliefs and perspectives, ultimately silencing speech through self-censorship. This chilling effect was confirmed by a 2021 joint study conducted by FIRE, College Pulse, and RealClearPolitics, which found that more than **80%** of college students in the U.S. self-censor.[12] The result of this climate of intimidation and self-censorship is a campus environment that fosters fearful silence instead of a healthy back-and-forth in the classroom, in dorms, at club events, and in social settings.

The broad definition of "bias" allows universities to burden a broad range of constitutionally protected expression. And a lack of clear and meaningful standards opens the door to arbitrary or discriminatory enforcement.

The definition of a "bias incident" at most universities is so broad that it encompasses even political speech. Common definitions include speech that is "motivated by a bias against a person in part because of that person's … *political affiliation … or intellectual perspective*" (the University of Mississippi), or biased expressions "based on … pe*rceived political ideas*" (Eastern Mennonite University). But students must be able

to speak freely and offer their perspectives on historical and current events and ideas. As Speech First warned in its case against the University of Michigan, "[u]nder the plain text of [the BRS's] definitions, a student may be deemed to have acted with 'bias' if, for example, she gives a speech sharply criticizing the Catholic Church and its adherents for not allowing women to become priests; this student has expressed a 'negative opinion' or 'attitude' about a certain group of people based on their 'cultural experience' of religion."[13] Such rich and valuable discourse should not be discouraged through university intimidation.

BRSs also frequently combine immense power with a lack of oversight or accountability. Many BRSs can either initiate disciplinary actions against students or refer allegations to other university departments with disciplinary authority. But even when a BRS disclaims any formal disciplinary authority, the mere presence of a team consisting of senior administrators responsible for monitoring student expression inevitably chills speech. The simple fear of being anonymously reported to university authorities and subjected to process-is-punishment investigations (which often include university officials and law enforcement), diversity and anti-bias trainings, and public stigmatization is a present and powerful force on campuses across the country.



# Bias reporting systems "represent the clenched fist in the velvet glove of student speech regulation."

Fifth Circuit Court Opinion
in *Speech First, Inc. v. Fenves*
(2020)

With these powerful, unaccountable systems and broad definitions in place, universities solicit complaints from students about their classmates' speech. Put differently, they ask students to report one another simply for expressing disagreement with or an alternative perspective from the dominant social, political, or cultural narrative on campus.

BRSs ultimately contribute to a culture on campus that prevents students from voicing unpopular beliefs about the most important issues of the day — topics like racial inequality, abortion, gender identity, gun control, or contemporary socio-political phenomena like the George Floyd protests.[14]

That's why these policies undermine the very foundational purpose of our educational institutions. As Amna Khalid and Jeff Snyder, professors of History and Educational Studies at Carleton College, have warned, BRSs "degrade education by encouraging silence instead of dialogue, the fragmentation of campuses into groups of like-minded people, and the deliberate avoidance of many of the most important — and controversial — topics across all academic disciplines. They are inherently anti-intellectual enterprises, fundamentally at odds with the mission of higher education."[15]

Paradoxically, BRSs undermine the very diversity that the proponents of BRSs claim to seek. Diversity of all kinds, including diversity of thought, is central to educational excellence. As a result, BRSs present a formidable threat to educational excellence. As Khalid and Snyder correctly feared, bias response systems:

> undermine a bedrock principle of the modern university: that more diversity leads to better learning ... [D]iversity works its magic only through meaningful contact between people with varying 'identity characteristics.' Contact, by definition, will sometimes lead to conflict. Imagine a conversation between an evangelical student and a gay student on same-sex marriage, or a discussion about U.S. drone policy between a dove and a hawk. Such conversations are invaluable. But without the space to debate and argue, students won't ever be forced to confront the underlying assumptions framing their worldviews. BRTs threaten to drive students into their own corners with peers who look and think like them, reducing the potency of diversity to a glib slogan on admissions brochures.[16]

# METHODOLOGY

### The Colleges and Universities in this Report

We evaluated the leading four-year colleges and universities in every state, generating a significant pool of both private and public schools. Ultimately, our study covered 444 private schools (which represent 23%[17] of all private four-year colleges in the U.S.), and 380 public schools (which represent 49%[18] of all public four-year colleges in the U.S.), for a total of 824 institutions.

In 2016, FIRE defined a Bias Reporting System as "any system identified as such, or that provides a formal or explicit process for or solicitation of reports from students, faculty, staff, or the community concerning offensive conduct or speech that is protected by the First Amendment or principles of expressive or academic freedom."[19] Similarly, in Speech First's report, an institution is deemed to have a Bias Reporting System if it houses an established system (a devoted incident report form and adjudicating team/council/board) that explicitly solicits reports of speech that is:

- Biased
- Offensive
- Unwanted
- Discriminatory
- Hate/hateful
- A microaggression

# RESULTS

We found **456 Bias Reporting Systems** at four-year public and private institutions of higher education across the country (56% of the total 824 schools examined in our report). Of these, **207** were found in private institutions and **249** in public institutions (46% of all private schools and 66% of all public schools examined in our report thus have a BRS).

Our report thus found **230%** more BRSs at private universities and **175%** more BRSs at public universities than FIRE did just five years ago (FIRE found 89 and 143 BRSs, respectively). Considering our report only examined 49% of public four-year colleges and 23% of private four-year colleges, the number of BRSs would swell if we were to examine every university.

Nearly every reporting system allows for anonymous reporting, and 53% of the most expansive forms[20] of these systems were housed in Diversity, Equity, and Inclusion (DEI) offices.

In total, we identified **twice as many** BRSs as FIRE did in 2017 (**456** identified in our report, versus **232** identified in FIRE's 2017 survey).

An appendix of all 456 schools with BRSs can be found in our <u>Appendix of Universities with BRSs</u> on p. 15.



# INSTITUTIONS WITH BIAS REPORTING SYSTEMS



## BRSs FOUND IN 2017 [21]

Massachusetts

New York

Pennsylvania

Rhode Island

## BRSs FOUND IN 2022

Massachusetts

New York

Pennsylvania

Rhode Island



"Students across the nation are self-censoring for fear of being suspended, failing to be hired for a job, or being ostracized from society. We see this because practical policy ideas are often turned into these outrageous questions of good and evil – if someone disagrees with you politically, you do not just disagree, but you are now a bad person."

Emma Blair, Grand Canyon University

# WHAT CAN BE DONE

Since our nation's founding, Americans have placed a high value on the fundamental freedoms to speak, inquire, and learn, freedoms enshrined in the First Amendment. These freedoms not only infuse the spirit of the liberal arts, but are also essential to the continued health and existence of our nation. Central to liberal democracy and the republican form of government is a spirit of political participation that requires curious, engaged citizens who can speak and think freely with one another. As is a basic tolerance for opposing viewpoints and a vigilance against tyranny in all of its obvious and subtle forms.

The dangerous effects of BRSs must be confronted and addressed. It's not just about defending essential freedoms, but also about creating and sustaining a society in which we can exercise them. These policies do not cultivate a space of inclusion and diversity. Instead, they compromise students' fundamental rights to free speech and inquiry, profoundly weaken the academy, and threaten our constitutional republic and our relentless pursuit of a more perfect union.

Several steps can and should be taken, in conjunction, to address BRSs.

**Take legal action.** Speech First holds universities accountable for their actions. We have been on the front lines of the fight against bias reporting policies from the beginning, and many of our cases have involved the activities of BRSs and their chilling effects on student speech. To date, Speech First is the only organization to prevail in litigation against a bias reporting system, effectively ending the systems at the University of Michigan and University of Texas. If you're interested in taking action on your own campus to stop a BRS from censoring student speech, you should reach out to Speech First or other public-interest groups who protect students' First Amendment rights.

**Monitor and revoke state and federal funding for universities that violate students' First Amendment rights.** Public universities are taxpayer-funded institutions and are thus answerable to the people. Even private universities receive state and federal grants and, as a condition of receiving those funds, must comply with the applicable regulations to the same degree as public universities.[22] At the federal level, the Department of Education needs to monitor the campus speech policies of schools that receive federal funding. Moreover, if a university applying for a federal grant has policies that appear to facially restrict student speech, its application should be paused for further investigation.

State governments can also play an important role. They can enact legislation to enhance transparency at state universities and provide oversight to ensure that public institutions comply with those requirements. State legislatures could, for example, require public universities to conduct annual student surveys evaluating the free speech climates on their campuses. States could mandate that freshmen orientations include courses on the First Amendment and exercising free speech. Additionally, because most BRSs are housed in university DEI departments, state legislators could mandate increased disclosures from DEI departments about their BRS procedures. A recent report from the Idaho Freedom Foundation[23] lists several additional ways lawmakers can reform college campuses, such as designating all outdoor areas on public universities as public forums open to free speech and requiring colleges and universities to disclose how their policies protect free speech on their campuses. These types of policies incentivize transparency and encourage universities to aim for open discourse and free speech on their campuses.

**Apply public pressure.** Parents, students, and alumni should regularly engage with their state legislators, congressional representatives and staff, and university boards of trustees. Public pressure can not only alert policymakers to the gravity of the issue but also inspire them to champion campus free speech issues. Lawmakers often don't see a spirited push about student free speech



rights from their constituents, but the more that constituents emphasize this issue, the greater the pressure to take action will become. Alumni must also emphasize to university boards of trustees that initiatives like BRSs will damage the prestige of their institutions and weaken their academic reputations.

**Engage alumni donors.** Alumni should exert pressure on their alma maters. Major donors should take a closer look at how the universities they love and support have changed from when they were last on campus. Millions of dollars of alumni donations are being spent on DEI departments and other misguided efforts that lead to speech restrictions on campus.[24]

**Empower students.** Finally, students must recognize the responsibility they have to themselves. Self-censorship, avoiding discussions and debates, and other forms of complacency will not lead to more open discourse on campus. Instead, it will embolden those who wish to eliminate dissenting voices. Students must know their constitutional rights, federal and state laws, and campus policies. Students should note any red flags when reading student handbooks and reach out to organizations like Speech First when they encounter policies that chill speech on campus. Because Speech First will be there every step of the way, students can have the courage to speak whenever and wherever campus administrators,

faculty, and peers try to shut down speech. Finally, students who support free speech on campus should consider running for Student Government, founding or joining clubs that advocate for the First Amendment, or writing for the campus paper or other news and media outlets.

Below is advice from students who are on campuses now and facing similar challenges:

*"The best advice I can give to the next generation of college students is to stand firm in your values and don't allow yourself to be silenced."* – Olivia Gallegos, Wichita State

*"The biggest piece of advice I would offer is to become so extraordinarily educated on your beliefs and opinions that you become confident enough to speak up and out against those silencing you. And when you are met with opposition and the stifling of your speech, fight back with facts."* – Adam Fairchild, University of Colorado- Boulder

*"My best advice to college students and beyond is to always remember that the Constitution is on your side. We need more students who are willing to stand up in their classrooms, challenge colleges and universities when they attempt to silence them and encourage their peers to do the same."*– Kiara Kincaid, University of Oklahoma



"The best advice I can give to the next generation of college students is to stand firm in your values and don't allow yourself to be silenced."

Olivia Gallegos, Wichita State

# APPENDIX OF UNIVERSITIES WITH BRSs

This appendix lists every university in our report that maintains a BRS and links to their respective webpages. As outlined in the What are Bias Reporting Systems? section on p. 5, these systems use a wide array of language and procedures, but they all have one thing in common—unnecessarily chilling speech student speech that is outside of the mainstream.

## Alabama
Auburn University
Birmingham-Southern College
Huntingdon College
Jacksonville State University
Spring Hill College
University of Alabama
University of South Alabama

## Arizona
University of Arizona

## Arkansas
Henderson State University
University of Central Arkansas

## California
California Polytechnic State University
California State University, Chico
California State University, East Bay
California State University, Northridge
California State University, Sacramento
California State University, San Marcos
Harvey Mudd College
Humboldt State University
Pomona College
San Francisco State University
San Jose State University
Santa Clara University
Scripps College
Stanford University
Sonoma State University
UC, Berkeley
UC, Davis
UC, Irvine
UC, Los Angeles
UC, Merced
UC, Riverside
UC, San Diego
UC, San Francisco
UC, Santa Barbara
UC, Santa Cruz
University of Southern California

## Colorado
Colorado Mesa University
Colorado School of Mines
Colorado State University
Colorado State University, Pueblo
Regis University
University of Colorado Boulder
University of Denver

## Connecticut
Central Connecticut State University
Connecticut College
Fairfield University
Sacred Heart University
Southern Connecticut State University
Trinity College - Connecticut
University of Connecticut
University of New Haven
University of Saint Joseph
Wesleyan University
Yale University

## Florida
Florida A&M University
Florida Gulf Coast University
Florida International University
Florida State University
Rollins College
Stetson University
University of Central Florida
University of Florida
University of Miami
University of North Florida
University of Tampa

## Georgia
Agnes Scott College
Berry College
Emory University
Georgia Institute of Technology
University of West Georgia

## Hawaii
Brigham Young University - Hawaii
University of Hawaii at Hilo

## Idaho
Boise State University
The College of Idaho
University of Idaho

## Illinois
Augustana College - Illinois
Eastern Illinois University
Illinois Institute of Technology
Illinois State University
Illinois Wesleyan University
Lake Forest College
Loyola University Chicago
Northern Illinois University
Northwestern University
Southern Illinois University at Carbondale
Southern Illinois University at Edwardsville
University of Chicago
University of Illinois at Chicago
Wheaton College - Illinois

## Indiana
Ball State University
Butler University
Depauw University
Earlham College
Hanover College
Indiana State University
Indiana University, Bloomington

Indiana University, East
Indiana University, Kokomo
Indiana University, Northwest
Indiana University - Purdue
University Indianapolis
Indiana University, South Bend
Indiana University, Southeast
Purdue University
Purdue University Fort Wayne/
Indiana University Fort Wayne
University of Evansville
University of Notre Dame
University of Southern Indiana
Valparaiso University
Wabash College

## Iowa
Coe College
Cornell College
Drake University
Grinnell College
Iowa State University
Luther College
University of Iowa
University of Northern Iowa

## Kansas
Baker University
Friends University
Pittsburg State University
Sterling College
Wichita State University

## Kentucky
Bellarmine University
Centre College
Eastern Kentucky University
Morehead State University
Northern Kentucky University
Transylvania University
University of Kentucky
University of Louisville
Western Kentucky University

## Louisiana
Centenary College of Louisiana
Dillard University
Grambling State University
Louisiana State University
Loyola University New Orleans
Southeastern Louisiana
University

Tulane University
University of New Orleans
Xavier University of Louisiana

## Maine
Bates College
Bowdoin College
Colby College
Husson University
University of Maine
University of New England
University of Southern Maine

## Maryland
Frostburg State University
Goucher College
Hood College
Johns Hopkins University
Loyola University Maryland
McDaniel College
Stevenson University
Towson University
University of Maryland
Washington College

## Massachusetts
Amherst College
Babson College
Boston College
Boston University
College of the Holy Cross
Fitchburg State University
Framingham State University
Harvard University
Massachusetts Institute of
Technology
Massachusetts Maritime
Academy
Northeastern University
Salem State University
Tufts University
University of Massachusetts -
Amherst
University of Massachusetts
Dartmouth
University of Massachusetts
at Lowell
Wellesley College
Westfield State University
Williams College
Worcester State University

## Michigan
Albion College
Andrews University
Aquinas College - Michigan
Calvin University
Central Michigan University
College for Creative Studies
Grand Valley State University
Hope College
Kalamazoo College
Lawrence Technological
University
Michigan State University
Michigan Technological
University
Saginaw Valley State University
Spring Arbor University
University of Michigan - Ann
Arbor
University of Michigan -
Dearborn
University of Michigan - Flint
Western Michigan University

## Minnesota
Bemidji State University
Carleton College
Concordia College
Gustavus Adolphus College
Macalester College
Minnesota State University,
Mankato
Minnesota State University,
Moorhead
North Central University
Saint Cloud State University
St. Catherine University
St. Olaf College
University of Minnesota - Morris
University of Minnesota - Twin
Cities
University of St. Thomas -
Minnesota

## Mississippi
Jackson State University
Mississippi College
Mississippi State University
University of Mississippi

## Missouri
Drury University

Fontbonne University
Maryville University
Missouri State University
Missouri University of Science and Technology
Saint Louis University
Southeast Missouri State University
University of Missouri - Columbia
University of Missouri – Kansas City
University of Missouri - Rolla
University of Missouri - St. Louis
Washington University in St. Louis
William Jewell College

## Montana
Carroll College

## Nebraska
Bellevue University
Creighton University
Doane University
Hastings College
Nebraska Wesleyan University
University of Nebraska - Lincoln
University of Nebraska Omaha

## Nevada
University of Nevada, Reno

## New Hampshire
Colby-Sawyer College
Dartmouth College
Franklin Pierce University
Southern New Hampshire University
University of New Hampshire

## New Jersey
Drew University
Kean University
Monmouth University
Montclair State University
New Jersey Institute of Technology
Princeton University
Rider University
Rowan University
Rutgers University – New Brunswick
Seton Hall University

Stevens Institute of Technology
Stockton University
The College of New Jersey
William Paterson University

## New Mexico
University of New Mexico

## New York
City College of New York
Colgate University
College of Staten Island
Columbia University
Cornell University
CUNY, Hunter College
Hamilton College
New York University
Skidmore College
Stony Brook University
SUNY Albany
SUNY Binghamton
SUNY Brockport
SUNY Buffalo
SUNY Cobleskill
SUNY Cortland
SUNY Environmental Science and Forestry
SUNY Empire
SUNY Fredonia
SUNY Geneseo
SUNY Morrisville
SUNY New Paltz
SUNY Old Westbury
SUNY Oneonta
SUNY Oswego
SUNY Plattsburgh
SUNY Potsdam
University of Rochester
Vassar College

## North Carolina
Appalachian State University
Davidson College
Duke University
Elizabeth City State University
Elon University
Fayetteville State University
High Point University
North Carolina State University
University of North Carolina – Asheville

University of North Carolina - Chapel Hill
University of North Carolina – Charlotte
University of North Carolina - Greensboro
Wake Forest University
Western Carolina University

## North Dakota
North Dakota State University
University of North Dakota

## Ohio
Bowling Green State University
Cleveland State University
Case Western Reserve University
College of Wooster
Denison University
John Carroll University
Keene State College
Miami University of Ohio
Oberlin College
Ohio University
The Ohio State University
University of Cincinnati
University of Dayton
Wright State University
Youngstown State University

## Oklahoma
Oklahoma State University
University of Central Oklahoma
University of Oklahoma

## Oregon
George Fox University
Lewis & Clark College
Linfield University
Oregon Institute of Technology
Oregon State University
Pacific University Oregon
Portland State University
Reed College
Southern Oregon University
University of Oregon
University of Portland specifically School of Nursing
Western Oregon University
Willamette University

## Pennsylvania

Bryn Mawr College
Bucknell University
California University of Pennsylvania
Carnegie Mellon University
Cheyney University of Pennsylvania
Clarion University of Pennsylvania
East Stroudsburg University of Pennsylvania
Edinboro University of Pennsylvania (Linked with Clarion)
Franklin & Marshall College
Indiana University of Pennsylvania
Kutztown University of Pennsylvania
Lafayette College
Lehigh University
Lock Haven University of Pennsylvania
Mansfield University of Pennsylvania
Millersville University of Pennsylvania
Pennsylvania State University - University Park
Shippensburg University of Pennsylvania
Swarthmore College
University of Pennsylvania
University of Pittsburgh
Villanova University
West Chester University of Pennsylvania

## Rhode Island

Brown University
Bryant University
Providence College
Rhode Island College
Rhode Island School of Design
Roger Williams University
University of Rhode Island

## South Carolina

Clemson University
Coastal Carolina University
College of Charleston
Furman University
Presbyterian College
University of South Carolina
Winthrop University
Wofford College

## South Dakota

Augustana University
South Dakota State University

## Tennessee

East Tennessee State University
Lipscomb University
Middle Tennessee State University
Rhodes College
Sewanee - The University of the South
Union University
University of Tennessee - Knoxville

## Texas

Baylor University
Rice University
Southern Methodist University
Tarleton State University
Texas A&M University
Texas Christian University
Texas State University
Texas Tech University
Texas Woman's University
Trinity University
University of Texas at San Antonio

## Utah

Southern Utah University
University of Utah
Utah Valley University
Weber State University
Westminster College - Utah

## Vermont

Champlain College
Middlebury College
Saint Michael's College
Sterling College - Vermont
University of Vermont

## Virginia

Eastern Mennonite University
George Mason University
James Madison University
Liberty University
Longwood University
Norfolk State University
Radford University
Roanoke College
Shenandoah University
The College of William and Mary
The University of Virginia's College at Wise
University of Mary Washington
University of Richmond
University of Virginia
Virginia Polytechnic Institute and State University
Washington and Lee University

## Washington

Central Washington University
Eastern Washington University
Evergreen State College
Gonzaga University
Pacific Lutheran University
Saint Martin's University
Seattle Pacific University
Seattle University
University of Puget Sound
University of Washington
University of Washington Bothell
Western Washington University
Whitworth University
Whitman College

## Washington D.C.

American University
Georgetown University
George Washington University

## West Virginia

Bethany College - West Virginia
Davis & Elkins College

## Wisconsin

Alverno College
Beloit College
Concordia University - Wisconsin
Lawrence University
Marquette University
Milwaukee Institute of Art and Design
Mount Mary University
St. Norbert College

University of Wisconsin – Eau Claire

University of Wisconsin - Green Bay

University of Wisconsin - La Crosse

University of Wisconsin – Madison

University of Wisconsin - Milwaukee

University of Wisconsin - Oshkosh

University of Wisconsin – Platteville

University of Wisconsin - River Falls

University of Wisconsin – Stevens Point

University of Wisconsin – Stout

University of Wisconsin - Whitewater

## Wyoming

University of Wyoming

# ENDNOTES

**1** This was in reference to the University of Michigan's BRS, in Speech First, Inc. v. Schlissel, 939 F.3d 756, 765 (6th Cir.2019). https://speechfirst.org/wp-content/uploads/2019/10/Michigan-Decision.pdf

**2** This was in reference to the University of Texas's BRS, in Speech First, Inc. v. Fenves, 979 F.3d 319, 338 (5th Cir. 2020). https://speechfirst.org/wp-content/uploads/2020/10/UT-opinion.pdf

**3** We define a BRS as any system that solicits reports of incidents concerning speech protected by the First Amendment, such as speech that is "biased," "offensive," "unwanted," "discriminatory," "hateful," or "microaggressive."

**4** These BRSs are formalized, coherent teams explicitly devoted to the solicitation and review of bias incident reports by a designated group of cross-departmental members, university officials and often campus security or law enforcement.

**5** "2017 Report on Bias Reporting Systems." FIRE. Accessed September 30, 2021. www.thefire.org/research/publications/bias response-team-report-2017/report-on-bias-reporting-systems-2017

**6** Ibid.

**7** Ibid.

**8** Ibid.

**9** Ibid.

**10** https://www.thefire.org/speech-code-of-the-month-university-of-vermont/

**11** FIRE. "The 2021 College Free Speech Rankings."

**12** Ibid.

**13** https://legalinsurrection.com/wp-content/uploads/2018/05/Speech-First-v.-U.-Michigan-Complaint.pdf

**14** These are, according to the FIRE/CollegePulse/RealClearPolitics 2021 report, the most difficult topics of discussion on campuses today.

**15** Snyder, Jeffrey Aaron, and Amna Khalid. "The Rise of 'Bias Response Teams' on Campus." The New Republic, March 30, 2016. https://newrepublic.com/article/132195/rise-bias-response-teams-campus.

**16** Ibid.

**17** "Digest of Education Statistics, 2020." National Center for Education Statistics (NCES) Home Page, a Part of the U.S. Department of Education. Accessed November 23, 2021. https://nces.ed.gov/programs/digest/d20/tables/dt20_317.20.asp.

**18** Ibid.

**19** "2017 Report on Bias Reporting Systems." FIRE.

**20** These BRSs are formalized, coherent teams explicitly devoted to the solicitation and review of bias incident reports by a designated group of cross-departmental members, university officials and often campus security or law enforcement.

**21** Data from FIRE's 2017 Report on Bias Reporting Systems

**22** See Department of Education, Free inquiry Rule, 85 Fed. Reg. 59916 (Sept. 23, 2020), https://bit.ly/3iROiq8.

**23** "Social Justice in Idaho Higher Education, University of Idaho - Idaho Freedom." Accessed February 4, 2022. https://idahofreedom.org/research/social-justice-in-idaho-higher-education-university-of-idaho/.

**24** "Greene, Jay P. "Diversity University: DEI Bloat in the Academy." The Heritage Foundation. Accessed February 4, 2022. https://www.heritage.org/education/report/diversity-university-dei-bloat-the-academy.

# Exhibit L



Spotlight on

# SPEECH CODES
# 2021

The State of Free Speech
on Our Nation's Campuses

FIG. 1

56     312     102

FIG. 2     FIG. 3     FIG. 4

# TABLE OF CONTENTS

**1** Executive Summary

**3** Methodology

**5** Findings

**9** Discussion

**23** What Can Be Done

**25** Spotlight On: New Title IX Regulations

**27** Appendices

# EXECUTIVE SUMMARY

For the thirteenth year in a row, the percentage of red light schools has declined.



Most college students in the United States should be able to expect that freedom of expression will be upheld on their campuses. After all, public institutions are legally bound by the First Amendment, and the vast majority of private colleges and universities promise their students commensurate free speech rights.

In spite of this legal landscape, far too many colleges across the country fail to live up to their free speech obligations in policy and in practice. Often, this occurs through the implementation of speech codes: university policies that restrict expression protected by the First Amendment.

For our 2021 report, FIRE surveyed the written policies of 478 colleges and universities, evaluating their compliance with First Amendment standards. Overall, 21.3% of surveyed colleges maintained at least one severely restrictive policy that earned FIRE's worst, "red light" rating, meaning that the policy both clearly and substantially restricts protected speech. This is the thirteenth year in a row that the percentage of schools earning a red light rating has gone down; last year, 24.2% of schools earned a red light rating.

The majority of institutions surveyed (65.3%) earned an overall "yellow light" rating, meaning they maintained at least one yellow light policy. Yellow light policies are either clear restrictions on a narrower range of expression or policies that, by virtue of vague wording, could too easily be applied to restrict protected expression. While the steady decline in red light institutions is cause for optimism, FIRE will continue to work with colleges and universities to ensure that yellow light institutions improve to earn our highest, "green light" rating.

A green light rating indicates that none of a university's written policies seriously imperil protected expression. A total of 56 colleges and universities (11.7% of those surveyed) earned an overall green light rating, up from 50 schools as of last year's report.

In further good news, more and more colleges and universities are adopting policy statements in support of free speech modeled after the "Report of the Committee on Freedom of Expression" at the University of Chicago (the "Chicago Statement"). As of this writing, 76 universities, university systems, or faculty bodies have endorsed a version of the "Chicago Statement," with six adoptions since last year's report.

Though these improvements in policy are heartening, free speech on campus remains under threat. Demands for censorship of student and faculty speech—whether originating on or off campus—are common, and universities continue to investigate and punish students and faculty over protected expression. FIRE surveyed 478 schools and found 21.3% maintain red light policies.

This year, schools across the country moved classes online and set forth new regulations in response to the COVID-19 pandemic, presenting a new set of challenges for campus free speech advocates.[1] These new challenges, combined with an increase in social justice protests and anti-racism activism on campuses, resulted in FIRE's busiest summer ever. Indeed, in the month of June, FIRE's Individual Rights Defense Program reviewed 287 cases of alleged violations of student and faculty rights, while the previous two years saw an average of just 49 cases each June.[2]

It is imperative that those who care about free speech on campus stay vigilant. The decrease in restrictive speech codes and the proliferation of free speech policy statements are the result of the tireless work of free speech advocates at FIRE and elsewhere. But we must ensure that new national and global challenges do not result in such progress being lost. We must continue to work to ensure that students have the opportunity to pursue their education, and that faculty are able to teach with the greatest possible foundation for free expression in place.

**FIRE surveyed 478 schools and found 21.3% maintain red light policies**



The State of Free Speech on Our Nation's Campuses

---

[1] See FIRE statement on COVID-19 restrictions on expressive and associational rights, FOUND. FOR INDIVIDUAL RIGHTS IN EDUC. (Sept. 8, 2020), thefire.org/fire-statement-on-covid-19-restrictions-on-expressive-and-associational-rights.
[2] Adam Steinbaugh, This has been FIRE's busiest summer ever. What happened?, FOUND. FOR INDIVIDUAL RIGHTS IN EDUC. (Sept. 14, 2020), thefire.org/this-has-been-fires-busiest-summer-ever-what-happened.

# METHODOLOGY

FIRE believes that free speech is not only a moral imperative, but an essential element of a college education.

For this report, FIRE surveyed publicly available policies at 372 four-year public institutions and 106 of the nation's most prestigious private institutions. Our research focuses in particular on public universities because, as explained in detail below, public universities are legally bound to protect students' right to free speech and can be successfully sued in court when they do not.

FIRE rates colleges and universities as "red light," "yellow light," or "green light" institutions based on how much, if any, protected expression their written policies governing student conduct restrict. The speech code ratings do not take into account a university's "as-applied" violations of student speech rights or other cases of censorship, student- or faculty-led calls for punishment of protected speech, and related incidents and controversies. Monitoring and rating such incidents consistently across 478 institutions with accuracy is not feasible and is beyond the scope of this report.

The speech code ratings are defined as follows:

 **Red Light:** A red light institution maintains at least one policy both clearly and substantially restricting freedom of speech, or bars public access to its speech-related policies by requiring a university login and password for access.

A "clear" restriction unambiguously infringes on protected expression. In other words, the threat to free speech at a red light institution is obvious on the face of the policy and does not depend on how the policy is applied. A "substantial" restriction on free speech is one that is broadly applicable to campus expression. For example, a ban on "offensive speech" would be a clear violation (in that it is unambiguous) as well as a substantial violation (in that it covers a great deal of what is protected under First Amendment standards). Such a policy would earn a university a red light.

When a university restricts access to its speech-related policies by requiring a login and password, it denies prospective students and their parents the ability to weigh this crucial information prior to matriculation. At FIRE, we consider this denial to be so deceptive and serious that it alone warrants an overall red light rating.

 **Yellow Light:** A yellow light institution maintains policies that could be interpreted to suppress protected speech or policies that, while clearly restricting freedom of speech, restrict relatively narrow categories of speech.

For example, a policy banning "verbal abuse" has broad applicability and poses a substantial threat to free speech, but it is not a clear violation because "abuse" might refer to unprotected speech and conduct, such as threats of violence or unlawful harassment. Similarly, while a policy banning "profanity on residence hall door whiteboards" clearly restricts speech, it is relatively limited in scope. Yellow light policies are typically unconstitutional when maintained by public universities,[3] and a rating of yellow light rather than red light in no way means that FIRE condones a university's restrictions on speech. Rather, it means that in FIRE's judgment, those restrictions do not clearly and substantially restrict speech in the manner necessary to warrant a red light rating.

 **Green Light:** If FIRE finds that a university's policies do not seriously threaten campus expression, that college or university receives a green light rating. A green light rating does not necessarily indicate that a school actively supports free expression in practice; it simply means that the school's written policies do not pose a serious threat to free speech.

 **Warning:** FIRE believes that free speech is not only a moral imperative, but an essential element of a college education. However, private universities, as private associations, possess their own right to free association, which allows them to prioritize other values above the right to free speech if they wish to do so. Therefore, when a private university clearly and consistently states that it holds a certain set of values above a commitment to freedom of speech, FIRE gives it a Warning rating in order to warn prospective students and faculty members of this fact.[4] Eight schools surveyed for this report meet these criteria.[5]

---

[3] *See, e.g.,* Gooding v. Wilson, 405 U.S. 518, 519, 528 (1972) (holding that a Georgia statute prohibiting "opprobrious words or abusive language" was unconstitutional because those terms, as commonly understood, encompass speech protected by the First Amendment). Under this and related precedents, a public university maintaining a ban on "verbal abuse" and similar expression would be constitutionally deficient.

[4] For example, Brigham Young University's "*Church Educational System Honor Code*" provides: "Brigham Young University and other Church Educational System institutions exist to provide an education in an atmosphere consistent with the ideals and principles of The Church of Jesus Christ of Latter-day Saints. . . . By accepting appointment, continuing in employment, being admitted, or continuing class enrollment, each member of the BYU community personally commits to observe these Honor Code standards approved by the Board of Trustees . . . including the avoidance of profane and vulgar language." *Church Educational System Honor Code,* BRIGHAM YOUNG UNIV., policy.byu.edu/view/index.php?p=26 (last visited Oct. 7, 2020). It would be clear to any reasonable person reading this policy that students are not entitled to unfettered free speech at BYU.

[5] FIRE has designated the following colleges and universities as "Warning" schools: Baylor University, Brigham Young University, Pepperdine University, Saint Louis University, the United States Military Academy, the United States Naval Academy, Vassar College, and Yeshiva University.

# FINDINGS

The number of green light institutions has continued to increase this year, from 50 to 56.



Of the 478 schools reviewed by FIRE, 102, or 21.3%, received a red light rating. 312 schools received a yellow light rating (65.3%), and 56 received a green light rating (11.7%). Eight schools earned a Warning rating (1.7%).[6]

This marks the thirteenth year in a row that the percentage of universities with an overall red light rating has fallen, this year from 24.2% to 21.3%. The continued reduction in red light institutions is encouraging: Just over a decade ago, red light schools encompassed about 75% of the report's findings.[7]

However, this year's numbers also reveal an increase in yellow light institutions, as 63.9% of schools earned an overall yellow light last year, compared to 65.3% this year. While yellow light policies are not as clearly and substantially restrictive as red light policies on their face, they nevertheless impose impermissible restrictions on expression.

The number of green light institutions has continued to rise this year, from 50 institutions last year to 56 now.[8] At 11.7%, the percentage of green light schools is at an all-time high, with more than one million students across the country enrolled at green light colleges and universities.[9]

In total, 27 schools improved their overall ratings this year.[10]



FIRE reviewed policies at 478 colleges and universities.



**RED LIGHT**

21.3%



**YELLOW LIGHT**

65.3%



**GREEN LIGHT**

11.7%



**WARNING**

1.7%

The State of Free Speech on Our Nation's Campuses

[6] See Appendix A for a full list of schools by rating.

[7] The 2009 report and all other past Spotlight on Speech Codes reports are available at thefire.org/spotlight/reports.

[8] Colorado Mesa University, Fayetteville State University, Florida State University, Jackson State University, and the University of Colorado Boulder all joined the ranks of green light schools since last year's report. Emory University, which went from an overall green light rating to an overall red light rating last year by password-protecting certain policies, resolved this issue over the past year, restoring its green light status.

[9] Press Release, Found. for Individual Rights in Educ., One million students now attend colleges with FIRE's highest free speech rating (Feb. 26, 2019), thefire.org/one-million-students-now-attend-colleges-with-fires-highest-free-speech-rating.

[10] See Appendix B for a full list of rating changes over the 2019–20 academic year.

[11] The remaining 0.5% of public institutions in the database earn FIRE's Warning rating. The Warning rating is typically reserved for private universities that clearly prioritize other values above students' free speech, such that students do not have a reasonable expectation of free speech rights. However, despite their public status as federal service academies, the United States Military Academy and the United States Naval Academy earn the Warning rating because they place other institutional priorities above free speech.

## PUBLIC COLLEGES AND UNIVERSITIES

The percentage of public schools with a red light rating dropped again, from 18.3% last year to 14.5% this year. Overall, of the 372 public universities reviewed for this report, 54 received a red light rating (14.5%), 264 received a yellow light rating (71%), and 52 received a green light rating (14%). As a result, public colleges and universities will soon reach a significant turning point: There are nearly the same number of public green light schools as public red light schools. As just nine public schools earned the green light rating a decade ago, this milestone reveals significant progress.

This year, FIRE was pleased to welcome Colorado Mesa University, Fayetteville State University, Florida State University, Jackson State University, and the University of Colorado Boulder to the list of green light institutions.

Notably, Florida State University and the University of Colorado Boulder bring more than 30,000 students each to the green light list. Both are flagship institutions in their state, a status we hope to leverage into further policy reform with other schools in their respective university systems.

In the coming year, FIRE will continue to work strategically to reform policies at public university systems across the country.

**All of the four-year public universities in Arizona now earn FIRE's highest rating, making Arizona the only state able to claim this distinction.**



LAST YEAR          THIS YEAR

**Red light ratings of public schools dropped from 18.3% to 14.5% this year.**

Foundation for Individual Rights in Education

## Private Colleges and Universities

Of the 106 private colleges and universities reviewed, 47 received a red light rating (44.3%). 49 received a yellow light rating (46.2%), four received a green light rating (3.8%), and six earned a Warning rating (5.7%).

The percentage of private universities earning a red light rating, which stood at 44.8% last year, continued to decrease, coming in at 44.3% this year. This progress, albeit slight, is hard-earned given that private universities are not legally bound by the First Amendment, which regulates only government actors. For this reason, it is gratifying that these colleges are closer to fulfilling their institutional commitments to free expression.

FIRE will continue to work with private colleges and universities to improve policies so that they better meet institutional commitments to protecting students' free speech rights.

**Of the 106 private schools reviewed by FIRE, 47 received a red light rating, 49 received a yellow light rating, 4 received a green light rating, and 6 earned a Warning rating.**



# DISCUSSION

## Speech Codes on Campus: Background and Legal Challenges

Speech codes—university regulations prohibiting expression that would be constitutionally protected in society at large—gained popularity with college administrators in the 1980s and 1990s. As discriminatory barriers to education declined, female and minority enrollment increased. Concerned that these changes would cause tension and that students who finally had full educational access would arrive at institutions only to be offended by other students, college administrators enacted speech codes.

In the mid-1990s, the phenomenon of campus speech codes converged with the expansion of Title IX, the federal law prohibiting sex discrimination in educational institutions receiving federal funds.[12] Under the rationale of the obligation to prohibit discriminatory harassment, unconstitutionally overbroad harassment policies banning subjectively offensive conduct proliferated. (This Title IX enforcement history is covered in further detail in this report's "Spotlight on: New Title IX Regulations" feature.)

In enacting speech codes, administrators ignored or did not fully consider the philosophical, social, and legal ramifications of placing restrictions on speech, particularly at public universities. As a result, federal courts have overturned speech codes at numerous colleges and universities over the past several decades.[13]

Despite the overwhelming weight of legal authority against speech codes, a large number of institutions—including some of those that have been successfully sued on First Amendment grounds—still maintain unconstitutional and illiberal speech codes. It is with this unfortunate fact in mind that we turn to a more detailed discussion of the ways in which campus speech codes violate individual rights and what can be done to challenge them.



[12] Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, provides that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." *See generally* Jacob E. Gersen & Jeannie Suk, *The Sex Bureaucracy*, 104 CAL. L. REV (2016) (discussing evolution of Title IX requirements).

[13] McCauley v. Univ. of the V.I., 618 F.3d 232 (3d Cir. 2010); DeJohn v. Temple Univ., 537 F.3d 301 (3d Cir. 2008); Dambrot v. Cent. Mich. Univ., 55 F.3d 1177 (6th Cir. 1995); Univ. of Cincinnati Chapter of Young Am. for Liberty v. Williams, 2012 U.S. Dist. LEXIS 80967 (S.D. Ohio Jun. 12, 2012); Smith v. Tarrant Cty. Coll. Dist., 694 F. Supp. 2d 610 (N.D. Tex. 2010); Coll. Republicans at S.F. St. Univ. v. Reed, 523 F. Supp. 2d 1005 (N.D. Cal. 2007); Roberts v. Haragan, 346 F. Supp. 2d 853 (N.D. Tex. 2004); Bair v. Shippensburg Univ., 280 F. Supp. 2d 357 (M.D. Pa. 2003); Booher v. N. Ky. Univ. Bd. of Regents, No. 2:96-CV-135, 1998 U.S. Dist. LEXIS 11404 (E.D. Ky. July 21, 1998); Corry v. Leland Stanford Junior Univ., No. 740309 (Cal. Super. Ct. Feb. 27, 1995) (slip op.); UWM Post, Inc. v. Bd. of Regents of the Univ. of Wis., 774 F. Supp. 1163 (E.D. Wisc. 1991); Doe v. Univ. of Mich., 721 F. Supp. 852 (E.D. Mich. 1989). In addition, numerous institutions have voluntarily modified their speech codes as part of settlement agreements. See, e.g., Press Release, Found. for Individual Rights in Educ., VICTORY: Speech rights of 150,000 students to be restored as Los Angeles Community College District settles lawsuit, will abandon Pierce College's tiny free speech zone (Dec. 13, 2018), thefire.org/victory-speech-rights-of-150000-students-to-be-restored-as-los-angeles-community-college-district-settles-lawsuit-will-abandon-pierce-colleges-tiny-free-speech-zone [hereinafter Pierce College Press Release]; Press Release, Found. for Individual Rights in Educ., VICTORY: Student detained for passing out political flyers settles lawsuit with Illinois College (Apr. 18, 2018), thefire.org/victory-student-detained-for-passing-out-political-flyers-settles-lawsuit-with-illinois-college; Press Release, Found. for Individual Rights in Educ., Victory: Texas College Settles Free Speech Lawsuit After Telling Student that Gun Rights Sign Needs 'Special Permission' (May 4, 2016), thefire.org/victory-texas-college-settles-free-speech-lawsuit-after-telling-student-that-gun-rights-sign-needs-special-

## Public Universities vs. Private Universities

With limited, narrowly defined exceptions, the First Amendment prohibits the government—including governmental entities such as state universities—from restricting freedom of speech. A good rule of thumb is that if a state law would be declared unconstitutional for violating the First Amendment, a similar regulation at a state college or university is likewise unconstitutional.

The guarantees of the First Amendment generally do not apply to students at private colleges because the First Amendment regulates only government conduct.[14] Moreover, although acceptance of federal funding does confer some obligations upon private colleges (such as compliance with federal anti-discrimination laws), compliance with the First Amendment is not one of them.

This does not mean, however, that students and faculty at all private schools are not entitled to free expression. In fact, most private universities explicitly promise freedom of speech and academic freedom in their official policy materials.

Middlebury College, for example, states in its student handbook that it "recognizes and affirms that free intellectual inquiry, debate, and constructive dialogue are vital to Middlebury's academic mission and must be protected even when the views expressed are unpopular or controversial."[15] Likewise, Princeton University, echoing the Chicago Statement, "guarantees all members of the University community the broadest possible latitude to speak, write, listen, challenge, and learn" and explains that "it is not the proper role of the University to attempt to shield individuals from ideas and opinions they find unwelcome, disagreeable, or even deeply offensive."[16] Yet both of these institutions, along with most other private colleges and universities, maintain policies that prohibit the very speech they promise to protect.[17]

This year, both private and public institutions, including statewide systems, have continued to adopt policy statements in support of free speech modeled after the one produced in January 2015 by the Committee on Freedom of Expression at the University of Chicago.[18] Since our last report, six more institutions have adopted policy statements in support of free speech modeled after the "Chicago Statement." Notably, Colorado Mesa University adopted the Chicago Statement in conjunction with revising all of its speech codes to earn an overall green light rating, further underscoring its commitment to free speech.[19]

**The First Amendment prohibits the government—including governmental entities such as state universities— from restricting freedom of speech.**

FIRE will continue to encourage institutions, private and public alike, to adopt a similar policy statement over the course of the next year.



Foundation for Individual Rights in Education

permission; Press Release, Found. for Individual Rights in Educ., Victory: Lawsuit Settlement Restores Free Speech Rights at Dixie State U. After Censorship of Bush, Obama, Che Flyers (Sept. 17, 2015), thefire.org/victory-lawsuit-settlement-restores-free-speech-rights-at-dixie-state-u-after-censorship-of-bush-obama-che-flyers.

[14] California maintains a law that applies the protections of the First Amendment to private, nonsectarian institutions of higher education in the state. Section 94367 of the California Education Code—the so-called "Leonard Law"—provides: "No private postsecondary educational institution shall make or enforce a rule subjecting a student to disciplinary sanctions solely on the basis of conduct that is speech or other communication that, when engaged in outside the campus or facility of a private postsecondary institution, is protected from governmental restriction by the First Amendment to the United States Constitution or Section 2 of Article I of the California Constitution." The code further provides that the law "does not apply to a private postsecondary educational institution that is controlled by a religious organization, to the extent that the application of this section would not be consistent with the religious tenets of the organization." Cal. Educ. Code § 94367(a).

[15] B.1.b. Non-Discrimination Investigations & Resolutions Procedure, MIDDLEBURY HANDBOOK, http://www.middlebury.edu/about/handbook/policies-for-all/non-discrim-policies/anti-harassment-discrimin (last visited Oct. 23, 2020).

[16] Statement on Freedom of Expression, PRINCETON UNIV. RIGHTS, RULES, RESPONSIBILITIES 2020, rrr.princeton.edu/university#comp113 (last visited Oct. 15, 2020).

## What Exactly Is "Free Speech," and How Do Universities Curtail It?

What does FIRE mean when we say that a university restricts "free speech"? Do people have the right to say absolutely anything, or are certain types of expression unprotected?

Simply put, the overwhelming majority of speech is protected by the First Amendment. Over the years, the Supreme Court has carved out a limited number of narrow exceptions to the First Amendment, including speech that incites reasonable people to immediate violence; so-called "fighting words" (face-to-face confrontations that lead to physical altercations); harassment; true threats and intimidation; obscenity; and defamation. If the speech in question does not fall within one of these exceptions, it most likely is protected.

The exceptions are often misapplied and abused by universities to punish constitutionally protected speech. There are instances where the written policy at issue may be constitutional—for example, a prohibition on "incitement"—but its application may not be. In other instances, a written policy will purport to be a legitimate ban on a category of unprotected speech like harassment or true threats, but (either deliberately or through poor drafting) will encompass protected speech as well. Therefore, it is important to understand what these narrow exceptions to free speech actually mean in order to recognize when they are being misapplied.

**The exceptions are often misapplied and abused by universities to punish constitutionally protected speech.**



PROTECTED

NOT PROTECTED

The State of Free Speech on Our Nation's Campuses

[17] Middlebury College and Princeton University both earn overall red light ratings. *See* School Spotlight: Middlebury College, Found. for Individual Rights in Educ., thefire.org/schools/middlebury-college (last visited Oct. 16, 2020); School Spotlight: Princeton University, Found. for Individual Rights in Educ., thefire.org/schools/princeton-university (last visited Oct. 16, 2020).

[18] Committee on Freedom of Expression at the University of Chicago, *Report of the Committee on Freedom of Expression, available at* provost.uchicago.edu/FOECommitteeReport.pdf. For a complete list of institutions that have adopted a version of the Chicago Statement, *see* thefire.org/chicago-statement-university-and-faculty-body-support.

[19] Press Release, Found. for Individual Rights in Educ., Colorado Mesa University earns nation's top free speech rating for colleges (Sept. 30, 2020), thefire.org/colorado-mesa-university-earns-nations-top-free-speech-rating-for-colleges.

# Threats and Intimidation

The Supreme Court has defined "true threats" as "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."[20] The Court also has defined "intimidation," of the type not protected by the First Amendment, as a "type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." [21]

Neither term would encompass, for example, a vaguely worded statement that is not directed at anyone in particular. Nevertheless, far too many institutions fail to properly define these legal standards in their written policies.

For example:

- California State University – Monterey Bay defines threats as "[a]ny threat or action of physical, emotional, or verbal harm in any form."[22]

- Southern Illinois University at Carbondale's student conduct code defines intimidation as "[i]mplied threats or acts that cause a reasonable fear of harm in another."[23]

- Southern Oregon University bans "[t]hreatening communication," defined as "[t]hreats made online or through electronic communication with sufficient content such that it causes fear of injury or other harm."[24]

Further, universities frequently misapply policies prohibiting threats and intimidation so as to infringe on protected speech, citing generalized concerns about safety with no regard to the boundaries of protected speech.

This year, Fordham University placed a student on probation over two social media posts, finding his actions constituted a violation of its "Threats / Intimidation" policy.[25] The student's first post was a photo of retired St. Louis Police captain David Dorn, a police officer killed by looters during unrest following the killing of George Floyd, with the caption "Y'all a bunch of hypocrites." In the second post, on the anniversary of the massacre at Tiananmen Square, he posted a photo of himself holding a gun in his backyard with the caption, "Don't tread on me."

In a letter to Fordham, FIRE explained that his conduct did not approach the actual legal standards for a true threat or intimidation:

> It appears that Tong's discipline is based on his benign photo of himself holding a firearm and his apparent criticism of protests for racial justice in his post about David Dorn. However, neither of his Instagram posts approximate a threat of any sort. Neither post was directed at a specific individual or group of individuals, and neither post on its face or in context indicates Tong intended to engage in any form of violence. Fordham's consideration of Tong's social media post of him holding a gun and his comment on David Dorn to be a "threat" demonstrates an abandonment of any reasonable or fair understanding of the term.[26]

Tong sued Fordham, and the university argued in response that it has the "prerogative to limit a student's free expression rights,"[27] despite repeatedly promising to protect students' free speech in its policies.[28] As a result, the Department of Education sent a letter notifying Fordham that it is investigating whether the university has misrepresented its commitment to the protection of students' expression.[29]



As Fordham's treatment of Tong demonstrates, universities that are bound by the First Amendment or that promise their students free speech must revise their policies so that they track the applicable First Amendment legal standards, and must enforce the policies accordingly.

<div style="transform: rotate(-90deg)">Foundation for Individual Rights in Education</div>

20 Virginia v. Black, 538 U.S. 343, 359 (2003).

21 Id. at 360.

22 Behavioral Health, and/or Safety of Self/Others, STUDENT HOUSING & RESIDENTIAL LIFE COMMUNITY STANDARDS AND CONDUCT PROCESS OVERVIEW, d2jtc9c99zuy7w.cloudfront.net/TJ9un1suS72Vzs2WsSuw_SHRL%20Community%20Standards%204.12.19.pdf (last visited Oct. 17, 2020).

23 Threatening Behaviors, SOUTHERN ILLINOIS UNIV. CARBONDALE STUDENT CONDUCT CODE at 66 (updated Aug. 14, 2020), srr.siu.edu/_common/Student_Conduct_Code.pdf.

24 Threatening Conduct, CODE OF STUDENT CONDUCT at 21 (updated Sept. 18, 2020), inside.sou.edu/assets/policies/Code_of_Student_Conduct_091820.pdf.

25 Austin Tong Sanction Letter, FOUND. FOR INDIVIDUAL RIGHTS IN EDUC. (July 17, 2020), thefire.org/austin-tong-sanction-letter-july-14-2020.

26 See Letter from Lindsie Rank, Program Officer, Individual Rights Defense Program, Found. for Individual Rights in Educ., to Father Joseph M. McShane, S.J., President, Fordham Univ. (July 17, 2020), d28htnjz2elwuj.cloudfront.net/wp-content/uploads/2020/07/17105352/FIRE-letter-to-Fordham-University-July-17-2020.pdf.

27 Adam Goldstein, Analysis: Department of Education investigates Fordham over broken speech promises in Austin Tong case, FOUND. FOR INDIVIDUAL RIGHTS IN EDUC. (Aug. 25, 2020), thefire.org/analysis-department-of-education-

## Incitement

There is also a propensity among universities to restrict speech that offends other students on the basis that it constitutes "incitement." The basic concept, as administrators too often see it, is that offensive or provocative speech will anger those who disagree with it, perhaps so much so that it moves them to violence. While preventing violence is necessary, this is an impermissible misapplication of the incitement doctrine.



Incitement, in the legal sense, does not refer to speech that may lead to violence on the part of those opposed to or angered by it, but rather to speech that will lead those who agree with it to commit immediate violence. In other words, the danger is that certain speech will convince sympathetic, willing listeners to take immediate unlawful action.

The paradigmatic example of incitement is a person standing on the steps of a courthouse in front of a torch-wielding mob and urging that mob to burn down the courthouse immediately. Misapplying the doctrine to encompass an opposing party's reaction to speech they dislike converts the doctrine into an impermissible "heckler's veto," where violence threatened by those angry about particular speech is used as a reason to censor that speech. As the Supreme Court has observed, speech cannot be prohibited because it "might offend a hostile mob" or because it may prove "unpopular with bottle throwers."[30]

The legal standard for incitement was announced in the Supreme Court's decision in Brandenburg v. Ohio.[31] There, the Court held that the state may not "forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."[32] This is an exacting standard, as evidenced by its application in subsequent cases.

For instance, in Hess v. Indiana, the Supreme Court held that a man who had loudly stated "We'll take the fucking street later" during an anti-war demonstration did not intend to incite or produce immediate lawless action.[33] The Court found that "at worst, it amounted to nothing more than advocacy of illegal action at some indefinite future time," and that the man could therefore not be convicted under a state disorderly conduct statute.[34] The fact that the Court ruled in favor of the speaker despite the use of such strong and unequivocal language underscores the narrow construction that has traditionally been given to the incitement doctrine, and its dual requirements of likelihood and immediacy. Nonetheless, college administrations have been all too willing to abuse or ignore this jurisprudence, often using the term in policies in a colloquial manner.

For example:

- The University of California system's "intolerance report form" encourages students to report instances of "hate speech," defined as "any speech, gesture or conduct, writing, or display that may incite violence or prejudicial action against someone" based on their actual or perceived personal characteristic.[35]

- Western Illinois University bans public decorations in the residence halls that "are deemed to be racist, sexist, indecent, scandalous, illegal, inciting, or in any way oppressive in nature."[36]

- Indiana State University explains that prohibited harassment can be expressed or implied, "creating and/or inciting a foreseeable hostile environment."[37]

**Nonetheless, college administrations have been all too willing to abuse or ignore this jurisprudence.**

The State of Free Speech on Our Nation's Campuses

investigates-fordham-over-broken-speech-promises-in-austin-tong-case.

[18] See, e.g., Mission Statement, FORDHAM UNIV. (Apr. 28, 2005), fordham.edu/info/20057/about/2997/mission_statement ("Fordham strives for excellence in research and teaching, and guarantees the freedom of inquiry required by rigorous thinking and the quest for truth."); Demonstration Policy, FORDHAM UNIV. STUDENT HANDBOOK, fordham.edu/info/21684/university_regulations/3709/demonstration_policy (last visited Oct. 29, 2020) ("Each member of the University has a right to freely express their positions and to work for their acceptance whether they assent to or dissent from existing situations in the University or society."); Bias-Related Incidents and/or Hate Crimes, FORDHAM UNIV. STUDENT HANDBOOK, fordham.edu/ info/21684/university_regulations/6566/bias-related_incidents_andor_hate_crimes (last visited Oct. 29, 2020) ("[T]he University values freedom of expression and the open exchange of ideas. The expression of controversial ideas and differing views is a vital part of University discourse.").

[29] Goldstein, supra note 27.

[30] Forsyth Cty. v. Nationalist Movement, 505 U.S. 123, 134–35 (1992).

[31] 395 U.S. 444 (1969).

[32] Id. at 447 (emphasis in original).

## Obscenity

The Supreme Court has held that obscene expression, to fall outside of the protection of the First Amendment, must "depict or describe sexual conduct" and must be "limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value."[38]

This is a narrow standard applicable only to certain highly graphic sexual material. It does not encompass profanity, even though profane words are often colloquially referred to as "obscenities." In fact, the Supreme Court has explicitly held that profanity is constitutionally protected. In Cohen v. California, the defendant, Paul Robert Cohen, was convicted in California for wearing a jacket bearing the words "Fuck the Draft" in a courthouse.[39] The Supreme Court overturned Cohen's conviction, holding that the message on his jacket, however vulgar, was protected speech.



Similarly, in Papish v. Board of Curators of the University of Missouri, the Court determined that a student's expulsion for distributing a student newspaper containing an article titled "Motherfucker Acquitted" violated the First Amendment.[40] The Court wrote that

"the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'"[41]

Nonetheless, many colleges erroneously believe that they may lawfully prohibit profanity and vulgar expression. For example:

- Alabama A&M University bans "[i]ndecent, obscene, immoral behavior and/or profanity," including "the use of obscene gestures" and "vulgar language."[42]

- The University of Louisiana at Lafayette's conduct code prohibits "[p]ublic [p]rofanity," defined as "[p]rofanity or abusive or foul language directed toward a person or persons."[43]

- Frostburg State University prohibits the placement of flyers in the residence halls "containing content that would be considered offensive to a reasonable person (e.g. nudity, obscenities, etc.)."[44]

Foundation for Individual Rights in Education

[33] 414 U.S. 105 (1973).
[34] *Id.* at 108–09.
[35] *Campus Climate*, Univ. of California, ucsystems.ethicspointvp.com/custom/ucs_ccc/default.asp (last visited Oct. 17, 2020).
[36] *Decorating Your Room*, Residence Hall Student Handbook at 18, wiu.edu/student_services/housing/living_on_campus/pdf/ResidenceHallHandbook2020.pdf (last visited Oct. 17, 2020).
[37] *Misconduct against Persons*, Code Of Student Conduct, indstate.edu/code-of-student-conduct/prohibited-conduct/against-persons (last visited Oct. 17, 2020).
[38] Miller v. California, 413 U.S. 15, 24 (1973).
[39] 403 U.S. 15 (1971).
[40] 410 U.S. 667 (1973).
[41] *Id.* at 670.
[42] *Code of Conduct Offenses and Sanctions*, Ala. A&M Univ. Student Handbook (revised 2019), aamu.edu/about/administrative-offices/student-affairs/student-handbook/_documents/aamu-student-handbook.pdf.

## Harassment

Hostile environment harassment, properly defined, is not protected by the First Amendment. In the educational context, the Supreme Court has defined student-on-student (or peer) harassment as discriminatory, unwelcome, and targeted conduct that is "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit."[45]

This is not simply expression; it is conduct far beyond the protected speech that is too often deemed "harassment" on today's college campus. For example, in Davis, the conduct found by the Court to constitute harassment was a months-long pattern of conduct including repeated attempts to touch the victim's breasts and genitals, together with repeated sexually explicit comments directed at and about the victim.

For decades now, however, many colleges and universities have maintained policies defining harassment too broadly and prohibiting constitutionally protected speech. Years of Title IX enforcement by the Department of Education's Office for Civil Rights (OCR) that neglected to fully protect First Amendment rights, including an unconstitutionally broad definition of sexual harassment promulgated by OCR itself,[46] led numerous colleges and universities to enact overly restrictive harassment policies in an effort to avoid an OCR investigation.

On May 6, 2020, the Department of Education published new Title IX regulations that adopted the Supreme Court's peer harassment standard from Davis, taking effect August 14, 2020. The regulations and emerging trends in universities' compliance are discussed in further detail in this report's "Spotlight on: New Title IX Regulations" feature.

Although the full impact of the regulations remains to be seen as of this writing, we expect university policies on harassment to generally improve. However, even where policies reasonably track the Supreme Court's standard from Davis, problems remain. Many policies define harassment narrowly, then proceed to provide a list of examples of prohibited conduct that do not necessarily meet that standard when standing alone. Others provide multiple definitions of harassment, resulting in a policy scheme that is confusing for students and likely to have a chilling effect on expression.

Here are just a few examples of overly broad harassment policies:

- Northwestern University's harassment policy states: "Examples of harassment include offensive jokes related to a protected class; . . . name calling related to a protected class," and "mockery connected to a protected class."[47]

- Portland State University's policy defines sexual harassment as "unwelcome conduct of a sexual nature," before labeling "sexual or derogatory comments" and "sending letters, notes, cartoons, emails, text or audio messages of a sexually suggestive nature" as examples of "inappropriate behavior."[48]

- Furman University goes so far as to warn students that the university "may address conduct that, although it does not rise to the level of constituting Sexual Misconduct as defined by this Policy, is nevertheless offensive and/or unwanted conduct of a sexual nature."[49]

These examples, along with many others, demonstrate that colleges and universities often fail to limit themselves to the narrow definition of harassment that is outside the realm of constitutional protection. Instead, they expand the term to prohibit broad categories of speech that do not even approach actionable harassment, despite similar policies having been struck down by federal courts years earlier.[50]

Having discussed the most common ways in which universities misuse the narrow exceptions to the First Amendment to prohibit protected expression, we now turn to the innumerable other types of university regulations that restrict free speech on their face. Such restrictions are generally found in several distinct types of policies.

The State of Free Speech on Our Nation's Campuses

43 Code of Student Conduct, Univ. of Louisiana at Lafayette at 16 (last updated August 18, 2020), studentrights.louisiana.edu/sites/studentrights/files/Code%20of%20Student%20Conduct%20Sept.20.pdf.
44 Residence Life Office Residence Hall Posting Guidelines, Frostburg St. Univ. frostburg.edu/student-life/residence-life/residence-life-office/rlo-posting-policy.pdf (last visited Oct. 13, 2020).
45 Davis v. Monroe County Board of Education, 526 U.S. 629, 633 (1999).
46 See Letter from Shaheena Simons and Damon Martinez, U.S. Dep't of Justice to Robert E. Frank, President, Univ. of N.M. (Apr. 22, 2016), available at justice.gov/opa/file/843901/download; Letter from Anurima Bhargava, Chief, Civil Rights Div., U.S. Dep't of Justice, and Gary Jackson, Reg'l Dir., Office for Civil Rights, U.S. Dep't of Educ., to Royce Engstrom, President, Univ. of Mont. and Lucy France, Univ. Counsel, Univ. of Mont. (May 9, 2013), available at justice.gov/opa/documents/um-ltr-findings.pdf.
47 Policy on Discrimination & Harassment, Northwestern Univ. (Sept. 1, 2019), northwestern.edu/equity/documents/discrimination-harassment-policy-resources-procedures-final.pdf.
48 Prohibited Discrimination & Harassment Policy, Portland St. Univ. (Sept. 28, 2017), docs.google.com/document/d/e/2PACX-1vRBvO64ghsJ4GeuDWaEvzmv9r95jMzJDsIEP9Jqx3LwdRjcb9DvWRVtC3QA6W8Jenhp-txbfpxCRWg/pub.
49 Sexual Misconduct Policy, Furman Univ. at 4 (Aug. 14, 2020), furman.edu/title-ix/wp-content/uploads/sites/128/2020/08/Furman-2020-21-Sexual-Misconduct-Policy-8.14.20.pdf.
50 See, e.g., DeJohn v. Temple Univ., 537 F.3d 301 (3d Cir. 2008) (holding that Temple University's sexual harassment policy was unconstitutionally overbroad); Doe v. Univ. of Mich., 721 F. Supp. 852 (E.D. Mich. 1989) (holding that

## Anti-Bullying Policies

Over the past decade, FIRE has found that numerous colleges and universities have adopted policies on "bullying" and "cyberbullying." On October 26, 2010, OCR issued a letter on the topic of bullying, reminding educational institutions that they must address actionable harassment, but also acknowledging that "[s]ome conduct alleged to be harassment may implicate the First Amendment rights to free speech or expression." For such situations, OCR's letter refers readers back to the 2003 "Dear Colleague" letter stating that harassment is conduct that goes far beyond merely offensive speech and expression. However, because it is primarily focused on bullying in the K–12 setting, the 2010 letter also urges an in loco parentis approach that is inappropriate in the college setting, where students are overwhelmingly adults.[53]

Court decisions and other guidance regarding student speech in the K–12 setting often "trickle up" to the collegiate setting, and indeed, FIRE has come across numerous university policies prohibiting bullying in a problematic manner. For example:

- Western Michigan University defines bullying as "[r]epeated and/or severe aggressive behavior likely to intimidate or intentionally hurt, control or diminish another person, physically or mentally."[54] The policy goes on to list as examples of bullying "creating web pages with a negative focus; posting insults on social networking sites; and/or spreading rumors with malicious intent."[55]

- Howard University's student handbook defines bullying as "[u]nwanted, aggressive and/or hostile behavior" that involves a power imbalance and is "intended to humiliate" another individual or group. The policy makes clear that bullying "can be one single act" and states that examples include "spreading rumors" and "marginalizing and/or excluding someone from a group, event or activity."[57]

- At Towson University, "[c]yberbullying" is defined as conduct that has the effect of "intimidating; humiliating; harassing; harming; embarrassing; or damaging person(s) or organization(s)."[58]

But as courts have held in rulings spanning decades, speech cannot be prohibited simply because someone else finds it offensive, even deeply so.[59] Offensive speech, if it does not rise to the level of harassment or one of the other narrow categories of unprotected speech and conduct, is entitled to constitutional protection (and, accordingly, to protection at private institutions that claim to uphold the right to free speech).

**FIRE has come across numerous university policies prohibiting bullying in a problematic manner.**



Foundation for Individual Rights in Education

---

University of Michigan's discriminatory harassment policy was unconstitutionally broad); Booher v. N. Ky. Univ. Bd. of Regents, No. 2:96-CV-135, 1998 U.S. Dist. LEXIS 11404 (E.D. Ky. July 21, 1998) (holding that Northern Kentucky University's sexual harassment policy was unconstitutionally broad). The United States Court of Appeals for the Fifth Circuit recently questioned whether purely speech harassment claims could ever meet the *Davis* standard, stating: "Whether *Davis* may constitutionally support purely verbal harassment claims, much less speech-related proscriptions outside Title IX protected categories has not been decided by the Supreme Court or this court and seems self-evidently dubious." Speech First, Inc. v. Fenves, No. 19-50529, n. 16 at 29* (5th Cir. 2020).

[51] "Dear Colleague" Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ. (Oct. 26, 2010), *available at* ed.gov/about/offices/list/ocr/letters/colleague-201010.html.

[52] "In the place of parents."

[53] *See generally* McCauley v. Univ. of the V.I., 618 F.3d 243–44 (3d Cir. 2010) ("[T]he pedagogical missions of public universities and public elementary and high schools are undeniably different. While both seek to impart knowledge, the former encourages inquiry and challenging priori assumptions whereas the latter prioritizes the inculcation of societal values. . . . The idea that public universities exercise strict control over students via an *in loco parentis* relationship has decayed to the point of irrelevance.").

[54] *Student Code,* Western Michigan Univ. at 15 (last updated Sept. 2020), wmich.edu/sites/default/files/attachments/u492/2020/Student%20Code%20October%202020.pdf.

## Policies on Tolerance, Respect, and Civility

Many schools invoke laudable goals like respect and civility to justify policies that violate students' free speech rights. While a university has every right to promote a tolerant and respectful atmosphere on campus, a university that claims to respect free speech must not limit discourse to only the inoffensive and respectful. And although pleas for civility and respect are often initially framed as requests, many schools have speech codes that effectively turn those requests into requirements.



For example:

- Boston College's information technology use policy states: "Communications from members of the University community are to reflect mutual respect, civility, and other moral standards." The policy specifically bans "[t]he use of obscene or intolerant language, and the use of similarly offensive graphic or video images," and notes that "[t]he determination of what is obscene, offensive, or intolerant is within the sole discretion of the University."[60]

- At Boise State University, students are informed that "[m]embership in the campus community is a privilege and requires its members to conduct themselves ethically with integrity and civility," which includes "adhere[nce] to the principles of civil discourse."[61]

- Georgetown University bans "[i]ncivility," broadly defined as "[e]ngaging in behavior, either through language or actions, which disrespects another individual."[62]

While respect and civility may seem uncontroversial, most uncivil or disrespectful speech is protected by the First Amendment,[63] and is indeed sometimes of great political and social significance. Some of the expression employed in the civil rights movement of the 1950s and '60s, for example, would violate campus civility codes today. Colleges and universities may encourage civility, but public universities—and those private universities that purport to respect students' fundamental free speech rights—may not require it or threaten mere incivility with disciplinary action.

## Internet Usage Policies

University policies regulating online expression, while perhaps appearing to be narrow, can have a significant impact on students' and faculty members' free speech rights, given the prevalence of online communication on today's college campuses.

Examples of impermissibly restrictive Internet usage policies include the following:

- Drexel University calls the use of "offensive language" an abuse of email privileges that could result in "de-activation of the account (for minor first offenses) through university judicial action or referral to law enforcement authorities."[64]

- At Carleton College, students are prohibited from "distributing material which is demeaning."[65] Carleton's policy also bans using information technology resources for "political purposes."

- The College of the Holy Cross informs students that "[o]bscene or intolerant language, as well as offensive images" are prohibited, and makes clear "[t]he determination of what is obscene, offensive or intolerant is within the sole discretion of the College." [67]

The State of Free Speech on Our Nation's Campuses

53 *Id.*
54 *Howard University Student Handbook*, HOWARD UNIV., studentaffairs.howard.edu/sites/studentaffairs.howard.edu/files/2020-07/howard-university-student-handbook-2019-2020-REM.pdf (last visited Oct. 13, 2020).
57 *Id.*
58 *Code of Student Conduct*, TOWSON UNIV. at 4 (Aug. 12, 2020), towson.edu/studentaffairs/policies/documents/code_of_student_conduct.pdf.
59 *See* Texas v. Johnson, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"); *see also* Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 206 (3d Cir. 2001) (holding that there is "no question that the free speech clause protects a wide variety of speech that listeners may consider deeply offensive. . . . "); Bair v. Shippensburg Univ., 280 F. Supp. 2d 357, 369 (M.D. Pa. 2003) ("[R]egulations that prohibit speech on the basis of listener reaction alone are unconstitutional both in the public high school and university settings"); Doe v. Univ. of Mich., 721 F. Supp. 852, 863 (E.D. Mich. 1989) ("Nor could the University proscribe speech simply because it was found to be offensive, even gravely so, by large numbers of people").
60 *Use of University Technological and Information Resources*, BOSTON COLLEGE POLICIES AND PROCEDURES at 4 (last updated Mar. 30, 2004), bc.edu/content/dam/files/offices/policies/pdf/policies/I/1-100-025.pdf.
61 *Statement of Shared Values*, BOISE ST. UNIV. OFFICE OF THE PRESIDENT, boisestate.edu/president/values/statement-of-shared-values (last visited Oct. 16, 2020).

As campuses shifted to online learning during the COVID-19 pandemic this year, the concerns presented by problematic speech codes governing online expression were amplified. Indeed, FIRE recently released a report focusing on the recent surge in online censorship.[68]

To take one recent example, at Stockton University, a student faced a litany of charges, including "Disruptive Behavior," "Discrimination," and "Harassment," over using a photograph of President Donald Trump as his Zoom background and posting a political message on Facebook.[69] Stockton's incident report explained that the background made members of his class feel "offended, disrespected, and taunted."[70]

Just as speech that occurs in the public square may not be sanctioned merely because it has made others feel "offended, disrespected, and taunted," online speech may not be restricted on those bases alone.

## Policies on Bias and Hate Speech

In recent years, colleges and universities around the country have instituted policies and procedures specifically aimed at eliminating "bias" and "hate speech" on campus.[71] These sets of policies and procedures, frequently termed "Bias Reporting Protocols" or "Bias Incident Protocols," often include bans on protected expression. For example:

- Grinnell College defines a "bias-motivated incident" as "an expression of hostility toward, a person, group, or property thereof" because of an individual or group's identifying or perceived characteristic. The College warns: "Since these behaviors are not reflective of our Community Standards, student(s) found responsible for bias-related charges may face outcomes up to and including suspension, dismissal or degree withdrawal."[72]

- Bates College lists the following as examples of bias incidents: "hate speech," "sexist jokes or cartoons," and "disparaging remarks on social media sites." Students are told to report

such incidents in order to assist the college in "addressing behaviors that are antithetical to our community values."[73]

- DePauw University states: "Not all bias incidents constitute harassment under these policies. However, even if a bias incident does not constitute harassment, we can and will respond to address hurtful behavior and to support the targeted individual or group."[74]

While speech or expression that is based on a speaker's bias may be subjectively offensive, it is protected under First Amendment standards unless it rises to the level of unlawful conduct like harassment. Some bias reporting policies acknowledge the distinction between unlawful conduct, like hate crimes or harassment, and bias-related incidents. However, many of these policies nonetheless encourage students to report such broadly defined bias incidents, and reserve the right to take action against incidents that do not constitute unlawful behavior or unprotected speech.



Bias incident protocols also often infringe on students' right to due process by allowing for anonymous reporting that denies students the right to confront their accusers. Moreover, universities are often heavily invested in these bias incident policies, having set up extensive regulatory frameworks and response protocols devoted solely to addressing them.

Although some bias incident protocols do not include a separate enforcement mechanism, the mere threat

Foundation for Individual Rights in Education

62 Code of Student Conduct, Georgetown Univ. Division of Student Affairs at 13 (last updated fall 2018), studentconduct.georgetown.edu/code-of-student-conduct.
63 See, e.g., Coll. Republicans at S.F. St. Univ. v. Reed, 523 F. Supp. 2d 1005, at 23* (N.D. Cal. 2007) (enjoining enforcement of university civility policy because "there is a substantial risk that the civility requirement will inhibit or deter use of the forms and means of communication that, to many speakers in circumstances of the greatest First Amendment sensitivity, will be the most valued and the most effective.").
64 Email Policy, Drexel Univ. Information Technology (last revised July 1, 2014), drexel.edu/it/about/policies/policies/07-Email.
65 Academic User Agreement, Information Technology Services (last updated Apr. 13, 2020), apps.carleton.edu/campus/its/policies/agreement.
66 Id.
67 Use of Information Technology Services, College of the Holy Cross Policies and Procedures Manual (Dec. 16, 2015), holycross.edu/sites/default/files/files/policyprocedure/its/350000-002_use_of_information_technology_services_2015_accepted.pdf.
68 Memory-holed: Universities and Internet Speech, Found. for Individual Rights in Educ., thefire.org/ research/publications/miscellaneous-publications/memory-holed-universities-and-internet-speech.
69 See Letter from Zachary Greenberg, Program Officer, Individual Rights Defense Program, Found. for Individual Rights in Educ., to Harvey Kesselman, President, Stockton Univ. (Aug. 7, 2020), thefire.org/fire-letter-to-stockton-

of a bias investigation will likely be sufficient to chill speech on controversial issues. Indeed, the United States Court of Appeals for the Sixth Circuit recently held that, even though it lacked the power to punish students independently, the University of Michigan's former "Bias Response Team" policy was likely to chill the speech of students because "the invitation from the Response Team to meet could carry an implicit threat of consequence should a student decline the invitation."[75] As a part of a settlement agreement,[76] the university replaced its Bias Response Team with a "Campus Climate Support" program. The new policy makes its purpose—to provide support, rather than to investigate or punish protected speech—clear: "CCS is not a disciplinary body, cannot impose discipline, and does not require participation in any aspect of CCS's work."[77]

Overbroad bias reporting policies must be revised so that they narrowly target unlawful conduct, or to make clear they exist for purposes of providing support for affected individuals.

## Policies Governing Speakers, Demonstrations, and Rallies

Universities may enact reasonable, narrowly tailored "time, place, and manner" restrictions that prevent demonstrations and other expressive activities from unduly interfering with the educational process.[78] They may not, however, regulate speakers and demonstrations on the basis of content or viewpoint, nor may they maintain regulations that burden substantially more speech than is necessary to maintain an environment conducive to education. Such regulations can take several forms, as discussed in the sections below.

## Security Fee Policies

In recent years, FIRE has seen a number of colleges and universities hamper—whether intentionally or just through a misunderstanding of the law—the invitation of controversial campus speakers by levying additional security costs on the sponsoring student organizations.

The Supreme Court addressed a very similar issue in Forsyth County v. Nationalist Movement, where it struck down an ordinance in Georgia that permitted the local government to set varying fees for events based upon how much police protection the event would need.[79] Invalidating the ordinance, the Court wrote that "[t]he fee assessed will depend on the administrator's measure of the amount of hostility likely to be created by the speech based on its content. Those wishing to express views unpopular with bottle throwers, for example, may have to pay more for their permit."[80] Deciding that such a determination required county administrators to "examine the content of the message that is conveyed," the Court wrote that "[l]isteners' reaction to speech is not a content-neutral basis for regulation. . . . Speech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob."[81]

Despite this precedent, the impermissible use of security fees to burden controversial speech is all too common on university campuses:

- At Evergreen State College, factors that are considered in evaluating risk and determining security needs include the "topic" of the event and the "history of the performer."[82] If extra security is deemed necessary by the university, "this additional cost will be the responsibility of the event sponsor."[83]

- Bridgewater State University informs students that users of facilities will be billed for "extraordinary staff support needs arising from the particular nature of the event."[84]

- The State University of New York – New Paltz chillingly states: "Where a controversial speaker is likely to engender demonstrations from other student groups, the sponsoring organization must recognize the rights of other groups and consider the impact of inviting each speaker on the orderly and lawful functioning of the College."

The State of Free Speech on Our Nation's Campuses

university-august-7-2020.
[70] Id.
[71] See generally Bias Response Team Report 2017, Found. for Individual Rights in Educ., thefire.org/research/publications/bias-response-team-report-2017.
[72] Campus Life Policies, Grinnell College 2019-2020 Student Handbook, catalog.grinnell.edu/content.php?catoid=12&navoid=2536#Hate_Crimes_and_Bias-Motivated_Incidents_Policy (last visited Oct. 16, 2020).
[73] Bias Incidents & Hate Crimes, Bates Office of Equity and Inclusion, bates.edu/equity-inclusion/bias-incidents-hate-crimes (last visited Oct. 16, 2020).
[74] What is a Bias Incident?, DePauw Univ. Bias Incident Resources, depauw.edu/studentacademiclife/campus-safety/bias-incident-resources/investigation-follow-up (last visited Oct. 16, 2020).
[75] Speech First, Inc. v. Schlissel, 939 F.3d 756 (6th Cir. 2019). Quoting Schlissel, the United States Court of Appeals for the Fifth Circuit recently found a university bias reporting team's practice of making referrals to university disciplinary bodies "sufficiently proscriptive to objectively chill student speech." Speech First, Inc. v. Fenves, No. 19-50529, at 22* (5th Cir. 2020).
[76] Speech First v. U of M; Settlement Agreement, Speech First – Univ. of Michigan Case (Oct. 28, 2019), speechfirst.org/court-battles/speech-first-v-u-of-m-settlement-agreement.
[77] Campus Climate Support, Univ. of Michigan Dean of Students, deanofstudents.umich.edu/campus-climate-support (last visited Oct. 29, 2020).

## Prior Restraints

The Supreme Court has held that "[i]t is offensive—not only to the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so." Yet many colleges and universities enforce prior restraints, requiring students and student organizations to register their expressive activities well in advance and, often, to obtain administrative approval for those activities. For example:

- Virginia State University's student handbook prohibits "[u]nauthorized assembly, demonstrations, or acts of picketing of any kind" as "Disorderly Conduct," explaining that all "assemblies, demonstrations, and similar acts must have prior approval and be registered."[86]

- Students wishing to conduct a demonstration at Rensselaer Polytechnic Institute must submit an application to the dean of students' office "at least seven (7) days prior to the proposed demonstration date" for approval.[87]

- Students on Kean University's campus can't even hand out flyers without "submitting a formal request online . . . at least five (5) business days prior to the requested use."[88]

## Free Speech Zone Policies

Of the 478 schools surveyed for this report, 34 institutions (7.1%) enforce "free speech zone" policies—policies limiting student demonstrations and other expressive activities to small and often out-of-the-way areas on campus.[89] This number represents a significant improvement over the course of the past decade: a 2013 FIRE survey of the institutions covered in this report found that 16.4%—over double the percentage today—maintained such policies.[90] This positive shift can be traced in large part to FIRE's litigation and legislative efforts.

Over the past several years, free speech zones have

repeatedly been struck down by courts or voluntarily revised by colleges as part of settlements to lawsuits brought by students. FIRE's Stand Up For Speech Litigation Project has mounted successful challenges to free speech zone policies at eight colleges.[91] Most recently, the Los Angeles Community College District agreed to settle a lawsuit brought after an administrator told a student his rights were restricted to a tiny free speech zone on the Los Angeles Pierce College campus. As the largest community college district in the country, this victory for the Stand Up For Speech Litigation Project restored free speech rights to roughly 150,000 students.[92]

Additionally, state legislatures have continued to take action to prohibit public colleges and universities from maintaining free speech zones. Currently, seventeen states have enacted laws prohibiting these restrictive policies: Virginia, Missouri, Arizona, Kentucky, Colorado, Utah, North Carolina, Tennessee, Florida, Georgia, Louisiana, Arkansas, South Dakota, Iowa, Alabama, Oklahoma, and Texas. In doing so, several states utilized FIRE's model legislation.

Due to FIRE's efforts in litigation and legislation, as well as our continued policy reform work, free speech zones have declined dramatically over the past decade. In spite of this progress, too many universities still maintain free speech zones. Despite being inconsistent with the First Amendment, free speech zones are more common at public universities than at private universities: 8.1% of public universities surveyed maintain free speech zones, while just 3.8% of private universities that promise their students free speech rights do.

Examples of current free speech zone policies include the following:

- Eastern Illinois University restricts the distribution of written materials to a single area on campus, which it accurately and candidly calls the "Free Speech Zone."[93] The policy also provides that the university and registered student organizations may reserve this area for events, presenting the

78 *See* Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).
79 Forsyth, 505 U.S. 123.
80 *Id.* at 134.
81 *Id.* at 134–35 (emphasis added).
82 *Id.*
83 *Event Security and Safety*, Evergreen St. College Policies and Procedures, evergreen.edu/policy/eventsecurityandsafety (last visited Oct. 13, 2020).
84 *Free Speech and Demonstration Policy*, Bridgewater St. Univ. (reviewed Sept. 2017), handbook.bridgew.edu/sites/handbook/files/2019-08/BSU_Free_Speech_and_Demonstration_Policy_Revised_2017.pdf.
85 Watchtower Bible and Tract Society of NY, Inc. v. Village of Stratton, 536 U.S. 150, 165–66 (2002).
86 *Disorderly Conduct*, Virginia St. Univ. Student Handbook at 88, vsu.edu/files/docs/student-activities/student-handbook.pdf (last visited Oct. 16, 2020).
87 *Rules for Maintenance of Public Order*, Rensselaer Handbook of Student Rights and Responsibilities at 88 (last rev. Aug. 21, 2020), rpi.app.box.com/s/3f1cl3wl1t1mq8gqla68v6uk3vh1c19f.
88 *Distribution of Literature Policy*, Kean Univ. Policies, kean.edu/offices/policies/distribution-literature-policy (last visited Oct. 16, 2020).

Foundation for Individual Rights in Education

concern that other students wishing to hand out flyers may not be able to do so if this area has been previously reserved.[94]

- The University of California – Riverside provides that all persons may use "[a]reas open to the public generally" for expressive activity, but those areas are defined exceedingly narrowly as "the outdoor paved walkways on the campus."[95] If an activity is "pre-advertised" or can be expected to attract a crowd of over 25 people, it is limited to either "the Tower Mall or Speaker's Mound area."[96]

- At Vanderbilt University, students may only hand out written materials "on Rand Terrace or outside the building in which a meeting has been scheduled by another organization, if the distributors position themselves twenty feet from the entrance and so as to avoid restricting access."[97]

Although free speech zone policies are indeed being steadily revised across the country, they continue to pose problems for students' expressive activities. country, they continue to pose problems for students' expressive activities.

[89] See Appendix D for a full list of schools with free speech zone policies.

[90] *Infographic: Free Speech Zones on America's Campuses* (2013), thefire.org/infographic-free-speech-zones-on-americas-campuses-2.

[91] For more information about FIRE's Stand Up for Speech Litigation Project and Million Voices campaign, *see* standupforspeech.com.

[92] Pierce College Press Release, *supra* note 13.

[93] #138.1 - *Posting and Distribution of Materials*, Eastern Illinois Univ. Internal Governing Policies (July 27, 2020), castle.eiu.edu/~auditing/138_1.php.

[94] *Id.*

[95] *Speech and Advocacy*, Univ. of California Riverside (Sept. 15, 1992), fboapps.ucr.edu/policies/index.php?path=printPolicies.php&policy=700-70.

[96] *Id.*

[97] *Freedom of Expression*, Vanderbilt Univ. Student Handbook, vanderbilt.edu/student_handbook/student-engagement/#freedom-of-expression (last visited Oct. 13, 2020).

# WHAT CAN BE DONE?

The good news is that the types of restrictions discussed in this report can be reformed. Students and faculty members can be tremendously effective advocates for change when they are aware of their expressive rights and willing to engage administrators in their defense. FIRE provides a number of resources to assist advocates and administrators in revising speech codes, including our Model Code of Student Conduct.[98] The Model Code includes provisions regarding prohibited conduct that would all earn green light ratings, as well as student conduct procedures and procedural safeguards that comply with the Department of Education's recent Title IX regulations.

Unconstitutional policies also can be defeated in court, especially at public universities, where speech codes have been struck down in federal courts across the country. Many more such policies have been revised in favor of free speech as the result of legal settlements.

Any speech code in force at a public university is vulnerable to a constitutional challenge. Moreover, as speech codes are consistently defeated in court, administrators cannot credibly argue that they are unaware of the law, which means that they may be held personally liable when they are responsible for their schools' violations of constitutional rights.[99]

The suppression of free speech at institutions of higher education is a matter of national concern. But, by working together with universities to revise restrictive speech codes and to reaffirm commitments to free expression, we can continue to make strides toward campuses that truly embody the "marketplace of ideas" that such institutions are meant to be in our society.

**Public exposure is also critical to defeating speech codes, since universities are often unwilling to defend their speech codes in the face of public criticism.**



[98] *Model Code*, Found. for Individual Rights in Educ. (May 28, 2020), thefire.org/legal/procedural-advocacy/model-code. For other resources regarding policy reform, see thefire.org/resources/fires-speech-code-resources.
[99] *See, e.g.,* Marieke Tuthill Beck-Coon, *FIRE lawsuit against Iowa State University administrators ends with nearly $1 million in damages and fees*, Found. for Individual Rights in Educ. (Mar. 23, 2018) thefire.org/fire-lawsuit-against-iowa-state-university-administrators-ends-with-nearly-1-million-in-damages-and-fees. *See also* Azhar Majeed, *Putting Their Money Where Their Mouth Is: The Case for Denying Qualified Immunity to University Administrators for Violating Students' Speech Rights*, 8 Cardozo Pub. L., Pol'y & Ethics J. 3, 515 (2010).

## Spotlight On:
# New Title IX Regulations

Foundation for Individual Rights in Education

Conduct that constitutes hostile environment harassment, as legally defined, isn't protected by the First Amendment, but colleges all too often miss the mark when drafting harassment policies. In fact, harassment policies earn FIRE's worst, red light rating more frequently than any other type of policy in the Spotlight database, with 68 schools currently maintaining a policy that earns the rating.[100]

In Davis v. Monroe County Board of Education, the Supreme Court defined student-on-student (or peer) harassment in the educational setting as discriminatory, unwelcome conduct that is "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit."[101] In other words, harassment is extreme and repetitive behavior—behavior so serious that it would interfere with a reasonable person's ability to receive their education. However, most colleges have adopted a broader standard, putting protected speech at risk of punishment.

To understand why universities so commonly fail to define harassment properly, it helps to take a look back through the past decade of Title IX enforcement.

In 2013, the U.S. Department of Education's Office for Civil Rights (OCR) and the Department of Justice issued a joint findings letter announcing a resolution agreement with the University of Montana, following an investigation into the university's Title IX policies and practices.[102] The letter described this agreement as "a blueprint for colleges and universities throughout the country to protect students from sexual harassment and assault," and defined sexual harassment as "any unwelcome conduct of a sexual nature," including "verbal conduct."[103]

Under this broad, "blueprint" definition of sexual harassment, which fails to incorporate the critical

"severe, pervasive, and objectively offensive" components from the Davis standard, a single instance of subjectively offensive verbal conduct (i.e., speech, such as an off-color joke) could be considered punishable harassment.

OCR later backed away from the term "blueprint" in a letter to FIRE, in which it explained that "the agreement in the Montana case represents the resolution of that particular case and not OCR or DOJ policy,"[104] but the damage caused by the promotion of this definition had already been done. Many universities across the country had adopted it as their controlling standard for peer harassment, or had added it to existing policies, presenting students with a confusing array of definitions at a single school.

After years of pushback from FIRE and other civil liberties groups, OCR finally reversed course. On May 6, 2020, the agency announced new regulations that, among other important reforms regarding procedural safeguards, adopt the standard from Davis for Title IX sexual harassment. Those regulations took effect August 14, 2020.[105]

The colleges and universities analyzed in this report were reviewed incrementally over the course of the past year, from October 2019 to September 2020. Thus, we have only seen the impact of the regulations on schools that were updated since they went into effect. However, we have already identified a few trends in how schools have responded to the regulations.

First, some schools have missed the effective date of the regulations entirely. For example, Murray State University notes that the revision of its "Sexual Harassment Policy" is pending final approval in December 2020 by its board of regents.[106] Most universities have a process for expediting the adoption of a policy on an interim basis, but evidently 100 days

[100] *FIRE's Spotlight Database Search Results*, FOUND. FOR INDIVIDUAL RIGHTS IN EDUC., thefire.org/resources/spotlight/?x=&speech_code=Red&y=&institution_type=&speech_code_advanced=Red&y_advanced=&statement%5B%5D=804#search-results (last visited Oct. 29, 2020).
[101] 526 U.S. 629, 633 (1999).
[102] U.S. Dep't of Educ., Dear Colleague Letter from Gerald A. Reynolds, Assistant Sec'y for Civil Rights (July 28, 2003), https://www2.ed.gov/about/offices/list/ocr/firstamend.html.
[103] *Id.*
[104] Letter from Catherine E. Lhamon, Assistant Secretary for Civil Rights, U.S. Department of Education, to Greg Lukianoff, President, Foundation for Individual Rights in Education (Nov. 14, 2013), *available at* thefire.org/letter-from-department-of-education-office-for-civil-rights-assistant-secretary-catherine-e-lhamon-to-fire.
[105] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) (to be codified at 34 C.F.R. pt. 106).
[106] *Sexual Harassment Policy*, MURRAY ST. UNIV. (last updated May 1, 2017), murraystate.edu/headermenu/administration/OfficeOfInstitutionalDiversityEquityandAccess/pdf/sexualharassmentpolicy.pdf.
[107] *See Title IX*, OFFICE OF INSTITUTIONAL DIVERSITY, EQUITY AND ACCESS, murraystate.edu/headermenu/administration/titleix/index.aspx (last visited Oct. 20, 2020).
[108] The regulations note that "inappropriate or illegal behavior may be addressed by a recipient even if the conduct clearly does not meet the *Davis* standard or otherwise constitute sexual harassment under § 106.30, either under a recipient's own code of conduct or under criminal laws in a recipient's jurisdiction (e.g., with respect to a commenter's example of drugging at a dorm party)." Nondiscrimination, *supra* note 105. However, developing two entirely separate definitions of sexual harassment with correspondingly distinct procedural protections gives administrators the power to decide which definition and procedures to apply to each case (and even to conduct concurrent

(from May 6, when the regulations were released, to the effective date on August 14) was not sufficient for Murray State. Instead, the university will wait a total of 209 days before revising its policy. In the interim, Murray State has not added the definition of harassment from the regulations to its Title IX webpage or any other location on its website.[107]

The majority of schools, however, have unfortunately adopted what FIRE is calling a "dual-track approach" to reaching policy compliance. While these schools adopted the regulations' definition of sexual harassment for Title IX cases, they also maintain a broader sexual harassment definition for other types of cases.[108]

For example, the State University of New York at Fredonia adopted a "Title IX Grievance Policy" that incorporates the definition from the regulations. However, the policy also provides that "SUNY Fredonia remains committed to addressing any violations of its policies, even those not meeting the narrow standards defined under the Title IX Final Rule," and that "the institution retains authority to investigate and adjudicate the allegations under the policies and procedures defined within the Code of Conduct through a separate grievance proceeding."[109]

This "Code of Conduct" policy in turn references the university's "Sexual Harassment Policy," which provides the "blueprint" definition of sexual harassment discussed earlier.[110] Thus, with both the speech-protective definition from the regulations and this broader definition in place, students at SUNY Fredonia are still at risk of being punished for engaging in protected speech.

The results thus far are not all negative. Some schools have adopted the definition of sexual harassment from the regulations in their policies across the board. For example, West Virginia University previously banned "severe or pervasive" conduct in defining hostile environment harassment, rather than requiring that conduct be both "severe" and "pervasive," as per the standard from Davis.[111] Now, that hostile environment definition has been revised to fully track the regulations, requiring both severity and pervasiveness in not only

Title IX cases, but also cases of hostile environment harassment based on other protected characteristics.[112]

And even where schools haven't adopted the Davis standard across all policies, revising policies pursuant to the regulations has resulted in significant improvements. Wichita State University, for one, improved from an overall red light rating to an overall yellow light rating by removing its blueprint sexual harassment policy and replacing it with one that adopts the definition from the regulations.[113] The university still maintains a harassment provision in its student code of conduct that defines harassment more broadly than the regulations, but the removal of the blueprint definition is an important victory for free speech rights.[114]

At the time of this writing, it is difficult to be sure of the future of the Department of Education's regulations. Thus, civil liberties advocates must continue to be diligent in identifying threats to free expression presented by overbroad harassment policies.

Whether or not the Title IX regulations remain in place, schools will need to be urged into compliance, watched to make sure they don't adopt additional, conflicting policies, and monitored to ensure that the application of such policies does not infringe on student rights. FIRE will continue to do so, regardless of what the future holds for these regulations.



proceedings), a scenario that invites administrative abuse and puts free speech and due process rights at risk. As a federal district court recently explained: "Such disregard for the inevitable administrative headaches of a multi-procedure approach certainly qualifies as evidence of an irregular adjudicative process." Doe v. Rensselaer Polytechnic Institute, No. 1:20-cv-1185, at 13* (N.D.N.Y. Oct. 16, 2020). The court found that a school's "conscious and voluntary choice to afford a plaintiff, over his objection, a lesser standard of due process protections when that school has in place a process which affords greater protections, qualifies as an adverse action." *Id.*

[109] *Title IX Grievance Policy*, SUNY FREDONIA at 5, fredonia.edu/sites/default/files/section/about/diversity-inclusion/SUNY%20Fredonia%20Title%20IX%20Policy.pdf (last visited Oct. 20, 2020).

[110] *Sexual Harassment Policy*, UNIV. POLICIES FOR STUDENTS, fredonia.edu/student-life/student-conduct/policies#SexualDiscrimination (last visited Oct. 20, 2020).

[111] *Archive: BOG Policy 44 - Policy Regarding Discrimination, Harassment, Sexual Harassment, Sexual & Domestic Misconduct, Stalking, and Retaliation*, WEST VIRGINIA UNIV. RULES, POLICIES, AND PROCEDURES (repealed Aug. 14, 2020), policies.wvu.edu/archives/bog-policy-44-policy-regarding-discrimination-harassment-sexual-harassment-sexual-domestic-misconduct-stalking-and-retaliation.

[112] *BOG Governance Rule 1.6 - Rule Regarding Discrimination, Harassment, Sexual Harassment, Sexual Misconduct, Domestic Misconduct, Stalking, Retaliation, and Relationships*, WEST VIRGINIA UNIV. RULES, POLICIES, AND PROCEDURES (Aug. 14, 2020), policies.wvu.edu/finalized-bog-rules/bog-governance-rule-1-6-rule.

[113] *Sexual Harassment, Discrimination and Retaliation for Employees, Students and Visitors*, WSU POLICIES AND PROCEDURES (last revised Aug. 13, 2020), wichita.edu/about/policy/ch_03/ch3_06.php.

[114] *Student Code of Conduct Handbook*, WSU POLICIES AND PROCEDURES (last revised June 24, 2020), wichita.edu/about/student_conduct/student-code-of-conduct-handbook.php.

# APPENDICES

## Appendix A: Schools by Rating



**RED LIGHT**



**RED LIGHT**

Adams State University
Alabama A&M University
Barnard College
Bates College
Boston College
Boston University
California State University - Dominguez Hills
California State University – Fresno
California State University - Monterey Bay
Carleton College
Case Western Reserve University
Cheyney University of Pennsylvania
Chicago State University
Clark University
Clemson University
Coastal Carolina University
Colby College
Colgate University
College of the Holy Cross
Connecticut College
Dakota State University
Davidson College
Delaware State University
DePauw University
Dickinson College
Drexel University
Eastern Illinois University
Evergreen State College
Fordham University
Fort Lewis College
Framingham State University
Furman University
Georgetown University
Grinnell College
Harvard University
Harvey Mudd College
Howard University
Johns Hopkins University
Kean University
Lafayette College
Lake Superior State University
Lehigh University
Lewis-Clark State College
Lincoln University
Louisiana State University - Baton Rouge

Macalester College
Marquette University
Middlebury College
Mount Holyoke College
Murray State University
Northeastern University
Northern Vermont University
Northwestern University
Portland State University
Princeton University
Reed College
Rensselaer Polytechnic Institute
Rice University
Santa Clara University
Shawnee State University
Southern Illinois University at Carbondale
Southern Illinois University Edwardsville
Southern Oregon University
St. Olaf College
State University of New York - Fredonia
State University of New York - New Paltz
Stevens Institute of Technology
Tennessee State University
The College of New Jersey
Troy University
Tufts University
Tulane University
Union College
University of Alaska Anchorage
University of Alaska Fairbanks
University of Central Missouri
University of Central Oklahoma
University of Colorado Denver
University of Houston
University of Houston-Downtown
University of Illinois at Chicago
University of Louisiana Lafayette
University of Massachusetts at Dartmouth
University of Massachusetts at Lowell
University of Miami
University of Notre Dame
University of Southern California
University of Texas at Arlington
University of Texas at Austin
University of Texas at Dallas
University of Tulsa
University of Wisconsin - Oshkosh
University of Wyoming
Utah State University
Valdosta State University
Villanova University



**RED LIGHT**

Virginia State University
Western Illinois University
Western Michigan University
William Paterson University
Winston-Salem State University
Worcester Polytechnic Institute



**YELLOW LIGHT**

Central Michigan University
Central Washington University
Centre College
Christopher Newport University
Clarion University of Pennsylvania
College of Charleston
Colorado College
Colorado School of Mines
Colorado State University
Colorado State University Pueblo
Columbia University
Cornell University
Dartmouth College
East Stroudsburg University of Pennsylvania
East Tennessee State University
Eastern Michigan University
Eastern New Mexico University
Eastern Washington University
Elizabeth City State University
Ferris State University
Fitchburg State University
Florida A&M University
Florida Atlantic University
Florida Gulf Coast University
Florida International University
Fort Hays State University
Franklin & Marshall College
Frostburg State University
George Washington University
Georgia Gwinnett College
Georgia Institute of Technology
Georgia Southern University
Georgia State University
Gettysburg College
Governors State University
Grambling State University
Grand Valley State University
Hamilton College
Haverford College
Henderson State University
Humboldt State University
Hunter College, City University of New York
Idaho State University
Illinois State University
Indiana State University
Indiana University - Bloomington
Indiana University - Kokomo
Indiana University - Purdue University Columbus
Indiana University - Purdue University Indianapolis
Indiana University of Pennsylvania
Indiana University South Bend



**YELLOW LIGHT**

Alabama State University
American University
Angelo State University
Arkansas State University
Athens State University
Auburn University Montgomery
Ball State University
Bard College
Baruch College
Bemidji State University
Black Hills State University
Bloomsburg University of Pennsylvania
Boise State University
Bowdoin College
Bowling Green State University
Brandeis University
Bridgewater State University
Brooklyn College, City University of New York
Brown University
Bryn Mawr College
Bucknell University
California Institute of Technology
California Maritime Academy
California Polytechnic State University
California State Polytechnic University, Pomona
California State University - Bakersfield
California State University - Channel Islands
California State University - Chico
California State University - East Bay
California State University - Fullerton
California State University - Long Beach
California State University - Los Angeles
California State University - Northridge
California State University - Sacramento
California State University - San Bernardino
California State University - San Marcos
California State University - Stanislaus
California University of Pennsylvania
Cameron University
Carnegie Mellon University
Central Connecticut State University

Foundation for Individual Rights in Education



**YELLOW LIGHT**

Indiana University, East
Indiana University, Northwest
Indiana University, Southeast
Iowa State University
Jacksonville State University
James Madison University
Kennesaw State University
Kent State University
Kentucky State University
Kenyon College
Kutztown University of Pennsylvania
Lock Haven University of Pennsylvania
Longwood University
Louisiana Tech University
Mansfield University of Pennsylvania
Marshall University
Massachusetts College of Liberal Arts
Massachusetts Institute of Technology
Metropolitan State University
Metropolitan State University of Denver
Miami University of Ohio
Michigan State University
Middle Georgia State University
Middle Tennessee State University
Millersville University of Pennsylvania
Missouri State University
Missouri University of Science & Technology
Montana State University
Montana Tech of the University of Montana
Montclair State University
Morehead State University
New College of Florida
New Jersey Institute of Technology
New Mexico State University
New York University
Nicholls State University
Norfolk State University
North Carolina A&T State University
North Dakota State University
Northeastern Illinois University
Northern Illinois University
Northern Kentucky University
Northern Michigan University
Northwestern Oklahoma State University
Northwestern State University
Oakland University
Oberlin College
Occidental College
Ohio University
Oklahoma State University - Stillwater
Old Dominion University



**YELLOW LIGHT**

Pennsylvania State University - University Park
Pittsburg State University
Pitzer College
Pomona College
Radford University
Rhode Island College
Rogers State University
Rowan University
Rutgers University - New Brunswick
Saginaw Valley State University
Saint Cloud State University
Salem State University
Sam Houston State University
San Diego State University
San Francisco State University
San Jose State University
Scripps College
Sewanee, The University of the South
Skidmore College
Slippery Rock University of Pennsylvania
Smith College
Sonoma State University
South Dakota State University
Southeast Missouri State University
Southeastern Louisiana University
Southern Connecticut State University
Southern Methodist University
Southern Utah University
Southwest Minnesota State University
Stanford University
State University of New York - Binghamton
State University of New York - Oswego
State University of New York - Albany
State University of New York - University at Buffalo
State University of New York College of Environmental Science and Forestry
Stockton University
Stony Brook University
Swarthmore College
Syracuse University
Tarleton State University
Temple University
Tennessee Technological University
Texas Southern University
Texas State University - San Marcos
Texas Tech University
Texas Woman's University
The City College of New York
The Ohio State University
The University of Virginia's College at Wise
Towson University



**YELLOW LIGHT**

Trinity College
University of Akron
University of Alabama
University of Alabama at Birmingham
University of Alabama in Huntsville
University of Alaska Southeast
University of Arkansas - Fayetteville
University of California Berkeley
University of California Davis
University of California Irvine
University of California Merced
University of California Riverside
University of California San Diego
University of California Santa Barbara
University of California Santa Cruz
University of Central Arkansas
University of Central Florida
University of Cincinnati
University of Connecticut
University of Delaware
University of Denver
University of Georgia
University of Hawaii at Manoa
University of Hawaii Hilo
University of Idaho
University of Illinois at Springfield
University of Illinois at Urbana-Champaign
University of Iowa
University of Kansas
University of Kentucky
University of Maine
University of Maine at Fort Kent
University of Maine Presque Isle
University of Mary Washington
University of Massachusetts - Amherst
University of Massachusetts - Boston
University of Memphis
University of Michigan - Ann Arbor
University of Michigan - Dearborn
University of Michigan - Flint
University of Minnesota - Morris
University of Minnesota - Twin Cities
University of Missouri - Columbia
University of Missouri-Kansas City
University of Missouri-St. Louis
University of Montana
University of Montana Western
University of Montevallo
University of Nebraska - Lincoln
University of Nebraska Omaha
University of Nevada, Las Vegas



**YELLOW LIGHT**

University of Nevada, Reno
University of New Mexico
University of New Orleans
University of North Alabama
University of North Carolina at Asheville
University of North Carolina School of the Arts
University of North Georgia
University of North Texas
University of Northern Colorado
University of Northern Iowa
University of Oklahoma
University of Oregon
University of Pennsylvania
University of Pittsburgh
University of Rhode Island
University of Richmond
University of Rochester
University of South Alabama
University of South Carolina Columbia
University of South Dakota
University of South Florida
University of South Florida at Saint Petersburg
University of Southern Indiana
University of Southern Maine
University of Texas at El Paso
University of Texas at San Antonio
University of Texas at Tyler
University of Texas Rio Grande Valley
University of Toledo
University of Utah
University of Vermont
University of Washington
University of West Alabama
University of West Florida
University of West Georgia
University of Wisconsin - Eau Claire
University of Wisconsin - Green Bay
University of Wisconsin - La Crosse
University of Wisconsin - Madison
University of Wisconsin - Stout
University of Wisconsin Milwaukee
Utah Valley University
Vanderbilt University
Virginia Commonwealth University
Virginia Polytechnic Institute and State University
Wake Forest University
Washington & Lee University
Washington State University
Washington University in St. Louis
Wayne State University
Weber State University

Foundation for Individual Rights in Education



**YELLOW LIGHT**

Wellesley College
Wesleyan University
West Chester University of Pennsylvania
West Virginia University
Western Kentucky University
Western Oregon University
Western Washington University
Westfield State University
Whitman College
Wichita State University
Williams College
Winona State University
Worcester State University
Wright State University
Yale University
Youngstown State University

State University of New York - Brockport
State University of New York - Plattsburgh
Texas A&M University
The College of William & Mary
University of Arizona
University of California Los Angeles
University of Chicago
University of Colorado at Boulder
University of Florida
University of Louisville
University of Maryland - College Park
University of Mississippi
University of New Hampshire
University of North Carolina - Pembroke
University of North Carolina Chapel Hill
University of North Carolina Charlotte
University of North Carolina Greensboro
University of North Carolina Wilmington
University of North Dakota
University of North Florida
University of Southern Mississippi
University of Tennessee Knoxville
University of Virginia
Western Carolina University
Western Colorado University



**GREEN LIGHT**

Alcorn State University
Appalachian State University
Arizona State University
Auburn University
Claremont McKenna College
Cleveland State University
Colorado Mesa University
Delta State University
Duke University
East Carolina University
Eastern Kentucky University
Edinboro University of Pennsylvania
Emory University
Fayetteville State University
Florida State University
George Mason University
Jackson State University
Kansas State University
Keene State College
McNeese State University
Michigan Technological University
Mississippi State University
North Carolina Central University
North Carolina State University
Northern Arizona University
Oregon State University
Plymouth State University
Purdue University
Purdue University Fort Wayne
Purdue University Northwest
Shippensburg University



**WARNING SCHOOLS**

Baylor University
Brigham Young University
Pepperdine University
Saint Louis University
United States Military Academy
United States Naval Academy
Vassar College
Yeshiva University

The State of Free Speech on Our Nation's Campuses

## APPENDIX B: Rating Changes, 2019–2020 Academic Year

| SCHOOL NAME | 2018–2019 RATING | 2019–2020 RATING |
|---|---|---|
| Boise State University | ● Red | ● Yellow |
| College of Charleston | ● Red | ● Yellow |
| Colorado Mesa University | ● Yellow | ● Green |
| Dartmouth College | ● Red | ● Yellow |
| Emory University | ● Red | ● Green |
| Fayetteville State University | ● Yellow | ● Green |
| Florida State University | ● Red | ● Green |
| Georgia Southern University | ● Red | ● Yellow |
| Governors State University | ● Red | ● Yellow |
| Harvey Mudd College | ● Yellow | ● Red |
| Idaho State University | ● Red | ● Yellow |
| Jackson State University | ● Yellow | ● Green |
| Morehead State University | ● Red | ● Yellow |
| New Jersey Institute of Technology | ● Red | ● Yellow |
| Northern Illinois University | ● Red | ● Yellow |
| Northwestern University | ● Yellow | ● Red |
| Oklahoma State University - Stillwater | ● Red | ● Yellow |
| Rice University | ● Yellow | ● Red |
| Shawnee State University | ● Yellow | ● Red |
| Southeastern Louisiana University | ● Red | ● Yellow |
| Southern Utah University | ● Red | ● Yellow |
| State University of New York - Albany | ● Red | ● Yellow |
| Syracuse University | ● Red | ● Yellow |
| University of Alabama at Birmingham | ● Red | ● Yellow |
| University of Colorado at Boulder | ● Yellow | ● Green |

Foundation for Individual Rights in Education

| SCHOOL NAME | 2018-2019 RATING | 2019-2020 RATING |
|---|---|---|
| University of Montana | 🔴 Red | 🟡 Yellow |
| University of New Orleans | 🔴 Red | 🟡 Yellow |
| University of North Texas | 🔴 Red | 🟡 Yellow |
| University of South Carolina Columbia | 🔴 Red | 🟡 Yellow |
| University of Texas at Arlington | 🟡 Yellow | 🔴 Red |
| Valdosta State University | 🟡 Yellow | 🔴 Red |
| Western Michigan University | 🟡 Yellow | 🔴 Red |
| Whitman College | 🔴 Red | 🟡 Yellow |
| Wichita State University | 🔴 Red | 🟡 Yellow |
| Winston-Salem State University | 🟡 Yellow | 🔴 Red |

## APPENDIX C: Schools at Which a Faculty or Administrative Body Has Adopted a Version of the 'Chicago Statement'

Adrian College*
American University
Amherst College
Appalachian State University
Arizona State University
Ashland University*
Ball State University
Board of Regents, State of Iowa
Brandeis University
California State University – Channel Islands
Case Western Reserve University
Chapman University*
Christopher Newport University
Claremont McKenna College
Clark University
Cleveland State University
Colgate University
Colorado Mesa University
Columbia University
Denison University*
Eckerd College*
Franklin & Marshall College
George Mason University
Georgetown University
Gettysburg College
Jacksonville State University
Johns Hopkins University
Joliet Junior College*
Kansas State University
Kenyon College
Kettering University*
Louisiana State University System
Miami University of Ohio
Michigan State University
Middle Tennessee State University
Nevada System of Higher Education
Northern Illinois University
Ohio University
Ohio Wesleyan University*
Princeton University
Purdue University
Ranger College*
Smith College
Snow College*
South Dakota University System

State University of New York – University at Buffalo
State University System of Florida
Stetson University*
Suffolk University*
Tennessee Technological University
The Citadel*
The City University of New York
University of Alabama System
University of Arizona
University of Arkansas at Little Rock*
University of Colorado System
University of Denver
University of Louisiana System
University of Maine System
University of Maryland
University of Minnesota
University of Missouri System
University of Montana
University of Nebraska
University of North Carolina – Chapel Hill
University of Southern Indiana
University of Texas at San Antonio
University of Toledo
University of Virginia College at Wise
University of Wisconsin System
Utica College*
Vanderbilt University
Washington and Lee University
Washington University in St. Louis
Winston-Salem State University
Winthrop University*

**NOTE: Some of the institutions on this list are not rated as a part of the Spotlight database at this time and thus do not fall within this report's speech code analysis. However, they have been included here in order to provide a full list of the institutions at which either the administration or a faculty body has adopted a version of the Chicago Statement. Such institutions are denoted with an asterisk.**

## APPENDIX D: Schools with "Free Speech Zones"

Auburn University Montgomery
Ball State University
Bemidji State University
Bridgewater State University
California State University - Dominguez Hills
California State University - Los Angeles
California State University – Sacramento
East Tennessee State University
Eastern Illinois University
Elizabeth City State University
Grambling State University
Kentucky State University
Montclair State University
Morehead State University
Northwestern State University
Occidental College
Rutgers University - New Brunswick
Saint Cloud State University
Southern Illinois University at Carbondale
Stanford University
Texas Southern University
The College of New Jersey
Tulane University
University of Alabama in Huntsville
University of California Riverside
University of Illinois at Urbana-Champaign
University of Iowa
University of Massachusetts at Dartmouth
University of Nebraska - Lincoln
University of North Carolina School of the Arts
University of South Carolina Columbia
University of Southern Indiana
University of West Alabama
Vanderbilt University



510 Walnut Street, Suite 1250
Philadelphia, PA 19106
**T:** 215.717.3473   **F:** 215.717.3440
**E:** speechcodes@thefire.org
**www.thefire.org**

 @thefireorg



# Exhibit M



# BIAS RESPONSE TEAM

## REPORT 2017








The mission of FIRE is to defend and sustain individual rights at America's colleges and universities. These rights include freedom of speech, legal equality, due process, religious liberty, and sanctity of conscience—the essential qualities of individual liberty and dignity. FIRE's core mission is to protect the unprotected and to educate the public and communities of concerned Americans about the threats to these rights on our campuses and about the means to preserve them.



**510 WALNUT ST.**
**SUITE 1250**
**PHILADELPHIA, PA 19106**

 

# TABLE OF CONTENTS

**4**    **EXECUTIVE SUMMARY**

**6**    **METHODOLOGY**

**7**    **FINDINGS**

**9**    **DISCUSSION**

9    **WHY** BIAS RESPONSE TEAMS EXIST

10    **HOW MANY** BIAS RESPONSE TEAMS EXIST

12    WIDELY **DEFINING "BIAS"**

15    **EXAMPLES** OF REPORTED INCIDENTS

19    **WHO** SERVES ON THE BIAS RESPONSE TEAM: THE SPEECH POLICE

20    THE **RISK** OF FIRST AMENDMENT LAWSUITS

23    A **LACK OF TRAINING** ON FREEDOM OF SPEECH

24    HOW SOME UNIVERSITIES ARE **RESISTING TRANSPARENCY**

26    NORMATIVE **CRITICISMS** OF BIAS RESPONSE TEAMS

28    **STRIKING A BALANCE**

**29**    **APPENDICES**

29    APPENDIX A: CATEGORIES OF BIAS

31    APPENDIX B: INSTITUTIONS WITH BIAS REPORTING SYSTEMS

# EXECUTIVE SUMMARY

Over the past several years, the Foundation for Individual Rights in Education (FIRE) has received an increasing number of reports that colleges and universities are inviting students to anonymously report offensive, yet constitutionally protected, speech to administrators and law enforcement through so-called "Bias Response Teams." These teams monitor and investigate student and faculty speech, directing the attention of law enforcement and student conduct administrators towards the expression of students and faculty members.

To better understand this phenomenon, FIRE gathered data throughout 2016 on every bias reporting system we could locate. FIRE sought to determine who reviews the reports, what categories of bias they are charged with addressing, and whether the institution acknowledges that the system generates a tension with free speech and academic freedom.

FIRE discovered and surveyed **231 Bias Response Teams at public and private institutions** during 2016. The expression of at least **2.84 million American students** is subject to review by Bias Response Teams. While most students in higher education do not yet appear to be subject to bias reporting systems, we believe that the number of Bias Response Teams is growing rapidly.

The composition of Bias Response Teams is not always made public. About 28% did not reveal the names or rules of any team members. Of those whose membership FIRE could ascertain:

- 42% report speech to members of law enforcement or campus security officers, even though the teams deliberately solicit reports of a wide variety of non-criminal speech and activity.
- 12% of teams include at least one administrator dedicated to media relations, suggesting that part of the

purpose of such teams is to deter and respond to controversies that might embarrass the institution.
- Fewer than a third of teams included faculty members, whose absence diminishes the likelihood that the team will have a meaningful understanding of academic freedom.

Teams tend to cast a wide net when defining "bias." Almost all use categories widely found in discrimination statutes (race, sex, sexual orientation, etc.), while others investigate bias against obscure categories, such as "smoker status," "shape," and "intellectual perspective." A significant minority include **political affiliation or speech as a potential bias, inviting reports of and investigations into political speech by law enforcement and student conduct administrators**.

In responding to reports regarding this wide array of protected expression, administrators are frequently armed with vague or overly broad rules granting them leeway to impose sanctions for speech they dislike. In December 2016, FIRE found that some 92.4% of the 449 schools surveyed for our annual speech code report maintain policies that either clearly and substantially restrict speech, or can otherwise be interpreted to punish protected speech. At such schools, a Bias Response Team's practice of broadly defining and identifying "bias" may expose a wide range of protected speech to punishment. Even where schools purport only to provide "education" to the offending speaker, instead of formal punitive sanctions (such as suspension or expulsion), this response is often undertaken by student conduct administrators, not educators, and more closely resembles a reprimand.

There is an unavoidable tension between promoting free speech and academic freedom and working to combat the presence of "bias" (however defined) on campus. Yet **only 84**

EXECUTIVE SUMMARY

**(50.6%) of the teams surveyed acknowledged a tension with freedom of speech**, freedom of inquiry, or academic freedom on their websites or in their policies.

FIRE also used public records requests to discover the reports made at some institutions, how the schools responded to those reports, and the teams' policies and training. Many institutions complied with these requests. Others stonewalled, hid records, deleted websites, or demanded thousands of dollars to view records, claiming that knowing how Bias Response Teams operate is not in the public interest.

Further, how universities respond to bias reports may expose them to First Amendment lawsuits. Individual team members risk being held personally liable for violating constitutional rights in some circumstances. They may not even be aware of where the lines are drawn. FIRE found little evidence that Bias Response Teams are trained on First Amendment issues.

Bias Response Teams, when armed with open-ended definitions of "bias," staffed by law enforcement and student conduct administrators, and left without training on freedom of expression, represent an emerging risk to free and open discourse on campus and in the classroom. Bias Response Teams create—indeed, they are intended to create—a chilling effect on campus expression. Even if a Bias Response Team does not have the power to take punitive action, the prospect of an official investigation may make students and faculty more cautious about what opinions they dare to express.

Beyond First Amendment concerns, encouraging students and faculty to anonymously report one another to administrators for subversive or offensive views is illiberal, and antithetical to a campus open to the free exchange of ideas. While universities should certainly be listening to their students and offering resources to those who encounter meaningful difficulties in their lives on campus, the posture taken by many Bias Response Teams is all too likely to create profound risks to freedom of expression, freedom of association, and academic freedom on campus.

## METHODOLOGY

### WHAT IS A BIAS REPORTING SYSTEM?

In order to distinguish bias reporting systems from other speech codes, and to identify systems that may not be explicitly identified as a "bias reporting" system,[1] FIRE applied a three-part definition. Where it was unclear whether a particular element was met, we used our best judgment. Links to the websites of all Bias Response Teams are provided in Appendix B so that the reader may form his or her own opinion.

FIRE defines a bias reporting system as any system identified as such, or that provides:

(1) a formal or explicit process for or solicitation of
(2) reports from students, faculty, staff, or the community
(3) concerning offensive conduct or speech that is protected by the First Amendment or principles of expressive or academic freedom.

Under FIRE's definition, a school policy or reporting system limited to criminal offenses involving hate or bias does not constitute a bias reporting system.

### LOCATING AND OBSERVING BIAS REPORTING SYSTEMS

FIRE relied on a number of methods to locate bias reporting systems, including mining schools' websites for information, using tools to monitor websites for changes, and issuing public records requests to collect additional information.

We first gathered state-by-state lists of public and private institutions on Wikipedia, as well as in FIRE's own Spotlight database,[2] to identify leading institutions in the United States. We then reviewed each school's website and Google presence, searching for references to bias reporting systems. To locate other systems, we searched for reporting forms provided by Maxient and other companies known to host reporting forms. The location process also utilized Google alerts and media reports concerning bias reporting systems.

Once the institutions were identified, FIRE monitored each Bias Response Team page for changes in text—a practice we will continue in order to observe whether, or how, institutions change their systems over time.[3]

FIRE also reviewed the public-facing websites of reporting systems to identify relevant policies, definitions, forms, and other information. We recorded the definitions of "bias" in both policies and reporting forms, which often differed from one another, to determine the categories of bias defined by each institution.

Finally, we utilized public records requests at some institutions to uncover the types of reports being made and how the Bias Response Teams acted in response to each submission.

### A NOTE ABOUT LIMITATIONS

This survey documents how Bias Response Teams operate and who serves on them. Given the number of higher education institutions in the United States, this survey was not intended to identify the rate at which institutions have adopted such systems.

---

[1] For simplicity's sake, this report uses the phrase "Bias Response Team" broadly to encompass both the teams and the reporting systems, even if there is no dedicated, independent team in place.
[2] FIRE's Spotlight database is a collection of policies at over 400 of our nation's biggest and most prestigious universities, collected in an effort to document institutions that ignore students' rights, or don't tell them the truth about how they've taken them away. Spotlight is available at https://www.thefire.org/spotlight.
[3] In doing so, we have observed a number of institutions delete, modify, or hide their bias reporting systems following media criticism or public records requests.

**BIAS REPORTING SYSTEMS ARE WIDESPREAD**

During the course of 2016, at least **231** Bias Response Teams were publicized on American university or college campuses. **143** are at public institutions and **88** are at private institutions.[4] At least 2.84 million students are enrolled in these schools.

Of the 471 institutions catalogued in FIRE's Spotlight database, 181 (or 38.4%) maintain bias reporting systems. The committees that administer these systems are known by a variety of names, usually a variation on "Bias Response Team." Some schools do not provide an independent "team," instead channeling reports directly to existing offices or departments, including law enforcement or security, human resources departments, or campus housing authorities.

**CASTING A WIDE NET: WHAT CATEGORIES OF "BIAS" ARE REPORTED?**

## IMMUTABLE CHARACTERISTICS AND OTHER CATEGORIES OF BIAS

The most common categories of bias reports solicited[5] come from federal and state laws governing educational and employment discrimination. Every system surveyed invites reports of bias concerning race or religion, and most invite reports concerning sex, sexual orientation, gender identity or expression, age, disability, and so on. Some are unusual, such as bias against "behavior" (**Macalester College**), which appears to define criticism of behavior of any kind as "bias."

## POLITICAL AND SOCIAL BELIEFS

Some systems define "bias incidents" to include expressions of bias against political and social affiliations. 14% of institutions include "political affiliation" among their categories of bias. Still others include bias against similar categories such as "intellectual perspective" (**University of Central Arkansas**), "political expression" (**Dartmouth**), or "political belief" (**University of Kentucky**). It is critical to note that by soliciting reports of speech that is biased against political views, universities are expressly requesting that their students report one another to the authorities for expressing divergent political views.

## DEFINITIONS OF "BIAS INCIDENTS" BROADLY ENCOMPASS SPEECH

Bias reporting systems raise free speech concerns because they solicit reports of legal, protected speech and expression in addition to unprotected conduct such as actionable discrimination or harassment. The definitions often explicitly state that students should report speech protected by the First Amendment.

Many policies include catch-all categories of bias—*e.g.*, "other" biases. In such cases, the definition of a bias incident encompasses not only protected speech, but also any speech that offends ***anyone*** for ***any*** reason. The net effect is that broad definitions of "bias" invite reports of any offensive speech, whether or not it is tethered to a discernable form of bias, thereby inviting scrutiny of student activists, organizations, and faculty engaged in political advocacy, debate, or academic inquiry. For examples of reported political expression, see the Discussion section at page 15.

---

[4] For a list of schools with bias reporting systems observed in FIRE's survey, see **Appendix B**.
[5] For a list of the categories of bias observed in FIRE's survey, see **Appendix A**.

# FINDINGS

**WHO'S ON A BIAS RESPONSE TEAM? OFTEN, LAW ENFORCEMENT**

FIRE was unable to determine the makeup of every Bias Response Team. Of the 166 teams whose composition FIRE could determine, almost half include law enforcement ("speech police," in a quite literal sense) and more than half include what appear to be student conduct administrators. Only 27% include faculty members, reducing the likelihood that a Bias Response Team will have members likely to recognize issues of academic freedom. And 12% contain public relations administrators, raising the possibility that a team's decisions, including about whether to seek discipline for those displaying "bias," may be made on the basis of an institution's desire to avoid public embarrassment. Both common sense and FIRE's extensive experience suggest that public and donor relations can be significant factors driving universities' decisions.

|  | All institutions (166) | Public (104) | Private (62) |
|---|---|---|---|
| Law Enforcement[6] | 42% (70) | 41% (43) | 43% (27) |
| Student Conduct[7] | 63% (105) | 56% (59) | 74% (46) |
| Public or Media Relations | 12% (21) | 14% (15) | 9.7% (6) |
| Faculty | 27% (45) | 24% (25) | 32% (20) |
| Students | 21% (35) | 18% (19) | 26% (16) |

**ACKNOWLEDGING A TENSION WITH FREEDOM OF EXPRESSION AND ACADEMIC FREEDOM, BUT PROVIDING LITTLE (IF ANY) TRAINING**

84 institutions (50.6%) acknowledged freedom of speech, freedom of inquiry, or academic freedom in the descriptions or policies of their Bias Response Teams. Of these, 50 are public and 34 are private.

However, despite professing a dedication to free expression and academic freedom, few schools provide meaningful training to Bias Response Teams on recognizing these issues. Public records requests issued to dozens of schools have revealed only one Bias Response Team, at Louisiana State University, that offered any substantial training whatsoever on First Amendment concerns.

---

[6] "Law enforcement" includes campus police departments and their equivalents at private schools.

[7] Determining whether an administrator serving on a Bias Response Team is responsible for implementing disciplinary procedures can be difficult. FIRE views the inquiry from the student's perspective: What will a reasonable student perceive the administrator's role or authority to be? This number excludes administrators affiliated with diversity offices and includes administrators affiliated with dean of students' offices, absent specific information concerning an administrator's responsibilities or authority.

## DISCUSSION

### WHY DO BIAS RESPONSE TEAMS EXIST?

University administrators receive many complaints about criminal conduct on campus. They also learn of students who encounter "offensive" but legally protected speech or expression.[8] A proper response to these incidents would involve prompt, fair, and impartial discipline for instances of physical misconduct, true threats, and harassment, while fostering an environment in which offensive speech would be answered with more speech.

Campuses with Bias Response Teams have chosen to go further, often deploying administrators to conduct an "investigation" of the incident and, if the "respondent" is found "guilty," summon them for a "hearing" or an "educational" discussion, which may more closely resemble a reprimand than an enlightening exchange of views.

Such procedures risk becoming tools not only for imposing some form of political or intellectual orthodoxy, but also for policing politeness or civility.[9] They invite law-enforcement authorities and administrators, who are likely to be wary of expression that can cause conflict of any kind, to scrutinize activism, debate, and political speech regarding every ideology and viewpoint. Yet the essential elements of free discourse, whether on campus or off, *require* that people have right to offend or to cause conflict through speech.[10]

Other factors may also contribute to a university's decision to implement a Bias Response Team, such as:

- **Inability to implement speech codes.** FIRE has seen a continuous, nine-year decline in the maintenance of speech codes that prohibit speech,[11] and courts routinely strike down speech codes at public universities on First Amendment grounds.[12] In fact, some bias reporting systems, such as **Longwood University's**, have cited the unconstitutionality of speech codes as a reason for their existence.[13]

- **The low cost of expanding employment-based anti-discrimination systems.** A university cannot function as a true "marketplace of ideas" if campus expression is as

---

[8] Eugene Volokh, *No, It's Not Constitutional for the University of Oklahoma to Expel Students for Racist Speech*, Wash. Post, Mar. 10, 2015, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/03/10/no-a-public-university-may-not-expel-students-for-racist-speech; *see also* Susan Svrluga, *Student Arrested After Wearing Gorilla Mask, Handing Out Bananas at Black Lives Matter Protest*, Wash. Post, Sept. 29, 2016, https://www.washingtonpost.com/news/grade-point/wp/2016/09/29/student-arrested- after-wearing- gorilla-mask-handing- out-bananas- at-black- lives-matter- protest.

[9] *See, e.g.*, José A. Cabranes, *If Colleges Keep Killing Academic Freedom, Civilization Will Die, Too*, Wash. Post, Jan. 10, 2017, https://www.washingtonpost.com/opinions/if-colleges-keep-killing-academic-freedom-civilization-will-die-too/2017/01/10/74b6fcc2-d2c3-11e6-9cb0-54ab630851e8_story.html (Judge on the U.S. Court of Appeals for the 2nd Circuit arguing that Bias Response Teams indicate that "campus administrators have morphed into civility police.").

[10] For example, in overturning a man's conviction for wearing a jacket reading "Fuck the Draft" in a courthouse hallway, the Supreme Court noted that "the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us," and that words can serve an "emotive function" and are "often chosen as much for their emotive as their cognitive force." Cohen v. California, 403 U.S. 15, 25-26 (1971). In other words, words chosen because they convey hostility or incivility are as deserving of protection as calm, polite debate.

[11] *Spotlight on Speech Codes 2017*, Found. for Individual Rights in Educ., *available at* https://d28htnjz2elwuj.cloudfront.net/wp-content/uploads/2016/12/12115009/SCR_2017_Full-Cover_Revised.pdf.

[12] McCauley v. Univ. of the V.I., 618 F.3d 232 (3d Cir. 2010); DeJohn v. Temple Univ., 537 F.3d 301 (3d Cir. 2008); Dambrot v. Cent. Mich. Univ., 55 F.3d 1177 (6th Cir. 1995); Univ. of Cincinnati Chapter of Young Ams. for Liberty v. Williams, 2012 U.S. Dist. LEXIS 80967 (S.D. Ohio Jun. 12, 2012); Smith v. Tarrant Cty. Coll. Dist., 694 F. Supp. 2d 610 (N.D. Tex. 2010); Coll. Republicans at S.F. St. Univ. v. Reed, 523 F. Supp. 2d 1005 (N.D. Cal. 2007); Roberts v. Haragan, 346 F. Supp. 2d 853 (N.D. Tex. 2004); Bair v. Shippensburg Univ., 280 F. Supp. 2d 357 (M.D. Pa. 2003); Booher v. N. Ky. Univ. Bd. of Regents, No. 2:96-CV-135, 1998 U.S. Dist. LEXIS 11404 (E.D. Ky. July 21, 1998); Corry v. Leland Stanford Junior Univ., No. 740309, slip op. (Cal. Super. Ct. Feb. 27, 1995); UWM Post, Inc. v. Bd. of Regents of the Univ. of Wis., 774 F. Supp. 1163 (E.D. Wisc. 1991); Doe v. Univ. of Mich., 721 F. Supp. 852 (E.D. Mich. 1989).

[13] *Bias & Hate Incidents*, Longwood Univ., archived on June 14, 2016 and *available at* http://archive.is/uUQic; *see also*, *No Hate Initiative*, Miami Univ., archived on Dec. 15, 2005 and *available at* http://web.archive.org/web/20051215002453/http://www.miami.muohio.edu/documents_and/nohate/index.cfm#hc9 (noting that "[e]very college hate speech code reviewed in the federal courts has been struck down").

## DISCUSSION

highly regulated as expression among employees in business corporations. Borrowing well-developed and widely available corporate procedures is a tempting shortcut. For as little as $8,600, schools can create reporting forms derived from existing systems used by employers to permit employees to report employment-based sexual harassment.[14] But using the tools of corporate anti-discrimination systems—perhaps even those used internally among their own employees—to solicit bias reports from and about the larger campus community sets colleges on a collision course with free discourse.

- **Avoiding public controversy**. By learning of events and disputes quickly, public and media relations administrators can attempt to frame the institution's response in the media. At the **University of New Mexico**, for example, administrators pushed to release a statement "rather than waiting for the media to get ahold of" flyers criticizing UNM's logo (which involves a conquistador) that were reported to the Bias Response Team.[15] Some 12% of Bias Response Teams include media relations administrators.

- **Student demand**. Certain student groups have called upon administrators to implement bias reporting systems.[16] But this seems to be relatively rare: Of

the various recent demands from students across the country, few have involved requests for reporting systems,[17] and one institution's audit suggested that students are unfamiliar with the term "bias incident."[18]

Whatever their motivations, universities implementing Bias Response Teams have cast a wide net, inviting reports of any offensive speech, on virtually any topic, for any reason. The result is that speech on political and social subjects, which is likely (and may be intended) to offend, gets reported to law enforcement and student conduct administrators, and bias reporting systems serve to "alert administrators to specific individuals … who would benefit most from diversity inclusion training."[19] This institutionalizes surveillance of activists of all political persuasions, exposes universities (and their administrators) to the prospect of costly First Amendment claims, and encourages an illiberal culture of anonymously reporting students or faculty for subversive or offensive speech—on hundreds of campuses across the country.

### BIAS RESPONSE TEAMS ARE FOUND ON HUNDREDS OF AMERICAN COLLEGE CAMPUSES

In early 2016, when Appalachian State University explored a proposal to create a Bias Response Team, administrators wanted to see what other schools were doing. They didn't have

---

[14] *Statement of Work*, ETHICSPOINT, July 12, 2010, produced to the Foundation for Individual Rights in Education by the University of California Office of the President in response to a public records request, *available at* https://www.documentcloud.org/documents/3418749-University-of-California-EthicsPoint-Statement.html.

[15] *See*, emails and photos produced to the Foundation for Individual Rights in Education by the University of New Mexico in response to a public records request, *available at* https://www.documentcloud.org/documents/3234845-University-of-New-Mexico-What-Indians-Report.html.

[16] *See, e.g.*, Black Student Union, *BSU Calls for Action*, THE TOWERLIGHT, Apr. 18, 2016, http://thetowerlight.com/bsu-calls-for-action.

[17] *See, e.g., The Demands*, WETHEPROTESTERS, *available at* http://www.thedemands.org (last visited Jan. 9, 2017) (tracking demands of student protesters across the country).

[18] COLGATE UNIVERSITY ADVISORY COMMITTEE ON CAMPUS SECURITY, ACCS COMPLIANCE REPORT 2014-15 (2015), *available at* https://www.documentcloud.org/documents/3234248-Colgate-Advisory-Committee-on-Campus-Security.html.

[19] Liz Fonseca & John Tannous, PROMOTING DIVERSITY AND INCLUSION IN THE CLASSROOM: STRATEGIES TO FOSTER INCLUSIVE ACADEMIC ENVIRONMENTS AT LARGE RESEARCH UNIVERSITIES, EDUCATION ADVISORY BOARD (2013), *available at* https://www.mga.edu/student-affairs/docs/Promoting_Diversity_and_Inclusion_in_Classrooms.pdf.

to look far; one said she was "hard pressed to find a school without" a Bias Response Team.[20] Boston College's student government described them as "ubiquitous."[21]

To a certain extent, FIRE found this to be true. According to publicly available records, there were at least 231 Bias Response Teams publicized by four-year or post-graduate institutions during 2016. Of these, 143 were at public institutions, all of which are bound by the First Amendment, while 88 were at private institutions, most of which advertise or commit to respecting students' freedom of expression and freedom of academic inquiry in official policy. At a conservative estimate,[22] at least 2.84 million American students are subject to often-anonymous reporting systems monitored by administrators and police officers.[23] But while Bias Response Teams are in use at hundreds of institutions, and appear to be growing in number, it does not appear that they can yet be found on a majority of campuses.

The names and acronyms used for bias reporting systems vary from campus to campus. The **University of Oregon**'s team is currently known as the "Bias Education and Response Team,"[24] and the **University of North Carolina at Asheville**'s team is the "Bias Incident Response Team."[25] While most team names appear to include some variation on "Bias Response Team," some do not. **Arizona State University** previously hosted a "Campus Environment Team,"[26] and **Illinois State University** currently utilizes an "Inclusive Community Response Team."[27] The **University of Central Florida**'s "Just Knights Response Team" reflects the name of its athletic teams.[28] And some institutions do not have a separate team for bias reports, instead relying on existing offices or departments. Some direct reports to police departments,[29] various deans[30] or human resources offices,[31] or housing authorities.[32]

To better understand these report-and-response systems, and to distinguish them from other types of speech codes, FIRE views "Bias Response Teams" as identified as such or generally adhering to three criteria:

[20] Email from Bindu Jayne, Assoc. Vice Chancellor for Equity, Diversity & Compliance, Appalachian State Univ. (Feb. 4, 2016), *available at* https://www.documentcloud.org/documents/3233900-Appalachian-State-University-Email-Re-Forming.html.

[21] Boston College UGBC Student Assembly, *A Resolution Concerning Bias Incidents, available at* https://www.documentcloud.org/documents/3233930-Boston-College-UGBC-Resolution-Concerning-Bias.html.

[22] This estimate assumes that each bias reporting system applies only to (1) undergraduate students, unless it is expressly dedicated to a graduate program or campus; (2) at the primary or main campus, unless it is expressly dedicated to a particular campus. It does not include faculty, staff, or (for the most part) post-graduate students or undergraduate students at satellite campuses.

[23] Enrollment statistics were calculated using data from the Integrated Postsecondary Education Data System, which is compiled by the U.S. Department of Education's National Center for Education Statistics. *About IPEDS*, NATIONAL CENTER FOR EDUCATION STATISTICS, https://nces.ed.gov/ipeds/Home/AboutIPEDS (last visited Jan. 8, 2017).

[24] Office of the Dean of Students, *Bias Education and Response Team*, UNIV. OF OREGON, http://dos.uoregon.edu/bias (last visited Jan. 1, 2017).

[25] *Bias Incident Response Team (BIRT)*, UNIV. OF N.C., https://msp.unca.edu/bias-incident-response-team-birt (last visited Jan. 2, 2017).

[26] ALLAN MICHAEL HOFFMAN ET AL., VIOLENCE ON CAMPUS: DEFINING THE PROBLEMS, STRATEGIES FOR ACTION, 300 (1998).

[27] Division of Student Affairs, *Inclusive Community Response Team*, ILLINOIS STATE UNIV., http://studentaffairs.illinoisstate.edu/who/diversity/icrt (last visited Jan. 1, 2017).

[28] *Just Knights Response Team*, UNIV. OF CENT. FLA., http://jkrt.sdes.ucf.edu/bias (last visited Jan. 1, 2017).

[29] *See, e.g., USM Public Safety Anonymous Crime Reporting Form*, UNIV. OF SOUTHERN MAINE, https://usm.maine.edu/police/usm-public-safety-anonymous-crime-reporting-form (last visited Jan. 2, 2017) (form for reporting "Bias/hate activity" to campus police); *Human Dignity – Reporting Process*, DEPAUL UNIV., http://dignity.depaul.edu/report.html (last visited Jan. 2, 2017) ("any victim" of a "Bias Incident […] must report the incident to the Public Safety Office" in order to be investigated).

[30] *See, e.g., Office of Student Conduct*, PENSACOLA STATE COLLEGE, http://www.pensacolastate.edu/studentconduct (last visited Jan. 2, 2017) (directing reports of bias incidents to the Office of Student Conduct); *Report an Incident*, BOWLING GREEN STATE UNIV., https://www.bgsu.edu/dean-of-students/student-conduct/report-an-incident.html (last visited Jan. 2, 2017) (directing reports to the Office of the Dean of Students).

[31] *See, e.g., Bias Incident Report Form*, WASH. STATE UNIV., http://public.wsu.edu/~hrd/programs/hbreport.pdf (last visited Jan. 2, 2017) (directing reporting party to forward the form to the Human Relations and Diversity office).

[32] *See, e.g., Bias Protocol & Illinois Intervenes*, UNIV. OF ILL. AT URBANA-CHAMPAIGN, http://housing.illinois.edu/living-options/why-housing/inclusive-communities/bias-protocol (last visited Jan. 2, 2017) (directing reports to a "Residential Life professional").

## DISCUSSION

(1) a formal or explicit process for or solicitation of
(2) reports from students, faculty, staff, or the community
(3) concerning offensive conduct or speech that is protected by the First Amendment or principles of expressive or academic freedom.[33]

These criteria are designed to include systems that invite reports of protected speech without specifically labeling it as "bias," while distinguishing speech codes unaccompanied by formal or explicit policies for reporting such incidents.

### CASTING A WIDE NET FOR BIAS INCIDENTS

What constitutes a "bias incident" varies widely from campus to campus. As the **University of West Florida** puts it, defining the term "seem[s] like a murky ground to traverse."[34]

Even the use of the term "bias incident" engenders debate and confusion. In a February 2015 audit of **Colgate University**'s bias reporting system, a campus committee reported that, although the sample size was small, *no*

student was aware that they could file bias reports online, most had never heard the phrase "bias incident" before, and the majority had "incorrect interpretations" about its meaning.[35]

Broad applications of the term can diminish serious misconduct by equating political squabbles and caustic speech with violent criminal conduct. For example, *The New York Times* was widely and credibly criticized[36] for an article[37] noting that "[b]ias incidents on both sides have been reported" at the **University of Michigan**, with one student alleging[38] that she had been "threatened with being lit on fire because she wore a hijab." The article continued: "Other students were accused of being racist for supporting Mr. Trump … ."[39]

Such political criticism can hardly be placed under the same umbrella as true threats of violence. Yet this is precisely what many bias reporting systems do. Schools largely define bias incidents to encompass more than hate crimes or actionable conduct. Hate crimes—criminal conduct undertaken on the basis of a protected characteristic of the victim, which is *not* protected by the First Amendment[40]—are always bias incidents. "Bias incidents," however, include speech or expressive conduct that is not necessarily criminal or in violation of applicable policy.

---

[33] The U.S. Department of Justice employed a similar definition of "bias incident" in a 2001 report: "acts of prejudice that are not accompanied by violence, the threat of violence, property damage, or other illegal conduct." U.S. DEPT. OF JUSTICE BUREAU OF JUSTICE ASSISTANCE, HATE CRIMES ON CAMPUS: THE PROBLEM AND EFFORTS TO CONFRONT IT 5 (Oct. 2001), *available at* https://www.ncjrs.gov/pdffiles1/bja/187249.pdf.

[34] *What is Bias?*, UNIV. OF WEST FLA., http://uwf.edu/offices/bias-response/what-is-bias (last visited Jan. 5, 2017).

[35] COLGATE UNIVERSITY ADVISORY COMMITTEE ON CAMPUS SECURITY, ACCS COMPLIANCE REPORT 2014-15 (2015), *available at* https://www.documentcloud.org/documents/3234248-Colgate-Advisory-Committee-on-Campus-Security.html.

[36] *See, e.g.*, John K. Wilson, *Safe Spaces for Conservatives: Why Being Called a Racist Is Not a Bias Incident*, ACADEME BLOG, Dec. 11, 2016, https://academeblog.org/2016/12/11/safe-spaces-for-conservatives-why-being-called-a-racist-is-not-a-bias-incident; *see also*, Andre Segura (@andresegura), TWITTER (Dec. 8, 2016, 5:01 PM), http://twitter.com/andresegura/status/806982019674677248; Jessica Valenti (@JessicaValenti), TWITTER (Dec. 8, 2016, 4:17

PM), http://twitter.com/JessicaValenti/status/806971007307280384.

[37] Anemona Hartocollis, *On Campus, Trump Fans Say They Need 'Safe Spaces'*, N.Y. TIMES, Dec. 8, 2016, http://www.nytimes.com/2016/12/08/us/politics/political-divide-on-campuses-hardens-after-trumps-victory.html.

[38] Police later alleged that the report was false. John Counts, *U-M Student's Claim of Threat for Wearing Hijab Is False, Police Say*, MLive.com, Dec. 21, 2016, http://www.mlive.com/news/ann-arbor/index.ssf/2016/12/police_say_no_evidence_muslim.html. While some reports of bias incidents, as with any type of report to authorities, may be false, there is no shortage of true threats (if not acts) of violence similar to that alleged at the University of Michigan.

[39] Erik Wemple, *New York Times Deserts 'Both Sides' Language in Story on Campus Trump Supporters*, WASH. POST, Dec. 9, 2016, https://www.washingtonpost.com/blogs/erik-wemple/wp/2016/12/09/new-york-times-deserts-both-sides-language-in-story-on-campus-trump-supporters/?utm_term=.341a5dd304a5.

[40] Wisconsin v. Mitchell, 508 U.S. 476, 484-490 (1993).

Take, for example, the **University of Northern Iowa**'s definition:[41]

> A bias-related incident is any word or action directed toward an individual or group based upon actual or perceived identity characteristics or background of a group or person that is harmful or hurtful. Some bias-related incidents may be contrary to law or policy, while some may be speech protected by the First Amendment of the Constitution of the United States.

**Western Washington University**'s definition extends to "demonstrations" of bias, including "language, words, signs, symbols, threats, or actions that could potentially cause alarm, anger, or fear in others[.]"[42] Moreover, the existence of a bias incident under the policy turns entirely on whether the complainant subjectively perceived the incident to be motivated by bias, rather than on the intent of the speaker.[43]

In targeting speech that may cause "alarm, anger, or fear," or that might otherwise offend on the basis of a proscribed subject, universities expressly set their sights on constitutionally protected speech. All speech is presumptively protected by the First Amendment unless it falls within certain narrow exceptions carved out by the Supreme Court: incitement to immediate violence; so-called "fighting words"; harassment[44]; true threats and intimidation; obscenity; child pornography; and defamation. Speech is *not* unprotected simply because it is offensive,[45] insulting,[46] causes anger,[47] or is viewed as prejudiced or as "hate speech."[48] If the speech in question does not fall within one of the listed exceptions, it most likely is protected speech.[49]

Most reporting systems are predicated on specific, enumerated characteristics. Of the systems identified by FIRE, 199 (or 86%) explicitly set forth these characteristics. Among them, the categories vary widely on different campuses. Each of these teams solicits reports about bias against race or religion, and all but one explicitly solicit reports about disability or sexual orientation.[50] There is less agreement on more specific categories. For example, while 94.5% seek reports of bias based on national origin or nationality, only 14.1% explicitly seek reports of bias against immigration or citizenship status.

Some categories of "bias" are peculiar. For example, the **University of Kentucky** permits

---

[41] *Bias Response Protocol*, UNIV. N. IOWA, https://uni.edu/brt/bias-response-protocol#overlay-context=bias-response-protocol (last visited Jan. 5, 2017).

[42] *Bias Incident Reporting Form*, WESTERN WASH. UNIV., http://www.wwu.edu/eoo/bias-incident-response.shtml (last visited Jan. 5, 2017).

[43] *See, e.g., Florida State University Bias Incident Response System*, FLA. STATE UNIV., http://thecenter.fsu.edu/article/florida-state-university-bias-incident-response-system (last visited Jan. 5, 2017) ("An incident of bias may occur whether the act is intentional or unintentional").

[44] For more on the application of peer harassment law on campus, see Azhar Majeed, *The Misapplication of Peer Harassment Law on College and University Campuses and the Loss of Student Speech Rights*, 35 J.C. & U.L. 385 (2009), *available at* https://ssrn.com/abstract=1400300.

[45] *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

[46] *Boos v. Barry*, 485 U.S. 312, 322 (1988) (First Amendment protects "insulting, and even outrageous, speech").

[47] *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949) (A "function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.").

[48] Eugene Volokh, *No, There's No "Hate Speech" Exception to the First Amendment*, WASH. POST., May 7, 2015, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/05/07/no-theres-no-hate-speech-exception-to-the-first-amendment/?utm_term=.2cca993394b8.

[49] For a more in-depth discussion of the application of the First Amendment to public universities, and of the principles of freedom of speech to the private institutions that promise it, see FIRE's *Spotlight on Speech Codes 2017*, *supra* note 11, *available at* https://d28htnjz2elwuj.cloudfront.net/wp-content/uploads/2016/12/12115009/SCR_2017_Full-Cover_Revised.pdf#page=10.

[50] The anomaly, at Baylor University, appears to be the result of a lack of effort to promulgate a complete definition, providing that bias incidents relate to "race, nationality, religion, gender, age, etc." *Bias Motivated Incident Support Team*, BAYLOR UNIV., http://www.baylor.edu/student_life/index.php?id=85780 (last visited Jan. 5, 2017).

## DISCUSSION

reports of bias against "smoker status,"[51] perhaps as a result of borrowing language from a state law concerning employment discrimination against tobacco users.[52]

There is also significant divergence when it comes to reporting bias based on political affiliation, views, or conduct. Worryingly, 21% of public institutions seek out reports of bias on the basis of political affiliation, as opposed to 2.6% of private institutions. Among them, concerns regarding bias against political and social views vary:

- **Dartmouth College** lists "political expression" as a potential motivation on its reporting form[53] and defines bias to include "[t]reating someone negatively because of their actual or perceived .... [p]olitical or social affiliation."[54] This broad wording could encompass voting against a person for campus political offices or simply criticizing their political speech.

- The **University of North Carolina at Charlotte** includes "[p]olitical beliefs" in its definition of bias, and provides the following example: "Drawing pictures or cartoons that belittle someone because of their beliefs ... or political affiliation."[55] This would apply to virtually all political cartoons.

- Examples of bias incidents at **Williams College** include "comments on social media about someone's ... political affiliations/beliefs."[56] This definition could include any response to any political view posted on social media, or even simple criticism of elected officials.

- The **University of Colorado** included both "political philosophy" and "political affiliation" as protected classes.[57] (It has since shut down its Bias Response Team.)

- The **University of Kentucky**'s definition targets, in part, bias against a person for his or her "political belief."[58]

Other systems invite reports of even broader ranges of criticism and discussion:

- **Macalester College**'s now-deleted definition included "bias against another person based on ... his or her membership in a group ... or an individual's particular characteristics, *role*, or *behavior*."[59] This definition could apply to almost any criticism of anyone.

- Both **Syracuse University** and **Longwood University** list political and "social affiliation" as unacceptable grounds for bias.[60] It is nearly impossible

[51] *Bias Incident Report Form*, UNIV. OF KY., https://docs.google.com/forms/d/e/1FAIpQLSezIXDEHHU1RX-sldceuBDcZioM4buVea9F2CJmaatW61-nDA/viewform (last visited Jan. 5, 2017).
[52] Unlawful discrimination by employers – Difference in health plan contribution rates for smokers and nonsmokers and benefits for smoking cessation program participants excepted, KY. REV. STAT. § 344.040.
[53] *Bias Reporting Form*, DARTMOUTH COLLEGE, http://www.dartmouth.edu/~opal/act (last visited Jan. 5, 2017).
[54] *Achieving Community Together (A.C.T.) Program*, DARTMOUTH COLLEGE, http://www.dartmouth.edu/~opal/act (last visited Jan. 5, 2017).
[55] *What is Bias*, UNIV. N.C. BIAS ASSESSMENT AND RESOURCE TEAM, http://unccdso.uncc.edu/org/biasassessmentandresourceteam145871/What_Is_Bias (last visited Jan. 31, 2017).

[56] *Questions about Bias and Bias Reporting*, WILLIAMS COLLEGE, http://speakup.williams.edu/faq (last visited Jan. 6, 2017).
[57] *Definitions*, UNIV. OF COLO., archived on July 25, 2016 and available at http://archive.is/hR0ps.
[58] *Bias Incident Report Form*, UNIV. OF KY., https://docs.google.com/forms/d/e/1FAIpQLSezIXDEHHU1RX-sldceuBDcZioM4buVea9F2CJmaatW61-nDA/viewform (last visited Jan. 5, 2017).
[59] *What is a bias-related incident?*, MACALESTER COLLEGE, archived on Sept. 12, 2016 and available at http://archive.is/27e8C (emphasis added).
[60] *What is bias?*, SYRACUSE UNIV., http://www.syracuse.edu/currentstudents/stopbias/whatisbias.html (last visited Jan. 5, 2017); *What is Bias?*, LONGWOOD UNIV., http://www.longwood.edu/diversity/experiencing-bias/what-is-bias (last visited Jan. 5, 2017).

to discern a meaningful limit to this category.

Some of these examples are likely the result of definitions borrowed from state employment discrimination statutes. Yet asking students to report one another for broadly defined bias against their voluntary political or social affiliation invites surveillance of and intrusion into political speech, subjecting it to the scrutiny of administrators and police.

**EXAMPLES OF REPORTED INCIDENTS: CAUGHT IN A WIDE NET, UNIVERSITIES ENTANGLE THEMSELVES INTO REFEREEING POLITICAL SPEECH**

It is not mere speculation that core political speech, academic discourse, and outspoken activists are likely to become the subjects of bias incident reports. FIRE used public records requests, reviewed similar requests by media outlets, and examined the sparse public disclosures by Bias Response Teams to discern what gets reported.

The reports we reviewed, which often fail to disclose what action (if any) was undertaken in response, span the ideological spectrum:

- **Appalachian State University**: A student filed a report regarding the 2016 presidential election, claiming to be "offended by the politically biased slander that is chalked up everywhere reading 'TRUMP IS A RACIST'" and describing the "slander" as "unlawful." Another report stated that supporters of then-candidate Bernie Sanders were "destroying" messages chalked by

Trump supporters by drawing penises next to them. Yet another report complained that a pro-Trump student organization was using chalk to write "hate speech" in support of Trump.[61]

Another series of reports was filed against a student activist on several grounds: tweeting that she "hate[s] white men"; "refus[ing] to support all students if a student fits the certain stereotype of a white male"; "display[ing] disturbing apathy [and] ignorance and bitterness"; and "express[ing] profound disregard for the lives of students based on race and gender and for [police] officers based on their careers."[62]

- **Texas Tech University**: The Black Student Union (BSU) was reported to administrators for tweeting "All lives don't matter... White lives don't matter... Blue lives don't matter... #BlackLivesMatter." The complainant wanted the BSU characterized as a "Hate Group" and complained that the student chapter of the College Democrats planned to release a statement in support of BSU.[63]

- **University of California, San Diego** (UCSD): A student humor publication, *The Koala*, lost its student funding after satirizing "safe spaces" on campus.[64] Spurred by bias incident reports, specifically one calling on UCSD to "stop funding" *The Koala*, administrators asked the university's lawyer to "think creatively" about how to address the newspaper, which they felt "crosse[d]

---

[61] Spreadsheet of Incidents Reported, APPALACHIAN STATE UNIV., produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* http://www.documentcloud.org/document/3255183-Appalachian-State-University-Bias-Incident.html.
[62] APPALACHIAN STATE UNIV., *supra* note 61.
[63] Texas Tech University Campus Climate & Incident Reporting Form Submitted on July 14, 2016, produced to the Foundation for Individual Rights in Education in response to a public records

request, *available at* https://www.documentcloud.org/documents/3255186-Texas-Tech-BSA-Black-Lives-Matter-tweet.html.
[64] Adam Steinbaugh, *As 'The Koala' Files Lawsuit Against University of California, San Diego, Public Records Reveal Administration's Censorship*, NEWSDESK, June 1, 2016, https://www.thefire.org/as-the-koala-files-lawsuit-against-university-of-california-san-diego-public-records-reveal-administrations-censorship/.

## DISCUSSION

the 'free speech' line."[65] It didn't, and *The Koala* is suing UCSD with the assistance of the ACLU of Southern California.[66]

- **John Carroll University**: A summary report recounted that an "[a]nonymous student reported that [the] African-American Alliance's student protest was making white students feel uncomfortable."[67]

- **University of Northern Colorado** (UNC): Two professors were investigated for encouraging students to debate gay and transgender rights in class—including one professor who was responding to a student's comments on the issue and encouraging his students to confront arguments they find uncomfortable.[68] Other reports indicated that students were ordered to remove a Confederate flag from their dormitory room because it might offend someone.[69] These disclosures spurred letters of inquiry from two state senators,[70] a condemnation from the *Denver Post* editorial board,[71] and

concessions from a UNC administrator that the Bias Response Team's efforts may have been improper in some cases.[72] UNC subsequently shuttered its Bias Response Team.[73]

- **University of Oregon:** The Bias Response Team intervened to explain "community standards and expectations" when students had the audacity to "express[] anger about oppression."[74] In a separate incident, the Bias Response Team intervened with the reporter and editor of a student newspaper after an anonymous report that the "newspaper gave less press coverage to trans students and students of color."[75]

- **University of Michigan**: A snow sculpture perceived to be a "snow penis" was reported.[76]

- **Connecticut College**: Pro-Palestinian students were reported over flyers mimicking Israeli eviction notices to Palestinians, sparking an investigation

---

[65] Email from Becky Pettit, Univ. of Cal. San Diego Vice Chancellor for Equity, Diversity, and Inclusion, to Daniel Park, Univ. of Cal. San Diego Chief Campus Counsel, Nov. 13, 2016, *available at* https://d28htnjz2elwuj.cloudfront.net/wp-content/uploads/2016/06/01095740/Koala-v-UCSD_Public-Records-and-Bias-Incident-Reports.pdf#page=8.

[66] *Defending Freedom of Speech for Everyone, ACLU Sues UCSD to Enforce First Amendment Rights of the Student Press*, AM. CIVIL LIBERTIES UNION OF SAN DIEGO, May 31, 2016, https://www.aclusandiego.org/defending-freedom-speech-everyone-aclu-sues-ucsd-enforce-first-amendment-rights-student-press/.

[67] JOHN CARROLL UNIV., INTERIM REPORT ON BIAS REPORTING SYSTEM SUMMER-FALL 2015 4 (2015) *available at* http://webmedia.jcu.edu/bias/files/2016/02/Bias-Reports-Fall-2015-web-rev.-2.24.2016.pdf.

[68] Adam Steinbaugh & Alex Morey, *Professor Investigated for Discussing Conflicting Viewpoints, 'The Coddling of The American Mind'*, NEWSDESK, June 20, 2016, https://www.thefire.org/professor-investigated-for-discussing-conflicting-viewpoints-the-coddling-of-the-american-mind/.

[69] Tyler Silvy, *University of Northern Colorado's Handling of Speech Deemed Offensive Raises Questions, Concerns*, GREELEY TRIBUNE, June 28, 2016, http://www.greeleytribune.com/news/local/university-of-northern-colorados-handling-of-speech-deemed-offensive-raises-questions-concerns/.

[70] Tyler Silvy, *Sen. John Cooke Rips University of Northern Colorado in Scathing Letter*, GREELEY TRIBUNE, July 2, 2016, http://www.greeleytribune.com/news/local/sen-john-cooke-rips-university-of-northern-colorado-in-scathing-letter/.

[71] Denver Post Editorial Board, *UNC's Weak-Kneed Commitment to Free Speech*, DENVER POST, July 5, 2016, http://www.denverpost.com/2016/07/05/uncs-weak-kneed-commitment-to-free-speech/.

[72] Alex Morey, *Facing More Troubling Details and Public Outcry, Northern Colorado Vows to Reconsider Bias Response Team*, NEWSDESK, June 27, 2016, https://www.thefire.org/facing-more-troubling-details-and-public-outcry-northern-colorado-vows-to-reconsider-bias-response-team/.

[73] Adam Steinbaugh, *University of Northern Colorado to End 'Bias Response Team,' But What Next?*, NEWSDESK, Sept. 9, 2016, https://www.thefire.org/university-of-northern-colorado-to-end-bias-response-team-but-what-next/.

[74] Conor Friedersdorf (@conor64), TWITTER (May 14, 2016, 12:29 PM), https://twitter.com/conor64/status/731521764912730112.

[75] UNIVERSITY OF OREGON BIAS RESPONSE TEAM, ANNUAL REPORT 2014-2015 10 (2015), archived at http://web.archive.org/web/20151015075754/http://uodos.uoregon.edu/Portals/0/BRT/Annual%20Report%202014-2015.pdf.

[76] Erin Dunne, *Snow Penis Reported as Bias-Incident*, MICH. REVIEW, Feb. 25, 2016, http://www.michiganreview.com/snow-penis-reported-as-bias-incident/.

by a dean.[77] The college's response led to students occupying the president's office, inquiring "about the differential treatment of alleged bias incidents on campus, particularly why some bias incidents warrant all-campus communications and administrative actions while others do not."[78]

- **Colby College**: Logs of bias incident reports—which are now hidden from public view[79]—show one student reported for claiming that a student group was racist against white people, while another was reported for using the phrase "on the other hand," which was perceived as ableist.[80]

- **University of New Mexico** (UNM): A student member of the College Republicans was reported and investigated by the office of the dean of students for criticizing a student and her organization by name[81] during a public debate over whether UNM should cut ties with Chick-fil-A.[82]

- **Cornell University**: A professor was reported for speaking at a rally as a private citizen and referring to police as "terrorists." The complaint was referred to human resources administrators, who discussed freedom of speech policies with the complainant.[83]

In a separate instance, an anonymous person reported the student government for participating in efforts to encourage Cornell to become a sanctuary campus.[84]

- **Ohio State University**: A group of students was reported for sharing memes comparing Hillary Clinton to Adolf Hitler in a "political discussion," resulting in a housing employee holding a "mandatory floor meeting about triggering events."[85]

Another student called upon administrators to compel the College Democrats to allow anyone to attend their meetings after the Democrats had asked the student to leave, believing him to be a member of the College Republicans sent to observe the meeting.[86]

Yet another student reported a chalk message stating "Build the Wall," which the student wanted "erased"; the student also requested "a clear message from the

---

[77] Lea Speyer, *Anti-Israel Students at Connecticut College 'Occupy' Office of School President in Protest Over Investigation of Mock Eviction Notices*, ALGEMEINER, May 16, 2016, https://www.algemeiner.com/2016/05/16/anti-israel-students-at-connecticut-college-occupy-office-of-school-president-in-protest-over-investigation-of-mock-eviction-notices/.
[78] *Why We're Here*, OCCUPY FANNING, May 13, 2016, http://occupyfanning2.blogspot.com/2016/05/why-were-here.html.
[79] Colby College's bias incident policy earned that institution the dubious honor of being FIRE's July 2016 Speech Code of the Month. Samantha Harris, *Speech Code of the Month: Colby College*, NEWSDESK, July 20, 2016, https://www.thefire.org/speech-code-of-the-month-colby-college/.
[80] *Bias Incident Log*, COLBY COLLEGE, archived on July 23, 2016 and *available at* http://archive.is/wRwfw.
[81] University of New Mexico Hate/Bias Incident Reporting Form, Feb. 27, 2013, produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3234044-University-of-New-Mexico-Chick-Fil-a-Report.html.
[82] Astrid Galvin, *UNM Board: Chick-fil-A to Stay*, ALBUQUERQUE JOURNAL, Feb. 27, 2013,

https://www.abqjournal.com/173096/unm-board-chick-fil-a-to-stay.html; *Chick-fil-A to Stay on UNM Campus*, KOAT-TV, Feb. 27, 2013, https://www.youtube.com/watch?v=LYUCfnstTro.
[83] *Bias Incident Summaries: July 1 – August 31, 2016*, CORNELL UNIV., http://diversity.cornell.edu/sites/default/files/documents/Aug2016_Incident%20Summaries.pdf.
[84] *Bias Incident Summaries: July 1 – November 30, 2016*, CORNELL UNIV., http://diversity.cornell.edu/sites/default/files/documents/Nov2016_Incident%20Summaries.pdf.
[85] Bias incident report dated Oct. 23, 2015, OHIO STATE UNIV., produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3255200-Ohio-State-University-Bias-Assessment-and.html. How OSU responded to these reports is unclear, as OSU declined to produce "voluminous" records relating to its responses.
[86] Bias incident report dated Feb. 1, 2016, OHIO STATE UNIV., produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3418811-Ohio-State-University-College-Democrats-Report.html.

<u>DISCUSSION</u>

university that this type of hate speech will not be allowed."[87]

(OSU's police chief, in an article posted on OSU's Bias Assessment and Response Team's website, recommends that students who are "verbally insulted or confronted by someone with whom you strongly disagree" should "not engage in debate.")[88]

- **University of Texas at Austin**:[89] The Campus Climate Response Team (CCRT) fielded dozens of reports about a conservative student group's protest of affirmative action in the form of an "affirmative action bake sale."[90] 94% of the reports sought disciplinary action. Administrators met with the student group following the reports and acknowledged in an open letter that it was the student group's "right to" engage in the protest.[91] The CCRT's annual report also disclosed that "[f]aculty and student commentary in the classroom perceived as derogatory and insensitive" was an example of the "types of incidents" reported to the CCRT.[92]

- **University of Wisconsin—Platteville**: Documents acquired by *Heat Street* showed that students were reported for

dressing up as the "Three Blind Mice" for Halloween, which the complainant feared *might* offend others who *might* believe the costumes were making fun of disabilities.[93]

- **Case Western Reserve University** (CWRU): A professor was reported for a writing assignment that challenged students to "[w]rite about a gay child being kicked out of their house, and make the audience feel sorry for the person kicking them out."[94]

  Another CWRU professor was reported because, among other things, students were "required to read plays with racist depictions of First Nations people."[95]

  A third CWRU professor was reported for asking students who were neither citizens nor permanent residents to raise their hands, then pointing out that they could be sued anywhere.[96] This appears to have been an exercise in explaining residency and venue during a law school course on civil procedure.[97]

  There is no public indication as to whether CWRU intervened in any of these cases.

[87] Bias incident report dated Apr. 18, 2016, OHIO STATE UNIV., produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3418842-Ohio-State-University-Build-the-Wall-Report.html.

[88] Paul S. Denton, *How OSU Police Respond to Incidents of Bias or Intimidation*, OHIO STATE UNIV., http://studentlife.osu.edu/bias/pdfs/how-osu-police-respond-to-incidents-of-bias-or-intimidation.pdf (last visited Jan. 31, 2017); *see also*, *Bias Response Tools*, OHIO STATE UNIV., http://studentlife.osu.edu/bias/bias-response-tools.aspx (last visited Jan. 6, 2017) (linking to Chief Denton's article as one of its "bias response tools").

[89] UT Austin asked FIRE to pay $2,437.20 for records relating to how its CCRT responded, although other Texas institutions provided such records at no cost. We declined.

[90] UNIVERSITY OF TEXAS AT AUSTIN CAMPUS CLIMATE RESPONSE TEAM, CAMPUS CLIMATE TREND REPORT, 2013-2014 20 (2014), *available at* http://utexas.app.box.com/s/88ccrqlayd41b1nzqjos7z3izkrepol3.

[91] *Statement From Dr. Gregory Vincent About the Young Conservatives of Texas's Bake Sale*, UNIV. OF TEXAS AT AUSTIN, Sept. 27, 2013, http://diversity.utexas.edu/news/2013/09/27/statement-from-dr-gregory-vincent-about-the-young-conservatives-of-texass-bake-sale/.

[92] UNIVERSITY OF TEXAS AT AUSTIN CAMPUS CLIMATE RESPONSE TEAM, *supra* note 90 at p. 15.

[93] Jillian Kay Melchior, *'Bias Incident Team': Students' Three Blind Mice Halloween Costume 'Makes Fun of a Disability'*, HEAT STREET, Aug. 3, 2016, https://heatst.com/culture-wars/bias-incident-team-students-three-blind-mice-halloween-costume-makes-fun-of-a-disability/.

[94] *Bias Reporting System (BRS)*, CASE WESTERN RESERVE UNIV., archived on Sept. 12, 2016 at http://archive.is/kpceX.

[95] *Id.*

[96] *Id.*

[97] 28 U.S.C. § 1391 (2011).

To be sure, Bias Response Teams also field a number of reports of conduct *not* protected by the First Amendment. For example, many reports involve vandalism, assault, or true threats motivated by bias. These, however, are acts that may be reported to existing resources, such as student conduct administrators or police departments. Schools could also invite students to report unlawful conduct using online reporting systems, or even to a team set aside to address unlawful conduct motivated by bias. But schools are implementing broad definitions of "bias" to expressly invite reports of protected *speech*, including a broad range of political speech, and they often do so without any training on First Amendment rights.

## WHO SCRUTINIZES THE SPEECH? POLICE, CONDUCT ADMINISTRATORS, AND MEDIA RELATIONS STAFF

Having cast a wide net, who reviews the reported speech? Bias Response Teams are often populated by police and student conduct administrators. They also include, to a lesser extent, media relations administrators, faculty members, and students.

Some institutions, including the **University of West Florida**[98] and **Montana State University**,[99] embed police or security officials within their Bias Response Teams. Others, such as the **University of Montana**[100] and **DePaul University**,[101] direct reports straight to police or security officers.

Some 42% of Bias Response Teams include police or security officials. By including police and student conduct administrators on their Bias Response Teams, schools send a message to students that undercuts claims of respect for freedom of expression: If you say something that offends someone, you may (or in some cases *will*) be investigated by police. Their inclusion can also lead universities to use police to investigate offensive speech or anonymous speakers.[102] For example, at **Evergreen State College**, administrators responded to anonymous flyers critical of, among other things, Black Lives Matter, by emailing students:[103]

> The College wants to identify the individual(s) engaged in posting and distributing these flyers. If you have any information about who may be doing this, it is critical that you contact Police Services or provide information anonymously using the online incident report form.

Including student conduct administrators, as do approximately 63% of Bias Response Teams, also sends a chilling message. Students summoned to meet with a member of the office of the dean of students are likely to view the meeting not as educational, but as punitive. Even when the intention is not punitive, administrators are likely to approach "offensive" speech or sharp disagreement from a conflict-resolution perspective. This approach may conflict with a student speaker's purpose; many use speech to heighten or clarify conflict and disagreement in order to further their message.

---

[98] *About Us,* UNIV. OF WEST FLA., http://uwf.edu/offices/bias-response/about-us (last visited Jan. 9, 2017) (including Chief of University Police on its Bias Response Team).
[99] *Bias Incident Response Team,* MONT. STATE UNIV., http://www.montana.edu/biasreporting/BIRT.html (last visited Jan. 9, 2017) (Bias Incident Response Team includes a "representative from the Montana State University Police Department").
[100] *Hate Crime Form,* UNIV. OF MONT., http://www.umt.edu/police/Police/Hate%20Crime%20Form.php (last visited Jan. 9, 2017) (Police department soliciting reports of bias incidents, including "Leafleting" and the use of slurs).

[101] *Reporting Process,* DEPAUL UNIV., http://dignity.depaul.edu/report.html (last visited Jan. 9, 2017) (directing reports to the DePaul Public Safety Office).
[102] The First Amendment protects anonymous speech and association. *See, e.g.,* Talley v. California, 362 U.S. 334, 357 (1960) (anonymous pamphleteering), NAACP v. Alabama, 357 U.S. 449, 462 (1958) (anonymous association).
[103] *Bias Related Incident – April 19 Flyers,* EVERGREEN STATE COLLEGE, Apr. 19, 2016, produced to the Foundation for Individual Rights in Education in response to a public records request and *available at* https://www.documentcloud.org/documents/3418430-Evergreen-State-College-April-19-2016-Flyers.html.

## DISCUSSION

Including media relations administrators is also concerning, because it suggests that a school's decision to respond to offensive speech may be driven by the potential impact to the school's reputation. Where this is the case, it undermines the notion implicitly underlying Bias Response Teams that universities are primarily concerned with providing a safe environment.

And there is reason to be concerned that universities' responses may be driven by a desire to manage the institutions' reputation at the expense of protecting freedom of expression. At the **University of New Mexico**, administrators wanted to rush to release a statement from the Office of the President "rather than waiting for the media to get ahold of" flyers critical of the university's logo, which included conquistadors but not Native Americans.[104] These flyers were perceived by the Bias Response Team as a threat to Native Americans because the mock logo incorporated skulls and bones underneath the feet of conquistadors—a rather obvious criticism of the treatment of Native Americans in the New Mexico area. Ultimately, it was faculty members on the Diversity Council who placed the flyers in context. Without their intervention, it is possible that administrators who erroneously viewed the flyers as threatening could have continued their investigation and initiated charges.



In other words, the lack of faculty or student membership may deprive Bias Response Teams of valuable insight into instances of purportedly offensive speech, as well as principles of academic freedom. That may explain why the **University of Northern Colorado**'s Bias Response Team warned at least one professor that he could face lengthy, intrusive investigations for permitting students to debate controversial issues in class.[105]

## BIAS RESPONSE TEAMS MAY EXPOSE UNIVERSITIES TO FIRST AMENDMENT LAWSUITS

To date, FIRE is aware of no legal challenges to a bias reporting system. It's unclear whether a legal challenge could be mounted by a student or faculty member based on the mere existence of such a system. However, each time a Bias Response Team embarks upon an investigation or intervention with the reported person, it risks exposing the institution and its administrators to claims under the First Amendment.

That a university provides a mechanism for community members to share information concerning offensive speech may not, alone, amount to a justiciable First Amendment controversy. In *Laird v. Tatum* (1972), the Supreme Court of the United States held that the "mere existence" of broad, intelligence-gathering programs does not, "without more," impermissibly chill speech.[106]

The First Amendment, however, does not simply restrict the government from expressly *penalizing* or *prohibiting* speech. It also prohibits "adverse government action against an individual because of First Amendment freedoms."[107] When universities depart from the *Laird* baseline by mounting investigations or interventions with offending speakers, they expose themselves to the possibility of a First

[104] *See* emails and photos produced to the Foundation for Individual Rights in Education by the University of New Mexico in response to a public records request, *available at* https://www.documentcloud.org/documents/3234845-University-of-New-Mexico-What-Indians-Report.html.

[105] Jillian Kay Melchior, *Colorado 'Bias Response Team' Threatened Prof to Change His Lessons*, HEAT STREET, July 5, 2016, https://heatst.com/culture-wars/bias-response-team-threatened-prof-with-title-ix-vii-probe/.

[106] Laird v. Tatum, 408 U.S. 1, 10 (1972).

[107] Izen v. Catalina, 398 F.3d 363, 367 (5th Cir. 2005).

Amendment retaliation claim. This exposure isn't limited to legal action against the university; because many First Amendment principles are so well established under the law, members of a Bias Response Team risk being held *personally* liable for their actions in some circumstances.

To mount a First Amendment retaliation claim, for example, an aggrieved party must demonstrate three things: "first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech."[108] Whether government conduct has an adverse effect is determined by an objective standard: if the retaliatory conduct "would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights."[109] The retaliatory conduct need not be successful, as the cause of action is intended to address "conduct that tends to *chill* [speech], not just conduct that *freezes* it completely."[110]

To the extent that Bias Response Teams are used to better understand students' perspectives, to prepare general programming to constituents of

the institution, or to provide resources to a complaining student, these goals are unobjectionable on First Amendment grounds. But the reality is that Bias Response Teams are generally intended to deter offensive speech and conduct. Their goal is to chill speech that the institution or its constituents find offensive or unkind.[111]

When Bias Response Teams intervene directly with the reported student, the risk of exposing the university to First Amendment claims increases. Bias Response Teams often submit speech to the review of police and campus conduct administrators, who launch an "investigation"[112] or bring "charges"[113] against the "respondent,"[114] who may be summoned for a "hearing"[115] and found "guilty"[116] or be provided with an "educational"[117] reprimand—or, in the case of **Longwood University**, "education sanctions."[118] This is the language of punitive systems, not educators, and it is likely to be perceived as such by students and by courts. Simply calling a quasi-punitive response system "educational" doesn't make it so. After all, many institutions already describe at least some of their *punitive* measures as "educational" in nature.[119]

---

[108] Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005).
[109] *Id.*
[110] Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005) (emphasis in original).
[111] Rio Fernandes, *In a Charged Climate, Colleges Adopt Bias-Response Teams*, CHRON. OF HIGHER EDUC., Feb. 1, 2016, http://www.chronicle.com/article/In-a-Charged-Climate-Colleges/235120 (describing how Ohio State University formed a bias response team because "they needed a proactive means to prevent occurrences of offensive speech").
[112] *See, e.g.*, *Discrimination Cases, Fall 2015*, UNIV. OF CAL. DAVIS, http://reporthateandbias.ucdavis.edu/fall_2015.html (last visited Jan. 30, 2017) ("Offensive classroom comments, course content" resulted in an "Investigation").
[113] *See, e.g.*, *Student Reporting of Bias-Related Incidents*, STATE UNIV. OF N.Y. GENESEO, https://www.geneseo.edu/diversity/procedures (last visited Jan. 30, 2017) (in a "Level I" incident, "the accused student is made aware of the charges and has a hearing with the Student Conduct Administrator").
[114] *See, e.g.*, *Tolerance Program Annual Report: 2014-2015*, UNIV. OF ILL. AT URBANA-CHAMPAIGN, at 4, *available at* http://www.conflictresolution.illinois.edu/tolerance/downloads/toleranceReport_1415.pdf ("If a meeting with the respondent(s) occurs, the assigned [Bias Incident Investigation Team] member will provide her/him with general information about bias-

motivated incidents and the Tolerance Program and will give her/him the opportunity to respond to the report.").
[115] *See, e.g.*, *Student Reporting of Bias-Related Incidents*, *supra* note 113 (describing a "hearing with the Student Conduct Administrator").
[116] *See, e.g.*, *Difference Between a Hate Crime and a Bias Incident*, DAVIDSON COLLEGE, http://www.davidson.edu/student-life/multicultural-life/hate-crime-and-bias-incidents (last visited Jan. 30, 2017) ("Professors who make pejorative comments or stereotypes about a protected class of people ... are also guilty of commiting [*sic*] a bias incident.").
[117] *See, e.g.*, *Bias and Discrimination Response Protocol*, COLUMBIA COLLEGE, https://www.cc-seas.columbia.edu/studentlife/bias/protocol (last visited Jan. 30, 2017) ("Columbia College and Columbia Engineering students involved in perpetrating a hate crime/ bias incident will be subject to an educational and/or disciplinary process determined by Judicial Affairs.").
[118] *Bias & Hate Incidents*, LONGWOOD UNIV., http://www.longwood.edu/diversity/experiencing-bias/bias--hate-incidents (last visited Jan. 9, 2017).
[119] *See, e.g.*, Missouri State University, which promises not to "discipline" through its Bias Response Team, but instead "provide educational opportunities for those engaging in speech contrary to ... values [of diversity and inclusion]." Its Code of Conduct, however, is *also* "intended to be educational in nature[.]" If

## DISCUSSION

Even the public pronouncement that an investigation is underway—particularly when conducted by law enforcement—can itself have a chilling effect.[120] While universities need not remain silent about offensive speech, going "beyond simple vocal condemnation" and implying that particular instances of protected speech may be punished can amount to a violation of the First Amendment.[121]

The Supreme Court's perspective in *Bantam Books, Inc. v. Sullivan* (1963) is instructive. There, the state of Rhode Island established a commission whose goal was to, among other things, "educate the public" about books and printed materials it viewed as obscene, acting as a gatekeeper to "investigate and recommend the prosecution" of persons found to be distributing obscene materials.[122] The commission promulgated lists of "objectionable" publications to police departments and, when booksellers were reportedly selling objectionable material, the commission sent them notices suggesting that the commission had the power to recommend prosecution if materials were found to be obscene.[123] The Supreme Court held that the commission's claim that it simply "exhort[ed]" publishers to avoid distributing obscenity, and could not itself punish booksellers, was "untenable":[124]

It is true that [the] books have not been seized or banned by the State, and that no one has been prosecuted for their possession or sale. But though the Commission is limited to informal sanctions—the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation—the record amply demonstrates that the Commission deliberately set about to achieve the suppression of publications deemed "objectionable" and succeeded in its aim. We are not the first court to look through forms to the substance and recognize that informal censorship may sufficiently inhibit the circulation of publications … .

Bias Response Teams are arguably quite comparable to the Rhode Island commission discussed in *Bantam Books*. While they might protest that they are intended not to punish speech but to discourage speech contrary to the values of the institution, even if that speech is protected, Bias Response Teams are nevertheless intended to chill speech. By using the language, tools, and administrators associated with disciplinary systems, Bias Response Teams risk being perceived as intimidating, not educating. While some systems strike an appropriate balance by, among other things, limiting their definitions of reportable conduct to speech unprotected by the First Amendment,[125] the vast majority do not.

---

discipline can be described as educational, then an "educational" response which is mandatory or lacks substance may be perceived as disciplinary. *Cf. Bias Response Team,* Mo. State Univ., https://www.missouristate.edu/dos/268885.htm (last visited Jan. 11, 2017); *Code of Student Rights and Responsibilities,* Mo. State Univ., https://www.missouristate.edu/policy/G5_01_StudentRightsand Responsibilities.htm (last visited Jan. 11, 2017).

[120] *See generally* Adam Steinbaugh, *The Chilling Effect of Investigations*, Newsdesk, May 11, 2016, https://www.thefire.org/the-chilling-effect-of-investigations/; *see also* Sweezy v. New Hampshire, 354 U.S. 234, 245 (1957) ("There is no doubt that legislative investigations, whether on a federal or state level, are capable of encroaching upon the constitutional liberties of individuals. It is particularly important that the exercise of the power of compulsory process be carefully circumscribed when the investigative process tends to impinge upon such highly sensitive areas as freedom of speech or press,

freedom of political association, and freedom of communication of ideas, particularly in the academic community."); *see also* Coszalter v. City of Salem, 320 F.3d 968, 976 (9th Cir. 2003) (an "unwarranted disciplinary investigation" alone amounted to an adverse employment action in a First Amendment retaliation case).

[121] Levin v. Harleston, 966 F.2d 85, 89-90 (2d Cir. 1992); *but see* Stolle v. Kent State Univ., 610 Fed. App'x 476, 482-83 (6th Cir. 2015) (faculty member verbally reprimanded for sending letter to legislator on university letterhead in violation of policy amounted to "de minimus" act insufficient to deter person of ordinary firmness from First Amendment activities).

[122] Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 59-60 (1963).

[123] *Id.* at 62-63.

[124] *Id.* at 66-67 (footnotes omitted).

[125] *See, e.g.,* Azhar Majeed, *UW-Madison Demonstrates What a 'Green Light' Definition of a Bias Incident Looks Like*, Newsdesk, Oct. 6, 2016, https://www.thefire.org/uw-madison-demonstrates-

## DISCUSSION

The prospect of a retaliation claim should alarm colleges and universities. The central question of such a claim—whether the conduct would deter a person of ordinary firmness from continuing to speak—is fact-based, meaning it's unlikely to be resolved before summary judgment, increasing universities' legal exposure.[126] Additionally, many of the scattered decisions on what meets the "ordinary firmness" test are based in the context of government employment, where the government's interest is given substantially more weight, than in the context of retaliation against a non-employee.[127]

This is not to say that universities must refrain from criticizing or condemning offensive conduct or speech. Criticism is not censorship, whether it is broadcast to the student body or public at large or instead sent directly to a student. University officials retain their own First Amendment right to contribute to discourse on campus and can do so without creating a substantial risk of a First Amendment retaliation claim.[128] The tools universities deploy in response to speech, how they are deployed, and how universities describe these systems to students matter.

Finally, because universities often keep opaque records documenting their interventions with reported speakers (discussed below), universities have a diminished ability to argue that such interventions provided meaningful education, as opposed to a chilling instruction to stop speaking.

### DESPITE ACKNOWLEDGING FIRST AMENDMENT TENSIONS, UNIVERSITIES PROVIDE LITTLE IF ANY TRAINING

The First Amendment issues faced by Bias Response Teams are complex, nuanced, and fraught with potential pitfalls that may lead public institutions into costly lawsuits. Leaving aside legal risks, Bias Response Teams also risk conflicting with essential principles of academic freedom, freedom of expression, and freedom of inquiry. Yet despite these risks, few Bias Response Teams receive meaningful training, if any, on the contours of these issues.

Of institutions surveyed, **84** (50.6%) acknowledge a tension with freedom of speech, freedom of inquiry, or academic freedom on their websites or in their policies. Of these, 50 are public institutions and 34 are private.

While Bias Response Team training requirements and materials were not part of FIRE's survey, FIRE has utilized state public records requests to explore the types of training required of members of Bias Response Teams. Although FIRE has issued or reviewed dozens of public records requests to universities seeking training materials distributed to Bias Response Teams, we've only seen materials from one school, **Louisiana State University**, that provided substantive training on First Amendment issues.[129]

---

what-a-green-light-definition-of-a-bias-incident-looks-like (definition of bias incidents consistent with standard for peer-on-peer hostile environment harassment standard in an educational setting, as set forth in Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 651 (1999)).

[126] Thompson v. Ohio State Univ., 990 F. Supp. 2d 801, 809 (S.D. Ohio) (retaliation claim against professor proper where the professor allegedly filed charges against a student in retaliation for criticism of a colleague, as issue of whether an action is sufficient to deter a person of ordinary firmness) (citing Wurzelbacher v. Jones-Kelley, 675 F.3d 580, 584 (6th Cir. 2012)).

[127] *See generally* Kinney v. Weaver, 367 F.3d 337, 358-60 (5th Cir. 2004) (noting that First Amendment analyses proceed on a "spectrum").

[128] *See, e.g.*, Samad v. Jenkens, 845 F.2d 660, 663 (6th Cir. 1988) (university's statement to outgoing dean that it would release

information to defend itself against any criticism by the dean was a reservation of "their own first amendment right to speak out," and the subjective chill resulting was insufficient to establish a justiciable controversy); *see also*, Nunez v. City of Los Angeles, 147 F.3d 867, 875 (9th Cir. 1998) (concluding in the employment context that merely being "bad-mouthed and verbally threatened" by supervisors was insufficient, and that it "would be the height of irony, indeed, if mere speech, in response to speech, could constitute a First Amendment violation"); *but see* De Leon v. Little, 1999 U.S. Dist. LEXIS 23091, at *13-14 (D. Conn. Sept. 29, 1999) (criticizing Nunez as inconsistent with Supreme Court precedent in that threats of dismissal can support First Amendment retaliation claims).

[129] FIRE is currently sponsoring a First Amendment lawsuit against Louisiana State University over its treatment of a former

## DISCUSSION

Other institutions, despite acknowledging that identifying First Amendment issues can be nuanced, do not appear to provide training. For example, the **University of California, San Diego (UCSD)** notes on its website that "[i]ssues pertaining to freedom of speech and expression can be very complicated and confusing."[130] The university's definition of "bias incidents" likewise observes that the "protection of freedom of expression, including controversial speech and sometimes even offensive or hurtful words, is vital to a community of teachers and learners" and that some "acts of bias may either not be severe enough to violate policy or be protected expressions of speech."[131] Yet despite freedom of expression being both "complicated" and "vital," the University of California's Office of the President, responding on UCSD's behalf to a public records request issued by FIRE, did not produce any training materials relating to the First Amendment at UCSD.

Another school, **Longwood University**, claimed as recently as August 2016 that because universities could not impose "campus judicial codes that include specific prohibitions related to bias and hate" under the First Amendment, it instead "train[s] board members to identify bias-related behavior and include appropriate education sanctions when a student is found responsible."[132] An August 2016 "Bias Response Team Training" memorandum, in discussing

"consequences" for bias incidents, asserted that there are "no laws for bias incidents" and that the team doesn't "get the firm backing through law or the institution in general about these topics."[133] A contemporaneous training slideshow indicated that Bias Response Team members would be trained on "legal issues" without elaboration.[134] None of the materials provided to FIRE indicate that any training on First Amendment issues was provided.

## A RESISTANCE TO TRANSPARENCY

With few exceptions, Bias Response Teams suffer from a lack of transparency, and universities are too often willing to stonewall public records requests concerning their teams. While protecting the privacy of both reporting and reported parties is important, this hesitance to engage in meaningful transparency is worrisome. The ways in which universities respond to offensive speech and discrimination are of particular public concern,[135] and doing so without being transparent, or being selectively transparent,[136] risks being seen as an effort to hide incidents from the community.

Approximately 28% of institutions with bias reporting systems do not even disclose who reviews the reports. If universities are unwilling to publicly identify who is responsible for

---

faculty member, Teresa Buchanan, but the case does not involve the school's Bias Response Team.

[130] *Freedom of Speech and Expression at UC San Diego*, UNIV. CAL., SAN DIEGO, https://students.ucsd.edu/student-life/diversity/expression (last visited Dec. 29, 2016).

[131] *Frequently Asked Questions*, UNIV. CAL., SAN DIEGO OFFICE FOR THE PREVENTION OF HARASSMENT & DISCRIMINATION, http://ophd.ucsd.edu/faq/index.html#What-are-bias-incidents? (last visited Dec. 29, 2016).

[132] *Bias & Hate Incidents*, LONGWOOD UNIV., archived on Aug. 26, 2016 and *available at* http://web.archive.org/web/20160826220917/http://www.longwood.edu/diversity/45365.htm.

[133] *Bias Response Team Training (Handout)*, LONGWOOD UNIV., Aug. 11, 2016, produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3288823-Longwood-University-Bias-Response-Team-Training.html.

[134] *Bias Response Team Training (Slideshow)*, LONGWOOD UNIV., Aug. 11, 2016, produced to the Foundation for Individual Rights in

Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3288824-Longwood-University-Bias-Response-Team-Training.html.

[135] *See, e.g.*, Black Student Union, *BSU Calls for Action*, THE TOWERLIGHT, Apr. 18, 2016, http://thetowerlight.com/bsu-calls-for-action (student group, "disheartened by the lack of communication and transparency" concerning a student's conduct, calls upon administrators to take acts "to ensure that hate bias on this campus is heavily policed, reported, and made transparent").

[136] *See, e.g.*, Lea Speyer, *Anti-Israel Students at Connecticut College 'Occupy' Office of School President in Protest Over Investigation of Mock Eviction Notices*, THE ALGEMEINER, May 16, 2016, http://www.algemeiner.com/2016/05/16/anti-israel-students-at-connecticut-college-occupy-office-of-school-president-in-protest-over-investigation-of-mock-eviction-notices (students protest, in part, over mass email concerning political protest labeled as a bias incident, when other bias incidents weren't similarly announced).

reviewing and responding to reports, then students, faculty, and the public will be hindered in holding public servants accountable. Similarly, a refusal to identify Bias Response Team members does not instill confidence that schools take complaints seriously by devoting capable people to overseeing them.

And while many Bias Response Teams purport to exist for the purpose of keeping statistics, the statistics themselves are rarely published. The **University of California**, for example, developed its multi-campus reporting system in 2010 with the "[p]rimary purpose" of "statistical reporting,"[137] yet it appears to have *never* published statistics. The University of California Office of the President, in response to a public records request for all statistics,[138] only provided statistics last compiled in 2012 and apparently never published.[139] Some institutions publish statistics on periodic bases, with varying degrees of transparency. And while the Clery Act requires federally funded institutions to publish statistics concerning hate crimes,[140] most schools define "bias incident" more broadly than criminal acts. In any event, most institutions publish neither statistics nor reports.

FIRE has utilized public records requests under state law—similar to requests pursuant to the federal Freedom of Information Act—to ask dozens of schools to produce records relating to complaints; how they responded to those

complaints; and the composition, policies, and training of their Bias Response Teams. While most complied with both the letter and spirit of the law,[141] a number have resisted. Ominously, even where schools produce records, those records often fail to substantially document the actions the university took in response to the report, instead stating that the respondent was provided with "education." This does not inspire confidence that the response was meaningful education, as opposed to a reprimand.

Justice Louis Brandeis famously opined that sunlight was the best of disinfectants.[142] But a popular tactic of sunshine-shy administrators is the employment of hefty fees to locate and redact public records, notwithstanding open records laws encouraging universities to reduce or waive fees when releasing documents that would serve the public interest. The **University of Northern Colorado** attempted to charge FIRE hundreds of dollars for records eventually obtained by a media outlet, *Heat Street,* which revealed that UNC's Bias Response Team had discouraged professors from discussing subjects of debate raging in legislatures and the media.[143] That blast of sunlight caused UNC to shutter its Bias Response Team.[144]

Similarly, the **University of Oregon** concluded that releasing its records would not be in the public interest,[145] demanding that FIRE pay

---

[137] Meg Carter & Jerlena Griffin-Desta, *Campus Climate Project Requirements*, UNIV. OF CAL., June 16, 2010, produced to the Foundation for Individual Rights in Education in response to a public records request and *available at* https://www.documentcloud.org/documents/3288857-University-of-California-Campus-Climate-Project.html.

[138] California Public Records Act Request from Adam Steinbaugh to the University of California Office of the President, Apr. 8, 2016, *available at* https://www.documentcloud.org/documents/3288861-2016-04-08-Public-Records-Request-to-the.html.

[139] *Update on Universitywide Campus Climate Incidents Reporting System*, UNIV. OF CAL. ETHICS, COMPLIANCE AND AUDIT SERVICES, Feb. 7, 2012, produced to the Foundation for Individual Rights in Education in response to a public records request and *available at* https://www.documentcloud.org/documents/3288860-University-of-California-Feb-7-2012-Update-on.html.

[140] Institutional Security Policies and Crime Statistics, 34 C.F.R. § 668.46(c)(1)(iii).

[141] Evergreen State College merits an honorable mention, having produced over seven *thousand* pages of thorough records on a timely basis, in a response to a records request by FIRE. Contrast this with the University of California, which produced scant records after months of delay and obfuscation.

[142] Louis D. Brandeis, *Other People's Money*, HARPER'S WEEKLY, Dec. 20, 1913, at 92.

[143] Jillian Kay Melchior, *Colorado 'Bias Response Team' Threatened Prof to Change His Lessons*, HEAT STREET, July 5, 2016, https://heatst.com/culture-wars/bias-response-team-threatened-prof-with-title-ix-vii-probe/.

[144] Adam Steinbaugh, *University of Northern Colorado to End 'Bias Response Team,' But What Next?*, NEWSDESK, Sept. 9, 2016, https://www.thefire.org/university-of-northern-colorado-to-end-bias-response-team-but-what-next/.

[145] *See* In Defense of Animals v. Oregon Health Sciences University, 112 P.3d 336, 354 (Or. Ct. App. 2004) (agencies may reduce or waive fees if it determines that the records relate to a matter which "affects the community or society as a whole, in contrast to a concern or interest of a private individual or entity").

## DISCUSSION

$1,483.30 to review its team's records.[146] The university's steadfast refusal to acknowledge the public interest was plainly belied by criticism by national media outlets,[147] which spurred a faculty inquiry into the team's activities. When the records were eventually produced, Oregon was unable to locate records of some incidents, including one pilloried in the media.[148]

Other institutions have been quick to delete or hide once-public websites documenting bias incidents following public criticism. **Colby College** placed its log of bias incidents behind a password-protected field after it was publicly criticized.[149] So, too, did **Skidmore College**.[150] More alarmingly, several institutions responded to FIRE's public records requests by initially claiming that there were no records to produce. When FIRE issued additional requests seeking records of what efforts the school made to search for records, the originally-requested records were suddenly located and produced. This suggests a certain lack of good faith from these institutions in following their legal obligations.

Other institutions found more creative ways to stonewall. The **University of California**'s Office of the President (UCOP), for example, intervened to respond on behalf of its subsidiary campuses after FIRE issued records requests to each campus about its processes. Months later, UCOP professed that it would be too difficult for the central office to locate records of how its campuses responded to reported incidents. UCOP also refused to produce records of any reported incident whatsoever, claiming that it would be too difficult to redact students'

names—a task somehow accomplished without complaint by dozens of other schools, many of which boast far fewer resources than the University of California system.

## NORMATIVE CRITICISMS OF BIAS RESPONSE TEAMS

Given that reported incidents of perceived "bias" run the ideological gamut, subjecting campus speech to review by conflict-averse administrators runs the risk of chilling speech from any and every perspective. This illiberal approach invites administrative intervention whenever there are impolite words or disagreement of any sort. College campuses must remain open for vehement disagreement and impolite rhetoric lest they invite administrators to limit speech and debate.

This view is not FIRE's alone. Writing in the *New Republic*, Carleton College professors Jeffrey Aaron Snyder and Amna Khalid aptly observed the limitations of Bias Response Teams and their potential chilling effects on academic discourse and campus speech:

> We do not want our campuses overrun with eager "see something, say something" "student informants." Far from empowering students with the requisite skills for having difficult conversations, bias response initiatives, as a Boston College student asserted, encourage "students to ask the administration to solve problems

[146] Adam Steinbaugh, *University of Oregon on 'Bias Response Team': Nothing to See Here*, NEWSDESK, May 27, 2016, https://www.thefire.org/university-of-oregon-on-bias-response-team-nothing-to-see-here/.

[147] *See, e.g.*, Catherine Rampell, *College Students Run Crying to Daddy Administrator*, WASH. POST, May 19, 2016, https://www.washingtonpost.com/opinions/college-students-run-crying-to-daddy-administrator/2016/05/19/61b53f54-1deb-11e6-9c81-4be1c14fb8c8_story.html?utm_term=.f2f5652cd55c; *see also, e.g.*, Robby Soave, *The University of Oregon's Thought Police Investigate Students for Saying Anything*, REASON, May 10, 2016, http://reason.com/blog/2016/05/10/the-university-of-oregons-thought-police.

[148] Conor Friedersdorf (@conor64), TWITTER (May 14, 2016, 12:29 PM), https://twitter.com/conor64/status/731521764912730112.

[149] Samantha Harris, *Speech Code of the Month: Colby College*, NEWSDESK, July 20, 2016, https://www.thefire.org/speech-code-of-the-month-colby-college/; Robby Soave, *Saying 'On the Other Hand' Got a Student Reported to the Campus Bias Police*, REASON, June 22, 2016, http://reason.com/blog/2016/06/22/saying-on-the-other-hand-got-a-student-r.

[150] Blake Neff, *Skidmore College: 'Make America Great Again' Is A 'Racialized Attack'*, THE DAILY CALLER, July 1, 2016, http://dailycaller.com/2016/07/01/skidmore-college-maka-america-great-again-is-a-racialized-attack/.

instead of solving them amongst themselves."

[...]

Let us be clear: Bias and discrimination are real and pressing concerns on campuses across the country. There must be channels for students, especially those from historically underrepresented populations, to communicate their concerns to administrators and their peers. Institutions need to keep on top of "campus climate" concerns through surveys and community-wide discussions. But to institute a formal body that assesses the merits of bias incident complaints is profoundly misguided.

[...]

BRTs will result in a troubling silence: Students, staff, and faculty will be afraid to speak their minds, and individuals or groups will be able to leverage bias reporting policies to shut down unpopular or minority viewpoints.[151]

At **John Carroll University**, a private, Catholic institution, Bias Response Team administrators acknowledged that critiques concerning freedom of speech "must be taken seriously."[152] Troubled both by the potential for "malicious-anonymous" abuse of the ability to anonymously report others and by the possibility that the system might have a chilling effect on speech, the university's annual report observed:[153]

If a person is able to report a peer, professor, supervisor, or other community member for "speech code violations," and particularly if those reports result in punitive action toward the offender, the system could shut down, rather than open up, critically important dialogue. On a university campus with an implicit commitment to the free exchange of ideas, such a result must be considered unacceptable.

Other institutions have recognized these risks. In August 2016, the **University of Iowa** scrapped a planned Bias Response Team, observing a "high failure rate in the [teams] at other institutions" as they became "almost punitive in nature," rendering them "scolding panels." Although the University of Iowa's planned team did not involve a punitive component, the type of response undertaken by other BRTs "accomplishes nothing," said one administrator.[154]

As academic freedom expert Donald Downs, professor of political science, law, and journalism at the University of Wisconsin—Madison, observed, Bias Response Teams attempt to strike a difficult balance:[155]

In some telling respects, some of these new policies [including Bias Response Teams] do not overtly call for censorship, as the old speech codes did. Rather, they are meant to "educate" the academic community about the negative impact that certain types of speech can have. Such educational schemes can be consistent with the goals of higher education if

---

[151] Jeffrey Aaron Snyder & Amna Khalid, *The Rise of "Bias Response Teams" on Campus*, THE NEW REPUBLIC, Mar. 30, 2016, https://newrepublic.com/article/132195/rise-bias-response-teams-campus.
[152] JOHN CARROLL UNIVERSITY, BIAS REPORTS 2014-2015, *available at* http://webmedia.jcu.edu/diversity/files/2015/12/2014-2015-Bias-Report-web-version.pdf.
[153] *Id.*

[154] Jeff Charis-Carlson, *University of Iowa Changing Course on Bias Response Team*, IOWA CITY PRESS-CITIZEN, Aug. 18, 2016, http://www.press-citizen.com/story/news/education/university-of-iowa/2016/08/18/university-iowa-changing-course-bias-response-team/88962048.
[155] Donald Downs, *The Good, the Less-Good, and the Path Forward: Thoughts on FIRE's Annual Report*, OPEN INQUIRY PROJECT, Jan. 4, 2017, http://openinquiryproject.org/blog/thoughts-on-fires-annual-report/.

## DISCUSSION

done right and in the right spirit. There is nothing intrinsically wrong with educating students and others about the potential impacts of speech, so long as such educational endeavors are not smokescreens for informal or formal ideological bullying. However, given the climates on many campuses today, such educational efforts too often amount to speech codes in disguise. The new policies may not be overt speech codes, but they can accomplish censorship by other means.

### STRIKING A BALANCE

It is understandable that universities wish to monitor the climate for students on their campuses and to have support systems in place for students who, for one reason or another, may be struggling to feel at home on campus. But it does not follow from these precepts that universities must effectively establish a surveillance state on campus where students and faculty must guard their every utterance for fear of being reported to and investigated by the administration.

While not every Bias Response Team impermissibly limits protected speech, the reality is that it is extremely difficult to have a system in place for the reporting of protected speech without creating a risk that speech and expression on campus will be chilled as a result. As lawyer, writer, and former FIRE President David French wrote, universities with Bias Response Teams are playing a "dangerous constitutional game" by not explicitly prohibiting protected speech but creating a "process-is-punishment" mechanism that deters people from speaking out.[156]

When setting parameters for their teams and implementing responses, universities must be cognizant of the risks created by broad definitions, anonymous reporting systems, unclear policies, and lack of training, and must take steps to minimize or eliminate these risks. While some Bias Response Teams have demonstrated familiarity with freedom of speech in their responses to reports of offensive speech, such actions are too often *not* the result of effective training and policies.

If bias reporting systems are to exist on campuses, they should describe reportable situations narrowly, excluding protected speech, or at the very least avoid characterizing the teams and their responses in ways that convey a punitive message. Universities should also recognize that even narrow definitions of bias are likely to result in reports of protected speech, and provide accurate and impartial training to Bias Response Team members so that they are able to identify protected speech.

Universities would do best to focus on how they can help the reporting student, not on the reported speaker. Unless a community member has engaged in conduct *unprotected* by the First Amendment or academic freedom, any institutional response to bias should avoid uninvited intervention with the speaker and instead focus on providing resources to the reporting student. In doing so, they will help encourage all community members to express themselves and participate in the marketplace of ideas that our nation's colleges and universities are uniquely suited to provide.

---

[156] David French, *Campus Ideologues Double Down on Censorship—Beware the 'Bias Response Team,'* Nat'l Review, Feb. 3, 2016, http://www.nationalreview.com/corner/430750/campus-ideologues-bias-response-teams-first-amendment.

The following is the percentage of schools that promulgate the following categories of bias:

**Race and Culture**
Race: 100%
National Origin or Nationality: 94.5%
Ethnicity or Ethnic Origin: 73%
Color: 60.3%
Ancestry: 25.6%
Immigration Status or Citizenship: 14.1%
Language or Accent: 2%
Culture: 2%
Geographic Origin: 1%
Anti-Semitism: 0.50% (U. Vermont)
Place of Birth: 0.50% (Middlebury)

**Religion or Existential Beliefs**
Religion or Spiritual Beliefs: 100%
Creed: 22%
Spirituality: 0.50% (Middlebury)

**Sex, Gender, and Sexuality**
Sexual Orientation: 99.5%
Gender Identity or Expression: 81%
Gender: 61%
Sex: 41.2%

**Military Service**
Veteran Status: 60%
Military Status: 9%
National Guard Status: 0.50% (SUNY Potsdam)

**Family and Relationships**
Marital Status: 36.2%
Familial or Parental Status: 7%
Victim of Domestic Violence: 1%
Relationship Status: 0.50% (U. Nebraska—Omaha)
Civil Union Status: 0.50% (Rutgers)
Domestic Partnership: 0.50% (Rutgers)
Spousal Relationship to Current Employee: 0.50% (N. Dakota State U.)
Childbirth: 0.50% (Grinnell College)

**Ex-Offender Status:** 4%

**Ability, Disability, Health, or Physical Attributes Unrelated to Race or Gender**
Disability: 99%
Age: 81.4%
Genetic Information: 19%
Pregnancy: 15%
Mental Health: 7%
Physical Appearance: 7%
Medical Condition: 5%
Size: 2.5%
Height: 2%
Weight: 2%
Shape: 0.50% (U. Northern Colorado)
Atypical Heredity: 0.50% (Rutgers)
Cellular Blood Trait: 0.50% (Rutgers)
Positive HIV-Related Blood Test Results: 0.50% (Middlebury)
Intellectual Ability: 0.50% (Clemson)
Emotional Ability: 0.50% (Clemson)
Smoker Status: 0.50% (U. Kentucky)

**Views and Beliefs**
Political Affiliation: 14%
Membership Affiliation: 3.5%
Group Affiliation: 1.5%
Intellectual Perspective: 0.50% (U. Central Arkansas)
Participation in Lawful, Off-Campus Activity: 0.50% (North Dakota State U.)
Role: 0.50% (Macalester College)
Political Expression: 0.50% (Dartmouth)
Religious Expression: 0.50% (Dartmouth)
Social Affiliation: 1% (Syracuse, Longwood U.)
Social Standing: 0.50% (UNC Charlotte)
Belief System: 0.50% (UNC Charlotte)
Political Belief: 1% (U. Kentucky, U. Central Arkansas)

**Income, Housing, and Welfare**
Socioeconomic Status: 23.6%
Public Assistance Status: 1.5%
Homelessness: 1 %

## APPENDIX A: CATEGORIES OF BIAS

**Miscellaneous Categories of Bias**[157]

Anti-Semitism: University of Vermont
Atypical Heredity: Rutgers University
Behavior: Macalester College
Belief System: University of North Carolina, Charlotte
Cellular Blood Trait: Rutgers University
Characteristics: Macalester College
Childbirth: Grinnell College
Cultural: University of Wisconsin, Madison
Emotional Ability: Clemson
Intellectual Ability: Clemson
Intellectual Perspective: University of Central Arkansas
Major of Study: Missouri University of Science and Technology
National Guard Status: SUNY Potsdam
Participation in Lawful, Off-Campus Activity: North Dakota State University
Place of Birth: Middlebury College
Political Belief: University of Central Arkansas, University of Kentucky
Political Expression: Dartmouth
Positive HIV-Related Blood Test Results: Middlebury College
Religious Expression: Dartmouth
Role: Macalester College
Shape: University of Northern Colorado
Smoker Status: University of Kentucky
Social Affiliation: Syracuse University, Longwood University
Social Standing: University of North Carolina, Charlotte
Spirituality: Middlebury College
Spousal Relationship to Current Employee: North Dakota State University
Victim of Domestic Violence: SUNY Potsdam, University of Denver

---

[157] These categories of bias are unique to only one or two institutions. Some are identified in subcategories above and repeated here.

## APPENDIX B: INSTITUTIONS WITH OBSERVED BIAS REPORTING SYSTEMS

**Alabama**
University of Alabama at Birmingham

**Alaska**
None observed

**Arizona**
Arizona State University
Northern Arizona University
University of Arizona

**Arkansas**
University of Central Arkansas

**California**
California Polytechnic State University,
  San Luis Obispo
California State Polytechnic Institute,
  Pomona
California State University, Chico
Humboldt State University
Loyola Marymount University
Occidental College
Pepperdine University
Pomona College
Sonoma State University
University of California, Berkeley
University of California, Los Angeles
University of California, Davis
University of California, Irvine
University of California, Merced
University of California, Riverside
University of California, San Diego
University of California, San Francisco
University of California, Santa Barbara
University of California, Santa Cruz
University of Southern California
University of the Pacific
Whittier College

**Colorado**
Colorado State University
University of Colorado at Boulder
University of Denver
University of Northern Colorado

**Connecticut**
Central Connecticut State University
Connecticut College
Trinity College
University of Connecticut
University of New Haven

**Delaware**
None observed

**Florida**
Florida International University
Florida State University
Pensacola State College
Stetson University
University of Central Florida
University of Florida
University of West Florida

**Georgia**
Armstrong State University
Emory University
Georgia Southern University
Kennesaw State University

**Hawaii**
None observed

**Idaho**
Boise State University

**Illinois**
DePaul University
Illinois State University
Loyola University Chicago
Northeastern Illinois University
Northern Illinois University
Northwestern University
Saint Xavier University
University of Chicago
University of Illinois at Urbana—
  Champaign

**Indiana**
Ball State University
DePauw University
Indiana University—Bloomington
Purdue University

## APPENDIX B: INSTITUTIONS WITH OBSERVED BIAS REPORTING SYSTEMS

**Iowa**
  Coe College
  Grinnell College
  University of Northern Iowa

**Kansas**
  Kansas State University

**Kentucky**
  Georgetown College
  Kentucky State University
  University of Kentucky
  University of Louisville

**Louisiana**
  Louisiana State University—Baton Rouge
  Tulane University

**Maine**
  Bates College
  Bowdoin College
  Colby College
  University of Southern Maine

**Maryland**
  St. Mary's College of Maryland
  Towson University

**Massachusetts**
  Babson College
  Boston College
  Clark University
  Emerson College
  Framingham State University
  Harvard University
  Mount Holyoke College
  Northeastern University
  Smith College
  Tufts University
  University of Massachusetts Amherst
  Williams College

**Michigan**
  Grand Valley State University
  Michigan State University
  University of Michigan—Ann Arbor

**Minnesota**
  Carleton College[j]
  Hamline University
  Macalester College
  Minnesota State University, Mankato
  University of Minnesota—Morris
  University of Minnesota—Twin Cities

**Mississippi**
  University of Mississippi

**Missouri**
  Missouri State University
  Missouri University of Science and
    Technology
  Saint Louis University
  Southeast Missouri State University
  University of Central Missouri
  University of Missouri—Columbia
  Washington University in St. Louis

**Montana**
  Montana State University
  University of Montana

**Nebraska**
  University of Nebraska—Lincoln
  University of Nebraska—Omaha
  University of Nebraska Medical Center

**Nevada**
  None observed

**New Hampshire**
  Dartmouth College
  Plymouth State University
  University of New Hampshire

**New Jersey**
  Montclair State University
  Rowan University
  Rutgers University
  The College of New Jersey

**New Mexico**
  University of New Mexico

## APPENDIX B: INSTITUTIONS WITH OBSERVED BIAS REPORTING SYSTEMS

**New York**
Alfred University
Bard College
Buffalo State College
Colgate University
Columbia University
Cornell University
Empire State College
Fordham University
Hamilton College
Le Moyne College
New York University
Skidmore College
SUNY Binghamton
SUNY Buffalo
SUNY Cobleskill
SUNY Cortland
SUNY Fredonia
SUNY Geneseo
SUNY New Paltz
SUNY Old Westbury
SUNY Oneonta
SUNY Oswego
SUNY Potsdam
Syracuse University
Union College
University of Rochester
Vassar College

**North Carolina**
Appalachian State University
Davidson College
Duke University
Elon University
Fayetteville State University
North Carolina State University—Raleigh
University of North Carolina, Asheville
University of North Carolina, Charlotte
Wake Forest University
Western Carolina State University

**North Dakota**
North Dakota State University
Valley City State University

**Ohio**
Bowling Green State University
Case Western Reserve University
John Carroll University
Kenyon College
Miami University of Ohio
The Ohio State University
University of Cincinnati
Wright State University

**Oklahoma**
University of Oklahoma

**Oregon**
Lewis & Clark College
Oregon Institute of Technology
Oregon State University
Portland State University
Reed College
Southern Oregon University
University of Oregon

**Pennsylvania**
Albright College
Allegheny College
Bryn Mawr College
Bucknell University
Dickinson College
Gettysburg College
Lafayette College
Lehigh University
Muhlenberg College
Pennsylvania State University—
   University Park
Swarthmore College
University of Pittsburgh
Villanova University
West Chester University of Pennsylvania
Widener University

**Rhode Island**
Providence College
Rhode Island College
University of Rhode Island

## APPENDIX B: INSTITUTIONS WITH OBSERVED BIAS REPORTING SYSTEMS

**South Carolina**
Clemson University
Furman University
University of South Carolina
Winthrop University

**South Dakota**
None observed

**Tennessee**
Sewanee, The University of the South
University of Tennessee, Knoxville

**Texas**
Baylor University
Southern Methodist University
Texas A&M University—College Station
Texas Tech University
University of Texas at Austin

**Utah**
University of Utah

**Vermont**
Middlebury College
University of Vermont

**Virginia**
George Mason University
Longwood University
University of Mary Washington
University of Richmond
University of Virginia
Virginia Commonwealth University
Virginia Polytechnic Institute
   and State University

**Washington**
Central Washington University
Evergreen State College
Washington State University
Western Washington University
Whitman College

**Washington, D.C.**
Georgetown University

**West Virginia**
None observed

**Wisconsin**
Marquette University
St. Norbert College
University of Wisconsin—Eau Claire
University of Wisconsin—Green Bay
University of Wisconsin—La Crosse
University of Wisconsin—Madison
University of Wisconsin—Milwaukee
University of Wisconsin—Oshkosh
University of Wisconsin—Platteville
University of Wisconsin—River Falls
University of Wisconsin—Stevens Point
University of Wisconsin—Stout
University of Wisconsin—Whitewater

**Wyoming**
None observed

---

[i] **Correction:** Carleton College was included due to a misinterpretation of a proposed policy found on its website. FIRE has since been informed that the proposal was rejected and was not implemented, and we regret the error. This report has been updated to reflect minor changes in figures impacted by the removal of Carleton College, but no findings were significantly impacted.



510 WALNUT ST.
SUITE 1250
PHILADELPHIA, PA 19106




# Exhibit N

https://www.wsj.com/articles/the-pronoun-police-middle-schoolers-sexual-harassment-title-ix-nine-mispronouning-transgender-lgbtqia-free-speech-pronoun-11653337766

OPINION COMMENTARY    Follow

# The Progressive Pronoun Police Come for Middle Schoolers

A Wisconsin school district opened a Title IX sexual-harassment investigation against 8th graders for calling a student 'her' instead of 'them.'

By Rick Esenberg and Luke Berg

May 23, 2022 6:11 pm ET

Share    Resize    1026    |    Listen (4 min)    ⋮

*Kiel, Wis.*

For most people, the term "Title IX investigation" calls to mind allegations of rape, groping, unwanted sexual advances or a pervasive pattern of verbal abuse. Think again. Wisconsin's Kiel Area School District, in deep red Manitowoc and Calumet counties along the western shore of Lake Michigan, has uncovered a new form of harassment. On April 25 they accused three eighth-grade boys of sexual harassment—and launched a Title IX investigation—for something called "mispronouning." These children used "her" to refer to a classmate who wants to be called "them."

It's easy to dismiss this as bizarre. You won't find mispronouning in the Wisconsin statutes or U.S. code. It hardly resembles the egregious aggression that we associate with harassment. It doesn't, in and of itself, constitute conduct "so severe, pervasive, and objectively offensive that it effectively denies a person equal access to education" as Title IX law on harassment requires. But the stain that such a charge could leave on these boys' reputations and the harm inflicted upon their futures is real.

The boys' parents first heard about the charges when they received a call from the district that their sons were about to be charged with sexual harassment under Title IX. There had been no prior warning or discussions with the families about pronoun use at school, nor did the district initially explain what the boys had done to warrant being investigated for a

violation of federal law. When the families were finally informed that the alleged sexual harassment—the boys' potential federal offense—was "using incorrect pronouns," terror quickly turned to bewilderment. "Is this real? This has to be a joke," thought Rose Rabidoux, one of the parents.

When the parents reached out to us at the Wisconsin Institute for Law & Liberty, we had the same reaction: This can't be real. Alas, it is. The district appears to believe that once a student announces different pronouns to others, any subsequent use of the biologically and grammatically correct pronouns—even when not directed to the student—may be punishable as sexual harassment under Title IX.

We hope Kiel is an outlier, but it may not be. A school board in Virginia is reportedly considering adding a policy to prohibit "malicious misgendering." The Biden administration is about to unveil its long-awaited update to Title IX regulations and, given the president's pronouncement that transgender discrimination is the civil-rights issue of our time, it wouldn't be surprising if the new rules call for the policing of pronouns. All of this may soon be coming to a school near you.

Apparently, any failure to comply will subject an adolescent to a frightening inquisition. Parents need to stand up against this wherever it rears its ugly head. Middle school is hard enough as it is. Young students shouldn't live in fear of punishment if they don't follow the left's ever-changing fads about speech. And they should know that they have a right to disagree respectfully with the idea that gender is self-declared. Of course, teasing or aggravating other students—including through the use of names or pronouns—is wrong. But generations have been raised into courteous adults without formal investigations and allegations of federal offense. When common sense goes missing in places like Kiel, something has gone wrong.

Title IX regulations require a district to dismiss a complaint immediately if the allegations, even if proven, wouldn't amount to sexual harassment. That's what should have happened here, so that's what our letter to the district urges it to do: Dismiss the charges, clear these kids' records, and make changes so this doesn't happen again. It isn't too late for the district to do the right thing. It blew the matter out of proportion and has harmed the children who were charged to its care.

This episode doesn't have to become a federal lawsuit, but if the district follows through and punishes these boys solely for "mispronouning," it will.

*Mr. Esenberg is president and general counsel of the Wisconsin Institute for Law & Liberty, where Mr. Berg is deputy counsel.*

*Appeared in the May 24, 2022, print edition as 'The Pronoun Police Come for Middle Schoolers'.*

# Exhibit O



CONNECTING COLLIN COUNTY

**LATEST, EDUCATION + ENRICHMENT**

# Controversy Sparks over Frisco Transgender Students' Right to Choose Preferred Pronouns

BY ALEXANDRA CRONIN
SEPTEMBER 28, 2020



Shutterstock

On Thursday Sept. 24, Wakeland High School in Frisco released its weekly student-produced broadcast, WIN-TV. It's only about 15 minutes, covering everything from dress code, to their COVID-19 numbers, and how to

purchase tickets to varsity football games.

The moment that caused a stir among Frisco parents came about three minutes into the broadcast.

"You can't always know what someone's pronouns are by just looking at them," the news anchor said in the video. "Asking and correctly using somebody's pronouns is one of the most basic ways to show your respect for their gender identity." As many Frisco students may not yet realize, they can update their school profiles with the correct gender pronouns.

Immediately, parents began to respond, both on social media and some directly calling the school.

Reactions varied. Some parents applauded the news, calling it a sign of compassion and a simple way to make all students feel more comfortable. Other parents were concerned. They had not been consulted. Some wanted the right to vote on the issue and whether students should be allowed to display their gender identity.

A Frisco ISD representative confirmed that they had been receiving calls from parents regarding the broadcast. But she says that it's all a misunderstanding and that there has been "some confusion among parents as to what has transpired."

Frisco ISD's decision to allow students to change their preferred pronouns on the district's online system came at the behest of the students themselves.

"Earlier this fall, the District was contacted by students requesting that the District enable a function in Canvas, the online learning platform for middle and high school students, that would allow students to designate their preferred pronouns," says Meghan Cone, Frisco ISD's assistant communications director. "An online petition gathered hundreds of signatures."

A nonbinary Wakeland High School sophomore — a person who doesn't identify with either gender — started the petition over the summer. "I saw an Instagram post for how to enable your pronouns on Canvas, and when I went to try it myself, I saw that this setting was disabled," the student wrote on the petition. "… Since we interact with each other on a regular daily basis, whether in person or virtually, being aware of our peers' pronouns is crucial."

Over 650 students signed the petition in about a week, and on August 31, the district turned on the setting allowing students the option of changing their pronouns.

One petitioner wrote, "I'm signing this because as someone who identifies as genderfluid using the correct pronouns and etc. helps with my dysphoria and it also makes me feel like the space I am in is safe."

"I [may] not have other pronouns besides she/her but we should all be able to be who we truly are," another posted.

Another signer simply wrote: "YES PLEASE."

Cone says Frisco ISD was merely responding to student concerns, not making any kind of policy change. "Students are not required to list their pronouns, but the opportunity is available should students so choose. It is completely voluntary," she says. "Frisco ISD has always worked to foster a safe and welcoming environment that is responsive to student needs."

For almost a month, the change to Canvas wasn't an issue. Then the broadcast class at Wakeland High School chose to highlight their classmate who had started the petition; the video spread like a wildfire through the Frisco parent community.

"Our student journalists have the ability to cover various topics of their own interest as part of the broadcast class," Cone says. "The District seeks to limit the restriction of free student speech to the greatest extent possible."

Cone confirms that while they have heard from parents and seen comments on social media reacting to the report this week, the students had appreciated the change.

Kisha Anderson is a therapist based in Prosper who specializes in LGBT matters. She sees many clients who have struggled with their gender identity and their families. Anderson says what's most important for anyone struggling with gender identity is support and that for students who are are nonbinary or trans, correct pronouns can have a positive impact on their mental health and overall wellbeing.

"When I talk to parents, I tell them we have a choice, we can use their preferred pronouns or keep revisiting suicide attempts," she says. "It seems like an extreme dichotomy, but that's the way it is sometimes."

Unfortunately, suicide rates in trans people are very high. "Adolescence is already so difficult without this," Anderson points out.

Anderson suggests what is missed in the debate is a sad reality: struggling students who need support. A 2016 study found that 40 percent of transgender adults reported having made a suicide attempt and 92 percent of

them attempted suicide before the age of 25.

A teenager struggling with their gender identity is not the only one who is under stress, Anderson adds. For parents, there is stress and pain too.

Anderson sits parents down and asks that they imagine what it would be like to walk through the world being addressed as the wrong gender. Every misplaced "sir" or "ma'am," "he" or "she" would be like a paper cut. At the end of the day, those pricks of pain add up.

"I talk to kids who cry after school because they have been misgendered all day [or] who are traumatized and humiliated when teachers refuse to use pronouns in class." Even something as simple as going to the bathroom becomes complicated because they don't feel safe there. Then they don't go to the bathroom all day.

Further, they are shamed for not fitting in. Many are terrified to tell their parents at all for fear of being rejected or kicked out. Anderson says that it's pretty typical for parents to be resistant to trans experiences—until they realize their child is struggling with it.

"The way they act when it's their kid is completely different. It's no longer a protest, it's curiosity. 'What do I need to do?' 'Is my kid confused?' 'What's going on?' I urge my parents to get support from each other. They feel isolated too."

Often parents feel that their child is losing the values they were raised with, or worry about who their child will be at the end of the day. "It's hard on these kids," she says. "If your kid affirms a gender, it doesn't mean they'll lose the values they were raised with."

Anderson also points out that preferred pronouns are not necessarily permanent, but a simple way for a child to feel supported and at ease. When people are given the respect and freedom to be who they are, Anderson says, the transformation is wonderful to see.

"They're thriving," she says. "They come in to see me at first depressed, suicidal, often self-harming. When the parents jump on board, now that kid is now thriving. They've got self esteem, they're completely comfortable in their own skin, affirmed at home, affirmed at school, not afraid to talk in class. It's such a dramatic change."

Anderson says that based on the petition, the students were asking for the change not simply on their own behalf but on behalf of the whole student body. The student author pointed out that Frisco ISD's mission

5/5/23, 11:... Frisco Sparks Over Transgender Student Pronoun Choices | Frisco...

Case: 2:23-cv-01595-ALM-KAJ Doc #: 7-1 Filed: 05/1/23 Page: 215 of 229 PAGEID #: 330

statement is "to know every student by name and need."

> "Our need is to be better allies to the LGBTQ+ community, and we can be better allies in school by using people's pronouns," the author wrote. "By enabling them on Canvas, it will significantly help LGBTQ+ people in FISD."

Everyone's path is different, Anderson adds. Some teenagers will use a pronoun, but later return to their assigned gender. Others find new life and confidence. "It's important to note that trans kids need a lot of love, comfort, but parents do too."

© 2023 Local Profile is a registered trademark of Community Profile LLC. All Rights Reserved..

# Exhibit P

Case: 2:23-cv-01595-ALM-KAJ Doc #: 1-1 Filed: 05/11/23 Page: 217 of 229 PAGEID #: 332

**The New York Times** | https://www.nytimes.com/2019/11/16/opinion/sunday/pronouns-quakers.html

# What Quakers Can Teach Us About the Politics of Pronouns

In the 17th century, they also suspected that the rules of grammar stood between them and a society of equals.

Nov. 16, 2019

By Teresa M. Bejan

Dr. Bejan is a professor of political theory.

**Sign up for the Opinion Today newsletter** Get expert analysis of the news and a guide to the big ideas shaping the world every weekday morning. Get it sent to your inbox.

Pronouns are the most political parts of speech. In English, defaulting to the feminine "she/her" when referring to a person of unspecified gender, instead of the masculine "he/him," has long been a way of thumbing one's nose at the patriarchy. ("When a politician votes, *she* must consider the public mood.")

More recently, trans, nonbinary and genderqueer activists have promoted the use of gender-inclusive pronouns such as the singular "they/their" and "ze/zir" (instead of "he/him" or "she/her"). The logic here is no less political: If individuals — not grammarians or society at large — have the right to determine their own gender, shouldn't they get to choose their own pronouns, too?

As with everything political, the use of gender-inclusive pronouns has been subject to controversy. One side argues that not to respect an individual's choice of pronoun can threaten a vulnerable person's basic equality. The other side dismisses this position as an excess of sensitivity, even a demand for Orwellian "newspeak."

Both sides have dug in. To move the conversation forward, I suggest we look backward for an illuminating, if unexpected, perspective on the politics of pronouns. Consider the 17th-century Quakers, who also suspected that the rules of grammar stood between them and a society of equals.

Today the Quakers are remembered mainly for their pacifism and support for abolition. Yet neither of these commitments defined the Quaker movement as it emerged in the 1650s from the chaos of the English Civil War. What set the Quakers apart from other evangelical sects was their rejection of conventional modes of address — above all, their peculiar use of pronouns.

In early modern England, the rules of civility dictated that an individual of higher authority or social rank was entitled to refer to himself — and to be referred to by others — with plural, not singular, pronouns. (A trace of this practice survives today in the "royal 'we.'") The ubiquitous "you" that English speakers now use as the second-person singular pronoun was back then the plural, while "thee" and "thou" were the second-person singulars.

When Quakerism emerged, proper behavior still required this status-based differentiation. As one early Quaker explained, if a man of lower status came to speak to a wealthy man, "he must *you* the rich man, but the rich man will *thou* him."

Quakers refused to follow this practice. They also refused to doff their hats to those of higher social standing. The Quakers' founder, George Fox, explained that when God sent him forth, "he forbade me to put off my hat to any, high or low; and I was required to *thee* and *thou* all men and women, without any respect to rich or poor, great or small."

The Quakers thus declared themselves to be, like God, "no respecter of persons." So they *thee*-ed and *thou*-ed their fellow human beings without distinction as a form of egalitarian social protest. And like today's proponents of gender-inclusive pronouns, they faced ridicule and persecution as a result.

But there is also an important difference between the Quakers and today's pronoun protesters. While modern activists argue that equality demands displays of equal respect toward others, the Quakers demonstrated conscientious *disrespect* toward everyone. Theirs was an equality of extreme humility and universally low status. Even the famously tolerant founder of Rhode Island, Roger Williams, couldn't stand the Quakers and complained of the "familiarity, anger, scorn and contempt" inherent in their use of "thee" and "thou."

Indeed, the trend in pronouns at that time was toward a leveling up, not a leveling down. By the middle of the 17th century, in response to increasing geographic and social mobility, the plural "you" had begun to crowd out the singular "thee" as the standard second-person pronoun, even for those of a lower social station. This meant that everyone would soon become, effectively, entitled — at least to the

Case: 2:23-cv-01595-ALM-KAJ Doc #: 71 Filed: 05/11/23 Page: 218 of 229 PAGEID #: 333

honorific second-person plural.

One might expect principled egalitarians like the Quakers to celebrate a linguistic process whereby all social ranks experienced an increase in dignity. But Fox and his followers looked on the universal "you" with horror, as a sign of the sin of pride. Long before he founded Pennsylvania, the Quaker William Penn would argue that when applied to individuals, the plural "you" was a form of idolatry. Other Quakers produced pamphlets citing examples from more than 30 dead and living languages to argue that their use of "thee" and "thou" was grammatically — as well as theologically and politically — correct.

The Quaker use of "thee" and "thou" continued as a protest against the sinfulness of English grammar for more than 200 years. (In 1851, in "Moby-Dick," Herman Melville could still marvel at "the stately dramatic thee and thou of the Quaker idiom.") But eventually, in the 20th century, even the Quakers had to admit that their grammatical ship had sailed.

Modern practitioners of pronoun politics can learn a thing or two from the early Quakers. Like today's egalitarians, the Quakers understood that what we say, as well as how we say it, can play a crucial part in creating a more just and equal society. They, too, were sensitive to the humble pronoun's ability to reinforce hierarchies by encoding invidious distinctions into language itself.

Yet unlike the early Quakers, these modern egalitarians want to embrace, rather than resist, pronouns' honorific aspect, and thus to see trans-, nonbinary and genderqueer people as equally entitled to the "title" of their choosing.

To their critics, however, allowing some people to designate their own pronouns and expecting everyone else to oblige feels like a demand for distinction. Yes, some of these critics may be motivated by "transphobic" bigotry. But others genuinely see such demands as special treatment and a violation of equality. They themselves experience "he" and "she" as unchosen designations. Shouldn't everyone, they ask, be equally subject to the laws of grammatical gender?

According to the Quakers, both sides are right: Language reflects, as well as transforms, social realities. But the dual demands of equality and respect aren't always in perfect harmony. Sometimes they are even in conflict. Respect can require treating people unequally, and equality can mean treating everyone with disrespect.

At present, the battle over the third-person singular subject in English seems to be resolving itself in the direction of the singular "they" — at least when referring to a person of unspecified gender. ("When a politician votes, *they* must consider the public mood.") Pedants naturally complain. They argue that applying a plural pronoun to a singular subject is simply bad English. But as linguists note, spoken English has been tending that way for many years, long before the issue became politicized.

If the rules of grammar are indeed an obstacle to social justice, then the singular "they" represents a path of least resistance for activists and opponents alike. It may not be the victory that activists want. Still, it goes with the flow of the increasing indifference with which modern English distinguishes subjects on the basis of their social position. More fittingly, if applied to everyone, "they" would complete the leveling-up progress of equal dignity that "you" started centuries ago.

Of course, a 17th-century Quaker would be likely to dismiss the singular "they" as diabolically bad grammar. But hey, who asked them?

Teresa M. Bejan (@tmbejan) is an associate professor of political theory at Oxford and the author of "Mere Civility: Disagreement and the Limits of Toleration."

*The Times is committed to publishing a diversity of letters to the editor. We'd like to hear what you think about this or any of our articles. Here are some tips. And here's our email: letters@nytimes.com.*

*Follow The New York Times Opinion section on Facebook, Twitter (@NYTopinion) and Instagram.*

# Exhibit Q

Advertisement





# Reading, Writing, Ratting Each Other Out

By Nicole Neily
June 14, 2021

Much ink has been spilled over the illiberal education that college students receive these days, and how ivory tower-incubated ideas are now finding their ways into society at large. But less well-known is how some of the more devious – and unconstitutional – policies employed by America's colleges and universities have begun to migrate down to the K-12 level as well.

One such program is the bias response team, which encourages students and staff to file reports about perceived "bias incidents" through portals on the school's website – anonymously if individuals so choose. Reports are sent to a school's "team," which is often composed of assorted university officials such as campus police, deans of students, Title IX administrators, and diversity employees. A 2017 report from the Foundation for Individual Rights in Education identified 231 bias response teams operating in higher education institutions across the country, a number which has undoubtedly risen since then.

Advertisement





As Jeffrey Aaron Snyder and Amna Khalid wrote in the *New Republic* in 2016, "They degrade education by encouraging silence instead of dialogue, the fragmentation of campuses into groups of like-minded people, and the deliberate avoidance of many of the most important—and controversial—topics across all academic disciplines."



SUBSCRIBE TO AD-FREE

FREE FOR 7 DAYS

It should surprise nobody that these programs have become weaponized in recent years. Students frequently reported for discussing political and religious topics – which are constitutionally protected on public university campuses, much to the chagrin of these bureaucratic star chambers. Once made aware of these programs' existence, most rational students simply refrain from discussing potentially controversial topics altogether out of an abundance of caution; as a result, whole lines of discussion and arguments that might be found on a nightly news show quietly and conveniently disappear from college campuses.

But to a growing number of K-12 administrators, that chilling isn't a bug – it's a feature. And it's why they're spreading.

In California, the Acalanes Union High School District maintains an online portal "for students to report incidents of harm - acts of racism, bias, sexism, microaggressions, etc." In Massachusetts, Wellesley Public Schools (WPS) maintains a policy on "Responding to Bias-based Incidents," which lists "telling rude jokes" and "using a slur or insult toward a student or their family" as examples of bias-based behavior; slides of a mandatory teacher training provide examples of microaggressions in the classroom, such as "mispronouncing the names of students" and "scheduling tests and project due dates on religious or cultural holidays." Microaggressions in the workplace include saying, "you're so articulate," and "my principal is crazy!"

PROMOTED CONTENT                                                                    mgid ▷









Here's A Secret On How To Clean The Drain

Arlington: These Unsold Storage Units May Now

Dog Excessive Paw Licking: Top Vet Says To

How To Quickly Of Mice In The

In Maryland, the Montgomery County Public Schools plan to launch an online portal where students and parents can report "bias-related" or "hate" incidents. In Massachusetts, Newton Public Schools are in the process of building out a new discrimination and bias response portal, which will be distinct from their existing bullying prevention & intervention website.

existing bullying prevention & intervention website:

This month, a bias response program in Virginia became the target of a federal lawsuit; the Liberty Justice Center is challenging Loudoun County Public Schools' "Share, Speak Up, Speak Out" program, administered by the district's "Student Equity Ambassadors," among other programs.

Bias response programs have come under significant criticism by federal appellate courts, and with good reason. In an October 2019 decision, the 6th Circuit Court of Appeals found that students at the University of Michigan faced "an objective chill based on the functions of the Response Team." In October 2020, a decision from the Fifth Circuit Court of Appeals noted that the University of Texas' Campus Climate Response Team "represents the clenched fist in the velvet glove of student speech regulation."

Students absorb more in school than simply lesson plans; they're also learning how to interact with individuals who come from different backgrounds and viewpoints. Bias response teams send a clear message not only that certain opinions are wrong but that the correct coping method, when confronted with such a situation, is to "go tell the grownups."

Creating the expectation that authority figures can – or should – adjudicate all interpersonal disputes isn't just denying children the opportunity to develop better interpersonal skills. It's also a slippery slope to big government, which by necessity must expand to fulfill this new role.

*Nicole Neily is the president and founder of Parents Defending Education.*

## PROMOTED CONTENT





**Here's A Secret On How To Clean The Drain (Click Here)**
Search Ads



**Getting Rid Of Termites Can Be Easier Than You Think**
Search Ads



**The Number 1 Brand You Should Not Feed Your Dog**
Nutra Complete







### How To Quickly Get Rid Of Mice In The House?
Search Ads

### Unsold Sofas Almost For Nothing In Arlington. (See Prices)
Search Ads

### Arlington: These Unsold Storage Units May Now Be Almost Given Away!
Search Ads



### Arlington: Unsold Refrigerators Are Selling Almost For Nothing!
Search Ads



### New Mobile Stair Lifts Require No Installation
Search Ads

# Exhibit R

# WSJ | OPINION

OPINION | REVIEW & OUTLOOK

# *Parents Prevail Over K-12 'Bias Incidents'*

Wellesley Public Schools amends woke policies after families sue.

By The Editorial Board

Feb. 7, 2022 6:34 pm ET

 Listen to article  (3 minutes)



Students released from Wellesley Middle School in Wellesley, MA wait outside for parents to pick them up in front of the school on March 6, 2020.

PHOTO: DAVID L. RYAN/THE BOSTON GLOBE VIA GETTY IMAGES

Score one more victory for the parental revolt against woke K-12 education.

As part of a legal settlement on Monday, Wellesley Public Schools in Massachusetts agreed to amend practices that parents said excluded some students from events because of their race.

Last year the nonprofit Parents Defending Education sued in federal court on behalf of three Massachusetts families over Wellesley policies and practices that they said violated the First Amendment, the Fourteenth Amendment and civil-rights law. The settlement looks like a solid win for the parents.



🎧 OPINION: POTOMAC WATCH

**Mike Pence, Donald Trump and Jan. 6**

▶  25:18  1x  🔊

SUBSCRIBE

Wellesley's "affinity groups" had held events aimed at specific races. School officials claimed no students or staff were excluded, but the families argued that isn't what their children were told. The complaint quoted an email where a middle-school teacher said a specific "healing space" was "for our Asian/Asian-American and Students of Color, *not* for students who identify only as White."

Under the settlement, Wellesley agreed not to "exclude students from affinity-based group sessions or any other school-sponsored activities on the basis of race." The district won't identify events "as intended only for certain racial groups." It "will provide notice" of affinity-based group sessions "to all grade-eligible students, regardless of their race." Announcements will feature a disclaimer saying that "this event is open to all students regardless of race, color, sex, gender identity, religion, national origin, or sexual orientation."

The parents also challenged Wellesley's policies regarding so-called bias incidents, which they argued were "overbroad" and could apply to "virtually any opinion or political belief." The settlement says Wellesley has "rescinded and will not reinstate" its original bias-reporting procedures.

The district's new policy makes clear it isn't a bias incident if a student "wears a political candidate's button to school" or if "a teacher encourages a political discussion in class and students disagree with each other." Protection for political speech is welcome, since colleges have sometimes claimed it's a bias incident if students use terms like "illegal alien" or dispute claims about transgender identity.

But Wellesley still says bias incidents can include acts of "unconscious bias." Parents Defending Education says the families will watch what happens next, and we'll see whether it takes another round in court to protect students' rights. Meantime, the victory could spur cases elsewhere—or, better, give other districts like Wellesley a reason to change their policies before they get served.



Wonder Land: President Biden must declare the pandemic over, so that Americans can return to normal lives, in which Covid-19 is treated as endemic. Images: AFP/Getty Images/Image of Sport/Zuma Press Composite: Mark Kelly

THE WALL STREET JOURNAL INTERACTIVE EDITION

## POPULAR ON WSJ.COM

U.S.

ECONOMY

### Epstein's Private Calendar Reveals Prominent Names

### The Building Boom Is Prolonging Market Pain

---

FINANCE

### First Republic Bank Is Seized and Bulk Sold to JPMorgan

---

PERSONAL TECHNOLOGY: REVIEW

### We Hope Your iPhone Never Gets Stolen. But Just in Case...

---

REVIEW & OUTLOOK

### Opinion: The Blue State Exodus Accelerates

---

BACK TO TOP

     

WSJ Membership Benefits

Customer Center

Legal Policies

Do Not Sell My Personal Information

Limit the Use of My Sensitive Personal Information



©2023 Dow Jones & Company, Inc.
All Rights Reserved.