IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| PARENTS DEFENDING EDUCATION, <br><br> *Plaintiff*, <br><br> v. <br><br> OLENTANGY LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, *et al.*, <br><br> *Defendants*. | Case No. 2:23-cv-01595 |

**DECLARATION OF NICOLE NEILY**

1. I am the President of Parents Defending Education ("PDE").

2. I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

3. PDE is a nationwide, grassroots membership organization whose members are primarily parents of school-aged children. PDE has members throughout the country. PDE's mission is to prevent the politicization of K-12 education, including government attempts to usurp parents' rights and to silence students who express opposing views. PDE seeks to stop indoctrination in the classroom and promote the restoration of a healthy, non-politicized education for kids. PDE furthers this mission through network and coalition building; investigative reporting; engagement on local, state, and national policies; disclosure of harmful local and national school policies to PDE's members and other parents; advocacy; and, if necessary, litigation.

1

4. PDE has members whose children attend Olentangy Local School District ("District"), including Parents A-D. PDE also has student members that attend Olentangy public schools, including the school-aged children of Parents A, B, and D.

5. I am personally familiar with, and have spoken to, PDE members whose children are enrolled in the District, including those discussed in the complaint and whose declarations have been provided in this case. Based on those conversations and other materials I have reviewed, I know the following.

6. Parents A-D have children who attend District schools. Parents A-D's children will also attend District schools next year.

7. Many of PDE's members, including Parents A-D mentioned in this case, hold traditional views and opinions on matters of sex and gender identity. In particular, Parents A-D and other PDE members within the District believe that sex is determined at birth and is immutable, regardless of an individual's internal perceptions about their identity. They wish to exercise their fundamental rights as parents to guide the upbringing of their children and to instill their children with important values.

8. The children of PDE's members who are enrolled in the District—and PDE's members who are enrolled in District high schools themselves—do not want to be compelled to speak in a particular way about other students' gender identity at school or for school-related tasks and assignments. Moreover, PDE's members, including Parents A-D, want to guide their children's upbringing by instructing them to respectfully decline to affirm other students' claims to be male or female when those claims are inconsistent with biological reality. They also want to direct their children to seek and facilitate open, robust intellectual

discussions on gender identity issues with other students, with the goal of changing those students' minds or, at a minimum, helping those students understand their children's perspectives.

9. Yet PDE's members, including Parents A-D, are unable to effectively exercise their fundamental interest to direct and control the development and upbringing of their children. The children of PDE's members, including Parents A-D's children, limit their speech because they reasonably fear it will be considered "harassment," "bullying," "discriminatory," or otherwise prohibited under the District policies challenged in the complaint. They have seen firsthand that failure to comply with the District's speech policies will lead to "no contact" orders, "contracts," or other written punishments that can lead to suspension or expulsion.

10. Indeed, PDE's members, including Parents A-D, are aware that, according to the District, "[a] student purposefully referring to another student by using gendered language they know is contrary to the other student's identity would be an example of discrimination under Board Policy." Attached as Exhibit S is a true and accurate copy of correspondence between one of PDE's members and the District's attorney.

11. PDE's members, including Parents A-D, are aware that the District has a Gender Support Plan that it claims to use. Attached as Exhibit T is a true and accurate copy of that document, entitled "Title IX Gender Support Plan," obtained pursuant to a Freedom of Information Act request.

12. PDE brought this suit to protect the constitutional rights of PDE's members, their children, and other parents and students within the District.

13. As President of PDE, I am in constant communication with our membership, and I frequently travel to speak to parents with children in K-12 public schools. It is my experience that parents would be far less likely to join PDE if they could not be anonymous. Many members of PDE would limit their communications and participation within the organization if they believed that their names, communications, and contributions could be disclosed to the public or their school. Moreover, many parents would not participate in litigation to vindicate their children's—or their own—constitutional rights if they could not participate anonymously. This is especially true because if the parents' identities are disclosed to the District or the general public, then the identities of their minor children will be exposed as well.

14. I have witnessed the chilling effect that the possibility of retaliation has caused parents. Parents and students are aware of the potential consequences of expressing an unpopular viewpoint. As they have told me and as I have witnessed firsthand, these parents and students have seen numerous people "canceled" for expressing controversial viewpoints. Many parents, for example, have told me that they worry about prospective employers (or current employers) searching their names online, seeing their names associated with accusations of "bigotry" or "hate," and deciding not to hire them (or, in the case of current employers, to fire them). Their children risk similar repercussions.

15. I am also aware of the recent retaliation against students and parents who associate with organizations like PDE, bring litigation, or speak on controversial topics involving schools.

16. For example, Rochester Community School officials in Michigan reportedly "compil[ed] a dossier on parents who commented negatively on the school's virtual learning policy." S. McClallen, *Rochester Schools Collect Dossier, Call Employers on Critical Parents*, The Center Square (Feb. 23, 2022), perma.cc/8LGX-5D8W. "One official even called a parent's employer, which possibly resulted in the parent's termination." *Id.*; *see also* E. White, *Rochester Schools Settles with Parent for $190K After She Said Lost Her Job Criticizing Their Covid Policies*, Fox2 Detroit (Mar. 23, 2022), perma.cc/46LV-UUNP ("Rochester acknowledged that a deputy superintendent … called [the parent's] employer."); N. Neily, *Testimony of Nicole Neily, President of Parents Defending Education Before the House Committee on Judiciary Subcommittee on the Constitution and Limited Government*, Press Release, PDE, at 5 (Mar. 23, 2023), perma.cc/CH2T-9LAS ("*Neily Testimony 2023*") ("In Michigan, Rochester Community Schools was forced to pay a parent after contacting her employer and getting her fired from her job[.]").

17. An Arizona school board president likewise kept "an 'online dossier' with personal information and images of outspoken parents who oppose mask mandates and critical race theory." Y. Steinbuch, *Arizona School Board Head Allegedly Kept 'Dossier' of Parent Info*, N.Y. Post (Nov. 12, 2021), perma.cc/4DR5-KEZP. The dossier also included information on each parent's children. *Id.*; *see also Neily Testimony 2023* at 5 ("In Arizona, one superintendent created a secret dossier on families in the district that was allegedly aimed at intimidating them into silence.").

18. And after a father of two students in Pasco County's Pine View Middle School visited their school with other parents to raise concerns about one of the school's murals, he immediately "got a message from his supervisor at the Hillsborough County Fire-Rescue

5

Department, where he's been a firefighter for nearly 20 years." J. Solochek, *Pasco Dad Seeks Apology After Principal Calls His Boss to Complain*, Tampa Bay Times (Jan. 17, 2023), perma.cc/Y686-NU6T. Pine View's principal reportedly called the fire department and made numerous accusations against the father, leading the department to open a formal investigation into the matter. *Id.*; *see also Neily Testimony 2023* at 5.

19. When a free speech association filed a lawsuit against Virginia Tech on behalf of its student members, a tenured professor at the university publicly called the anonymous students "conservative shitbags" who were "suing the school because they're bigots." Tweet by @prof_gabriele, Joint Appendix 274 in *Speech First v. Sands*, No. 21-2061 (4th Cir.).

20. The experience of Abigail Fisher—the named high-school student who challenged affirmative action in *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297 (2013), and *Fisher v. Univ. of Texas at Austin*, 579 U.S. 365 (2016)—is particularly salient. Ms. Fisher "endured consistent harassment" for years "[a]s a direct result of [her] involvement in that case." *SFFA v. Harvard Coll.*, No. 1:14-cv-14176 (D. Mass. Apr. 29, 2016), ECF 150-4 ¶3. She experienced "threats" and "insults" from across the country and even suffered professionally later in life. *See* ¶¶5, 9-10. According to Fisher, these experiences "often led [her] to second-guess [her] involvement in the case and as an advocate against unlawful affirmative action policies." ¶11.

21. Even public officials are not exempt from targeted intimidation campaigns. Recently, "the home of a state senator who sponsored a bill restricting transgender youth healthcare" was vandalized in retaliation for his support of the bill. B. Winslow, *Social Conservatives, LGBTQ Rights Group Condemn Vandalism at Utah Lawmaker's Home*, Fox13 (Apr. 21, 2023), perma.cc/44ZC-5SUX; *see also* R. Riess & S. Smart, *Utah State Senator's Home*

6

*Vandalized in Possible Retaliation for Transgender Bill, Police Say*, CNN (Apr. 22, 2023), perma.cc/LJ4C-6ZRH.

22. Troublingly, campaigns to intimidate parents and suppress dissenting viewpoints are now coming from federal actors in addition to local government employees. On October 4, 2021, the Attorney General of the United States—at the urging of the National School Board Association—issued a memo "'directing the Federal Bureau of Investigation, working with each United States Attorney, to convene meetings with [government] leaders in each federal judicial district'" for the purpose of intervening against speech that the government found inconvenient. *See Neily Testimony 2023* at 1-2 (citing the letter and providing further discussion). The Attorney General justified this unprecedent intrusion on parents' First Amendment freedoms by citing, among other statutes, the U.S. Patriot Act. *Id.*

23. Unsurprisingly, parents were frightened by this escalation; in the days following the release of the Attorney General's memo, my colleagues and I fielded dozens of requests from concerned parents who worried whether they should continue their advocacy work or simply stay home, fearing a knock at the door from federal law enforcement. *See id.* at 2. Their fears turned out to be well-founded. Shortly after the Attorney General's letter, a federal official sent a memo to Montana officials and others outlining "'federal statutes that may serve as a basis for a prosecution'" of parents who were allegedly disruptive at school board meetings. *Id.* (quoting memo).

24. I understand that being the president of a national association that is sometimes the named plaintiff in lawsuits comes with risks. But most parents and minors whose rights

are being violated are, understandably, unwilling to endure the kind of retaliation that comes with such litigation.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May __7__, 2023.

*Nicole Neily*
Nicole Neily
President, Parents Defending Education

# Exhibit S

From: ▇
Date: Wed, Mar 8, 2023 at 10:41 AM
Subject: Re: Religious protections and freedom of expression
To: Jessica Philemond ▇

Ms. Philemond,

I have ▇ children in the district. I would be happy to join them in discussing this, but by no means do I desire the administration of Olentrangy to instruct my children on such matters without me being present. Please let me know how to proceed.

Thank you,

▇

On Tue, Mar 7, 2023 at 3:49 PM Jessica Philemond ▇ wrote:

▇

In response to your question below, the District would not discipline your ▇ for ▇ religious beliefs. Also, you had previously asked questions about your ▇'s use of pronouns for peers at school. While you did not raise this, if your ▇ would like to discuss accommodations to avoid using pronouns where doing so would be contrary to ▇ religious beliefs, the District is happy to discuss those options with ▇.

Jessica

**Jessica K. Philemond** | ▇
250 East Broad St., Suite 900, Columbus, OH 43215
▇
**www.scottscrivenlaw.com**

**NOTICE OF ATTORNEY/CLIENT PRIVILEGE**
This email message is intended for use only by the individual or entity to which it is addressed. This message may contain information that is privileged or confidential. It is not intended for transmission to, or receipt by, anyone other than the named addressee (or a person authorized to receive and deliver to the named addressee). If you have received this transmission in error, you are hereby notified that any dissemination, distribution, use or copying of this communication is prohibited. Please delete it from your system and notify the sender of the error by reply email or by calling ▇. Thank you.

**From:** ▇
**Sent:** Friday, March 3, 2023 6:44 AM
**To:** Jessica Philemond ▇ >
**Cc:** kevin_obrien ▇ >; krista_davis < ▇ >;

mark_raiff █████████████ >
**Subject:** Re: Religious protections and freedom of expression

Ms. Philemond,

I would like you to respond in writing to this question.

If my child expresses their religious beliefs that marriage is between a man and a woman OR that homosexuality is a sin, will they be disciplined for their beliefs as harassment, bullying per the policy cited in my previous email?

Thank you for your timely response.

████████████

On Mon, Feb 27, 2023 at 10:16 AM Jessica Philemond ████████████████████ wrote:

████████,

I am responding to your e-mail below on behalf of the District. As you are aware, the Olentangy Board of Education has adopted an Anti-Harassment Policy that prohibits discrimination and harassment based upon a student's sex, including sexual orientation and gender identity. While your children certainly maintain religious rights of freedom at school, those rights do not relieve them of the obligation to comply with Board Policy and the code of conduct. A student purposefully referring to another student by using gendered language they know is contrary to the other student's identity would be an example of discrimination under Board Policy. The Board Policy is intended to create a safe learning environment for all students, free of harassment and discrimination, and does not require any student to affirm or deny any individual religious beliefs, but students must comply with Board Policy and school rules. Thank you for seeking clarification.

Jessica

**Jessica K. Philemond** | ████████████████
250 East Broad St., Suite 900, Columbus, OH 43215

████████████████████
www.scottscrivenlaw.com

**NOTICE OF ATTORNEY/CLIENT PRIVILEGE**
This email message is intended for use only by the individual or entity to which it is addressed. This message may contain information that is privileged or confidential. It is not intended for transmission to, or receipt by, anyone other than the named addressee (or a person authorized to receive and deliver to the named addressee). If you have received this transmission in error, you are hereby notified that any dissemination, distribution, use or copying of this communication is prohibited. Please delete it from your system and notify the sender of the error by reply email or by calling ████████████. Thank you.

**From:** ▇▇▇▇▇▇▇▇
**Sent:** Thursday, February 23, 2023 10:09 AM
**To:** Jessica Philemond ▇▇▇▇▇▇▇▇; kevin_obrien ▇▇▇▇▇▇▇▇; krista_davis ▇▇▇▇▇▇▇▇; mark_raiff ▇▇▇▇▇▇▇▇
**Subject:** Re: Religious protections and freedom of expression

Please let me know when I can expect a response.

On Fri, Feb 17, 2023 at 4:50 PM ▇▇▇▇▇▇▇▇ wrote:
Good morning,

I would like an official statement from the district on the attached snip from the district website.

If my devoutly Christian child who believes in two biological genders male/female and that those genders are decided at conception by God, would they be forced to use the pronouns that a transgender child identifies with or be subject to reprimand from the district if they refuse to do so?

I would like to remind the district of the Shawnee State University case in the 6th Circuit and how it was decided in favor of the professor and his religious beliefs.   This was also proven in Kansas as well as Wisconsin and an upcoming case in VA where the Solicitor General and Attorney General are in support of the teachers religious freedom.   You can not compel a child with deeply held religious beliefs to go against those beliefs inside the school system.

https://www.npr.org/2022/04/20/1093601721/shawnee-state-university-lawsuit-pronouns

https://www.nixonpeabody.com/insights/alerts/2021/03/29/religious-freedom-ruling

Please provide me with a written response.
▇▇▇▇▇▇▇▇

# Exhibit T

**Confidential Student Education Record**
**Olentangy Local School District**
**Title IX Support Plan**

---

School _____    Today's Date _____

Name Student Uses: _____    Pronouns Student Uses: _____

Name on Birth Certificate: _____    Sex Assigned at Birth _____

Date of Birth _____    Student's Grade Level _____

Sibling(s)/Grade(s) _____ / _____   _____ / _____

Parent(s), Guardian(s), or Caregiver(s) /relation to student

_____ / _____    _____ / _____

_____ / _____    _____ / _____

Meeting participants: _____

---

**PRIVACY: CONFIDENTIALITY AND DISCLOSURE**

A student's Gender Identity Support Plan is a confidential education record and shall only be shared with educators who have a legitimate educational interest in the plan and as permitted by state and federal law.

How public or private will information about this student's gender be (check all that apply)?

_____ District staff will be aware (Superintendent, Student Support Services, District Psychologist, etc.)
Specify the adult staff members: _____

_____ Site level leadership/administration will know (Principal, head of school, counselor, etc.) NOT teachers.
Specify the adult staff members: _____

_____ Teachers and/or other school staff will know (including admin and school counselor)
Specify the adult staff members: _____

_____ Student will not be openly "out," but some students are aware of the student's gender
_____ Student is open with others (adults and peers) about gender
_____ Other – describe: _____

**Confidential Student Education Record**
**Olentangy Local School District**
**Title IX Support Plan**

### PRIVACY: NAMES, PRONOUNS AND STUDENT RECORDS

**Where required by law, the district will use the student's legal name (birth name or legal name, if changed). All other records will reflect the student's preferred name.**

Name to be used when referring to the student _____ Pronouns _____
Name/gender marker as listed on the student's identity documents _____
Name/gender marker entered into the Student Information System _____

*Complete a *FERPA – Request to Amend Education Records* form if legal education records need to be amended.

### USE OF FACILITIES

Student will use the following bathroom(s) on campus _____
Student will change clothes in the following place(s) _____
If student/parent have questions/concerns about facilities, who should they contact? _____
What are the expectations regarding the use of facilities for any class trips? _____
What are the expectations regarding rooming for any overnight trips? _____
Are there any questions or concerns about the student's access to facilities? _____

### EXTRA-CURRICULAR ACTIVITIES

In what extra-curricular programs or activities will the student be participating (sports, theater, clubs, etc.)? _____
What steps will be necessary for supporting the student in these spaces? _____
Does the student participate in an after-school program? _____
What steps will be necessary for supporting the student in these spaces? _____

### OTHER CONSIDERATIONS

Are there any other questions, concerns or issues to discuss? _____
_____
_____
_____
_____
_____
_____

### NEXT STEPS: SUPPORT PLAN COMMUNICATION

Based on the adjustments detailed above, who are all of the individuals that need to be informed about any changes (use of a different name, access to facilities, changes in student records, etc.) _____
_____
_____
_____

Who will be responsible for making sure these individuals are informed? _____
**The student, parent/guardian or school officials may revisit this plan upon request.**

1/10/23     2

**Confidential Student Education Record**
**Olentangy Local School District**
**Title IX Support Plan**

| **PARTICIPANT SIGNATURES** |

| Name | School Social Worker | Date |
|---|---|---|
| | Title | |
| Name | Student | Date |
| | Title | |
| Name | School Administrator | Date |
| | Title | |
| Name | School Counselor | Date |
| | Title | |
| Name | Parent | Date |
| | Title | |
| Name | Title | Date |

| **REVIEW AND/OR REVISIONS** |

This document should be reviewed and revisited in order for the most up to date information to be documented. If there is a revision, attach an amendment to the original plan.

Review date: _____ Revision? Yes / No
Review date: _____ Revision? Yes / No
Review date: _____ Revision? Yes / No
Review date: _____ Revision? Yes / No

1/10/23                                                                                                                  3