**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO EASTERN DIVISION**

| | | |
|---|---|---|
| **PARENTS DEFENDING EDUCATION** : | Case No. 2:23-CV-01595 | |
| : | **Chief Judge Algenon L. Marbley** | |
| Plaintiff, | **Magistrate Judge Kimberly A. Jolson** | |
| v. : | | |
| **OLENTANGY LOCAL SCHOOL DISTRICT BOARD OF EDUCATION,** et al. : | **DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S COMPLAINT** | |
| Defendants. : | | |

## I.  BACKGROUND

This case was filed by Plaintiff, an organization, purportedly on behalf of member parents and students and non-member students, seeking dispensation under the free speech clause of the First Amendment to harass other students based on their gender identity. See Doc. # 1, generally. The Christian, cisgender students specifically allege that they want to **openly** discuss their views on gender identity and the immutability of sex. See Docs. # 7-3, 7-4, 7-5, 7-6. They are not illegal immigrants subject to deportation.  They are not gay soldiers under Don't Ask Don't Tell.  They're not African-Americans in the Jim Crow south.  They've not been systematically oppressed.  They're members of the majority who want to—under the guise of the First Amendment—openly voice their opposition to an historically maligned minority group, transgendered people.  See Doc. # 1.

II.     LEGAL ANALYSIS

    **A. This Court lacks Subject Matter Jurisdiction Because There is no Case or Controversy.**

        *1. Plaintiffs have not identified any student that has suffered or will imminently suffer any harm.*

Plaintiff's brazen attempt to align the interests of their members to historically subverted and oppressed populations aside, they've still failed to specifically identify members that have suffered injury. In construing Summers, the Ninth Circuit explained the distinction: "Where it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury, we see no purpose to be served by requiring an organization to identify by name the member or members injured." Natl. Council of La Raza v. Cegavske, 800 F.3d 1032, 1041 (9th Cir.2015).

Here, it is *not* clear—the Defendants have been emphatic in asserting that the anonymous claims here are *entirely* speculative. The members and students Plaintiff claims to have "identified" have not suffered an injury in fact and are not at imminent risk thereof.

Plaintiff attempts to establish standing by citing policies in piecemeal in order to manufacture a strict liability basis for school punishment where none exists. As pointed out, Policy 5517 proscribes *harassment*; it is not a speech policy. Moreover, harassment is specifically defined as: "any threatening, insulting, or dehumanizing gesture, use of technology, or written, verbal or physical conduct directed against a student or school employee that: A. places a student or school employee in reasonable fear of harm to his/her person or damage to his/her property; B. has the effect of substantially interfering with a student's educational performance, opportunities, or benefits, or an employee's work performance; or C. has the effect of substantially disrupting the orderly operation of a school." See Doc. # 24-1, at PAGEID# 537-38. Members of the school

community who believe they have been unlawfully harassed are entitled to utilize the Board's complaint process, which can be informal or formal, and requires a complainant.  Id. at PAGEID# 541-43. E.g., a student who believes that they've been purposefully misgendered and that such action arises to the level of harassment as specifically defined in the policy.

And, yes, the District policies further provide that its policies are strictly enforced.  Yet, again, the policy proscribes harassment and bullying.  But, no, the District has not refused to provide assurances that students wouldn't be punished for pronoun references in accordance with students' sincerely held beliefs about gender, and Plaintiffs' Exhibit S reveals such.  District counsel indicated that purposeful misgendering would be discrimination but that students would not be disciplined for their deeply held views. Doc. # 24-2 at PAGEID# 770-71.

As held by this Court, the conduct that the students' allegedly seek to engage in is not proscribed by the policies, harassment is:

> On the other hand, much of the speech discussed by PDE consists of neutral, respectful, and generalized discussions of gender identity issues. (See, e.g., Decl. of Parent D ¶ 21, ECF No. 7-6) (noting their children's desire to "express[] an opinion about the nature of biological sex (whether based on science or religion)"). Such speech should be permitted, as it neither targets nor expresses disrespect for particular individuals or groups. And, in fact, there is nothing to suggest that such speech is prohibited under the Policies, except for the parents' subjective beliefs that it is. No email, communication, or past enforcement of the Policies provides any indication that they cover speech expressing disagreement with transgender students' identity or beliefs in a respectful, non-derogatory manner.
>
> Instead, a plain reading of the Policies indicates that they prohibit only that subset of discriminatory speech that creates a threat of physical harm, interferes with students' educational opportunities, substantially disrupts the operation of schools, or causes or contributes to a hostile environment. Each of these reasons for regulating school speech is permitted by the First Amendment. It also appears that the Policies allow students to continue engaging in well-intentioned, respectful discussions about gender identity, as the First Amendment contemplates.

See Doc. # 28, PAGEID# 836-37.

There is a difference between, perhaps, a student's desire to wear a t-shirt with a message that displays their view, e.g., a shirt that says "gender is immutable" compared to a student directly and personally harassing a transgender student for wanting to be referred to by a pronoun that doesn't correspond with their gender at birth. One is protected by the First Amendment in the K-12 setting and one is not, and only the unprotected activity is what is proscribed by the policies at issue. The policies do not proscribe discussion on the fluidity of gender, nor could they. As specifically pled by Plaintiff, teachers have discussed the issue of gender identity in school and offered pronoun surveys. A pronoun survey offered by the District is not adopting a point of view. That there are people in this country, including students in the District, that identify with a gender that does not correspond with their sex assigned at birth is a fact. That there are people in this country, including students in the District, that want to be called by a different pronoun is fact. The anonymous members' deeply held beliefs that this goes against their own religious or scientific beliefs does not negate these facts. Moreover, all students, including the anonymous members are free to respond to discussions on gender identity in general to the effect that their religion teaches that gender is immutable. This is what the members assert they'd like to do and the policies at issue do not even arguably proscribe this conduct.[1]

This case is distinguishable from the cases upon which Plaintiff relies for numerous reasons. First, Plaintiff overwhelmingly relies on cases outside of the K-12 context and on cases that implicate strict scrutiny. But Tinker is the standard, not strict scrutiny, because the Court recognized the unique environment of the school setting as distinctively different. The most

---

[1] Though the declarations do include contradictory contentions: the students allegedly want to openly discuss the issue while simultaneously stating that they do not believe gender identity should be discussed in school at all. See Doc. # 7-3, ¶ 6 (Parent A believes gender should only be discussed with families); Doc. # 7-4, ¶ 6 (same for Parent B); Doc. # 7-5, ¶ 5 (same for Parent C); Doc. # 7-6, ¶ 6 (same for Parent D).

analogous argument of this case to Tinker is a negative analogy regarding the pronoun bracelets decried by Plaintiff. Doc. # 1, ¶ 140. Therein, Plaintiff expressly alleges that pronoun bracelets had been offered for sale and that the wearing of such bracelets expresses that a student is considered an "ally." Id. Notably, Plaintiff does not allege that the *District* sold these bracelets or that the *District* suggests that students who don't wear them are "enemies." The bracelets are precisely the sort of speech governed by Tinker— a bracelet instead of an arm band. A student's desire to express their opinion regarding gender identity through a bracelet is protected by the First Amendment. The flip side of that coin is that the anonymous members here *have* exercised their own First Amendment rights, unencumbered by the District, to *not* wear the bracelets to express their own opinions. That other students might interpret that choice in a certain manner does not change the nature of the expressive conduct, unless it qualifies under one of the Tinker requirements (e.g., substantial disruption or interfering with the rights of others).

If instead of asking this Court to void the policies protecting students from direct *harassment*, the anonymous students had desired to wear arm bands or bracelets that communicated the message "gender is not fluid," their speech would be protected and preventing such speech would constitute an injury to confer standing. To be sure, some students and teachers may find this view offensive. It is implied from the declarations that the anonymous students and parents found the pronoun bracelets to communicate a message that is likewise offensive to them, as it goes against their deeply held beliefs. Yet, Plaintiff would not assert that students should not be permitted to wear the bracelets, which neither substantially disrupt the learning environment nor interfere with the rights of others.

Moreover, Plaintiff's conclusion of the "recent amendment" is likewise unavailing, and the cases cited in reliance do not support Plaintiff's position. As seen at the bottom of Policy 5517,

the changes made in September 2022 and April 2023 are marked as "T.C.," which means technical correction. In this instance, it was to update the name of the Compliance Officers. Moreover, as represented to the Court at the hearing on July 24, 2023, the inclusion of the prohibition on harassing students based on sexual orientation and transgender has been part of the policy since 2013. Transgender identity was added to Policy 5136 in 2017. Plaintiff relies on Speech First, Inc. v. Fenves, 979 F.3d 319 (5th Cir.2020), to conclude without analysis that policy amendments create a credible threat of enforcement. First, Fenves is a Fifth Circuit case that has been specifically distinguished by courts in the Sixth Circuit as inapplicable: "The Sixth Circuit's jurisprudence on standing, in particular, the issue of whether there exists a credible threat of prosecution, bears considerable differences from the Fifth and Eighth Circuit's." Am. College of Pediatricians v. Becerra, E.D.Tenn. No. 1:21-cv-195, 2022 U.S. Dist. LEXIS 209569, at *37 (Nov. 18, 2022). Second, the "recently enacted" language was a single quotation to another case and the Fifth Circuit did not dedicate any of its opinion to a discussion about purported revisions to the policies University of Texas at Austin with the exception of a discussion on mootness for post-Complaint revisions.

Plaintiff's carefully-plucked language criticizing the District for "vigorously litigating" the lawsuit it filed against Defendants is likewise misleading. Therein, Plaintiff cites to Online Merchants Guild v. Cameron, 995 F.3d 540 (6th Cir.2021). In that case, the plaintiff, Online Merchants Guild, challenged the constitutionality of Kentucky's price-gouging law as applied to sellers on Amazon early in the COVID-19 pandemic (e.g., elevated prices for things like hand sanitizer and masks, etc.) based on the Commerce Clause. The state's attorney general had previously sent subpoenas and civil investigative demands in state court stating they had reason to believe violations occurred. Moreover, the Sixth Circuit likewise found that the Attorney General

engaged in significant posturing regarding his price-gouging investigations in public comments: that third-party sellers suspected of price gouging "will not be tolerated in Kentucky," and warned that the subpoenas and civil investigative demands "should serve as a warning to anyone who tries to illegally profit from COVID-19." As gleaned from the case, the "vigorously litigated" concept is not regarding defense of the current suit, otherwise a plaintiff could create standing simply by filing a lawsuit. Rather, "vigorously litigated" references *past enforcement*—something the Plaintiff has failed to present in this case.

Plaintiff also incorrectly asserts that the Stay Safe Speak Up hotline is the equivalent of bias reporting systems at universities. Plaintiff relies on Speech First, Inc. v. Schlissel, 939 F.3d 756 (6th Cir.2019), in support. In Schlissel, the University of Michigan enacted a policy prohibiting harassing and bullying behavior, but utilized broad Merriam-Webster definitions for the terms instead of legal definitions. The university also had what it called a Bias Response Team, which allowed anyone to submit complaints of a "bias incident," which was defined "conduct that discriminates, **stereotypes**, **excludes**, harasses or harms anyone in our community based on their identity (such as race, color, ethnicity, national origin, sex, gender identity or expression, sexual orientation, disability, age, or religion)." Speech First challenged the policies as overbroad. In agreeing with the plaintiff, the Sixth Circuit agreed the Merriam-Webster definitions were overbroad. Moreover, the Court criticized the Bias Response Team for the implications that attached from its name alone: "The very name 'Bias Response Team' suggests that the accused student's actions have been prejudged to be biased. The name is not the 'Alleged Bias Response Team' or 'Possible Bias Investigatory Team.' It is the 'Bias Response Team.' And as such, the name intimates that failure to meet could result in far-reaching consequences, including reputational harm or administrative action."

Here, the "Stay Safe Speak Up" hotline name doesn't carry the same connotations. Moreover, District guidance specifically defines bullying, harassment/discrimination in legal terms, not the overbroad Merriam-Webster terms like "annoy" or "frighten."  See Doc. # 24-1 at PAGEID# 627.  Further, it bears noting again the differences in regulation in the university versus the K-12 context.  Accordingly, it is clear that the cases upon which Plaintiff relies are not analogous.

Because the students, through Plaintiff, aren't asking this Court to allow them to harass others based on their views on gender and the District's unequivocal confirmation that they will not be disciplined for discussing their religious views, there is simply no controversy to resolve.  Accordingly, this Court lacks subject matter jurisdiction and this case must be dismissed.

  2. *Plaintiff's unidentified parent members have not suffered and will not imminently suffer any concrete injuries.*

In its opposition, Plaintiff contends that the anonymous parents have standing to bring Fourteenth Amendment claims, contending that three things qualify for an injury: (1) their *children's* self-censorship; (2) their *children's* loss of self-esteem; and (3) the parents' anxiety and "crisis of conscience."  Plaintiff also attempts to establish an injury in fact for the parents based on the *children's* alleged desire to discuss gender identity with their friends.  Plaintiff simply concludes, without support that "if the parents teach their children how they wish and their children do not self-censor, then there is a credible risk of the school punishing their children under the challenged policies, harming them in a host of ways."  Doc. # 24, PAGEID# 529.

Yet, none of these qualifies as an injury to the parents.  Worry is not an injury for a standing analysis—the injury has to be an interference with constitutional rights.  The parents never allege, and the policies relied upon by Plaintiff do not bare out, any credible allegations that the District policies enter into the "zone of the parental" by preventing the parents from teaching their children

- 9 -

as they wish. Rather, the Complaint makes abundantly clear that the parents have done so and continue to do so—the declarations of all the anonymous parents swear that "I have raised my child to believe that biological sex is immutable and does not change based on someone's internal feelings." Doc. # 24-3, ¶ 7; Doc. # 24-4, ¶ 7; Doc. # 24-5, ¶ 6; Doc. # 24-6, ¶ 7. Moreover, they further declare specifically that their children in fact do believe that sex is binary and immutable. Doc. # 24-3, ¶ 8; Doc. # 24-4, ¶ 8; Doc. # 24-5, ¶7; Doc. # 24-6, ¶ 8. Therefore, it appears that the anonymous parents have not been interfered with in their rights to teach their children their own religious values at home; rather, they've successfully imparted their chosen beliefs. Their subjective fears that their children may be disciplined are both unsubstantiated and insufficient to establish an injury to the parents. Worry does not supply an injury in fact so as to manufacture standing for the parents' claims.

Plaintiff's citation to Mahanoy Area School Dist. v. B.L., ___U.S.___, 141 S.Ct. 2038, 2046, 210 L.Ed.2d 403 (2021), is again unavailing. First, Mahanoy did not involve parent claims pursuant to the Fourteenth Amendment. The parents were only plaintiffs in their capacity as parents. Second, Mahanoy likewise did not discuss the issue of standing at all. Rather, Plaintiff again conveniently plucks out the phrase "zone of parental," but it has no teeth here. In discussing the "zone of parental," the Court was analyzing the regulation of a student's off-campus speech in the context of *in loco parentis*. Instead, parental standing in this regard has been found, for example, when a state law mandates public school attendance, as that is an interference with a parent's right to send their child to a religious school if desired. See, e.g., Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

Accordingly, it is clear that the unidentified parents have not suffered any concrete injury. Moreover, their hypothetical injuries would be of their own doing. No District policy tells the

**FREUND, FREEZE & ARNOLD**
**A Legal Professional Association**

parents and students that they cannot discuss the fluidity or immutability of gender in their homes. No District policy tells the parents and students that they will be disciplined for discussing their religious views on gender. No District policy tells parents they must educate their children to believe that gender is fluid. Therefore, the unidentified parents lack standing for their purported Fourteenth Amendment challenges and the Complaint must be dismissed.

### III. CONCLUSION

Based on the foregoing, Defendants Olentangy Local School District Board of Education, Kevin Daberkow, Brandon Lester, Kevin O'Brien, Libby Wallick, LaKesha Wyse, Mark T. Raiff, Randy Wright, and Peter Stern respectfully request this Court dismiss Plaintiff's Complaint for the reason that this Court lacks subject matter jurisdiction and Plaintiff lacks standing because there is no case or controversy and no injury in fact.

Respectfully submitted,

*/s/ Bartholomew T. Freeze*
Bartholomew T. Freeze (0086980)
Myrl H. Shoemaker, III (0099149)
FREUND, FREEZE & ARNOLD
Capitol Square Office Building
65 East State Street, Suite 800
Columbus, OH 43215-4247
Phone: (614) 827-7300
Fax: (614) 827-7303
bfreeze@ffalaw.com
mshoemaker@ffalaw.com
*Counsel for Defendants Olentangy Local School District Board of Education, Mark T. Raiff, Randy Wright, Peter Stern, Kevin Daberkow, Brandon Lester, Kevin O'Brien, Libby Wallick and LaKesha Wyse*

*and*

- 11 -

                                              Jessica K. Philemond (0076761)
                                              Sandra R. McIntosh (0077278)
                                              Mitchell L. Stith (0096759)
                                              SCOTT SCRIVEN LLP
                                              250 E. Broad St., Suite 900
                                              Columbus, OH 43215
                                              jessica@scottscrivenlaw.com
                                              sandra@scottscrivenlaw.com
                                              mitch@scottscrivenlaw.com
                                              *Co-Counsel for Defendant Olentangy Local School District Board of Education*

## CERTIFICATE OF SERVICE

      A true and accurate copy of the foregoing was served this 1st day of August 2023, via the Court's electronic filing system, upon:

| | |
|---|---|
| Emmett E. Robinson (OH Bar No. 88537) | J. Michael Connolly |
| Trial Attorney | Taylor A.R. Meehan |
| ROBINSON LAW FIRM LLC | James F. Hasson |
| 6600 Lorain Ave. #731 | Thomas S. Vaseliou |
| Cleveland, OH 44102 | CONSOVOY McCARTHY PLLC |
| Telephone: (216) 505-6900 | 1600 Wilson Blvd., Ste. 700 |
| Facsimile: (216) 649-0508 | Arlington, VA 22209 |
| erobinson@robinsonlegal.org | mike@consovoymccarthy.com |
| Counsel for Plaintiff | taylor@consovoymccarthy.com |
| | james@consovoymccarthy.com |
| | tvaseliou@consovoymccarthy.com |

                                              /s/ Bartholomew T. Freeze
                                              Bartholomew T. Freeze (0086980)