```
                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
                        EASTERN DIVISION

PARENTS DEFENDING EDUCATION,     )
                                 )
   PLAINTIFF,                    )     CASE NO. 2:23-cv-1595
                                 )
        vs.                      )
                                 )
OLENTANGY LOCAL SCHOOL DISTRICT  )
BOARD OF EDUCATION, et al.,      )
                                 )
                                 )
   DEFENDANTS.                   )
_____)



       TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS
           BEFORE THE HONORABLE ALGENON L. MARBLEY
               UNITED STATES DISTRICT JUDGE
              JULY 31, 2023; 10:00 A.M.
                    COLUMBUS, OHIO



   APPEARANCES:

   FOR THE PLAINTIFF:
        Consovoy McCarthy PLLC
        By:  James F. Hasson, Esq.
             John M. Connolly, Esq.
        1600 Wilson Boulevard, Suite 700
        Arlington, Virginia  22209

        Robinson Law Firm LLC
        By:  Emmett E. Robinson, Esq.
        6600 Lorain Avenue #731
        Cleveland, Ohio  44102
```

```
    APPEARANCES CONTINUED:

FOR THE DEFENDANTS:
      Scott Scriven LLP
      By:  Jessica K. Philemond, Esq.
      250 East Broad Street, Suite 900
      Columbus, Ohio  43215

      Freund, Freeze & Arnold
      By:  Bartholomew T. Freeze, Esq.
           Genevieve Hoffman, Esq.
      620 East Broad Street, Suite F
      Columbus, Ohio  43215
```

- - -

```
      Proceedings recorded by mechanical stenography,
transcript produced by computer.
```

3

1                                MONDAY MORNING SESSION

2                                    JULY 24, 2023

3                               - - -

4    (The following proceeding was held in chambers with all

5 counsel present.)

6        THE COURT:  Good morning, everyone.

7     I'm going to have you introduce yourselves on the record

8 when we get back in court, but I'll have you do that now so I

9 know who I'm talking to.  So counsel for the plaintiff.

10        MR. HASSON:  James Hasson with my colleagues --

11        THE COURT:  Mr. Hasson, where are you from?  I know

12 there are two firms involved.

13        MR. HASSON:  From Consovoy and McCarthy based out of

14 Virginia.

15        MR. CONNOLLY:  Michael Connolly from Consovoy and

16 McCarthy.

17        MR. ROBINSON:  Emmett Robinson from Robinson Law Firm.

18 It's generously called a firm.

19        THE COURT:  And that's in Cleveland, right?

20        MR. ROBINSON:  That's right.

21        THE COURT:  Counsel for the defense.

22        MR. FREEZE:  Bartholomew Freeze, Freund, Freeze and

23 Arnold.

24        MS. HOFFMAN:  Genevieve Hoffman, Freund, Freeze and

25 Arnold.

4

1      MS. PHILEMOND:  Jessica Philemond, Scott Scriven.

2      MS. FAUST:  Sarah Faust, Scott Scriven.

3      THE COURT:  It's been a while, Ms. Philemond.

4  You might be the only one who knows what I'm going to

5  say here.  First of all, I was going to determine whether --

6  who -- whether you were going to have witnesses today?

7      MR. HASSON:  No, Your Honor.

8      THE COURT:  So you're just going to be arguing points

9  of law.  You're going to be relying on the affidavits.  Fair

10 statement?

11     MR. HASSON:  That's correct, Your Honor, truly on our

12 briefs and attached exhibits.

13     THE COURT:  Good enough.

14 That brings me to the most -- the important question.  I

15 wanted to make sure -- I know that all of you have done a

16 number of probably circuit arguments and oral arguments before

17 different judges and different venues throughout the country.

18 And there's one thing that's common among all of us is that a

19 judge's questions are opportunities to persuade.  If you don't

20 answer my questions, then your opportunity to persuade me is

21 essentially torn asunder.

22 So I want to make sure that everybody understands that I

23 read the briefs and, equally as important, I've done my own

24 independent research so I know what the law really says.  I

25 don't need anyone to read me their briefs.  I'm sure everyone

5

1    has beautiful outlines you would like to get through.  If you

2    don't get through them, don't worry about it.  The only purpose

3    for oral argument is for you to answer my questions so I can

4    fill in gaps in my knowledge and get a better understanding of

5    the arguments.

6         The briefs were well written.  They were clear.  But

7    even clear briefs need backfill from time to time.  And there's

8    some unsettled areas of law.

9         So I just want you to understand the importance of

10   answering my questions and, in exchange, I will promise you

11   that I will allow you to say whatever you want to say about my

12   questions and to elaborate on your answers.  But I need my

13   questions answered as asked because, when you answer them as

14   asked, I want you to understand, at least from this judge, that

15   that is not a concession.  It's simply an answer.  A lot of

16   times lawyers say, well, if I answer it this way, I'm conceding

17   this point.  If you don't answer it, you lose the point.  So a

18   loss, a concession, is essentially the same thing.  It might be

19   a distinction without a difference.

20        So I want to make it clear on an important issue such as

21   this that my questions are answered clearly because like -- as

22   you have seen, other courts in the country are struggling with

23   some of these same issues.  So there are no clear-cut answers;

24   so the questions may be nuanced and your answers may be

25   nuanced.  If you have nuanced answers, they might beget other

1    questions.  The key is to answer the questions as asked so we

2    can gain clarity in some of these murky areas.

3        Any questions from the plaintiff?

4        MR. HASSON:  No, Your Honor.

5        THE COURT:  Any questions from the defense?

6        MR. FREEZE:  No, Your Honor.

7        THE COURT:  Who is going to argue for the plaintiff?

8        MR. HASSON:  I will, Your Honor.

9        THE COURT:  Who is going to argue for the defendants?

10       MR. FREEZE:  I will.

11       THE COURT:  Good enough.  Let's get started.

12     (End of chambers conference.)

13     (The following proceeding was held in open court.)

14       THE COURT:  Ms. Stash, would you please call the case.

15       THE DEPUTY CLERK:  Case No. 2:23-cv-1595, Parents

16   Defending Education v. Olentangy Local School District Board of

17   Education, et al.

18       THE COURT:  Would counsel please identify themselves

19   for the record beginning with counsel for the plaintiff.

20       MR. HASSON:  Yes, Your Honor.  James Hasson for

21   plaintiff, Parents Defending Education, with my colleagues

22   Michael Connolly and Emmett Robinson.

23       THE COURT:  Good morning.  Counsel for the defense.

24       MR. FREEZE:  Good morning, Your Honor.  Bartholomew

25   Freeze for the Olentangy Local School District Board of

1    Education and its board members and employees who have been

2    named in the lawsuit.

3         MS. HOFFMAN:  Genevieve Hoffman with Freund, Freeze

4    and Arnold for the defendants.

5         MS. PHILEMOND:  Jessica Philemond with Scott Scriven

6    for the defendants.  And that completes defense counsel.

7         THE COURT:  For the record, Ms. Philemond, would you

8    identify the other persons at counsel table.

9         MS. PHILEMOND:  Yes, Your Honor.  With us today is

10   Todd Meyer, superintendent of Olentangy Schools, and a summer

11   clerk from our office, Sarah Faust.

12        THE COURT:  Ms. Faust, please stand.  I can't see you

13   over -- good morning, Ms. Faust.

14        Ms. Faust, where are you a student?

15        MS. FAUST:  I'm a student at the Ohio State

16   University.

17        THE COURT:  What year are you?

18        MS. FAUST:  I just finished my first year of law

19   school.

20        THE COURT:  What do you think?

21        MS. FAUST:  It was an interesting experience, Your

22   Honor.

23        THE COURT:  That's a fair and honest answer.  That's a

24   fair and honest answer.

25        We're here this morning on the plaintiff's motion for a

8

1   preliminary injunction.  Mr. Hasson and Mr. Freeze, each side

2   will have 30 minutes.  Mr. Hasson, you may reserve time for

3   rebuttal.

4        I'm going to ask all of you to first address the issue

5   of standing and then address the four prongs of the preliminary

6   injunction standard, or at least structure your argument within

7   the four prongs.  I'm going to give you all a hint, though.  I

8   think it was the Cheshire Cat who said if you don't know where

9   you're going, it doesn't matter which road you take.

10       So I find compelling the likelihood of success on the

11  merits prong.  I think that that's one that merits some

12  emphasis.  I want to know something, too, about the balancing

13  of hardships, where you juxtapose a student's desire to call --

14  let's say that there is a trans student who was born physically

15  identifiable as male whose name was Terrence but he came to

16  realize that he was female and he changed his name to Terri.

17  So I want to balance the hardship that's visited upon one of

18  the anonymous parents' students -- kids -- whether it's more

19  difficult for them to simply call the student Terri than it is

20  for him to reconcile Terri with his well-founded religious

21  beliefs.

22       That's just a preview of some of the questions that I

23  have contemplated since this motion came in.

24       Mr. Hasson, are you ready to proceed?

25        MR. HASSON:  Yes, I am, Your Honor.

9

1          THE COURT:  Please proceed.

2          How much time do you wish for rebuttal?

3          MR. HASSON:  I'd like to reserve five minutes for

4    rebuttal.

5          THE COURT:  Ms. Stash is the official timekeeper.

6          Mr. Hasson, please proceed.

7          MR. HASSON:  Thank you, Your Honor.

8          May it please the Court.  James Hasson for the

9    plaintiff, Parents Defending Education.  In *West Virginia v.*

10   *Barnette*, the Supreme Court held that public schools cannot

11   compel students to profess beliefs they do not hold.  It

12   emphasized there are no, quote, circumstances which permit an

13   exception to this rule.

14         The topics of public debate may be different today than

15   they were then, but the First Amendment principle applies all

16   the same.  By requiring students to salute the flag, the school

17   district in *Barnette* forced them to publicly, quote, affirm a

18   belief and attitude of mind to their classmates.  That was

19   compelled speech and it was unconstitutional.  By requiring

20   PDE's members to use pronouns that do not align with biological

21   sex, the Olentangy School District is forcing them to

22   publically --

23         THE COURT:  Let's take that for a minute: Terrence and

24   Terri.  Why can't those kids simply call someone by their new

25   name: Terri?  They don't have to use a pronoun.  They don't

1  have to say his or her.  They can just say this is Terri's coat

2  as opposed to this is Terrence's coat.

3        What harm could that possibly visit about your client's

4  child?  What difference does it make for the child to call

5  somebody Terri instead of Terrence?

6        MR. HASSON:  That's a great question, Your Honor.  I'd

7  like to begin by emphasizing first that our focus is on

8  pronouns because, as the Sixth Circuit recognized, those do --

9  recognized in *Meriwether*, those implicitly carry a message, the

10  use of pronouns.

11        THE COURT:  So does the use of a name.  That

12  implicitly carries the same message.  It's almost like forcing

13  the Court to choose between a noun and a pronoun, a proper noun

14  and a pronoun, because they're both labels, right?

15        MR. HASSON:  A noun and a pronoun are perhaps

16  different things.  But to your point, one is a label.

17        My name is James.  People call me Jim.  And that does

18  not contain a statement about whether or not I am male or

19  female.  You could have a -- there's some names that both males

20  use and females use.  But saying he or saying she, as the Sixth

21  Circuit recognized in *Meriwether*, comes with a statement that

22  in a case of Terri and Terrence, calling somebody -- if you

23  believe that people are biologically male or female, to use

24  "she" instead of "he" necessarily carries a statement that you

25  believe the idea that gender is a spectrum or any other kind

1   of --

2          THE COURT:  Why can't it be that's just a person's

3   name?  I mean, why does that student have a right to use a

4   pronoun instead of a noun?  What rights does Terrence have to

5   be called by his given name, and his given name now is Terri?

6          It's like you sending your son to school and his name is

7   also James, but a group of his classmates decide there are too

8   many Jimmys and Jameses around so they're going to call him

9   Harry.  And you don't like the name Harry.  Calling him Harry

10  constantly is offensive because it tells him we don't recognize

11  who you think you are.  We recognize who we want you to be.

12  And since we're -- when we're the majority, we can do that.  We

13  have the numbers.  We can bully you.  We can tell you that your

14  name is Harry until we force you to accept that because that's

15  what we think.  That's what -- and we don't want any more

16  Jimmys.

17         MR. HASSON:  I think a name is different than -- to

18  answer the question directly, Your Honor, our position here

19  isn't that calling someone -- that they must call somebody --

20         THE COURT:  The reason I ask that question is there is

21  an alternative here.  You see, it's almost like your clients

22  want their children to be able to do what they want to do.

23  They're the majority.  It's couched under the veil of religion.

24  But implicit in the concept of ordered liberties in everything

25  we hold holy in this country and in this Constitution is

1    religious freedom, the freedom to worship as you choose and the

2    freedom not to worship and the freedom not to be subjected to

3    the tyranny of a religious majority who says that we think we

4    ought to be able to call him a pronoun. I don't care what his

5    name is. I want to make sure -- and it may be the parents. I

6    want to make sure Terrence is called Terrence because he was

7    born with a penis. In our religion, that's what we do and

8    we're the majority here.

9         Those are not the precepts on which this country was

10   founded. It was founded on the view that there is freedom of

11   religion which means to be free from the tyranny of religion.

12   That's what the pilgrims escaped from, the tyranny of religion.

13   The parents should go back to History 101 and understand that.

14        Tell me why it is that religion can be used as a sword

15   here to make this child Terri be called Terrence, "he," because

16   that's what their religion says when, as an option, they can

17   simply call that person Terri.

18        MR. HASSON: Your Honor --

19        THE COURT: Where is it in the law?

20        MR. HASSON: If I may on a few different points,

21   please, Your Honor. First of all, PDE did not bring a

22   religious liberty claim. This is a speech claim.

23        THE COURT: I understand.

24        MR. HASSON: To that point, if you reference paragraph

25   21 of Parent D's declaration, Parent D talks about those

1   beliefs being motivated by science.  These are not simply just

2   a motivation -- a religiously motivated belief.

3        To that end, the Supreme Court in *Barnette* specifically

4   stated that it wouldn't matter if beliefs were motivated by

5   religion or if they're motivated by something else because the

6   constitutional infirmity is the government compelling speech

7   and compelling agreements with ideas.

8        To your second point, PDE is not saying that nobody else

9   can use pronouns as their beliefs dictate, or names as their

10  beliefs dictate.  It's not even saying that its children don't

11  want to use a name that somebody has asked to be called just

12  like any other nickname or anything else.  They're simply

13  saying they -- and when I say PDE's members, the children of

14  Parents A, B and D are all PDE members as well; so as a

15  shorthand.  They're saying they do not want to be required to

16  make a statement about biological sex and gender that they do

17  not believe.

18       And it is --

19        THE COURT:  But that's my point.  They don't believe

20  that Terrence is female, right?  And so they don't want to be

21  compelled to go against the science or the religion.  Why can't

22  they call Terrence "Terri"?  If I'm going to balance the

23  hardships as a part of this, what prohibits me from saying,

24  well, you know, considering what has happened to some of the

25  science and data with respect to a higher incidence of suicides

1    for trans students and the like, what is to prohibit your

2    clients from simply calling him by his given name, whatever his

3    given name is right now – Terri – if I'm balancing the

4    hardships?

5           MR. HASSON:  I would refer to the Sixth Circuit's

6    conclusion in the *Meriwether* case where they said in a

7    pedagogical environment, at some point the use of pronouns is a

8    virtual necessity.  If the children are in the same classroom

9    for eight hours a day, six years in a row, then at some point

10   it's going to come up.

11          But as a broader point, this isn't simply –– the

12   policies simply do not –– are not limited simply to compelled

13   speech.  They're also overbroad.  The way they're written says

14   that any statement that you make that another person finds,

15   quote, offensive, dehumanizing, derogatory or insulting on the

16   basis of gender identity can also be grounds for harassment.

17   So simply a statement, as we cited in our reply brief, "I bear

18   no ill will towards anyone, but I do not believe that people

19   can transition from one sex to another," that would also

20   violate the policies.  And that is content based and also

21   viewpoint based.

22          We're not simply in the land of using names or not.

23   We're in the land of expressing beliefs.  And pronouns carry

24   beliefs and other statements as well, Your Honor.

25          THE COURT:  So, in *Meriwether*, the university

1   professor taught a political philosophy course where

2   discussions about gender identity often came up, right?

3         MR. HASSON:  Yes, Your Honor.

4         THE COURT:  By prohibiting him from using pronouns

5   that he preferred when addressing students, the Court found

6   that the university apparently, quote, silenced a viewpoint

7   that could have catalyzed a robust and insightful in-class

8   discussion.

9         Is that a distinction without a difference, the facts in

10  *Meriwether*, Mr. Hasson?

11        MR. HASSON:  I think for this purpose, the facts are

12  actually relatively similar.  And the fact that we're dealing

13  with students versus a professor I think is immaterial because

14  in this case also, if you look at I believe it's exhibits -- or

15  actually the declarations of Parents B and C, they -- or B and

16  D, they talk about surveys that required -- students are

17  required to say which pronouns they should be used by.  So it

18  does --

19        THE COURT:  Were the students asked about that in the

20  survey?

21        MR. HASSON:  Say again, Your Honor.

22        THE COURT:  Were the students asked about it in the

23  survey?

24        MR. HASSON:  If you refer to declaration of Parent

25  B --

16

1      THE COURT:  They were, weren't they?  That was the

2  point of the survey.  But when they have roll call in the

3  morning, do they say -- they point to a student and say she or

4  do they point to a student and say he?  No.  They call them by

5  what?  What do they call them by, Mr. Hasson, when they do roll

6  call?

7      MR. HASSON:  When the teacher does roll call?

8      THE COURT:  Yes.

9      MR. HASSON:  I believe the teacher --

10      THE COURT:  I know it's been a while since all of us

11  were in -- they call them by their names.  And when they want

12  to go and visit each other, they don't say, can I go to her

13  house?  They say can I go to Sally's?  Or can I go to Billy's?

14  Or can I go to Jim's?  Isn't that what they say?

15      Because, you see, in *Meriwether*, because of the nature

16  of the subject taught, those kinds of gender identity issues

17  and pronoun proliferation was necessary.

18      When teachers are in a classroom -- and I know because I

19  still teach.  You know, I don't say him or her.  I'll say Will,

20  or Jim, or Mr. Hasson, or Mr. Madison, whatever the case may

21  be.  I use names and not pronouns.  So this fixation on pronoun

22  could be a ruse.  I'm not certain that *Meriwether* controls in

23  this case because there is an argument that can be made that

24  the professor, because of the nature of the work, was required

25  to use pronouns more so than you would in common social

1    intercourse.

2         But I took you off of message.  Go back to what you were

3    saying.

4         MR. HASSON:  Thank you, Your Honor.

5         To respond to some of what you just asked right there,

6    I'd like to point out two things.  First, at some point,

7    students, of course, use names, identify people by names from

8    time to time.  That's just part of normal human interaction.

9    But I think also, as part of normal conversation, it is

10   virtually impossible to avoid speaking about sex at some point

11   along the line.  And as we mentioned, the policies cover more

12   than just pronouns.  They cover general statements of belief.

13   And it does come up, which is -- the reason I brought up the

14   surveys is an example of saying it does come up in class and so

15   it is an issue of discussion.

16        But if I refer to Exhibit S, which is the email from

17   district's counsel, if you notice, it offered an accommodation

18   to avoid the use of pronouns.  So if -- and only on the grounds

19   of religion.  My point being that if it requires a discussion

20   about a, quote, accommodation to, quote, avoid the use of

21   pronouns, it must be the case that the policy as a general

22   matter requires the use of pronouns.

23        And as the Supreme Court -- my second point about the

24   virtual necessity, the Supreme Court's decision in *Wooley v.*

25   *Maynard*, it talks quite a bit about something that's very

18

1    analogous which is that it -- at some point, it is a virtual

2    necessity for people to use -- it's not enough for the district

3    to say, well, we're not literally pulling the words out of your

4    mouth.  If the government makes it incredibly burdensome or

5    virtually impossible to avoid the use of doing something,

6    that's the same thing for First Amendment purposes.

7            THE COURT:  Let's go back for a moment, Mr. Hasson, to

8    the school district policies.  The way I read it, there are

9    basically five categories of speech that are implicated here,

10   prohibited speech.

11           First, we have policies prohibiting discriminatory

12   speech that creates a threat of physical harm or violence to

13   another student.  And that's your Exhibit A at 2 and 3; that

14   defining unlawful harassment in reference to speech that,

15   quote, places a student in reasonable fear of harm to his or

16   her person or damage to his or her property.

17           Second -- the second category is the policies prohibit

18   speech that, quote, has the effect of substantially interfering

19   with a student's educational performance, opportunities, or

20   benefits.

21           Third, speech that prohibits discriminatory speech that

22   has the, quote, effect of substantially disrupting the orderly

23   operation of school.

24           Fourth, speech that proscribes repeated and persistent

25   speech that creates a hostile, i.e., intimidating, threatening

1    or abusive, learning environment for students, and;

2          Fifth, the policies proscribe the use of derogatory

3    language on the basis of an individual's identity, including

4    the intentional misgendering of transgender students.

5          So the first of these categories fit within the first

6    prong of *Tinker*.  I don't think anybody really argues that.

7    They proscribe speech that would tend to create a threat of

8    physical harm, a substantial interference with the student's

9    performance, or cause a substantial disruption to the operation

10   of the school.

11         This is precisely what *Tinker* allows, restrictions on

12   speech that substantially disrupt the operation of the school,

13   including by interfering with the operation of the school and

14   keep students from physical harm.  You don't disagree with any

15   of that, do you?

16         MR. HASSON:  I do not disagree with the fact that

17   *Tinker* provides a substantial disruption inquiry, if that's

18   your question, Your Honor.

19         THE COURT:  Now, to the Court -- and this is what I'm

20   getting to, Mr. Hasson.  The fourth and fifth categories pose a

21   closer call.  It's an unsettled question whether a hostile

22   environment created by harassing language or bullying behavior

23   or discriminatory comments is enough to constitute a

24   substantial disruption on its own.

25         If you look at *Harper* and Judge Kozinski dissenting

1    where he noted that much of what harassment law seeks to

2    prohibit, the First Amendment seeks to protect.  And in *Saxe*,

3    for instance, Alito -- then Judge Alito -- found that the

4    anti-harassment policy in that case was overbroad because the

5    policy's hostile environment prong did not, on its face,

6    require any threshold showing of severity or persuasiveness.

7         Now, you just mentioned that the policies are overbroad.

8    Are you relying on the fact, in part, of what Judge -- then

9    Judge Alito said was a failure of showing severity or

10   pervasiveness?

11        MR. HASSON:  I would say that is a persuasive

12   precedent.  I think the precedent we think is directly on point

13   is the Supreme Court's decision in *Davis v. Monroe County Board*

14   *of Education* where it said that schools can punish conduct that

15   is severe, persuasive, and objectively offensive such that it

16   rises to the level of conduct and not speech.

17        But *Davis* was very clear that single instances do not

18   rise to that level and that pure speech does not rise to that

19   level.

20        THE COURT:  What *Davis* said was that -- *Davis*

21   authorized private damages actions against public school boards

22   for student-on-student harassment only where the board has

23   acted with indifference to known harassment that is, quote, so

24   severe, persuasive and objectively offensive that it

25   effectually bars the victim's access to an educational

1  opportunity or benefit.

2          MR. HASSON:  Yes, Your Honor.

3          THE COURT:  So are you saying that your clients'

4  children are the victims here?

5          MR. HASSON:  No.  What we're saying is that school

6  district policies can punish harassment that meets the standard

7  set forth in *Davis*.  And the school district's policy here is

8  overbroad.  In response to your question about overbreadth,

9  it's overbroad because it fails to meet that *Davis* standard.

10         THE COURT:  What I'm asking you is does it fail to

11 meet the *Davis* standard because it doesn't have a threshold of

12 pervasiveness?

13         MR. HASSON:  Because it doesn't have severe,

14 pervasive, and objectively offensive.  It has to meet all

15 three.

16         THE COURT:  If we were to apply that test, would we

17 look at it through the lens of the transgender student who the

18 majority students want to call by what they and their parents

19 believe is his gender by birth?  Or should we look at it

20 through this transgender student's eyes who is basically being

21 picked on because -- going back to my example of Jim and Harry.

22 Do you think that son Jim would find everybody calling him out

23 of his name fun?  Or should we look at it through his eyes?

24 Would he be the victim or would the kids who could call him

25 what they wanted to be the victim?

1          Because that's what it comes down to.  These kids want

2     to be able to call Terrence "he."  They want to call him he.

3     And they're saying this affects me that I can't call him he.  I

4     don't know how it affects me, but somewhere I learned in church

5     that if you're born with a penis, you're a man and you will

6     always be a man and you shouldn't be called "she."  And that's

7     what I learned in the church or that's what the science -- this

8     science tells me.  Because there's other science that says

9     that -- what do they call it?  Gender --

10          MR. HASSON:  -- dysphoria, Your Honor.

11          THE COURT:  Yeah.  And other conditions where someone

12     actually believes that he is a she.  And we aren't in their

13     bodies, and there's science that supports it.  So I'm going to

14     go out on a limb and assume that your clients are not

15     scientists who are caught up in this debate, but they've chosen

16     the science that they're willing to follow which is in

17     alignment with their Christian values.  I'm assuming that

18     they're mostly Christians, not Muslims, not Buddhists, not

19     Jeffersonian Deists.

20          MR. HASSON:  I know they're motivated by their

21     religious values.  I didn't get into substantive, long,

22     drawn-out theological conversations.

23          THE COURT:  But they aren't scientists, are they?

24          MR. HASSON:  No, Your Honor.

25          THE COURT:  There are scientists who support the view

23

1   that Terrence is Terri.  That's true, too, isn't it?

2           MR. HASSON:  I know that there are -- that gender

3   dysphoria is --

4           THE COURT:  It's a real thing.

5           MR. HASSON:  To your point, Your Honor, though, to

6   address our position --

7           THE COURT:  Yes.

8           MR. HASSON:  -- I would redirect you to the Supreme

9   Court's holding in *Barnette* where the Supreme Court said it

10  doesn't matter whether the school thinks that the student's

11  view is right or wrong.  It's a constitutional harm to force

12  someone to express a belief.  And that's where --

13          THE COURT:  That's my point.  They aren't expressing a

14  belief.  What they're expressing is a -- you're arguing that

15  they are -- you're making your argument based on a compelled

16  speech doctrine.  Am I right?

17          MR. HASSON:  In that context.  But, as we noted in our

18  brief, it's also a viewpoint - discriminatory - which I would

19  note that the Sixth Circuit in *Barr v. Lafon* said violates the

20  *Tinker* standard per se -- is per se unconstitutional, *Tinker*

21  aside, and we also believe it's overbroad.

22          THE COURT:  Doesn't the school have the right to

23  regulate speech, though, to make for a nonhostile environment,

24  to make for a learning environment?  Can't schools do that?

25          MR. HASSON:  Of course they can, but it's on -- the

1   burden is on the school to show that there is any evidence that

2   restricting speech will cause a substantial disruption.  And by

3   that, in *Tinker*, the Supreme Court meant classroom disruptions

4   to the point that it prevents children from learning.

5           THE COURT:  But they also -- they can regulate speech

6   to the extent that they create an environment that is safe for

7   all students to learn, a learning environment, a learning

8   environment where the majority doesn't get to call someone out

9   of their name or something other than what they are just

10  because their science or their religion -- it's not like one of

11  the students says:  I'm Martian.  I was born on Mars and you

12  have to recognize that fact.

13          There's no science that supports that.

14          But you invoke science -- there's science that supports

15  Terri's position that Terri is female even though Terri was

16  born with a penis.  So given that fact, what is the basis for

17  your saying that this can't be -- this policy can't coexist

18  with a learning environment consistent with the mission of

19  schools?  Because isn't that what the policy, in fact, does?

20  It protects everyone.

21          Then that traces me back to a balancing test which we

22  must also consider in this PI hearing, the interest of these

23  students who say my science says one thing and the interest of

24  this student, who is a victim of the majority, says my science

25  supports my position that I'm Terri and not Terrence.

1          MR. HASSON:  But the point from PDE's perspective,

2     Your Honor, is it's irrelevant whose science is correct.  The

3     idea is that every student has a First Amendment right, whether

4     or not the government thinks they're correct or incorrect, to

5     express their opinion.  And to the balancing test --

6          THE COURT:  I agree with you.  But that's why -- but

7     your clients have an option because they aren't like the

8     professor in *Meriwether*.  They can call Terri by Terri's name.

9     They don't have to call Terri he or she.  They can call -- and

10    that benefits Terrence.  And it doesn't hurt them by saying

11    call me by my name.  Don't call me Harry.  My name is Jim.

12    Call me Jim.  Don't call me Terrence.  My name is Terri.  Call

13    me Terri.  You don't have to get into "he" or "she."

14         MR. HASSON:  I would have two responses to that, Your

15    Honor.  I would also like to address standing at some point as

16    well.

17         THE COURT:  I'm not as concerned about standing for

18    you as I am for -- Mr. Freeze is going to have to spend about

19    as much time on standing as you've spent on balancing these

20    hardships.  You each have your burden to bear.

21         MR. HASSON:  Understood, Your Honor.

22          To your question, there are two responses to that.  The

23    first is that it's virtually impossible at some point to avoid

24    using language about sex and gender, especially in a school in

25    a classroom environment.  But, secondly, by altering the

1  content of their speech, that alone is a First Amendment

2  violation, which the Supreme Court held in *Riley* exactly that.

3  And if they remain silent, compelled speech and compelled

4  silence are simply two sides of the same coin.  And the Supreme

5  Court held exactly that in *Riley* as well.  So, from our point

6  of view, either way you look at it, there's constitutional

7  harm.  And First Amendment -- violations of First Amendment

8  rights are irreparable, as the Supreme Court held in *Elrod v.*

9  *Burns*.

10         To quickly kind of run through the -- our last remaining

11  points -- I'm certain that I'm getting close to time.

12         THE COURT:  I want to go back to *Davis* just for a

13  second.

14         MR. HASSON:  Certainly, Your Honor.

15         THE COURT:  *Davis* sets a high standard for when a

16  school board can be held liable to prevent student-on-student

17  harassment.  But does that have to dictate when a school may

18  institute policies that restrict harassment?  Because it

19  appears -- and I'm going to get to Mr. Freeze on this, but it

20  appears that the school board adopted these policies to

21  restrict harassment.

22         While you're contemplating the answer, consider the

23  categories of speech that schools regulate and the reason why.

24  For instance, the Supreme Court has permitted restrictions on

25  lewd speech in deference to, quote, the social interest in

1  order and morality –– that's the *Bethel School District* case

2  which I'm sure you're familiar with –– and to the school's

3  vital role in inculcating fundamental values of habits and

4  matters of civility essential to a democratic society.

5       Now, speech promoting drug use can be punished in light

6  of, quote, important, indeed, perhaps compelling interest in

7  protecting students against the physical, sociological, and

8  addictive effects of drugs.  There was no suggestion in any of

9  these cases that the schools would have been exposed to

10  liability for failing to promote the habits and manners of

11  civility, to awaken students to cultural values or norms that

12  we seek to protect in a democratic society, or to protect

13  students from addiction, or to protect students from

14  harassment.

15       It's not as if the First Amendment gives a blanket

16  prohibition against regulating any kind of speech in a school

17  situation.  *Tinker* makes that clear.  *Tinker* has spawned ––

18  this is the progeny of *Tinker*.  There are restrictions.

19       See, here is something that –– here's the elephant in

20  the room.  Trans students are real.  They're not a figment of

21  one's imagination.  The science proves that.  But they're in

22  the minority.  So you can slice it however you wish,

23  Mr. Hasson, but what it amounts to is that the majority doesn't

24  like the fact that there's somebody who was born with a penis

25  who says that he is a she.  And we don't know whether it's

28

1    gender dysphoria or what.  And that poses a threat.

2         That won't be the first time in our nation's history

3    when a difference posed a threat and then they hide behind

4    religion or science.  I'm so old, Mr. Hasson, that I remember

5    the scientist who talked about the inherent inferiority of

6    black people which justified slavery.  And you know what?  The

7    tragedy is that's not dead yet because there's some educators

8    who believe that the slaves benefited from slavery.  I was

9    trying to contact some old people in my family to find out if

10   they had passed those benefits down through the generations

11   because I seem to have missed my benefit.  But, anyway, that's

12   another story.

13        So I'm not so uncertain that that's what we have here

14   because this is not a *Davis* case.  Speech can be regulated to

15   prevent harassment and speech can be regulated to promote a

16   learning environment.  If these kids who have a higher

17   incidence of suicide, a higher incidence of harassment – that's

18   what the data shows – can't be protected, then –– and the only

19   way they can be protected is by the same curb of speech that

20   was used in *Bethel School District* in the interest of –– social

21   interest and morality, what's more vague than social interest

22   and morality?

23        So I know that I've given you a lot, but I will allow

24   you to end without interruption, Mr. Hasson, with a response to

25   those series of questions.

29

1        MR. HASSON:  Thank you, Your Honor.  And taking them

2   one at a time.

3        THE COURT:  And you get points for even remembering

4   them all.

5        MR. HASSON:  I'll do my best.

6        Taking those one at a time, for the *Davis* question, of

7   course, schools can regulate conduct, and *Tinker* says they can

8   also regulate speech.  But it has to meet a certain standard.

9   So if we're addressing the *Tinker* standard, the Sixth Circuit

10  in *Fisher* said that the *Tinker* standard is essentially narrow

11  tailored.  To survive that, you have to show some kind of

12  evidence, some kind of support to forecast that it is

13  absolutely necessary to restrict the speech to prevent

14  classroom disruption, things like complete disruptions and

15  shutdowns of abilities to learn.

16       What *Davis* said was that to meet the First Amendment

17  standard for harassment in particular, it has to apply to

18  conduct, not speech.  And that was specifically in response to

19  Justice Kennedy's dissent in that case where he raised First

20  Amendment concerns.  The majority in *Davis* specifically

21  referenced the First Amendment and said we have -- in response

22  to Justice Kennedy, we have created the standard that requires

23  things to be repeated, objectively offensive, and severe such

24  that it crosses the line from speech into conduct.  Here, the

25  district does not contest at all that it punishes speech.  So

1    we're firmly in First Amendment land now.

2            To the other point, in reference to the shameful history

3    of discrimination in our country, the Sixth Circuit in

4    *Meriwether* actually distinguished invidiously hateful rhetoric

5    such as the nature that you alluded to with statements about

6    gender identity.  And the way it did so is it -- in *Dambrot*,

7    the Sixth Circuit held that a public university basketball

8    coach could not recover for First Amendment retaliation because

9    his use of racial slurs did not touch on a matter of public

10   concern.  They simply had no redeeming value.

11           In *Meriwether*, the Sixth Circuit referred back to that

12   and said we properly concluded that in *Dambrot*, that that

13   language had no redeeming value and didn't touch on a matter of

14   public concern.  But pronouns and gender identity, sex-specific

15   language, do touch on a matter of public concern and that's why

16   it was different there.  That's how I would distinguish those

17   two issues.

18           THE COURT:  Would you just add one thing to that and

19   tell me how the use of pronouns in this case touches on a

20   matter of public concern.

21           MR. HASSON:  What I would say is it's speech about a

22   political issue and an idea that is being hotly debated in our

23   country right now, as you referenced earlier.  And that's

24   specifically, exactly what the Supreme Court said in

25   *Meriwether*.  And as the Supreme Court recognized in *Tinker*,

1    students do have First Amendment rights.  And inherent in those

2    First Amendment rights is the ability to engage in political

3    speech or speech about matters of public concern.  And that's

4    exactly what the Court held in *Tinker*.  It emphasized that.

5    That's where I would cite to.

6            If you have any further questions.

7            THE COURT:  Not at this time.  Thank you for answering

8    my questions, Mr. Hasson.

9            MR. HASSON:  Thank you, Your Honor.

10           THE COURT:  You still have five minutes for rebuttal.

11           Mr. Freeze.

12           Mr. Freeze, I know that you're anxious to get to some of

13   the issues that Mr. Hasson raised.  I'm anxious for you to get

14   to them, but I want you to start with standing.

15           MR. FREEZE:  To start, plaintiff has not presented

16   sufficient evidence to meet the first prong of the standing

17   decision which is invasion of a legally protected interest.

18           Not to delve too deep into the merits at this point,

19   Your Honor, but I think there is overlap here.  I think you

20   made the point that there is no legal right that has been

21   recognized by the federal courts or in federal law suggesting

22   that a particular individual has the right or -- to use a

23   pronoun versus a noun when speaking.  I think at the end of the

24   day, that's what we're talking about here.

25           THE COURT:  Do you think that we have associational

1   standing in this case?

2          MR. FREEZE:  I think there is associational standing

3   from the standpoint that these members are members of the

4   organization.  I think they failed to meet, however, the

5   elements that are necessary --

6          THE COURT:  Which elements specifically do you believe

7   that they failed to meet?  So they -- associational standing

8   exists when the members of the organization would otherwise

9   have standing to sue in their own right.  Secondly, the

10  interests at stake are germane to the organization's purpose,

11  and; third, neither the claim asserted nor the relief requested

12  requires the participation of individual members in the

13  lawsuit.  That's, of course, from *Friends of the Earth*.

14         MR. FREEZE:  I think the first and the third elements

15  there, Your Honor.

16         THE COURT:  Okay.  Let me ask you this.  Do the

17  plaintiffs need to wait to be punished?  I know that there was

18  correspondence back and forth with the board or maybe with the

19  school principal from one of the concerned parents.  Do they

20  need to wait to be punished or prosecuted to bring a facial

21  challenge especially where they have refrained from certain

22  conduct for fear of punishment?  In other words, the mother's

23  son has refrained from calling Terrence a "she" because of fear

24  of punishment.  So do the plaintiffs need to wait?

25         MR. FREEZE:  Not in all circumstances, Your Honor.

1   But in this circumstance, I don't believe they have put forth

2   in front of this Court a sufficient legally protected interest

3   that is concrete and particularized nor actual or imminent.

4          THE COURT:  But in the First Amendment context, can't

5   the plaintiffs bring a pre-enforcement challenge if they intend

6   to engage in expression that the First Amendment would protect,

7   or their expression is arguably proscribed by the policies at

8   issue and they face a credible threat of enforcement of the

9   rules?

10          MR. FREEZE:  Your Honor, the subjective chill factor

11   is insufficient to convey standing upon a plaintiff.  There

12   needs to be more than that.  It can't be simply a subjective

13   belief that there may be discipline in the future or some

14   speculative potential future injury.

15          THE COURT:  What if there's some indication of

16   imminent enforcement?

17          MR. FREEZE:  If there was some indication of that,

18   then I think that would convey an injury.  But we don't have

19   that in this case.

20          THE COURT:  We don't have it in this case because the

21   plaintiffs have refrained from calling Terrence "she."

22          MR. FREEZE:  Well, Your Honor -- and I believe that

23   that, again, gets back to whether there is any legally

24   protected interest here.  There are accommodations available

25   from the school district.  You can call Terrence "Terri."  You

34

1    cannot talk to this student at all.  You can avoid seeing this

2    student.

3         This is not the situation in *Meriwether* where a teacher

4    needs to teach to a specific room of students.  The Olentangy

5    Local School District has over 23,000 students.  Less than one

6    percent of those students identify in some way as transgender.

7         THE COURT:  How many students in the Olentangy School

8    District identify as trans?

9         MR. FREEZE:  That we are aware of, approximately 50,

10   Your Honor.

11        THE COURT:  Fifty?

12        MR. FREEZE:  Yes.

13        THE COURT:  Are they concentrated in a particular

14   school or grade?

15        MR. FREEZE:  Your Honor, I don't have that

16   information.

17        THE COURT:  Okay.  Let me ask you this before you get

18   into the heart of your argument, Mr. Freeze.  What factors

19   prompted the school district to enact the transgender policies,

20   anti-harassment policies?

21        MR. FREEZE:  I think an important fact for this Court

22   to be aware of is that the current iteration of the policy that

23   is a part of the board policies was last amended in April of

24   this year.  But those amendments were technical changes.  This

25   addition of gender identity to the policies has been in place

1  since 2013.  I believe at that point, that was when the Obama

2  Administration was looking at Title IX protections and that

3  federal law began to shift in the manner where these

4  protections were being extended under Title VII and Title IX

5  both to transgender and nonbinary students.

6         I believe what the district was trying to do was, as

7  closely as it can, mirror federal law and federal requirements

8  when adopting these policies.  I think you made a good point

9  earlier, Your Honor, that when you look at these policies, in

10  some ways, they're almost ripped from the federal law and put

11  into the policy notebook.  These policies are not adopted in a

12  vacuum.  They were adopted pursuant to and consistent with

13  federal law.

14         So the issue of transgender, nonbinary students being

15  protected under these federal laws was arising and that's how

16  it ended up in the policy since 2013.  That's specific to 5517,

17  Your Honor.  I can tell you the addition of that language did

18  not make it into the personal communication device policy until

19  2017.

20              THE COURT:  Please proceed.

21              MR. FREEZE:  Sure, Your Honor.

22         So to continue on standing, Your Honor, I think, again,

23  we're dealing with actual or imminent harm here.  I think an

24  important note on the communication between general counsel for

25  the school district and the parent is that, yes, misgendering a

1    student would be considered discrimination, and no place in

2    those emails does it suggest that it would rise to the level of

3    harassment per se or bullying per se to the extent that it

4    would subject that student to discipline.

5        In fact, the follow-up email specifically asks whether

6    the student would be disciplined for their religious beliefs,

7    and the answer is no.  But, at the same time, the school

8    district protects all students from harassment and bullying and

9    does not believe it's appropriate, nor does federal law require

10   the district to allow certain students, for certain points of

11   view, to use the First Amendment as a sword to bully and harass

12   other students, specifically, in this instance, very vulnerable

13   students based on the nature of their being.  There is no First

14   Amendment right to have carte blanche access to harass or bully

15   students based on a particular factor of their being.

16       In this case, I think that's really what's being

17   requested.  The challenge is to the policies as a whole.  Those

18   policies protect all manner of protected classes.  But --

19           THE COURT:  Would you address Mr. Hasson's overbreadth

20   argument first, please?

21           MR. FREEZE:  Sure, Your Honor.

22       From the overbreadth perspective, I believe you've

23   already mentioned, Your Honor, the first three manners of

24   speech that we are dealing with are basically lifted from

25   *Tinker*.  When we are talking about the fourth element which is

1  essentially the hostile environment aspect, we're looking at

2  the bullying policy.  I think it's important to note what the

3  definition of that bullying policy is.  It requires severe or

4  pervasive actions but it also requires, in order to raise the

5  level under the board policies to unlawful harassment, that

6  those actions be taken in a systematic and chronic manner

7  toward one person.

8       Only when bullying raises to the severe, persuasive,

9  systematic, and chronic level would it then constitute

10  harassment and then be subject to potential discipline under

11  the harassment policy.  So from that perspective, these

12  policies are quite narrowly tailored.

13       The first three prongs that you mentioned are

14  essentially from *Tinker*.  The fourth is essentially lifted from

15  Title IX requirements, Your Honor.  I don't subscribe, nor does

16  the district, to the concept that a district is powerless to

17  create a good learning environment for its students unless and

18  until it meets that Title IX pervasive standard to which it

19  might be subject to civil liability.  I believe that a district

20  is able to and even required to intervene before --

21       THE COURT:  But in order to invoke it, is there a need

22  for there to be a threshold of pervasiveness as *Davis* found?

23       MR. FREEZE:  I think to understand *Davis* -- I mean,

24  *Davis* is talking about what would subject a school district to

25  civil liability under Title IX.  I think that's a different

1    conversation than the one we're having.  Under *Davis*, the

2    Supreme Court found that under Title IX, yes, a school district

3    could be subject to civil liability when the school board acted

4    with deliberate indifference to known harassment and the

5    harassment was so severe, pervasive, and objectively offensive

6    that it effectually barred the victim's access to an

7    educational opportunity or benefit.

8         *Davis* doesn't stand for the concept that a school

9    district is unable to or legally prevented from intervening in

10   any type of situation until it becomes so severe, pervasive,

11   and objectively offensive that it effectively barred the

12   victim's access to an educational opportunity.  It talks about

13   that in the context of civil liability.  So we're going back to

14   the *Tinker* standard, again, as to when these types of speech

15   would be proscribed, Your Honor.

16        Since you asked about standing, Your Honor, if you'd

17   like me to continue.

18        THE COURT:  I have nothing further for you on

19   standing.

20        MR. FREEZE:  Okay.  Thank you.

21        Your Honor, plaintiffs spent a significant amount of

22   time talking about *Meriwether*.  I think *Meriwether* is clearly

23   distinguishable in this instance.  *Meriwether*, one, involved a

24   university professor.  It involved issues of academic

25   expression and freedom in the university setting.  That, from

1    the beginning, shows two big differences.

2            One, federal law consistently treats kindergarten

3    through 12 schools differently than it treats universities.

4    And certain aspects of the First Amendment and free speech that

5    may be allowed or inherent on college campuses may not be so

6    extensive in the K through 12 setting.

7            The second issue is Meriwether himself was an employee;

8    in that particular instance, was dealing with students that he,

9    in large part, had no option whether to deal with or not.  And

10   it also implicated his religious beliefs which, based on

11   plaintiff's representation earlier, are not at issue in this

12   case, Your Honor.

13           THE COURT:  Let me ask you this.  Under *Meriwether*,

14   which kind of articulates the compelled speech doctrine, do the

15   policies require the speaker to affirm a certain belief?  That

16   is, by not using a pronoun, or by using "she" for Terrence,

17   does that require, as Mr. Hasson seemingly alluded to, an

18   affirmation of or belief of a hot button item in public debate

19   now, that is, that I recognize you as trans?

20           MR. FREEZE:  The Sixth Circuit in *Meriwether* said it

21   did.  I think that that follows from *Meriwether*.  I think the

22   distinction from *Meriwether* is the university in that case was

23   unwilling to provide any type of accommodations, one, as to

24   what he could call these individuals, and; two, as to more

25   generalized speech as to these particular topics within the

1  realm of his curriculum.

2          THE COURT:  Let me ask you a similar question or maybe

3  a variation on the same theme.  Can you use a pronoun to

4  respect someone without agreeing with that person's gender

5  identity?  In other words, by calling Terrence "she," does

6  that -- does the speaker, then, by doing so, say that I

7  acknowledge, Terrence, that you're transgender?  Or can you do

8  that out of respect?  That's what, I, Terrence, want to be

9  called.

10          MR. FREEZE:  That certainly is the district's

11  position.  This is a situation where a little respect and

12  tolerance would go a long way.  We're standing here in federal

13  court, and I'm standing here arguing in front of you, Your

14  Honor.  I think there is a pretty easy way to get to a place

15  where we aren't here, Your Honor, if there was a little bit

16  respect and tolerance shown by certain folks to others.

17          I understand that there are constitutional issues that

18  are potentially implicated here, Your Honor, but I think that

19  could certainly be a matter of: I'm going to call you what you

20  want to be called because I respect you as a person.  I

21  understand that that's not my personal view, but I'm willing to

22  do that.  So --

23          THE COURT:  Doesn't that play right into what

24  Mr. Hasson said?  You're compelling someone to acknowledge

25  something that they don't want to acknowledge.  That student

41

1    does not want to acknowledge that Terrence is "she."  And why

2    is that not covered by *Meriwether*?

3           MR. FREEZE:  Your Honor, it's not covered by

4    *Meriwether*, one, because it's an employment case; two, because

5    that involved religious freedom; three, because it involved

6    employment and religious freedom in the university context;

7    four, because *Meriwether*, in that particular context, had to

8    deal with those same students almost every day; five, because

9    *Meriwether* didn't allow any accommodations.  The university

10   didn't allow any accommodation as --

11          THE COURT:  What accommodations has Olentangy allowed?

12          MR. FREEZE:  I can tell you that this policy, from our

13   understanding and recall, has never been enforced against a

14   student who has made a comment to a transgender student or a

15   nonbinary student.  So I think the answer is none because the

16   circumstances haven't presented themselves with the exception

17   of the email that was presented with plaintiff's complaint.  In

18   that email, there's a specific note from Attorney Philemond:

19   Please let us know if you would like to discuss accommodations.

20          I believe the parent's response was that they are happy

21   to join them in discussing this, but by no means do I desire

22   the administration of Olentangy to instruct my children on such

23   matters without me being present.  There was no follow-up in

24   regards to that as far as I'm aware, Your Honor.

25          THE COURT:  Thank you, Mr. Freeze.  I have nothing

1    further.

2            MR. FREEZE:  Thank you, Your Honor.

3            THE COURT:  Mr. Hasson, I might have a couple of more

4    questions for you, just a couple.

5            Is it possible, in the context of *Meriwether*, to use

6    pronouns to respect someone without agreeing with their gender

7    identity?  Is that possible?

8            MR. HASSON:  I would refer back to what the district

9    just said which was that under their understanding of

10   *Meriwether*, and that's our understanding of *Meriwether* as well,

11   the use of pronouns, and especially the compelled use of

12   pronouns which I understand my friend on the other side of the

13   aisle to -- conceded that's what the policy does, inherently

14   carries an idea.  So it would be impossible to --

15           THE COURT:  I understand.  I'm going to let you finish

16   that, but you realize that didn't answer my question.  I asked

17   you if it was possible to use the pronoun out of respect

18   without agreeing with their gender identity.  Is it possible?

19           MR. HASSON:  I think pronouns inherently carry an

20   idea.  So it's possible to respect a student, but, once you use

21   a pronoun that does not align with biological sex, if your

22   belief is that people are only male or female, you can't do

23   that without expressing an idea.

24           THE COURT:  As a lawyer, every argument you make it's

25   your idea or is it just the position that you're taking?

43

1          MR. HASSON:  In this context --

2          THE COURT:  That's a rhetorical question, Mr. Hasson,

3    because you and I both know that the answer is no.  You argue

4    positions that advance your client's interests that are

5    consistent with your ethics, et cetera, but they may or may not

6    be the position that you personally take.  Am I correct?

7          MR. HASSON:  Of course, Your Honor.

8          THE COURT:  Of course I'm correct on that.  Every

9    lawyer in America knows that.  But you're saying once I use a

10   pronoun, then that per se means that I am on one side of the

11   transgender debate or another.  I automatically accept that

12   person as transgender and I automatically accept the fact and

13   reality of transgenderism.

14        But you're telling me that it's impossible for me to

15   say, Terrence, I don't believe in this, but if you say that

16   you're a she, I'm going to call you she.

17        That's impossible, Mr. Hasson.

18         MR. HASSON:  I think it's impossible to speak in the

19   manner the district is trying to compel without publicly

20   affirming an idea --

21         THE COURT:  We're trying to figure out how *Meriwether*

22   fits here.  So you've got to help me because you want

23   *Meriwether* to control.  You've got a little bit of a problem

24   with *Meriwether* because *Meriwether* is factually

25   distinguishable.  It may or may not control.  But I need your

1   insight into this, and I need you to answer my questions

2   directly.  I don't want -- I understand some of the nuances

3   that you and Mr. Freeze are talking about.  I want to know my

4   hypothetical.  That's the point of oral arguments.

5        Is it possible for someone to use a pronoun without

6   conveying or agreeing with the listener's gender identity?

7        MR. HASSON:  I think it's impossible to publicly state

8   that someone is that without making a public statement that you

9   do not yourself believe.  And that's --

10       THE COURT:  So the answer is no, it's not possible.

11  Because you changed my hypothetical on me, Mr. Hasson.  I don't

12  want you to change my hypothetical.

13       MR. HASSON:  My apologies, Your Honor.

14       THE COURT:  I'll let your hypothetical stand.  You

15  posed your hypothetical and answered it.  Fine.  Now you can

16  get to mine.  Mine is, is it possible to call Terrence "she"

17  out of respect as opposed to out of agreeing with Terrence's

18  gender identity?

19       MR. HASSON:  It would be impossible to do so without

20  also conveying an idea that you don't believe.  That's the

21  constitutional injury, is being forced to do that or being

22  punished for refusing to do that, which is where the viewpoint

23  comes in, the viewpoint-based discrimination comes in, and the

24  overbreadth.

25       As part of rebuttal, Your Honor, I would like to very

1    briefly walk through the three-prong test for standing from

2    *Susan B. Anthony*, and then conclude with a point about

3    viewpoint discrimination and compelled speech from *Barnette*

4    because --

5              THE COURT:  I'm going to help you here, Mr. Hasson.  I

6    want you to take the time that you were going to talk about

7    standing and devote it to the other two prongs.

8              MR. HASSON:  To the balance of the equities and public

9    interest, Your Honor?

10             THE COURT:  That's exactly right.

11             MR. HASSON:  Absolutely, Your Honor.

12             What I would say there is that the courts have -- in

13   terms of the balance of the equities, because speech first

14   is -- or, excuse me, because PDE is, first of all, likely to

15   prevail on their speech claims, the school district has no

16   interest in enforcing an unconstitutional policy.  They can --

17   if this policy is enjoined, they can simply rewrite policies

18   that comply with the Constitution the next day.  And we cited

19   that in our reply brief.  That's the *Doe v. Pennsylvania County*

20   case out of the Western District of Virginia.

21             Moreover, because violations of First Amendment rights

22   are per se irreparable, as the Supreme Court held in *Elrod v.*

23   *Burns*, the students have a very strong interest in being able

24   to exercise their constitutional rights, and the school

25   district has very little interest in violating those rights.

46

1    And there's nothing in injunction, as we just mentioned, that

2    would prevent them from protecting other students.

3         As far as the public interest, we believe it's always in

4    the public interest to require government actors to respect the

5    Constitution.  So, for those two prongs, Your Honor, we believe

6    that because we're likely to prevail on the merits that those

7    necessarily fall into place as well.

8         To get back to the merits very quickly, Your Honor, in

9    the *Barnette* opinion, the Supreme Court said on page 635 that

10   it did not matter whether someone's view flowed from religion

11   or from anything else because the constitutional harm was

12   inherent in the fact that they're being compelled to speak or

13   punished for refusing to do so.

14        THE COURT:  *Barnette* was a case in which the student

15   was required to salute the flag.  The Court struck down a

16   requirement that school children salute the American flag

17   because it was -- they said that -- well, the school had argued

18   that it promoted national unity.  But it was really compelling

19   the speaker's affirmative belief.

20        MR. HASSON:  Indeed, Your Honor.

21        THE COURT:  Which the Court found would force

22   orthodoxy.

23        Now, the courts have noted that public educators can

24   compel speech.  You know that.  There was a class -- there was

25   a case in which -- I don't remember the name of it right now,

47

1  but the math teacher could compel students in math class to

2  talk about math and not about something else.  You can compel a

3  student to submit their homework.  You can compel a student to

4  answer questions in class.

5       So there's no per se proscription against compelled

6  speech in the classroom or in the school setting.  I'm right

7  about that, aren't I, Mr. Hasson?

8            MR. HASSON:  But this is a public issue.

9            THE COURT:  Am I right about that?

10            MR. HASSON:  You're right, Your Honor.  You're right

11  about you can require a student to answer questions.  But what

12  you can't do is require --

13            THE COURT:  So what it really comes down to is that

14  the compelled speech doctrine in the public school context

15  focuses on the rationale behind the policy.  So the question

16  before this Court is not whether the policies compel speech, in

17  my view, but whether they do so for an impermissible reason

18  since we all know that schools can compel speech.

19       You can't argue that because that's what the case law

20  says, okay.  So they can compel speech in certain limited

21  context, Mr. Hasson.  You know that and I know that.  And if

22  I'm incorrect, just point me to the case that says under no

23  circumstances can they compel speech.

24       Is there such a case?  Of course there isn't.  Or were

25  you about --

48

1          MR. HASSON:  I was just going to clarify that our

2     position is you can't compel speech about political issues or

3     anything about matters of public concern.

4          THE COURT:  You're correct about that.  But what if

5     this Court found that they could compel speech to maintain a

6     safe learning environment?  Or in the interest of pedagogy, to

7     maintain a pedagogically sound learning environment?  What

8     about creating an environment in which the students feel

9     respected, acknowledged, heard by their classmates, the use of

10    preferred pronouns would allow all students to feel comfortable

11    in participation in discussions and the like?  Or would that be

12    the Court weighing in on a political matter?  Would that still

13    be forcing the students to weigh in on a political matter?

14         The schools do have a responsibility for creating a safe

15    learning environment for all students.  How does this threaten

16    your clients' students' safety?

17         MR. HASSON:  How does it threaten their safety to be

18    forced to...

19         THE COURT:  Using preferred pronouns threaten your

20    clients' children's safety.

21         MR. HASSON:  I would say the use of pronouns either

22    way is not a safety issue for a student in either direction.

23    What it is is a constitutional right.  What it does is it

24    violates their constitutional rights, and that is irreparable

25    harm.

49

1        THE COURT:  All right.  Thank you, Mr. Hasson.

2        MR. HASSON:  Thank you, Your Honor.

3        THE COURT:  Because I understand that we are coming up

4   on the school year more rapidly than I'm sure your clients'

5   kids or kids on the other side -- all kids think that summer is

6   coming to a close too quickly and they're not quite ready to

7   get back.  They weren't even thinking about lofty issues about

8   what they can call their classmates.  They're thinking about

9   one more week at Disney or something like that.  But I

10  understand that it's imminent, and so I will -- I want to give

11  further consideration to some of the points raised at oral

12  argument.

13       I hope to have an opinion out by close of business

14  Wednesday and certainly by this week so that you will -- the

15  school district will have an understanding, as will the

16  plaintiffs, of what the rules of engagement will be on this

17  upcoming school year.  But I appreciate the argument back and

18  forth.  It was very illuminating to the Court.

19       Mr. Hasson, Mr. Freeze, thank you very much for your

20  patience and for listening carefully to the questions and

21  answering them directly.  That was very helpful.

22       For those of you who have to travel, good luck.  I hope

23  you travel safely.  We all know that there are certain

24  challenges associated with flight these days.  So I hope that

25  you can all get back before your kids start school in later

50

1    August or September.

2          Ms. Stash.

3        (Proceedings concluded at 11:29 a.m.)

4                        - - -

5

6

7                  C E R T I F I C A T E

8

9        I, Shawna J. Evans, do hereby certify that the

10   foregoing is a true and correct transcript of the proceedings

11   before the Honorable Algenon L. Marbley, Judge, in the United

12   States District Court, Southern District of Ohio, Eastern

13   Division, on the date indicated, reported by me in shorthand

14   and transcribed by me or under my supervision.

15

16

17                              s/Shawna J. Evans_____
                                Shawna J. Evans, RMR, CRR
18                              Official Federal Court Reporter

19

20                              August 10, 2023

21

22

23

24

25