IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **PARENTS DEFENDING EDUCATION,** | : |
| | : |
| Plaintiff, | : Case No. 2:23-cv-1595 |
| | : |
| v. | : Chief Judge Algenon L. Marbley |
| | : |
| **OLENTANGY LOCAL SCHOOL** | : Magistrate Judge Kimberly A. Jolson |
| **DISTRICT BOARD OF EDUCATION,** | : |
| *et al.*, | : |
| | : |
| Defendants. | : |

**OPINION AND ORDER**

This matter is before this Court on Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction and Standing. (ECF No. 16). For the reasons that follow, Defendants' Motion is **DENIED**.

**I.     BACKGROUND**

This Court has summarized the relevant facts of this case before (*see* ECF No. 28) and will do so only briefly here. The Olentangy Local School District ("OLSD" or "the District") is one of the largest school districts in Ohio, operating over twenty schools in Delaware and Franklin Counties. Parents Defending Education ("PDE"), an organization that represents several anonymous students and parents, brings this lawsuit against the OLSD Board of Education and several OLSD officials to challenge three policies that prohibit discriminatory or harassing language. Because the students and parents believe that the policies require students to affirm the idea that gender is fluid through the use of preferred pronouns and infringe on the parents ability to govern their children's upbringing outside of school, PDE askes this Court to declare OLSD's

1

policies unconstitutional in violation of the First and Fourteenth Amendments and enjoin their enforcement.

Policy 5517 prohibits students from engaging in discriminatory harassment or bullying based on the personal characteristics of other students, such as their "race, color, national origin, sex (including sexual orientation and gender identity), disability, age (except as authorized by law), religion, ancestry, or genetic information." (ECF No. 7-1). The policy defines harassment as conduct that puts another student in reasonable fear of harm, substantially disrupts the orderly operation of the school, or substantially interferes with a student's educational performance. (*Id.* at 2-3). Bullying, meanwhile, is defined as "any unwanted and repeated written, verbal, or physical behavior, including any threatening, insulting, or dehumanizing gesture . . . that is severe or pervasive enough to create an intimidating, hostile, of offensive educational or work environment; cause discomfort or humiliation; or unreasonably interfere with the individual's school or work performance or participation." (*Id.* at 2).

Another policy, Policy 5136, prohibits the use of personal devices to send messages that threaten, humiliate, harass, embarrass, or intimidate other students, or that can be construed as harassment or disparagement of others based on certain protected characteristics, including transgender identity. (*Id.* at 2).

Finally, the student Code of Conduct prohibits speech that involves "discriminatory language," including jokes or slurs based on protected characteristics. (*Id.* at 9). The Code also prohibits harassment, which is defined as conduct sufficiently "severe, persistent, or pervasive that it creates an intimidating, threatening or abusive educational environment for the other student(s)." (*Id.* at 16-17). These provisions are "in effect while students are under the authority of school personnel or involved in any school activity," and cover "[m]isconduct by a student that occurs off

2

school district property but is connected to activities or incidents that have occurred on school district property" or is "directed at a district official or employee." (*Id.* at 8).

In February 2023, a parent emailed OLSD officials, asking the following:

> If my devoutly Christian child who believes in two biological genders male/female and that those genders are decided at conception by God, would they be forced to use the pronouns that a transgender child identifies with or be subject to reprimand from the district if they refuse to do so?

(ECF No. 7-2 at 13). OLSD's counsel replied, explaining that "[a] student purposefully referring to another student by using gendered language they know is contrary to the other student's identity would be an example of discrimination under Board Policy." (*Id.*). When the parent then asked if their child would be disciplined for expressing the "religious beliefs that marriage is between a man and a woman OR that homosexuality is a sin," the District explained that students would not be disciplined for their religious beliefs. (*Id.*). The District also clarified that a student would be permitted to seek accommodations to "avoid using pronouns where doing so would be contrary to [their] religious beliefs." (*Id.*).

A few months later, PDE, a nationwide membership organization whose members include students enrolled in the School District and parents of enrolled students, filed this lawsuit. PDE simultaneously requested a preliminary injunction on the basis of declarations from four pseudonymous parents of OLSD students who believe that individuals cannot transition from one gender to another, because biological sex is immutable. (*See, e.g.*, Decl. of Parent A ¶¶ 4, 8, ECF No. 7-3). Those students, according to their parents, "wish[] to use pronouns that are consistent with a classmate's biological sex, rather than the classmate's 'preferred pronouns'" in light of their views, but that the students self-censor themselves because of the policy. (*See e.g.*, *id.* at ¶¶ 11, 13-14).

This Court adjudicated Plaintiff's Motion for Preliminary Injunction, and concluded that while "there is a substantial likelihood that PDE can establish Article III standing," Plaintiff did not demonstrate a substantial likelihood of success on the merits. (ECF No. 28 at 16, 39). After weighing the preliminary injunction factors, this Court denied Plaintiff's Motion. (*Id.* at 41). PDE appealed the decision, but the Sixth Circuit affirmed this Court's conclusion, agreeing that Plaintiff had not demonstrated a likelihood of success on the merits of its claims. *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 109 F.4th 453, 466 (6th Cir. 2024).

Now that the preliminary injunction issue has been resolved, this Court turns to Defendants' Motion to Dismiss the Complaint for Lack of Subject Matter Jurisdiction and Standing. (ECF No. 16). Defendants challenge Plaintiff's standing to bring both the students' First Amendment claims and the parents' Fourteenth Amendment claim for interference with parental rights. (*See id.*). The Motion is ripe for review.

## II. STANDARD OF REVIEW

This Court's jurisdiction is limited to the adjudication of "cases" and "controversies." U.S. Const. art. III, § 2. One characteristic of "cases" and "controversies" is that the plaintiff has standing to bring them as lawsuits. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

Standing is appropriately challenged under Rule 12(b)(1), *In re Dublin Sec., Inc.*, 197 B.R. 66, 69 (S.D. Ohio 1996), *aff'd*, 133 F.3d 377 (6th Cir. 1997), which provides that the defendant may file a motion to dismiss based on a "lack of jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1). The Sixth Circuit recognizes two kinds of motions to dismiss for lack of standing pursuant to Rule 12(b)(1): a facial attack and a factual attack. *United States v. Ritchie*, 15 F.3d

4

592, 598 (6th Cir. 1994). A facial attack merely questions the sufficiency of the pleading. *See id.* In deciding a facial motion to dismiss, much like in a motion to dismiss for failure to state a claim, "the court must take the material allegations in the petition as true and construed in the light most favorable to the nonmoving party." *Id.* A factual attack, on the other hand, is an attack on the factual existence of standing. *See id.* In deciding a factual motion to dismiss, "the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* In either case, "the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Rogers v. Stratton Indus.*, 798 F.2d 913, 915 (6th Cir. 1986).

Defendants assert that they are mounting a factual attack to Plaintiff's standing, such that no presumption of truthfulness applies to Plaintiff's allegations. (ECF No. 16 at 7). They ground this argument in the following quote: "A motion to dismiss in a declaratory judgment action," such as this one, "is considered a factual attack on subject matter jurisdiction." *Beach Sales & Eng'g, LLC v. Telebrands, Corp.*, 2015 WL 1930337, at *1 (N.D. Ohio Apr. 28, 2015). But *Beach Sales* and the case that it quotes, *Google, Inc. v. EMSAT Advanced Geo-Location Tech., LLC*, 2010 WL 55685, at *2 (N.D. Ohio Jan. 4, 2010), provide no analysis for the conclusion that a Rule 12(b)(1) motion in a case including claims for declaratory judgment must always be a factual challenge. Indeed, *EMSAT* justifies this conclusion simply by citing to a case in which the Defendant submitted a declaration with its motion to dismiss, thereby "present[ing] a 'factual' rather than a 'facial' motion for dismissal under Rule 12(b)(1)." *3D Sys., Inc. v. Envisiontec, Inc.*, 575 F. Supp. 2d 799, 804-05 (E.D. Mich. 2008).

This Court sees no reason to extrapolate this seemingly case-specific conclusion to the circumstance at hand, where Defendants submit no affidavits or declarations to challenge standing but, instead, raise two issues of law: (1) whether PDE's members' use of pseudonyms undermines

5

PDE's associational standing; and (2) whether the challenged policies objectively chill speech. These are issues of law that turn on the face of the complaint. "A factual attack . . . requires a factual dispute." *Const. Party of Pennsylvania v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014). But no such factual disputes are present. Accordingly, this Court construes Defendants' Motion as a facial challenge to Plaintiff's standing, thereby "tak[ing] the material allegations in the petition as true and constru[ing them] in the light most favorable to the nonmoving party." *Ritchie*, 15 F.3d at 598.

### III.   LAW & ANALYSIS

When an organization, such as PDE, brings suit, it may establish standing as an entity or on behalf of its members. *See Ne. Ohio Coal. For the Homeless v. Husted*, 837 F.3d 612, 624 (6th Cir. 2016). PDE pursues the latter route, known as associational or organizational standing. Associational standing exists when: (1) "members would otherwise have standing to sue in their own right"; (2) "the interests at stake are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 181 (2000). Defendants contest only the first prong: whether Students A-D and Parents A-D would have standing to sue in their own right. To show that its members would have standing, PDE must show that they have suffered "(1) an injury in fact that is (2) fairly traceable to the defendant's conduct and (3) likely to be redressed by a favorable judicial decision." *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 555 (6th Cir. 2021).

### A.   Pseudonyms

Before reaching the traditional standing factors, however, Defendants argue that Plaintiff PDE does not have standing because the members it represents are identified through pseudonyms.

6

In Defendants' view, cases in which courts have used the words "name" or "naming" to describe what organizations must do with respect to their members in order to show standing require organizational plaintiffs to reveal the legal names of their members. For example, in *Summers v. Earth Island Inst.*, the Supreme Court summarized an earlier case, *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 235 (1990), in which the Court "noted that the affidavit provided by the city to establish standing would be insufficient because it did not *name* the individuals who were harmed . . ." 555 U.S. 488, 498 (2009) (emphasis added). The Sixth Circuit later quoted this language, explaining that "[t]o establish organizational standing, 'plaintiff-organizations [must] make specific allegations establishing that at least one identified member had suffered or would suffer harm'" and that "[s]uch specificity requires that the plaintiff-organization '*name* the individuals who were harmed.'" *Tennessee Republican Party v. Sec. & Exch. Comm'n*, 863 F.3d 507, 520 (6th Cir. 2017) (emphasis added).

But, as Plaintiff argues, it is clear from the context of those cases, and the language of the cases on which they rely, that those courts were explaining that individual members must be "identified," not legally named. For example, in *Summers*, the Court raised the issue of "naming" while rejecting a theory of standing based on the associations' "self-descriptions of their membership" and "statistical probabilities," as opposed to "individual affidavits," because the former approach only indicated a likelihood that an individual had been harmed, not a certainty. 555 U.S. at 498-99. The Court's concern was not pseudonyms—indeed, there were no pseudonymously identified members in *Summers*—but the identification of any specific members whatsoever. *Id.*; *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 235 (1990), *holding modified by City of Littleton, Colo. v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774 (2004) (noting that a submission "fails to *identify* the individuals whose licenses were revoked") (emphasis added).

7

In other words, "requiring an organizational plaintiff to tie its injury to specific, identifiable members is not equivalent to requiring that plaintiff to name those members at the pleading stage." *Humane Soc'y of the United States v. United States Dep't of Agric.*, 2021 WL 1593243, at *5 (C.D. Cal. Mar. 26, 2021); *see also Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 594 (D.C. Cir. 2022) (explaining that even though "we do not know the names of the individuals in the survey, . . . anonymity is no barrier to standing on this record."). This conclusion stands to reason because "[n]aming those members adds no essential information bearing on the injury component of standing," so long as "the requirements of 'injury in fact' and causation have been met." *Hotel & Rest. Emps. Union, Local 25 v. Smith*, 846 F.2d 1499, 1506 (D.C. Cir. 1988) (Mikva, J., separate opinion). Having concluded that pseudonymity presents no obstacle here, this Court turns now to the traditional standing requirements.

### B.  Standing Requirements

As mentioned above, standing doctrine requires plaintiffs to show that they have suffered "(1) an injury in fact that is (2) fairly traceable to the defendant's conduct and (3) likely to be redressed by a favorable judicial decision." *Hargett*, 2 F.4th at 555.  Plaintiff brings claims on behalf of both parents and students.

#### 1. *Students' Standing: First Amendment Claims*

At the outset, it is worth noting that PDE generally identifies two categories of speech the students it represents wish to engage in: (1) the use of pronouns differing from those preferred by transgender students; and (2) speech questioning the prevalence of gender dysphoria and discussing issues of gender identity.  But in its response to Defendants' Motion to Dismiss, PDE focuses entirely on its standing to challenge the policies on the grounds that they prohibit students from using pronouns other than those preferred by transgender classmates.  As a result, this Court

8

limits its analysis to that theory of the case.  Specifically, Plaintiff alleges that requiring students to use other students' preferred pronouns constitutes compelled speech in violation of the First Amendment and seeks declaratory relief invalidating the relevant regulations and enjoining Defendants from requiring students to use pronouns that may differ from those that accord with other students' sex at birth. (ECF No. 1 ¶¶ 150-59).  It also alleges that the policies amount to unconstitutional content- and viewpoint-based discrimination and are overbroad.  (*Id.* ¶¶ 160-79).

None of the students represented by PDE has been disciplined by the school for using non-preferred pronouns, so this case arises in a pre-enforcement posture.  *See e.g., 303 Creative LLC v. Elenis*, 600 U.S. 570, 597 (2023) (deciding a pre-enforcement free speech challenge). Article III does not require a plaintiff—or its members—to have endured "an actual arrest, prosecution, or other enforcement action." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).  Instead, to show injury-in-fact in the First Amendment pre-enforcement context, such that an injunction is justified, plaintiffs must show that: "(1) they intend to engage in expression that the Free Speech Clause arguably protects, (2) their expression is arguably proscribed by the challenged [rules], and (3) they face a credible threat of enforcement from those [r]ules." *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022).  And "[o]btaining standing for declaratory relief has the same requirements as obtaining standing for injunctive relief." *Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, 927 F.3d 396, 406 (6th Cir. 2019).

With respect to the first factor, as this Court identified in its Preliminary Injunction Opinion & Order, "declarations provided by PDE show" that "the children of Parents A-D wish to engage in speech that the Free Speech Clause arguably protects." (ECF No. 28 at 12 (citing Decl. of Parent A ¶ 10, ECF No. 7-3).  And in affirming this Court's denial of PDE's request for a preliminary injunction, the Sixth Circuit confirmed that "[t]he intentional use of preferred or non-preferred

9

pronouns . . . represents speech protected by the First Amendment." *Parents Defending Educ.*, 109 F.4th at 466; *see also Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021) (reaching the same conclusion in the university context).

With respect to the second factor, Defendants have confirmed that purposeful references to students' non-preferred pronouns would violate District policy. (ECF No. 13-1 ("A student purposefully referring to another student by using gendered language they know is contrary to the other student's identity would be an example of discrimination under Board Policy.")). Naturally, such expression is at least arguably proscribed by the challenged rules.

The Parties devote the bulk of their briefing to the third factor: whether there is a credible threat of enforcement. Many of Defendants' arguments conflate the students' desire to use non-preferred pronouns and their desire to speak freely about their abstract beliefs without fear of discipline, the latter of which Defendants disavow any interest in prohibiting. But once the analysis is appropriately focused on the use of non-preferred pronouns, it becomes clear that there is a credible threat of enforcement.

"To identify a credible threat of enforcement, the first and most important factor is whether the challenged action chills speech." *Fischer*, 52 F.4th at 307. Although "mere allegations of a 'subjective chill' on protected speech are insufficient to establish an injury-in-fact for pre-enforcement standing purposes," when a subjective chill, like the one Plaintiff alleges here, is coupled with "some combination" of certain reoccurring factors, courts generally conclude that a plaintiff has established a credible threat of enforcement. *McKay v. Federspiel*, 823 F.3d 862, 868-69 (6th Cir. 2016). The reoccurring, but non-exhaustive, factors are as follows:

> (1) Does the relevant prosecuting entity have a prior history of enforcing the challenged provision against the plaintiffs or others? (2) Has that entity sent warning letters to the plaintiffs regarding their conduct? (3) Does the challenged regulatory regime make enforcement easier or more likely? and (4) Did the

>prosecuting entity refuse to disavow enforcement of the challenged provision against the plaintiffs?

*Fischer*, 52 F.4th at 307.

Taking these considerations in turn, the record here contains no indication that the District has enforced these challenged provisions against Plaintiff or others. And because this is a pre-enforcement challenge, it is unsurprising that Defendants have not sent warning letters to the students regarding their conduct. The third and fourth factors, however, are satisfied. Plaintiff alleges that anyone can report perceived bias through the District's "Stay Safe Speak Up Helpline," (ECF No. 1 ¶ 60), which resembles bias-reporting systems that have been found to increase the likelihood of enforcement. *See Fischer*, 52 F.4th at 308. More important is the District's refusal to disavow enforcement, explaining to parents that "[a] student purposefully referring to another student by using gendered language they know is contrary to the other student's identity would be an example of discrimination under Board Policy." (ECF No. 13-1 at 2).

It is these objective indicia of the likelihood of enforcement that distinguish this case from *Morrison v. Bd. of Educ. of Boyd Cnty.*, 521 F.3d 602, 610 (6th Cir. 2008), on which Defendants rely. There, a student brought an as-applied pre-enforcement challenge for nominal damages, arguing that his school board's policies in the 2004-05 school year chilled his speech. *Id.* at 608. But unlike the case *sub judice*, Morrison could not "point to anything beyond his own 'subjective apprehension and a personal (self-imposed) unwillingness to communicate.'" *Id.* at 610. Here, the students have every reason to believe that the policies will be enforced against them, should they choose to speak as they wish: when a parent asked whether their child would be punished for referring to children by non-preferred pronouns, the District responded by explaining that such behavior would amount to discrimination under the District's policies. And the policies themselves explain that they will be "vigorously enforced." (ECF No. 7-1 at 6). It is, therefore,

11

evident that there is a credible threat that Defendants will enforce the relevant policies against students who purposefully use non-preferred pronouns.

The Parties do not raise causation and redressability, but this Court finds that they, too, are satisfied. Plaintiff has shown causation because its members' anticipated harms are "fairly traceable" to Defendants—the District and its officials—and, if granted, the injunctive and declaratory relief Plaintiff seeks is likely to redress any future harms the students may suffer from the policies and their enforcement. In sum, Plaintiff has shown that is has standing to challenge the relevant policies on behalf of the identified students on First Amendment grounds.

2. *Parents' Standing: Fourteenth Amendment Claims*

Plaintiff also alleges that Parent-members A-D have been injured through the relevant policies' intrusion into their "right to raise their children beyond the schoolhouse gate," in violation of the substantive due process secured by the Fourteenth Amendment. (ECF No. 1 ¶ 187). Specifically, Plaintiff argues that "by prohibiting off-campus speech, including speech not during a school-sponsored activity, the Policies also violate parents' 'fundamental right[s] . . . to make decisions concerning the care, custody, and control of their children.'" (*Id.* ¶ 189 (quoting *Troxel v. Granville*, 530 U.S. 57, 66 (2000))).

In their Motion to Dismiss, Defendants argue that Plaintiff does not have standing to bring this claim on behalf of the parents because parents' right to direct the instruction that children receive in public schools is limited, and nothing in the policies proscribes parents from discussing gender identity with their children in their own homes.[1] These are arguments perhaps well-suited

---

[1] In hopes of honing the focus of litigation as it proceeds, this Court notes that it does not read Plaintiff's Fourteenth Amendment claim as alleging that the subject somehow policies govern private, kitchen-table conversations between a parent and child. Instead, Plaintiff alleges that the policies impermissibly restrict students from discussing these "topics with other students and the Olentangy community on and off campus, including during off-campus activities with no connection to any school-related activity." (ECF No. 1 ¶ 97).

for challenging whether Plaintiff has stated a claim on the merits. Standing, however, "in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Warth*, 422 U.S. at 500. Instead, this Court "must assume that 'if proved in a proper case,' Defendants' alleged practices 'would be adjudged violative of the [Plaintiff's] constitutional rights.'" *Kanuszewski*, 927 F.3d at 407 (quoting *Warth*, 422 U.S. at 502). Accordingly, this Court assumes that Plaintiff will be able to prove that its allegations amount to a Fourteenth Amendment violation.

Plaintiff's allegations that the subject policies interfere with parents' right to control their children's upbringing represent an ongoing harm sufficient to confer standing such that Plaintiff may seek injunctive and declaratory relief on behalf of its members. Indeed, "[t]he Supreme Court has held that parents have standing when the state interferes with their right to control the upbringing of their children." *Id.* And, taking Plaintiff's allegations as true, these ongoing harms are fairly traceable to the policies promulgated and enforced by Defendants, and thereby, redressable through declaratory and injunctive relief. In sum, Plaintiff has standing to challenge the policies on behalf of Parents A-D.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction and Standing (ECF No. 16) is **DENIED**.

**IT IS SO ORDERED.**

ALGENON L. MARBLEY
CHIEF UNITED STATES DISTRICT JUDGE

**DATE: August 28, 2024**