# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Kelly L. Stephens
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  November 06, 2025

Mr. John J. Bursch
Alliance Defending Freedom
440 First Street, N.W.
Suite 600
Washington, DC 20001

Mr. Talmadge Butts
Foundation for Moral Law
1 Dexter Avenue
Montgomery, AL 36104

Mr. David Joseph Carey
American Civil Liberties Union of Ohio Foundation
1108 City Park Avenue
Suite 203
Columbus, OH 43206

Mr. John Michael Connolly
Consovoy McCarthy
1600 Wilson Boulevard
Suite 700
Arlington, VA 22209

Mr. Robert L. Corn-Revere
Foundation for Individual Rights in Education
General Counsel
700 Pennsylvania Avenue, S.E.
Suite 340
Washington, DC 20003

Mr. Donald Albert Daugherty Jr.
Defense of Freedom Institute
1455 Pennsylvania Avenue, N.W.
Suite 400
Washington, DC 20004

Mr. William M. Deters II
Ennis Britton
1714 W. Galbraith Road
Cincinnati, OH 45239

Ms. Ruthanne Mary Deutsch
Deutsch Hunt
300 New Jersey Avenue, N.W.
Suite 900
Washington, DC 20001

Ms. Deborah Jane Dewart
111 Magnolia Lane
Hubert, NC 28539

Mr. Steven W. Fitschen
National Legal Foundation
524 Johnstown Road
Chesapeake, VA 23322

Mr. Bartholomew Thomas Freeze
Freund, Freeze & Arnold
88 E. Broad Street
Suite 875
Columbus, OH 43215

Ms. Amy Gilbert
ACLU of Ohio Foundation
4506 Chester Avenue
Cleveland, OH 44103

Mr. Paul Giorgianni
Giorgianni Law
1538 Arlington Avenue
Columbus, OH 43212-2710

Mr. James Hasson
Consovoy McCarthy
1600 Wilson Boulevard
Suite 700
Arlington, VA 22209

Mr. Christopher J.C. Herbert
Goodwin Procter
100 Northern Avenue
Boston, MA 02210

Mr. Mark P. Herron
5001 Mayfield Road, Suite 318
Lyndhurst, OH 44124

Mr. Mathew Hoffmann
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176

Mr. Benjamin Isgur
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, GA 30075

Mr. Tyson Charles Langhofer
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176

Ms. Freda Levenson
ACLU of Ohio Foundation
4506 Chester Avenue
Cleveland, OH 44103

Ms. Karen Loewy
Lambda Legal Defense & Education Fund
815 16th Street, N.W.
Suite 4140
Washington, DC 20002-8105

Mr. Ronald Gary London
Foundation for Individual Rights in Education
General Counsel
700 Pennsylvania Avenue, S.E., Suite 340
Washington, DC 20003

Ms. Sherrie Clayborne Massey
Peters Kalail & Markakis
5005 Rockside Road, Suite 840
Cleveland, OH 44131

Ms. Sandra R. McIntosh
Scott Scriven
250 E. Broad Street
Suite 900
Columbus, OH 43215

Ms. Taylor A.R. Meehan
Consovoy McCarthy
1600 Wilson Boulevard
Suite 700
Arlington, VA 22209

Mr. Kerry Lee Morgan
Pentiuk, Couvreur & Kobiljak
2915 Biddle Avenue
Suite 200
Wyandotte, MI 48192

Mr. Brett Robert Nolan
Institute for Free Speech
1150 Connecticut Avenue, N.W.
Suite 801
Washington, DC 20036

Mr. Cameron Thomas Norris
Consovoy McCarthy
1600 Wilson Boulevard
Suite 700
Arlington, VA 22209

Mr. William Jeffrey Olson
Law Office
370 Maple Avenue, W.
Suite 4
Vienna, VA 22180-5615

Mr. Scott C. Peters
Peters Kalail & Markakis
5005 Rockside Road
Suite 840
Cleveland, OH 44131

Ms. Jessica Kathryn Philemond
Scott Scriven
250 E. Broad Street, Suite 900
Columbus, OH 43215

Mr. Emmett Robinson
Robinson Law Firm
6600 Lorain Avenue
Suite 731
Cleveland, OH 44102

Ms. Jaime Santos
Goodwin Procter
1900 N Street, N.W.
Washington, DC 20036

Mr. Adam Ezra Schulman
Hamilton Lincoln Law Institute
1629 K Street, N.W.
Suite 300
Washington, DC 20006

Mr. Ilya Shapiro
Manhattan Institute
52 Vanderbilt Avenue
New York, NY 10017

Mr. Daniel Shisler
Peters Kalail & Markakis
5005 Rockside Road
Suite 840
Cleveland, OH 44131

Mr. Joseph David Spate
Office of the Attorney General
of South Carolina
P.O. Box 11549
Columbia, SC 29211

Ms. Mathura Jaya Sridharan
Office of the Attorney General
of Ohio
30 E. Broad Street
17th Floor
Columbus, OH 43215

Mr. Mitchell Stith
Scott Scriven
250 E. Broad Street
Suite 900
Columbus, OH 43215

Ms. Kayla Toney
First Liberty Institute
2001 W. Plano Parkway
Suite 1600
Plano, TX 75075

Mr. John Marc Wheat
Advancing American Freedom
801 Pennsylvania Avenue
Suite 930
Washington, DC 20004

> Re:   Case No. 23-3630, *Defending Educ. v. Olentangy Loc. Sch. Dist, et al*
>       Originating Case No. 2:23-cv-01595

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

> Yours very truly,
>
> Kelly L. Stephens, Clerk
>
>
> Cathryn Lovely
> Deputy Clerk

cc:  Mr. Richard W. Nagel

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0307p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

DEFENDING EDUCATION, fka Parents Defending Education,

*Plaintiff-Appellant*,

*v.*

OLENTANGY LOCAL SCHOOL DISTRICT BOARD OF EDUCATION; MARK T. RAIFF, in his official capacity as Superintendent of Olentangy Local School District; PETER STERN, in his official capacity as Olentangy's Assistant Director of Equity and Inclusion; RANDY WRIGHT, in his official capacity as Olentangy's Chief of Administrative Services; KEVIN DABERKOW, in his official capacity as a member of the Olentangy Board of Education; BRANDON LESTER, in his official capacity as a member of the Olentangy Board of Education; KEVIN O'BRIEN, in his official capacity as a member of the Olentangy Board of Education; LIBBY WALLICK, in her official capacity as a member of the Olentangy Board of Education; LAKESHA WYSE, in her official capacity as a member of the Olentangy Board of Education,

*Defendants-Appellees*.

> No. 23-3630

———————————

On Petition for Rehearing En Banc.

United States District Court for the Southern District of Ohio at Columbus.
No. 2:23-cv-01595—Algenon L. Marbley, District Judge.

Argued En Banc:  March 19, 2025

Decided and Filed:  November 6, 2025

Before:  SUTTON, Chief Judge; BATCHELDER, MOORE, CLAY, GRIFFIN, KETHLEDGE, STRANCH, THAPAR, BUSH, LARSEN, NALBANDIAN, READLER, MURPHY, DAVIS, MATHIS, BLOOMEKATZ, and RITZ, Circuit Judges.[*]

———————————

[*]Pursuant to 6 Cir. I.O.P. 40(g), Composition of the En Banc Court, Judge Batchelder, a senior judge of the court who sat on the original panel in this case, participated in this decision.  Judge Hermandorfer, whose commission date is July 17, 2025, did not participate in this appeal.

No. 23-3630      *Defending Educ. v. Olentangy Loc.*      Page 2
*Sch. Dist. Bd. of Educ., et al.*

―――――――――

## COUNSEL

**ARGUED EN BANC:** Cameron T. Norris, CONSOVOY MCCARTHY PLLC, Arlington, Virginia, for Appellant. Jaime A. Santos, GOODWIN PROCTER LLP, Washington, D.C., for Appellees. T. Elliot Gaiser, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Amici Curiae. **ON SUPPLEMENTAL BRIEF:** Cameron T. Norris, J. Michael Connolly, Thomas S. Vaseliou, CONSOVOY MCCARTHY PLLC, Arlington, Virginia, Emmett E. Robinson, ROBINSON LAW FIRM LLC, Cleveland, Ohio, for Appellant. Bartholomew T. Freeze, Genevieve M. Hoffman, FREUND, FREEZE & ARNOLD, Columbus, Ohio, Jessica K. Philemond, Sandra R. McIntosh, Mitchell L. Stith, SCOTT SCRIVEN LLP, Columbus, Ohio, for Appellees. **ON AMICUS BRIEF:** T. Elliot Gaiser, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, Joseph D. Spate, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, Kayla A. Toney, FIRST LIBERTY INSTITUTE, Washington, D.C., Brett R. Nolan, INSTITUTE FOR FREE SPEECH, Washington, D.C., Adam E. Schulman, HAMILTON LINCOLN LAW INSTITUTE, Washington, D.C., Ilya Shapiro, MANHATTAN INSTITUTE, New York, New York, David J. Carey, AMERICAN CIVIL LIBERTIES UNION OF OHIO FOUNDATION, Columbus, Ohio, Amy R. Gilbert, Freda J. Levenson, AMERICAN CIVIL LIBERTIES UNION OF OHIO FOUNDATION, Cleveland, Ohio, J. Marc Wheat, ADVANCING AMERICAN FREEDOM, INC., Washington, D.C., Benjamin Isgur, SOUTHEASTERN LEGAL FOUNDATION, Roswell, Georgia, Tyson C. Langhofer, Matthew W. Hoffmann, ALLIANCE DEFENDING FREEDOM, Lansdowne, Virginia, John J. Bursch, ALLIANCE DEFENDING FREEDOM, Washington, D.C., Talmadge Butts, FOUNDATION FOR MORAL LAW, Gallant, Alabama, Kerry Lee Morgan, THE LONANG INSTITUTE, Wyandotte, Michigan, Donald A. Daugherty, Jr., DEFENSE OF FREEDOM INSTITUTE, Washington, D.C., William J. Olson, WILLIAM J. OLSON, P.C., Vienna, Virginia, Robert L. Corn-Revere, FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, Philadelphia, Pennsylvania, Scott C. Peters, Sherrie C. Massey, Daniel R. Shisler, PETERS KALAIL & MARKAKIS CO., L.P.A., Cleveland, Ohio, Jaime A. Santos, GOODWIN PROCTER LLP, Washington, D.C., Karen L. Loewy, LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC., Washington, D.C., Mark P. Herron, HERRON LAW OFFICES, Lyndhurst, Ohio, Paul Giorgianni, GIORGIANNI LAW LLC, Columbus, Ohio, for Amici Curiae.

    MURPHY, J., delivered the opinion of the court in which, SUTTON, C.J., and BATCHELDER, GRIFFIN, KETHLEDGE, THAPAR, BUSH, LARSEN, NALBANDIAN, and READLER, JJ., concurred. BATCHELDER, J. (pp. 36–38), KETHLEDGE, J. (pp. 39–45), THAPAR and NALBANDIAN, JJ. (pp. 46–57), and BUSH, J. (pp. 58–83), delivered separate concurring opinions. STRANCH, J. (pp. 84–112), delivered a separate dissenting opinion in which MOORE, CLAY, DAVIS, MATHIS, BLOOMEKATZ, and RITZ, JJ., concurred.

———————————

**OPINION**

———————————

MURPHY, Circuit Judge.  An Ohio public school district bars its students from referring to transgender and nonbinary classmates using the pronouns that match their biological sex if the classmates prefer to go by different pronouns.  The plaintiff in this case has parent and student members who believe that a person's sex is immutable.  The members want to express this view by using biological pronouns.  And they believe that they would convey a falsehood—that a person's gender is fluid—if they use preferred pronouns.  So the plaintiff challenged the school district's speech ban on behalf of its members under the First Amendment's Free Speech Clause.

This case about pronouns pits two important interests against each other.  On the one hand, the school district has prohibited speech (biological pronouns) that expresses a message on a matter of pressing public concern.  And because the district requires other speech (preferred pronouns) that expresses a competing view, it has discriminated based on its students' viewpoints.  Its approach thus raises serious free-speech concerns.  On the other hand, the school district rightly responds that it has a duty to protect all students—including transgender and nonbinary students— from bullying and harassment.  And this protection, while necessarily restricting speech, does not violate the Free Speech Clause.  So which of these competing concerns should prevail in this case?

The Supreme Court's cases provide a clear answer.  A school district may not restrict personal speech on matters of public concern unless the speech would "materially and substantially disrupt" school activities or infringe the legal "rights of others" in the school community.  *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969).  In this case's current posture, the school district has fallen far short of meeting this demanding standard.  It introduced no evidence that the use of biological pronouns would disrupt school functions or qualify as harassment under Ohio law.  Our society continues to debate whether biological pronouns are appropriate or offensive—just as it continues to debate many other issues surrounding transgender rights.  The school district may not skew this debate by forcing one side to change the way it conveys its message or by compelling it to express a different view.  We thus reverse and remand

for the entry of an appropriately tailored preliminary injunction barring the district from punishing students for the commonplace use of biological pronouns.  Yet nothing we say here forecloses the district from enforcing its anti-harassment policies against the abuse of transgender students just as it enforces those policies against the abuse of all other students.

I

The Olentangy Local School District Board of Education operates a large school district in central Ohio that has four high schools and many elementary and middle schools.  In February 2023, a concerned parent emailed Olentangy officials about the School District's transgender policies.  The parent has a "devoutly Christian child" who believes that only "two biological genders" exist ("male/female") "and that those genders are decided at conception by God[.]"  Emails, R.7-2, PageID 357.  The parent thus asked whether Olentangy's policies would force students "to use the pronouns that a transgender child identifies with or be subject to reprimand from the district if they refuse to do so[.]"  *Id.*

A few days later, the School District's legal counsel responded "on behalf of the District."  *Id.*, PageID 356.  Counsel explained that Olentangy's anti-harassment policy "prohibits discrimination and harassment based upon a student's sex, including sexual orientation and gender identity."  *Id.*  She added: "A student purposefully referring to another student by using gendered language they know is contrary to the other student's identity would be an example of discrimination under Board Policy."  *Id.*  In a later email, though, counsel suggested that district administrators would happily discuss "accommodations to avoid using pronouns where doing so would be contrary to [a child's] religious beliefs[.]"  *Id.*, PageID 355.

This email exchange led to this lawsuit.  As it turns out, the parent who sent the email belonged to an organization that now goes by "Defending Education."  Defending Education's president has described it as a "nationwide, grassroots membership organization whose members are primarily parents of school-aged children."  Neily Decl., R.7-2, PageID 345.  At least four of its members—whom the parties have called Parents A, B, C, and D—have children who attend Olentangy schools.  The children of these four Parents often interact "with students that identify as transgender or nonbinary at school."  *See, e.g.*, Parent A Decl., R.7-3, PageID 363.  The children

have "no ill-will toward children or adults who identify as transgender or nonbinary[.]"  *See, e.g.*, *id.*  But they believe that people are born "either male or female and that a child cannot 'transition' from one sex to another."  *See, e.g.*, *id.*  The children thus desire "to use pronouns that are consistent with a classmate's biological sex, rather than the classmate's 'preferred pronouns'—*i.e.*, the pronouns that the classmate has decided reflect[] the classmate's gender identity."  *See, e.g.*, *id.*  And they assert that they would violate their scientific and religious beliefs if they were "to 'affirm' that a biologically female classmate is actually a male—or vice versa—or that a classmate is 'nonbinary' and neither male nor female."  *See, e.g.*, *id.*  Yet the children have "self-censor[ed]" for fear that the School District will punish them if they adhere to what they believe to be the undeniable truth by using biological pronouns.  *See, e.g.*, *id.*, PageID 364.

Parents A, B, C, and D do not want to reveal their identities because they worry that school officials or members of the broader community will retaliate against them for their beliefs. Defending Education thus sued the School District's board and administrators on behalf of its members who live in the District.  In the email response to the concerned parent, the District's legal counsel had not identified the specific policies that barred the use of biological pronouns.  So Defending Education opted to challenge several parts of three policies: Policy 5517, Policy 5136, and the Code of Conduct.

*Policy 5517*.  Policy 5517 lists the School District's anti-harassment rules.  *See* Policy 5517, R.7-1, PageID 121.  It explains that the District will "vigorously enforce its prohibition against discriminatory harassment based on" "gender identity" (among other traits).  *Id.*  The policy defines "harassment" to mean "any threatening, insulting, or dehumanizing gesture, use of technology, or written, verbal or physical conduct directed against a student or school employee that" meets various elements.  *Id.*, PageID 123.  Speech can qualify as harassment if it has "the effect of substantially interfering with a student's educational performance, opportunities, or benefits" or of "substantially disrupting the orderly operation of a school."  *Id.*

Policy 5517 separately bars "bullying" if it rises "to the level of unlawful harassment[.]" *Id.*, PageID 122.  The policy notes that bullying would reach this prohibited level if it "systematically and chronically inflict[s] physical hurt or psychological distress" on a student

"based upon" a protected category such as gender identity.  *Id.*  At the start of this suit, the policy clarified that "bullying" covered "unwanted and repeated" speech, "including any threatening, insulting, or dehumanizing gesture . . . that is severe or pervasive enough to create an intimidating, hostile, or offensive educational or work environment; cause discomfort or humiliation; or unreasonably interfere with the individual's school or work performance or participation[.]"  *Id.*

*Policy 5136*.  Policy 5136 regulates the student use of "personal communication devices," including cellphones, tablets, and computers.  Policy 5136, R.7-1, PageID 133.  It bars students from using these devices "in any way that might reasonably create in the mind of another person an impression of being threatened, humiliated, harassed, embarrassed or intimidated."  *Id.*, PageID 134.  It specifically mentions that students may not use their devices to "transmit material" that qualifies as "disruptive" or that could "be construed as harassment or disparagement of others based upon" protected characteristics, including gender identity.  *Id.*

*Code of Conduct*.  The School District's student handbook also includes a Code of Conduct for students.  This code reiterates that students may not engage in "harassment" or "bullying" during school activities.  Handbook, R.7-1, PageID 157.  It defines harassment and bullying in a similar way.  *Id.*  Elsewhere, the code bars students from using "discriminatory language," defined "as verbal or written comments, jokes, and slurs that are derogatory towards an individual or group based on," among other characteristics, gender identity.  *Id.*, PageID 150.

According to Defending Education, these policies violated the Free Speech Clause in several ways.  Its complaint alleged that the policies unconstitutionally compelled speech by requiring students to use preferred pronouns rather than biological pronouns.  Compl., R.1, PageID 39–42.  Alternatively, the complaint alleged that the policies engaged in improper content- and viewpoint-based discrimination.  *Id.*, PageID 42–44.  Lastly, the complaint alleged that the policies suffered from unconstitutional overbreadth.  *Id.*, PageID 45–48.

Defending Education moved for a preliminary injunction to bar the School District from enforcing the policies.  The district court denied the motion.  *See Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 684 F. Supp. 3d 684, 694–712 (S.D. Ohio 2023).  A panel of our court affirmed over Judge Batchelder's dissent.  *See Parents Defending Educ. v. Olentangy*

*Loc. Sch. Dist. Bd. of Educ.*, 109 F.4th 453, 474 (6th Cir. 2024). The full court granted rehearing en banc, vacated the panel decision, and agreed to rehear this case. *See Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 120 F.4th 536, 537 (6th Cir. 2024) (order).

## II

A request for a preliminary injunction requires us to ask four questions: Will the plaintiff likely succeed on the merits? Will it suffer an irreparable injury without the injunction? Which way do the balance of any equities tip? And does the public interest favor one side or the other? *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Our answers to these questions establish that Defending Education is entitled to a preliminary injunction.

### A. Likelihood of Success: Justiciability

We begin with the likelihood-of-success factor—the most important one in First Amendment cases. *See Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) (per curiam) (order). In its supplemental briefing, the School District challenged this likelihood with standing and mootness objections to our review of the free-speech claims on the merits. But both objections fall short.

*Standing*. Plaintiffs who want to invoke a federal court's coercive powers against state officials must show that they seek to litigate an actual "Case[]" or "Controvers[y]" under Article III. U.S. Const. art. III, § 2, cl. 1; *see Ass'n of Am. Physicians & Surgeons v. U.S. FDA*, 13 F.4th 531, 536–37 (6th Cir. 2021). To make out an Article III case, they must satisfy standing's three well-known elements. *See Murthy v. Missouri*, 603 U.S. 43, 57 (2024). That is, they must show that they have incurred (or face an imminent risk of incurring) a cognizable injury; that this injury flows out of the defendant's conduct; and that their requested relief will redress the injury. *See id.* They must establish these three elements at each stage of a case in the same way they must prove the merits of their claims at each stage. *See Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 543–44. To obtain a preliminary injunction, then, plaintiffs must show that they "likely" will prove standing's elements. *Murthy*, 603 U.S. at 58 (citation omitted).

Defending Education does not try to prove its own standing. Rather, it relies on the "associational standing" doctrine. This doctrine sometimes permits an entity to sue as a representative of its members. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977). To do so, an organization must satisfy three other requirements: that at least one of its members can prove the three usual elements of standing; that the organization has filed the suit to promote "interests" relevant to its "purpose"; and that the proposed claims and remedies do not require the individual members with standing to join the suit. *Id.* at 343.

The School District raises a narrow argument under these rules. Starting with the second associational-standing requirement, the District does not dispute that this case advances Defending Education's purposes. That entity seeks to protect against efforts to "usurp parents' rights and to silence students who express opposing views." Neily Decl., R.7-2, PageID 345. And it advances this goal through "litigation" like this suit. *Id.* Turning to the third associational-standing requirement, the School District does not argue that the nature of the claims or remedies requires Defending Education's members to join the suit. And because the Supreme Court has called this element prudential rather than jurisdictional, we need not find it met ourselves. *See United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 554–55 (1996).

These concessions leave only associational standing's first requirement. The School District suggests that no member of Defending Education has asserted a "redressable injury" and thus that no member has standing. Appellees' Supp. Br. 8. The type of injury that a plaintiff must assert depends on the type of relief the plaintiff seeks. *See Davis v. Colerain Township*, 51 F.4th 164, 171 (6th Cir. 2022). Defending Education requests injunctive relief to bar the School District from punishing its members for their speech. To pursue this type of relief tied to possible future harm, the organization must show that its members plan to speak in a way "that the Free Speech Clause arguably protects"; that their speech is "arguably proscribed" by the School District's policies; and that "they face a credible threat" that the District will punish the speech. *Fischer*, 52 F.4th at 307 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)).

Defending Education has "likely" shown all these things. *See Murthy*, 603 U.S. at 58 (citation omitted). To start, the School District does not dispute that the children of Parents A, B,

No. 23-3630          *Defending Educ. v. Olentangy Loc.*          Page 9
                     *Sch. Dist. Bd. of Educ., et al.*

C, and D want to engage in speech (the use of biological pronouns) that is at least "arguably" protected by the First Amendment. *See Fischer*, 52 F.4th at 307. Next, the School District does not dispute that its policies could be read to "proscribe" this speech. *Id.* To give one example, the School District could treat a knowing use of biological pronouns as "discriminatory language" if the District decided that the speech was "derogatory towards" transgender students "based on" their gender identity. Handbook, R.7-1, PageID 150. Lastly, a "credible threat" likely exists that the School District will enforce these policies against students who engage in this speech. *See Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 843 (6th Cir. 2024) (quoting *Driehaus*, 573 U.S. at 167). The School District's counsel already warned a parent that the District interpreted its policies to bar students from "purposefully referring to another student by using gendered language they know is contrary to the other student's identity[.]" Emails, R.7-2, PageID 356. Even at oral argument, counsel refused to "disavow[] enforcement against" students using that specific speech as long as students intentionally and repeatedly engaged in it. *See Christian Healthcare Ctrs.*, 117 F.4th at 850.

The School District responds with just one point: that it has never disciplined a student for using biological pronouns during the decade that it has maintained its anti-harassment policies. Appellees' Supp. Br. 7–8. The District correctly recognizes that a government's enforcement of its policies in the past can help illustrate how it will enforce them in the future. *See Christian Healthcare Ctrs.*, 117 F.4th at 848–49. But plaintiffs "need not always show" that the defendant has enforced the policies in the feared way. *Id.* at 849. Indeed, this enforcement history tells us little without more. Of most note, the School District offers no evidence of any students ever engaging in the speech at issue or of any transgender or nonbinary students ever claiming that the speech qualified as bullying or harassment. If the District had previously permitted that speech, those hypothetical facts might make enforcement less likely. As far as the record reveals, however, this issue has never come up. When measured against the District's warning that its policies bar the speech, the lack of any enforcement history cannot eliminate the credible threat of enforcement. In sum, Defending Education likely has standing to seek an injunction barring the School District from enforcing its policies against the specific speech that the entity's members wish to convey.

No. 23-3630          *Defending Educ. v. Olentangy Loc.*          Page 10
                    *Sch. Dist. Bd. of Educ., et al.*

*Mootness*. Article III of the Constitution applies just as much to appellate courts as it does to district courts. For us to have jurisdiction, then, the case or controversy that existed at the start must continue to exist on appeal. *See Brown v. Yost*, 122 F.4th 597, 601 (6th Cir. 2024) (en banc) (per curiam). If "later events" eliminate the credible threat of enforcement, those events could render the case moot. *Davis*, 51 F.4th at 174. A defendant, for example, might repeal the challenged law that threatened the feared injury. *See id.* at 174–75; *Resurrection Sch. v. Hertel*, 35 F.4th 524, 528 (6th Cir. 2022) (en banc). To prove that such a change moots a case, though, the defendant must show that enforcement cannot "reasonably be expected" to occur any longer. *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).

The School District argues that it enacted this type of repeal. In September 2024, while we were deciding whether to rehear this case en banc, its board amended Policies 5517 and 5136. For example, in Policy 5517 (the anti-harassment rules), the board eliminated speech that might "cause discomfort or humiliation" or amount to "teasing" from the definition of "bullying." Add., 6th Cir. R.126, at 50. And in Policy 5136 (the rules for personal-communication devices), the board clarified that the policy should "not be interpreted to infringe upon the First Amendment rights of students (i.e., to prohibit a reasoned and civil exchange of opinions, or debate, that is conducted at appropriate times and places during the school day and is protected by State or Federal law)." *Id.* at 47.

But these modest changes do not moot the threatened freedom-of-speech injury. *See Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 661–63 (1993). To the contrary, the School District admits that it will continue to bar what it calls "misgendering" if it determines that this speech "rises to the level of bullying or harassment." Appellees' Supp. Br. 23. The District thus might punish a student for using biological pronouns because the District could perceive that speech as creating an "offensive" educational environment—no matter the student's audience, the student's good faith, or any other circumstance. Policy 5517, R.7-1, PageID 122.

That said, these changes have altered Defending Education's requested relief.  It now asks for an injunction that bars the School District only "from punishing students for misgendering other students" based on their honest belief that only two genders exist and that individuals cannot change their genders.  Appellant's Supp. Br. 10.  We thus turn to considering whether Defending Education has likely shown that the First Amendment protects this proposed speech in schools.

### B.  Likelihood of Success: Merits

### 1. How May Public Schools Regulate Student Speech?

As incorporated against the States by the Fourteenth Amendment, the First Amendment prohibits those wielding state power from "abridging the freedom of speech[.]"  U.S. Const. amend. I; *see W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943).  What must state actors do to "abridg[e]" (that is, "contract" or "diminish") this freedom?  1 Samuel Johnson, *Dictionary of the English Language* 65 (4th ed. 1773).  Most obviously, they can infringe the freedom by punishing speech through a criminal prosecution or civil fine.  *See Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 978 F.3d 481, 489 (6th Cir. 2020).  If, for example, an Ohio criminal law barred the use of biological pronouns in public because this speech offends the transgender community, the law would raise "grave constitutional" doubts.  *Id.* (citing *Snyder v. Phelps*, 562 U.S. 443, 451–58 (2011)).  As the Supreme Court has explained, the Free Speech Clause exists to stop the government from banning speech because of disdain for "its message, its ideas, its subject matter, or its content."  *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790–91 (2011) (citation omitted).  Or, as James Madison explained, "[t]he censorial power is in the people over the Government, and not the Government over the people."  Nathan S. Chapman & Michael W. McConnell, *Agreeing to Disagree* 191 (2023) (quoting 1 Annals of Congress 934 (1794)).  And a legislature commits perhaps the greatest of free-speech evils—discrimination based on a speaker's viewpoint—if it bars "speech found offensive to some portion of the public[.]"  *Matal v. Tam*, 582 U.S. 218, 253 (2017) (Kennedy, J., concurring in part and concurring in the judgment).

But the government does not just affect speech through criminal or civil regulations alone.  It can also burden speech in other ways.  For instance, the government might require applicants to

No. 23-3630          *Defending Educ. v. Olentangy Loc.*          Page 12
                     *Sch. Dist. Bd. of Educ., et al.*

refrain from speech as a condition of obtaining a public benefit (say, a money grant or access to a public venue). *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 210, 213 (2013); *Am. Freedom Def. Initiative*, 978 F.3d at 486–90. Or it might limit its employees' speech as a job requirement and enforce this ban through an employment action (say, a note to an employee's personnel file) rather than a criminal punishment. *See Meriwether v. Hartop*, 992 F.3d 492, 501 (6th Cir. 2021). The Supreme Court has held that the government has "broader powers" to restrict speech in these nonregulatory settings than the powers it possesses to restrict speech as a "sovereign" exercising the police power. *Waters v. Churchill*, 511 U.S. 661, 671–75 (1994) (plurality opinion). That is why the government may fire employees for speech on important public topics if a court finds that the government's operational interests in limiting the speech outweigh an employee's interests in speaking. *See Meriwether*, 992 F.3d at 507, 509–10.

This case involves the government acting as an "educator" of children. *Hou. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 480–81 (2022). When wearing its teaching hat, does the government look more like a "sovereign" issuing criminal laws or an "employer" issuing employee codes of conduct? *Id.* The answer is debatable. *See Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 196–201 (2021) (Alito, J., concurring). States have long offered parents a *free* education for their children. *See* Ellwood P. Cubberley, Public Education in the United States 163–206 (revised ed. 1947). So one might argue the government has broader power to impose speech "conditions" on this educational benefit like the power it possesses when imposing conditions on public jobs or money grants. *Barnette*, 319 U.S. at 632; *see Ward v. Polite*, 667 F.3d 727, 734 (6th Cir. 2012). Yet States have long *coerced* parents to send their children to school (public or private) on threat of punishment. *See Ingraham v. Wright*, 430 U.S. 651, 660 n.14 (1977). Indeed, the Jehovah's Witnesses who violated the flag-salute law in *Barnette* could have been found "delinquent"—and their parents "liable to prosecution"—for their expulsion from school after they refused to salute the flag. 319 U.S. at 629–30 & n.5. If parents cannot afford private school and if a State lacks a voucher program, then, their children might have no choice but to follow a public school's speech codes. *See Mahmoud v. Taylor*, 145 S. Ct. 2332, 2351, 2359–60 (2025); *Mahanoy*, 594 U.S. at 199–200 (Alito, J., concurring). And if those codes could trigger these types of sanctions, they look a lot more like sovereign regulations than conditions on benefits.

Ultimately, the Court has settled on a unique middle ground in the educational context. It has held that students do not forfeit their First Amendment rights when they choose to attend public school to satisfy their state-mandated educational obligations. *See Mahanoy*, 594 U.S. at 187; *Tinker*, 393 U.S. at 506. But it has also held that the government has greater power to restrict student speech within a school's walls than the power it possesses to punish adult speech outside those walls. *See Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). The reason? The Court has justified this view on the ground that educators act "*in loco parentis*" ("in the place of parents") when they supervise children during the school day. *Id.* at 684; *see Mahanoy*, 594 U.S. at 187. Under that common-law doctrine, judges assumed that parents impliedly gave school authorities a portion of their disciplinary power to allow those authorities to perform the educational tasks for which they were paid. *Mahanoy*, 594 U.S. at 198 (Alito, J., concurring); *see* 2 St. George Tucker, Blackstone's Commentaries 453 (1803).

This dichotomy has led the Court to adopt different standards of review based on the speech at issue: Did a student engage in school-sponsored expression "as part of the school curriculum" or did the student engage in "personal expression" with no connection to official school activities? *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988); *see Ward*, 667 F.3d at 732–34. The Court applies a more deferential test to the former type of speech that a child conveys *as a student*—say, expression on a math exam or in a history essay. *See Hazelwood*, 484 U.S. at 271. Just as the government has greater power to control an employee's on-the-job speech expressed as part of official duties, *see Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), so too it has greater power to control a student's on-the-school speech expressed as part of official instruction, *see Hazelwood*, 484 U.S. at 271. If a school's regulation of this speech "reasonably relate[s] to legitimate pedagogical concerns," it will pass First Amendment muster. *Ward*, 667 F.3d at 734 (quoting *Hazelwood*, 484 U.S. at 273). So, for example, teachers act reasonably when they give students a failing grade for stating that $2 + 2 = 5$ on a math test or for denying the Holocaust in a history essay. *See id.* at 733; *see also Mahanoy*, 594 U.S. at 196–97 (Alito, J., concurring). Likewise, *Hazelwood* found that this deferential reasonableness test applied to a school principal's decision to cut two student-written articles from a student newspaper because the students wrote the articles as part of the official journalism curriculum. *See* 484 U.S. at 274–76.

The Court, by contrast, applies a different test for "personal expression" at school—one that demands more of school officials before they may restrict speech. *Id.* at 271. In *Tinker*, it held that schools generally may not restrict this personal speech unless the speech "substantially interfere[s] with the work of the school or impinge[s] upon the rights of other students." 393 U.S. at 509. *Tinker*'s facts show this test's "demanding" nature. *Mahanoy*, 594 U.S. at 193. There, the Court held that students had the right to wear armbands to school as a protest of the then-ongoing conflict in Vietnam. *Tinker*, 393 U.S. at 507–14. This private speech merely "happen[ed] to occur on the school premises" and had nothing to do with classwork. *Hazelwood*, 484 U.S. at 270–71. The speech also had not "disrupted" classes or generated more than a few "hostile remarks" outside of the classroom. *Tinker*, 393 U.S. at 508. And while administrators feared a disturbance because a former student had died in Vietnam and his friends still attended school, this "undifferentiated fear" did not suffice to prohibit speech. *Id.* at 508–09 & n.3.

That said, the Court has adopted two exceptions to *Tinker*'s rigorous test for personal speech. To begin with, it has held that schools may bar "offensively lewd and indecent speech" on school grounds without asking whether this speech disrupts school. *Fraser*, 478 U.S. at 685–86; *see Morse v. Frederick*, 551 U.S. 393, 405 (2007). In *Fraser*, the Court found that a school could punish a student for giving a speech filled with sexual innuendo while nominating a classmate for student council during an assembly. 478 U.S. at 677–78, 680–86. This speech would have fallen within the Free Speech Clause's protections outside school. *See Morse*, 551 U.S. at 405 (citing *Cohen v. California*, 403 U.S. 15, 22–26 (1971)). But administrators have greater "latitude" to ban "vulgar" language during the school day. *Fraser*, 478 U.S. at 682–83. The Court reasoned that schools must teach students about "the appropriate form of civil discourse" in our society. *Id.* at 683. It added that the speech was "plainly offensive" to all in the audience and potentially "damaging" to younger students. *Id.* at 683–84. So schools "acting *in loco parentis*" may protect a student speaker's "captive audience" classmates "from exposure to sexually explicit, indecent, or lewd speech." *Id.* at 684.

Schools also may bar students from "encouraging illegal drug use" at school functions. *Morse*, 551 U.S. at 397. In *Morse*, the Court allowed a school to discipline a student for refusing to take down a banner with the message "BONG HiTS 4 JESUS." *Id.* at 397–98, 403–10. Here

too, the government could not have barred this speech outside school under its strict "incitement" test for speech encouraging illegal acts. *See id.* at 436 (Stevens, J., dissenting) (citing *Brandenburg v. Ohio*, 395 U.S. 444, 449 (1969) (per curiam)). Still, the Court held that schools have the power to bar speech promoting illegal drug use even if they allow speech discouraging that use. *Id.* at 403–09 (majority opinion). It explained that drug abuse by children remained a serious problem substantially exacerbated by peer pressure from classmates. *Id.* at 407–08.

Apart from *Tinker* and its exceptions, the Court has also adopted a separate category of personal speech that it has seemingly rendered off limits to school regulation: compelled speech. *See Barnette*, 319 U.S. at 642. When holding that a State could not force children to salute the flag during the school day, the Court stated a strict rule: public schools may not "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Id.* At the least, the government must rely on "more immediate and urgent grounds" to compel a student to make an "'involuntary affirmation' of objected-to beliefs" than to require the student only to maintain "silence." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 585 U.S. 878, 893 (2018) (quoting *Barnette*, 319 U.S. at 633).

### 2. How Do These First Amendment Standards Apply Here?

This school-speech framework shows that we must first categorize the type of speech at issue when children use biological or preferred pronouns to refer to classmates. The School District has not even tried to describe its general mandate to use preferred pronouns "as part of the school curriculum," which might trigger *Hazelwood*'s deferential test for school-sponsored speech. 484 U.S. at 271; *see Ward*, 667 F.3d at 733–34. For good reason. The School District's ban on biological pronouns extends far beyond the classroom—indeed, its anti-harassment policies reach personal speech on social media off school grounds. *Cf. Mahanoy*, 594 U.S. at 191–92; *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 216 (3d Cir. 2001) (Alito, J.). And the State in *Barnette* could just as well have called its flag-salute law part of the educational curriculum designed for "the training of children in good citizenship[.]" 319 U.S. at 655 (Frankfurter, J., dissenting). But the Court rejected that view and the deferential test that *Hazelwood* later adopted. *See id.* at 631, 640–42 (majority opinion). *Barnette* thus shows that schools do not have free license to make all

speech regulations part of their "educational mission" and thereby obtain a more favorable standard of review.  *Morse*, 551 U.S. at 423 (Alito, J., concurring).

Next, the School District has not tried to argue that the use of biological pronouns qualifies as the type of "'indecent,' 'lewd,' or 'vulgar' speech" that schools may ban on school grounds *regardless of* its disruptive effects.  *Mahanoy*, 594 U.S. at 187 (quoting *Fraser*, 478 U.S. at 685). Again, for good reason.  Since *Fraser*, the Supreme Court has clarified that we should not read its exception to *Tinker* broadly to "encompass any speech that could fit under some definition of 'offensive.'"  *Morse*, 551 U.S. at 409.  And nobody would describe the words in this case—mere pronouns—as an *inherently* offensive "form of expression" like the sexual innuendo from *Fraser* or the F-word from *Cohen*.  *Fraser*, 478 U.S. at 682 (discussing *Cohen*, 403 U.S. at 15).

The School District instead justifies its ban on biological pronouns under *Tinker*'s test for "personal expression" at school.  *Hazelwood*, 484 U.S. at 271.  For its part, Defending Education argues that *Barnette*'s more categorical ban on compelled speech should apply instead because the School District requires students to use preferred pronouns and to affirm a belief with which they disagree: that gender is fluid.  *See* 319 U.S. at 642.  Yet the School District responds that it would permit "accommodations" that would allow students to "avoid using pronouns" at all if they refuse to use preferred pronouns.  Emails, R.7-2, PageID 355.  Ultimately, we need not decide whether *Barnette*'s test for compelling speech should apply because the District has not met *Tinker*'s test for silencing personal (non-school-sponsored) speech on school grounds.

### a.  What Does *Tinker* Require?

Under *Tinker*, schools may restrict speech if the speech will cause certain school-related harms.  *See* 393 U.S. at 507–14.  This test raises both substantive constitutional questions (what school-related harms suffice to allow schools to restrict private student speech?) and procedural evidentiary questions (what must the record contain to show that the speech will likely cause the feared harms?).  It is useful to differentiate these two distinct types of questions.

*Substantive Constitutional Questions*.  *Tinker* tells school officials that they may silence speech if the speech will *either* cause a "substantial disruption" *or* infringe "the rights of others." *Id.* at 513–14.  We will discuss each alternative path in turn.

Path One: Begin with the "substantial disruption" path.  *Tinker* described this path in different ways at different places.  At one point, it said that schools may ban speech that "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school[.]"  *Id.* at 509 (citation omitted).  It later said that schools may ban speech that "materially disrupts classwork or involves substantial disorder[.]"  *Id.* at 513.  And it said that schools may ban speech that "materially and substantially disrupt[s] the work and discipline of the school."  *Id.*

These varied formulations unambiguously allow schools to ban speech that *itself* disrupts school functions.  *Tinker* likely had this "aggressive, disruptive" expression in mind.  *Id.* at 508. The Court contrasted the armbands in that case with a case in which a student entered a classroom without permission to interrupt ongoing class instruction.  *See id.* at 505 n.1, 513 (citing *Blackwell v. Issaquena Cnty. Bd. of Educ.*, 363 F.2d 749, 751–53 (5th Cir. 1966)).  So if a student had given a speech criticizing our country's involvement in Vietnam during "math class," the school could have stopped it.  *See Mahanoy*, 594 U.S. at 196–97 (Alito, J., concurring).  The students in *Tinker*, though, engaged in no similar "disturbance" by wearing armbands.  393 U.S. at 508.  (Although Justice Black's dissent suggested that a discussion about the armbands had interfered with a math lesson, the majority did not agree.  *Compare id.*, *with id.* at 517–18 (Black, J., dissenting).)

*Tinker* thus did not confront when schools may ban speech that is not *inherently disruptive* but that causes a disruption because of the *audience's reaction* to it.  According to the Court, the armbands in that case had led to only a few "hostile remarks" without any "threats or acts of violence on school premises."  *Id.* at 508 (majority opinion).  Suppose instead that the classmates who had lost a friend in Vietnam had threatened to assault the armband wearers, shouted them down in math class to an extent that barred all instruction, or simply skipped school because they could not bear to see the armbands.  *See id.* at 509 n.3.  Would *Tinker* have allowed the school to bar the silent political protest based on any of these reactions by other students?

This question poses a tougher free-speech problem.  The government typically may not ban speech simply because the audience will respond with "violence or threats or other unprivileged retaliatory conduct[.]"  *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 879 (7th Cir. 2011).  If schools enforced this type of "heckler's veto" (barring speech because of

an audience's reaction), they would commit the "odious viewpoint discrimination" that cuts to the First Amendment's core. *Bible Believers v. Wayne County*, 805 F.3d 228, 248 (6th Cir. 2015) (en banc). At the same time, schools contain a "captive audience" filled with "immature" students. *Zamecnik*, 636 F.3d at 879–80. So the Court has held that schools may ban speech that is vulgar or promotes drug use because of the speech's specific message to its student audience. *See Morse*, 551 U.S. at 408; *Fraser*, 478 U.S. at 684. Given these seemingly conflicting principles, the Court's cases leave unclear when (if ever) schools may silence nondisruptive speakers because of the way that listeners will react to their message. *See B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 322 n.24 (3d Cir. 2013) (en banc); *compare Barr v. Lafon*, 538 F.3d 554, 566–68 (6th Cir. 2008), *with Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1274–76 (11th Cir. 2004).

That said, we find two extremes clear. On the one hand, schools may not ban student speech just because the audience will suffer "discomfort and unpleasantness" from hearing ideas they dislike. *Tinker*, 393 U.S. at 509; *see Saxe*, 240 F.3d at 212, 215. *Morse* made this clear when it held that schools could ban speech promoting illegal drug use only because of the harms that drugs cause—not because this speech's content was "offensive." 551 U.S. at 407, 409. And as the Court added when distinguishing the lewd speech in *Fraser* from the armbands in *Tinker*, this principle reaches its apex if a listener's discomfort arises from a "political" idea. *Fraser*, 478 U.S. at 680. Speech on public policy has long received special protection under the First Amendment. *See Snyder*, 562 U.S. at 452–53; *Buckley v. Valeo*, 424 U.S. 1, 14–15 (1976) (per curiam).

On the other hand, schools may ban student speech that resembles statements that generally fall outside the First Amendment because of their likely effects on their audience. Take "fighting words." *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992). The government may ban "personally abusive epithets" targeting a specific recipient because these words are "inherently likely to provoke violent reaction" from that recipient. *Virginia v. Black*, 538 U.S. 343, 359 (2003) (quoting *Cohen*, 403 U.S. at 20). And just as schools have "greater authority" to prohibit student advocacy of illegal drug use than the general incitement test would allow, *Morse*, 551 U.S. at 425 (Alito, J., concurring) (citing *Brandenburg*, 395 U.S. 444), they likely have greater authority to restrict harassing speech "targeting particular individuals" than the general fighting-words doctrine would allow, *Mahanoy*, 594 U.S. at 188; *see Chen ex rel. Chen v. Albany Unified Sch. Dist.*, 56

No. 23-3630          *Defending Educ. v. Olentangy Loc.*          Page 19
                     *Sch. Dist. Bd. of Educ., et al.*

F.4th 708, 717 (9th Cir. 2022); *Zamecnik*, 636 F.3d at 876. In the school setting, then, this expanded fighting-words doctrine prevents students from directing "abusive language" at students or teachers. *Chen*, 56 F.4th at 717 (quoting *Mahanoy*, 594 U.S. at 191).

Or take "true threats." *See Counterman v. Colorado*, 600 U.S. 66, 74 (2023). The government may ban threats of harm because of the "fear of violence" that the threats instill in their victims and the "disruption" in the victims' lives that they cause. *Id.* (quoting *Black*, 538 U.S. at 360). And again, schools likely have greater authority to regulate threatening speech than the Court's true-threats test would permit for adults. *See Chen*, 56 F.4th at 718, 722; *Bell v. Itawamba Cnty. Sch. Bd.*, 799 F.3d 379, 397–400 (5th Cir. 2015) (en banc); *see also Kutchinski ex rel. H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 359–60 (6th Cir. 2023). In short, although the Court's cases have never allowed a heckler's veto, they have sometimes allowed what might be called a "victim's veto."

Path Two: *Tinker* also held that schools may restrict speech that infringes the "rights of others" in the school community. 393 U.S. at 513. Decades after *Tinker*, this path to restricting speech still has an "unclear" scope. *Saxe*, 240 F.3d at 217; *see Chen*, 56 F.4th at 717. The uncertainty arises from the Court's failure to articulate what it meant by the word "rights." Did it mean to give the judiciary the power to pick the substantive privileges that a speaker's audience should possess based on their own philosophical predilections? We doubt it. Instead, we interpret the word to require schools to identify some source of positive law—whether the Constitution, a federal statute, or a state law—that the speaker violated. *See Saxe*, 240 F.3d at 217.

*Tinker* proves this point. Again, the Court contrasted the silent political speech in that case with the "aggressive, disruptive" speech in another one. *Tinker*, 393 U.S. at 505 n.1, 508, 513 (distinguishing *Blackwell*, 363 F.2d 749). In the other case, students forcibly placed "freedom buttons" on classmates without their consent. *See Blackwell*, 363 F.2d at 751. The speakers' "offensive contact" with their classmates could have constituted a battery under state tort law. *See* Restatement (Second) of Torts § 18(1) (A.L.I. 1965). Besides, "physically harassing *conduct*" falls outside the First Amendment's protections for *speech*. *Saxe*, 240 F.3d at 206.

Other examples of positive "rights" readily come to mind. As a general matter, tort laws bar speakers from defaming others, intentionally inflicting emotional distress on them, or intruding on their seclusion. *See* Restatement (Second) of Torts §§ 46, 558, 652B. As a school-specific matter, federal law requires schools to bar student-on-student "harassment based on," among other traits, sex and race. *Saxe*, 240 F.3d at 210; *see Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649–53 (1999); *Meriwether*, 992 F.3d at 511. And Ohio law requires schools to bar students from engaging in "harassment, intimidation, or bullying" of others. Ohio Rev. Code § 3313.666(B)(1); *cf. Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 29 (1st Cir. 2020).

Conversely, no laws give members of our society the "right" to avoid messages they dislike. As the Seventh Circuit put it, "people in our society do not have a legal right to prevent criticism of their beliefs or even their way of life." *Zamecnik*, 636 F.3d at 876. Nor do they have a right to avoid speech that they find "offensive" in some way. *Saxe*, 240 F.3d at 217. If anything, we suspect that the First Amendment may well limit a state legislator's ability to create these types of unprecedented "rights" for students or teachers. *Cf. Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1197–98 (9th Cir. 2006) (Kozinski, J., dissenting).

*Procedural Evidentiary Questions*. Apart from these substantive constitutional questions, *Tinker* also implicates a few procedural or evidentiary ones. For instance, who bears the burden of proof? Circuit precedent reveals the answer: schools. As Judge Batchelder noted at the panel stage, schools may restrict speech under *Tinker* only if they prove that the speech will disrupt school activities or infringe the rights of others. *See Parents Defending Educ.*, 109 F.4th at 489–90 (Batchelder, J., dissenting) (citing, among others, *Norris*, 969 F.3d at 25; *B.H.*, 725 F.3d at 321; *N.J. ex rel. Jacob v. Sonnabend*, 37 F.4th 412, 426 (7th Cir. 2022)). So schools may not require students to prove the value of their message before allowing them to convey it. *See id.* at 490.

Next, should this burden of proof change at the preliminary-injunction stage? The Supreme Court's cases reveal the answer: No. Admittedly, plaintiffs (not defendants) typically must prove that they will likely succeed on the merits to obtain a preliminary injunction. *See Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 428 (2006). But the Supreme

Court has clarified that the burdens of proof that parties must meet at the preliminary-injunction stage "track" those they must meet at a trial. *Id.* at 429. So courts must hold that a student speaker will "likely" prevail at this stage "unless" a school establishes one of *Tinker*'s two paths to restricting speech. *Ashcroft v. Am. Civ. Liberties Union*, 542 U.S. 656, 666 (2004).

Lastly, what "standard of proof" must schools meet to satisfy their burden? *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. #204*, 523 F.3d 668, 674 (7th Cir. 2008). The answer likely changes based on the speech. To be sure, our cases seem to set uniform ground rules. We have made clear that school officials need not wait to see if the speech will have harmful effects before restricting it. *See Kutchinski*, 69 F.4th at 359. We have also made clear that they need not prove with "certainty" that the feared effects will arise. *Id.* (quoting *Lowery v. Euverard*, 497 F.3d 584, 592 (6th Cir. 2007)). Rather, we hold schools to a reasonableness test: they must "reasonably forecast" that the speech will cause a disruption or violate the rights of others. *Barr*, 538 F.3d at 565; *see Kutchinski*, 69 F.4th at 359; *see also Zamecnik*, 636 F.3d at 876; *Saxe*, 240 F.3d at 217.

In practice, though, this reasonableness test requires different things for different speech. The closer the speech resembles the fighting words, true threats, defamation, or other statements that fall outside the First Amendment, the less evidence a school must present to show that the speech will likely cause a substantial disruption or infringe the rights of others. So, for example, we held that a school reasonably predicted a disruption with little need for evidence when students operated a "fake Instagram account that impersonated a" teacher and targeted members of the school community with "sexual and violent posts" from this account. *Kutchinski*, 69 F.4th at 359–60; *cf. Novak v. City of Parma*, 33 F.4th 296, 305 (6th Cir. 2022).

But the closer the speech resembles political expression at the First Amendment's core, the more evidence a school must present of the disruption or violation of rights. Our cases about the Confederate flag prove this point. *Compare Barr*, 538 F.3d at 565–69, *with Castorina ex rel. Rewt v. Madison Cnty. Sch. Bd.*, 246 F.3d 536, 541–44 (6th Cir. 2001). In *Castorina*, we held that a school's ban on images of that flag would have violated the First Amendment under the student's version of the record evidence, which showed that the flag had not caused any prior disruption. *See* 246 F.3d at 541–44. We refused to uphold the principal's prediction that the flag would cause

a disruption based on its "controversial" nature alone. *Id.* at 542. The record also suggested that the school had allowed other students to wear attire containing images "associated with Malcolm X and the Black Muslim movement," so the school had engaged in an egregious "targeted ban" that discriminated based on viewpoint. *Id.* at 541–42. In *Barr*, by contrast, we held that a school could ban images of the Confederate flag because the record contained substantial evidence of the ongoing "racial tension" at the school, which had resulted in recent and repeated racial violence and threats. 538 F.3d at 565–69. Requiring this real-world evidence for political (if offensive) speech makes good sense. *Tinker* would not create much of a "demanding" test if officials could freely bar that speech based on hunches. *See Mahanoy*, 594 U.S. at 193.

Our colleagues in dissent reject any notion that administrators should have to shoulder a heavier burden when they seek to silence private student speech that discusses matters of public concern as compared to private student speech that, say, hurls abusive invective at a classmate. By doing so, the dissent conflicts with bedrock First Amendment principles. Expression about "matters of public concern," the Supreme Court has repeatedly reminded us, falls "at the heart of the First Amendment's protection." *Snyder*, 562 U.S. at 451–52 (citation omitted). Or, as the Court put it in another case, this type of speech "occupies the 'highest rung of the hierarchy of First Amendment values'" and so receives "special protection" from the courts. *Connick v. Myers*, 461 U.S. 138, 145 (1983) (citation omitted). When, by contrast, the speech has "purely private significance," courts "often" apply "less rigorous" review to it. *Snyder*, 562 U.S. at 452.

We thus break no new ground in applying this well-established dichotomy in the student-speech context. Indeed, the Court has repeatedly made this distinction. When allowing school administrators to bar the "sexual content" conveyed in *Fraser*, the Court distinguished that speech from "the political 'message' of the armbands in *Tinker*[.]" *Fraser*, 478 U.S. at 680. And when holding that school administrators could punish speech promoting illegal drug use, the Court disavowed any claim that this speech concerned a "political debate" about drug legalization. *Morse*, 551 U.S. at 403, 408; *see also Mahanoy*, 594 U.S. at 203–05 (Alito, J., concurring).

Nor do the decisions from our court on which the dissent relies require a different rule. *See C.S. v. McCrumb*, 135 F.4th 1056, 1060–68 (6th Cir. 2025); *Lowery*, 497 F.3d at 589, 593–95. In

*McCrumb*, we granted qualified immunity to administrators who barred a student from wearing a hat with the phrase "COME AND TAKE IT" and a picture of an AR-15-style rifle.  135 F.4th at 1058–59.  Yet *McCrumb* acknowledged that its "fact-driven" result turned on "novel" facts: the school was close to a district at which a tragic school shooting had just occurred and some students from that district had transferred to the *McCrumb* school.  *Id.* at 1058, 1062, 1067–68.  Indeed, *McCrumb* suggested it might have reached a different result if the tragedy had not just happened or if the students had not transferred.  *See id.* at 1067–68.  Given its admitted narrowness, *McCrumb* "has little, if any, precedential value going forward."  *C.S. v. McCrumb*, 149 F.4th 848, 853 (6th Cir. 2025) (Readler, J., statement respecting the denial of rehearing en banc).

And, if anything, *Lowery* supports our interpretation of *Tinker*.  There, disgruntled players on a high-school football team hoped to get their coach fired by asking teammates to sign a petition opining that they hated their coach and did not want to play for him.  *Lowery*, 497 F.3d at 585–86.  The coach dismissed these players.  *Id.* at 586.  *Lowery* held that they did not have a First Amendment right "to remain on the football team after" engaging in this insubordination.  *Id.* at 589–601.  Yet we made clear that *Tinker* did not adopt "a uniform, 'one size fits all'" approach and that a court's analysis must turn on the "content and context of the speech" at issue.  *Id.* at 588.  And we opted for a deferential standard of review because speech "[r]estrictions that would be inappropriate for the student body at large may be appropriate in the context of voluntary athletic programs."  *Id.* at 597.  We follow the same context-specific approach here.

b.  Has the School District Satisfied *Tinker*'s Requirements?

Defending Education now seeks a narrow injunction that would bar the School District from punishing students for using biological pronouns to refer to transgender and nonbinary individuals without any subjective "ill will" toward those individuals.  Parent A Decl., R.7-3, PageID 364.  When we compare this proposed speech against the record evidence, we readily conclude that the School District has failed to satisfy either part of *Tinker*'s test.  *Mahanoy*, 594 U.S. at 193.  As a summary: the District's ban on the use of biological pronouns regulates speech on a public concern in a way that discriminates based on viewpoint.  So the District bears a heavy

evidentiary burden to justify its ban. But it presented no evidence at all that the use of biological pronouns would disrupt school functions or violate anyone's rights.

*Type of Speech*. To start, the School District has regulated personal expression—the use of biological pronouns to convey a student's scientific and religious beliefs—that addresses a "sensitive topic of public concern." *Meriwether*, 992 F.3d at 508; *see Mahmoud*, 145 S. Ct. at 2354. As part of the broader debate over transgender rights, the question whether speakers should use preferred pronouns to refer to transgender individuals—and whether we should treat the commonplace (and non-antagonistic) use of biological pronouns as proper or offensive—has stirred a "passionate political and social debate" in our society. *Meriwether*, 992 F.3d at 508.

The different sides of this debate are clear. Like Defending Education's members, many believe that only two sexes (male and female) exist, that a person's "immutable" sex is "determined at birth," and that the "internal perceptions" that people have about their sex cannot alter biological facts. Neily Decl., R.7-2, PageID 346; *see* Parent A Decl., R.7-3, PageID 363. Those in this camp "convey a message" consistent with these scientific beliefs when they use biological pronouns to refer to all individuals, including transgender or nonbinary individuals. *Meriwether*, 992 F.3d at 508. In contrast, they would "affirm a belief with which [they] disagree[]" if the School District required them to use preferred pronouns that differ from a person's biological sex. Tenn. Code Ann. § 49-6-5102(a)(4). These views also sometimes stem from "sincerely held religious beliefs." Parent A Decl., R.7-3, PageID 363; *see Meriwether*, 992 F.3d at 498–99. So forcing these individuals to choose between *either* violating their scientific and religious beliefs *or* facing punishment for adhering to those beliefs can cause "mental and psychological harm" to them. Parent A Decl., R.7-3, PageID 366. And some holding these views also believe that they will help individuals with gender dysphoria more by affirming their biological sex than by refuting it. *See Parents Defending Educ.*, 109 F.4th at 492 (Batchelder, J., dissenting) (citing Ryan T. Anderson, *A Brave New World of Transgender Policy*, 41 Harv. J. L. & Pub. Pol'y 309, 318–19 (2018)).

Yet many others in our society hold a conflicting view. They believe that people can have a "sense of their gender" that differs from their biological sex. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg.

33474, 33809 (Apr. 29, 2024); *see Bostock v. Clayton County*, 590 U.S. 644, 660, 669 (2020); *id.* at 715 & n.30, 726 & n.45 (Alito, J., dissenting). Indeed, many in this camp view gender as a fluid concept, so a person's preferred pronouns can expand beyond the standard "he" or "she" and include terms like "ve," "ze," or a singular version of "they." *See United States v. Varner*, 948 F.3d 250, 257 (5th Cir. 2020). Individuals who hold this view tend to believe that we can best help those with gender dysphoria ("a lack of alignment between their biological sex and perceived gender") by allowing them to disregard biology and instead socially and medically transition to the gender that they prefer. *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 466 (6th Cir. 2023), *aff'd sub nom.*, *United States v. Skrmetti*, 145 S. Ct. 1816 (2025). They also believe that everyone should use a person's preferred pronouns as a matter of basic courtesy, denying that this usage conveys a belief about the broader transgender debate. *See* Chan Tov McNamarah, *Misgendering as Misconduct*, 68 UCLA L. Rev. Discourse 40, 48–50 (2020). And they believe that the failure to use preferred pronouns can cause "measurable psychological and physiological harms" to those who have a sense of their gender that differs from their biological sex. *Id.* at 43.

This general debate—including the specific debate about whether to use preferred pronouns—has spilled over into the broader political arena. The practices of the two most recent presidential administrations emphatically prove the point. The Biden Administration concluded that federal transgender employees should be able to express their perceived gender "and have these identities *affirmed*" in the workplace. Exec. Order No. 14035, 86 Fed. Reg. 34593, 34600 (June 30, 2021) (emphasis added). It also contended that the use of biological pronouns might rise to the level of unlawful sexual harassment in some circumstances. *See, e.g.*, *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 585 (6th Cir. 2024); *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 544–45 (E.D. Ky. 2024), *stay pending app. denied*, 2024 WL 3453880 (6th Cir. July 17, 2024), *appeal dismissed as moot sub nom.*, *Tennessee v. McMahon*, 2025 WL 848197 (6th Cir. Mar. 18, 2025).

The Trump Administration, by contrast, changed course. *See* Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025). It criticized efforts at "replacing the immutable biological reality of sex"—what it described as the "truth"—with "an internal, fluid, and subjective sense of self unmoored from biological facts." *Id.* at 8615. And it suggested that "[t]he erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire

*Defending Educ. v. Olentangy Loc.*
                    *Sch. Dist. Bd. of Educ., et al.*

American system." *Id.* So the Administration decided to use language that "recognize[s] [only] two sexes, male and female." *Id.* It also ordered officials to read the civil-rights laws to give individuals "the freedom to express the binary nature of sex" in their workplaces. *Id.* at 8617; *see also* Exec. Order, No. 14190, 90 Fed. Reg. 8853, 8854–55 (Feb. 3, 2025).

Even more concerning from a First Amendment perspective, the School District has not just entered this policy debate. It has taken a side. The School District has "targeted" a speaker's use of biological pronouns as improper while allowing students to use preferred pronouns (no matter how novel). *See Castorina*, 246 F.3d at 541. As Judge Batchelder well explained, this differential treatment qualifies as the type of "viewpoint discrimination" that raises the most serious red flags under the First Amendment. *See Parents Defending Educ.*, 109 F.4th at 485–89 (Batchelder, J., dissenting). A government that discriminates based on viewpoint does not just put an entire topic off limits; it allows certain speech on the topic but silences other points of view. *See Iancu v. Brunetti*, 588 U.S. 388, 393 (2019); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–30 (1995). This viewpoint discrimination is "uniquely harmful to a free and democratic society" because it skews the marketplace of ideas by putting a thumb on the scale in favor of certain perspectives. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024).

Any ordinary person who learned of the School District's anti-harassment policies would believe that it has engaged in this type of viewpoint discrimination. Under its reading of those policies, a student speaker may not consistently and intentionally use the pronoun "he" to refer to a biological male who identifies as female. But the speaker may use that pronoun to refer to a biological female who identifies as male. What separates the lawful and unlawful uses of "he"? The "message" conveyed about the individual's gender. *Meriwether*, 992 F.3d at 508. The School District permits certain approved messages on this topic—that individuals can have genders that differ from their sex or at least that our society should refer to individuals using preferred pronouns to be courteous. And the School District prohibits a disfavored view on the topic—that individuals can have only one gender determined at birth and that it is perfectly appropriate to refer to others using biological pronouns. *See Iancu*, 588 U.S. at 393.

A counterfactual confirms this discrimination.  Suppose that a school required students to use biological pronouns and barred students from referring to others by preferred pronouns that differed from their biological sex.  *Cf.* Fla. Stat. § 1000.071(3).  Like the School District's policies at issue, it is hard to see how that competing policy does not discriminate based on viewpoint.

The School District (supported by our colleagues in dissent) responds that the District has not engaged in viewpoint discrimination because it allows those who believe that sex is immutable to express this view *in other ways*, and it has restricted just one way to express that message: through pronouns.  Appellees' Supp. Br. 14–15.  The District, for example, would seemingly allow a shirt that read "There Are Only Two Genders."  *But cf. L.M. v. Town of Middleborough*, 103 F.4th 854, 860–61 (1st Cir. 2024).  This logic—that a regulation targeting a disfavored message is neutral if it allows the speaker to express the message in other ways—conflicts with many cases.  Take *R.A.V.*  There, the Court held that a ban on fighting words that insulted others on the basis of race discriminated based on "viewpoint" because it applied to those expressing hatred toward a race but not those "arguing *in favor* of" racial tolerance.  505 U.S. at 391–92.  Under the School District's logic, though, this ban did not engage in viewpoint discrimination because it allowed racist speakers to express their hostility in ways other than through fighting words.  Or take *Iancu*.  There, the Court held that a ban on "scandalous" trademarks discriminated based on viewpoint because it allowed trademarks "inducing societal nods of approval" but not "those provoking offense and condemnation."  588 U.S. at 394.  Yet that case would have been simple under the School District's logic.  Those who sought to register scandalous marks could express their offensive speech in any other conceivable way.  So the fact that people may speak in other ways does nothing to eliminate the viewpoint discrimination.

The dissent also seeks to avoid the viewpoint-discrimination label through a creative hypothetical.  According to the dissent, the School District's policies do not just prohibit students from using biological pronouns for transgender students.  The policies also would prohibit a student from using male pronouns for a female classmate who identified as female even if this student acted with the good-faith belief that the classmate had suppressed her true transgender identity.  Even accepting this (somewhat fanciful) hypothetical, it does not eliminate the viewpoint discrimination.  Quite the contrary.  That the policies might cover a second viewpoint on a second

set of facts "makes [them] more viewpoint based, not less so." *Matal*, 582 U.S. at 249 (Kennedy, J., concurring in part and concurring in the judgment). Indeed, the Supreme Court's cases reject the dissent's narrow view of viewpoint discrimination. The Court has instead defined that phrase in a "broad" way when finding unconstitutional a law that restricted *all* speech that disparaged others. *Id.* at 243 (Alito, J., lead opinion). The Court reasoned that "[g]iving offense is a viewpoint," *id.*, and that the government targets points of view when it permits all "positive" speech but bars all "derogatory" speech, *id.* at 249 (Kennedy, J., concurring in part and concurring in the judgment). The Court reached this conclusion even though the law equally prohibited speech that ridiculed "Democrats and Republicans, capitalists and socialists, and those arrayed on both sides of every possible issue." *Id.* at 243 (Alito, J., lead opinion). The same logic covers the School District's policies here. If anything, the dissent's hypothetical shows why the Court adopted this broad definition. In nearly all real-world cases, the School District's policies would prohibit just one point of view in an ongoing political debate and so would "silence dissent and distort the marketplace of ideas." *Id.* at 249 (Kennedy, J., concurring in part and concurring in the judgment).

In other contexts, a viewpoint-discrimination finding suffices—without more—to hold a government action unconstitutional. *Iancu*, 588 U.S. at 393; *Rosenberger*, 515 U.S. at 829–30. And our precedent (in particular, *Barr*) might extend this categorical viewpoint-discrimination ban to the student expression governed by *Tinker*. *See Barr*, 538 F.3d at 571. That holding would mean that a school could not justify this discrimination under *Tinker* even if it showed that the forbidden speech would cause a substantial disruption. For three reasons, though, we opt to save whether this bright-line rule applies in this context for another day. To start, *Barr* also seemed to use a narrow definition of viewpoint discrimination that sits in tension with the Supreme Court's broader view because it treated a ban on "racially divisive" (but not racially inclusive) speech as viewpoint neutral. 538 F.3d at 572; *but cf. Matal*, 582 U.S. at 249 (Kennedy, J., concurring in part and concurring in the judgment). Next, the Supreme Court has since seemed to suggest that schools may engage in some viewpoint discrimination (for example, by allowing students to discourage drug use but not promote it). *See Morse*, 551 U.S. at 409. Lastly, other courts have recognized the uncertainty over how the law on viewpoint discrimination interacts with *Tinker*.

*See Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 443 (4th Cir. 2013). To be clear, we do not foreclose the possibility that the general ban on viewpoint discrimination extends to this context. But we need not resolve that question. At the least, the School District must present substantial evidence establishing the harmful effects that *Tinker* requires to justify its "targeted ban" on student speech about an issue of important public concern. *Castorina*, 246 F.3d at 541.

*Record Evidence*. Yet the School District presented no evidence on this score. Starting with *Tinker*'s substantial-disruption prong, the District does not even try to argue that the speech *itself*—the commonplace use of biological pronouns—would "materially disrupt[] classwork" or other school activities. 393 U.S. at 513. Unlike, say, a political diatribe about transgender rights in math class, the mere use of biological pronouns does not entail "aggressive, disruptive action[.]" *Id.* at 508. Nor does the School District suggest that such speech has ever disrupted any school activity in the past. *Cf. Barr*, 538 F.3d at 565–69.

To justify its prohibition under the substantial-disruption prong, the School District instead turns to the speech's effects on only a part of its potential audience: the transgender or nonbinary students who would prefer to be called by different pronouns. At times, the District suggests that the use of biological pronouns amounts to the type of "abusive language" that schools may ban under the relaxed fighting-words doctrine that applies in the school context. *See Chen*, 56 F.4th at 717 (quoting *Mahanoy*, 594 U.S. at 191). For example, the District compares a student's use of biological pronouns for transgender or nonbinary classmates to another student's mocking a smaller male student by referring to him with feminine pronouns or shouting "go back to Mexico!" to Hispanic students. Appellees' Supp. Br. 12, 16. The School District is right that schools may bar abusive "invective" that targets "specific" students—whether transgender students, religious students, female students, Hispanic students, or any others. *See Chen*, 56 F.4th at 717. That is, a school could bar a student from abusively ridiculing a transgender classmate's "physical characteristics" in the same way it could bar a student from abusively ridiculing a smaller student's physical characteristics. *See id.* at 718.

But the School District is wrong to treat the use of biological pronouns alone as analogous to this abusive invective. Defending Education's members want to use biological pronouns not

because they seek to ridicule others but because they want to speak what they view as the truth (and cannot "affirm" a view with which they disagree on a pressing matter of public concern). Parent A Decl., 7-3, PageID 363. What evidence permits the School District to treat this speech as "abusive"? It points to none. Throughout most of our country's history, our society viewed biological pronouns as a proper (perhaps the only proper) way to refer to others. Even today, many States (including two in our circuit) have passed laws that bar schools from punishing teachers or students for refusing to use preferred pronouns. *See* Ky. Rev. Stat. § 158.191(5)(c); Tenn. Code Ann. § 49-6-5102(b); *see also* Ark. Code Ann. § 6-1-108(d)(2)(B), (e)(B); Fla. Stat. § 1000.071(2); Idaho Code § 67-5909B(2)(b), (4)(b); La. Stat. Ann. § 17:2125(C)(1)(a)–(c); 2025 Mont. Laws ch. 275, § 3 (H.B. 400); N.D. Cent. Code § 15.1-06-21(1).

The choice to use biological pronouns also fundamentally differs from, say, the choice to wear a t-shirt with the message "There Are Only Two Genders." A student prohibited from wearing that shirt to school is not forced to wear one that reads "Gender Is Fluid." But it is much more difficult to avoid the pronoun debate. For centuries, the English language has relied on pronouns "to designate" someone or something who or which "is known from context" or "has been already mentioned[.]" XII *Oxford English Dictionary* 624 (2d. ed. 1989); *see Meriwether*, 992 F.3d at 508–09. Perhaps in formal writing, one can work hard to delete all pronoun references and still avoid bewildering prose. *Compare Burt v. Titlow*, 571 U.S. 12, 15–18 (2013) (avoiding pronouns), *with id.* at 24 (Sotomayor, J., concurring) (using pronouns). But in ordinary conversations (especially conversations between young students), it would be all but "impossible" to train oneself not to use pronouns when referring to others. *Meriwether*, 992 F.3d at 517. Students do not use this speech to belittle others; they use it because there is no practical alternative short of expressing a viewpoint with which they might fundamentally disagree.

We made a similar point when protecting a professor's First Amendment right to avoid using preferred pronouns during class discussions. *See Meriwether*, 992 F.3d at 517. *Meriwether* held that the Free Speech Clause barred a university from punishing a professor for refusing to use preferred pronouns (or from using no pronouns at all) during class discussions. *Id.* at 509–11. That decision all but compels our result here. Because *Meriwether* involved *on-the-job* speech that a professor conveyed during official instruction, we applied a balancing test like the one that

*Hazelwood* applied for school-sponsored speech that children use in their capacity as students during official instruction. Yet this case involves "personal expression" that students use during the school day—*not* "school-sponsored" speech. *Hazelwood*, 484 U.S. at 271. If a requirement to use preferred pronouns cannot even satisfy the judicial balancing test for employee speech, it is hard to see how it could survive *Tinker*'s more "demanding standard." *Mahanoy*, 594 U.S. at 193.

At most, the School District highlights the concession from some of Defending Education's members that transgender or nonbinary students might view the use of biological pronouns as "'insulting,' 'humiliating,' 'dehumanizing,' 'derogatory,' and 'unwanted'" because they prefer to be called by other pronouns. Parent A Decl., R.7-3, PageID 364. In other words, these members acknowledge the risk that their speech might *offend* others—even though the members do not mean for their speech to come across that way and even though they have no "ill will" toward anyone. *Id.* Under *Tinker*, however, this "undifferentiated fear" of the possibility for offense does not suffice to proscribe speech on an important matter of public policy. 393 U.S. at 508. As the Court explained, a school must identify "something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 509.

What "more" is required under *Tinker* to show a disruption that might suffice to silence political speech? *Id.* Like the dissent, some courts have suggested that schools may prohibit speech if they can prove that it will interfere with the "educational performance" of other students. *Saxe*, 240 F.3d at 216–17. Because "[t]he primary function of a public school is to educate its students," this reasoning goes, "conduct that substantially interferes with [that] mission is, almost by definition, disruptive to the school environment." *Id.* at 217. Under this view, a school might ban speech if it could show that speech has led to a "decline in students' test scores," an "upsurge in truancy," or other harmful effects. *Zamecnik*, 636 F.3d at 876. We have our doubts about this approach. Could the school in *Tinker* really have barred the students' political armbands if other classmates had done worse on exams, suffered distress, or refused to attend school in response? *See L.M. ex rel. Morrison v. Town of Middleborough*, 145 S. Ct. 1489, 1495–96 (2025) (Alito, J., dissenting from the denial of certiorari). Our colleagues in dissent would presumably answer "yes" to this question. But we need not decide the question here. Even under this view, the School District has made no claim (and presented no evidence) that the mere use of biological pronouns

would create these types of educational problems. Suffice it to say, we also do not think that the district court's efforts to fill in the evidentiary void with citations to law-review articles meets *Tinker*'s high bar for the speech at issue here. *See Mahanoy*, 594 U.S. at 193.

Turning to *Tinker*'s violation-of-rights prong, the School District all but concedes that it has not shown that the use of biological pronouns would violate the rights of any students under Title IX—the federal law barring a school's deliberate indifference to student-on-student sexual harassment. Appellees' Supp. Br. 20–21; *see Saxe*, 240 F.3d at 210. Title IX bars only speech (typically combined with conduct) that is "so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect." *Davis*, 526 U.S. at 652. And the School District lacks evidence that the use of biological pronouns would deny any students an equal access to education in this way. *See Meriwether*, 992 F.3d at 511.

The School District responds that transgender and nonbinary students have a right to be free from "harassment" and "bullying" under Ohio law. Ohio Rev. Code § 3313.666(B)(1); *see* Appellees' Supp. Br. 11. But this argument suffers from similar problems. Again, the District is right that it has the same power to discipline students for bullying or harassing transgender classmates that it has to discipline students for bullying or harassing other classmates for other reasons—whether their bodily appearances, unusual names, or religious affiliations. But again, the District is wrong to equate the speech here (the use of biological pronouns) with the bullying and harassment that it may prohibit. Ohio law defines "harassment, intimidation, or bullying" to cover speech directed at another student only if the speech *both* "[c]auses mental or physical harm to the other student," *and* "[i]s sufficiently severe, persistent, or pervasive that it creates an intimidating, threatening, or abusive educational environment for the other student." Ohio Rev. Code § 3313.666(A)(2)(a). And the School District has offered no evidence that the commonplace use of biological pronouns would create an intimidating, threating, or abusive environment.

One final point: When a political debate has fractured our society in such a significant way, the originalist case for giving schools greater power to regulate a student's personal speech loses its force. That case rests on the "*in loco parentis*" doctrine—that is, on the notion that parents have impliedly delegated their disciplinary power to schools. *See Mahanoy*, 594 U.S. at 187.

Perhaps when schools punish students for widely condemned behavior, one can reconcile this doctrine with the traditional rule that, "[i]n our society, parents, not the State, have the primary authority and duty to raise, educate, and form the character of their children." *Id.* at 201–02 (Alito, J., concurring). Yet a world of difference exists between punishing a student for taking part in a national policy debate and for mocking a teacher's old age. *See id.* at 202 n.14 (citing *Lander v. Seaver*, 32 Vt. 114 (1859)). It is implausible to suggest that parents with strong feelings on this sensitive issue have impliedly given schools the power to force their children to express viewpoints at odds with those they teach at home. *Cf. Mahmoud*, 145 S. Ct. at 2351–52. How can we say that parents have delegated to schools the authority to dictate "the boundaries of socially appropriate behavior" on the issue when those boundaries continue to get worked out in our broader society? *Fraser*, 478 U.S. at 681.

Like all language, pronouns can affect culture. "Words and images act at the level of the subconscious before they persuade at the level of the conscious." *Am. Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 329 (7th Cir. 1985) (Easterbrook, J.). The use of "he" or "she" will lead most to believe that the identified person is male or female. And if our society makes it socially unacceptable for people to *speak* about transgender individuals using their biological pronouns, it may well establish a new cultural norm about the *thoughts* that are "expected" or "permissible." *Id.* at 328. Perhaps this significant social change may one day arise. But the First Amendment bars the government from enforcing the change through its control of language. The government may not restrict the speech that individuals use to alter the beliefs that they hold. That is "thought control." *Id.* And "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion[.]" *Barnette*, 319 U.S. at 642. The School District's ban on the use of biological pronouns violates this principle. So Defending Education is likely to succeed on the merits of its claim that the District may not punish students solely for the use of biological pronouns at school.

## C. Other Injunction Factors

The remaining preliminary-injunction factors need not detain us long.  As we said at the outset, the likelihood-of-success factor looms large over the others in constitutional cases.  *See Fischer*, 52 F.4th at 307.  Take the irreparable-harm factor.  The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably" qualifies as the kind of "irreparable injury" that courts cannot adequately fix after the fact with a damages remedy.  *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).  The School District's ban on the use of biological pronouns triggers this rule because the ban likely violates the Free Speech Clause.

The School District responds that a plaintiff still must show that the constitutional injury will arise during the lawsuit to establish the need for a preliminary injunction (as compared to a permanent injunction at the suit's end).  *See Fischer v. Thomas*, 78 F.4th 864, 868–69 (6th Cir. 2023); *see also D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326–27 (6th Cir. 2019).  In other words, when speakers do not want to speak until well into the future, they may not need a preliminary injunction to protect this speech if a court can resolve the dispute before then.  *See Fischer*, 78 F.4th at 868–69.  But that principle does not apply here.  The record shows that the children of Parents A, B, C, and D know transgender students in their school and want to use biological pronouns "*now*" rather than at some unknown future date.  *Id.* at 868 (quoting *D.T.*, 942 F.3d at 327); *see, e.g.*, Parent A Decl., R.7-3, PageID 363–66.  And again, the School District has made clear that it prohibits this speech.  So this irreparable injury is occurring every school day.

Or take the balance of the equities and public interest.  On one side of this balance, our cases make clear that protecting constitutional rights serves the public interest.  *See, e.g.*, *Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 736 (6th Cir. 2021) (per curiam) (order); *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001).  Defending Education has also identified other injuries that might arise absent an injunction.  Its parent members worry that the School District's policies cause their children "mental and psychological harm" by forcing them to choose between their beliefs and potential punishment.  *See, e.g.*, Parent A Decl., R.7-3, PageID 366.  And this injury becomes more acute for those who

fear violating their "sincerely held religious beliefs." *Id.*, PageID 363. On the other side of the balance, the School District rightly highlights the potential psychological harms to transgender and nonbinary students from an injunction barring enforcement of its anti-harassment policies. We can best balance these competing equities by granting a "tailored injunction" that covers the speech Defending Education seeks to protect but permits the School District to discipline bullying and harassment separate from that speech. *Ramirez v. Collier*, 595 U.S. 411, 433–34 (2022); *see Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (per curiam).

For the foregoing reasons, Defending Education is entitled to an appropriately tailored preliminary injunction. We reverse and remand for proceedings consistent with this opinion.

———————————

**CONCURRENCE**

———————————

ALICE M. BATCHELDER, Circuit Judge, concurring.  The School District's policies are unconstitutional for at least three separate and stand-alone reasons.  One, they violate the constitutional prohibition against compelled speech.  *See W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  Two, they constitute impermissible viewpoint discrimination.  *See Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).  And three, while *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 513 (1969), would permit the School District to suppress certain types of student speech under certain circumstances by showing that the speech would cause certain consequences (i.e., it would "materially and substantially disrupt" school activities, or it would infringe the legal "rights of others"), the School District has made no such showing and, in fact, it produced no evidence whatsoever to support such a showing.

The majority opinion states that it decides this case solely on the School District's failure to satisfy *Tinker*, and I agree with the majority's conclusion as to that failure.  But insofar as any language in the opinion would have *Tinker* apply to Defending Education's compelled-speech or viewpoint-discrimination claims, that is not the law, and therefore I cannot agree.  "In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate.  They may not be confined to the expression of those sentiments that are officially approved. . . . [And] school officials cannot suppress expressions of feelings with which they do not wish to contend."  *Tinker*, 393 U.S. at 511 (quotation marks and citation omitted); *cf. Mahmoud v. Taylor*, 606 U.S. --, 145 S.Ct. 2332, 2386 (2025) (Sotomayor, J., dissenting) (insisting that, even in the elementary school setting, "no robust democracy insulates its citizens from views that they might find novel or even inflammatory" (quotation marks and citation omitted)).

Simply put, *Tinker* creates a narrow exception to the First Amendment's guarantee of free speech, allowing some limited suppression of certain types of inflammatory speech under specific conditions.  But *Tinker* does not create an exception to the Free Speech Clause's heightened—or more emphatic—prohibitions against viewpoint discrimination and compelled speech.  *Tinker* has

no role in a viewpoint-discrimination or compelled-speech analysis. Justices Alito and Thomas recently raised this same point. *See L.M. ex rel. Morrison v. Town of Middleborough*, 145 S. Ct. 1489, 1492-94 (2025) (Alito, J., dissenting from the denial of certiorari).

The majority reads the Court's cases as having permitted public schools to engage in some type of viewpoint discrimination. But, taking the Court at its word (and going no further), the Court has merely held that schools can proscribe speech in four specific and limited contexts:

> This Court has previously outlined three specific categories of student speech that schools may regulate in certain circumstances: (1) 'indecent,' 'lewd,' or 'vulgar' speech uttered during a school assembly on school grounds; (2) speech, uttered during a class trip, that promotes 'illegal drug use'; and (3) speech that others may reasonably perceive as bearing the imprimatur of the school, such as that appearing in a school-sponsored newspaper.

> Finally, in *Tinker*, we said schools have a special interest in regulating speech that materially disrupts classwork or involves substantial disorder or invasion of the rights of others. These special characteristics call for special leeway when schools regulate speech that occurs under its supervision.

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 187-88 (2021) (editorial marks, certain quotation marks, and citations omitted). As I see it, this short list of exceptions comprises little more than time, place, and manner restrictions targeting the promotion of unlawful activity, lewd or indecent behavior, disruption of the school's ordinary operation, or violating the legal rights of others. It does not matter that the speech being suppressed expresses a viewpoint. This free-speech exception is not based on viewpoint; it is based on content (or conduct) so inflammatory that it directly—*not through a heckler's veto*—disrupts the school's ordinary operations. Even under the most liberal reading of the Court's cases, it goes too far to read these exceptions as a broad endorsement of viewpoint discrimination in the school setting.

Rather, the "bedrock principle" is "that a school may not engage in viewpoint discrimination when it regulates student speech." *L.M.*, 145 S. Ct. at 1492 (Alito, J., dissenting from the denial of certiorari). Nothing in the *Tinker* case line holds otherwise. *See id.* at 1493-94 (Alito, J., dissenting from the denial of certiorari). Nor does *Tinker* allow public schools to compel student speech. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023) (citing *Tinker* while explaining that "the government may not compel a person to speak its own preferred messages").

Surely, the Supreme Court's "fixed star" of constitutional certainty, *see Barnette*, 319 U.S. at 642, does not give way just because school administrators see a need to compel their students to conform to and recite their preferred viewpoint on matters of public concern.

The majority opinion states that it is not deciding the compelled-speech or viewpoint-discrimination issues, so its holding is that the School District's policies are unconstitutional bans on student speech because the School District cannot satisfy its reliance on *Tinker* (to save the policies) in that it produced no evidence to satisfy *Tinker*'s test. But the opinion also treads into the topics of compelled speech and viewpoint discrimination, eventually opining that the School District has not produced sufficient evidence pursuant to *Tinker* that would justify compelled speech or viewpoint discrimination on matters of public concern. This excess language, while apparently dicta, suggests that the School District *could have* produced sufficient *Tinker* evidence (i.e., of material disruption, substantial disorder, or infringement on the legal rights of others) to justify compelled speech or viewpoint discrimination on matters of public concern.

Should a school in a future case produce evidence that satisfies *Tinker*, it might point to this language as meaning that *Tinker* allows it to engage in compelled speech and viewpoint discrimination on matters of public concern. And the purpose of this separate writing is to say that such an argument must fail. Under the Supreme Court's cases, there is no amount of *Tinker* evidence that would permit a school to compel student speech or to ban student speech on a matter of public concern based *solely* on its viewpoint. Therefore, as this case returns to the district court on remand, even if the School District were to produce overwhelming evidence of disruption, that evidence would still not justify the compelled-speech or viewpoint-discrimination aspects of its preferred-pronoun policies.

With this understanding, I concur in the majority opinion.

_____

## CONCURRENCE

_____

KETHLEDGE, Circuit Judge, concurring.  I join the majority opinion, which carefully applies the Supreme Court's caselaw concerning school speech and viewpoint discrimination.  But I am not at all convinced that contemporary free-speech doctrine affords us a clear basis to decide cases like this one by the application of legal rules.  Nor do I think that current free-speech doctrine even attempts to discern whether speech falls within "the freedom of speech" as that phrase was originally understood.  I thus write separately to explain those defects and to suggest how the historic common law might help to remedy them.

The First Amendment prohibits Congress (or the states) from making any law "abridging the freedom of speech, or of the press."  Like the Second Amendment, that phrase employs the definite article—"*the* freedom of speech"—indicating that it refers to a right already existing.  Thus, as with the Second Amendment, whether certain speech falls within the scope of that original right would seem to be central to the question whether the First Amendment protects it.  *See New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022); *National Republican Senatorial Committee v. Federal Election Commission*, 117 F.4th 389, 398 (6th Cir. 2024) (en banc) (Thapar, J., concurring); *cf. Hall v. Meisner*, 51 F.4th 185, 189-90 (6th Cir. 2022).

Yet First Amendment doctrine, since the early 20th century at least, has not asked that question.  Instead, for the most part, that doctrine (as to speech) is founded on judicial proclamations.  From Justice Holmes's dissenting opinion in *Abrams v. United States*, for example, came the idea that the First Amendment protects a "marketplace of ideas."  250 U.S. 616, 624 (1919) (dissenting opinion); *see also, e.g.*, *Citizens United v. Federal Election Commission*, 558 U.S. 310, 335 (2010).  Eight years later, Justice Brandeis wrote that the "freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth."  *Whitney v. California*, 274 U.S. 357, 375 (1927) (concurring opinion); *see also, e.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023).  And in *Cohen v. California*, the Court held that a war protester's vulgar jacket was entitled to constitutional protection, based on the maxim that

"one man's vulgarity is another's lyric"—thereby ranking unfiltered self-expression among the First Amendment's highest ideals.  403 U.S. 15, 25-26 (1971).

The Holmes and Brandeis statements, especially, provide strong rhetorical support for the freedom of speech.  What modern free-speech doctrine seems to lack, however, is a coherent body of legal rules.  Rules are statements of legal cause and effect:  when certain circumstances are present, a prescribed result follows.  And legal rules bind courts and citizens alike.  Speech that amounts to a willful misrepresentation of some material fact, for example, is sanctionable as fraud.  *See, e.g., Illinois, ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600, 620 (2003).  The citizen knows that rule in advance; and the court's duty is simply to apply it to the facts at hand.  A determination whether one interest outweighs another, by contrast, is a legislative judgment.  Those judgments are hard for citizens to predict in advance; and in making them the courts have a relatively free hand.

Some other areas of doctrine do have a coherent body of rules.  For example, the Supreme Court's caselaw governing standing, ripeness, and mootness—however much one might disagree with the decision in one or another case, *e.g., United States Parole Commission v. Geraghty*, 455 U.S. 388 (1980)—comprises a coherent body of rules that enables federal courts to decide cases on grounds legal rather than legislative.  Among those peaks, the Court's decision in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), is a notable summit; and a lower court armed with that opinion and *Marbury* can navigate nearly any justiciability question presented.

In free-speech cases, however, courts often find themselves on marshier ground.  True, the doctrine does comprise some legal rules:  viewpoint discrimination is generally prohibited, for example, as are certain content-based restrictions on speech.  But other parts of the doctrine—for example, cases concerning government-employee speech—expressly direct courts to balance competing interests rather than to apply legal rules.  *See Pickering v. Board of Education*, 391 U.S. 563 (1968).  And an appreciable swath of free-speech doctrine, respectfully, seems to be ad hoc:  the Court simply makes a decision that the speech at issue is (or is not) more important than the reasons to restrict it in a particular instance.  *See, e.g.*, *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 684-85 (1986).  In many cases, those decisions appear to make good practical sense.

But the nature of balancing tests and ad hoc decisions alike is that they are not based on articulated rules. Instead, they are essentially conclusory: they present the reader with various circumstances and an outcome, but lack any rule that recites the more abstract qualities (like imminence or concreteness in standing cases) that make those circumstances dispositive. The precedential scope of these decisions is therefore unclear. Thus, when a later case is a hybrid—when it resembles in some ways a case where speech was protected, but in others a case where speech was not—the caselaw can point in opposite directions. And without a body of rules making clear which case governs, the lower courts are sometimes faced with the task, as distasteful as it might be, of making legislative judgments themselves.

This is shaping up as such a case. One line of free-speech cases affords schools more latitude than other state actors to limit speech. *See, e.g.*, *id.; Tinker v. Des Moines Independent Community Sch. Dist.*, 393 U.S. 503, 514 (1969). But another line of cases says that viewpoint discrimination is all but categorically prohibited. *See Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819 (1995). This case shares features of both: the state actor is a school, which has rather plainly discriminated based on viewpoint as to the pronouns it allows students to use. Hence this case might require us to decide whether a school may engage in viewpoint discrimination to prevent a "substantial disruption" in "the work and discipline of the school." *Tinker*, 393 U.S. at 513-14. The Supreme Court seems to have left that door open: that a student's speech advocated drug use, for example, was reason enough for a principal to forbid it. *Morse v. Frederick*, 551 U.S. 393, 401-02 (2007). But our (pre-*Morse*) circuit precedent says the contrary, holding that a school may *not* prohibit speech based on the viewpoint it expresses—even when the speech causes substantial disruption. *See Castorina ex rel. Rewt v. Madison Cnty. Sch. Bd.*, 246 F.3d 536, 544 (6th Cir. 2001). Several courts of appeals have since disagreed with us. *See Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 443 (4th Cir. 2013) (collecting cases); *L.M. v. Town of Middleborough*, 103 F.4th 854, 883-84 & n.11 (1st Cir. 2024). Meanwhile, a related circuit split has broken out as to whether schools may discriminate based on viewpoint when students engage in speech that is arguably sponsored by the school—as in school newspapers and theater productions. *See Busch v. Marple Newtown Sch. Dist.*, 567 F.3d 89, 108 (3d Cir. 2009) (Hardiman, J., dissenting in part) (collecting cases). That the circuits disagree on doctrinal issues,

of course, is not necessarily the doctrine's fault. But I do suggest, respectfully, that the reason for the opacity of free-speech doctrine is its unusually legislative character.

A methodology like the one the Supreme Court prescribed for the Second Amendment in *Bruen*, by contrast, would make free-speech doctrine more firmly grounded in law. As discussed above, the Speech Clause by its terms points toward a preexisting right. Professor Jud Campbell has made a strong historical case that this preexisting right included, as its core, an inviolable right to express one's opinions in good faith. Jud Campbell, *Natural Rights and the First Amendment*, 127 Yale L.J. 246, 280-87 (2017). But in a more concrete sense, "the freedom of speech" as it existed in 1791 (or 1868, as the case may be) also included every form of speech or expression for which there was no liability at common law. For citizens then were in fact free to engage in all that speech without penalty; and the First Amendment provides that Congress (and the states, after 1868) shall thereafter "make no law . . . abridging the freedom of speech[.]" A determination that certain speech was permissible under the common law, therefore, should go a long way toward answering the question whether it fell within "the freedom of speech" as originally understood. *See* Richard Epstein, *A Common Law for the First Amendment*, 41 Harv. J.L. & Pub. Pol'y 1, 14 (2018).

An inquiry more focused on the historic common law would also ground free-speech doctrine in *rules*; for the common law was itself a body of rules, indeed rules incrementally "fined and refined," as Edward Coke put it, across centuries of human experience. *Calvin's Case*, 7 Co. Rep. 1a, 3b (1608). Thus, as Richard Epstein observed: the common law "should not be understood as some arbitrary assemblage of rules, but as a comprehensive world-view that seeks, however haltingly, to understand the proper spheres for cooperation and coercion in diverse settings." Epstein, *supra*, at 8.

To some extent, "[w]hat history suggests," the Court's "contemporary doctrine confirms." *Houston Community College System v. Wilson*, 595 U.S. 468, 477 (2022). One example, as noted above, is that (as a matter of public law binding upon the government itself) honest expression of opinion was protected. That protection, by implication at least, would bar viewpoint discrimination. Another example is that, under the common law, mere offense—at speech or

anything else—was not a cognizable legal harm.  Epstein, *supra*, at 25.  Likewise unactionable were truthful statements of fact.  *Id*. at 27.  By contrast, speech amounting to coercion—"your money or your life," for example—most certainly was a basis for punishment.  *See United States v. Taylor*, 596 U.S. 845, 852 (2022).  So was speech amounting to misrepresentation or fraud.  Reference to the historic common law thus would not effect a wholesale change in the substance of free-speech doctrine.  But it would bolster the doctrine's more infirm structures with sturdier beams of actual law—meaning legal rules.

Thus, to determine whether the plaintiffs here should prevail on their First Amendment claim, we should begin with the right question:  namely, whether the historic common law would have subjected a student to punishment (as a matter of public law or private) for referring to a classmate with biological pronouns that the classmate had insisted the student not use.  Considering the speech alone, the answer is likely no.  For one thing, as noted above, offense or dignitary harm was not cognizable at law.  Epstein, *supra*, at 35.  And the right to express one's opinions in good faith would almost certainly protect the speech at issue here.  Jud Campbell connects this right to an antecedent right of conscience, which John Locke described as "for the most part, only passive" because what the mind "perceives, it cannot avoid perceiving."  Campbell, *supra*, at 281 (citation omitted).  In this case no one disputes that the plaintiffs' proposed speech—the use of biological pronouns—would express their honest opinion about the immutability of gender.  Indeed, as a matter of customary practice (which was itself the "great Substratum" of the common law, as Matthew Hale wrote) biological pronouns until recently were the only pronouns that anyone used.  Sir Matthew Hale, The History of the Common Law of England, at 46 (Gray, ed., 1971).  True, that answer might change if the speech at issue amounted to what we now call bullying.  For in that event it might cross the line into coercion—meaning the use of force or a threat to use it—which the common law as a general matter strictly forbade (save exceptions like self-defense).  *See, e.g.*, *Scheidler v. National Organization for Women*, 537 U.S. 393, 405-06 (2003).  But the record here lacks any evidence of bullying.

That said, as Richard Epstein observed, the common law took into account the "diverse settings" in which human action takes place.  Epstein, *supra*, at 8.  The setting here is a school; and in schools, under the common law (as under current doctrine), the rules were sometimes

different. Justice Thomas has argued that—during the ratification era and for some time afterward—students had no speech rights at all while in school. Rather, "in the earliest public schools, teachers taught, and students listened. Teachers commanded, and students obeyed. Teachers did not rely solely on the power of ideas to persuade; they relied on discipline to maintain order." *Morse*, 551 U.S. at 412 (Thomas, J., concurring). Under that view, the school here would have authority to command students to use whatever pronouns the school wanted them to use.

But this point nicely illustrates how, under the common law, outcomes are directed by rules rather than by facts alone. For in the olden days, the schoolmaster's authority was itself governed by rules—namely those of the doctrine called *in loco parentis*. *See generally, e.g.*, *Mahanoy Area Sch. Dist. v. B.L., by and through Levy*, 594 U.S. 180, 187 (2021). Under that doctrine, the schoolmaster would possess only the authority that the students' parents, by word or deed, had delegated to him. And in those days—before compulsory education, for one thing—that authority was likely far greater than the authority that parents delegate today when they send their children to public schools. Parents in the early 19th century likely knew the schoolmaster, shared his values, and thus granted him broad authority not only to discipline their children, but also to instruct them morally. But today very few parents—least of all the parents here—can be deemed to grant that broad authority. *See Mahanoy Area Sch. Dist.,* 594 U.S. at 198-201 (Alito, J., concurring). So the rules (of *in loco parentis*) are the same as they were then; but the facts have changed. I think that Justice Alito is almost certainly correct, therefore, when he says that public schools today lack the command-and-control authority possessed by schoolmasters in Puritan New England. And if so the students here retain their right, under the historic common law, to use the pronouns they honestly think they should use.

\*      \*      \*

A final point is hortatory rather than legal. That the law permits certain action does not mean that an individual should necessarily engage in it. In a free society, law regulates conduct only at the extremes. And within those broad confines there exists constantly a potential for conflict among individuals with different beliefs and competing interests. To minimize those conflicts, we habitually comply with what Hayek called moral rules—being a set of voluntary

rules, most of them traditional, that suppress egotism and reconcile everyday conflicts of interest. These include rules relating to civility, decency, and certain kinds of self-regulation. These rules demand a certain forbearance; and without it, to maintain order, the alternative is eventually coercion. In that sense, Hayek wrote, "it is probably true that a successful free society will always in a large measure be a tradition-bound society." F.A. Hayek, The Constitution of Liberty 122 (Chicago 2011).

Recent history in our own circuit shows how customary rules of civility can head off the need for coercion in a situation very much like the one here. Specifically, at Shawnee State University, Professor Nicholas Meriwether, a devout Christian believer, proposed a compromise in which he would address a nonbinary student by the student's last name alone—without a gender-specific honorific that the student had asked him not to use. *See Meriwether v. Hartop*, 992 F.3d 492, 499 (6th Cir. 2021). At least initially, his student agreed, thus enabling Meriwether to honor his conscience without speaking in a way his student found demeaning. The First Amendment might not have compelled that compromise, but—if the law is to avoid becoming a clash of absolutes where peace comes only through coercion—voluntary accommodation is often necessary.

Here, during oral argument, counsel for the school told us that, under its rules, students "can wear a t-shirt that says there are only two genders . . . . You can say, 'I have a strong belief that marriage is between a man and a woman, that gender is immutable.'" Oral Arg. 1:02:10-1:02:35. True, some forms of expression are more vivid or powerful than others. But the students here are free to wear such t-shirts and otherwise to express themselves however they like on the topic of gender. So within those broad confines, perhaps they too can do what Professor Meriwether did, and forbear from making an example of the eighth grader sitting next to them—if not as a matter of law, then of grace.

---

## CONCURRENCE

---

THAPAR and NALBANDIAN, Circuit Judges, concurring.  We join the majority's excellent and thoughtful opinion.  But we would go further and rule that the School District's policies are invalid because they discriminate based on viewpoint against one side of an ongoing political debate.

If there's one thing that everyone agrees on here, it's that pronouns matter.  "Pronouns can and do convey a powerful message implicating a sensitive topic of public concern."  *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021); *see also Janus v. AFSCME*, 585 U.S. 878, 913–14 (2018) ("[S]exual orientation and gender identity . . . are sensitive political topics, and they are undoubtedly matters of profound value and concern to the public." (cleaned up)).

The battle of the pronouns is a matter of serious political and social concern.  Such speech is "at the heart of the First Amendment's protection."  *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (citation omitted).  So, in nearly any other setting, this would be an open-and-shut case.  The government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972).

But schools get extra leeway to regulate speech "in light of the special characteristics of the school environment."  *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (citation omitted).  After all, it's hard to imagine how a school could function without teachers being able to tell students to be quiet or answer questions.  While students don't "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," First Amendment doctrine operates differently in the public-school setting.  *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

Supreme Court precedent shows that the School District discriminated against the viewpoint that sex and gender are immutable characteristics.  How so?  The policies permit *some* pronouns (those that "affirm" gender transition) to be used for transgender students, but not *other*

pronouns (those reflecting the view that sex and gender are immutable). The School District didn't ban the use of all pronouns. It just prohibited using ones that reflect a viewpoint it didn't like.

But even the "special characteristics" of public schools can't justify viewpoint discrimination on a matter of public concern. A consistent theme in the Supreme Court's student-speech jurisprudence (and, indeed, all First Amendment jurisprudence) is that speech on a matter of public concern is privileged. Of course, schools have plenty of leeway to punish students for all sorts of inappropriate speech. *See Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 678 (1986) (sexually explicit speech); *Morse v. Frederick*, 551 U.S. 393, 396 (2007) (apparent drug-promoting speech). But when schools get in the business of regulating politically charged speech, they approach the outer bounds of what the First Amendment allows. *See Tinker*, 393 U.S. at 504–05 (protesting the Vietnam War); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 626 (1943) (requiring flag salutes). Viewpoint discrimination on an issue of political and cultural salience like pronouns falls outside those bounds.

The First Amendment permits schools to educate—not indoctrinate and censor.

## I.

Education has always been a priority in America. Several early state constitutions placed a duty on the government to provide for public schooling. *See* Steven G. Calabresi, Sarah E. Agudo & Kathryn L. Dore, *State Bills of Rights in 1787 and 1791: What Individual Rights Are Really Deeply Rooted in American History and Tradition?*, 85 S. Cal. L. Rev. 1451, 1540 (2012). Why? As John Adams put it in the Massachusetts Constitution of 1780, it was necessary to spread "[w]isdom and knowledge" throughout the body politic so that Americans could "preserv[e] . . . their rights and liberties" as citizens. Mass. Const. of 1780 pt. II, ch. V, § II. To that end, the Massachusetts Constitution made it "the duty of the legislators and magistrates" to "cherish . . . public schools." *Id.*

Even the fledgling federal government got into the public-education game. The Northwest Ordinance, enacted by the Confederation Congress and reaffirmed by the First Congress in 1789, provided that "schools and the means of education shall forever be encouraged" in the territories,

since the "[r]eligion, morality, and knowledge" that schools impart are "necessary to good government and the happiness of mankind."  Nw. Ord. § 14, art. 3.

As public schools proliferated in the nineteenth century thanks to the "common school" movement, so did the number of students.  *See Ingraham v. Wright*, 430 U.S. 651, 660 n.14 (1977); Michael S. Katz, *A History of Compulsory Education Laws* 14–16 (1976).  And where there are schoolchildren, there will be mischief.

To manage that mischief, the common-law doctrine of *in loco parentis* permitted schoolmasters, "in the place of the parents," to discipline students for misbehavior.  As Blackstone explained, a parent "may . . . delegate part of his parental authority, during his life, to the tutor or schoolmaster of his child; who is then *in loco parentis*, and has such a portion of the power of the parent committed to his charge, *viz.* that of restraint and correction, as may be necessary to answer the purposes for which he is employed."  1 William Blackstone, *Commentaries* *441.

But with the advent of compulsory-education laws in the late nineteenth century, the scope of *in loco parentis* became unmoored from its justification.  *In loco parentis* was thought of as a form of voluntary delegation.[1]  Parents delegated authority to private tutors, and later, schoolteachers, to educate their children.  Those teachers often reflected the viewpoints of the parents.  *See* Kethledge Conc. Op. at 44.  As leading nineteenth-century educators put it, "teachers are confidential *agents*; employed, by parents, to discharge a duty."  Alonzo Potter & George B. Emerson, *The School and Schoolmaster: A Manual* 256 (Boston, Wm. B. Fowle & N. Capen 1843) (emphasis added).  But the extensive scope of this delegated parental power rested, at least in part, on a family's consent.

Widespread education is, of course, an excellent thing.  But as education has transitioned from an optional to a mandatory part of life, and as the hours in an academic day and the days in an academic year have crept up, the assumption of consent underlying *in loco parentis* has lost its

---

[1]*See* Blackstone, *supra*; James Wilson, *Of the Natural Rights of Individuals*, *in* 2 Collected Works of James Wilson 1053, 1076 (Kermit L. Hall & Mark D. Hall eds., Liberty Fund 2007) (1790); 2 James Kent, *Commentaries on American Law* 170 (1827); Finley Burke, *A Treatise on the Law of Public Schools* 90 (New York, A. S. Barnes & Co. 1880).

force. After all, parents face criminal sanctions for failing to send their children to school or to otherwise properly educate their children (in the eyes of the state). *See Mahmoud v. Taylor*, 145 S. Ct. 2332, 2342, 2359 (2025); *New Jersey v. T.L.O.*, 469 U.S. 325, 336 (1985) (recognizing that "'the concept of parental delegation' as a source of school authority is not entirely 'consonant with compulsory education laws'" (quoting *Ingraham*, 430 U.S. at 662)).

Some parents can pay for private schools or devote the time it takes to educate their children at home. But most can't. *See Mahmoud*, 145 S. Ct. at 2359. Ultimately, "many parents have no choice but to send their children to a public school." *Id.* at 2351 (cleaned up).

In such a system of compulsory education, schools don't have a blank check to suppress disagreement on matters of public import. That's especially true with young students who are "more impressionable and thus more susceptible to indoctrination." *L.M. ex rel. Morrison v. Town of Middleborough*, 145 S. Ct. 1489, 1496 (2025) (mem.) (Alito, J., dissenting from the denial of certiorari). The greater the state's control, the greater the need to protect students' and parents' rights—especially when the state is claiming a right not just to step into the parents' shoes, but to inculcate values that directly contradict the parents' views. *Cf. Mahmoud*, 145 S. Ct. at 2352, 2357–58.

*     *     *

In short, public schools have long been tasked with the awesome responsibility of teaching students to read, write, and be productive members of society. But education is about more than just preparing for success in the real world. It "is the very foundation of good citizenship." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954). And good citizenship entails being able to disagree respectfully with one's fellow Americans.

With this backdrop in mind, we turn to the Supreme Court's school-speech precedent.

II.

A.

The First Amendment's normal rules of the road change in public schools.  Take content and viewpoint discrimination.  Content discrimination, or content-based regulations, "target speech based on its communicative content."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  In general, content-based regulations survive only if they can clear the demanding hurdle of strict scrutiny.  *Id.* at 165.

Viewpoint-based regulations are even more suspect.  They're "an egregious form of content discrimination."  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).  When the "perspective of the speaker is the rationale for the restriction," the government has discriminated on the basis of viewpoint.  *Id.*  The First Amendment forbids the government from regulating speech based on "hostility" or "favoritism towards the underlying message expressed."  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992).

But public schools *can* engage in lawful content-based discrimination.  For instance, in *Fraser*, the school punished a student for using an "elaborate, graphic, and explicit sexual metaphor" at a school assembly.  478 U.S. at 678.  As the Supreme Court put it, schools may punish student speech that "would undermine the school's basic educational mission" or be "inconsistent with the 'fundamental values' of public school education."  *Id.* at 685–86.  That included sexual jokes.  The school's rule unquestionably applied because of the speech's communicative content.

And public schools can arguably engage in viewpoint discrimination as well.  In *Morse*, a student unfurled a banner that read "BONG HiTS 4 JESUS."  551 U.S. at 397.  The school disciplined the student based on the apparent drug-promoting message.  *Id.* at 398, 402.  Still, there was no First Amendment problem.  *Id.* at 403.  In both *Fraser* and *Morse*, the schools reasonably concluded that vulgar sexual language and the promotion of illegal drug use weren't appropriate things for students to be saying.

For adults, "[g]iving offense" is a viewpoint that the First Amendment protects.  *Matal v. Tam*, 582 U.S. 218, 243 (2017) (plurality opinion of Alito, J.).  But that's not necessarily so for students in public schools.  Schools need not tolerate lewd, indecent, obscene, or profane speech.[2] Nor must they tolerate speech that promotes illegal drug use or illegal activity more generally. While students don't shed their constitutional rights at the schoolhouse gates, the First Amendment still gives schools room to do what they do best—teach, instruct, and discipline.

Finally, schools receive even more leeway over student speech that's part of the curriculum, like a student newspaper written for a journalism course.  *Kuhlmeier*, 484 U.S. at 263, 270–71.  When the public "might reasonably perceive [the speech] to bear the imprimatur of the school," the school can regulate the speech so long as its regulation is "reasonably related to legitimate pedagogical concerns."  *Id.* at 271, 273.  But our case doesn't touch on school curricula. It deals exclusively with student speech that just so happens to take place at school.

B.

So what are the limits on schools' authority to discipline students for their speech?

Start with *Tinker*.  There, a school disciplined students for wearing black armbands protesting the Vietnam War.  *Tinker*, 393 U.S. at 504.  The Supreme Court held the school's policy was unconstitutional.  To lawfully punish the students, the school needed to show that the armbands would "materially disrupt[] classwork or involve[] substantial disorder or invasion of the rights of others."  *Id.* at 513.  A "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" didn't justify the restrictions.  *Id.* at 509.

In doing so, the *Tinker* Court found it especially concerning that the school hadn't banned all controversial symbols—it permitted the Nazi Iron Cross, for example.  *Id.* at 510.  The school singled out the anti-Vietnam War armbands.  Against that backdrop, the Court explained that

---

[2]Even this power has limits.  There's another constraint on schools' authority that applies to even "low value" speech: location.  *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 189–90 (2021).  In *Mahanoy*, a student named B.L. made expletive-ridden statements about the cheer team after school and off campus.  *Id.* at 185.  The Court held that B.L.'s off-campus location, among other factors, meant the school couldn't punish B.L. for her speech. *Id.* at 189–91.  That was true even though the school could've punished B.L. had she cursed out her team in the locker room.

prohibiting the "expression of one particular opinion"—the essence of viewpoint discrimination—wasn't "constitutionally permissible." *Id.* at 511.

*Barnette*, meanwhile, limited schools' authority to *compel* speech. During World War II, the West Virginia Board of Education required students to salute the flag or be disciplined. *Barnette*, 319 U.S. at 626. Several students sued because their faith barred them from saluting the flag. The Court concluded that "a ceremony so touching matters of opinion and political attitude" couldn't be "imposed upon" the students. *Id.* at 636. Mandatory flag salutes in school "transcend[ed] constitutional limitations" on the school's power and "invade[d] the sphere of intellect and spirit" at the heart of the First Amendment. *Id.* at 642. And this compelled speech, of course, was a form of viewpoint discrimination— demanding, rather than banning, a certain view. *See Ward v. Polite*, 667 F.3d 727, 733 (6th Cir. 2012) (observing that *Barnette* "enforced that prohibition [on viewpoint discrimination] in the public school setting").

What do *Tinker* and *Barnette* have in common? The contested speech dealt with controversial political subjects. Criticizing the Vietnam War is a quintessential "political message." *Fraser*, 478 U.S. at 680 (cleaned up); *see also Morse*, 551 U.S. at 403 ("The essential facts of *Tinker* are quite stark, implicating concerns at the heart of the First Amendment. The students sought to engage in political speech . . . ."). And saluting the flag likewise "convey[ed] political ideas" because it "require[d] the individual to communicate by word and sign his acceptance of the political ideas it thus bespeaks." *Barnette*, 319 U.S. at 632–33. Whether a school wants to punish students for making statements on a matter of public concern or compel them to do so, its policies raise an eyebrow.

The Supreme Court has indicated that the viewpoint-neutrality rule has bite for student speech on matters of public concern. Even while recognizing the need for public schools to receive significant leeway to regulate student speech, the Court has taken pains to emphasize that the student speech did *not* involve a serious matter of political or social concern. Neither *Fraser*'s sexual innuendos nor *Morse*'s bong hits nor *Mahanoy*'s "f--- school" implicated matters of public concern.

In *Fraser*, the Court noted that "the penalties imposed in this case were unrelated to any political viewpoint."  478 U.S. at 685.  And in *Morse*, the Court likewise made clear that this was "plainly not a case about political debate over the criminalization of drug use or possession."  551 U.S. at 403.  The student claimed that his drug banner was simply "meaningless and funny," not that it conveyed "any sort of political or religious message."  *Id.* at 402–03 (quotation omitted).[3]

Even still, two Justices in *Morse* concurred only with the "understanding that the opinion does not endorse any further extension" of the leeway given to schools to regulate speech.  *Id.* at 425 (Alito, J., concurring).  The *Morse* Court even declined to adopt a rule that the school could regulate the student's speech because it was "plainly offensive."  *Id.* at 409 (majority opinion) (cleaned up).  That rule wouldn't work, the Court explained, because "much political and religious speech might be perceived as offensive to some."  *Id.*; *see also id.* at 423 (Alito, J., concurring) (rejecting the proposition that schools may censor any student speech that interferes with the school's "educational mission" because "some public schools have defined their educational missions as including the inculcation of whatever political and social views are held by the members of" those in power).

The Court's most recent foray into school rights accords with this understanding.  In *Mahmoud*, the Court struck down a school board's policy of using "LGBTQ+-inclusive" books without opt-out options as a free-exercise violation.  145 S. Ct. at 2363.  In doing so, the Court observed the "objective danger" when schools "exert upon children a psychological 'pressure to conform' to their specific viewpoints."  *Id.* at 2355 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 211 (1972)); *see also id.* at 2353.  That's indoctrination outside any reasonable understanding of *in loco parentis*.

Schools may, of course, punish students if they express political speech in a particularly disruptive way:  If a student shouts about his favored political party during a music recital, he can be sent to the principal's office.  The same goes for a student who heckles a classmate for her

---

[3]Nor was the banner simply an innocent joke.  The student's admitted purpose was one of bad faith, to "embarrass the high school administration" on live TV because he didn't like the principal.  *See* Scott A. Moss, *The Story of* Tinker v. Des Moines *to* Morse v. Frederick*: Similar Stories of Different Student Speech with Different Results*, *in* First Amendment Stories 401, 417–18, 435 (Richard W. Garnett & Andrew Koppelman eds., 2012).

transgender status whenever she contributes to a class discussion. But those are like "time, place, and manner" or harassment restrictions—not viewpoint discrimination. *Cf. Ward v. Rock Against Racism*, 491 U.S. 781, 797 (1989); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). The student would receive the same punishment for the *way* he spoke, no matter what viewpoint he was expressing.

And under *Tinker*, a school can still enforce content-based restrictions on political speech that aren't viewpoint based—a math teacher can make a student walk through an algebra problem instead of drumming up support for certain immigration laws. But a policy crosses the line into impermissible indoctrination when it imposes viewpoint restrictions on political speech. That teacher can't allow students who want less immigration to advocate for their views, but force students who disagree to focus on math.

This principle also aligns with the Court's approach in the other context where traditional First Amendment protections are relaxed based on the government's special role—when the government acts as an employer. There, as here, the critical inquiry is whether a given employee has spoken on "matters of public concern." *Connick v. Myers*, 461 U.S. 138, 143 (1983); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). This is because speech of public concern "falls within the core of First Amendment protection." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 600 (2008); *see also Lane v. Franks*, 573 U.S. 228, 235 (2014) ("Speech by citizens on matters of public concern lies at the heart of the First Amendment . . . .").

And similarly, when a government employee's speech is of public concern, the Court has suggested that viewpoint discrimination is categorically barred. *See Rankin v. McPherson*, 483 U.S. 378, 384 (1987) ("Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse . . . simply because superiors disagree with the content of employees' speech."). So this "core First Amendment principle of viewpoint neutrality applies in the *Pickering-Garcetti* context as elsewhere." *MacRae v. Mattos*, 145 S. Ct. 2617, 2620 (2025) (mem.) (statement of Thomas, J., respecting the denial of certiorari); *see also Elrod v. Burns*, 427 U.S. 347, 357 (1976) (plurality opinion).

The Court has also articulated the contours of "public concern" in the context of government-employee speech.  Speech is on a matter of "public concern" when it relates "to any matter of political, social, or other concern to the community."  *Connick*, 461 U.S. at 146; *see also Meriwether*, 992 F.3d at 508.  In performing this inquiry, a court should consider the speech's "content, form, and context."  *Connick*, 461 U.S. at 143–48.  So, for example, making inflammatory statements about the President's welfare policies is of public concern.  *Rankin*, 483 U.S. at 381, 387.  As is a teacher's discussion of "race, gender, and power conflicts."  *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 679 (6th Cir. 2001).  And just because the government finds speech "inappropriate or controversial," that doesn't stop it from being of public concern and protected.  *Rankin*, 483 U.S. at 387.

\*          \*          \*

The Supreme Court's caselaw reveals a few principles.  First, schools have the authority in the first instance to determine "what manner of speech in the classroom or in school assembly is inappropriate."  *Fraser*, 478 U.S. at 683; *see Kuhlmeier*, 484 U.S. at 273; *Tinker*, 393 U.S. at 507.  Second, schools have more leeway over their own curriculum.  *Kuhlmeier*, 484 U.S. at 272–73.  Third, schools' authority over off-campus speech is diminished.  *Mahanoy*, 594 U.S. at 189–90.  And fourth, schools may not engage in viewpoint discrimination on matters of public concern and so single out disfavored political views for opprobrium.  *See Tinker*, 393 U.S. at 509–11.

## C.

Yet the School District here targeted one side of a live political debate and concluded that the desire to use biological pronouns—and biological pronouns only—is bullying.[4]  *Cf. Hardy*, 260 F.3d at 679.  But there's a difference between student speech that is sexually explicit, vulgar, or otherwise inappropriate, and well-intentioned moral or political viewpoints.[5]  The Supreme

---

[4]That's not to say the School District can't enforce its anti-harassment pronoun policies at all.  If a bully calls a boy "little princess" or "baby girl," that isn't protected speech.  It's not speech on a political or social matter.  Rather, it's a taunt that schools are free to regulate.

[5]As the plaintiffs point out in their briefing, they harbor no ill-will towards any transgender student.  They don't seek a blanket license to harass, intimidate, degrade, humiliate, or bully transgender students.  Rather, they want

Court's school-speech precedent hews to that line. And here, the students' desire to use biological pronouns and weigh in on the "culture war" falls on the *Barnette-Tinker* side of the line, not the *Fraser-Morse* side.

The School District's policies discriminate based on viewpoint, as the majority opinion ably explains. That viewpoint is a sincerely held belief on an issue of undisputed importance—that sex is immutable.

Indeed, the whole *point* of using this-versus-that pronoun is "to convey a message," one "concern[ing] a struggle over the social control of language in a crucial debate about the nature and foundation, or indeed real existence, of the sexes." *Meriwether*, 992 F.3d at 508 (quotation omitted). Pronouns are a proxy for an entire worldview. When you use biological pronouns, rather than so-called preferred ones, you express the belief "that sex is fixed in each person from the moment of conception, and that it cannot be changed, regardless of an individual's feelings or desires." *Id.* at 509 (quotation omitted); *see also* Dennis Baron, *What's Your Pronoun?: Beyond He & She* 2 (2020) (explaining that the question "'*[w]hat's your pronoun?*' is an invitation to declare, to honor, or to reject, not just a pronoun, but a gender identity").

Nor does recasting the speech here as vulgar or indecent save the district's policy. *Cf. Mahanoy*, 594 U.S. at 187–88 (noting schools' ability to restrict vulgar and indecent speech). Of course, foul language, racial slurs, and other epithets have no place in school. But "lumping those who hold traditional beliefs about [biological sex] together with racial bigots is insulting to those who retain such beliefs." *Fulton v. City of Philadelphia*, 593 U.S. 522, 616 (Alito, J., concurring in the judgment). Until very recently, it was unheard of to think that men could become women and vice versa. But according to the School District, the plaintiff's viewpoint is so anathema to contemporary sensibilities that it is per se bullying.

In short, courts may not inquire into whether political speech presents a "substantial disruption" based on its *viewpoint* alone—like the district court did here. *See Tinker*, 393 U.S. at 514. As Justice Thomas has observed, "[i]t undermines core First Amendment values to allow a

---

to continue to respectfully refer to other students with biological pronouns, regardless of the other students' preferred pronouns.

government employer to adopt an institutional viewpoint on the issues of the day and then . . . portray this disagreement as evidence of disruption." *MacRae*, 145 S. Ct. at 2620 (statement of Thomas, J., respecting the denial of certiorari). So too with schools. Just because a school argues that other students will be offended by a particular viewpoint and disrupt the school environment doesn't mean it can restrict that speech. It must point to something more to justify the regulation—like actual harassment or vulgarity.

Schools like the Olentangy School District have the awesome responsibility of preparing tomorrow's leaders. To do so, they must teach the students not only the basics of arithmetic, grammar, and history, but also how to discuss hotly contested matters in a respectful way. Picking a side in a debate and then trying to impose that viewpoint on students who see things differently is not educating. It's indoctrinating.

In the end, the School District's policy "mandates orthodoxy, not anti-discrimination," and fails to recognize that "[t]olerance is a two-way street." *Polite*, 667 F.3d at 735. The District chose a side in a hotly contested debate and tried to squelch the opposing viewpoint by imposing an ideological speech code. When it did so, it unlawfully discriminated based on viewpoint. And while we appreciate the majority's thoughtful *Tinker* approach, we worry that students' rights to speak freely on important matters of public interest should not hang in the balance while district courts perform ad hoc inquiries into how "disrupt[ive]" they find the students' viewpoint. In short, we believe this case should have ended today.

We concur.

---

## CONCURRENCE

---

BUSH, Circuit Judge, concurring.  This case is about a government attempt to alter traditional grammar.  If the issue seems odd, that's because it is.  Unlike languages in many countries, American English develops through custom, not law.  True, we have "rules" of grammar.  But they are rules only because we follow them until they change through voluntary, widespread decisions of individuals and groups.  This change occurs through persuasion, not government mandate.

Our Nation's historical tradition allows people to speak freely about their honest beliefs and disallows compelling them to speak counter to those beliefs unless they remain silent.  Some people may not think pronouns worth fighting over.  But we should respect the free speech rights of the students represented by the plaintiff organization.  Even if pronoun usage is not everyone's cause, we all care about some form of speech that reflects our core values—speech that the government has no business regulating.[1]

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."  *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  Because of constitutional protections, Americans work out changes in word usage through dialogue, not diktat.  Only the natural evolution of language, free from government regulation, accords with freedom of speech.  The First and Fourteenth Amendments confirm that principle.  And it holds true no matter who the government actor is, be it Congress or a local school board.

---

[1]As the Anti-Federalist writer Junius explained in 1788, the "least encroachment on the liberty of conscience, ought to awaken the resentment of a free and enlightened people; as if they suffer a precedent in one instance, there will be less room to guard against another on a similar occasion."  Junius, *in Massachusetts Supplement to The Documentary History of the Ratification of the Constitution* 88 (John P. Kaminski et al., eds., 2nd ed. 1998).

Absence of state control over language in America helps explain why we find George Orwell's novel *1984* so jarring. In *1984*, government is a "Big Brother" that mandates English usage in "Newspeak."[2] Big Brother enforces its language mandate through Thought Police, who monitor the speech and thoughts of citizens to ferret out free thinkers and eliminate nonconformity.[3] In America, unlike in *1984*, government can never be the thought police—or, in the case before us, the pronoun police. Our Nation's history of linguistic regulation—or lack thereof—helps explain why.

First, though, I explain the need to write separately. The majority opinion ably addresses relevant caselaw, including *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), and *Barnette*, 319 U.S. 624. But the rationales for our free speech doctrines are often obscured by the doctrines themselves. Also, sometimes, our free speech jurisprudence strays from the historical understanding of the First Amendment. To find the First Amendment's original meaning, we must examine older sources. And when past practice and present doctrine align, as they do here, historical analysis serves a twofold purpose: it not only helps explain our decision to the public, but also ensures that our ruling rests on longstanding and legitimate legal principles, not merely on shifting policy preferences. In short, reliance on history and tradition makes a judicial decision more understandable and neutral. For these reasons, I will address our Nation's shared experience that provides the foundation for the majority's doctrinal analysis. *See Hou. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022) ("What history suggests, we believe our contemporary doctrine confirms.").

Examining history and tradition also eliminates the need to weigh in on the scope of *Tinker*, 393 U.S. 503, addressed by the three other concurring opinions. Those concurrences express different views on the scope of *Tinker* and whether it applies at all to speech on matters of public concern. *See* Batchelder Concurring Op. at 37–38; Kethledge Concurring Op. at 41; Thapar and Nalbandian Concurring Op. at 54–55. In my view, explained below, government simply cannot

---

[2]*See* George Orwell, *1984* (Penguin Books 1977) (1949).

[3]Jon Miltmore, *The Origins of the Thought Police—And Why They Scare Us*, Found. for Econ. Educ. (Nov. 15, 2019), https://fee.org/articles/the-origins-of-the-thought-police-and-why-they-scare-us/ [https://perma.cc/8QN9-48T2].

regulate grammar—full stop.  English language and grammar usage is completely beyond the government's regulatory authority.  That is so no matter what legal standard we apply here, or how narrowly or broadly we read *Tinker*.

Also, as discussed below, the censorship cannot be justified by the doctrine of *in loco parentis*—a school administrator's traditional role to educate a student in the place of the parents with parental consent.  Here, the parents *want* their children to use traditional grammar.  Although the educational mission of the school district may include instruction on new forms of grammar, it cannot require that students change ordinary, parentally approved speech patterns to conform to the school district's views.

The dissent nonetheless attempts to defend the language regulation as non-coercive because the regulation technically does not force students to use pronouns in the way the school district advocates.  Dissenting Op. at 97–99.  The dissent notes that the students can simply refer to others without using pronouns at all.  *Id.* at 98.  That does nothing to eliminate the free speech problem.  Government regulation is coercive whether it compels or censors—those are two sides of the same coin.  In either case, the policy forces students to monitor their use of ordinary English or face punishment.  That abridges speech in violation of the First Amendment.

Nor can the speech regulation be justified as necessary to prevent bullying, as the dissent suggests.  *Id.* at 108.  The school district cannot recast ordinary acceptable English usage as bullying in order to ban it.  Otherwise, all language is at risk of censorship.  But even if the students' traditional use of pronouns were a minority view, that would not justify the school district's regulation.  Their speech is an honest expression of how they view reality—the core of protected speech.

The school district's policy forbids students from speaking in well-established, socially acceptable ways, effectively compelling a new form of grammar.  If the First Amendment stands for anything, it stands for freedom from government rewrite of what was long considered—and for most still is—standard English.

# I.

Governments around the world use the force of law to regulate language. Take the People's Republic of China. The Chinese government mandates standard Chinese through the State Language Work Committee.[4] Or consider French, officially regulated in France since 1635 by the French Academy.[5] Likewise, the Quebec Office of the French Language oversees the dialect spoken in Canada.[6] And Belgium fashions its French through the Royal Academy of French Language and Literature of Belgium.[7] These French and Chinese language managers are not outliers: scores of government-run or -affiliated entities supervise linguistics around the world.[8]

English is the notable exception. Governments in English-speaking countries have traditionally done nothing, nada, zilch to regulate English common usage. That is not for the lack of some people trying.

Consider, for instance, John Adams. "Contrary to the general *laissez faire* legislative attitude towards overt language planning, John Adams assumed a considerably more activist stance with respect to linguistic matters."[9] Before he was our second president, Adams was a diplomat and negotiator in Europe. In 1780, he wrote from Amsterdam to the Confederation Congress, urging it to establish a "public Institution for refining, correcting, improving and ascertaining the

---

[4] *See* Law of the People's Republic of China on the Standard Spoken and Written Chinese Language (promulgated by the Standing Comm. Nat'l People's Cong., and Order No. 37, Oct. 31, 2000 (China)), http://en.moe.gov.cn/Resources/Laws_and_Policies/201506/t20150626_191388.html [https://perma.cc/HU8E-32HP].

[5] *Historical Overview*, L'Académie française, https://www.academie-francaise.fr/linstitution/lhistoire [https://perma.cc/R68F-XMRQ] (last visited Nov. 5, 2025).

[6] *See* Charter of the French Language, R.S.Q., c. C-11 (1977), amended by 2022, c. 17 (Can.), https://www.legisquebec.gouv.qc.ca/en/document/cs/C-11 [https://perma.cc/K8NB-8XHM].

[7] *See Organisation*, L'Académie royale de langue et de littérature françaises de Belgique, https://www.arllfb.be/organisation/index.html [https://perma.cc/MPT8-7KU9] (last visited Nov. 5, 2025).

[8] *See, e.g.*, *La Real Academia Española*, European Lexicographic Infrastructure, https://elex.is/portfolio-item/rae/ [https://perma.cc/7BYM-938P] (last visited Nov. 5, 2025) (overseeing the Spanish language since 1713 and affiliated with national language academies in 22 other Spanish-speaking nations through the Asociación de Academias de la Lengua Española).

[9] Sándor Czeglédi, *Language and the Continental Congress: Language Policy Issues in the Founding Documents of the United States from 1774 to 1789*, 24 Hung. J. Eng. & Am. Stud. 113, 115 (2018) (Czeglédi).

No. 23-3630                     *Defending Educ. v. Olentangy Loc.*                     Page 62
                               *Sch. Dist. Bd. of Educ., et al.*

English Language . . . ."  John Adams, *To the President of Congress No. 6 (Sept. 5, 1780)*, *in* 10 *The Adams Papers: Papers of John Adams* (Gregg L. Lint et al. eds., 1996), https://www.masshist.org/publications/adams-papers/index.php/view/ADMS-06-10-02-0067 [https://perma.cc/W5P5-QHH3].

Adams noted that "most of the Nations of Europe . . . thought it necessary to establish by public Authority, Institutions for fixing and improving their proper Languages." *Id.* The English Nation was different: "it is very remarkable that although many learned and ingenious Men in England have, from Age to Age, projected Similar Institutions for correcting and improving the English Tongue, yet the Government have never found time to interpose in any manner so that to this day, there is no Grammar nor Dictionary, extant of the English Language, which has the least public Authority . . . ." *Id.* Indeed, even the King's English was not compelled by the King, or by Parliament.

Adams urged the new United States to take a different approach from England: government regulation of language. Under the Articles of Confederation, he wrote, "the Honour of forming the first public Institution for refining, correcting, improving and ascertaining the English Language, I hope is reserved for [the Confederation] Congress." *Id.* Adams's idea fell with a thud—the proposal never emerged from Congress.[10]

"In rejecting a national language academy, the founding fathers made clear their choice *not* to designate a national tongue; moreover, the state refused to provide official sanction for specific criteria and procedures of linguistic change or standardization." Shirley B. Heath, *A National Language Academy? Debate in the New Nation*, 189 Int'l J. Soc. Language 9, 9 (1976) (Heath). The Founders "believed the individual's freedoms to make language choices and changes represented a far more valuable political asset to the new Nation than did a state decision to remove these freedoms from the individual." *Id.* at 10.

---

[10]Shirley B. Heath, *A National Language Academy? Debate in the New Nation*, 189 Int'l J. Soc. Language 9, 22 (1976); *see also* Czeglédi, *supra*, at 115 ("Overall, the majority of the Founding Fathers probably considered language an individual matter while expecting newcomers to assimilate as a matter of course." (cleaned up)).

No. 23-3630              *Defending Educ. v. Olentangy Loc.*              Page 63
                         *Sch. Dist. Bd. of Educ., et al.*

On a macrolevel, the Founding Generation understood that individuals have natural rights of expressive freedom.  Jud Campbell, *Natural Rights and the First Amendment*, 127 Yale L.J. 246, 251–53 (2017) (Campbell).  As one Anti-Federalist writer explained in 1787, freedom of thought and expression was considered vital to American life:

> In a free country, as this is, every man has an indubitable right to think for himself, and to express his approbation or disapprobation of public measures, when ever he supposes them consistent or inconsistent with the interest and happiness of the people.  If this is not the case, then have we been fighting for a shadow, and lavishing our blood and treasure to very little purpose.[11]

Federalists also adhered to these principles.  One such Federalist was James Wilson, who was an associate justice on the first Supreme Court, a signer of both the Declaration of Independence and the Constitution, and a professor.[12]  In his law lectures in 1790, Wilson taught: "The citizen under a free government has a right to think, to speak, to write, to print, and to publish freely, but with decency and truth, concerning publick men, publick bodies, and publick measures."[13]  Decency guarded against traditionally unprotected words, such as profanity or defamation.[14]  And truth, according to Wilson and others in his generation, was an absolute, not relative, standard that people could discover through reason.[15]  Honest debate furthered the search for truth, so freedom of expression aligned with natural law.  *See* Campbell, *supra*, at 310–11.

---

[11]Rusticus, *in* 19 *The Documentary History of the Ratification of the Constitution: Ratification of the Constitution by the States: New York* 24, 25 (John P. Kaminski, et al., eds., 2003).

[12]*See* William M. Treanor, *The Case of the Dishonest Scrivener: Gouverneur Morris and the Creation of the Federalist Constitution*, 120 Mich. L. Rev. 1, 8 (2021) ("James Wilson, although not a Committee member, worked informally with the Committee as it prepared its draft."); *Newspaper Reports of the Public Celebration of Ratification on 13 December*, *in* 2 *The Documentary History of the Ratification of the Constitution: Ratification of the Constitution by the States: Pennsylvania* 606, 609 (Merrill Jensen ed., 2001) (suggesting that the U.S. Constitution "was framed by" Wilson "and our worthy friend Mr. Gouverneur Morris in the Federal Convention" (cleaned up)).

[13]2 *Collected Works of James Wilson* 1046 (Mark D. Hall & Kermit L. Hall eds., 2007) (*Collected Works of James Wilson*).

[14]*See, e.g., Extract from a Charge . . . by the Honorable Thomas M'Kean, Chief Justice of the Supreme Court, with the unanimous approbation of the other Judges, in* Pa. Packet (Philadelphia), Apr. 19, 1785, at 3 ("Men therefore have only to take care in their publications, that they are decent, candid and true, that they are for the purpose of reformation and not of defamation, and that they have an eye solely to the public good.").

[15]*See* 1 *Collected Works of James Wilson* 497–98.

Wilson and other Federalists argued that the First Amendment was not even necessary because natural law protected the rights to speak, write, and publish, and because the People granted Congress no express authority to override those natural rights.[16]  Indeed, the default rule under natural law was—and is—that no government has legitimate power to abridge the "freedom to express thoughts" that reflect "*honest* statements—not efforts to deceive others." *Id.* at 282.[17]

The Supreme Court has said as much: "the freedom to think and speak is among our inalienable human rights." *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023).  The First Amendment codified that fundamental maxim in the positive law.  *See District of Columbia v. Heller*, 554 U.S. 570, 592 (2008) (noting the First Amendment "codified a *pre-existing* right"); *see also McDonald v. City of Chicago*, 561 U.S. 742, 818 (2010) (Thomas, J., concurring in part) ("[T]he founding generation generally did not consider many of the rights identified in these amendments as new entitlements, but as inalienable rights of all men, given legal effect by their codification in the Constitution's text.").  Later, the Fourteenth Amendment incorporated the guarantee of free speech as a limitation against the states and their political subdivisions, such as the school district here.  *See Gitlow v. New York*, 268 U.S. 652, 664 (1923).

## II.

Almost as soon as the First Amendment was adopted, free speech faced a test.  It came from the French Revolution, which erupted in 1789, the same year Congress approved the First Amendment.  While Americans debated their Bill of Rights, the French National Assembly adopted a "Declaration of the Rights of Man and of the Citizen." *La Déclaration des Droits de*

---

[16]*See, e.g.*, *id.* at 194–96; Alexander White, *in* 8 *The Documentary History of the Ratification of the Constitution: Ratification of the Constitution by the States: Virginia* 401, 404–05 (John P. Kaminski, et al., eds., 1988) ("The freedom of speech and of the press, are likewise out of the jurisdiction of Congress.").

[17]As a noted early American jurist, St. George Tucker, wrote: "Liberty of speech and of discussion in all speculative matters, consists in the absolute and uncontrollable right of speaking, writing, and publishing, our opinions concerning any speech, whether religious, philosophical, or political; and of inquiring into and, examining the nature of truth, whether moral or metaphysical; the expediency or inexpediency of all public measures, with their tendency and probable effect; the conduct of public men, and generally every other subject, without restraint, except as to the injury of any other individual, in his person, property, or good name." *Of the Right of Conscience; And of the Freedom of Speech and of the Press, in* St. George Tucker, *View of the Constitution of the United States With Selected Writings* 377 (Liberty Fund 1999).

No. 23-3630        *Defending Educ. v. Olentangy Loc.*        Page 65
                 *Sch. Dist. Bd. of Educ., et al.*

*l'Homme et du Citoyen* art. I (1789) (Fr.). The French revolutionaries proved more adept at drafting rights than at honoring them in practice. Unlike the American Revolution, the French Revolution descended into a Reign of Terror—heads on pikes, guillotines, butchering, and all.[18]

It did not start that way. In the early days of the conflict in France, many Americans sympathized with the French revolutionaries' professed egalitarian goals. *See* René Koekkoek, *The Post-Revolutionary Contestation and Nationalization of American Citizenship*, *in The Citizenship Experiment* 169, 174 (2020). American Francophiles even began to mimic new French forms of address. Rather than employ the traditional *monsieur* (for a man) and *madame* or *mademoiselle* (for women) or use longstanding aristocratic titles such as *roi* and *reine* (for king and queen), the French revolutionaries replaced those words with the masculine *citoyen* or feminine *citoyenne* (both translated as "citizen") to refer to all men and women, respectively, regardless of station.[19] Some Americans followed suit by employing *citizen* instead of *Mr.*, *Mrs.*, *Miss*, or a title of office.[20] For example, when Edmond Charles Genêt, the first minister of the French Republic to the United States, arrived in America in 1793, admirers refrained from identifying him as "Mr. Genêt" or "Minister Genêt" and instead used his preferred identifier, "Citizen Genêt."[21]

The promoted grammar change made a political statement that all citizens, even the King, were equal. *See Regicide and Revolution: Speeches at the Trial of Louis XVI* 242 (Michael Walzer

---

[18]*See, e.g.*, Alexander Hamilton, *Views on the French Revolution [1794]*, *in* 26 *The Papers of Alexander Hamilton* 738–41 (Harold C. Syrett. ed., 1979).

[19]*See* William H. Sewell, Jr., *Le Citoyen/La Citoyenne*, *in Democracy: A Reader* 214, 214–15 (Ricardo Blaug & John Schwarzmantel eds., 2001) ("The term 'citoyen' called forth precisely the sort of obsessive patriotism that swept over Paris" and "began to replace the 'aristocratic' designations 'monsieur' and 'madame.'" While earlier forms of address "implied the existence of social distinctions" and "smacked of fawning and artificial courtly manners," by 1792 the citizen term "implied virtue and devotion to the public good.").

[20]*See* William Cobbett & William Playfair, *History of the American Jacobins, Commonly Denominated Democrats*, *in The Making of the Modern World, Part I: The Goldsmiths'-Kress Collection, 1450–1850* 24 (1797) ("The word *citizen*, that stalking horse of modern liberty-men, became almost as common in America as in France. People, even people of sense, began [to use it] in as shameful a manner as the red-headed ruffians of the Fauxbourg St. Antoine.").

[21]Stanley Elkins & Eric McKitrick, *The Age of Federalism: The Early American Republic, 1788–1800* 308 (1993) (Elkins & McKitrick).

No. 23-3630          *Defending Educ. v. Olentangy Loc.*          Page 66
                     *Sch. Dist. Bd. of Educ., et al.*

ed., 1992).  So, when revolutionaries guillotined Louis XVI in 1793, they called him "Citizen Louis Capet."  Noah Feldman, *The Three Lives of James Madison: Genius, Partisan, President* 372 (2017).

Like the French revolutionaries, communists also sought to revolutionize forms of address for political ends.  Communist regimes strongly encouraged and sometimes mandated use of "comrade" instead of traditionally employed honorifics to refer to another person, just as the French revolutionaries insisted on the use of "citizen."[22]  That was not surprising.  "[T]he history of authoritarian government . . . shows how relentless authoritarian regimes are in their attempts to stifle free speech . . . ."  *Nat'l Inst. of Fam. & Life Advoc. v. Becerra*, 585 U.S. 755, 780 (2018) (Kennedy, J., concurring).

Governments in the United States—federal or state—never operated that way.  Our Constitution forbids mandatory use of certain titles to refer to others.  Under Article I, the federal government may not grant titles of nobility, and public-office holders may not accept such titles from foreign governments without Congressional approval.  *See* U.S. Const. art. I, § 9, cl. 8.  States enacted similar provisions in their constitutions and declarations of rights.[23]  Yet no law has ever prevented non-officeholders from using such titles as forms of address.[24]  And although Jeffersonian Republicans tried to convince Americans to refer to each other as *citizen*, American law never mandated it.

---

[22]*See generally* Paul J. Kohlenberg, *The Use of "Comrade" as a Political Instrument in the Chinese Communist Party, from Mao to Xi*, 77 China J. 72 (2017); *see also* Jodi Dean, *Comrade: The Zero-level of Communism*, 6 Stasis 100, 101 (2018) ("Although already established as a term of address in the world socialist movement in the late nineteenth century, 'comrade' as an emancipatory egalitarian figure of belonging derives its energy from the Bolsheviks and the early years of the Soviet experiment.").

[23]Carlton F.W. Larson, *Titles of Nobility, Hereditary Privilege, and the Unconstitutionality of Legacy Preferences in Public School Admissions*, 84 Wash. U. L. Rev. 1375, 1383–85 (2006).  For example, the Maryland Declaration of Rights forbade any "title of nobility" from being "granted in this State."  Md. Declaration of Rights of 1776, art. XL.  Georgia "prohibited any person holding a title of nobility from voting or holding office."  Larson, *supra*, 1385 (citing Ga. Const. of 1777, art. XI).  And South Carolina's constitution prohibits passage of laws "granting any title of nobility."  S.C. Const. Art. I, § 4.

[24]For example, Meghan Markle remains free to refer to herself, and other Americans remain free to address her, as the "Duchess of Sussex."  *See* Jennifer Clarke, *Why Did Harry and Meghan Leave the Royal Family?*, BBC (Sept. 11, 2025), https://www.bbc.com/news/explainers-51047186 [https://perma.cc/YHB6-5QM7] (noting that Markle and Prince Harry continue to retain "their Duke and Duchess of Sussex titles").

One Federalist—Noah Webster, of dictionary fame—explained why the Jeffersonian Republicans failed to persuade.[25] Webster initially supported the French Revolution, but later, like many Americans, found it repulsive.[26] He particularly objected to the mandated use of *citizen*.[27] Webster argued that terms such as *monsieur* were "mere names of civility, implying no distinction, and applied equally to all classes of people. They are literally terms of equality; for when *A* addressed *B* with the appellation, *Monsieur*, *B.* answered him with the same address; denoting an equality of standing and of respect."[28] Webster found it distressing that "these harmless titles, which had no more connection with government, than the chattering of birds, became the subject of grave legislative discussion [in France], and the use of them was formally abolished."[29]

Federalist Gouverneur Morris, the stylist of the federal Constitution,[30] had similar concerns. The Constitution nowhere expressly authorizes Congress or any other government entity to regulate language usage. As U.S. Minister to France at the beginning of the French Revolution,[31] Morris may have realized the importance of that omission. His diary records an

---

[25]Noah Webster, *The Revolution in France, in* 2 *Political Sermons of the American Founding Era* (Ellis Sandoz ed., 1998) (1794), https://www.consource.org/document/the-revolution-in-france-by-noah-webster-1794/ [https://perma.cc/7AAM-2YDW] (Webster).

[26]*See* Howe Whitman III, *Noah Webster on the Limits of Revolution*, 65 Nat'l Affairs 149, 153 (2025) ("[T]he emerging character of the revolution disturbed Webster profoundly. . . . Webster was aghast at the breakdown of order and lawful authority . . . .").

[27]Webster, *supra* ("Why the awkward term citizen, which is in fact a title of distinction, denoting a man who . . . enjoys rights distinct from his fellow inhabitants; or at least one that has a legal residence in a country, and in consequence of it, enjoys some rights or privileges, that are not common to all its people. In proof of this I need only suggest, that in the United States and I believe in all other countries, certainly in France, legal provision is made for acquiring the rights of citizenship.").

[28]*Id.*

[29]*Id.*

[30]*See Letter from James Madison to Jared Sparks, April 8, 1831, in The Papers of James Madison* (Univ. of Chic. Press) ("The finish given to the style and arrangement of the Constitution, fairly belongs to the pen of Mr. Morris.").

[31]Elkins & McKitrick, *supra*, at 312, 321.

instance when he handsomely tipped a French innkeeper for repeatedly addressing him, unprompted, in the old-school way as *monsieur*.[32]

We can tell from modern usage that people like Morris and Webster won the *citizen* linguistics debate. Their side prevailed not because government declared the outcome, but because custom eventually rejected the new approach. The American people remained free to use honorifics according to their honest opinions. As Morris wrote, it "is among the advantages of a government, administered on free principles, that a man may not only follow what occupation he pleases, but hold also the opinions, and publish the doctrines which are most agreeable to him."[33] Public opinion, expressed through the "doctrines" of common speech, voted down the newfangled use of *citizen*.

Beyond the *citizen* controversy, Webster played a key role in encouraging individual Americans—not their governments—to take the lead in shaping American English through personal linguistic decisions. Heath, *supra*, at 24. Rather than support a government-run national language academy, Webster compiled and published dictionaries, and authored other works about language. He sought to convince, not to legislate, the American people in how they should employ words. To be sure, Webster proposed "linguistic independence for the United States." *Id.* But it would come not by a declaration of government, but by "individuals independently choosing to further their education and to advance their social position" through volitional refinement of their communication. *Id.* In this vein, Webster wrote in his 1828 dictionary's preface "that language was the pragmatic instrument of the people, and as such, would be molded by them in accordance with their choice for adoption and adaptation of grammars, spellers, dictionaries, or the emulation of models in public usage." *Id.*

John Adams, however, did not give up on his dream of governmental control of American English. He continued to advocate for public regulation of the language, including support for a short-lived American Academy of Language and Belles Lettres, which organized as a private

---

[32]Gouverneur Morris, *The Diaries of Gouverneur Morris: European Travels 1794-1798* 6 (Melanie R. Miller ed., Univ. of Va. Press, 2011).

[33]Gouverneur Morris, *To Secure the Blessings of Liberty* 118 (J. Jackson Barlow ed., 2012).

group in 1820 and died after a short while. *See id.* at 28–32, 34. Adams wanted Congress to adopt the Academy as its own. *Id.* at 32. Again, there was little congressional interest. Thomas Jefferson—Adams's frenemy—"warned that the Academy should not attempt to 'fix' the language." *Id.* at 33. "Jefferson's democratic faith in the people extended to language: it was society itself, and not some self-appointed arbiters, who would determine the shape that American English took." Frank Proschan, *Language in the New Nation—Jefferson and Rush*, *in* 1987 *Festival of American Folklife: Smithsonian Institution National Park Service* 22, 25 (1987).

This was one of the rare points on which both Jefferson and Chief Justice John Marshall, a Federalist, agreed. *See* Heath, *supra*, at 33. When Webster wrote Marshall to ask for a public endorsement of Webster's dictionary, Marshall declined. *Id.* Marshall reasoned that his position of judicial authority would suggest that the government had endorsed Webster's linguistics determinations. Marshall then "reminded Webster" of what he already knew: "that in America, individuals, not public bodies, made such choices." *Id.*

### III.

Writing about 19th-century America, Alexis de Tocqueville observed that the "bond of language is perhaps the strongest and most durable that can unite men." 1 Alexis de Tocqueville, *Democracy in America, English Edition* 49 (Eduardo Nolla ed., James T. Schleifer trans., Liberty Fund 2012) (1835). But no government, either then or now, has dictated unity of English speech in America. Apart from a few categories historically not considered true speech—such as profanity, defamation, and fraud[34]—the American people have had the liberty to say what they mean and mean what they say, even if their speech is old-fashioned.

Americans have had this freedom since colonial times. "Seventeenth-century Quakers rebelled against the pronoun standards of their day, which proscribed what was then the second-person plural pronoun, 'you,' to address a higher-class individual, while assigning 'thou' and 'thee' to commoners. But the egalitarian and humble Quakers used 'thou' and 'thee' with

---

[34] *See, e.g.*, *Counterman v. Colorado*, 600 U.S. 66, 73 (2023) ("From 1791 to the present, the First Amendment has permitted restrictions upon the content of speech in a few limited areas. These historic and traditional categories are long familiar to the bar and, perhaps too, the general public." (cleaned up)).

everyone, to some people's consternation."  Br. for Institute for Free Speech as Amicus Curiae Supporting Plaintiff-Appellant at 4.  Also, some "'Quakers produced pamphlets . . . to argue that their use of "thee" and "thou" was grammatically—as well as theologically and politically— correct.'"  *Id.* (quoting Teresa M. Bejan, *What Quakers Can Teach Us About the Politics of Pronouns*, The N.Y. Times (Nov. 16, 2019), https://www.nytimes.com /2019/11/16/opinion/sunday/pronouns-quakers.html [https://perma.cc/4TUC-CRRV]).  No law, however, was enacted to implement, or prohibit, the Quakers' way of speech.  Instead, they remained free to speak in their traditional ways, using *thou* and *thee* according to their honest beliefs.  That was their natural right.

These cited uses of *thee, thou,* and *citizen*, for the most part, did not stand the test of time. By contrast, other forms of reference caught on, even when they changed longstanding usage.  For example, using masculine pronouns to refer to all people in the generic sense has largely died out. Still, that was standard in the Founding Era and early American Republic.  When Morris styled the original Constitution, he used masculine words to refer to men and women universally, the customary grammar of that time.  Male pronouns were actually considered inclusive.  As Professor Mary Sarah Bilder explains, "the final drafting committee imposed stylistic consistency in using a neutral 'person/he' in describing the various offices.  'Persons' meant inhabitants of every sex, and 'he' was used as a generic pronoun."  Mary Sarah Bilder, *Female Genius: Eliza Harriot and George Washington at the Dawn of the Constitution* 146 (2022).  Not only was the stylistic consistency "impressive" and "striking," but the "style of the Constitution" also "created constitutional space," as citizens evaded sharp constitutional definition and categorization thanks to the document's "gender-neutral formula."  *Id.* at 6, 146–47.

But by the late 20th century, the word *he* had taken on a more confined meaning.  People increasingly used masculine words to refer exclusively to males.  Thus, writers more commonly used *he or she* to refer to both sexes, rather than simply *he*.  *See, e.g.*, *Carrington v. Rash*, 380 U.S. 89, 89 (1965) (discussing Texas Constitution provision allowing any Texan to vote in state elections "so long as he or she is a member of the Armed Forces").  Some writers and speakers also began using *she* and *her* to reference all people, just like the previous use of *he* and *him*.  *See, e.g.*, *Gutierrez v. Saenz*, 145 S. Ct. 2258, 2269 (2025) ("[T]he person 'living adjacent to the site

for proposed construction of a federally licensed dam' would lose her claim 'to challenge the licensing agency's failure to prepare an environmental impact statement' as long as the agency promised that the statement would not cause the license to be withheld or altered." (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992)) (changing *Lujan*'s masculine pronoun to feminine)).  And still others repurposed the traditionally plural *they* as a singular pronoun to avoid gender-specific pronouns.  *See, e.g.*, *Lockhart v. United States*, 577 U.S. 347, 357 (2016) ("Section 2252(b)(2)'s list is hardly the way an average person, or even an average lawyer, would set about to describe the relevant conduct if they had started from scratch.").  For similar reasons, many people increasingly used words they perceived as more gender-inclusive—such as substituting *humankind* for *mankind*.[35]

The original meaning of Article II of the Constitution provides a concrete example.  When that provision refers to the office of "President of the United States" and provides that "He shall hold his Office," U.S. Const. art. II, § 1, *He* and *his* refer to a president who is either male or female.  But if drafted today, the clause would likely be written differently because of natural development in pronoun usage.

None of these language alterations happened through government mandate.  Instead, usage evolved organically.

## IV.

That finally brings us to the present pronoun dispute.  The students represented by the plaintiff (student plaintiffs) want to use pronouns that reflect a classmate's "biological sex," as the Supreme Court and the plaintiff call it, *United States v. Skrmetti*, 145 S. Ct. 1816, 1824 (2025); *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2354 (2025); Appellant Br. at 32; or the classmate's "sex assigned at birth," to employ the defendant school district's phrasing, Appellee Br. at 14.  By contrast, the school district wants the student plaintiffs to use others' "preferred pronouns," pronouns that align with someone's gender identity.  *See id.* at 2, 14.

---

[35]*Compare The Book of Common Prayer* (Protestant Episcopal Church in the United States of America 1928) *with The Book of Common Prayer* (Episcopal Church 1979).

No. 23-3630                    *Defending Educ. v. Olentangy Loc.*                    Page 72
                               *Sch. Dist. Bd. of Educ., et al.*

Nearly the entire history of English grammar buttresses the plaintiff side of this debate. Until only a few years ago, practically everyone used pronouns the way the student plaintiffs use them. This traditional practice reflects longstanding religious and philosophical beliefs that there are two immutable sexes, male and female.[36]

In contrast, the school district's side of this debate is supported by only a few decades of new English usage and represents, at best, "a hotly contested view of sex and gender." *Mahmoud*, 145 S. Ct. at 2354 (discussing book asking children, "What pronouns fit you best?"). So far American society has reached no general agreement on the acceptability of this new way of speaking. *See generally id.* ("Many Americans . . . believe that biological sex reflects divine creation, that sex and gender are inseparable, and that children should be encouraged to accept their sex and to live accordingly.").

In fact, a contest is afoot between two sides regarding the new pronoun approach. It is unclear which side will prevail in common parlance, if either ever does. If one side prevails, it will not be because government declared a winner. *See 303 Creative*, 600 U.S. at 599–603. The government may advance a viewpoint and may regulate its own speech. *See, e.g.*, *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467–68 (2009). But the government may never "interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 579 (1995).

---

[36]*See* Brief for National Legal Foundation as Amicus Curiae Supporting Plaintiff-Appellant at 4 ("The Old Testament, which serves as a foundational holy text for both Jews and Christians, states, 'God created man in his own image, in the image of God he created him; male and female he created them.' Genesis 1:27 (NIV). The Islamic Holy Scriptures similarly assert, 'He made of him a pair, male and female.' Qu'ran 75:36–39."); *id.* at 4–5 (many "religious groups affirm that sex is biologically determined at birth and immutable") (citing materials from the Catholic Conference Council of Bishops, the Southern Baptist Convention, and the Orthodox Church in America); *see also* Brief for Jewish Coalition for Religious Liberty, Coalition for Jewish Values, American Hindu Coalitions, and Islam and Religious Freedom Action Team, as Amici Curiae Supporting Appellant at 13–23 (noting that religions "from diverse cultures and geographic regions assert—as they have for millennia—that sex is an objective, binary category that cannot be changed by self-perception or medical intervention," and discussing supporting sources from the Roman Catholic Church, the Orthodox Church of America, the Anglican Church, Assemblies of God, the Church of God in Christ, the Lutheran Church, the Presbyterian Church in America, Southern Baptists, the Church of Latter-Day Saints, and the Muslim, Hindu, and Jewish faiths); *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2354 (2025).

No. 23-3630    *Defending Educ. v. Olentangy Loc.*    Page 73
*Sch. Dist. Bd. of Educ., et al.*

"Preferred pronouns" may gain general acceptance, or they may go the way of *citizen*—an identity reference that failed to catch on. Or society may resolve the debate with another usage altogether. The American people must make these decisions as individuals. No government has any business dictating the outcome for everyone.

Unfortunately, that has not stopped governmental authorities—like the school district here—from recently attempting to make it their business. Sometimes, it is public-school administrators who purport to want to create a positive learning environment for students—then threaten to discipline and shame students who won't get with the program.[37] Often, those same school administrators fire or discipline teachers for refusing to speak in the new way.[38] And language regulators also operate at certain public universities.[39]

---

[37] *See, e.g.*, *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 664 (8th Cir. 2023) (school district policy stated that not using student's preferred pronouns was harassment and bullying); *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 684 F. Supp. 3d 684, 707 (S.D. Ohio 2023), *aff'd*, 109 F.4th 453 (6th Cir. 2024), *reh'g en banc granted*, *opinion vacated*, 120 F.4th 536 (6th Cir. 2024) (same).

[38] *See, e.g.*, *Geraghty v. Jackson Loc. Sch. Dist. Bd. of Educ.*, No. 5:22-cv-02237, 2024 WL 3758499, at *11 (N.D. Ohio Aug. 12, 2024) (public school forced teacher to resign for refusing to use two students' preferred names and pronouns that corresponded with their gender identity but not their biological sex); *Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861, 864 (7th Cir. 2023), *vacated on denial of reh'g*, No. 21-2475, 2023 WL 4842324 (7th Cir. July 28, 2023) (public high school policy required teachers to refer to transgender students by their preferred first names and pronouns; school fired a teacher for using only last names instead); *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 680 F. Supp. 3d 1250, 1265–66 (D. Wyo. 2023) (school policy required teachers to "use a student's preferred/chosen name or pronoun in verbal, written, and electronic communications" or face "discipline" for "discriminat[ing]" against students); *Damiano v. Grants Pass Sch. Dist. No. 7*, 140 F.4th 1117, 1132 (9th Cir. 2025) (two school employees were put on administrative leave for starting campaign against, among other things, the school's policy requiring use of transgender students' preferred pronouns); *Ramirez v. Oakland Unified Sch. Dist.*, No. 24-cv-09223, 2025 WL 1507092, at *1 (N.D. Cal. May 27, 2025) (a public school teacher "was terminated after she refused to use a student's preferred pronouns"); *Ricard v. USD 475 Geary Cnty., KS Sch. Bd.*, No. 5:22-cv-04015, 2022 WL 1471372, at *1 (D. Kan. May 9, 2022) (school policy required teachers to use students' preferred name and pronouns; teacher was suspended and disciplined for violating the policy); *Polk v. Montgomery Cnty. Pub. Sch.*, No. CV DLB-24-1487, 2025 WL 240996, at *3 (D. Md. Jan. 17, 2025) (substitute teacher lost her job because she refused to follow school policy requiring her to use students' preferred pronouns).

[39] *See, e.g.*, *Meriwether v. Hartop*, 992 F.3d 492, 498–500 (6th Cir. 2021) (public university initiated formal investigation against a professor for refusing to refer to a biologically male student with feminine pronouns); *Stannard v. State Ctr. Cmty. Coll. Dist.*, 733 F. Supp. 3d 946, 953, 955 (E.D. Cal. 2024) (public university disciplined gay professor for using the pronouns "Do, Re, Mi" at a university-sponsored meeting "on the subject of personal gender pronoun etiquette").

Some federal government agencies have demanded state compliance with the new pronoun usage.[40] And sometimes state agencies try to enforce their own pronoun mandates, such as by seeking to prevent a religious preschool from receiving state government grants, barring a female Christian minister from volunteering inside a prison, and denying foster-parent applications when parents would not promise to use foster children's preferred pronouns.[41] Pronoun policies have been imposed at state-run hospitals[42] and have even invaded private employers.[43]

Although the newly emergent pronoun regulators wear a variety of attire and target a diverse range of dissenters, they all use similar tactics. Like the school board here, they seek to wield their authority to compel speech or demand silence from citizens who disagree with the regulators' politically controversial preferred new form of grammar. It is a power play entirely without precedent in American history.

---

[40]*See, e.g.*, *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 546–47 (E.D. Ky. 2024), *appeal dismissed sub nom. Tennessee v. McMahon*, No. 24-5588, 2025 WL 848197 (6th Cir. Mar. 18, 2025) (the Biden Administration's Department of Education issued rule that would force public school teachers to use students' preferred pronouns or face federal consequences under Title IX); *Texas v. EEOC*, No. 2:24-cv-173, 2025 WL 1414332, at *2 (N.D. Tex. May 15, 2025) (2021 EEOC Title VII enforcement guidance defined harassment as using "pronouns not consistent with someone's gender identity").

[41]*Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1170–71 (D. Colo. 2023) (Colorado Department of Early Childhood conditioned state funding for preschools on the preschools agreeing to use "an individual's preferred . . . gender-related pronoun" and refused to grant exemptions to religious preschools); *Kuenzi v. Reese*, No. 3:23-cv-00882, 2024 WL 4592424, at *1 (D. Or. Oct. 28, 2024) (volunteer Christian minister barred from serving at a prison because she would not promise to use inmates' preferred pronouns); *Bates v. Pakseresht*, 146 F.4th 772, 776 (9th Cir. 2025) (Oregon Department of Human Services required all "prospective parents applying to adopt children from foster care" to "respect, accept, and support the children's sexual orientation, gender identity, and gender expression"; the state denied a prospective adoptive mother's application because she, among other things, "objected to using adopted children's preferred pronouns" (cleaned up)); *Antonucci v. Winters*, 767 F. Supp. 3d 122, 136 (D. Vt. 2025) (state agency required prospective foster parents to agree to use children's preferred pronouns and offered no exemptions).

[42]*Kloosterman v. Metro. Hosp.*, No. 24-1398, 2025 WL 2463138, at *2 (6th Cir. Aug. 27, 2025) (state hospital fired nurse in large part "because of her refusal to use preferred pronouns").

[43]*See, e.g.*, *Niederberger v. Wegmans Food Markets, Inc.*, No. CV JKB-23-2759, 2024 WL 2866609, at *2 (D. Md. June 6, 2024) (grocery store manager demoted by his employer for refusing to use an employee's preferred pronouns); *Haskins v. Bio Blood Components*, No. 1:22-CV-586, 2023 WL 2071483, at *2 (W.D. Mich. Feb. 17, 2023) (employee fired after asking for an accommodation to not use coworker's preferred pronouns).

## V.

The school district here argues that, unlike other government actors, it possesses a unique authority to control language through *in loco parentis*, its educational mission, and the need to prevent bullying.  When measured against First Amendment standards, none of these purported reasons justify the school board's action.

### A.

*In loco parentis*, an old common-law doctrine, allows (among other things) a teacher to regulate student speech in some cases "in the place of parents."  *Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*, 594 U.S. 180, 187 (2021).

The first and most obvious problem with applying *in loco parentis* here is that the parents represented by plaintiff completely *dis*approve of the school's actions.  Suppl. Br. for Appellant at 3.  The parents *want* their children to use traditional pronouns, not the new pronouns required by the school district.  So the school district acts *without* the parents' express permission and despite their disapproval.

The second problem with relying on *in loco parentis* here is that the doctrine arose long before public schools even existed, and in an era when school attendance was not mandatory.[44]  English jurist and scholar Sir William Blackstone articulated the doctrine in the 1760s.  He wrote that a parent "may also delegate part of his parental authority, during his life, to the tutor or schoolmaster of his child."  1 William Blackstone, *Commentaries on the Laws of England* 441 (1769) (Blackstone).  The schoolmaster then acts "*in loco parentis*, and has such a portion of the power of the parent committed to his charge, viz. that of restraint and correction, as may be necessary to answer the purposes for which he is employed."  *Id.*  When Blackstone penned those words in 18th-century England, public schools did not exist.[45]  At that time, parents typically

---

[44] *See* Michael S. Katz, *A History of Compulsory Education Laws*, *in* 75 *Bicentennial Series* 14–20 (1976) (recognizing that Massachusetts in 1852 became the first state to mandate school attendance and that all states had enacted similar requirements by 1918).

[45] *See id.* at 14.

No. 23-3630          *Defending Educ. v. Olentangy Loc.*          Page 76
                     *Sch. Dist. Bd. of Educ., et al.*

contracted for a private teacher or tutor's services and, as part of that agreement, either explicitly or implicitly granted the teacher supervisory power over the student. *See Mahanoy*, 594 U.S. at 198–99 (Alito, J., concurring).

Here, the defendant is a public school district, not a privately contracted tutor or school. Also, state law requires the parents to send their children to a school in the district, unless they can afford private or home school. Nor is there any contract through which the parents have delegated any parental power to the public school. In short, this is not the Founding Fathers' *in loco parentis*.

Yet even in today's era of compulsory education laws, courts have applied *in loco parentis* to public schools. Seemingly, this is because a state has police power to establish and require attendance at public schools, unless the student is educated in an appropriate private institution or at home. *See Gruenke v. Seip*, 225 F.3d 290, 304 (3d Cir. 2000) (citing *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655, 664–65 (1995)). As Justice Alito has pointed out, when parents send their child to a public school, the parents have impliedly consented "to a public school's exercise of a degree of authority that is commensurate with the task that the parents ask the school to perform." *Mahanoy*, 594 U.S. at 200 (Alito, J., concurring). That task, of course, is to educate. But only to educate. *See id.* at 201–03 (Alito, J., concurring). To accomplish that goal, a school may appropriately act on a range of concerns for student well-being, such as promoting hygiene, health, and safety, as well as maintaining an orderly operation. *See id.* at 201 (Alito, J., concurring). But, unlike a private boarding-school master in Blackstone's era who was delegated supervisory authority by the parent, today's public-school educators do not have carte blanche to regulate every aspect of the student's daily life. *Id.* at 198 (Alito, J., concurring).

As Justice Alito has also explained, to function as a school, a public school needs some power to regulate student speech. *See id.* at 197 (Alito, J., concurring). "In a math class, for example, the teacher can insist that students talk about math, not some other subject." *Id.* at 196–97 (Alito, J., concurring). But even in the classroom, a teacher does not have unlimited authority to regulate speech.

A teacher or school has particularly limited authority when students speak about areas of great societal debate. *See Tinker*, 393 U.S. at 510 n.4 (noting that school authorities prohibited

students from protesting the Vietnam War because the War was a "major controversy," societal "debate . . . had become vehement," and both sides of the debate "were quite vocal in expressing their views"; yet, this did not justify censoring speech on the War (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 258 F. Supp. 971, 972–73 (S.D. Iowa 1966))). Here, the policy disciplines students for using traditional grammar that a large segment of people continue to use. From the perspective of the student plaintiffs, requiring use of preferred pronouns is like making them profess support for the Vietnam War—forcing them to take one side of a heated societal debate. Although many people increasingly do not see preferred pronouns as up for debate, many other people—including the student plaintiffs—still do.

According to a Pew Survey conducted less than a year ago, most "teens (69%) say that whether someone is a man or a woman is determined by the sex they were assigned at birth."[46] And when asked "whether they are comfortable or uncomfortable with someone using the pronouns 'they/them' instead of 'he' or 'she' to describe themselves," "[h]alf of teens say they are uncomfortable with this, while 48% say they are comfortable."[47] "Similarly, 65% of adults say a person's gender is determined by their sex at birth," and 54% of adults are uncomfortable with the substitution of "they/them" for "he" or "she."[48]

Based on these statistics, the pronoun debate seems unlikely to resolve any time soon. That profound disagreement makes it entirely inappropriate for the school district to take sides and force students to comply. Pronoun usage is one of those areas of public debate "which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *Barnette*, 319 U.S. at 642.

---

[46] *See* Juliana Menasce Horowitz, *U.S. Teens are Less Likely Than Adults to Know a Trans Person, More Likely to Know Someone Who's Nonbinary*, Pew Rsch. Ctr. (Jan. 24, 2025), https://www.pewresearch.org/short-reads/2025/01/24/us-teens-are-less-likely-than-adults-to-know-a-trans-person-more-likely-to-know-someone-whos-nonbinary/ [https://perma.cc/84CT-ZG6P].

[47] *Id.*

[48] *Id.*

## B.

The school district also claims the power to regulate pronouns to fulfill its educational mission. But a school may not hide behind its educational mission to coerce students to conform their speech or stay silent.

The school district's policy requires the student plaintiffs to do one of three things: use preferred pronouns, use first or last names, or not speak certain words of identification at all. The dissent argues that the existence of these options solves the First Amendment problem. Dissenting Op. at 97–100. It does not. The students sincerely desire to use pronouns in the traditional way, and as everyone knows, pronouns are central to everyday speech. The school district's policy thus offers an illusory choice that is no choice at all—self-censor or acquiesce in the compelled speech. *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1156 (10th Cir. 2013) (Gorsuch, J., concurring), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). Any way you slice it, the policy abridges speech.

Nor is the policy necessary to the school district's educational mission. This idea of educational mission dates back at least as far as Blackstone's admonition that a teacher has delegated disciplinary authority only to do what "may be necessary to answer the purposes for which he is employed." Blackstone, *supra*, 453. Applying that standard here, it may be appropriate for the school district to educate students on proposed grammar changes. That may fit within a school's educational purpose. But the school district does not have delegated authority to redefine grammar or to force students to take a certain side in a heated public debate. That falls outside a school's educational purpose. And even if preferred pronouns were majority usage, the school district's educational mission cannot override the First Amendment by "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509. By ordering students to refrain from speaking ordinary grammar, the school district indoctrinates rather than educates—something the First Amendment forbids. *See Oliver v. Arnold*, 19 F.4th 843, 844 (5th Cir. 2021) (Ho, J., concurring).

The Supreme Court recently made clear in *Mahmoud* that school administrators cannot recast their educational mission in order to suppress parental and student views on matters of public

concern.  145 S. Ct. 2332.  In *Mahmoud*, the Court analyzed a school policy under the First Amendment's Free Exercise Clause, *id.* at 2350, but articulated a clear principle equally applicable under the Free Speech Clause: public schools may not coerce students to accept or affirm certain viewpoints.  *See Doe No.1 v. Bethel Loc. Sch. Dist. Bd. of Educ.*, No. 23-3740, 2025 WL 2453836, at *12 (6th Cir. Aug. 26, 2025) (Larsen, J., concurring) ("*Mahmoud* describes the First Amendment broadly . . . .").  In *Mahmoud*, the school district compelled attendance at pro-LGBTQ instruction. 145 S. Ct. at 2342.  To justify itself, the school claimed the power to "expos[e]" students to "objectionable ideas" and teach them "lessons in mutual respect," *id.* at 2356 (cleaned up)— seemingly worthy educational goals.  The school even claimed that allowing opt-outs for objecting students would "undermin[e] [its] educational mission." *Id.* at 2380 (Thomas, J., concurring).  The Supreme Court rejected the school's argument.  In the Court's view, the instruction "unmistakably convey[ed] a particular viewpoint about same-sex marriage and gender.   And the [school] . . . specifically encouraged teachers to reinforce this viewpoint and to reprimand any children who disagree[d]." *Id.* at 2356 (majority op.).  This was coercion, not exposure.  *See id.*

The Court considered viewpoint coercion especially egregious in the public-school setting. Through public schools, "[t]he State exerts great authority and coercive power . . . because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure." *Id.* at 2355 (quoting *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987)).  Public schools enable "direct, coercive interactions between the State and its young residents" because "[t]he public school imposes rules and standards of conduct on its students and holds a limited power to discipline them for misconduct." *Id.* at 2357.  For this reason, the public-school setting raises "heightened concerns with protecting [students'] freedom of conscience from subtle coercive pressure . . . ." *Lee v. Weisman*, 505 U.S. 577, 592 (1992); *see Mahmoud*, 145 S. Ct. at 2355. Thus, *Mahmoud* requires heightened attention to school policies that compel or coerce students in the name of educational mission—as the policy does here.

The bottom line is simple: schools may not coerce student viewpoints or ban disfavored views under the guise of fulfilling their educational mission.  Trampling constitutionally protected student speech is not a legitimate educational goal.  "The First Amendment does not vary based on whether a particular viewpoint is agreeable or offensive to one community or another.

It protects every student in classrooms across the country who has been coerced into expressing a particular position, whether on matters of race, gender, religion, or politics . . . .  And that is so whatever one may think of [a student's] views."  *Oliver*, 19 F.4th at 847 (Ho, J., concurring).

## C.

Finally, the school district tries to defend its speech policy on the grounds of preventing bullying of transgender and non-binary students.  This argument has transparent appeal but falls short.

No one on this court—either in the majority or in dissent—condones bullying, regardless of a student's gender identity.  The school district may discipline bullying consistent with our traditional understanding of *in loco parentis*.  But following traditional English grammar rules does not constitute bullying.  If schools may prohibit common, historically acceptable pronoun usage by simply relabeling it "bullying," then they may prohibit virtually any speech.

The First Amendment guarantees our freedom to speak out about our honest beliefs, whether or not that speech harms others' feelings.  As the Supreme Court put it, "[s]peech may not be banned on the ground that it expresses ideas that offend."  *Matal v. Tam*, 582 U.S. 218, 223 (2017); *see also Texas v. Johnson*, 491 U.S. 397, 414 (1989) (collecting cases).  The "point of all speech protection" is to "shield" those "choices of content that in someone's eyes are misguided, or even hurtful."  *Hurley*, 515 U.S. at 574.

That principle applies in public schools.  "First Amendment rights [are] not shed at the schoolhouse gate."  *Mahmoud*, 145 S. Ct. at 2350 (citing *Tinker*, 393 U.S. at 506–07) (cleaned up).  It may be commendable to foster a welcoming classroom environment.  *See Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 684 F. Supp. 3d 684, 706 (S.D. Ohio 2023), *aff'd*, 109 F.4th 453 (6th Cir. 2024), *reh'g en banc granted, opinion vacated*, 120 F.4th 536 (6th Cir. 2024).  But the school district here does not get a free pass.  "A school district cannot avoid the strictures of the First Amendment simply by defining certain speech as 'bullying' or 'harassment.'"  *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 667 (8th Cir. 2023).

By preventing so-called bullying of one group of students (students who want to be referred to by pronouns consistent with gender identity), the policy arguably bullies another (students who do not want to refer to others using pronouns consistent with gender identity). The school district "cannot purport to rescue one group of students from stigma and isolation by stigmatizing and isolating another." *Mahmoud*, 145 S. Ct. at 2363. The school prefers pronouns consistent with gender identity. But "[a] commitment to speech for only *some* messages and *some* persons on a public issue is no commitment at all." *303 Creative*, 600 U.S. at 602; *Tinker*, 393 U.S. at 510–11.

In *Tinker*, the First Amendment protected student speech that deeply offended other students and society at large. 393 U.S. 503. In America during that time, "'dominant opinion' . . . regarded opposition to the war as unpatriotic, if not treason." *Morse v. Frederick*, 551 U.S. 393, 447 (2007) (Stevens, J., dissenting) (quoting *Tinker*, 393 U.S. at 526) (describing the historical context of *Tinker*). Further, a former student from that high-school system died serving in Vietnam, and some of his friends were still in school. Resp't Br. at 11, *Tinker*, 393 U.S. 503 (No. 21). Students who supported the war effort took great offense at the anti-war students' views and expression. *Id.* at 5–8. The Supreme Court held that armband-wearing students had the First Amendment right to express their sincere views against the war, even though students opposed to North Vietnamese communist ideology were justifiably offended. *See Tinker*, 393 U.S. at 513. The school in *Tinker* could not censor speech out of "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 509. And neither can the school district here.

Similarly, in *Barnette*, the First Amendment protected students' "deeply unpopular" views. *303 Creative*, 600 U.S. at 602 (citing *Barnette*, 319 U.S. at 662–63 (Frankfurter, J., dissenting)). The Supreme Court held that students had the First Amendment right to refrain from pledging allegiance to the American flag—even though at that time "the world was at war and many thought respect for the flag and the pledge essential for the welfare of the state." *Id.* (citing *Barnette*, 319 U.S. at 662–63 (Frankfurter, J., dissenting)) (cleaned up). The First Amendment protected students' right both to pledge and to refrain from pledging allegiance to the flag, regardless of offending the other side.

Both *Barnette* and *Tinker* upheld a traditional understanding embodied in the First and Fourteenth Amendments: people have freedom to speak about their honest beliefs. *See* Campbell, *supra*, at 282. Government may not silence that speech in the name of protecting a listener who zealously disagrees.

That same principle has applied to every policy debate in United States history. American colonists did not temper their calls for independence just because British Loyalists disagreed.[49] Abolitionists were not deterred by opposite beliefs of slaveholders.[50] And suffragists, despite males' diminished sense of power at the ballot box, spoke and marched boldly onwards.[51] In all these matters of public concern, the right to free speech trumped the aggrieved impact on listeners with opposite views.

The current pronoun debate is another matter of public concern. *See Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021) (recognizing pronouns "can and do convey a powerful message implicating a sensitive topic of public concern"). And speech on matters of public concern falls within the "heart of the First Amendment's protection" because our Nation remains committed to "uninhibited, robust, and wide-open" public debate. *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (first quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59 (1985) (plurality op.); and then quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). After all, public debate is "more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964).

---

[49]*See, e.g.*, Patrick Henry, *Give Me Liberty or Give Me Death! March 23, 1775*, The Avalon Project at Yale L. Sch., https://avalon.law.yale.edu/18th_century/patrick.asp [https://perma.cc/8RB9-7TVM] ("Entertaining as I do opinions of a character very opposite to theirs, I shall speak forth my sentiments freely and without reserve. This is no time for ceremony. . . . Should I keep back my opinions at such a time, through fear of giving offense, I should consider myself as guilty of treason towards my country, and of an act of disloyalty toward the Majesty of Heaven, which I revere above all earthly kings.").

[50]*See, e.g.*, William L. Garrison, *To the Public*, *in The Liberator* (Jan. 1, 1831) ("I am in earnest—I will not equivocate—I will not excuse—I will not retreat a single inch—and I will be heard!").

[51]*See* Susan B. Anthony, *Is it a Crime for Women to Vote?* (Apr. 3, 1872) ("It was we, the people; not we, the white male citizens; nor yet we, the male citizens; but we, the whole people, who formed the Union.").

No. 23-3630        *Defending Educ. v. Olentangy Loc.*        Page 83
*Sch. Dist. Bd. of Educ., et al.*

## VI.

American history and tradition uphold the majority's decision to strike down the school's pronoun policy. Over hundreds of years, grammar has developed in America without governmental interference. Consistent with our historical tradition and our cherished First Amendment, the pronoun debate must be won through individual persuasion, not government coercion. Our system forbids public schools from becoming "enclaves of totalitarianism." *Tinker*, 393 U.S. at 511. I therefore concur in the majority's opinion.

———————————

**DISSENT**

———————————

JANE B. STRANCH, Circuit Judge, dissenting.  "[E]ducation has a fundamental role in maintaining the fabric of our society," and public schools are "a most vital civic institution for the preservation of a democratic system of government."  *Plyler v. Doe*, 457 U.S. 202, 221 (1982) (quoting *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 230 (1963) (Brennan, J., concurring)).  "[P]ublic education must prepare pupils for citizenship in the Republic. . . . It must inculcate the habits and manners of civility as values in themselves conducive to happiness and as indispensable to the practice of self-government in the community and the nation."  *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681 (1986) (alteration in original) (quoting C. Beard & M. Beard, *New Basic History of the United States* 228 (1968)).

To effectuate the essential societal function—and promise—of public education, we charge our schools with the great responsibility of developing an educated, well-adjusted populace.  To do so, our schools must not only provide effective academic instruction but also safeguard the wellbeing of the students under their supervision.  The task of fostering a positive and productive educational environment conducive to learning presents a conundrum for educators who must balance "two strongly competing interests: ensuring safe learning environments for all students *and* protecting student free speech."  Francisco M. Negrón, Jr., *Maddening Choices: The Tension between Bullying and the First Amendment in Public Schools*, 11 First Amend. L. Rev. 364, 364 (2013).  On this, the majority and I agree.

This challenge comes to a head when schools address bullying and harassment by students.  "Bullying and severe harassment are serious and age-old problems."  *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 209 (2021) (Alito J., concurring) (citation modified).  Although "these concepts are not easy to define with the precision required for a regulation of speech," *id.*, the law delegates to our teachers and administrators the difficult work of defining, addressing and, when possible, preventing bullying and severe harassment in public schools.  *Cf. Lowery v. Euverard*, 497 F.3d 584, 596 (6th Cir. 2007).  This is no easy task.  We expect schools to accord students the

"freedom to advocate unpopular and controversial views" but also to "teach[] students the boundaries of socially appropriate behavior." *Fraser*, 478 U.S. at 681. After all, in our compulsory educational system, students are often a "captive audience" for the speech of other students. *Id.* at 684. For that reason, free speech rules for public schools must "take into account consideration of the sensibilities of . . . fellow students," *id.* at 681, and provide school officials the latitude necessary to act *in loco parentis* and regulate speech that "would undermine the school's basic educational mission," *id.* at 684–85. The stakes of this balancing act are high: in recent years there has been a spate of tragic teen suicides following allegations of school bullying, underscoring the very real consequences for educators who are left to make the actual on-the-ground decisions. *See* Negrón, *supra*, at 365–66.

Consistent with these legal and moral imperatives, the Olentangy Local School District Board of Education has long maintained a set of rules to prohibit discrimination and harassment among students. Together, these rules amount to a ban on harassment, intimidation, and bullying. Twelve years ago, the District amended its rules to explicitly include gender identity, thereby applying to it the same prohibitions as those governing traits such as race, ethnicity, and religion. For over a decade, these rules functioned without issue—until Defending Education filed this challenge. It contends that the children of its parent-members are entitled to intentionally use non-preferred pronouns to refer to and to directly address all students—including transgender and nonbinary students—in District schools without regard to the effect such statements may have on these children. The majority opinion agrees. For the reasons that follow, I respectfully dissent.

## I. BACKGROUND

### A. The School Board's Policies

The Olentangy Local School District Board of Education has long maintained a set of rules to prohibit discrimination and harassment among students. As currently stated, these rules, found in the Code of Conduct and the School District's policies, seek to "foster self-discipline in all students and maintain an appropriate educational atmosphere . . . . that respects the rights and safety of [all students]," App'x 14; "maintain an education . . . environment that is free from all forms of unlawful harassment," App'x 61; and prevent "bullying or harassment . . . that has the

effect of substantially interfering with a student's educational performance, or that has the effect of substantially disrupting the orderly operation of the school," App'x 72. Over the past two decades, the Code of Conduct and the School District's policies have been amended a number of times. These rules cover a range of subjects but relevant here are definitions of harassment and bullying found in Policy 5517, Policy 5136, and the Code of Conduct (collectively herein, "Policies").

### 1. Policy 5517—The Anti-Harassment Policy

The District adopted Policy 5517 "to maintain an education and work environment that is free from all forms of unlawful harassment." App'x 61. The Policy prohibits "discriminatory harassment based on race, color, national origin, sex (including sexual orientation and gender identity), disability, age[,] . . . religion, ancestry, or genetic information," App'x 61; gender identity has been a protected characteristic since 2013. The Policy defines harassment as

> any threatening, insulting, or dehumanizing gesture, use of technology, or written, verbal or physical conduct directed against a student or school employee that . . . places a student or school employee in reasonable fear of harm to their person or damage to their property; . . . has the effect of substantially interfering with a student's educational performance, opportunities, or benefits, or an employee's work performance; or . . . has the effect of substantially disrupting the orderly operation of a school.

App'x 62. Policy 5517 also prohibits bullying when it rises to the level of unlawful harassment. App'x 62. The current iteration of Policy 5517 defines bullying as

> any unwanted and repeated written, verbal, or physical behavior, including any threatening, insulting, or dehumanizing gesture, by an adult or student, that is severe or pervasive enough to create an intimidating, hostile, or offensive educational or work environment; or unreasonably interfere with the individual's school or work performance or participation.

App'x 62. Bullying is considered unlawful harassment prohibited under Policy 5517 when

> one . . . or more persons systematically and chronically inflict physical hurt or psychological distress on one . . . or more students or employees and that bullying is based upon one . . . or more Protected Classes, that is, characteristics that are protected by Federal civil rights laws.

App'x 62.

## 2. Policy 5136—The Personal Communication Devices (PCD) Policy

Policy 5136 governs student usage of personal communication devices. The Policy imposes separate rules for speech on school grounds or during school-sponsored activities and speech outside those contexts. While on school grounds or during school-sponsored activities,

> [s]tudents may not use a PCD on school property or in connection with a school activity in a way that is threatening or otherwise constitutes bullying or harassment under Board Policy 5517 (Anti-Harassment) or Board Policy 5517.01 (Bullying and Other Forms of Aggressive Behavior), that has the effect of substantially interfering with a student's educational performance, or that has the effect of substantially disrupting the orderly operation of the school.

App'x 72. Otherwise, "students are prohibited from using a PCD in a way that constitutes serious or severe harassment of school employees or students, . . . that has the effect of materially disrupting classwork or the order of the school, or [that] invades the rights of others." App'x 72.

## 3. The Code of Conduct

The School District's Code of Conduct promulgates rules for students meant to promote, among other things, "respect" for the "rights . . . of others." App'x 18. Relevant here are two provisions. First, the Code prohibits the use of discriminatory language, "defined as verbal or written comments, jokes, and slurs that are derogatory towards an individual or group based on one or more of the following characteristics: race, color, national origin, sex (including sexual orientation and transgender identity), disability, age, religion, ancestry, or genetic information." App'x 15. Second, the Code prohibits "[h]arassment, intimidation, or bullying," defined as

> any intentional written, verbal, electronic, or physical act that a student has exhibited toward another particular student or students more than once and the behavior causes mental or physical harm to the other student(s) and is sufficiently severe, persistent or pervasive that it creates an intimidating, threatening or abusive educational environment for the other student(s).

App'x 23.

**B.  The Controversy**

This case began with an email exchange.  In February 2023, a parent-member of Defending Education emailed a group of Olentangy officials requesting a statement from the School District. The member asked,

> If my devoutly Christian child who believes in two biological genders male/female and that those genders are decided at conception by God, would they be forced to use the pronouns that a transgender child identifies with or be subject to reprimand from the district if they refuse to do so?

R. 7-2, Ex. S, PageID 357.  Jessica Philemond, counsel for the School District, unequivocally answered no, explaining that, while the School District's Anti-Harassment Policy prohibits discrimination and harassment based on a student's sex, including sexual orientation and gender identity, no rule required any student to use pronouns in contravention of the student's religious beliefs.  Philemond's response read,

> As you are aware, the Olentangy Board of Education has adopted an Anti-Harassment Policy that prohibits discrimination and harassment based upon a student's sex, including sexual orientation and gender identity.  While your children certainly maintain religious rights of freedom at school, those rights do not relieve them of the obligation to comply with Board Policy and the code of conduct.  A student purposefully referring to another student by using gendered language they know is contrary to the other student's identity would be an example of discrimination under Board Policy.  The Board Policy is intended to create a safe learning environment for all students, free of harassment and discrimination, and does not require any student to affirm or deny any individual religious beliefs, but students must comply with Board Policy and school rules.  Thank you for seeking clarification.

R. 7-2, PageID 356.  Thereafter, the Defending Education member asked another question:

> If my child expresses their religious beliefs that marriage is between a man and a woman OR that homosexuality is a sin, will they be disciplined for their beliefs as harassment, bullying per the policy cited in my previous email?

R. 7-2, PageID 356.  Philemond responded again, assuring the Defending Education member that the School District would not discipline the member's child for that child's religious beliefs. Philemond wrote,

> In response to your question below, the District would not discipline you [child] for . . . religious beliefs.  Also, you had previously asked questions about your [child]'s use of pronouns for peers at school.  While you did not raise this, if your [child] would like to discuss accommodations to avoid using pronouns when doing so would be contrary to [the child's] religious beliefs, the District is happy to discuss those options . . . .

R. 7-2, PageID 355.  In short, these emails establish that one application of the School District's policies is that children are prohibited from referring to classmates by non-preferred pronouns but are not required to affirmatively use preferred pronouns.  The Defending Education member did not respond or otherwise inquire into the offered accommodations.

Two months after the email exchange between the Defending Education member and Philemond, in May 2023, Defending Education filed suit against the School District and numerous District officials seeking a declaratory judgment and a permanent injunction against the Policies.  According to Defending Education, the Policies violated the First Amendment's Free Speech Clause because they unconstitutionally compel speech by requiring students to use preferred pronouns rather than sex-based pronouns; are improper content- and viewpoint-based discrimination; and are unconstitutionally overbroad.

Among Defending Education's members are four pseudonymous parents (Parents A–D), each of whom has one or more children in District schools.  All four parents filed declarations in the court record.  Each parent declares as follows: they have raised their children to believe that biological sex is immutable and that individuals cannot transition from one sex to another.  Three parents declare that their children wish[] to express[] their belief that sex is immutable" by "us[ing] the pronouns that are consistent with [the] child's classmates' biological sex repeatedly and at all times, including inside and outside the classroom," and specifically in the presence of those classmates.  R. 7-3, Parent A Decl., PageID 364; *see* R. 7-4, Parent B Decl., PageID 370; R. 7-6, Parent D Decl., PageID 385.[1]  These parents also acknowledge that their children know that their

---

[1] Parent C declares that their child "wish[es] to use pronouns that are consistent with a classmate's biological sex, rather than the classmate's 'preferred pronouns.'" R. 7-5, Parent C Decl., PageID 378.

transgender or nonbinary classmates will consider that "'insulting,' 'humiliating,' 'dehumanizing,' 'derogatory,' and 'unwanted.'"  R. 7-3, PageID 364; R. 7-4, PageID 371; R. 7-6, PageID 385.

### C.  Procedural History

Along with the Complaint, Defending Education filed a motion to "preliminarily enjoin [the School District] from enforcing the Policies" at issue.  The district court held that Defending Education had standing to challenge the Policies but failed to show that the Policies were likely to violate the First Amendment on the merits.  *See Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 684 F. Supp. 3d 684, 698, 712 (S.D. Ohio 2023).  The court noted that, although the Policies prohibit the use of non-preferred pronouns, they contain "nothing to suggest" that other discussions of gender identity issues are "prohibited under the Policies."  *Id.* at 704.  It determined that the challenged Policies accord with the standard for regulating student speech established in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969).  The court then held that the Policies did not unconstitutionally compel speech, constitute unconstitutional viewpoint discrimination, or represent impermissibly overbroad restrictions.  Reasoning that the remaining preliminary injunction factors also favored the School District, the district court denied Defending Education's motion for a preliminary injunction.  Defending Education timely appealed pursuant to our jurisdiction over denials of injunctive relief.  *See* 28 U.S.C. § 1292(a)(1).

A divided panel of our court affirmed.  *See Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 109 F.4th 453, 474 (6th Cir. 2024).  A majority of the full court granted rehearing en banc, vacated the panel decision, and ordered this case reheard.  *See Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 120 F.4th 536, 537 (6th Cir. 2024) (mem.).  Through briefing, and as confirmed at oral argument, Defending Education narrowed the scope of its requested preliminary injunctive relief to enjoin the School District only from "punishing students for 'misgendering' other students."

### II.  STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy" which should only be awarded upon a clear showing that the four preliminary injunction factors—likelihood of success

on the merits, danger of irreparable harm, balance of the equities, and the public interest—point in the plaintiff's favor. *James B. Oswald Co. v. Neate*, 98 F.4th 666, 672 (6th Cir. 2024) (quoting *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). When assessing an appeal of a preliminary injunction decision involving the First Amendment, we "review the District Court's legal rulings de novo (including its First Amendment conclusion), and its ultimate conclusion as to whether to grant the preliminary injunction for abuse of discretion." *O'Toole v. O'Connor*, 802 F.3d 783, 788 (6th Cir. 2015) (quoting *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 454 (6th Cir. 2014)). But "our cases warn that a court must not issue a preliminary injunction where the movant presents no likelihood of merits success." *Daunt v. Benson*, 956 F.3d 396, 421–22 (6th Cir. 2020) (citation modified) (quoting *La.-Pac. Corp. v. James Hardie Bldg. Prod., Inc.*, 928 F.3d 514, 517 (6th Cir. 2019)). Factual findings are reviewed for clear error. *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 403 (6th Cir. 2022).

## III.  ANALYSIS

### A.  The First Amendment in Our Schools

The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits the government from "abridging the freedom of speech." U.S. Const. amend. I; *see Kutchinski ex rel. H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 356 (6th Cir. 2023). Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506. But as the Supreme Court has long recognized, the First Amendment's guarantee is subject to greater restrictions for public school students "in light of the special characteristics of the school environment." *Id.*

This precedent reflects the competing values inherent in the public school setting. As "nurseries of democracy," public schools have "an interest in protecting a student's unpopular expression" and preserving the "marketplace of ideas." *Mahanoy*, 594 U.S. at 190. This "tolerance of divergent political and religious views, even when the views expressed may be unpopular," constitutes a "fundamental value[]" of elementary and secondary education. *Fraser*, 478 U.S. at 681. Nonetheless, "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Id.* at 682. The breadth of students'

constitutional rights must be tailored to "what is appropriate for children in school," *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995), with recognition for public schools' societal duty to promote "essential lessons of civil, mature conduct," *Fraser*, 478 U.S. at 683. As a result, free speech rules for schoolchildren must "take into account consideration of the sensibilities of . . . fellow students," *id.* at 681, and schools are entitled to regulate speech that "would undermine the school's basic educational mission," *id.* at 685. While that authority is not limitless, *see id.* at 689–90 (Brennan, J., concurring), "[t]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board" in the first instance, *id.* at 683 (majority opinion).

In the landmark case *Tinker v. Des Moines Independent Community School District*, school officials suspended students who wore black armbands to protest the Vietnam War. 393 U.S. at 504. The Court found that "the record [did] not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities" from the wearing of the armbands, *id.* at 514, emphasizing that students employed a "silent, passive expression of opinion," *id.* at 508. "[N]o disturbances or disorders on the school premises in fact occurred," and there was no evidence that the armbands intruded upon the rights of other students. *Id.* at 514. Without indicia that the wearing of these armbands might disrupt the school, the Court held that suspension of the students violated the First Amendment. *Id.*

Therefore, under *Tinker*, a school policy may prohibit speech where officials have a reasonable basis to believe that the speech will either substantially disrupt school activities or interfere with the rights of others. This requires evidence of "something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 509. *Tinker* thus sets forth a "demanding standard" to regulate student speech. *Mahanoy*, 594 U.S. at 193.

*Tinker* does not, however, present an insurmountable burden. The Supreme Court recently blessed the authority of schools to regulate bullying and harassment. *See id* at 188. It did so without specifying whether such authority falls under schools' general authority to prohibit speech

that will substantially disrupt school activities or that will interfere with the rights of others, or under a special exception of its own.  *See id.*  The Court instead simply emphasized that the "special characteristics" of the public school context afford schools "special leeway when [they] regulate speech that occurs under [their] supervision."  *Id.*  Our analysis must also account for the "difficult jobs of school administrators and educators in maintaining a school environment that is, above all, conducive to learning for all of its students."  *C.S. ex rel. Stroub v. McCrumb*, 135 F.4th 1056, 1067 (6th Cir. 2025).

What, then, must a school district show to demonstrate that particular speech is sufficiently bullying or harassing to render it regulable under the First Amendment?  First, *Tinker* places the burden on the school to justify student speech restrictions, *see B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 321 (3d Cir. 2013) (en banc), and that burden applies even at the preliminary injunction stage, *see Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) ("[T]he burdens at the preliminary injunction stage track the burdens at trial.").

*Tinker*, however, does not require school authorities to wait for a disturbance before regulating speech, nor does it "require certainty that disruption will occur."  *Lowery*, 497 F.3d at 591–92 (quoting *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 767 n.17 (9th Cir. 2006)).  To do so would place school officials "between the proverbial rock and hard place: either they allow disruption to occur, or they are guilty of a constitutional violation."  *Barr v. Lafon*, 538 F.3d 554, 565 (6th Cir. 2008) (quoting *Lowery*, 497 F.3d at 596).  "Such a rule is not required by *Tinker*, and would be disastrous public policy" because it would strip officials of the ability to carry out the "affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place."  *Lowery*, 497 F.3d at 596.  School officials must merely demonstrate that the school reasonably forecast that disruption would occur based on the speech at issue.  *Id.*  Given administrators' need to affirmatively protect the learning environment, moreover, officials will sometimes be unable "to offer any 'proof' [of disruption] beyond common-sense conclusions based on human experience."  *Id.* at 594.  Such "common-sense conclusions," we noted, "do not require substantial evidentiary support."  *Id.*  The Supreme Court, moreover, has never held that where *Tinker* is satisfied, the First Amendment's categorical

prohibition on viewpoint discrimination also applies. Indeed, at least in the K–12 environment, the Supreme Court has "seemed to suggest that schools may engage in some viewpoint discrimination." Maj. op. at 28 (citing *Morse v. Frederick*, 551 U.S. 393, 409 (2007)). Today's majority leaves open the question of how the categorical ban on viewpoint discrimination interacts with *Tinker*—a choice with which I agree.

The closest we have come to saying that a categorical ban on viewpoint discrimination applies to the student expression that may be regulated under *Tinker* was in *Barr v. Lafon*, 538 F.3d 554 (6th Cir. 2008), and *Castorina ex rel. Rewt v. Madison County School Board*, 246 F.3d 536 (6th Cir. 2001). But as the majority acknowledges, our holdings in those cases rested on a "narrow definition" of viewpoint discrimination. Maj. op. at 28. In *Barr*, we described "a blanket ban on the use of 'odious racial epithets' by 'proponents of all views' [as] mere content-based regulations," whereas we described "a ban on the use of racial slurs by one group of speakers but not 'those speakers' opponents' [as] viewpoint-discrimination." 538 F.3d at 572 (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992)). And in *Castorina*, we remanded to the district court to determine whether a school's decision to ban clothing with images of a Confederate flag but not clothing with other "potentially racially divisive symbols"—images associated with Malcolm X and the Black Muslim movement—comported with *Tinker* and viewpoint discrimination jurisprudence. 246 F.3d at 541–44.

Our cases thus teach that while schools may regulate student expression under *Tinker*, they cannot do so in a manner amounting to a targeted prohibition—"at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline." *Tinker*, 393 U.S. at 511. Today, we need not decide more than our prior cases have already held, and I agree that we should save any further questions "for another day." Maj. op. at 28.

The Supreme Court has long recognized that schools may prohibit certain *forms* of expression on a particular subject while permitting other forms. Under the First Amendment, "the use of an offensive form of expression may not be prohibited to adults," but it does not follow that "the same latitude must be permitted to children in a public school." *Fraser*, 478 U.S. at 682. Consider two manners of articulating anti-draft sentiment: the black arm bands worn by students

in *Tinker* and the "F--- The Draft" jacket worn by the adult in *Cohen v. California*, 403 U.S. 15, 16 (1971). While both forms of expressing this message are constitutionally protected, educators may nonetheless prohibit one of the two forms in schools. Put simply, "the First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's jacket." *Fraser*, 478 U.S. at 682 (quoting *Thomas v. Bd. of Educ., Granville Central Sch. Dist.*, 607 F.2d 1043, 1057 (2d Cir. 1979) (Newman, J., concurring)). In sum, schools may permissibly enact and enforce regulations for certain modes of speech, as long as they do so in order to prevent substantial disruption in the learning environment, and not for the purpose of selectively silencing a particular viewpoint.

The First Amendment's "free-speech guarantee also generally prohibits . . . compelling an individual 'to utter what is not in her mind' . . . in the public school setting." *Ward v. Polite*, 667 F.3d 727, 733 (6th Cir. 2012) (citation modified) (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943)). Indeed, the seminal case on compelled speech—*Barnette*— occurred in a public school. In *Barnette*, the Supreme Court held that school officials could not compel students with a religious objection to say the Pledge of Allegiance or salute the flag. 319 U.S. at 642. Despite the interest in national unity during World War II, *id.* at 640, the Court explained in soaring terms the Constitution's protection of the right not to speak the government's preferred message: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein," *id.* at 642.

Still, "a violation of the First Amendment right against compelled speech occurs only in the context of actual compulsion." *Wilkins v. Daniels*, 744 F.3d 409, 415 (6th Cir. 2014) (quoting *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 189 (3d Cir. 2005)). There is a fundamental difference between prohibiting certain speech and compelling alternative speech. Where individuals "have options" to act in a way that does not violate the individuals' consciences and still complies with the government-imposed rules no compulsion has occurred. *Wilkins*, 744 F.3d. at 416. This is true even if the options the government provides do not present "a choice [the individuals in question] welcome" unless the cost of the conscience accommodating choice is "so exorbitantly high as to present an illusory" or "sham option." *Id.* at 415–16 (citation modified).

No. 23-3630                     *Defending Educ. v. Olentangy Loc.*                     Page 96
                                   *Sch. Dist. Bd. of Educ., et al.*

For example, a mandatory license plate motto compels speech because "driving an automobile [is] a virtual necessity for most Americans"; the option to stay silent by not driving is no option at all. *Wooley v. Maynard*, 430 U.S. 705, 715 (1977).  Conversely, a group of permitting exemptions for keeping a "dangerous wild animal or restricted snake" that includes as an option, but does not require, accreditation through two trade organizations does not amount to a compelled subsidy to those organizations, even when the other options were more expensive.  *Wilkins*, 744 F.3d at 410, 415.

    With these principles in mind, we turn to Defending Education's claims.

    **B.  Defending Education's Challenges to Olentangy's Policies**

    Defending Education challenges the prohibitions on harassment, intimidation, and bullying found in the Policies.  Because it challenges these Policies only as they apply to gender identity (not, for example, as applied to race or religion) and only in the context of pronouns, I consider whether the School District's rules governing the use of non-preferred pronouns prohibit a substantial amount of protected speech.

    First, a word on where I differ from the majority opinion's statement of the governing precedent.  Although the opinion concedes that our caselaw applying *Tinker* sets "uniform ground rules," Maj. op. at 21, it then asserts that those same cases require "different things for different speech," *id.*  Finding a pattern in a handful of our cases, the majority opinion posits that expressive speech should be judged on a spectrum where "the closer the speech resembles political expression at the First Amendment's core, the more evidence a school must present of the disruption or violation of rights."  *Id.*

    As will be discussed further below, I have several concerns with this approach.  For one, it does not fully accord with, nor account for, significant student speech cases that have come before this court, including cases concerning speech that appears paradigmatically "political."  *See, e.g.*, *Lowery*, 497 F.3d at 585–86; *McCrumb*, 135 F.4th at 1059.  The cases on which the majority opinion does rely, moreover, do not turn on the "political" or "nonpolitical" nature of the speech, but rather on the application of *Tinker*'s "reasonable forecast" test, as appropriate to each case and its specific procedural posture.  *See Castorina*, 246 F.3d at 541; *Barr*, 538 F.3d at 566–68;

*Kutchinski*, 69 F.4th at 359–60.  The majority opinion's approach also seems to disregard the Supreme Court's continued recognition of the "special First Amendment leeway" granted to public schools in addressing complex issues like on-campus bullying, *see Mahanoy*, 594 U.S. at 189, as well as the Court's solicitude for the duty of schools to impart to students "fundamental values of 'habits and manners of civility' essential to a democratic society," *see Fraser*, 478 U.S. at 681.

I am also troubled by a standard that would authorize the demand for "more evidence" in school speech cases based on how "political" we judge the speech to be.  And I am concerned because on such sliding scale, the quantum of evidence required to prohibit speech on the "more political" end of the proposed spectrum is much higher than what has been required under *Tinker*'s "uniform ground rules."  I do not see the need for a more amorphous, and subjective, sliding scale approach when *Tinker* already accounts for differing variables and factual situations.  Because I think *Tinker* and its progeny are up to the task before us, I turn to our existing precedent and begin by addressing whether the Policies compel speech or constitute viewpoint discrimination.  I then turn to the application of the *Tinker* standard.

        1.  <u>Compelled Speech</u>

Defending Education contends that the Policies compel speech because "[c]hildren must attend school; students must speak at school; and speaking proper English is 'impossible' without pronouns."  To its credit, the majority opinion does not hold that any of the Policies compel speech, but it does comment on the idea that it might.  *See* Maj. op. at 16.  Likewise, Judge Bush, concurring, notes that the Policies may have "effectively compel[led] a new form of grammar." Bush Conc. op. at 60.

I therefore pause briefly to note that the record belies those suggestions.  The record contains no evidence of compulsion or of an illusory choice.  Start with actual compulsion.  Even in the email exchange that prompted this litigation, the School District's attorney explained that no child would be compelled to use gender-based pronouns.[2]  Philemond wrote, "While you did

---

[2]A note on terminology: I use the term "gender-based pronouns" to refer to pronouns selected based on one's gender identity, which may (or may not) differ from one's sex assigned at birth.  "Sex-based pronouns" refers to the

not raise this, if your [child] would like to discuss accommodations to avoid using pronouns where doing so would be contrary to [your child's] religious beliefs, the District is happy to discuss those options with [your child]."  R. 7-2, PageID 355.  That statement, which demonstrates that the District would not compel the use of preferred pronouns, is dispositive.  But were it not enough, attorneys for the School District have repeatedly explained that no students, based on religious beliefs or otherwise, will be forced to "affirm a belief they [do] not hold," or be "coerced into speaking a message they do not agree with."  Such a representation binds the School District.  *See Borror Prop. Mgmt., LLC v. Oro Karric N., LLC*, 979 F.3d 491, 495 (6th Cir. 2020) ("Once litigation commences, a party typically is bound by its action," including "an argument to the court by its counsel."); *see also Link v. Wabash R.R. Co.*, 370 U.S. 626, 634 (1962).

Likewise, the alternatives to using preferred pronouns to refer to students are by no means illusory.  For one, students may permissibly use no pronouns at all when discussing transgender classmates.  Students can refer to each other using last or first names when required to speak in class.  Outside instructional time, students may elect to continue this practice or not refer to transgender or nonbinary classmates at all.  This choice to not speak mirrors the generally accepted accommodation for students morally opposed to reciting the Pledge of Allegiance.  *See Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1038 n.33 (9th Cir. 2010) (noting that where "[n]o student is required to recite . . . the Pledge, nor can any student be disciplined for refusing to participate . . . the free speech claim that was involved in *Barnette*, where the students were forced to say the Pledge, is not at issue").  Remember, this lawsuit was brought by Defending Education, but none of its members have asserted that any school or District official has required any child to use another student's preferred pronouns.  *See, e.g.*, R.7-3, PageID 364 (stating only that Parent A's child "self-censors").  Defending Education has, accordingly, not demonstrated unconstitutional compulsion of speech.

Nor has Defending Education made any showing that the inconvenience associated with avoiding pronouns amounts to the sort of cost recognized under the law as creating a "sham" or

---

pronouns that match the individual's sex assigned at birth, which usually aligns with the individual's biological sex (i.e., sex based on gametes and genes).

"illusory" choice. *Wilkins*, 744 F.3d at 415–16; *see Wooley*, 430 U.S. at 715. Based on this record, the children of Defending Education's members are unlikely to have sufficient interactions with transgender or nonbinary students that the use of last or first names will become a substantial burden. As the district court noted, as of May 3, 2023, only 50 out of the 23,640 students enrolled in District schools were transgender. R. 28, Order, PageID 816. Consistently referring to a small handful of classmates by names rather than pronouns is not too heavy a burden to bear.

The majority opinion suggests that "in ordinary conversations (especially conversations between young students), it would be all but 'impossible' to train oneself not to use pronouns when referring to others." Maj. op. at 30. Two facts undermine this point. First, while it may be a new phenomenon for many to use new pronouns or to avoid using pronouns, it is certainly possible. As Judge Bush's historical review helpfully points out, social mores around pronouns have shifted over the course of American history, and these shifting mores have not suddenly rendered people unable to speak. This entire dissent is written without using gendered third person pronouns to refer to individuals (excepting direct quotations). Second, while there may be a learning curve for young students who, on occasion, might forget and use non-preferred pronouns, the District's Policies prohibit only the intentional use of non-preferred pronouns. As Philemond noted in the email that sparked this controversy, "[a] student *purposefully* referring to another student by using gendered language they know is contrary to the other student's identity would be an example of discrimination under Board Policy." R. 7-2, PageID 356 (emphasis added). The key word is "purposefully." The possibility that students might make mistakes does not render the choice presented to those students illusory when only purposeful conduct is prohibited.

Defending Education next complains that requiring students to avoid pronouns when referring to transgender classmates would still "alter" what the students would otherwise say. This "alteration" argument fails given "the special characteristics of the school environment." *Mahanoy*, 594 U.S. at 187 (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988)); *see also Fraser*, 478 U.S. at 681. Any prohibition on a disruptive means of conveying a view will "alter" the way that view is conveyed. And yet, courts have long permitted such prohibitions. *See, e.g.*, *Fraser*, 478 U.S. at 682. These and similar rules are commonly and constitutionally imposed, regardless of the extent to which such rules impinge on students' preferred means of conveying

views, to protect the "basic educational mission" of public schools. *Id.* at 685. Defending Education also claims that requiring students to avoid using non-preferred pronouns is "unlikely to satisfy anyone" and states that "[t]he transgender student in *Meriwether*, after all, eventually soured on the no-pronouns compromise." This argument is a red herring. The School District's transgender or nonbinary students are free to lobby District officials to amend the Policies, but we must take the Policies on their terms, not the terms that may eventually evolve if another party later becomes dissatisfied.

Indeed, despite what the majority opinion and the concurrence of Judges Thapar and Nalbandian suggest, Maj. op. at 30; Thapar & Nalbandian Conc. op. at 46, *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) is an imperfect analogy. Consider the differences between the use of pronouns by a college professor during a lecture and the use of pronouns by students in a K–12 public school, the fact that the university in *Meriwether* imposed a gender-identity policy that *required* the plaintiff to either refer to all students using preferred pronouns or to use no pronouns at all, and that its policy *also* allowed no room for error. *Meriwether*, 992 F.3d at 517. We reasoned that the professor, who was required to interact with all students during lecture and class discussion, could not feasibly avoid all "pronouns or sex-based terms" without making a single mistake. *Id.* These facts simply do not apply to the Policies or young students at issue in this case, particularly because the students do not have the same level of required interaction, and mistaken "misgendering" will not be punished, provided that the speaking student is attempting to comply with the accommodations policy of using the names of students rather than pronouns. These differences are dispositive.

If anything, *Meriwether* supports the view that referring to transgender or nonbinary students using names rather than pronouns does not amount to compulsion. In that case, Meriwether suggested a compromise solution to the university: call on the transgender student using only the last name. *Id.* at 510. We described that compromise as a "win-win" because Meriwether "would not have to violate [any] religious beliefs, and [the transgender student] would not be referred to using pronouns [that student] finds offensive." *Id.* at 510–11. Notably, the School District here seems to have proposed exactly this win-win solution. *See* Kethledge Conc. op. at 45.

At bottom, Defending Education has failed to make a clear showing that the District's prohibition on the intentional use of non-preferred pronouns unconstitutionally compels speech. *Cf. Neate*, 98 F.4th at 672.

### 2. Viewpoint Discrimination

Defending Education next asserts that by preventing the use of non-preferred pronouns, the Policies unconstitutionally discriminate based on viewpoint. It frames the Policies as a "ban on biological pronouns." Maj. op. at 15. The very first paragraph of the majority opinion adopts this framing, stating the issue as, "An Ohio public school district bars its students from referring to transgender and nonbinary classmates using the pronouns that match their biological sex if the classmates prefer to go by different pronouns." *Id.* at 3. It describes the School District's rules as "prohibit[ing] speech (biological pronouns) that express[] a message on a matter of public concern" and "allow[ing] other speech (preferred pronouns) that express[] a competing view." *Id.*

None of the challenged Policies are nearly so viewpoint-specific or so situationally targeted. The challenged Policies here proscribe harassment, misconduct, and other disruptive speech across a variety of categories. They prohibit the use of pronouns to harass, intimidate, or bully other students regardless of whether the speaker does or does not believe sex-based or gender-based pronouns are appropriate and regardless of whether the individual described is or is not transgender. The School District's position that students may communicate a belief that sex is immutable through means other than the use of non-preferred pronouns, indicates that Olentangy is not attempting to prohibit any viewpoints.

Comparison with sister circuit caselaw emphasizes this point. The First Circuit recently concluded that a middle school reasonably forecast disruption from, and was entitled to prohibit the wearing of, a shirt reading "There Are Only Two Genders." *See L.M. v. Town of Middleborough*, 103 F.4th 854, 860, 879–83 (1st Cir. 2024) *cert. denied*, 145 S. Ct. 1489 (2025). I note that the District here has explicitly stated that it would permit students to espouse their beliefs by wearing apparel bearing the similar message "gender is immutable." The School District's allowance for substantial speech on all sides of the debate regarding gender identity suggests that its prohibition on the intentional use of non-preferred pronouns reflects a genuine

effort to limit disruption caused by a particular *form* of expression, not an attempt to favor one viewpoint over another.

True, the Defending Education member's email to Philemond, which purportedly sparked this controversy, asked about a particular application of the Policies in which the student desired to use sex-based pronouns to refer to a transgender classmate. And, true, Philemond answered that the Defending Education member's child would be prohibited from the intentional use of non-preferred pronouns. But that application is merely one example of the broader set of Policies, the thrust of which is straightforward—that no student may use non-preferred pronouns to bully another student. This is not complicated. Consider a student named Ryan. If Ryan's sex assigned at birth is male and Ryan prefers masculine pronouns, using feminine pronouns would be prohibited; and if Ryan's sex assigned at birth is female and Ryan prefers masculine pronouns, using feminine pronouns would be prohibited.

These Policies certainly protect transgender and nonbinary students from bullying through the use of non-preferred pronouns. But the Policies also protect students who do not believe in transgender identity. Consider Elizabeth and Daniel. Elizabeth, like the children of the Defending Education members, was raised to believe that sex is immutable and that there is no such thing as a legitimate gender identity that differs from a person's sex assigned at birth. Daniel believes that gender identity can differ from sex and comes to believe that Elizabeth, whose sex assigned at birth is female, is transgender and simply suppressing that identity. Convinced that it would be in Elizabeth's best interest to transition, Daniel intentionally refers to Elizabeth using exclusively masculine pronouns, contrary to Elizabeth's preference. If Elizabeth were shaken by Daniel's "encouragement" so much as to become unable to focus in school, the Policies would prohibit Daniel's conduct because the policy's prohibition does not differentiate on the basis of viewpoint. Indeed, when presented with this hypothetical at oral argument, counsel for Defending Education conceded as much. *See* March 19, 2025 Oral Arg. at 7:17–9:17 ("I think that's a difficult hypothetical, which I understand was designed to be difficult . . . I'll stipulate that that would protect that student.").

Contrary to Defending Education's arguments, the School District has not adopted a position on whether gender-based or sex-based pronouns are accurate, nor has it created a rule that selectively targets the use of sex-based pronouns for prohibition.  The District has not, as the majority suggests, "permit[ed] certain approved messages on this topic—that individuals can have genders that differ from their sex" or "prohibit[ed] a disfavored view on the topic—that individuals can have only one gender determined at birth."  Maj. op. at 26.  Rather, it has enforced a distinction that students may not intentionally refer to classmates by non-preferred pronouns, regardless of whether the preferred pronouns were selected based on a sex-based view or a gender-based view.

This distinction is important.  As discussed above, school districts may constitutionally distinguish between disruptive and non-disruptive manners of speech and choose to regulate the former but not the latter.  *See Fraser*, 478 U.S. at 682–83; *Barr*, 538 F.3d at 572; *Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 336–37 (6th Cir. 2012).  Again, consider *Castorina* and *Barr*, which establish that although bans on disruptive speech are appropriate, viewpoint discrimination between two forms of equally disruptive speech expressing different viewpoints is not.  *Barr*, 538 F.3d at 571 (citing *Castorina*, 246 F.3d at 544).  *Barr* specifically noted, that while viewpoint discrimination within the realm of disruptive speech is impermissible, a school may ban disruptive speech but permit non-disruptive speech on the same topic.  *Id.* at 571–72.  *Barr* considered the permissibility of bans on racially divisive iconography on student clothing.  *Id.*  We held that, although a ban on Confederate flag iconography mandated a ban on analogously divisive (as construed by the parties) and, therefore, disruptive Malcolm X iconography, it did not mandate a ban on racially inclusive symbols which did not carry the same potential for disruption.  *Id.*  This was true, even though one could theoretically argue that a belief in racial division and a belief in racial inclusion are opposites.

The repeated, intentional use of non-preferred pronouns is like a shirt that depicts the Confederate flag—speech admittedly presumed to cause disruption in the school—whereas the use of preferred pronouns is most like a shirt with a racially inclusive message.  The use of preferred pronouns is not like the Malcolm X iconography because it is not likely to cause disruption, especially given the opportunity to avoid usage.

No. 23-3630          *Defending Educ. v. Olentangy Loc.*          Page 104
                     *Sch. Dist. Bd. of Educ., et al.*

Finally, Defending Education submits that policies prohibiting derogatory, identity-focused speech are viewpoint-discriminatory because "[g]iving offense is a viewpoint." *Matal v. Tam*, 582 U.S. 218, 243 (2017). But, as our Confederate flag cases demonstrate, although school officials may not silence viewpoints based on offensiveness, schools may—in service of avoiding substantial disruption and in furtherance of its job to develop an educated, well-adjusted populace—regulate *how* potentially offensive viewpoints are expressed by limiting the disruptive means of expressing those viewpoints. *See Barr*, 538 U.S. at 571–72, *Defoe*, 625 F.3d at 336–37. Consider once again the *Tinker* armband versus the *Cohen* jacket. *See Fraser*, 478 U.S. at 682–83 (noting that schools are permitted to regulate "certain modes of expression").

In this case, the School District has repeatedly affirmed that the children of Defending Education members will have the right to express beliefs about transgender identities. Those children will be permitted to express the view that sex is immutable. But it is not viewpoint discrimination to require those students to share those beliefs in a manner that does not disrupt the education of others.

Thus, Defending Education has failed to show that the District engages in viewpoint discrimination.

### 3. *Tinker*

Under *Tinker*, the School District must demonstrate with evidence in the record that its officials could reasonably forecast that the intentional use of non-preferred pronouns would cause substantial disruption to the school or to the education of transgender or nonbinary students. 393 U.S. at 514.

At the outset, it is important to note that the majority of the School District's Policies set the threshold for punishable conduct at the point where substantial disruption has occurred. Each Policy is restricted to speech that creates an educational environment where the affected students cannot succeed. Both Policies 5517 and 5136 limit punishment to instances in which the speech at issue "has the effect of substantially interfering with a student's educational performance, or [] has the effect of substantially disrupting the orderly operation of the school," App'x 62, 72, and the Code of Conduct's definition of harassment has consistently been limited to speech that "is

sufficiently severe, persistent or pervasive that it creates an intimidating, threatening or abusive educational environment for the other student(s)," App'x 23.  Any speech that violates these Policies would fall outside the ambit of protected speech under *Tinker*.  Nonetheless, Defending Education argues that the interpretation of these Policies to prohibit intentional use of nonpreferred pronouns is a step too far.

Recall the forms of speech that Defending Education seeks for its members' children.  Its parent-declarants seek for their children to be permitted to use non-preferred pronouns "repeatedly and at all times, including inside and outside of the classroom, in the classmates' presence, and when referring to the classmates outside of their presence."  R. 7-3, Parent A Decl., PageID 364; R. 7-4, Parent B. Decl., PageID 370; R.  7-6, Parent D. Decl., PageID 385.  These parents declare that their children wish to "disagree[]" with another student's "assertion about whether they are male or female."  R.  7-3, PageID 365; R. 7-4, PageID 373; R. 7-6, PageID 387.

The District made clear in its Policies that the purpose of the ban on intentional use of non-preferred pronouns is to prevent disruption in the form of trauma to transgender or nonbinary students of a degree likely to hamper those students' ability to learn.  Evidence of that purpose was before the district court.  For example, the Code of Conduct explicitly asserts that "Olentangy Local Schools' Code of Conduct seeks to foster self-discipline in all students and maintain an appropriate educational atmosphere . . . that respects the rights and safety of [all students]." App'x 14.  Similarly, Philemond's email to the Defending Education member stating that intentional use of non-preferred pronouns would be considered a violation of the Policies also explained that the "Board Policy is intended to create a safe learning environment for all students, free of harassment and discrimination."  R. 7-2, PageID 356.  In other words, the record reflects that the District has made clear from the start that it forecasts disruption to the education of transgender and nonbinary students if those students are subjected to harassment and discrimination in the form of intentional use of non-preferred pronouns.

Even the limited preliminary injunction record contains evidence that the District was reasonable in making that forecast.  Through declarations supporting the preliminary injunction motion, Defending Education's parent-members conceded an understanding that use of non-

preferred pronouns "will be considered 'insulting,' 'humiliating,' 'dehumanizing,' 'derogatory,' and 'unwanted' to those who want to go by different pronouns."  R. 7-3, Parent A Decl., PageID 364; R 7-4, Parent B Decl., PageID 371; R. 7-6, Parent D Decl., PageID 385.  Defending Education also attached to its preliminary injunction motion an article containing a therapist's explanation that students who "have been misgendered all day" often become "traumatized," "humiliated," and "cry after school."  R. 7-1, Ex. O, PageID 329.  The same article notes that the difference between use of preferred pronouns and use of non-preferred pronouns to refer to a transgender student can be the difference between a student who is "depressed, suicidal, [and] often-self harming" and a student who is "thriving." R. 7-1, PageID 329.  It is not an unreasonable step to forecast that behavior which results in trauma, humiliation, depression, and self-harm will be disruptive to the educational process.

These concessions lead inexorably to the conclusion that the School District was reasonable in forecasting the common sense conclusion that "the dehumanizing and humiliating effects of non-preferred pronouns could create a substantial 'disrupt[ion] [to] the educational process[,]' justifying restricting the use of those pronouns." *Parents Defending Edu. v. Olentangy*, 109 F.4th at 464 (quoting R. 7-1, PageID 205), *vacated*, 120 F.4th at 537.

Defending Education's concessions also disprove the majority opinion's refrain that the basis for the School District's prohibition on the use of non-preferred pronouns stems from the "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."  Maj. op. at 31 (quoting *Tinker*, 393 U.S. at 509).  If the basis for the prohibition was a desire to shield transgender and nonbinary students from the viewpoint that sex is immutable and "gender identity" separate from sex is not real, one would expect the School District to ban other expressions of that viewpoint—such as shirts containing these messages.  The School District did not.  Instead, it banned only a particular type of speech which, while expressive of that viewpoint, is highly disruptive to the learning environment because it directly targets other children.

As the district court noted, studies show that intentional, repeated use of non-preferred pronouns is more disruptive than discussions about transgender issues.  Those studies represent a "common-sense conclusion[] based on human experience." *See Lowery*, 497 F.3d at 594.  Speech

criticizing the identity of specific classmates, including the use of non-preferred pronouns, is more likely to cause disruption than speech about social issues in the abstract. *Cf. Mahanoy*, 594 U.S. at 206–09 (Alito, J., concurring) (recognizing, in the context of off-campus speech, that "hurtful remarks about other students" are more regulable than mere "intemperate and crude" speech). Expressing views on immigration is different from telling a particular immigrant, "You don't belong here." Sharing controversial religious beliefs is different from describing a particular student as "damned to hell" for "not being a real Christian" due to sectarian differences. Questioning the merits of the "body-positivity movement" is different from ridiculing a classmate as "fat." By the same token, discussing sex and gender identity is different from using non-preferred pronouns to target or confront a particular student. So even though the discomfort associated with hearing one's classmates express views that oppose the concept of gender identity will be the "discomfort and unpleasantness that always accompany an unpopular viewpoint," *Tinker*, 393 U.S. at 509, it is reasonable to forecast that the trauma born from intentional and repeated use of non-preferred pronouns to refer to, address, or confront specific students will rise to the level of substantial disruption.

Defending Education disputes the claim that transgender and nonbinary students will be harmed by the repeated use of non-preferred pronouns. According to Defending Education, "whether it helps or hurts a child to affirm their stated gender identity is hotly disputed," and, because it is disputed, the School District needed to cite additional evidence both that its officials actually did forecast disruption based on intentional use of non-preferred pronouns and that such a forecast was reasonable.

That argument misses the point. Whether gender affirmation "helps or hurts" a child on a broad scale in the long run is an entirely different question from whether intentional use of non-preferred pronouns can be reasonably forecast to cause classroom disruption or hinder a child's learning. Take the example of Emily, a middle school girl struggling with weight issues, and Karen, a classmate who calls Emily "obese" or "the obese girl" believing it necessary to force Emily to confront potential adverse health effects of obesity. Under Defending Education's view, there might be some genuine dispute as to whether this name-calling would result in a long-term benefit to Emily. However, without regard to the intention behind the speech—or Karen's honest

belief about whether Emily did meet some recognized definition of obesity—the school could undoubtedly step in and prevent that method of drawing attention to weight if it impacted Emily's ability to learn in school. The issue is simply that disruption in the school is reasonably forecast, which turns on the impact of the speech on its target. Schools have long regulated this sort of demeaning and destructive language, calling it what it is: bullying. In the same way, the issue is not whether it is good for students in the long run to be allowed to identify as transgender or nonbinary.[3] It is whether the means of conveying disbelief in gender identity that Defending Education seeks for its members' children might reasonably result in disruption of the present ability to learn for the both the student to whom the words are spoken, as well as the rest of the class.

Second, Defending Education argues that the School District failed to meet the *Tinker* standard because the District itself did not put evidence into the record supporting its forecast of substantial disruption. The majority opinion follows suit by completely ignoring the evidence Defending Education put into the record that intentional use of non-preferred pronouns results in trauma, humiliation, depression, and, in some cases self-harm. Maj. op. at 3 (stating only that the School District "introduced no evidence that the use of biological pronouns would disrupt school functions"). This misunderstands the *Tinker* standard.

*Tinker* hinges on the conclusion that "the *record* does not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." 393 U.S. at 514 (emphasis added). I am aware of no case holding that the burden of proof under *Tinker* (at the preliminary injunction stage or otherwise) requires the government entity to produce additional evidence supporting its reasonable forecast when the evidence of substantial disruption or impairment of student rights is already in the record. Indeed, our sister circuits have consistently referenced the "record" as a whole when assessing

---

[3]Similarly, it does not matter to this analysis whether those who believe in gender-based pronouns or those who believe in sex-based pronouns are "correct" (or if there is one "correct" answer, given the scientific complexity of sex determination). *See, e.g.,* Claire Ainsworth & Nature Magazine, *Sex Redefined: The Idea of 2 Sexes Is Overly Simplistic,* Sci. Am., (Oct. 22, 2018), https://perma.cc/932A-KFY9 (explaining that "scientific discoveries have pointed to a complex process of sex determination," including intersex conditions for whom individuals' "sex chromosomes say one thing, but their gonads (ovaries or testes) or sexual anatomy say another").

whether a substantial disruption was reasonably foreseeable rather than relying exclusively on evidence presented by the government entity. *See, e.g.*, *Bell v. Itawamba Cnty. Sch. Bd.*, 799 F.3d 379, 397 (5th Cir. 2015) (en banc) ("The *Tinker* test is satisfied when: an actual disruption occurs; or the *record* contains facts 'which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities.'" (emphasis added) (quoting *Tinker*, 393 U.S. at 514)); *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 930 (3d Cir. 2011) (en banc) ("As explained above, however, this contention is simply not supported by the *record*. The profile was so outrageous that no one could have taken it seriously, and no one did." (emphasis added)); *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. #204*, 523 F.3d 668, 676 (7th Cir. 2008) ("Speculation that it might is, under the ruling precedents, and on the scanty *record* compiled thus far in the litigation, too thin a reed on which to hang a prohibition of the exercise of a student's free speech.") (emphasis added)). Even the majority opinion refers to the "record" rather than simply the School District's evidence multiple times. Maj. op. at 29.

This approach makes practical sense. It recognizes the obligation of the court to consider all the evidence placed before it by the parties to the litigation and avoids the danger of gamesmanship regarding *Tinker*'s burden. Thus, the appropriate consideration is whether evidence of likely substantial disruption was in the record—regardless of which party put it there.

At bottom, under *Tinker*, the School District may preemptively prohibit speech that it reasonably forecasts will cause substantial disruption. Here, the District sought to prohibit intentional use of non-preferred pronouns that would create an intimidating and hostile educational environment and unreasonably interfere with a student's school performance and participation. While an affirmative showing by the School District based on its own evidence might have further reinforced the reasonableness of the forecast of disruption, *Tinker* allows school districts to base restrictions on common sense conclusions about what might cause substantial disruption. The District did so here, appropriately relying on Defending Education's record evidence to support common-sense conclusions. The evidence in the record thus satisfies the District's burden under *Tinker*.

Review of the record and application of governing precedent leads to the conclusion that Defending Education failed to demonstrate a likelihood of success on the merits. I would therefore affirm the denial of its motion for a preliminary injunction.

### C. The Majority Opinion's New Rule for Speech in Our Schools

Though the record satisfied *Tinker*'s requirement that the School District's forecast be reasonable, the majority opinion concluded otherwise, positing and applying a new approach: that "the closer the speech resembles political expression at the First Amendment's core, the more evidence a school must present of the potential disruption or violation of rights." Maj. op. at 21.

As noted earlier, I have several concerns with this approach. First, it is not supported by our court's student speech jurisprudence—and is, in fact, contradicted by several of our cases involving "political" student speech. Consider *Lowery*, where the student speech in question—a written petition to have a coach, a government employee, removed—undoubtedly "resembles political expression at the First Amendment's core." Indeed, few things can be said to be *closer* to the heart of the First Amendment's protections than the right to petition one's government. Yet, there we permitted the school to regulate this "political" speech without requiring any heightened showing as to disruption, accepting as sufficient the "common-sense conclusion" that the petition would likely impact team morale. *See Lowery*, 497 F.3d at 594. Similarly, in *McCrumb*, we upheld a principal's decision to prohibit a third-grade student from wearing a black baseball cap that displayed a white star, a white image of an AR-15-style rifle, and the capitalized phrase, "COME AND TAKE IT." 135 F.4th at 1059, 1070. The hat's message was core political expression, but we did not place a greater burden on the school officials to meet the *Tinker* standard than in any other case. *Id.* at 1061–62.

The cases the majority does rely on—*Castorina*, *Barr*, and *Kutchinski*—do not turn on the "political" nature of the speech at issue, but rather on appropriate application of *Tinker*'s "reasonable forecast" test, as applied to each case and its specific procedural posture. In *Castorina*, the posture of the case, an appeal from a grant of summary judgment for the school, was essential to our court's decision, as was the plaintiff students' testimony that it was possible to wear clothing depicting the Confederate flag "in a manner that did not disrupt school activity or cause unrest

during the school day." 246 F.3d at 541. We acknowledged that the students' testimony created a genuine dispute of material fact requiring reversal and remand. And in *Barr*, although there was substantial evidence of prior disruption related to racial tension at the school, we did not suggest that the facts of the case should be used as a measuring post, nor that we were applying a heightened version of *Tinker* based on the kind of speech at issue. 538 F.3d at 566–68. Finally, in *Kutchinski*—which the majority cites for the proposition that "non-political" speech requires less proof of disruption—we applied the standard *Tinker* "reasonable forecast" test and inspected the evidence for signs of disruption, of which there were many. 69 F.4th at 359–60.

The majority's opinion's "political" sliding scale approach is also at odds with *Tinker* and the Supreme Court's other school speech precedent. *Tinker* made clear that "conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—*materially disrupts classwork* . . . is, of course, not immunized by the constitutional guarantee of freedom of speech." 393 U.S. at 513 (emphasis added); *see also Fraser*, 478 U.S. at 685 (permitting school officials to prohibit vulgar and lewd speech that "would undermine the school's basic educational mission"). Existing precedent provides educators—those most attuned to the issues in their schools—with a reasonable level of agency to develop productive, civilized educational settings while protecting both student rights *and* student safety.

Instead, I would hold that the Olentangy School District has met its burden under *Tinker* to reasonably forecast that the speech requested by Defending Education will "materially and substantially disrupt the work and discipline of the school." *Tinker*, 393 U.S. at 513. I therefore respectfully dissent.

## IV.  CONCLUSION

In *Tinker*, students wore "on their sleeve a band of black cloth, not more than two inches wide." *Id*. at 514. The students donned these black bands—a "silent, passive" expression of opinion—to "exhibit their disapproval of the Vietnam hostilities and their advocacy of a truce." *Id*. In so doing, the students sought to "make their views known and, by their example, to influence others to adopt them." *Id*. But they did not "interrupt[] school activities" nor seek to "intrude in

No. 23-3630          *Defending Educ. v. Olentangy Loc.*          Page 112
                     *Sch. Dist. Bd. of Educ., et al.*

the school affairs or the lives of others."  *Id.*  In such circumstances, "our Constitution does not permit officials of the State to deny their form of expression."  *Id.*

I cannot reach the same conclusion about the form of expression that Defending Education seeks for its members' children: the intentional usage of pronouns assumed, correctly or not, to be "consistent with [their] classmates' biological sex," stated "repeatedly and at all times, including inside and outside the classroom, in the classmates' presence, and when referring to the classmates outside of their presence."  This is speech that Defending Education and its members' children "understand . . . will be considered 'insulting,' 'humiliating,' 'dehumanizing,' 'derogatory,' and 'unwanted' to those who want to go by different pronouns."  And declarations submitted by Defending Education state that some members' children seek to "disagree[] with another student's assertion about whether they are male or female."  The form of expression sought in this case portends confrontations that will only increase the likelihood of children experiencing the harms and humiliations that Defending Education already acknowledges.

Considering what is at stake, I note my full agreement with Judge Kethledge's exhortation to students to forbear making an example of another child "if not as a matter of law, then of grace." Kethledge Conc. op. at 45.  As judges, we are fortunate to have a platform for expressing our hope for and endorsement of voluntary actions tied to civility and decency.  I gladly join Judge Kethledge's appeal to personal choices that here would help make schools safer and kinder places for all students.

But I am also very aware that school administrators and teachers are faced each day with the difficult and noble task of turning their hopes into an acceptable form of reality in their own schools, for their own students.  The work that school administrators and teachers must do to cultivate safe and productive educational environments while protecting students' rights, as the Supreme Court recognized in *Tinker*, is already challenging.  By introducing an amorphous standard weighing the political significance of the speech in question, I fear we will make the daunting tasks of these public servants all the more difficult.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 23-3630

DEFENDING EDUCATION, fka Parents Defending Education,

    Plaintiff - Appellant,

      v.

OLENTANGY LOCAL SCHOOL DISTRICT BOARD OF
EDUCATION; MARK T. RAIFF, in his official capacity as
Superintendent of Olentangy Local School District; PETER STERN,
in his official capacity as Olentangy's Assistant Director of Equity
and Inclusion; RANDY WRIGHT, in his official capacity as
Olentangy's Chief of Administrative Services; KEVIN
DABERKOW, in his official capacity as a member of the Olentangy
Board of Education; BRANDON LESTER, in his official capacity as
a member of the Olentangy Board of Education; KEVIN O'BRIEN,
in his official capacity as a member of the Olentangy Board of
Education; LIBBY WALLICK, in her official capacity as a member
of the Olentangy Board of Education; LAKESHA WYSE, in her
official capacity as a member of the Olentangy Board of Education,

    Defendants - Appellees.

```
┌─────────────────────────────┐
│                             │
│          FILED              │
│       Nov 06, 2025          │
│   KELLY L. STEPHENS, Clerk  │
│                             │
└─────────────────────────────┘
```

Before:  SUTTON, Chief Judge; BATCHELDER, MOORE, CLAY, GRIFFIN, KETHLEDGE,
STRANCH, THAPAR, BUSH, LARSEN, NALBANDIAN, READLER, MURPHY,
DAVIS, MATHIS, BLOOMEKATZ, and RITZ, Circuit Judges.

**JUDGMENT**

On Appeal from the United States District Court
for the Southern District of Ohio at Columbus.

UPON CONSIDERATION of the petition for rehearing en banc and the supplemental briefs and arguments
of counsel,

IT IS ORDERED that the district court's denial of an injunction is REVERSED and REMANDED for
proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_Kelly L. Stephens_

_____

Kelly L. Stephens, Clerk